# EXHIBIT 5

# LAW OFFICE OF
# ELIZABETH FITE, P.A.
### ATTORNEY

15316 N. Florida Avenue
Suite 100
Tampa, Florida 33613-1257
Tel (813) 908-6121
Fax (813) 908-6126

September 8, 2005

Jeremy Homer, Esq.
Parkowski, Guerke & Swayze
116 W. Water Street
Dover, DE 19903

RE: *Valerie Hue vs. NCO Financial Systems, Inc.*
Case No.: 05-225-KAJ

Dear Mr. Homer,

I am responding to your August 24, 2005 letter expressing concerns regarding NCO's discovery responses. I apologize for the delays, but with Katrina, David Israel and I have been very busy regarding numerous firm issues and re-setting the email system.

Below I will attempt to elaborate on certain responses that you specifically mentioned in your letter.

Interrogatory No. 14 requests: "Explain (as defined above) the use of the cash journal ledger, and state the code number used in the ledger to indicate that a payment has been "re-dipped" (i.e., redeposited after being returned for insufficient funds)."

NCO responded: "NCO objects to this interrogatory as vague, ambiguous, and compound. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, re-dipping is when a NSF check is re-submitted with proper debtor authorization and bank validation that the funds are available. Re-generating is when a NSF check is re-submitted to the bank as if it was never submitted before. Re-generating a check violates NCO procedure because it bypasses the requirements that collectors receive debtor authorization to re-submit the NSF check and bank validation that funds are available in the debtor's account."

You have expressed concern that NCO's response may not describe the policy correctly. The documents attached to this letter as Exhibit A best explain the policy. These documents are extracted from plaintiff's production and NCO's

production, thus, you should already have copies of them. From these documents, which are the best evidence of their contents, "re-dipping" required debtor authorization and an attempt to achieve verification from the bank that funds were available. Plaintiff instructed her subordinates to re-submit checks returned for insufficient funds (NSF) without obtaining the debtor's authorization and without attempting to verify with the bank that funds are available. As we have discussed, this wrongful practice permitted Ms. Hue to have inflated revenue and collection numbers for the month-end when this was done.

Interrogatory No. 4 requests: "With respect to the "check handling procedures" referenced in Exhibit A, attached hereto:
(a) identify any document that contains any or all such procedures;
(b) identify any person who defendant claims was instructed by Plaintiff to violate such procedures and any witness to such instruction;
(c) with respect to each person instructed to violate such procedure, explain what the person was told in as much detail as known by Defendant and the approximate date(s) of such instruction;
(d) identify any document that evidences that such instruction was made, including, without limitation, any tape recording or any written account of the instruction."

NCO responded: "NCO objects to this interrogatory as vague, ambiguous, overly broad, and compound. Notwithstanding such objections, NCO will produce documents containing the relevant check handling policies and procedures at a mutually agreeable time and place. Furthermore, NCO has produced documents as part of its initial disclosures demonstrating that plaintiff instructed her subordinates to violate NCO's check handling policy. The statements of said persons are the best evidence of their contents."

You have expressed concern that the statement "will produce documents containing the relevant check handling policies and procedures at a mutually agreeable time and place" violates the letter and spirit of the discovery rules. I again direct your attention to the documents attached as Exhibit A. These documents outline NCO's check handling policy, and were produced along with NCO and/or plaintiff's discovery responses. Because NCO produced documents contemporaneously with the written responses, I do not see that the phrase, "at a mutually agreeable time and place," either violates the spirit of the discovery rules, or has in any way postponed the production of documents.

Your concerns regarding Interrogatory No. 5 are likewise unfounded. NCO produced copies of the relevant check handling documents along with the discovery responses.

Interrogatory No. 6 requests: "If Defendant has not required its employees to follow the "check handling procedures" referenced in Exhibit A at all times between January 1, 2000, and June 30, 2005, explain what other procedures employees were required to follow regarding the subject matter of the "check handling procedures," and when those other procedures were in effect."

NCO responded: "NCO objects to this interrogatory as vague, ambiguous, and seeking irrelevant information. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, NCO requires (and has always required) NCO employees and managers to abide by the check handling policies and procedures in effect at that time."

You express concern that NCO's response is non-responsive because the question is "what were the other policies." The documents attached as Exhibit A explain how the check handling policy evolved between 2001 and 2005.

As demonstrated by Exhibit A, on December 26, 2001, Peter Buggelin sent a memorandum to all collection personnel instructing that "[m]anipulation of the timing of recoveries for any reason is strictly prohibited . . . breeches of our fundamental responsibility . . . will result in either a final warning or termination of employment depending upon the circumstances." On February 23, 2003, Phil Weaver clearly articulated the check handling policy by stating in an e-mail to Commercial Ops Managers: "**Effective immediately, the automatic re-deposit of returned items from the bank will cease.**" On March 4, 2003, the new process for re-depositing checks was detailed, and states in relevant part: "Requests can only be made on items that have been returned only once . . . [a]ccounting clerk will have [sic] do a final verification and only items meeting the above criteria will be posted and redeposited." Additionally, on August 7, 2003, Mike Scher reiterated that the practice of "manipulating" the check-by-phone process would not be tolerated because it "opens us up to huge liability issues and we cannot have that."

