## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VALERIE HUE, | : | |
| | : | |
| Plaintiff, | : | C.A. No.: 05-225-KAJ |
| | : | |
| v. | : | |
| | : | |
| NCO FINANCIAL SYSTEMS, INC., a | : | |
| Delaware corporation, trading as | : | |
| NCO FINANCIAL COMMERCIAL SERVICES | : | |
| | : | |
| Defendant. | : | |

## NCO'S OPENING BRIEF IN SUPPORT OF DISPOSITIVE
## MOTION FOR SUMMARY JUDGMENT

*Pro Hac* Counsel:

David Israel
Sessions, Fishman & Nathan, L.L.P.
3850 North Causeway Boulevard, Suite 1240
Metairie, Louisiana 70002
(504) 828-3700

Elizabeth K. Fite
Sessions, Fishman & Nathan, L.L.P.
15316 N. Florida Avenue, Suite 100
Tampa, Florida 33613
(813) 908-6121
Dated: April 17, 2006

Jennifer C. Jauffret (#3689)
jauffret@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Attorneys for Defendant
NCO Financial Systems, Inc.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ......................................................... 2

SUMMARY OF ARGUMENT .......................................................................................... 4

STATEMENT OF RELEVANT FACTS .......................................................................... 4

    A.   Background ............................................................................................................ 6

    B.   Plaintiff's Statement Regarding Savage's Inappropriate Comments ................... 8

    C.   Plaintiff's Misconduct and Termination .............................................................. 11

ARGUMENT ..................................................................................................................... 20

   I.   Summary Judgment Procedure ............................................................................. 21

   II.   Plaintiff Cannot State a Prima Facie Case for Retaliation ................................... 21

   III.   Plaintiff Cannot Offer Evidence that NCO's Legitimate,
Nondiscriminatory Reason for Terminating her Employment
Was a Pretext for Discrimination or Retaliation .................................................. 26

CONCLUSION ................................................................................................................... 30

RLF1-3000619-2

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................................. 21

*Anjelino v. New York Times Co.,*
   200 F.3d 73 (3d Cir. 1999) ................................................................... 22

*Bradley v. Harcourt, Brace & Co.,*
   104 F.3d 267 (9th Cir. 1996)................................................................. 28

*Brady v. Cheltenham Township,*
   1998 WL 164994 (E.D. Pa. Apr. 9, 1998) ........................................... 29

*Canal Ins. Co. v. Underwriters at Lloyd's London,*
   435 F.3d 431 (3d Cir. 2006)............................................................. 21, 23

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................................................. 21

*Clark County Sch. Dist. v. Breeden,*
   532 U.S. 268 (2001) ............................................................................. 22

*Desert Palace, Inc. v. Costa,*
   539 U.S. 90 (2003)............................................................................... 27

*EEOC v. Our Lady of Resurrection Med. Ctr.,*
   77 F.3d 145 (7th Cir. 1996).................................................................. 28

*Galindo v. Precision Am. Corp.,*
   754 F.2d 1212 (5th Cir. 1985)............................................................. 21

*Galloway v. United States,*
   319 U.S. 372 (1943) ............................................................................. 29

*Hockman v. Westward Communications, L.L.C.,*
   407 F.3d 317 (5th Cir. 2004)............................................................... 29

*Hughes v. Derwinski,*
   967 F.2d 1168 (7th Cir. 1992).............................................................. 23

*Jackson v. Univ. of Pittsburgh,*
   826 F.2d 230 (3d Cir. 1987) ................................................................ 23

ii

# TABLE OF AUTHORITIES
### continued

**CASES**                                                                              **PAGE**

*Jones v. Sch. Dist. of Philadelphia,*
    198 F.3d 403 (3d Cir. 1999) .................................................................. 22

*Kachmar v. Sungard Data Sys., Inc.,*
    109 F.3d 173 (3d Cir. 1997) ............................................................... 22, 23

*Keller v. Orix Credit Alliance, Inc.,*
    130 F.3d 1101 (3d Cir. 1997) ................................................................ 27

*Lexington Ins. Co. v. Western Pennsylvania Hosp.,*
    423 F.3d 318 (3d Cir. 2005) ................................................................. 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ........................................................................... 21

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) ....................................................................... 21, 26

*Momah v. Albert Einstein Med. Ctr.,*
    978 F.Sup. 621 (E.D. Pa. 1997) ............................................................. 23

*Richmond v. ONEOK, Inc.,*
    120 F.3d 205 (10th Cir. 1997) .............................................................. 22

*Robertson v. Allied Signal, Inc.,*
    914 F.2d 360 (3d Cir. 1990) ................................................................. 21

*Robinson v. City of Pittsburgh,*
    120 F.3d 1286 (3d Cir. 1997) ............................................................... 22

*Shaner v. Synthes,*
    204 F.3d 494 (3d Cir. 2000) ................................................................. 29

*Texas Dep't of Cmty. Affairs v. Burdine,*
    450 U.S. 248 (1981) ........................................................................... 27

*Waldron v. SL Indus., Inc.,*
    56 F.3d 491 (3d Cir. 1995) .................................................................. 28

*Williams v. Vitro Servs. Corp.,*
    144 F.3d 1438 (11th Cir. 1998) ............................................................. 28

iii

## TABLE OF AUTHORITIES
### continued

**CASES**                                                              **PAGE**

*Woodson v. Scott Paper Co.*,
   109 F.3d 913 (3d Cir. 1997) ............................................................... 22


**RULES**

Fed. R. Civ. P. 56 (c) ................................................................... 1, 21

## INTRODUCTION

Pursuant to Rule 56(c), Fed. R. Civ. P., defendant NCO Financial Systems, Inc. (NCO) moves the Court for summary judgment on all claims asserted by plaintiff Valerie Hue.

Plaintiff alleges that NCO discriminated against her on the basis of her race (African-American) and gender (female), and retaliated against her for participating in an investigation regarding the inappropriate comments of a former manager. The investigation, however, was more than two years prior to her termination.

The undisputed evidence demonstrates that in January 2004, NCO terminated plaintiff for personally violating and instructing her subordinates to violate NCO's well-known check handling policy. The check handling policy requires (and has always required) that debt collectors verify that funds are available before resubmitting a check that has been returned to NCO for non-sufficient funds (NSF).

The purpose of the check handling policy is to prohibit the resubmission (in collector lingo, "re-dipping") of NSF checks without objective proof that funds are available in the bank to cover the check. To do otherwise artificially inflates the end-of-month collection numbers and causes funds to be remitted to collection clients for money that NCO would not actually receive. Not one of the thirteen witnesses who were deposed supports any aspect of plaintiff's discrimination or retaliation theories.

In fact, during January 2004, the same month that plaintiff was terminated, NCO also terminated Large Balance Collector Matthew Lane (wh/m) and demoted Mid-Balance Collection Manager Eric Shaw (wh/m) for violating NCO's check handling policy. Mr. Lane and Mr. Shaw both reported to plaintiff.

