Exhibit A

Case 1:05-cv-00225-KAJ   Document 80-2   Filed 04/17/2006   Page 1 of 19

JENNIFER BIRDSON

Page 1

```
        IN THE UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF DELAWARE


VALERIE HUE,                    )
                                )
        Plaintiff,              )
                                )
  v.                            )
                                )    Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,    )    05-225-KAJ
a Delaware corporation,         )
trading as NCO FINANCIAL        )
COMMERCIAL SERVICES,            )
                                )
        Defendant.              )
```

            Deposition of JENNIFER BIRDSONG taken pursuant to notice at the law offices of Parkowski, Guerke & Swayze, P.A., 116 West Water Street, Dover, Delaware, beginning at 1:20 p.m. on Wednesday, March 8, 2006, before Robert Wayne Wilcox, Jr., Registered Professional Reporter and Notary Public.

APPEARANCES:

  JEREMY W. HOMER, ESQ.
  PARKOWSKI, GUERKE & SWAYZE, P.A.
   116 West Water Street
   Dover, Delaware  19903
   for the Plaintiff,

  ELIZABETH K. FITE, ESQ.
  SESSIONS, FISHMAN & NATHAN, L.L.P.
   15316 North Florida Ave - Suite 100
   Tampa, Florida  33613
   for the Defendant.


                CORBETT & WILCOX
        Registered Professional Reporters
  1400 French Street    Wilmington, DE 19801
                (302) 571-0510
            www.corbettreporting.com

Page 10

1  information on a form -- who they spoke with at the bank,
2  what check they wanted to redip. In case there was
3  multiple checks on the account, they had to list the
4  check number. They need to list the name of the person
5  on the account. They had to sign the Redip Form and turn
6  it in to their manager to be signed.
7    Q. Okay. When you say "they," you're talking
8  about the collectors?
9    A. Yeah.
10   Q. You've told me what the collectors were
11 supposed to do. What was your involvement in that
12 process?
13   A. I would not submit any check to be redipped --
14 to submit the request to our corporate office for a check
15 to be redipped if a manager had not signed off on it.
16   Q. Okay. So your responsibility was to make the
17 request for resubmitting the check to the corporate
18 office once you got the approval from the manager. Is
19 that right?
20   A. To be honest, I don't honestly remember if I'm
21 the one who was supposed to send the e-mail or if the
22 manager was supposed to send the e-mail.
23   Q. Okay. It could have been --
24   A. It was a long time ago.

Page 11

1    Q. Okay. It could have been you. But it was
2  done by e-mail?
3    A. Once we had e-mail.
4    Q. Okay.
5    A. Prior to that it would have been faxed.
6    Q. Okay. Do you recall when you got e-mail
7  approximately?
8    A. August 2002.
9    Q. Okay. When the redip request was sent to
10 corporate by e-mail, was there anything besides the
11 electronic mail that was sent? Was there any
12 documentation sent with it or separately to the corporate
13 office to show that there was authorization that redipped
14 the check?
15       MS. FITE: Object to form. But answer
16 if you can.
17   A. My knowledge was the only way I would submit a
18 request was if a manager signed off on it, because that's
19 supposed to mean the collector has notes in there, the
20 manager has reviewed the account, they have documented
21 the account. All I had to do was basically submit the
22 request.
23   Q. Okay. You've referred to a form that you call
24 the Redip Form.

Page 12

1    A. Mm-hmm.
2    Q. Was that the name of the form? Was there a
3  form that was titled Redip Form on it?
4    A. That's how the form was labeled, yes.
5    Q. At different times was there a form that was
6  similar to that that was titled some other way?
7    A. We had dozens of forms titled differently. A
8  lot of them I created just for my own personal backup to
9  keep me straight --
10   Q. Okay.
11   A. -- on the requests, because there was no
12 formal way for a collector to make requests.
13   Q. Before you developed the form, you mean?
14   A. Right. Yes, sir.
15   Q. Okay. Did you develop the Redip Form?
16   A. Yes, sir.
17   Q. Okay. What information was on the Redip Form?
18   A. Collector name, account number, bank name,
19 bank account number, whom they spoke with, the date they
20 spoke with them, the amount of the check, check number.
21 And then there was a line for the collector to sign and a
22 line for the manager to sign.
23   Q. Okay. Was there any place on the form for
24 explaining the basis for redipping the check or was that

Page 13

1  not on the form?
2    A. I honestly don't remember, sir.
3    Q. Okay. Were there any other forms that you
4  recall that were used in the process of redipping checks
5  other than the Redip Form?
6    A. Not for redipping checks, no.
7    Q. Okay. Was there a spreadsheet used by the
8  manager to review the NSF checks with the collectors?
9    A. If there was, I had no knowledge of it or
10 wasn't --
11   Q. Okay.
12   A. -- involved with it.
13   Q. Did you have any involvement in trying to
14 contact banks about NSF checks to see if there were funds
15 that would cover the checks?
16   A. No, sir.
17   Q. Okay. Do you know who Kathy Obenshain is?
18   A. Yes.
19   Q. Who is she?
20   A. She was at -- when Valerie was employed, she
21 was her manager.
22   Q. Okay. Did you have contact with her from time
23 to time?
24   A. When she'd visit the office.

Page 14

1  Q. Okay. Did you overhear conversations between
2  Kathy Obenshain and Valerie Hue over the telephone?
3  A. A few times.
4  Q. Your office was right next to Valerie Hue's,
5  wasn't it?
6  A. Yes.
7  Q. Could you hear through the wall sometimes what
8  phone conversations were going on?
9  A. Not unless someone was yelling. I wouldn't be
10 paying attention. Sorry.
11 Q. Sometimes they were yelling.
12    Okay. Did you ever hear Kathy Obenshain
13 say words to the effect that Valerie Hue should put all
14 the checks on?
15 A. I've heard her state "get them on."
16 Q. Okay. What do you recall about that exactly?
17 Can you give me any detail about what you heard?
18 A. I believe it was a conference call, and she
19 told everybody to get them on.
20 Q. Okay. What did that mean, do you know?
21 A. My interpretation would be that she wanted
22 them to make sure all the post dates verified and get
23 them on. If there was any problems prior to EOM where
24 they were not verifying, that they needed to get on the