In Ms. Hue's e-mail to Mr. Leckerman, dated January 22, 2004, she argues that "[w]e had a policy under Phil Weaver that all checks were re-dipped two times automatically. When that policy went away it was mgt discretion on re-dipping checks." *See* Exhibit A. Mr. Weaver's February 23, 2003 e-mail to managers stating that the "automatic de-posit of returned items from the bank will cease," clearly negates Ms. Hue's argument.

Interrogatory No. 11 requests: "With respect to the assertion that "charging party was aware that these checks would not clear the respective bank accounts," contained in Exhibit B, page 3:

      (a)    identify any person who has knowledge of any fact that supports the assertion and explain what knowledge he/she has;

      (b)    identify any document that supports the assertion, including, without limitation, each of the checks referenced in the assertion;

      (c)    explain, with respect to each check referenced in the assertion, the facts which support Defendant's claim that Plaintiff knew the check would not clear the account."

NCO responded: "NCO objects to this interrogatory as vague, ambiguous, and compound. Notwithstanding such objections, plaintiff knew or should have known that the checks would not clear the debtors' accounts because she was re-depositing and/or directing her subordinates to re-deposit NSF checks without debtor authorization and/or verification from the bank that funds were available."

You are concerned that NCO may possess additional factual information that supports the allegation that plaintiff knew there were insufficient funds to cover a certain check. Plaintiff re-submitted or directed her subordinates to re-submit NSF checks without debtor authorization and without attempting to obtain verification from the debtor's bank that the funds were available. This is not a situation where plaintiff knew for certain that the re-submitted NSF checks would bounce for a second (or third) time. Plaintiff re-submitted (or directed her subordinates to re-submit) NSF checks without following the check handling procedure, which resulted in a higher number of NSF checks bouncing for a second (or third) time. Once the check was re-submitted, my understanding is that NCO recognized any related commission as income. Plaintiff's practice would artificially inflate income if the check was returned NSF, until the following month when the check would be "backed off." There were times that improperly submitted checks would clear- but again- plaintiff still violated her obligations to ensure that NCO's policies were followed. NCO will supplement this response as necessary as discovery and investigation continue.

Interrogatory No. 12 requests: "Provide the name, address, phone number, name of employer, race and gender of all individuals employed by Defendant during any time between January 1, 2000 and June 30, 2005, who held a position equivalent to the position held by Plaintiff when Defendant discharged her."

NCO responded: "NCO objects to this request as vague, ambiguous, overly broad, and seeking irrelevant information. Notwithstanding such objections, plaintiff correctly asserts in her Complaint that at the time of her termination plaintiff was the only African American and female individual in her job position."

The chart attached as Exhibit B expands on NCO's response by listing other individuals employed by NCO in plaintiff's position at any time during the period of January 1, 2000 to June 30, 2005. This chart may be amended as discovery continues.

Interrogatory No. 15 requests: "For each affirmative defense set out in the answer to the complaint, explain each of the facts which support the defense, identify who has knowledge of such facts, and identify any document which supports the defense."

NCO's response states: "NCO objects this interrogatory as vague, ambiguous, and compound. Notwithstanding such objections, NCO's affirmative defenses are largely based upon the facts that (1) NCO did not discriminate or retaliate against plaintiff on the basis of her race or any other protected characteristic, and (2) plaintiff caused her own termination by violating NCO's check handling procedures and/or directing her subordinates to do the same."

More specifically, NCO's first affirmative defense is based on NCO's belief that plaintiff has not attempted to find work with comparable pay. NCO will supplement this answer as discovery continues. NCO's second, sixth, and eighth affirmative defenses are based upon the fact that NCO terminated plaintiff's employment because plaintiff violated company policy and instructed her subordinates to violate company policy, which are legitimate business reasons. NCO's third, fourth, fifth, and tenth affirmative defenses are based upon the fact that plaintiff caused her own termination by violating company policy and instructing her subordinates to violate company policy. NCO's seventh and ninth affirmative defenses are based upon the fact that any complaints by plaintiff of sex and/or race discrimination were rapidly investigated and resolved by such measures as the termination of Bill Savage. NCO's eleventh affirmative defense is based upon the fact that plaintiff files this action against NCO with knowledge that the facts and law do not support her claims, and that NCO has not violated state or federal laws with respect to her employment. NCO's twelfth affirmative defense is based upon the fact that some of the same NCO managers/employees who participated in promoting plaintiff to a manager's position were also instrumental in terminating plaintiff's employment. Please see the statements of NCO managers, including Kathy Obenshain, produced as part of NCO's initial disclosures.

With respect to plaintiff's request for documents from NCO, plaintiff's request for all documents to or from Ms. Kathy Obenshain for a number of years was overly broad and too burdensome for NCO to attempt a response prior to plaintiff narrowing the request. This request would yield tens of thousands of

irrelevant e-mails. Likewise, NCO will attempt to respond to other requests after plaintiff has drastically confined the scope of the requests.