## NATURE AND STAGE OF THE PROCEEDINGS

On April 15, 2005, plaintiff filed a Complaint alleging that NCO discriminated and retaliated against her in violation of 42 U.S.C. § 1981, as amended, and Title VII of the Civil Rights Act of 1964, as amended. D.I. 1 at ¶ 1. NCO filed an Answer and Affirmative Defenses denying all liability. D.I. 6. Therein, NCO asserted that plaintiff was appropriately discharged for violating and instructing subordinates to violate NCO's check handling policy. *Id.* at ¶ 18. NCO affirmatively asserted the "same actress" defense, whereby evidence that Kathleen Obenshain (wh/f) both promoted and spearheaded plaintiff's termination supports NCO's position that plaintiff's termination was not the result of an improper discriminatory or retaliatory motive. *Id.* at Aff. Def. 12.

In November 2005, NCO amended its Answer to include counterclaims against plaintiff for breach of the implied covenant of good faith and fair dealing, indemnification for monetary losses resulting from plaintiff's wrongful conduct, and breach of the duty of loyalty. D.I. 31. NCO's counterclaims seek damages for losses caused by plaintiff's intentional policy violations for personal gain, including bonuses and prizes that she wrongfully received as a result of her check manipulation, and the loss of an NCO employee who was terminated for following her wrongful instructions. D.I. 31 at ¶¶ 6 – 7.

Discovery was propounded and answered by both parties. Disputes ensued over issues such as whether plaintiff was entitled to all "cash journal ledgers, hold check request forms, U-Deposit forms, post date check reports, and NSF reports," which—as stated in NCO's response to plaintiff's Motion to Compel—would encompass "thousands and possibly millions of documents due to the nature of NCO's business." *See* D.I. 35 at ¶ 10.

During plaintiff's deposition in January 2004, NCO learned that what plaintiff really wanted were documents titled "Re-Dip Forms," which were purportedly created and maintained in the Dover branch office to ensure funds were verified prior to re-dipping checks. Following plaintiff's deposition, NCO diligently searched for the 2003 Re-Dip Forms, but to no avail. *See* Exhibit A, Birdsong, 24: 8 – 24; 27: 2 – 5, 13 – 23.[1] Despite plaintiff's suggestion of document destruction, testimony by administrative personnel relating to the storage of the forms does not suggest any intentional wrongdoing.[2] Birdsong, 29: 3 – 22 (stating that the policy was to "keep everything").

The discovery cut-off in the case was March 31, 2006. Trial is scheduled to begin September 18, 2006. This is NCO's Opening Brief in Support of its Motion for Summary Judgment.

---

[1] The relevant portions of the deposition transcripts, as well as the exhibits are attached to the Declaration of Alyssa M. Schwartz filed contemporaneously herewith. The transcripts will be referred to by Exhibit, last name of the person deposed, page number from transcript, and line numbers from transcript. For example: *See* Exhibit A, Birdsong, 1: 33, means: Birdsong deposition, page 1, line 33. Subsequent references to the same deposition transcript will be abbreviated to "Birdsong, 1: 33." Documents in the record will be referred to by Exhibit, brief description of the document, and the bate-stamp number identifying that it was produced as part of plaintiff's or NCO's document production.

[2] In February 2004, the Dover office physically moved its employees and contents locally. In January 2006, the Dover location closed permanently and relocated many of its personnel and files to the NCO Baltimore Office. Somewhere in those two moves, assuming that the Re-Dip Forms were kept throughout 2003, the documents were misplaced and cannot be found. Importantly, no information contained within the Re-Dip Forms would be unique from the information contained within the electronic account notes, which have been produced to plaintiff as part of discovery. As confirmed by Large Balance Collector, Ken Rose, who formerly reported to plaintiff, "everything that would be written by [collectors] in the redip forms . . . would also be put in the account notes." *See* Exhibit B, Rose, 46: 4 – 24.

3

## SUMMARY OF ARGUMENT

No reasonable fact-finder could conclude that plaintiff's termination was motivated by discriminatory or retaliatory animus. Plaintiff's Title VII and Section 1981 claims are analyzed under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* analysis, plaintiff cannot state a *prima facie* case for retaliation because the undisputed evidence shows that there is no causal connection between her purported protected activity, participating in an October 2001 investigation regarding the inappropriate comments of a manager, and her January 2004 termination for documented check handling violations. Even if plaintiff could state a *prima facie* case for discrimination or retaliation, thus shifting the burden to NCO to articulate a nondiscriminatory reason for the adverse employment action, plaintiff cannot carry her evidentiary burden by pointing to any record evidence that disproves NCO's legitimate reason for terminating her employment: documented, verifiable misconduct. NCO thus requests that the Court grant summary judgment in favor of NCO, dismissing plaintiff's lawsuit in its entirety.

## STATEMENT OF RELEVANT FACTS

The reasons for plaintiff's termination are not complicated. In January 2004, NCO conducted an audit of the Commercial Division's check handling practices focusing on NSF checks. The corporate auditor, Dina Sha'altiel, identified a systemic problem in the Dover, Delaware Commercial Branch Office where plaintiff was the General Collection Manager (GCM). Specifically, Ms. Sha'altiel found that collectors under plaintiff's supervision appeared to be violating NCO's check handling policy by re-dipping NSF checks without obtaining verification that the check would clear the bank.

4

Ms. Sha'altiel gave her initial findings to Commercial Division personnel, who ultimately learned of plaintiff's wrongdoing. All Dover collectors and administrative personnel, as well as the two managers who reported to plaintiff, confirmed that plaintiff instructed personnel to violate the policy.

Plaintiff could provide no reasonable explanation for her improper check handling practices, and even admitted her intentional wrongdoing during a telephone conference call with NCO's Vice President of Human Resources, Cherie Sugg. NCO terminated plaintiff's employment after a full investigation. Plaintiff's supervisor, Kathleen Obenshain, Vice President of Collections, the same woman who promoted plaintiff to the senior collections management role in Dover, testified that she had no choice but to recommend plaintiff's discharge. While currently employed by an NCO competitor, Ms. Obenshain confirmed during her deposition that because of the documented wrongdoing, she felt compelled to recommend plaintiff's discharge.

Plaintiff's allegations of employment discrimination and retaliation are negated by every witness who has been deposed in this case, including:

Matthew Lane (wh/m) Former NCO employee and Large Balance Collector supervised by plaintiff who was terminated by plaintiff for violating NCO's check handling policy. Mr. Lane confirmed that plaintiff instructed him to violate NCO's policies.

Dina Sha'altiel (wh/f) Corporate Compliance Auditor who identified the systemic check-handling problem in the Dover office in January 2004, where collectors under plaintiff's supervision were re-dipping NSF checks without verification.

Kathleen Obenshain (wh/f) Former NCO employee, Vice President of Collections for Commercial Division and plaintiff's boss. Ms. Obenshain is the NCO representative who promoted plaintiff to General Collections Manager in the Dover office and spearheaded plaintiff's termination.

Brad Reavis (bl/m) Large Balance Collector who was supervised by plaintiff. Mr. Reavis confirmed that plaintiff instructed him to violate NCO's check handling policy.

Eric Shaw (wh/m) Mid-Balance Collections Manager supervised by plaintiff who confirmed that plaintiff instructed him to violate NCO's check handling policies. Mr. Shaw was demoted from management for following plaintiff's improper instructions.