Page 15

1  phone and qualify the checks.
2  Q. Okay. But she didn't say that in those words.
3  Right?
4  A. No.
5  Q. Did she say anything other than to put the
6  checks on that gave you the understanding you just
7  expressed about what it meant?
8  A. No. That would be my interpretation of it.
9  Q. Okay. Did you ever hear her say words to the
10 effect that Valerie Hue should pull all the checks?
11 A. No.
12 Q. Okay. Once that Redip Form was filled out,
13 what happened to it?
14 A. The manager was supposed to sign off on it.
15 They would submit it to me. As long as the manager had
16 signed off on it, I believe I sent an e-mail, I guess. I
17 mean, I honestly don't -- I can't remember. It's been a
18 long time, and I don't handle any of that anymore.
19 Q. Okay. But you do recall that they gave you
20 the form at some point?
21 A. Mm-hmm.
22 Q. Correct?
23 A. Yes.
24 Q. Do you recall whether you reviewed the form to

Page 16

1  see if it had been filled out properly, or did you just
2  see that the manager signed it and deal with it at that
3  point?
4  A. It would have to be filled out properly
5  because I'd have to give that information to whoever
6  handled actually putting the checks back on.
7  Q. That would be with the corporate office? You
8  would have to give them the information?
9  A. Correct.
10 Q. The corporate office was in Horsham,
11 Pennsylvania?
12 A. Yes.
13 Q. Okay. What information would you have given
14 to the Horsham office about the redip request?
15 A. The account number, the amount of the check,
16 the check number, the reason it was being redipped or
17 that it had been verified. If they needed information
18 like who they spoke with at the bank, I would give them
19 that.
20 Q. Okay. Are you aware that the collectors were
21 not always able to contact the debtor when they were
22 trying to verify the NSF checks?
23 A. That wouldn't be something I would have
24 knowledge of.

Page 17

1  Q. Okay. Are you aware of any violation of NCO
2  policy regarding the request for resubmitting NSF checks
3  that took place before February 2004?
4    MS. FITE: Object to form. But answer
5  if you can.
6  A. I'm sorry. Could you repeat the question?
7  Q. Are you aware of any violations of NCO
8  policies regarding the request for resubmitting NSF
9  checks that occurred before February 2004?
10    MS. FITE: Same. But go ahead and
11 answer if you can.
12 A. I believe there was at least one collector
13 that was terminated for it.
14 Q. Okay. Would that have been Matthew Lane, do
15 you know?
16 A. Correct.
17 Q. Okay. Other than Matthew Lane, are you aware
18 of any other violations?
19 A. Not to my knowledge.
20 Q. Okay. Once the completed Redip Form was given
21 to you -- and I'm talking about after the collector had
22 filled it out and the manager had signed it -- and you
23 provided the information to Horsham, what did you do with
24 a Redip Form when you were done with it?

Page 18

1  A. Filed it away.
2  Q. Okay. Were you responsible for doing that --
3  for filing it?
4  A. Up until the time I left the position, yes.
5  Q. Okay. After you left the position, who was
6  responsible for it?
7  A. Leigh Ann Nickerson.
8  Q. Do you know how the records were organized,
9  the redip forms that you're talking about, the ones that
10 had been filled out in which you filed away?
11 A. When I did it, I only filed about every six
12 months and would staple them together at the end of the
13 month, date it what month it was and what year. And
14 they'd all go into a banker's box.
15 Q. You did that on a monthly basis?
16 A. Well, I'd staple them together on a monthly
17 basis, but I didn't file them into the box until about
18 six months.
19 Q. Okay. So at the end of the month you would
20 staple all the redip forms together. Then after six
21 months you'd put all of those for the six months in one
22 box.
23 A. Correct.
24 Q. Do you recall when the six-month periods would

Page 19

1  end? Would it be in September or July?
2  A. I usually filed -- would file all my paperwork
3  at the six-month mark of June.
4  Q. Okay.
5  A. However, when I left the position, I filed
6  everything away that I had done so that when the person
7  taking my place came in it was clean, basically.
8  Q. Okay. So at the end of August 2003, you would
9  have put all of the remaining Redip Forms into a banker's
10 box, the ones that would have covered the period of July
11 and August.
12 A. Correct.
13 Q. Okay. There would have been another banker
14 box that had the records from June to January --
15 A. Right.
16 Q. -- 2003.
17    Okay. How long did you use that system?
18 A. Since I started working there.
19 Q. Okay. So there would have been several boxes
20 of these things somewhere? I'm talking about the Redip
21 Forms.
22 A. For Redip Forms there wouldn't be several
23 boxes of them because the form wasn't created until our
24 accounting kind of dismantled at a branch level and moved

Page 20

1  to the corporate office. Prior to that there was like an
2  account that a collector could send a request to that
3  dismantled. When we got our CRS system in August of
4  2002, there was no way for a collector to submit a
5  request unless it was on paper form.
6  Q. Okay. Well, how long were the Redip Forms
7  used? When did you start using them?
8  A. It would have been after we got CRS. So
9  September 2002.
10 Q. Okay. From that point forward, there would be
11 Redip Forms that were kept on a monthly basis and put
12 into banker boxes every six months basically?
13 A. Yes, sir.
14 Q. Okay. Did you ever purge any of these records
15 after any given point in time? Did you throw any of them
16 away?
17 A. No, sir.
18 Q. Okay. Was Kathy Obenshain aware of the forms
19 that were used -- these Redip Forms?
20 A. I honestly don't know.
21 Q. Okay. Do you know who in NCO management --
22 anybody that was a manager or higher level -- who would
23 have known about the use of the forms?
24    MS. FITE: Object to form. But answer

Page 21

1  if you can.
2  A. Every manager in the building.
3  Q. Okay. Who would that have included?
4  A. It depends on the time frame.
5  Q. Okay. Would Mike Scher be one of the ones who
6  would have known?
7  A. Yes, sir.
8  Q. Okay. He would have known from at least
9  through the year 2003 about the use of the forms?
10 A. Yes, sir.
11 Q. Okay. Do you know whether Kathy Obenshain was
12 aware of the process that was used before February 2004
13 for verifying the checks with the bank?
14    MS. FITE: Object to form. But answer
15 if you can.
16 A. I'm not sure I understand.
17 Q. Okay. Let me try to rephrase it.
18    You testified that there was a process
19 by which banks were contacted to see if an NSF check
20 would be covered. Right?
21 A. Yes, sir.
22 Q. Do you know whether Kathy Obenshain was aware
23 of the process used in the Dover office to do that?
24 A. She would have been aware of the cash handling

JENNIFER BIRDSON

Page 22

1  policies which came from our corporate office that all
2  redips must be verified prior to being requested.
3      Q.  So she would have been aware of the policy for
4  verifying the --
5      A.  Yes.
6      Q.  -- checks?
7          Okay.  Likewise, would she have been
8  aware of the process that was used in the Dover office
9  for verifying with the debtor that monies were going to
10 be available to cover an NSF check?
11     A.  I can only assume.
12     Q.  Okay.  You don't have firsthand knowledge that
13 she knew?
14     A.  No, sir.
15     Q.  Do you know whether Kathy Obenshain was aware
16 that there were redip records that were maintained by the
17 Dover office?
18     A.  I wouldn't know if she knew that, sir.
19     Q.  Okay.  Do you know whether anybody ever
20 reviewed any of the redip records after you put them in
21 the banker boxes?
22     A.  Every six months when I filed, everything went
23 into a banker box.  It wasn't just Redip Forms.
24     Q.  Okay.