I hope this letter has alleviated your concerns regarding NCO's discovery responses. I have reviewed Delaware's default standard for discovery of electronic documents. We need to discuss drastically limiting the scope of the electronic searches (*e.g.,* time frames, fields, document types) as soon as practicable to avoid overly burdensome/harassing requests by plaintiff to NCO for vast amounts of documents and e-mails. Please call me when you would like to discuss.

Kind regards,

Elizabeth K. Fite

EKF/mjm
Enclosures: Discovery Documents
cc:    David Israel, Esq.
       Alyssa Schwartz, Esq.

**EXHIBIT A**

**NCO Financial Systems, Inc.®**
Commercial Services
802 Silverlake Blvd., Suite 200
Dover, Delaware 19904

NCO Financial Systems, inc.
Commercial Services
3850 N. Causeway Blvd.
Ste 200
Metairie, LA 70002
(504) 834-8800
(504) 837-3230
www.ncogroup.com



# Memorandum

To:     All Collection Personnel

From:   Peter Buggeln

Date:   December 26, 2001

Re:     Statement of Policy

Our obligation to our clients and to NCO is to optimize collections, service and results. It should go without saying that it is the responsibility of every collector to insure that every account they have responsibility for is collected as quickly and as efficiently as possible. Neverthess we are    blishing the following Statement of Policy to insure that all personnel have a clear understand of their obligations and responsibilities.

NCO Commercial Division
Statement of Policy

It is the responsibility of every collector to insure that every account they have responsibility for is collected as quickly and as efficiently as possible. Manipulation of the timing of recoveries for any reason is strictly prohibited. It is our responsibilty to both NCO clients, shareholders and management to effect all recoveries as quickly, to insure that recoveries are recognized at the first opportunity, and that revenue is not recognized before a recovery is actually effected. Producer practices that delay revenue, including the practice known as "sandbagging", as well as pratices that may seek to recognize revenue before an actual recovery occurs, are breeches of our fundamental responsibility and will result in either a final warning or termination of employment depending upon the circumstances.

Cc:     Steve Leckerman
        Phil Weaver
        Ted Fox
        Ron Castellon

*NCO Financial Systems, Inc.®*
Mailing Address: P.O. Box 558, Dover, Delaware 19903-9963
(National Toll Free) 1/800/788-1007 • (Delaware) 302/735-4891 • FAX 302/735-4893

# Birdsong, Jenie

**From:** McHugh, Shawna
**Sent:** Wednesday, January 21, 2004 9:19 AM
**To:** Birdsong, Jenie
**Subject:** FW: NSF's
**Importance:** High

The only change is that Vera Migliarese now gets the redip requests.

-----Original Message-----
**From:** Capaldo, Bette
**Sent:** Monday, December 01, 2003 2:27 PM
**To:** McHugh, Shawna
**Subject:** FW: NSF's
**Importance:** High

Here was the original email that outlined the requirements.


-----Original Message-----
**From:** Capaldo, Bette
**Sent:** Tuesday, March 04, 2003 1:28 PM
**To:** Weaver, Phil
**Cc:** McGowan, Meghan; Harkinson, Laura
**Subject:** RE: NSF's

Phil:

An employee has started today that is going to be responsible for the redeposit process. Please inform your staff of the below process which can begin tomorrow:

- Items that were posted on/after 2/25/03 are eligible for redeposit request
- Requests should be emailed to laura.harkinson@ncogroup.com
- Requests for redeposits can only be made for NSF items processed within the past 30 days (time frame provided by executives)
- Requests can only be made on items that have been returned only once
- Requests can only be made on true NSF items and not refer to makers, invalid accounts, etc. (this information can be found in the transactions on the debtor record)
- Emails will be processed in the order received
- Accounting clerk will have do a final verification and only items meeting the above criteria will be posted and redeposited

If you have any questions, please feel free to give me a call.

Bette

-----Original Message-----
**From:** Weaver, Phil
**Sent:** Monday, February 24, 2003 9:40 AM
**To:** Commercial Ops Mgrs

1/21/2004

**Cc:** Commercial Sales Mgrs; Capaldo, Bette; Leckerman, Steve; Winokur, Steven
**Subject:** NSF's

Effective immediately, the automatic re-deposit of returned items from the bank will cease. This will prevent items being returned after client remittance has been issued.

Shortly, I will be publishing a process for collectors to utilize for re-deposit of items only returned once on a case by case basis.

**Phillip Weaver**
**Senior VP Commercial Services**
**NCO Financial Systems, Inc**
3850 N Causeway Blvd
**Metairie, LA 70002**
Work-800 735 6008
Cell-985 807 7445
Phil.Weaver@NCOgroup.com

Notice of Confidentiality: The information included and/or attached in this electronic mail transmission may contain confidential or privileged information and is intended for the addressee. Any unauthorized disclosure, reproduction, distribution or the taking of action in reliance on the contents of the information is prohibited. If you believe that you have received the message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

1/21/2004