David McQuisten (wh/m) Large Balance Collector supervised by plaintiff.    Mr. McQuisten testified that plaintiff refused to "pull" checks that he told plaintiff would not clear the bank based upon discussions he had with the debtor.

Kim Marlow (wh/f) Small Balance Collections Manager supervised by plaintiff. Ms. Marlow confirmed that she witnessed plaintiff instruct collectors to violate NCO's check handling policies.

Jennifer Birdsong (wh/f) Administrative support person directly supervised by plaintiff. Ms. Birdsong confirmed that plaintiff instructed personnel to violate NCO's check handling policies.

Ken Rose (wh/m) Large Balance Collector supervised by plaintiff, who confirmed that plaintiff instructed collectors to violate NCO's check handling policies.

Theodore Fox (wh/m) Senior Vice President of the Commercial Division who supervised Kathy Obenshain, and who recommended the discharge of Bill Savage more than two years before plaintiff was discharged. Mr. Fox personally confirmed by interviewing collectors supervised by plaintiff that plaintiff instructed collectors to violate NCO's check handling policies.

## A.    Background.

NCO is an international provider of accounts receivables services, including commercial debt collection. NCO is an equal opportunity employer. *See* Exhibit C, Sugg Affidavit (Aff.), ¶ 3. The company hires, evaluates, compensates, promotes, and terminates employees without regard to race, color, religion, sex, national origin, age, disability, or any other protected status. Sugg Aff., ¶ 3. Furthermore, NCO encourages employees to immediately report any feelings of discrimination, retaliation, or harassment to NCO management or Human Resources, and maintains an Open Door Policy whereby employees can report wrongdoing without fear of reprisal.

NCO currently maintains commercial collection offices in eight locations, including an office in Baltimore, Maryland that was formerly in Dover. Until 1999, the

Dover commercial collection office was owned and operated by Milliken & Michaels (M&M). *See* Exhibit D, Hue, 52: 5 – 7, Part I. In May 1999, NCO purchased M&M and hired the majority of M&M's employees, including plaintiff. Prior to NCO's purchase of M&M, plaintiff worked for M&M as a collector. Hue, 43: 3 – 16, Part I.

On January 26, 1998, plaintiff resigned from her M&M employment in a letter to William (Bill) Savage, thanking Mr. Savage for "believing and trusting" in her. *See* Exhibit E, 1/26/98 resignation letter, bate-stamp 001353. Plaintiff's letter to Mr. Savage is signed: "I remain, Cuz, Valerie Hue." *See* Exhibit E. On April 19, 1999, M&M re-hired plaintiff as a collector in the Dover office.

Even though NCO assumed responsibility for the Dover operations in May 1999, the policy requiring the verification of funds prior to re-dipping an NSF check had been the practice for as long as any collector had worked at M&M. *See, e.g.*, Exhibit B, Rose, 15: 3 – 12; Exhibit F, Marlow, 11: 15 – 22; Exhibit G, Obenshain, 105: 6 – 16. The policy was reinforced through meetings where collectors and managers were trained to comply with all state and federal laws, as well as NCO's internal check handling policy. *See* Exhibit H, McQuisten, 11: 1 – 16; Rose, 13: 12 – 24; Obenshain, 105: 17 – 25; 106: 1 – 5; 108: 1 – 4. The practice was so ingrained in the business of NCO that it was never specifically reduced to writing.

NCO provided plaintiff with an employee handbook that contained NCO's policies against harassment and retaliation, as well as procedures for reporting discrimination. Sugg Aff., ¶ 4. Ms. Hue acknowledged receipt of the NCO Employee Handbook on December 14, 1999, and again on April 16, 2001. *See* composite Exhibit I, 12/14/99 and 4/16/01 acknowledgements, bate-stamps 001671, 001684.

7

After working as an M&M collector for approximately five years, plaintiff began her employment with NCO as a Large Balance Collector.  Hue, 43: 13 – 16, Part I. Plaintiff was promoted to Small and then Mid-Balance Manager in 2001.  As a manager, plaintiff understood that one of her job duties was to "ensure that the collectors that [she] supervised followed [compliance] rules" that were in effect.  Hue, 53: 5 – 8, Part I. Plaintiff "understood the rules relating to compliance" that were in effect, and also understood that compliance violations could result in discipline "[u]p to and including termination."  Hue, 54: 4 – 19, Part I.  Plaintiff acknowledged during her deposition that there were "certain violations that were more serious" than others.  Hue, 54: 20 – 24; 55: 1 – 2, Part I.

**B.    Plaintiff's Statement Regarding Savage's Inappropriate Comments.**

As an NCO Mid-Balance Manager, plaintiff reported to General Collections Manager Ric Boudreau, who in turn reported indirectly to Bill Savage, General Manager of the Dover office.  Hue, 48: 22, Part I.  Mr. Savage and Mr. Boudreau both reported to Phil Weaver, who was then the General Manager of the Commercial Division.

In October 2001, Mr. Boudreau informed Mr. Weaver and Theodore (Ted) Fox, former Senior Vice President of Sales, that Mr. Savage was making inappropriate racial and sexual comments in the workplace.  Hue, Exhibit 6 (Transcript of Conversation between Ric Boudreau, Phil Weaver, and Ted Fox).  Unbeknownst to Mr. Fox and Mr. Weaver, the conference call was tape-recorded.  The tape was anonymously mailed to plaintiff.  Hue, 58: 2 – 10, Part I.  While confusing to NCO, plaintiff asserts that the tape is helpful to her case to prove discrimination and retaliation.  Hue, 63: 15 – 23; 64: 3 – 18, Part I.  The tape proves that NCO reacted properly and quickly to the allegations of discriminatory conduct against Bill Savage.  Hue, Exhibit 6.

8

Mr. Weaver's reaction to the information regarding Mr. Savage's inappropriate behavior was concern bordering on dismay. Mr. Weaver stated: "I need [Valerie Hue] to document that" and "[h]old on, Rick, I need to get Ted [Fox] down here." Hue, Exhibit 6, pp. 10 – 11; *see also* Hue, 63: 17 – 19, Part I (plaintiff acknowledging that the tape shows "Boudreau reporting wrongful conduct by Savage").

When Mr. Boudreau and Mr. Weaver relayed the inappropriate comments to Mr. Fox, Mr. Fox concurred with Mr. Weaver that they needed statements from the employees who witnessed Mr. Savage's inappropriate behavior. Hue, Exhibit 6, p. 18. Throughout the taped discussion, Mr. Weaver reiterated that "this is a serious issue" and chastised Mr. Boudreau for not "bring[ing] this to [him] when it was happening." Hue, Exhibit 6, p. 18. Mr. Weaver also stated that he was "going to reach out to HR" and that "Ted makes a good point to document and go on record with all of this . . . that is going to get us in a great deal of trouble . . . ." Hue, Exhibit 6, p. 21 (emphasis added).