Page 23

1      A.  It would be all sorts of back up.  So all
2  boxes were labeled so that if any information had to be
3  pulled at a later date it would be easy to do so.  The
4  only other person that should have ever been in the boxes
5  would be Leigh Ann Nickerson.
6      Q.  Okay.  So the banker boxes would have been
7  forms other than Redip Forms in them?
8      A.  Yes, sir.
9      Q.  But the banker box would have a label
10 indicating what was in the box?
11     A.  Yes, sir.
12     Q.  Part of the label would say Redip Form?
13     A.  Yes, sir.
14     Q.  Were those very words used -- Redip Forms?
15     A.  Yes, sir.
16     Q.  Okay.  Do you know whether anybody ever asked
17 to see the Redip Forms after December of 2003, the ones
18 that you had prepared?
19     A.  I would have no way of knowing.
20     Q.  I said "prepared."  The ones that you had put
21 in the boxes.
22     A.  I would have no way of knowing.
23         MS. FITE:  Jerry, are you referring to
24 the attorneys?  Because if you're talking about us, we've

Page 24

1  had multiple conversations.  If you're talking about her
2  colleagues and her coworkers, it's probably a different
3  story.
4  BY MR. HOMER:
5      Q.  Okay.  I did intend to cover anybody, so --
6      A.  Oh.
7      Q.  -- if you want to clarify that.
8      A.  I'm sorry.  I thought you meant colleagues.
9  No.  The attorneys contacted us in regards to the Redip
10 Forms and some other paperwork, and the new collection
11 assistant at the time and I went through the -- Leigh Ann
12 Nickerson's closet basically that she had left behind.
13 And there wasn't much in there.
14     Q.  Okay.
15     A.  There was maybe a dozen boxes.  We went
16 through them several times -- even reboxed some of them.
17 We called our record storage to see if there was anything
18 there.  Nothing had been submitted to record storage
19 since late 2001.  So I can't honestly tell you if they
20 even left the old office and went to the new boxes -- new
21 office.  Sorry.
22     Q.  Okay.  When did you start looking for these
23 records with Leigh Ann Nickerson?
24     A.  Not with Leigh Ann Nickerson.  With the other

Page 25

1  collection admin who took her place --
2      Q.  Oh, okay.
3      A.  -- when she left.
4      Q.  I'm sorry.  Who was that?
5      A.  Brittany Marlow.
6      Q.  Is she related to Kim Marlow?
7      A.  Yes, she is.
8      Q.  How are they related?
9      A.  They're mother and daughter.
10     Q.  Okay.  Do you know when she was the admin
11 assistant?
12     A.  She's still employed.
13     Q.  Is that still her position, do you know?
14     A.  Technically, yes.
15     Q.  You say "technically."
16         Does that --
17     A.  She still handles many of the
18 responsibilities, but she only works part-time.
19     Q.  Okay.  When did she take over that position?
20     A.  August of 2004.
21     Q.  Okay.  Did Leigh Ann Nickerson have the
22 position until then?
23     A.  Yes, sir.
24     Q.  So Leigh Ann Nickerson had the position from

Page 26

1  September 1, 2003 to August 2004?
2     A.  Yes, sir.
3     Q.  Did you ever have any discussion with Leigh
4  Ann Nickerson about the Redip Forms -- the records?
5     A.  In what manner?
6     Q.  Do you ever discuss them at all with her?
7     A.  As it pertains to her position?
8     Q.  No. I'm sorry. I'll try to clarify.
9         Did you ever discuss with Leigh Ann
10 Nickerson the Redip Forms that you had maintained on
11 behalf of NCO or any Redip Forms that she had maintained
12 on behalf of NCO?
13        MS. FITE: Let me interject here and say
14 that, although this would normally be attorney-client
15 privilege, I'm going to waive the privilege because we
16 want Mr. Homer to know what we had done in order to try
17 to locate these documents.
18    A.  I just want to --
19        MR. HOMER: Well, just to clarify that,
20 I don't think there's any attorney-client privilege for a
21 conversation she had with Leigh Ann Nickerson.
22        THE WITNESS: It was a conference call.
23        MS. FITE: I was a part of the
24 conversation.

Page 27

1         MR. HOMER: Okay.
2         THE WITNESS: It was a -- she had a
3  phone call with Leigh Ann Nickerson, and I was
4  conferenced in. So she was speaking to us both. And
5  Leigh Ann's response was basically she didn't know.
6  BY MR. HOMER:
7     Q.  She didn't know what?
8     A.  Where they were.
9     Q.  Okay. Do you have any knowledge at all about
10 whether she maintained or continued to compile the Redip
11 Forms after you moved on -- after September 1, 2003?
12    A.  I don't know.
13    Q.  Okay. I think I asked you before at what
14 point in time you were asked about the records, and I
15 think you indicated initially nobody did. But then you
16 said the attorneys did. When did the attorneys first
17 talk to you about --
18    A.  In January of this year.
19    Q.  This year.
20        Did anybody between December '03 and
21 January of this year ever talk to you about any of the
22 Redip Forms?
23    A.  Just the attorneys.
24    Q.  When did they talk to you about it?