The transcript and NCO's subsequent actions, more than two years before plaintiff's January 2004 discharge, prove NCO's prompt and professional response to Mr. Boudreau's report of inappropriate conduct. Mr. Savage was suspended and terminated within 24 hours after the call. *See* Exhibit J, 10/11/01 Savage termination document, bate stamp 000189. After Mr. Savage had already been terminated, Mr. Fox procured written statements from Eric Shaw, Brian Waystack, and plaintiff regarding Mr. Savage's misconduct. *See* Composite Exhibit K, Written Statements regarding Savage's inappropriate comments, bate stamps 000190 – 192. As noted, the written statements were given to NCO on October 15, 2001, four days after Mr. Savage's termination. *See* Exhibits J and K.

9

After Mr. Savage's October 2001 termination, plaintiff never again reported any feelings of discrimination, harassment, or retaliation to any member of NCO management or Human Resources. Sugg Aff., ¶ 5. As Mr. Boudreau testified during his deposition, plaintiff "never" reported feelings of discrimination or retaliation to him at all. Exhibit L, Boudreau, 28: 2 –3.

Contrary to plaintiff's retaliation theory against Mr. Fox, the record evidence shows that Mr. Savage did not hire or mentor Mr. Fox. *See* Exhibit M, Fox, 15: 14 – 19 (stating that "the first time that I ever met Bill Savage was after I was offered the job"); 18: 24; 19: 1 – 15. Nor was Mr. Savage involved in any of Mr. Fox's promotions, or vice-versa. Fox, 18: 8 – 20; 19: 18 – 23. Further, Mr. Fox and Mr. Savage were not friends and did not socialize outside of office activities. Fox, 20: 18 – 24; 21: 1 – 19 (stating that he did not consider Bill Savage a friend); *see also* Exhibit N, Scher, 7: 15 – 23; 8: 17 – 20. In fact, the undisputed evidence shows that it was Mr. Fox, along with Mr. Weaver, who recommended that NCO terminate Mr. Savage for his inappropriate comments. Fox, 24: 1 – 22 (stating that it was a "no-brainer" that Mr. Savage had to be terminated for his inappropriate comments; further stating that he and Mr. Weaver contacted Mr. Savage and stated: "Bill, you said this. You did this. And he said yeah, I did. We said, okay, you're done");[3] Boudreau, 22: 1 – 17 (stating that upon reporting Mr.

---

[3] As discussed in detail below, Mr. Boudreau, not plaintiff, reported Mr. Savage's inappropriate behavior to Mr. Weaver and Mr. Fox. Mr. Fox and Mr. Weaver then sought out statements from plaintiff and several others regarding Mr. Savage's inappropriate behavior. Plaintiff and two others submitted their written statements on October 15, 2001, four days after NCO terminated Mr. Savage's employment. Not only was Mr. Fox not friends with Mr. Savage, but Mr. Fox and Mr. Weaver were the ones who confronted Mr. Savage and then recommended his termination. Furthermore, following Ms. Sha'altiel's audit and the investigation of Ms. Obenshain and Mr. Fox, Ms.

Savage's inappropriate comments, Mr. Weaver and Mr. Fox asked him to "[w]rite it down, start making times and dates and things of that nature. They wanted to be able to have it detailed"). Such a discharge hardly represents the actions of someone "protecting" a mentor or friend.

**C.**     **Plaintiff's Misconduct and Termination.**

Following Mr. Savage's termination in October 2001, plaintiff succeeded as an NCO employee. On April 19, 2002, plaintiff was promoted to GCM of the Dover branch office. Hue, 56: 13 – 21, Part I. Kathleen Obenshain authorized the promotion, as detailed with the Employee Change Form signed by Ms. Obenshain. Hue, 56: 19 – 21, Part I and Exhibit 5; Obenshain, 43: 14 – 25; 44: 1 – 11. As the Dover GCM, plaintiff "reported directly" to Ms. Obenshain. Obenshain, 38: 23 – 24. Plaintiff's ultimate success as GCM depended on the dollar amount collected each month by the Dover collections department. Like all GCMs, there was tremendous pressure on plaintiff to meet end-of-month collection goals. *See* Exhibit O, Lane, 7:22 – 23; Hue, 101: 19 – 21, Part II (stating that the "hardest thing about being a collection manager" is "the numbers").

As the Dover GCM, plaintiff was responsible for enforcing NCO's policies pertaining to commercial collections and for overseeing all collection activities within the Dover office. Hue, 53: 1 – 8, Part I; Lane, 6: 2 – 5. Plaintiff's duties as GCM included enforcement of NCO's check handling policies. Hue, 53: 1 – 8, Part I. NCO's check

---

Obenshain spearheaded plaintiff's termination. For these and other reasons, plaintiff cannot state a *prima facie* case for retaliation.

handling policies include rules for handling checks that have been returned to NCO for non-sufficient funds (NSF).[4]  Obenshain, 62: 1 – 24.

Prior to requesting the re-dipping of an NSF check, NCO required collectors to obtain verification from the bank that funds were available to cover the check or, "when you couldn't check with the bank, to talk to the debtor and verify with him that it would be okay to run the check." *See* Exhibit P Shaw, 30: 15 – 20; *see also* Exhibit Q, Sha'altiel, 25: 12 – 17; Obenshain, 62: 19 – 25; 63: 1 – 9; 65: 20 – 25; 66: 1 – 3.  If the collector is unable to obtain the debtor's authorization or the bank's verification that funds are available, the collector is prohibited from requesting the re-dip.  Lane, 15: 5 – 10.  The reason for the policy was to "make certain that we were putting on good solid revenue for our clients; so the collectors would be paid accurately, based on numbers that were good; so that general collection managers who were earning bonuses would be paid correctly; so there was no falsification of records."  Obenshain, 111: 4 – 10.

In Dover, collectors utilized a "Re-Dip Form" to request the resubmission of an NSF check.  Rose, 18: 12 – 21.  The Re-Dip Form had blanks for information regarding what type of authorization/verification the collector obtained from the debtor or the bank that funds were available, and a place for a manager's signature approving the re-dip. Birdsong, 12: 18 – 22.  In theory, an NSF check would only be re-dipped if a collector properly completed a Re-Dip Form, a manager signed the Re-Dip Form, the Re-Dip Form was given to the Collection Administrative Assistant, and the Administrative

---

[4] According to former NCO Large Balance Collector Matthew Lane, plaintiff began instructing collectors to re-dip checks without authorization "after [collectors] received the ability to create checks on the system" by telephone.  Lane, 15:17 – 24.  The ability to create a check-by-phone started in 2002.  Birdsong, 20: 3 – 9.  Therefore, it is NCO's belief that plaintiff was violating the check handling policy for at least one year prior to being caught by Dina Sha'altiel's audit.

Assistant e-mailed a re-dip request to NCO's Cash Department located in corporate headquarters in Horsham, Pennsylvania. *See generally*, Birdsong, 11: 9 – 22.

In practice, plaintiff and the employees under plaintiff's supervision did not always follow the re-dip procedure. Lane, 14: 1 – 15; 15: 11 – 16; Shaw, 33: 16 – 20; 43:2 – 7; Marlow, 53: 19 – 24. At month-end, when the pressure to collect was at its peak, plaintiff would bypass the re-dip procedure and instead request re-dips where funds had not been verified. Lane, 7: 18 – 23; 14: 1 – 15.