Page 28

1     A.  January of this year.
2     Q.  Okay. I meant anytime before January of '06.
3     A.  No. No, sir.
4     Q.  Okay. So the first time anybody asked you
5  about them after September 1, 2003 was January '06 when
6  the attorneys asked you about them?
7     A.  Correct.
8     Q.  Okay. Do you have any knowledge about what
9  happened to the Redip Forms after September 1, 2003?
10    A.  No, sir.
11    Q.  Okay. Is that true with the records you kept
12 and the ones that Nickerson kept as well, if she kept
13 any?
14    A.  Correct.
15    Q.  Okay. Did anyone in NCO's management ever
16 give you any directive regarding the preservation of the
17 redip records?
18        MS. FITE: Object to form.
19    A.  I'm not sure I understand the question.
20    Q.  In other words, did anybody in management,
21 including, for example, Mike Scher, ever give you any
22 directive about what should be done with the redip
23 records?
24        MS. FITE: Same objection. Answer if

Page 29

1  you can.
2     A.  No, sir.
3     Q.  Okay. How did you know to put them in the
4  closet? How did you know to put them in a banker box and
5  put them in storage?
6     A.  When I was in accounting, that's how we filed
7  everything.
8     Q.  And --
9     A.  I just continued the same procedures.
10    Q.  Okay. Nobody really told you to do that? You
11 did it because that's what you did with other records?
12    A.  Correct.
13    Q.  Okay. Do you know whether Leigh Ann Nickerson
14 was ever given any directive about what should be done
15 about the redip records?
16    A.  I know I instructed her to basically keep
17 everything.
18    Q.  Okay. That was during the transition period
19 when you were leaving and she was coming in?
20    A.  Correct.
21    Q.  You told her that orally?
22    A.  Yes --
23    Q.  You just said it to her?
24

Page 30

1   A. -- sir.
2   Q. Okay. Was that as part of the explanation of
3 what your job duties were basically?
4   A. Yes, sir.
5   Q. Okay. Did she have any questions about that
6 or did she -- did you have any understanding that she
7 knew what to do with the records, the redip records?
8       MS. FITE: Object to form. But go ahead
9 and answer.
10  A. I instructed her that in all matters of
11 documents all documents should be kept.
12  Q. Okay.
13  A. No matter what they are.
14  Q. Okay. Do you have any reason to think she
15 didn't do that other than you couldn't find the redip
16 records when you looked in the closet or wherever --
17  A. Yes, sir.
18  Q. -- you looked for them?
19      What is your understanding?
20  A. Because when she left, our company -- things
21 that should have been filed were thrown carelessly around
22 into drawers. And it took the new admin weeks to sort
23 through stuff.
24  Q. Okay.

Page 31

1   A. So...
2   Q. That would have been around September of 2004.
3 Correct?
4   A. Correct.
5   Q. Did you help at that point in trying to
6 straighten out the records?
7   A. Actually, no. It upset me too much. I left
8 work.
9   Q. Okay. I'm trying to find the name of the
10 individual that took over for Nickerson. I know it's
11 Marlow, but I forget her first name. Brittany. Brittany
12 Marlow. Did she have any help at all -- Brittany
13 Marlow -- in trying to straighten out the records, do you
14 know?
15  A. Not really, no.
16  Q. You don't know or she didn't?
17  A. No one helped her.
18  Q. No one helped her.
19      Okay. Do you know whether anybody gave
20 her any directives about what to do with the records?
21  A. I did. I told her that when she took over the
22 position that she basically should keep everything.
23  Q. No. I'm sorry. That was confusing.
24      Do you know whether anybody told

Page 32

1 Kimberly Marlow when she assumed the position what she
2 should do with respect to the records?
3       MS. FITE: You mean Brittany Marlow.
4       MR. HOMER: I'm sorry. Did I say --
5       THE WITNESS: You said Kimberly.
6       MR. HOMER: I'm sorry. Brittany Marlow.
7       THE WITNESS: That she should keep all
8 documents.
9       MR. HOMER: Okay.
10      THE WITNESS: But anything that she
11 found in like Leigh Ann's office, you know, should be
12 filed into the closets.
13 BY MR. HOMER:
14  Q. Okay. How do you know that she was given that
15 directive?
16  A. Because I gave it to her.
17  Q. Again, we're talking about --
18  A. Brittany Marlow.
19  Q. Brittany Marlow. Okay.
20  A. Yes.
21  Q. Is Brittany Marlow the mother or the daughter
22 of --
23  A. She's the daughter.
24  Q. She's the daughter. Okay.

Page 33

1   A. But she worked under me, so...
2   Q. She worked for you?
3   A. Mm-hmm.
4   Q. During what time period did she work for you?
5   A. From the time she started in May of 2004 to
6 current.
7   Q. Okay. So she has two different job functions
8 now. Is that right? Is she still your assistant?
9   A. Well, she's not my assistant.
10  Q. All right.
11  A. She works under me.
12  Q. All right.
13  A. She's part of our support staff.
14  Q. Okay. But part of her job still is to be the
15 admin assistant to the general collections manager?
16  A. Correct.
17  Q. Okay. Do you know when, if ever, she began to
18 keep records about redipping checks?
19      MS. FITE: Object to form. You can
20 answer, if you understand.
21  A. We don't use the form anymore.
22  Q. Okay. When was the form stopped? When did
23 you stop using the form?
24  A. I don't honestly know. I don't believe

Exhibit B

Case 1:05-cv-00225-KAJ   Document 80-2   Filed 04/17/2006   Page 9 of 19

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF DELAWARE
 3
    VALERIE HUE,                    )
 4                                  )
           Plaintiff,               )
 5                                  )
    v.                              )
 6                                  )    Civil Action No.
    NCO FINANCIAL SYSTEMS, INC.,    )    05-225-KAJ
 7  a Delaware corporation,         )
    trading as NCO FINANCIAL        )
 8  COMMERCIAL SERVICES,            )
                                    )
 9         Defendant.               )

10
            Deposition of KENNETH ALAN ROSE taken
11  pursuant to notice at the law offices of Parkowski,
    Guerke & Swayze, P.A., 116 West Water Street, Dover,
12  Delaware, beginning at 11:20 a.m. on Wednesday, March 8,
    2006, before Robert Wayne Wilcox, Jr., Registered
13  Professional Reporter and Notary Public.

14  APPEARANCES:

15         JEREMY W. HOMER, ESQ.
           PARKOWSKI, GUERKE & SWAYZE, P.A.
16            116 West Water Street
              Dover, Delaware  19903
17            for the Plaintiff,

18         ELIZABETH K. FITE, ESQ.
           SESSIONS, FISHMAN & NATHAN, L.L.P.
19            15316 North Florida Ave - Suite 100
              Tampa, Florida  33613
20            for the Defendant.