Every collector deposed confirmed plaintiff's wrongdoing. The testimony of former Large Balance Collector Matthew Lane is indicative of plaintiff's instructions to subordinates. Mr. Lane was fired by Ms. Hue for violating check handling procedures during January 2004, and confirmed during his deposition that "the policy [was] written by Ms. Hue, but the policy was continually told to be broken, so, I mean, the policy really didn't carry any weight if the writer tells us verbally to ignore it." Lane, 32: 11 – 15.

According to Mr. Lane, plaintiff pushed checks at month-end on a "hope" and a "prayer" that some of the checks would clear. Lane, 8: 23. Without authorization from the debtor or verification from the bank, many of the checks bounced. Sha'altiel, 189: 17 – 24 (stating that Dover had "much higher" NSF's than "any other office"). The results of this practice were inflated earnings, issues with remittances to collection clients, and high numbers of checks that would be returned NSF in the middle of the next month.

In October 2003, Dina Sha'altiel became NCO's Compliance Auditing Manager. Sha'altiel, 7: 10; 17: 23 – 24. Ms. Sha'altiel, a former collector, was charged with monitoring compliance and auditing NCO's check handling policy. Sha'altiel, 7: 16 – 21. Ms. Sha'altiel testified that Steve Leckerman, Chief Operating Officer, "wanted to

13

make sure that we were following policy and that we were putting good money in and we weren't chasing bad money." Sha'altiel, 16: 11 – 13; *see also* Fox: 39: 16 – 22 (stating that it was a "routine audit" because "you had things like Enron . . . and Tyco happening"). Specifically, Mr. Leckerman wanted Ms. Sha'altiel to "check to see if we contacted the debtors. He wanted to see if we contacted the banks. He wanted to see if the checks were verified, and he wanted to see that the accounts were documented accordingly." Sha'altiel, 17: 3 – 7.

In January 2004, Ms. Sha'altiel conducted her first audit of the checks that were submitted by NCO Commercial Collections Offices in December 2003 and were returned NSF during January 2004. Ms. Sha'altiel reviewed the account notes relating to NSF checks over $1,000 to attempt to determine whether the check bounced due to collector error, debtor error, or both. Sha'altiel, 23: 19 – 24; 24: 1 – 2; 35: 10 – 15. Collector error would encompass re-dipping a check without obtaining the debtor's authorization or verification from the debtor's bank that funds were available. Sha'altiel, 77: 13 – 20; 82: 12 – 14.

While not "final" and subject to further investigation, Ms. Sha'altiel's audit results were summarized in an NSF Report, which listed each check investigated and the suspected "root of problem"—*i.e.*, whether the check bounced due to collector error, debtor error, or both.[5] *See* Composite Exhibit R, NSF Report, Bate-Stamps 000944, *et seq.* Ms. Sha'altiel's report reflects that she suspected that the Dover office had an

---

[5] The NSF Report identifies the various commercial offices by "Unit." The first letter of the Unit code corresponds to the first letter of the office's location. For example, the first check in the NSF Report relates to Unit A11. The A stands for Atlanta, and the 11 stands for collector William Catlett. The Dover office is identified as Unit code "D" beginning on the third page of the NSF Report.

14

inordinate number of bounced checks due to "collector" error.[6] *See* Composite Exhibit R; *see also* Obenshain, 58: 3 – 8 (stating that Ms. Sha'altiel determined "that there was an inordinate amount of checks coming back in the Dover office that had not received the proper documentation concerning why they were redeposited"). In fact, in January 2004, Dover had six large-balance collectors and <u>all</u> six had checks on the NSF report where the suspected "root of problem" was "collector." *See* Composite Exhibit R, bate-stamps 001025, 001083, 001123. With this information, further research by Ms. Obenshain confirmed plaintiff's wrongdoing.

Certain account notes relating to Dover's December 2003 NSF checks document that plaintiff herself expressly ordered checks to be re-dipped improperly. *See* Composite Exhibit S, Account Notes relating to 12/03 NSF checks implicating plaintiff. The NSF Report specifically states that for several of the Dover NSF checks, the "root of problem" was "collector/mgr." *See* Composite Exhibit R, bate-stamp 001025 (Dover Collector, Dantae Ramirez, NSF Check due to "collector/mgr"); bate-stamp 001123 (Dover Collector, David McQuisten, NSF Checks due to "collector/mgt"). Of the 181 checks audited that appear on the NSF Report, <u>only Dover</u> has checks that were returned NSF due to "manager" misconduct. *See* Composite Exhibit R.

Ms. Sha'altiel provided the NSF Report to Mr. Leckerman and Joshua Gindin, NCO's General Counsel. Eventually, Ms. Sha'altiel was directed to call Ted Fox, who in turn redirected Ms. Sha'altiel "to call Kathy [Obenshain, who] was handling the

---

[6] At the time Ms. Sha'altiel conducted the audit, she only identified collectors and managers by their user code, not by their name or any other identifying characteristic. Sh'altiel, 48, 1 – 6. Therefore, at the time Ms. Sha'altiel conducted the audit, she did not know that plaintiff worked in the Dover office as the GCM, much less that she is African-American and female. Sha'altiel, 189: 1 – 6 (confirming that she was "blind as to the race and sex of the people [she] was checking").

commercial division." Sha'altiel, 66: 21 – 24; *see also* Fox, 44: 15 – 24; 45: 1 – 2 (stating that the investigation occurred "about two weeks after I had taken over the division," therefore "I was very reliant on Kathy [Obenshain] . . who worked on the collections side her whole career"). Ms. Sha'altiel then "started talking to Kathy, and . . . told her of [the] findings. [Ms. Obenshain] told [Ms. Sha'altiel] that she would research it, get back to [her]." Sha'altiel, 67: 1 – 3. Ms. Obenshain then contacted plaintiff for an "explanation" regarding NSF checks "that were on a spreadsheet" given to her by someone "in Horsham." Hue, 69: 18 – 22; 70: 1 – 17, Part II.

Ms. Obenshain oversaw the investigation with the assistance of Mr. Fox, who helped interview Dover collectors, and of NCO Human Resources, which confirmed that the investigation was done in a fair manner. Sugg Aff., ¶ 10. The purpose of the investigation was to determine why and how Dover collectors were re-dipping checks without authorization and/or verification. Fox, 40: 12 – 24; 41: 1 – 3.

Mr. Fox asked Dover employees "questions about procedures and what was going on in the Dover branch," and Ms. Obenshain obtained statements from collectors and managers in the Dover office regarding the check handling practices under plaintiff's leadership. Shaw, 8: 10 – 20; Obenshain, 56: 14 – 18; Fox, 46: 2 – 7. As former Mid-Balance Manager Eric Shaw stated during his deposition, interviews were conducted in order to come to "a deeper understanding of what had happened at this location, of why we were running the checks." Shaw, 11, 16 – 20. In other words, management wanted to know "why it happened, why did we do that procedure when we knew that procedure was not allowed at NCO." Shaw, 11:10 – 13

16

During the investigation, the Dover managers and collectors reported that they were instructed by plaintiff to "get the checks on." Shaw, 17:3 – 5. This meant that plaintiff was ordering that checks be resubmitted regardless of whether verification of funds had been obtained. Shaw, 26: 22 – 24. Additionally, certain collectors would tell plaintiff they wanted to "pull" checks because they were "insufficient, but were unable to, because they had been told by Valerie Hue they could not pull them." Shaw, 24:7 – 11, McQuisten, 48: 22 – 24; 49: 1 – 22 (testifying that he told plaintiff the "money is not available" and she replied that "nothing is being held," which in his opinion was "absolutely" a violation of NCO's policy).