21

22                   CORBETT & WILCOX
              Registered Professional Reporters
23       1400 French Street      Wilmington, DE 19801
                    (302) 571-0510
24              www.corbettreporting.com
```

KENNETH ROSE

Page 10

1  But what I'm saying is, if you had a
2  group of NSF checks and you redeposited all of them, some
3  of them are going to go through normally. Correct?
4      MS. FITE: Object to form. You can
5  answer.
6      A. I — the idea was to get money that cleared
7  the bank.
8      Q. What is your understanding of what the policy
9  for resubmitting checks was in the year 2003? I'm
10 talking about NSF checks.
11     A. For us to resubmit a check, we had to qualify
12 that the funds would be good in one of two ways or both
13 ways, one with the bank itself, if we could. Some banks
14 don't let us do that. Secondly would be with the debtor
15 themselves. And in doing that, qualify where those funds
16 are coming from in order to do so, that being redeposit
17 the check.
18     Q. I'm not sure I follow the last part of what
19 you just said there. You say you verify with the debtor
20 the source of the funds?
21     A. That's correct.
22     Q. What do you mean by that?
23     A. We were dealing with businesses. Businesses
24 relied on income from sales, services, whatever it was

Page 11

1  that drove that business. They would expect funds at
2  certain times. So in qualifying them to redeposit that
3  check, we would ask when they expected that money. And
4  if that money fell into a time frame that allowed us to
5  redeposit the check, then I would present that to the
6  manager for their approval.
7      Q. Well, were there cases where you would just
8  call the debtor and say, "Is this check going to be good
9  or not"? Would that satisfy the requirement to do the
10 debtor verification?
11     A. No.
12     Q. That wouldn't do it?
13     A. Not for me.
14     Q. When you say not for you, what do you mean by
15 that?
16     A. Again, being income-driven, okay, if the check
17 didn't clear the bank, there was no benefit to me.
18     Q. In addition to soliciting a statement from a
19 debtor that the funds were good, you would want to know
20 some information that supports his statement that the
21 funds would be good?
22     A. What do you mean solicit?
23     Q. When you call up the debtor and ask him, "Is
24 this check going to be good? Can we resubmit the check?"

Page 12

1  it wasn't enough for him to say, "Yes, it is. You can
2  resubmit it." You would want to know why it was a good
3  check.
4      A. If your question is if I'm qualifying his
5  statement, the answer is yes.
6      Q. I don't understand why you qualified your
7  answer.
8      A. Because that's what we did. We had to qualify
9  what the debtor was saying was in fact what was going to
10 happen, okay, given the circumstance.
11     Q. Was that your personal method of dealing with
12 it or was that NCO's policy that you had to go beyond
13 just getting a debtor's statement? You actually had to
14 find out what the basis of the statement was.
15     A. With regard to that, again, I'm going to go
16 back to being income-driven. You know, policies and
17 procedures, yes, were followed. Would I go a little step
18 further to ensure that I can calculate my commission
19 check for the next month? The answer is yes.
20     Q. So it would have been an extra step to take to
21 ask the debtor why the check would be good?
22     A. It would be part of procedure. But for me,
23 being in my position and being in this business as long
24 as I have, you know, it was just, you know, a natural

Page 13

1  course of events in dealing with an insufficient funds
2  check.
3      Q. Well, was it NCO's policy for processing the
4  resubmission of NSF checks that you would have to have
5  the debtor explain why the check would be good?
6      A. Part of training was always to qualify the
7  source of funds.
8      Q. So the answer is yes to my question?
9      A. That's correct.
10     Q. Okay. Was this policy that you've described
11 for redepositing the checks in writing?
12     A. I really don't know. There were many
13 policies. A lot of policies were read to us in morning
14 meetings. We may have gotten a memo on them.
15     Q. You don't remember if it's in writing or not?
16     A. Again, being ingrained in my brain on how to
17 process that type of a check, you know, the policy,
18 whatever it was, was followed in a way that the check
19 would clear the bank with some certainty on redeposit.
20     Q. Okay. How did you learn about this policy
21 that you described to me about resubmitting NSF checks?
22     A. It would be through training.
23     Q. NCO trained you on the policy?
24     A. The managers would train us on policy. If

Page 14

1  there were changes in policies, they would notify us of
2  changes in policy.
3     Q.  Okay. Do you recall who trained you on this
4  specific policy that we've just gone through?
5     A.  I've had many managers. They all reiterate
6  the same thing when it comes to an NSF check.
7     Q.  Okay. You don't have any recollection that at
8  one time there was a policy that you automatically
9  resubmitted the checks without doing verification?
10    A.  No, no. I don't recall just doing a
11 redeposit.
12    Q.  Okay. Your training about this policy that
13 you say NCO followed for the resubmission of checks,
14 would that have taken place before February 2003?
15    A.  The training with regard to how an NSF check
16 was handled?
17    Q.  Yes.
18    A.  Would it have taken place before 2003?
19    Q.  Yes.
20    A.  Yes.
21    Q.  So your understanding of the policy for
22 resubmitting checks at some time was derived at some
23 point before February of 2003?
24    A.  In my earlier statement, I indicated that upon

Page 15

1  hire the training -- that was part of our training as a
2  small balance collector.
3     Q.  Okay. The policy that you've described to me
4  for resubmitting checks which requires bank verification,
5  if possible, or debtor verification, that's the policy
6  that's been in place ever since you were trained back
7  when you first started with NCO?
8     A.  That was the policy that I would use for any
9  insufficient funds check.
10    Q.  Was that the policy that was in place from the
11 time you started at NCO to the present?
12    A.  Yes.
13    Q.  Did NCO use any forms for the collectors to
14 fill out during the process they used for either
15 verifying the checks or contacting the debtors?
16    A.  I'm not sure what you're saying.
17    Q.  Okay. Let me back up a bit.
18         Let's say that one of your accounts you
19 get an NSF check back on.
20    A.  Mm-hmm.
21    Q.  What do you do next with that check? What
22 happens next with it?
23    A.  When I'm notified of it?
24    Q.  Yes.

Page 16

1     A.  The first thing I do is check the bank.