The written statements obtained from three large balance collectors and two managers all echoed the same thing: plaintiff was violating and directing others to violate NCO's check handling policy. *See* Composite Exhibit T, Statements of David McQuisten, Mark LeFevre, Brad Reavis, Kim Marlow, and Eric Shaw, bate-stamps 00089 – 98

Ms. Obenshain's investigation findings were memorialized in a January 22, 2004 memorandum, which states: "We determined yesterday that an inordinate amount of NSF's from Dec 03 were a result of previously returned DCI's recreated by the collectors without the permission of the debtor and re-deposits that were run by producers and managers without talking to the debtor or making any attempt to verify funds with the bank." *See* Exhibit U, bate-stamp 000469.

According to Mr. Shaw, the Dover collectors and managers knew that plaintiff's practice of running checks without verification violated company policy, but did not report plaintiff's behavior because "Val was my boss, and I didn't want to get her in

17

trouble." Shaw, 29, 18 – 20. Notably, Mr. Shaw, a white male, was demoted because he followed plaintiff's directive to re-dip checks even when verification that funds were available could not be obtained. In Mr. Shaw's words: "I was not allowed to be a manager anymore. I was put back on collections." Shaw, 35: 16 – 17. Mr. Shaw works as a collector to this day.

Based upon the collectors' and managers' unequivocal statements that plaintiff was directing the re-dipping of checks without verification, Ms. Obenshain and Mr. Fox concluded the obvious–that plaintiff had "intentionally violated the check handling policy" and recommended plaintiff's termination. Obenshain, 60: 7 – 12. On January 28, 2004, plaintiff was suspended and ultimately terminated. During the teleconference with the Vice President of Human Resources, Cherie Sugg, confirming that plaintiff was terminated, plaintiff attempted to blame Ms. Obenshain for her improper conduct, and admitted that she "knew she [V. Hue] was wrong when she did violate the policies." Sugg Aff., ¶ 12 (emphasis added)

Between plaintiff's suspension on January 21, 2004 and plaintiff's termination on January 28, 2004, plaintiff sent NCO upper management a memorandum and an e-mail attempting to defend her check handling actions. First, plaintiff sent an e-mail to Steve Leckerman, the Chief Operating Officer, with a carbon copy to Mr. Fox, stating that on January 21, 2004 she "was placed on suspension with pay due to 2 concerns: Not pulling checks and creating dci on re-dips." *See* Exhibit V, 1/22/04 E-mail, bate-stamps 00023 – 24. Within the e-mail, plaintiff stated that she had a re-dip policy that consisted of a form that requires collectors to articulate the "verification method." *See* Exhibit V. Plaintiff then admitted that she "did notice numerous checks were redipped without the [Re-Dip]

18

form being signed" and that, "yes, I should have given Eric [Shaw] clearer direction." *See* Exhibit V. Importantly, Mr. Shaw was unequivocal that during December 2003 plaintiff directed him to "make sure the checks get on regardless . . . . If the checks are going to be good, bad, or indifferent, [they are] going to go on." Shaw, 57: 1 – 21.

On January 27, 2004, plaintiff wrote a memorandum to Mr. Leckerman and Mr. Fox blaming Ms. Obenshain for her check handling violations. She stated that she had a directive from Ms. Obenshain that "**ALL** checks were automatically redeposited," and asserted that the "communication was not clear by Kathy on redeposits." *See* Exhibit W, bate stamp 000467 – 68. Aside from being wrong, plaintiff's memo made no sense and was directly contrary to her January 21, 2004 e-mail, wherein she stated: "I have a redip policy in my branch with a form that the producer fills out. This form asks for verification method and once it is signed then it is redipped"—proving that plaintiff knew that verification had to be obtained prior to re-dipping a check. *See* Exhibit V. As noted above, during the telephone call where plaintiff was terminated, she admitted to Cherie Sugg that she "knew she was wrong when she did violate the policies." Sugg Aff., ¶ 12.

Adding confusion to plaintiff's case, plaintiff back-pedaled from blaming Ms. Obenshain during her deposition. She was asked, "Did [Ms. Obenshain] ever say, I want you to redeposit checks without verification of funds," to which plaintiff replied: "She would say, go through and see what you can get on the system, in her normal flip little way." Hue, 67: 21 – 22; 68: 1 – 3, Part II. This testimony contradicts plaintiff's January 27, 2004 memorandum stating that Ms. Obenshain ordered that "all" checks were to be "automatically" redeposited. *See* Exhibit W.

On February 3, 2004, plaintiff filed a Charge of Discrimination against NCO with the Delaware Department of Labor and the Equal Employment Opportunity Commission (EEOC) alleging race and gender discrimination, and retaliation by Mr. Fox. During the agency investigation, plaintiff retreated to the position taken in her January 27, 2004 letter where she essentially blamed her wrongdoing on Ms. Obenshain. *See* Exhibit W. In answering the Charge of Discrimination, NCO supplied ten statements from numerous GCMs and managers that were in positions similar to plaintiff. Each GCM and manager confirmed that at no time had Ms. Obenshain ever instructed them to violate NCO's check handling policies. *See* Composite Exhibit X, Written Statements of Managers. Hue's "Nazi-defense" at the charge level, *i.e.*, that she was only following Ms. Obenshain's orders, was ultimately rejected by the Delaware Department of Labor (the "DDOL").

The DDOL closed its investigation without finding "cause" to believe discrimination or retaliation occurred, and issued plaintiff a Right to Sue letter. In April 2005, plaintiff filed her meritless lawsuit alleging violations of Title VII and Section 1981.

## ARGUMENT

NCO is entitled to summary judgment on all claims filed by plaintiff. Plaintiff cannot state a *prima facie* case for retaliation because she has no evidence aside from her unfounded "belie[f]" and self-serving testimony that her 2001 written statement regarding Bill Savage's comments had any connection whatsoever to her 2004 termination for improper check handling practices. Furthermore, plaintiff cannot offer a single piece of evidence that NCO's legitimate, nondiscriminatory reason for terminating her

20

employment, namely, violating and directing her subordinates to violate the check handling policy, is a pretext for discrimination or retaliation.

## I.      **Summary Judgment Procedure.**

Rule 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); s*ee also Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 434 (3d Cir. 2006).

Once the moving party has carried its summary judgment burden, the opposing party must set forth specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Conclusory allegations are insufficient to create a general issue of material fact. *See Lexington Ins. Co. v. Western Pennsylvania Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) (citations omitted); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985). In other words, the nonmovant is required to "show more than some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). This is because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 (3d Cir. 1990) (citation omitted).