2     Q.  Okay. You personally call the bank?
3     A.  Yes.
4     Q.  And ask if there are funds available to cover
5  the check?
6     A.  Yes.
7     Q.  Okay. Suppose you can't get up with the bank
8  or they won't tell you. Suppose they won't tell you
9  whether the account is good or not. What happens next?
10    A.  Then I would talk to the debtor.
11    Q.  If the bank said that there were funds to
12 cover the check, would you still call the debtor, or
13 would that be the end of it?
14    A.  In most cases I'd still call the debtor.
15    Q.  You would still call the debtor even though
16 the bank said that there are funds to cover the check?
17    A.  Right.
18    Q.  Okay. Then you would call the debtor. What
19 would you do when you talked to the debtor? Would you
20 make notes? Would you fill out forms? How did you keep
21 track of your conversations with a debtor?
22    A.  Conversations with NCO are all recorded, and
23 those recordings -- I kept computer notes which
24 corresponded to the recording. If I called a debtor and

Page 17

1  left a message, it would be on a recording saying that,
2  and my notes would reflect at that date and time that I
3  left a message.
4     Q.  Okay. Other than your computer notes, did you
5  fill out any paperwork when you contacted the debtor when
6  you tried to verify whether the funds were available or
7  not?
8     A.  I don't understand what you mean.
9         Did I fill out a form saying that I
10 talked to the debtor?
11    Q.  Yes.
12    A.  No need. The computer and the recording were
13 documenting that particular --
14    Q.  Okay.
15    A.  -- call or message.
16    Q.  You worked in the Dover office. Did you not?
17    A.  Yes.
18    Q.  You worked in the Dover office in the year
19 2003?
20    A.  Yes.
21    Q.  Do you recall whether there were forms that
22 other collectors used to document that they had contacted
23 the debtor regarding an NSF check?
24    A.  I'm not sure what you mean.

Page 18

1  Do you know a name for a form you're
2  talking about?
3  Q. I'm give you some names -- check verification
4  form, a redip form.
5  A. Those are different things. Now you're asking
6  about a procedure in order to do something. That's a
7  little bit different.
8  Q. Okay.
9  A. But to actually talk to a debtor or a bank
10 about the check itself, the computer notes and the
11 recording were sufficient.
12 Q. Okay. Well, tell me, are you familiar with a
13 form that was called a redipping form --
14 A. Yes.
15 Q. -- or something like that?
16 A. Yes. That was a necessary form. There you
17 had to qualify that the funds were there, hopefully, with
18 both the debtor and the bank, and then you would give it
19 to your manager to sign off on.
20 Q. What was the title of the form?
21 A. Redip form.
22 Q. Was it ever called anything but redip form, do
23 you remember?
24 A. No.

Page 19

1  Q. Okay. Who prepared the form? Who originally
2  came up with the form, do you know?
3          MS. FITE: Object to form. You can
4  answer.
5  A. The form -- we were told at one point that if
6  we were to redip a check we would use this form.
7  Q. Okay. Who told you that?
8  A. Our manager.
9  Q. Would that be Valerie Hue?
10 A. I'm not sure when that form came to be.
11 Q. Okay. But it might have been Valerie Hue or
12 maybe a predecessor of Valerie Hue?
13 A. Yes.
14 Q. Okay. Did you use the redip forms?
15 A. I couldn't redeposit the check without a redip
16 form.
17 Q. Okay. So --
18 A. Let me rephrase it. I couldn't have the check
19 redeposited --
20 Q. Okay.
21 A. -- without the redip form.
22 Q. Let's continue on with what you were talking
23 about before. You were telling me that when you
24 contacted the debtor you would make notes in the computer

Page 20

1  about your conversation. Assuming the debtor told you
2  that funds were going to be available, when did you fill
3  out the redip form?
4  A. At the time of the qualification, if I also
5  got a bank verification. One or the other. I would fill
6  it out at that point.
7  Q. I'm not sure I follow.
8         You fill it out --
9  A. Once I could qualify that the funds would be
10 good if the check were to be redeposited.
11 Q. Then you would fill out the form?
12 A. Yes.
13 Q. So, normally, that would be after you talked
14 to the debtor if you couldn't get bank verification?
15 A. Yes.
16 Q. So you hang up the phone with a debtor and you
17 fill out the form?
18 A. Yes.
19 Q. Okay. Then what do you do with the form?
20 A. Gave it to my manager.
21 Q. When do you do that?
22 A. After I filled it out.
23 Q. Okay. Same day?
24 A. Yes.

Page 21

1  Q. Okay.
2  A. It would -- depending on what was going on, it
3  would go in their bin.
4  Q. Okay.
5  A. Every manager had a bin outside their office.
6  We put the form in the bin.
7  Q. Okay. Let's say that you've tried to get bank
8  verification and the bank wouldn't tell you whether the
9  funds were good or not. Does that happen very often, by
10 the way? Will banks verify whether funds are available
11 or not normally?
12 A. No. Now they don't. The Freedom of
13 Information Act has really limited our ability to verify
14 funds with a bank.
15 Q. How long has that been the case?
16 A. I think that started in 2005 -- the Freedom of
17 Information Act.
18 Q. I'm not asking when the Act started. I'm
19 asking when you did start having problems getting bank
20 verification.
21 A. When the Act was enforced.
22 Q. Do you know when that was?
23 A. Not exactly.
24 Q. Do you recall, independent of the Act, when

Page 22

1  you started having problems having banks verify funds?
2      A.  Certain banks just didn't release the funds.
3      Q.  At any time?
4      A.  At any time.
5      Q.  Okay.
6      A.  With some exceptions. If I had the debtor on
7  the phone with me, the debtor would say, fine, tell
8  Mr. Rose if I have the money or not.
9      Q.  Okay. Were you always able to contact the
10 debtor? Let's assume the bank won't verify the funds and
11 you're calling the debtor. Were you always able to
12 contact the debtor about the NSF check?
13     A.  Not always.
14     Q.  Okay. What would you do if you couldn't
15 contact the debtor?
16     A.  Try again the next day.
17     Q.  Okay. Let's assume you can't reach him again
18 that month. What do you do?
19     A.  Keep going until I can. Try to send a letter.
20 Try to get some response.
21     Q.  Okay. Do you recall meeting at the end
22 of the month or towards the end of the month with the
23 collections manager to review the NSF checks?
24     A.  Yes.

Page 23

1      Q.  What do you recall about that process?
2      A.  Well, I don't believe it was just the NSF
3  checks that they would be talking about.
4      Q.  Okay. What would they be talking about?
5      A.  Where I would finish, where would we finish as
6  a group, where the branch would finish.
7      Q.  Okay. Well, did you have one-on-one meetings