## II.     **Plaintiff Cannot State a *Prima Facie* Case for Retaliation.**

Plaintiff has not and cannot state a *prima facie* case for retaliation. Title VII and Section 1981 claims require application of the burden-shifting framework the Supreme Court articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See*

21

*also Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999).[7]    The

*McDonnell Douglas* analysis proceeds in three stages.    The first stage requires the

plaintiff to establish a *prima facie* case of discrimination or retaliation.

To establish a *prima facie* case of retaliation, a plaintiff must show: (1) she

engaged in a protected activity; (2) she was discharged subsequent to such activity; and

(3) a causal link exists between the protected activity and the discharge. *See Woodson v.*

*Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997); *Robinson v. City of Pittsburgh*, 120

F.3d 1286, 1299 (3d Cir. 1997) (citations omitted).

Generally, "the temporal proximity between the employee's protected activity and

the adverse employment action . . . is an obvious method by which a plaintiff can proffer

circumstantial evidence 'sufficient to raise the inference that her protected activity was

the likely reason for the adverse action.'" *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d

173, 177 (3d Cir. 1997) (citations omitted).    The opposite inference may be drawn when a

"substantial amount of time" separates the purported protected activity and the discharge.

*See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (ruling that adverse

employment action taken twenty months after the protected activity, by itself, suggests no

causality); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (ruling three-

month period insufficient to establish causation required for *prima facie* case); *Hughes v.*

---

[7] Plaintiff's Complaint does not delineate which claims are brought under which statute.    Instead, plaintiff generally asserts race, sex, and sex-based retaliation claims under 42 U.S.C. § 1981 and Title VII.    Section 1981 does not reach claims of gender discrimination and sex-based retaliation. *Anjelino v. New York Times Co.*, 200 F.3d 73, 78 (3d Cir. 1999).    Therefore, NCO will address plaintiff's race discrimination claim under Section 1981 and Title VII, and plaintiff's gender discrimination and sex-based retaliation claim under Title VII only.

22

*Derwinski*, 967 F.2d 1168, 1174 (7th Cir. 1992) (ruling four-month period insufficient to establish causation).

Additionally, a plaintiff can come forward with "circumstantial evidence of a 'pattern of antagonism' following the protected conduct [which could] also give rise to the inference [of retaliation]." *Kachmar*, 109 F.3d at 177 (citations omitted). The pattern of antagonism must be based upon more than "accusations" and "speculation" by the plaintiff. *Jackson v. Univ. of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987) (citations omitted); *see also Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 434 (3d Cir. 2006); *see also Momah v. Albert Einstein Med. Ctr.*, 978 F. Supp. 621, 632-33 (E.D. Pa. 1997) (granting summary judgment for the employer because "the only evidence that plaintiff's discharge was retaliatory comes from the plaintiff himself").

Plaintiff's retaliation claim fails as a matter of law because plaintiff's purported protected activity, participating in the investigation regarding Mr. Savage's comments, occurred more than two years prior to her termination for improper check handling practices. There is no evidence that the accused retaliator, Mr. Fox, harbored any retaliatory animus towards plaintiff or ever displayed any antagonism—much less a "pattern of antagonism"—towards plaintiff.

Plaintiff's retaliation theory is based upon her unfounded belief that Mr. Fox was friends with Mr. Savage. D.I. 1 at ¶ 26. Per the "retaliation theory," Mr. Fox became upset with plaintiff for participating in the investigation surrounding Mr. Savage's October 2001 termination and exacted his revenge on plaintiff more than two years later by having plaintiff fired. Hue, 86: 4 – 22; 87 – 89, Part II. It is plaintiff's theory that since Mr. Fox received three to four months of initial training in the Delaware office

upon joining M&M that Mr. Fox and Mr. Savage developed a close personal relationship. Hue, 116: 5 – 12, Part II.

Mr. Savage did not hire or mentor Mr. Fox. Fox, 15: 14 – 19 (stating that "the first time that I ever met Bill Savage was after I was offered the job"); 18: 24; 19: 1 – 15. Nor was Mr. Savage involved in any of Mr. Fox's promotions, or vice-versa. Fox, 18: 8 – 20; 19: 18 – 23. Further, the undisputed evidence shows that Mr. Fox and Mr. Savage were not friends and did not socialize outside of office activities. Fox, 20: 18 – 24; 21: 1 – 19 (stating that he did not consider Bill Savage a friend); *see also* Scher, 7: 15 – 23; 8: 1 – 20; Boudreau, 16: 15 – 18.

Plaintiff's retaliation theory should be rejected for a myriad of additional reasons. First, Ric Boudreau, not plaintiff, reported Mr. Savage's wrongdoing to upper management. Mr. Boudreau confirmed during his deposition that "Hue never complained to [him] that Savage treated her badly or in a discriminatory manner." Boudreau, 27: 16 – 24; 28: 1 – 24.

Second, Mr. Fox is the manager who ensured that there was clear evidence of Mr. Savage's wrongdoing by securing written statements from three witnesses to the Mr. Savage's misconduct, including plaintiff. Fox, 23: 2 – 9; Boudreau, 22: 6 – 17.

Third, Mr. Savage was terminated immediately after admitting his wrongdoing to Mr. Fox and Mr. Weaver and prior to the date that plaintiff and two others submitted the statements requested by Mr. Fox. Fox, 24: 1 – 22 (stating that it was a "no-brainer" that Mr. Savage had to be terminated for his inappropriate comments; further stating that he and Mr. Weaver contacted Mr. Savage and stated: "Bill, you said this. You did this. And he said yeah, I did. We said, okay, you're done"). In other words, even accepting

24

plaintiff's unfounded assertion that Mr. Fox and Mr. Savage were friends, Mr. Fox would have no reason to retaliate against plaintiff because plaintiff's witness statement had no bearing on NCO's decision to terminate Mr. Savage. Mr. Savage was discharged on October 11, 2001, and plaintiff and two others did not provide witness statements until four days later on October 15, 2001. *See* Composite Exhibit K.

Fourth, and most ironic, while Mr. Fox <u>was</u> instrumental in having Mr. Savage terminated for misconduct, Mr. Fox <u>was not</u> the person who spearheaded plaintiff's discharge for check handling practices. Fox, 61: 17 – 21 (stating that he and NCO HR acted on Ms. Obenshain's "recommendation" that plaintiff be terminated). The undisputed evidence shows that Ms. Obenshain—the same person who promoted and supervised plaintiff as GCM—is the person who spearheaded plaintiff's termination. Fox, 48: 13 – 17 (stating that "the heavy weight [regarding Ms. Hue's termination] came from what Kathy [Obenshain] was doing. Kathy's recommendation and Kathy's investigation to the files, to the checks, that's truly what pushed it over the edge to really go the way we went"). Ms. Obenshain testified that she spearheaded the investigation and the termination decision.