8  with the manager towards the end of the month about what
9  NSF checks to put back through the system?
10     A.  I don't recall meeting for that exact reason.
11 I recall meeting about checks or actually more about
12 where we would finish. But to ask me directly about a
13 check to be redeposited? If I went through the
14 procedures correctly, I don't know that that was an
15 actual question to ask.
16     Q.  You indicated that you reviewed Kim Marlow's
17 statement. Correct?
18     A.  Mm-hmm.
19     Q.  Doesn't that --
20     A.  I didn't read it at length.
21     Q.  Okay.
22     A.  I just saw it. It was on the table. You
23 asked me if I saw documents.
24     Q.  Okay. In that statement she describes a

Page 24

1  process where towards the end of the month the managers
2  met with the collectors one on one and they went through
3  the NSF checks. Do you recall that happening?
4      A.  Specifically NSF checks? Not specifically NSF
5  checks. It would be part of a broader meeting asking
6  what funds we expected.
7      Q.  But you don't recall any discussions with
8  managers towards the end of the month that pertain to the
9  resubmission of NSF checks?
10     A.  I do recall being asked if I could make up a
11 check.
12     Q.  That's my --
13     A.  That's exactly what you're asking me. So the
14 answer would be yes.
15     Q.  Whether you can make up a check?
16     A.  That's correct.
17     Q.  Okay.
18     A.  Not that it's going to be redeposited. If I
19 can make up an NSF before the end of the month.
20     Q.  What do you mean by "make up an NSF"?
21     A.  Well, purify the funds so it could be
22 redeposited.
23     Q.  Okay. If you could explain the distinction
24 between making up NSF and going through the check to see

Page 25

1  if there's been verification of the check or not.
2      A.  That's the same thing.
3      Q.  It is the same thing?
4      A.  Mm-hmm.
5      Q.  Okay. So you did meet with managers --
6      A.  Yes.
7      Q.  -- towards the end of the month to review NSF
8  checks to see whether or not they could resubmit it
9  because there was debtor verification?
10     A.  I'm not understanding your question.
11     Q.  Well, before you were trying to tell me that
12 there wasn't a discussion about the NSF checks at the end
13 of the month, and I think you just said now that there
14 was -- that you met with the managers and you went over
15 to see if you could make up NSFs.
16     A.  I was asked -- if I was asked a direct
17 question on a specific file on a check that bounced if I
18 can get the check made up by the end of the month, then I
19 answered your question correctly, which was yes.
20     Q.  Do you recall that the managers would have a
21 list, a spreadsheet, with the NSF checks listed?
22     A.  I guess they drew the information from
23 somewhere. So I'm sure that existed.
24     Q.  Okay.

Page 42

1  A. I wasn't really sure. Again, I'm taken a
2  little off guard when I'm taken out of my office into the
3  general manager's office to talk to Ted Fox.
4  Q. Did you ever tell Ted Fox or Kathy Obenshain
5  or anyone else that Valerie Hue ever directed you to
6  violate a policy of NCO?
7  A. No.
8  Q. Has Valerie Hue ever directed you to violate a
9  policy of NCO?
10  A. No.
11  Q. That would include the policy that deals with
12  check handling policies, I assume.
13  A. Yes.
14  Q. Okay. Could you explain the term
15  "sandbagging" to me as it relates to collection practice?
16  A. Yes, I could.
17  Q. Okay. Would you?
18  A. Oh, okay. I guess it's a term used for
19  carrying money over to the next month that you could post
20  this month.
21  Q. By that do you mean that a collector would not
22  want to submit a check until the following month even
23  though he knows it would clear during the existing month?
24  A. That's the definition of the term.

Page 43

1  Q. Why would they want to do that?
2  A. I really don't know. But I wouldn't do that.
3  But I guess to inflate their income for the next month.
4  Q. Okay. Have you ever been disciplined by NCO?
5  A. Yes.
6  Q. Were you ever disciplined by Valerie Hue?
7  A. I'm not sure. We would get verbal warnings or
8  some kind of warnings, disciplinary warnings.
9       THE WITNESS: What were they? JDS's?
10  What were they called? Yeah. Yes.
11  BY MR. HOMER:
12  Q. Did Valerie Hue ever talk to you about sexual
13  harassment?
14       MS. FITE: Object to form. Answer if
15  you can.
16  A. I'm not sure what you mean.
17  Q. In the course of being supervised by Valerie
18  Hue, was there ever a time where she came to you and
19  discussed sexual harassment?
20  A. Yes.
21  Q. Could you relay what the substance of that
22  discussion was?
23  A. Sure. There was an allegation by a secretary
24  that I said something.

Page 44

1  Q. Do you recall what the allegation was?
2  A. That I had said something.
3  Q. Do you recall what it was that you had
4  allegedly said?
5  A. I know what I said. As far as the allegation,
6  I know what I said. As far as what was alleged,
7  something that I didn't say.
8  Q. Did you get disciplined for that, do you know?
9  A. Yes, I did.
10  Q. What kind of discipline did you get for it?
11  A. I got written up with a -- I'm not sure if it
12  was like a final warning. One step down from being
13  terminated.
14  Q. Okay. When was that?
15  A. In 2003.
16  Q. Do you remember what month it was in?
17  A. No.
18  Q. Have you ever been convicted of a crime?
19  A. No.
20  Q. How are you compensated by NCO? Do you earn
21  salary or commission or a combination?
22  A. I get a draw. And once I fill a certain fee
23  bucket or dollars collected, I start making commissions
24  at 15 percent.

Page 45

1  Q. Okay. Do you know what your income was from
2  NCO in the year 2005?
3       MS. FITE: Object to form. Irrelevant.
4  Answer if you can remember.
5  A. In what? Last year, you're saying?
6  Q. Yes.
7  A. Mm-hmm.
8  Q. Approximately what was the amount?
9  A. A little over $77,000.
10  Q. Okay. In 2004 do you remember?
11  A. $55,000.
12  Q. How about 2003?
13  A. $96,000.
14       MR. HOMER: Okay. I don't have any
15  other questions.
16       MS. FITE: I'm going to step out and
17  talk with Dina. Off the record for a minute.
18       (A recess was taken.)
19       - - - - -
20       KENNETH ALAN ROSE, resumes
21  BY MS. FITE:
22  Q. You know me. I'm Elizabeth Fite. I'm an
23  attorney for NCO in this matter. I'm just going to ask
24  you two questions.

Page 46

1    A.  Sure. Yes, I know you.
2    Q.  We met yesterday, as you said, for a couple of
3  hours.
4        You were talking with Mr. Homer about
5  the redip forms. Is everything that would be written by
6  you in the redip forms things that would also be put in
7  the account notes?
8    A.  Yes.
9    Q.  So if we were able to pull the account notes
10  on that particular account, we should see that you
11  achieved debtor authorization or bank verification?