In an attempt to minimize the gap in the purported causal chain between her protected activity and termination, plaintiff has pointed to the fact that she was fired approximately two weeks after Mr. Fox became the General Manager for the Commercial Division, replacing Mr. Weaver. D.I. 1. at ¶¶ 27 – 28. Mr. Fox, however, testified that plaintiff's termination was a bad thing for the Commercial Division because he had "no replacement for Valerie as a general collection manager in Dover. This, in [his] opinion,

25

at that time was probably one of the worst things that could have happened to that office at the time." Fox, 51: 17 – 24; 52: 1 – 2.

Perhaps most importantly, when Ms. Hue was asked, "What, if anything, did Ted Fox do of a retaliatory or discriminatory nature against you," she replied: "Other than my suspension and termination . . . ignoring me. That would be basically it." Hue, 75: 9 – 23, Part I. When asked: "And in addition [to] him ignoring you from October of 2001 [when Bill Savage was fired] until your January 2004 suspension, what else, if anything else, did he [T. Fox] do," plaintiff could only reply: "<u>Nothing. I had no direct contact with Ted as he was in sales</u>." Hue, 76: 6 – 10, Part I (emphasis added). Plaintiff's admission refers to the fact that Mr. Fox worked as the VP of Sales and plaintiff worked in Collections, which are two separate functions and career paths within the Commercial Division. Fox, 11: 11 – 14. Plaintiff's own testimony proves that her retaliation claim must be dismissed on summary judgment for failure to state a *prima facie* claim.

### III. Plaintiff Cannot Offer Evidence that NCO's Legitimate, Nondiscriminatory Reason for Terminating her Employment Was a Pretext for Discrimination or Retaliation.

Plaintiff cannot provide any evidence to undermine NCO's straightforward, legitimate, nondiscriminatory reason for terminating plaintiff, namely, her documented acts of violating and instructing subordinates to violate NCO's check handling policy. In Title VII and Section 1981 cases, if the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973). Then, the burden shifts to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons,

26

but were a pretext for discrimination or retaliation. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252 – 53 (1981) (citations omitted).

To prove pretext, the plaintiff "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (en Banc) (citations omitted). Even under a mixed-motive analysis, the plaintiff must prove through direct or circumstantial evidence that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).

Assuming *arguendo* that plaintiff is able to establish a *prima facie* case for retaliation or discrimination, her attempts to discredit NCO's explanation for her termination must be rejected. Plaintiff's theory is that NCO singled her out for violating NCO's check handling policy because other collectors listed on the NSF Report as the "root of problem" were not disciplined. Plaintiff's theory is without merit because the undisputed evidence establishes that in January 2004, Dover had more NSF checks due to "collector error" than any other commercial office, and only Dover had NSF checks caused by "management" instructions, as documented in the relevant account notes. *See* Composite Exhibits P and Q.

Even if the NSF Report was incorrect, it was Ms. Obenshain who ultimately determined that plaintiff was instructing her personnel to violate the rules. It is illogical that Ms. Obenshain, the same person who promoted plaintiff to GCM knowing full well that plaintiff is African-American and female, would then recommend plaintiff's

27

termination because she is African-American and female.[8]  In the Third Circuit, as proof

that a defendant's nondiscriminatory reason is legitimate, the defendant may offer

evidence demonstrating that the same manager who hired the plaintiff also fired the

plaintiff.  This same actress evidence tends to show that discrimination was not a

determining factor for the adverse action taken by the manager.[9]  *Waldron v. SL Indus.,*

*Inc.*, 56 F.3d 491, 496 (3d Cir. 1995).

Plaintiff has attempted to overcome the "same actress" evidence by blaming Mr.

Fox for her termination.  This attempt also fails because Ms. Obenshain, two Dover

managers supervised by plaintiff, and numerous collectors supervised by plaintiff have all

confirmed that plaintiff directed checks to be submitted improperly.  *See* Composite

Exhibit Q.  Under plaintiff's implausible conspiracy theory, all of these people and more

have lied under oath during their depositions, as well as during the January 2004

investigation, because of pressure from Mr. Fox.  Hue, 59 – 64, Part I.  Importantly, the

undisputed evidence shows that plaintiff <u>admitted</u> on the day of her termination that she

"knew she was wrong when she did violate the policies."  Sugg Aff., ¶ 12.

Under a Title VII or Section 1981 analysis, a plaintiff's subjective belief that race

or retaliation must have been the reason for her termination does not amount to

---

[8] Plaintiff admits that Ms. Obenshain, a female, did not discriminate against plaintiff because she is female or African-American.  Hue, 85: 18 – 22; 86: 1 – 3, Part II.

[9] The Circuit Courts have applied varying weights to the value of evidence that both the hirer and firer are the same actor.  *See, e.g., Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) (stating that same actor facts give rise to a "permissible inference" that no discriminatory animus motivated the employer's actions); *EEOC v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir. 1996) (stating that "the same hirer/firer inference has strong presumptive value") (citation omitted); *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996) (ruling that "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive").

28

"circumstantial evidence" when that belief is based upon "speculation and conjecture." *See generally Galloway v. United States*, 319 U.S. 372 (1943); *Brady v. Cheltenham Township*, 1998 WL 164994, at *7 (E.D. Pa. Apr. 9, 1998) (Attached at Exhibit A hereto). Furthermore, a "scintilla of circumstantial evidence, absent more, is insufficient to support a rational jury's inference of racial discrimination." *Brady*, 1998 WL 164994, at *7. Here, there is not even a scintilla of evidence—just plaintiff's unsubstantiated allegations.

On the other hand, there is overwhelming evidence that negates plaintiff's discrimination and retaliation assertions, including her own admission of wrongdoing. This case is just the factual scenario that the Third Circuit contemplated when it counseled that it is "well aware that some employees do not recognize their deficiencies and thus erroneously may attribute negative [employment actions] to an employer's prejudice. Accordingly, in a case [where] the circumstances simply cannot support an inference that the [adverse employment actions] were related to the [protected activity], a court should not hesitate to say so." *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000).

While plaintiff may refuse to now acknowledge her documented (and admitted) wrongdoing, her lawsuit cannot survive summary judgment based upon "conclusory allegations, improbable inferences, and unsupported speculation." *Hockman v. Westward Communications, L.L.C.*, 407 F.3d 317, 332 (5th Cir. 2004). Instead, she must come forward with evidence showing that NCO's decision was truly motivated by discriminatory or retaliatory animus. Because plaintiff cannot overcome the voluminous, undisputed evidence that she was fired for documented misconduct, plaintiff's lawsuit should be dismissed in its entirety.

29

## CONCLUSION

WHEREFORE, NCO requests that the Court grant NCO's Motion for Summary

Judgment and dismiss plaintiff's lawsuit with prejudice.

*Pro Hac* Counsel:

Jennifer C. Jauffret (#3689)
jauffret@rlf.com

David Israel
Sessions, Fishman & Nathan L.L.P.
Lakeway Two, Suite 1240
3850 North Causeway Boulevard
Metairie, LA  70002-1252
(504) 828-3700

Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE  19899
(302) 651-7700

Elizabeth K. Fite
Sessions, Fishman & Nathan L.L.P.
15316 N. Florida Avenue, Suite 100
Tampa, Florida  33613
(813) 908-6121

Attorneys for Defendant
NCO Financial Systems, Inc.

Dated: April 17, 2006