12    A.  Yes.
13    Q.  If I pulled the account notes and there was
14  nothing in there about getting debtor authorization or
15  bank verification, what would that tell you?
16    A.  That the funds weren't qualified for
17  redipping.
18    Q.  If a check was redeposited that had previously
19  come back NSF, if it was redeposited and there's nothing
20  in the account notes showing that debtor authorization
21  was achieved or that the bank had verified the funds, to
22  your knowledge, would that be a violation of NCO's check
23  handling policy?
24    A.  Yes.

Page 47

1    Q.  Are you aware of whether Valerie Hue ever
2  asked anyone in your office to violate NCO's check
3  handling policy?
4    A.  There were conversations about that between
5  large balance collectors.
6    Q.  Who would you talk with?
7    A.  We talk to each other, all of us. Not all at
8  the same time.
9    Q.  Did you ever have another large balance
10  collector in your office tell you that Ms. Hue had
11  ordered them to redeposit a check without qualifying the
12  funds?
13        MR. HOMER:  Objection to the form of the
14  question.
15    A.  What I did hear was that a check was deposited
16  that shouldn't have been.
17    Q.  Who told you that?
18        MR. HOMER:  Objection. Go ahead. You
19  can answer.
20    A.  I heard tell, I think, Dave McQuisten on one
21  occasion of a situation where a check that went in that
22  shouldn't have.
23    Q.  Was he telling you this because he hadn't
24  wanted it to go in but Ms. Hue put it on anyway?

Page 48

1        MR. HOMER:  I'm going to have a standing
2  objection to all these hearsay questions.
3        MS. FITE:  Noted.
4  BY MS. FITE:
5    Q.  Go ahead and answer.
6    A.  The answer would come more from seeing the
7  fees the following day where fees would jump by a number
8  of dollars and wouldn't make sense. And, you know, I'm
9  inquisitive. I would ask.
10    Q.  So you had asked Mr. McQuisten. He wasn't
11  complaining to you about it. You had asked him, you
12  know, how did your fees jump?
13    A.  Not exactly like that. I mean, being a large
14  balance collector, we were all in competition with each
15  other. And, you know, when someone is doing better than
16  you or as good as you and they weren't the day before,
17  you would ask a question: Where did the fees come from?
18    Q.  At some point did you find out that other
19  large balance collectors in your office were violating
20  the check handling policy by submitting checks for
21  redeposit where was no qualification of funds?
22    A.  I have heard tell of that. I know that checks
23  did go in. I -- you know, I don't look at their files.
24  I mean, basically, you do what you do, and what they do

Page 49

1  is what they do. But, again, checks did go on and fee
2  would appear.
3    Q.  Then when would the money go off the next
4  month if the check bounced for a second time?
5    A.  For a second time? Usually in the first ten
6  days.
7    Q.  Okay. You said that you always made sure that
8  you had the debtor authorization and verification from
9  the bank so you weren't getting NSFs like that. Was it
10  your understanding --
11        MR. HOMER:  Objection. Finish the
12  question.
13  BY MS. FITE:
14    Q.  Was it your understanding from your
15  discussions with the other large balance collectors that
16  they were allowing things to go on or pushing things to
17  go on that would then bounce because they hadn't gotten
18  debtor authorization or bank verification?
19        MR. HOMER:  Objection to that question.
20  The form of the question is improper.
21  BY MS. FITE:
22    Q.  Go ahead and try to answer it if you can. I
23  know it was a little confusing.
24    A.  Yeah. But I understand what you're saying.

13 (Pages 46 to 49)

Exhibit C

AFFIDAVIT OF CHERIE A. SUGG
PAGE 1

STATE OF NEW YORK
COUNTY OF ERIE

### AFFIDAVIT OF CHERIE A. SUGG

BEFORE me the undersigned authority, personally came and appeared Cherie A. Sugg, who after being duly sworn did state:

1. I am the Senior Vice-President of Human Resources for NCO Financial Systems, Inc. During January 2004, I was the Vice President of Human Resources.
2. As the VP of HR for NCO, I oversaw various HR functions, including the direction of the employee relations responsibility.
3. NCO maintains a work environment that prohibits discrimination on the basis of all protected classifications, including race, sex and retaliation.
4. NCO's policy is published in the handbook and posted in all offices. NCO employees may complain, or report any discrimination issue to their supervisor, any member of management, to corporate HR via an 800-call-in number, or anonymously through an 800-call-in line. Reports are accepted with a guarantee that there will be no retaliation.
5. I have checked NCO's HR records and at no time did Ms. Hue ever complain regarding any discrimination issues in the Dover office. I have learned that in October 2001, she submitted a statement regarding Bill Savage's improper conduct.
6. At my direction, Ms. Carol Murray, a senior employee relations specialist assisted in the investigation of Ms. Valerie Hue, the former General Collections Manager for the Commercial Division Dover, Delaware office.
7. Along with Ms. Murray, I provided support to the then Commercial Division Vice President of Collections, Ms. Kathy Obenshain regarding the Hue investigation. Ms. Obenshain was Ms. Hue's direct supervisor.
8. Based upon information that was learned during this investigation, Ms. Hue was found to have instructed collections personnel, administrative personnel and 2 managers to violate Commercial Division check handling policies.
9. Ms. Obenshain and the newly appointed Commercial Division Senior Vice President, Mr. Ted Fox, secured statements confirming Ms. Hue's improper conduct.
10. Ms. Murray and I ensured that a full, fair and impartial investigation was completed. My staff also assisted with answering the later filed discrimination charge filed by Ms. Hue.
11. We never uncovered any type of discrimination or retaliation regarding Ms. Hue's discharge. To the contrary, all Dover employees reported the same type of wrongdoing by Ms. Hue and all similarly situated managers

AFFIDAVIT OF CHERIE A. SUGG
PAGE 2

to Ms. Hue in other Commercial Division offices confirmed that the check handling procedures were uniformly applied.

12. I participated in the telephone call with Ms. Hue, confirming that she was terminated. During this call, Ms. Hue stated that Ms. Obenshain was instructing her to violate NCO's check handling policies and that Ms. Hue knew she was wrong when she did violate the policies.

_____
Cherie A. Sugg

SWORN TO AND SUBSCRIBED
BEFORE ME, THIS 3rd DAY OF
APRIL, 2006.

_____
NOTARY- MY NOTARY IS UNTIL:

TRACEY A. WILD
Notary Public, State of New York
Qualified in Erie County
My Commission Expires 1/22/07