Exhibit D

Hue
Valerie D. Hue

v.

C.A. # 05-225-KAJ

NCO Financial Systems, Inc.
January 4, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE D. HUE,                    )
                                   )
            Plaintiff,             )
                                   )   Civil Action
v.                                 )   No. 05-225-KAJ
                                   )
NCO FINANCIAL SYSTEMS, INC.,       )
a Delaware corporation,            )
trading as NCO FINANCIAL           )
COMMERCIAL SERVICES,               )
            Defendant.             )

        Deposition of VALERIE D. HUE taken pursuant to
notice at the law offices of Parkowski, Guerke &
Swayze, 116 West Water Street, Dover, Delaware,
beginning at 9:41 a.m. on Wednesday,
January 4, 2006, via telephone before
Lucinda M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

        JEREMY W. HOMER, ESQ.
        PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware  19901
          for the Plaintiff,

        ELIZABETH FITE, ESQ.
        THE LAW OFFICE OF ELIZABETH FITE
          15316 North Florida Avenue, Suite 100
          Tampa, Florida  33613
            - and -
        DAVID B. ISRAEL, ESQ.
          3850 N. Causeway Boulevard, Suite 1240
          Metairie, LA  70002
          for the Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware  19801
(302) 655-0477

Hue                                                    NCO Financial Systems, Inc.
Valerie D. Hue                    v.                              January 4, 2006
                              C.A. # 05-225-KAJ

Page 38

1   that now. No.
2   Q.   Does your husband work?
3   A.   Yes.
4   Q.   Is he part of the same tax return?
5   A.   Yes.
6   Q.   What does your husband do?
7   A.   He is a therapist, mental health therapist.
8   Q.   After leaving NCO, did you apply to work
9   anywhere else?
10  A.   Yes.
11  Q.   Where was that?
12  A.   I applied with a company in Pennsylvania. I do
13  not recall the name.
14  Q.   What kind of company was it?
15  A.   It was a placement firm that deals with
16  accounting placements.
17  Q.   Did they offer you a job?
18  A.   No.
19  Q.   Aside from the accounting placement firm, any
20  other applications?
21  A.   Yes.
22  Q.   Do you remember where?
23  A.   No.
24  Q.   Do you remember how many?

Page 39

1   A.   Perhaps nine or 10.
2   Q.   Were you given any offers from those, perhaps,
3   nine or 10 applications?
4   A.   No.
5   Q.   Were any of them collection firms?
6   A.   I believe so.
7   Q.   Do you remember which ones?
8   A.   No.
9   Q.   Aside from the charge of discrimination in this
10  lawsuit and aside from your divorce, have you ever
11  been involved in any other litigation?
12  A.   No.
13  Q.   Ever filed a charge of discrimination anywhere
14  else?
15  A.   No.
16  Q.   Ever been sued by anybody?
17  A.   No.
18  Q.   Where did you grow up?
19  A.   In a small place called Harbeson, Delaware.
20  Q.   Where did you go to -- did you go to high
21  school?
22  A.   Yes.
23  Q.   Did you graduate?
24  A.   Yes.

Page 40

1   Q.   When was that?
2   A.   Eighty -- I am not really sure.
3   Q.   Well, did you graduate from a high school or
4   take a G.E.D.?
5   A.   High school.
6   Q.   Do you remember the name of your high school?
7   A.   Cape Henlopen High School, Lewes, Delaware.
8   Q.   Can you spell that?
9   A.   C-A-P-E H-E-N-L-O-P-E-N High School.
10  Q.   What town was that?
11  A.   Lewes, L-E-W-E-S.
12  Q.   Delaware?
13  A.   Yes.
14  Q.   Have you gone to college?
15  A.   I went to a couple of colleges.
16  Q.   Where was that?
17  A.   In Virginia, I started at Liberty University
18  and Del Tech, in Delaware.
19  Q.   Did you finish?
20  A.   No.
21  Q.   Do you have any degrees after high school?
22  A.   No.
23  Q.   What was your first professional job?
24  A.   My first professional job was a legal

Page 41

1   investigator.
2   Q.   When was that?
3   A.   Eighty something.
4   Q.   I have records that suggest you started at the
5   NCO predecessor Milliken & Michaels in March of 1994.
6   Did you ever work in collections before M&M?
7   A.   I believe so. I worked -- I cannot recall the
8   name of the company I worked for.
9   Q.   One job before M&M?
10  A.   In collections. I am not a hundred per sure.
11  It's been many years ago.
12  Q.   Aside from legal investigations and
13  collections, did you have any other types of jobs
14  before working at M&M?
15  A.   No. I have worked in legal investigations and
16  collections. High school, dishwasher, stuff like
17  that. That's what I can recall. That's going back
18  many years.
19  Q.   I am asking of a professional nature.
20  A.   Yes.
21  Q.   And at one point, you left M&M and then came
22  back. Do you remember that?
23  A.   Yes.
24  Q.   What did you do while you were gone from M&M?

Page 42

1   A.  Became a housewife.
2   Q.  Did you ever do belly-dancing or singing or
3   some type of career in show business?
4   A.  Yes.  I am a professional belly-dancer.
5   Q.  You say "professional."  Do you earn money
6   doing that?
7   A.  Yes.
8   Q.  Are you still belly-dancing today?
9   A.  Yes.
10  Q.  Where do you belly-dance?
11  A.  At shows, at lawyer conventions.  On cruise
12  ships.  In other countries.  For television shows.
13  Q.  When was the last time you did a TV show?
14  A.  WMDTV.  In December, November I was on
15  television.
16  Q.  How long have you been belly-dancing?
17  A.  The professional term is Raksharke dancer.
18  Q.  Can you spell that?
19  A.  R-A-K-S-H-A-R-K-E dancer.  And the art I have
20  been performing for probably about 15 to 20 years.
21  About 15 years professionally.
22  Q.  How much do you make a year from that?
23  A.  Not a lot.  Perhaps, maybe, $5,000.  It
24  depends.

Page 43

1   Q.  It depends on the year?
2   A.  It depends on the year and the location.
3   Q.  Did you start at M&M as a small balance
4   collector?
5   A.  Yes.
6   Q.  And you worked your way up to mid balance?
7   A.  Yes.
8   Q.  And then to super mid balance?
9   A.  Yes.
10  Q.  And those rankings from small to mid to super
11  mid are promotions?
12  A.  Yes.
13  Q.  I have a record that suggests effective
14  April 10, 1995, you were promoted from super mid to
15  large balance, Dover branch, for Milliken & Michaels.
16  Ring a bell?
17  A.  Yes.
18  Q.  In fact, this record appears to be signed by
19  Bill Savage.  Was he the one who hired you?
20  A.  No.
21  Q.  Was he your supervisor?
22  A.  No.
23  Q.  Was he in charge of the branch for Dover,
24  Delaware for M&M as of March of 1994?

Page 44

1   A.  He was the general manager for the branch.
2   Q.  He was the senior person there?
3   A.  Yes.
4   Q.  It's your testimony that Mr. Savage is the one
5   who made racial comments in addition to Mr. Scher?
6   A.  Oh, yes.
7   Q.  Was Mr. Savage making racial comments from when
8   you started in March of 1994?
9   A.  Yes.
10  Q.  Is it your testimony that from when you started
11  in the Dover branch to the first time you quit
12  Mr. Savage always made racial comments?
13  A.  Yes.
14  Q.  Did you ever complain about that?
15  A.  Yes.
16  Q.  And nothing was done?
17  A.  He was spoken to.
18  Q.  I wanted to focus on the first time you worked
19  at M&M before you left.  Okay?
20  A.  Sure.
21  Q.  I have a resignation for you effective
22  January 23, 1998.  Does that sound about right?
23  A.  Sounds about right.
24  Q.  When you say he was spoken to, you are saying

Page 45

1   that the M&M management spoke to Mr. Savage relating
2   to his racial comments against you?
3   A.  I believe so.
4   Q.  Did it ever change?  Meaning, did he ever make
5   less comments or no comments?
6   A.  He slacked off the comments for a period of
7   time.
8   Q.  Were they just racial or racial and sexual for
9   the first time you worked at M&M?
10  A.  Racial and sexual.
11  Q.  Who was your direct supervisor when you first
12  started at M&M?
13  A.  David Sokol.
14  Q.  I have records that say you came back to M&M in
15  April of 1999.  Does that sound right?
16  A.  Perhaps.
17  Q.  I have your offer letter.  Looks like it's
18  signed by you April 19, 1999.  Let the record reflect
19  I am showing the witness Bates numbers 122, 123 and
20  124.  Do you see that's dated April 19th, ma'am?
21  A.  Yes.
22  Q.  If you'd flip to 124.  Is that your signature?
23  A.  Yes.
24  Q.  When you got back in April of 1999, was

12 (Pages 42 to 45)

Hue                                                            v.                                       NCO Financial Systems, Inc.
Valerie D. Hue                                        C.A. # 05-225-KAJ                                          January 4, 2006

Page 46

1   Mr. Savage still there?
2   **A. Yes.**
3   Q.   Was he still making comments of a racial
4   nature?
5   **A. Yes.**
6   Q.   Was he still making comments of a sexual
7   nature?
8   **A. Yes.**
9   Q.   Did you ever report those comments upon your
10  return to M&M after April of 1999?
11  **A. I made mention of them.**
12  Q.   To whom?
13  **A. It would have been the general manager at the**
14  **time.**
15  Q.   Was the general manager different than Bill
16  Savage?
17  **A. Yes.**
18  Q.   Do you remember who that was?
19  **A. No, I don't remember.**
20  Q.   Was that Virgil Freeman?
21  **A. No. Virgil was before my time. There was a**
22  **time -- I went back. There was a time where --**
23  Q.   Tim Sanderson?
24  **A. No, Tim was before my time.**

Page 47

1   Q.   Joe Batie?
2   **A. No, no. There is someone we're missing in**
3   **there.**
4         (Hue Deposition Exhibit No. 3 was marked
5   for identification.)
6   BY MR. ISRAEL:
7   Q.   Well, let me know if it comes to you.
8         Let me show you what I have marked for
9   identification as Hue 3. It's dated June 16, 1999 and
10  I believe signed by you and entitled "M&M Policy
11  Prohibiting Harassment and Discrimination."
12        MR. HOMER:   What was Hue 2?
13        MR. ISRAEL:   It was the deposition notice.
14  BY MR. ISRAEL:
15  Q.   Is that your signature?
16  **A. Yes.**
17  Q.   Do you see on here the fifth paragraph, "Any
18  employee who believes that they have been harassed,
19  intimidated or discriminated against should report
20  this wrongful conduct to their supervisor, their
21  branch manager or M&M's president Mr. Trey Cefalu?
22  **A. Yes.**
23  Q.   Did you report this to your branch manager? I
24  am now speaking of Mr. Savage's discriminatory

Page 48

1   comments.
2   **A. Yes. That would have been the GM at the time.**
3   **I do not recall the person's name.**
4   Q.   What, if anything, was done after you reported
5   it?
6   **A. I don't know.**
7   Q.   Was anything done?
8   **A. I don't know.**
9   Q.   Was there any change in Mr. Savage's behavior
10  towards you after you reported it?
11  **A. He was nastier.**
12  Q.   Did he continue to make racial or sexual
13  comments of a discriminatory nature after you reported
14  it?
15  **A. Yes.**
16  Q.   Did you report it again?
17  **A. Yes.**
18  Q.   To the same GM who we haven't identified?
19  **A. The same GM and to a different GM.**
20  Q.   Do you know the name of the second GM that you
21  reported it to?
22  **A. Or GCM. Actually Rick Boudreau.**
23  Q.   Did Mr. Savage's treatment of you change after
24  you reported it to the general collections manager

Page 49

1   Mr. Rick Boudreau?
2   **A. Oh, yes, it changed.**
3   Q.   There was an inflexion in your voice. Meaning
4   it got worse or better?
5   **A. It got worse.**
6   Q.   And it got worse by way of racial and sexual
7   comments by Mr. Savage?
8   **A. Yes.**
9   Q.   Do you have a time frame as to when you went to
10  Mr. Boudreau, the GCM, regarding these comments?
11  **A. Rephrase the question, please.**
12  Q.   Do you have a time frame as to when you
13  complained, like the year?
14  **A. No, I don't.**
15  Q.   We know it was after 1999?
16        MR. HOMER:   I'm sorry. Would you mind
17  sitting down? I think it might be a little
18  intimidating to be talking up to you like that.
19        MR. ISRAEL:   No one has ever called me
20  intimidating before, but I'll take it.
21        THE WITNESS:   Okay.
22  BY MR. ISRAEL:
23  Q.   If at any time I do anything that intimidates
24  you in any way or is in any way disrespectful, you let

13 (Pages 46 to 49)

Page 50

1  me know. Okay?
2    A.  I will.
3    Q.  Now, for the time, how many times do you think
4  you complained to Mr. Boudreau as the general
5  collections manager regarding Mr. Savage's wrongful
6  treatment towards you?
7    A.  I made numerous complaints to numerous
8  managers, and nothing was done. His behavior
9  continued and escalated. And I do not have his name.
10   Q.  He was never your boss directly. Was he?
11   A.  That's always a question when it comes to the
12  NCO procedure. Is the general manager the manager of
13  the collections desk? Some say, yes; some say, no. I
14  cannot answer that. It all depends on their
15  philosophy.
16   Q.  Well, did he affect your pay as far as you
17  knew?
18   A.  Oh, yes.
19   Q.  As a collector, as a large balance collector,
20  he affected your pay?
21   A.  I believed as an employee he would have to sign
22  off on documents, you know, if I got promoted or
23  termed, or anything, he would sign off on it. I would
24  say, "yes" to that. I could be incorrect.

Page 51

1    Q.  To the best of your knowledge, did he ever
2  interfere with any of your promotions from small to
3  mid to super mid to large balance collector?
4    A.  No.
5    Q.  Did he ever interfere with your promotion into
6  management?
7    A.  No.
8    Q.  Did he ever interfere with any promotion?
9    A.  No.
10   Q.  Did he ever demote you?
11   A.  Threatened, but did not.
12   Q.  When do you remember him threatening?
13   A.  I do not remember the date or the year.
14   Q.  Mac Iago, do you remember that you worked for
15  him?
16   A.  Yes.
17   Q.  Now, I am looking at — and I'll be happy to
18  show you -- some 1999 written complaints against you
19  regarding compliance issues.
20   A.  Mm-hmm.
21   Q.  Was there anything discriminatory about the
22  issuance of these compliance issues?
23   A.  No.
24   Q.  I have number 77 and 78, a July 8th, 1999 memo

Page 52

1  from Mac Iago to you, Ms. Hue, along with a Milliken &
2  Michaels compliance violation notice. Do you remember
3  receiving those?
4    A.  Yes.
5    Q.  M&M was the predecessor business before NCO
6  took over the commercial division. Correct?
7    A.  Correct.
8    Q.  Do you remember that M&M had compliance rules
9  relating to how collectors would conduct themself?
10   A.  Yes.
11   Q.  Do you remember that collectors were obligated
12  to follow those rules?
13   A.  Yes.
14   Q.  Do you remember that if collectors violated
15  those rules that they were disciplined?
16   A.  Yes.
17   Q.  In fact, that would be an example of such
18  collector compliance discipline which you have in
19  front of you. Correct?
20   A.  Yes.
21   Q.  Do you remember that all collectors signed
22  acknowledgments concerning their responsibilities to
23  follow the rules?
24   A.  Yes.

Page 53

1    Q.  Do you remember that you, like other
2  collectors, signed such documents confirming your
3  obligations to follow the rules?
4    A.  Yes.
5    Q.  Eventually when you went into management, you
6  were responsible to ensure that the collectors that
7  you supervised followed those rules?
8    A.  Rules that were in effect at the time, yes.
9    Q.  Those rules had changes to them. Correct?
10   A.  Yes.
11      MR. ISRAEL:  I'll mark this as Hue 4,
12  document numbers 77 and 78.
13      (Hue Deposition Exhibit No. 4 was marked
14  for identification.)
15  BY MR. ISRAEL:
16   Q.  Did you consider yourself a successful
17  collector?
18   A.  Yes.
19   Q.  Meaning that you were talented at convincing
20  debtors to give money relating to debts they owed?
21   A.  Rephrase that one more time.
22   Q.  Sure. Did you consider yourself a successful
23  collector?
24   A.  Yes.

14 (Pages 50 to 53)

Hue                                                              NCO Financial Systems, Inc.
Valerie D. Hue                          v.                       C.A. # 05-225-KAJ                            January 4, 2006

Page 54

1    Q.   Meaning that you were capable in convincing
2    debtors to pay the debts that they owed?
3    **A.   Yes.**
4    Q.   Meaning you also understood the rules relating
5    to compliance?
6    **A.   That were effective, yes.**
7    Q.   Meaning that you followed those rules that were
8    effective?
9    **A.   Yes.**
10   Q.   Meaning that you understood that if you
11   violated those rules that you could be fired?
12          MR. HOMER:  Are you saying every single
13   rule?  Could you identify what you are talking about
14   with rules?
15   BY MR. ISRAEL:
16   Q.   Well, I am talking about the collectors
17   compliance program.  You understood that if you
18   violated rules, you could be fired?
19   **A.   Up to and including termination.**
20   Q.   Good point.  It would be progressive up to and
21   including termination.  Correct?
22   **A.   Correct.**
23   Q.   And there were certain violations that were
24   more serious and certainly violations that were less

Page 55

1    serious.  Correct?
2    **A.   Yes.**
3    Q.   Were you in the Dover branch when taping
4    occurred?
5    **A.   I'm sorry.  Repeat the question.**
6    Q.   Were you in the Dover branch when taping of
7    debtors occurred?
8    **A.   Yes.**
9    Q.   Do you remember when you became a manager?
10   **A.   I do not recall the date.**
11   Q.   I am not positive, but does November 2001 sound
12   right?  I have a memo to you from Rick Boudreau, re:
13   small balance manager compensation, dated November
14   2001.  Does that ring a bell?
15   **A.   No.  Can I see the document?**
16   Q.   Sure.  Do you think it was earlier?  This is
17   number 175.
18          MR. HOMER:  Is there a question?
19   Q.   I am trying to establish the date.  The
20   question is whether that refreshes your recollection
21   as to when you might have become a manager.  If it
22   doesn't, it doesn't.
23          MR. HOMER:  It doesn't say anything about
24   when she became a manager.

Page 56

1    **A.   It doesn't say when I became a manager nor does**
2    **it have the proper department I was promoted to**
3    **manager, so I --**
4    Q.   Who promoted you as a manager?
5    **A.   Rick Boudreau.**
6    Q.   You don't remember what year?
7    **A.   No, I don't.**
8    Q.   Now, I have a record that says from mid balance
9    manager to GCM effective immediately.  This is dated
10   April 19, '02.  Does that refresh your recollection as
11   to April of '02?
12          MR. HOMER:  Can you give her the document?
13   Q.   Sure.  Does that refresh your recollection,
14   April of '02, as to when you were promoted to GCM?
15   This is number 173.
16   **A.   Yes.**
17   Q.   Do you remember who promoted you?
18   **A.   Rick Boudreau.**
19   Q.   And Kathy Obenshain approved this, number 173?
20   Do you see that, lower left-hand side?
21   **A.   Yes.**
22   Q.   Was Kathy Obenshain involved in that decision?
23   **A.   I do not know.**
24   Q.   Well, after you were promoted, you reported to

Page 57

1    Ms. Obenshain?
2    **A.   Yes.**
3    Q.   Did you talk with her about becoming the GCM in
4    Dover before you were promoted?
5    **A.   No.**
6    Q.   Before you were the GCM, what other collection
7    departments did you supervise?
8    **A.   Mid balance department.**
9    Q.   Did you also supervise the small balance
10   department?
11   **A.   No.**
12   Q.   Did you go from large balance to the mid
13   balance manager?
14   **A.   Yes.**
15   Q.   Then from the mid balance manager to GCM
16   effective April of 2002?
17   **A.   Yes.**
18          MR. ISRAEL:  I am going to make this one
19   Hue No. 5.
20          (Hue Deposition Exhibit No. 5 was marked
21   for identification.)
22   BY MR. ISRAEL:
23   Q.   Nothing discriminatory about you being
24   promoted.  Was there?

Hue                                                                    NCO Financial Systems, Inc.
v.
Valerie D. Hue                          C.A. # 05-225-KAJ                  January 4, 2006

Page 58

1   A. No.
2   Q. How did you get the tape of Phil Weaver, Ted
3   Fox and Rick Boudreau?
4   A. It was mailed to me.
5   Q. When was it mailed to you?
6   A. In '03.
7   Q. Why was it mailed to you?
8   A. I don't know.
9   Q. Who mailed it to you?
10  A. I don't know.
11  Q. Where was it mailed to you?
12  A. My home.
13  Q. No return address?
14  A. No.
15  Q. Did you ever tell Mr. Boudreau that you had the
16  tape?
17  A. No.
18  Q. Do you know who made the tape?
19  A. No.
20  Q. Are you and Mr. Boudreau friends or friendly?
21  A. I have not spoken to Mr. Boudreau since he
22  left.
23  Q. Do you remember when he left?
24  A. Yes. We were friendly.

Page 59

1   Q. I'm sorry. Did you leave before or after
2   Mr. Boudreau?
3   A. Mr. Boudreau left first.
4   Q. Do you know how long before you he left?
5   A. In '02 he left. He left in '02.
6   Q. Where did he go?
7   A. I don't know.
8   Q. The tape that you received, was it on a
9   cassette?
10  A. Yes.
11  Q. A big cassette or a little cassette?
12  A. A little cassette.
13  Q. Like a microcassette?
14  A. Yes.
15  Q. Did you have any knowledge before you received
16  this tape in 2003 that the tape had been made?
17  A. No.
18  Q. Do you believe that the comments made on this
19  tape proved that NCO ignored complaints regarding
20  Mr. Savage's behavior? Let me rephrase. Do you
21  believe that this tape somehow shows wrongful conduct
22  by NCO?
23  A. Yes.
24  Q. What is the wrongful conduct?

Page 60

1   MR. HOMER: Do you need to look at the
2   document?
3   THE WITNESS: Yes.
4   MR. HOMER: She hasn't seen that in a long
5   time.
6   BY MR. ISRAEL:
7   Q. You are more than welcome to look at it. But
8   in general terms, what is the wrongful conduct? Tell
9   me in general terms what's the wrongful conduct.
10  A. I would like to take a look at it first.
11  Q. Well, you can, but I would like you to answer
12  if you can. You are more than welcome to look at it.
13  MR. HOMER: She's requested to look at the
14  document. She has a right to look at the document
15  before she answers the question.
16  MR. ISRAEL: No, she does not if she has
17  knowledge.
18  MR. HOMER: She's asked to see a document.
19  Let her see the document.
20  BY MR. ISRAEL:
21  Q. Let me go back. Have you ever listened to the
22  tape?
23  A. Yes.
24  Q. Is it your belief that that tape evidences

Page 61

1   wrongful conduct by NCO?
2   A. I am going to use the words "hurtful and
3   shameful conduct by NCO."
4   Q. That's my question. What was the hurtful and
5   shameful conduct by NCO as evidenced by the tape?
6   A. Ted Fox's remarks.
7   Q. On the tape?
8   A. Yes.
9   Q. Okay. I am handing you what I understand to be
10  a transcription of the tape. It is pages 124 through
11  147. And even before you look at the tape, do you
12  have a recollection as to what type of comment or
13  comments that Mr. Fox made that were hurtful or
14  shameful?
15  A. Attitude.
16  MR. HOMER: She asked to see the tape.
17  She has a right to see what's on the tape. You asked
18  her questions what's on the tape. She's asked to see
19  it. She has a right to refresh her recollection.
20  That's standard practice. She has a right to look at
21  the document you are referring to.
22  MR. ISRAEL: She doesn't have any right to
23  look at anything.
24  MR. HOMER: You are asking her about a

16 (Pages 58 to 61)

Hue                                    v.                    NCO Financial Systems, Inc.
Valerie D. Hue                   C.A. # 05-225-KAJ                      January 4, 2006

Page 62

1  document. She said she doesn't remember what's in it.
2  She would like to look at it.
3      MR. ISRAEL: You said that. That doesn't
4  mean she has a right to look at it.
5      MR. HOMER: You've asked her questions
6  about it. You have the document. I think she has the
7  right to look at it.
8      MR. ISRAEL: I am asking you to stop
9  interrupting. I am trying to get the witness' best
10  recollection. Then I promise, she can look at the
11  transcript.
12  BY MR. ISRAEL:
13      Q. Have you ever read the transcript, Ms. Hue, or
14  only listened to the tape?
15      A. I read the transcript this morning.
16      Q. When you read the transcript this morning, do
17  you now have a recollection as to what was the type of
18  comments that were hurtful or shameful by Mr. Fox?
19      A. There were comments that he made. And if I had
20  the document, I could tell you exactly what they were
21  that hurt and shamed me.
22      Q. Okay.
23      A. Very hurtful.
24      Q. Well, you can look at the document. I have

Page 63

1  taken the liberty to open it to page 17 of the
2  document, which is where I believe the first time I
3  see comments by Mr. Fox. I am giving you the whole
4  transcript and have put it in front of you. I am
5  going to ask, before you go through the whole
6  transcript, if you would look on page 17 in front of
7  you. Are those the comments by Mr. Fox that you find
8  hurtful or shameful?
9      MR. HOMER: You do have a right to look at
10  the whole transcript.
11  BY MR. ISRAEL:
12      Q. Absolutely. But before we get to the whole
13  transcript, that's my question. Are those comments on
14  page 17 that you believe to be hurtful or shameful?
15      A. This whole transcript is hurtful and shameful
16  to me, this whole transcript was.
17      Q. Why? The reason I ask is: I hear Boudreau
18  reporting wrongful conduct by Savage. Correct?
19      A. Yes.
20      Q. I hear Phil Weaver giving specific instructions
21  to have those issues investigated and to get
22  statements. Correct?
23      A. Yes.
24      Q. With Boudreau's report and Phil Weaver's

Page 64

1  request to get that information, what is hurtful or
2  shameful?
3      A. It's hurtful for me to read comments that were
4  made about my race. It's hurtful for me to read
5  comments when he's referring to African-Americans as
6  "niggers." It's hurtful. And it's shameful that in
7  this day and age that I have to read those things that
8  people are making those comments about women in the
9  workplace, about African-American women in the
10  workplace. It is hurtful and shameful. And it hurt
11  me today to read these documents.
12      Q. But Rick Boudreau didn't speak like that in the
13  workplace against you. Did he?
14      A. No, he did not.
15      Q. Phil Weaver, who was in charge of the
16  commercial division when that tape was made, didn't
17  make those types of comments. Did he?
18      A. No, he did not.
19      Q. Ted Fox did not make those types of comments
20  relating to women or race. Did he?
21      A. Reading this document, yes, he did.
22      Q. I opened it to page 17 where I understood Ted
23  Fox's comments to be. What comment in your opinion
24  would be of a racial or a sexual nature made by Ted

Page 65

1  Fox? Why don't we let the record reflect that the
2  witness is flipping through the transcript. You are
3  looking at the various names, Ms. Hue?
4      A. Yes, I am, starting at page 12.
5      Q. Okay. This is the comment by Mr. Fox?
6      A. It has "Unknown Voice."
7      Q. All right.
8      A. When I recalled listening to it, "Hold on for a
9  second."
10      Q. You have to speak up.
11      A. "Hold on for a second. That's off the chart.
12  This will get us in a lot of trouble."
13      Q. And you believe Ted Fox made that comment?
14      A. Yes.
15      Q. And you believe that Ted Fox making that
16  comment is hurtful or shameful?
17      A. It's hurtful because his -- yes.
18      Q. Why do you believe that to be hurtful or
19  shameful?
20      A. His concern that the company was going to get
21  in a lot of trouble. No concern for the employee.
22      Q. Okay. Anything else? Before we go on, when
23  you listened to the tape, even though the court
24  reporter on page 12 of the transcript wrote it says,

17 (Pages 62 to 65)

Page 66

1   "Unknown Voice" -- and it's the first line on page
2   12 -- do you think that was Mr. Fox?
3   A. I recall so.
4   Q. In fact, it says "Mr. Weaver" later on after
5   Boudreau on line 7 says, "Yeah, this is Ted." Okay?
6       All right. Any other hurtful or shameful
7   comments by Mr. Fox?
8   A. Mr. Boudreau, line 13, page 13: "'N' word, you
9   know, awake enough to be able to dial the phone,
10  Mr. Weaver says in front of producer." Mr. Fox says,
11  "How many people? How many?" "Just one."
12      Mr. Fox seemed to have no regard for the
13  words that were said, just about the company itself.
14  That to me was hurtful.
15  Q. So to make sure I understand. The hurtful and
16  shameful part by Fox is that while he is listening to
17  Savage's wrongful conduct, as described by Boudreau,
18  you think that he is showing no sensitivity toward you
19  since Boudreau is repeating who Savage is speaking to?
20  A. Yes.
21  Q. Okay. Anything else hurtful or shameful?
22  A. When Mr. Fox says on line 17, page 14 that
23  "What direction is this?" Then it has
24  "unintelligible."

Page 67

1   Q. What do you gather or garner out of that
2   comment that is hurtful or shameful?
3   A. Again, no regard, no sympathy and/or empathy of
4   the conduct paid to the employees. Just for the
5   company itself.
6   Q. Your criticisms of Mr. Fox, there were three,
7   each time you have indicated Fox doesn't care about
8   you as a person, but only about protecting the
9   company. Correct?
10  A. From reading these pages thus far, yes.
11  Q. Is there any other type of comment Fox made
12  that doesn't fall into that category hurtful or
13  shameful?
14      MR. HOMER: Let her finish reading it.
15  A. Page 15, line 3, where Mr. Fox says, "This is
16  not our concern."
17  Q. Can I see that for a moment. Can I see the
18  previous page 14?
19      On page 14 Boudreau says, "Right. I
20  already have a couple of salesmen, you know, that I
21  have got that had issues. Bob Garrett and I have
22  had" --
23      "Weaver says, Unintelligible racial
24  epithet."

Page 68

1       Fox says top of page 15, line 3, "That's
2   not our concerns."
3       Weaver top of page 15, line 4 "That's way
4   off the chart."
5       Do you know what Boudreau is speaking of
6   when he talks about a couple of salesmen that have
7   issues, Bob Garrett in particular? Do you have any
8   information about that?
9   A. No.
10  Q. So when Fox says that is not our concern, do
11  you know what this comment is in relationship to?
12  A. I believe it is in relationship to Rick's
13  and -- Mr. Boudreau explaining the racial and sexual
14  comments that were made by Bill and the general
15  conduct that Bill had in the office.
16  Q. I am not trying to argue with you. But from
17  this transcript, why do you believe that since it
18  says, "unintelligible"?
19  A. When I recalled listening to the tape and what
20  she has a "unintelligible," line 1, page 15, has
21  "racial epithets."
22  Q. Right.
23  A. It has "unintelligible." Then line 3, page 15
24  has Mr. Fox, "This is not our concern." When I

Page 69

1   recalled listening to that it was Mr. Weaver speaking
2   of racial and sexual comments that have been made.
3   And Mr. Fox's statement was: "It is not our concern."
4   She has "unintelligible."
5   Q. Okay. Anything else that is hurtful or
6   shameful by Mr. Fox?
7   A. Line 7, page 17. Mr. Fox states, "Okay. But
8   you know about Bill and her have joking relationship
9   that -- I don't know if they were joking or not, but
10  that they are related."
11  Q. Did you ever have a joking relationship with
12  Mr. Savage?
13  A. Bill had a relationship about joking about
14  being one of my masters because we're from the same
15  area. He would make that comment in front of many
16  people. I hated that comment.
17  Q. Okay. Anything else in the transcript hurtful
18  or shameful by Mr. Fox?
19  A. Page 17, line 13, "Mr. Fox: (Unintelligible.)
20  Apparently, I mean, there is a black heritage in
21  Bill's family going back to the Civil War or
22  whatever." Hurtful and shameful.
23  Q. As far as you know, does Bill Savage have some
24  kind of black heritage in his family?

18 (Pages 66 to 69)

Hue                                                                    NCO Financial Systems, Inc.
Valerie D. Hue                      v.                                  January 4, 2006
                              C.A. # 05-225-KAJ

Page 70

1   A. I don't know.
2       Page 17, line 18, Mr. Fox says, "Don't get
3   comfortable with someone or somebody. This is what
4   you get." "Don't get comfortable with somebody. This
5   is what you get."
6   Q. Okay. What does that refer to or what do you
7   understand that to refer to?
8   A. That if a female and a male employee work
9   together, and they are business associates, that
10  perhaps in his opinion that this is what you get when
11  a female and a male work together in a business
12  relationship. That's what I took it to mean.
13  Q. Meaning --
14  A. This is what you get.
15  Q. Meaning that whatever relationship Fox believes
16  is between you and Savage, that's what he's commenting
17  about?
18  A. Not Fox and Savage. Male and female.
19  Q. Okay. Anything else hurtful and shameful?
20  A. Page 23, line 15, "Mr. Fox:" It says,
21  "Unintelligible."
22      As I recall the tape, Fox had made a
23  comment about female and male workers, but it has
24  "unintelligible."

Page 71

1   Q. From your recollection of the tape, what's
2   hurtful and shameful about Fox's comments about male
3   and female workers?
4   A. I do not believe that because women are in the
5   workplace it causes sexual harassment. Do you?
6   Q. No. But is that what you infer from Mr. Fox's
7   comment there? That's what I am asking.
8   A. I recalled from the tape -- and she has
9   "unintelligible" -- I believe that's what he had said.
10  I am paraphrasing.
11      MR. ISRAEL: Let's attach as Hue No. 6 a
12  copy of the court reporter transcript that has
13  plaintiff Bates number 124 to 147. It is a 24-page
14  transcript.
15      (Hue Deposition Exhibit No. 6 was marked
16  for identification.)
17      MR. ISRAEL: Now, I have your October 15,
18  2001 memo to Ted Fox carboning Rick Boudreau, re:
19  comments of Bill Savage, Bates number 191. I am going
20  to mark this as Hue No. 7.
21      (Hue Deposition Exhibit No. 7 was marked
22  for identification.)
23  BY MR. ISRAEL:
24  Q. I hand it to your attorney and ask if that is

Page 72

1   your signature in the lower right-hand corner.
2       Is that your signature?
3   A. Yes.
4   Q. That was the statement that you prepared as a
5   result of who asking you?
6   A. Phil Weaver.
7   Q. And Bill Savage was fired in October of 2001.
8   Do you remember that?
9   A. Yes.
10  Q. Do you know why he was fired?
11  A. No.
12  Q. No one ever told you that he was fired relating
13  to comments of an inappropriate nature in the
14  workplace?
15  A. No.
16  Q. Is it your testimony that until this minute
17  right now you had never heard that before?
18  A. We were not given information about why Bill
19  was fired. We only speculated.
20  Q. And did you ever speculate with Rick Boudreau
21  as to why Bill Savage was fired?
22  A. Yes.
23  Q. Did Rick Boudreau confirm to you what he
24  thought as to why Savage was fired?

Page 73

1   A. Yes.
2   Q. Did he confirm to you that he thought Savage
3   was fired for his inappropriate behavior in the
4   workplace?
5       (Recess taken.)
6       (The reporter read the pending question.)
7   BY MR. ISRAEL:
8   Q. Did he confirm to you that he thought Savage
9   was fired for his inappropriate behavior in the
10  workplace?
11  A. Yes.
12  Q. Did others confirm that to you?
13  A. No.
14  Q. Did Phil Weaver ever discuss it with you?
15  A. Not that I recall, no.
16  Q. How long after your submission of your
17  Hue No. 7 was Savage fired?
18  A. I do not have documents that show he was fired.
19  Q. Right. I have a document that says October 11,
20  2001, his termination. What is your document dated,
21  Hue No. 7?
22  A. 10/15.
23  Q. Did anyone aside from Rick Boudreau talk to you
24  about Mr. Savage's inappropriate conduct toward you?

19 (Pages 70 to 73)

Hue                              v.                        NCO Financial Systems, Inc.
Valerie D. Hue               C.A. # 05-225-KAJ            January 4, 2006

Page 74

1    **A. No.**
2    Q.  Meaning he never asked anybody?
3    **A. No.**
4    Q.  Do you remember if your memo was sent to
5    Mr. Fox after Savage was gone?
6    **A. No, I don't recall.**
7    Q.  Were you aware that Rick Boudreau gave a
8    statement regarding Mr. Savage's inappropriate
9    conduct?
10    **A. I was aware yesterday.**
11    Q.  Did you ever discussions with Eric Shaw
12    regarding Mr. Savage's wrongful conduct?
13    **A. No.**
14    Q.  Okay. Now, after Mr. Savage was gone from the
15    business, who was the general manager in the office?
16    **A. I am not sure.**
17    Q.  At some point after Mr. Savage was gone
18    Mr. Batie was the general manager?
19    **A. Right.**
20    Q.  He took Mr. Savage's place or spot?
21    **A. Right.**
22    Q.  Mr. Davies is African-American?
23    **A. Right.**
24    Q.  You are not suggesting in any way that he,

Page 75

1    Mr. Davies, retaliated against you or treated you
2    badly as a result of anything you did regarding
3    Savage. Are you?
4    **A. No.**
5    Q.  It's your testimony that Mr. Fox retaliated or
6    has treated you badly over Mr. Savage being fired and
7    your report regarding Mr. Savage?
8    **A. Yes.**
9    Q.  What aside from your discharge, if anything,
10    did Mr. Fox do of a retaliatory or discriminatory
11    nature after Savage was gone?
12    **A. He suspended me, and he terminated me.**
13    Q.  And that all relates to the issue of improper
14    handling of checks. Correct?
15    **A. That's what he claimed.**
16    Q.  Between October of 2001 when you made your
17    report about Savage and when you were suspended
18    regarding improper handling of checks, as claimed by
19    NCO and Ted Fox, what, if anything, did Ted Fox do of
20    a retaliatory or discriminatory nature against you?
21    **A. Other than my suspension and termination?**
22    Q.  Yes.
23    **A. And ignoring me. That would be basically it.**
24    Q.  When you say ignoring you, what do you mean?

Page 76

1    **A. When he visited the office, he would not**
2    **acknowledge me. When I saw him on business trips, he**
3    **would not acknowledge me.**
4    Q.  Okay. So he would ignore you?
5    **A. Mm-hmm.**
6    Q.  And in addition or aside from him ignoring you
7    from October of 2001 until your January 2004
8    suspension, what else, if anything else, did he do?
9    **A. Nothing. I had no direct contact with Ted as**
10    **he was in sales. Only when he became the**
11    **vice-president or president of operations.**
12    Q.  Only when he became the head of the commercial
13    division?
14    **A. Right.**
15    Q.  Once he became head of the commercial division,
16    aside from ignoring you, anything else?
17    **A. He called me and terminated me and suspended**
18    **me.**
19    Q.  I am only asking for the time period between
20    October of 2001 when you made your report, which is
21    Hue 7 in front of you, and January of 2004 when you
22    were suspended and then terminated. That's the time
23    period I'm looking for. Aside from Mr. Fox ignoring
24    you during that time as head of the commercial

Page 77

1    division, anything else?
2    MR. HOMER:  You just asked the question.
3    She answered it she was suspended and fired. That was
4    in January of 2004. That's the time period you asked
5    about.
6    MR. ISRAEL:  Come on.
7    MR. HOMER:  What do you mean "come on?"
8    (Discussion off the record.)
9    BY MR. ISRAEL:
10    Q.  To make sure that, we're only dealing with the
11    time period of your October 2001 report -- and Hue 7
12    in front of you. Correct?
13    **A. Yes.**
14    Q.  -- and prior to your suspension and then
15    termination in January 2004, once Mr. Fox became the
16    head of the commercial division, did he do anything
17    wrong except ignore you?
18    **A. Once he became the head of commercial division,**
19    **within two weeks, he fired me -- he suspended me and**
20    **terminated me.**
21    Q.  Is it your belief that Mr. Fox was the
22    decision-maker relating to you being suspended and
23    fired?
24    **A. I believe he was.**

20 (Pages 74 to 77)

65

Hue - Israel

1  NCO's procedures regarding the submission of NSF
2  checks?
3           A.        No.
4           Q.        And at no time do you have
5  any recollection that any of your collectors violated
6  NCO procedure regarding the submission of NSF checks?
7           A.        I cannot answer that.
8           Q.        As you sit here, you don't
9  know of any?
10          A.        I do not, I can't answer
11 that. I don't know what they did or did not do.
12          Q.        To the best of your
13 knowledge.
14          A.        I will not answer that. I
15 do not know.
16          Q.        Do you have any knowledge
17 that they violated the procedure?
18          A.        Obviously, Matt Lane
19 violated the procedure. I'm not sure of other
20 collectors that have not been caught yet through
21 investigation, so I don't feel comfortable answering
22 that question.

DELMARVA REPORTING
(302) 653-1036

66

Hue - Israel

1           Q.        Have you seen the sworn
2  statements of Brian Laiche, Darron DeEsch, Steve Ross,
3  Chris Satasiero, Lenny Ciccarone, Mannie Cardozo, Joe
4  Batie, and Mike Scher?
5           A.        I read those yesterday.
6           Q.        And Joe Thomas?
7           A.        Yes.
8                     MR. HOMER:  Are those all
9  the identical statements?  Can I get one
10                    of them to look at?
11                    MR. ISRAEL:  Sure.  They're
12                    not quite identical, but they're very
13                    similar.
14 BY MR. ISRAEL:
15          Q.        Do you have, which statement
16 in front of you?
17          A.        Brian.
18          Q.        Paragraph two, take a look
19 at that. At any time did Kathy Obenshain ever
20 instruct you to redeposit checks without verification
21 of funds?
22          A.        Mm-hmm.

DELMARVA REPORTING
(302) 653-1036

67

Hue - Israel

1           Q.        Yes; is that what you are
2  saying?
3           A.        I'm reading the statement.
4           Q.        Oh.
5           A.        You are asking me a question
6  about that?
7           Q.        Yes.
8                     At any time did Kathy Obenshain instruct
9  you to redeposit checks without verification of funds?
10          A.        If you cannot reach a bank,
11 which is verification of funds, yes.
12          Q.        Okay.  Did you ever witness
13 Miss Obenshain instruct any other managers to
14 redeposit checks without verification of funds?
15          A.        No.
16          Q.        I'm talking about in a
17 general meeting, where you would have conference calls
18 with other GCM's and Miss Obenshain. You participated
19 in that?
20          A.        Yes.
21          Q.        Did she ever say, I want you
22 to redeposit checks without verification of funds?

DELMARVA REPORTING
(302) 653-1036

68

Hue - Israel

1           A.        She would say, go through
2  and see what you can get on the system, in her normal
3  flip little way.
4           Q.        Okay.
5                     (Whereupon an off-the-record
6                     discussion was held.)
7  BY MR. ISRAEL:
8           Q.        Do you believe that Kathy
9  Obenshain had any influence relating to the decision
10 you be discharged?
11          A.        Very little.
12          Q.        What is the basis of that
13 belief?
14          A.        A conversation I had with
15 Kathy.
16          Q.        When was this conversation?
17          A.        The day before I was
18 suspended.
19          Q.        What did Miss Obenshain and
20 you discuss?
21          A.        The firing of Matt Lane, the
22 analysis that I had done, and her response to me that

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1  I had done a great job.
2          Q.          Well, at the time that you
3  had that discussion with Kathy Obenshain, do you know
4  whether issues relating to check handling in your
5  branch had been brought to Miss Obenshain's attention?
6          A.          Yes, I do.
7          Q.          How do you know that?
8          A.          Because she was referring to
9  Matt Lane and to my analysis, which was in response to
10  an email that she had gotten from corporate, and
11  regarding check handling throughout all of Commercial
12  because there were many, many checks from other
13  offices, not just Dover.
14          Q.          Now I'm confused on what you
15  told me. Were there other checks that were
16  problematic so far as corporate was concerned in your
17  office for December of 03 besides Matt Lane's?
18          A.          There was a list that was
19  generated by someone in Horsham or wherever that had
20  checks from all offices that were on a spreadsheet.
21  And as I stated earlier, all the GCM's were to give an
22  analysis.

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1          Q.          For the checks that related
2  to your office, aside from Matt Lane's, were there
3  other problem checks so far as corporate was concerned
4  in December of 03?
5          A.          I'd have to give an
6  explanation.
7          Q.          Did the explanations you
8  gave for those checks, did Miss Obenshain accept those
9  explanations as satisfactory?
10          A.          Yes.
11          Q.          What changed between your
12  explanations to Miss Obenshain regarding those
13  problematic checks and your discharge, or your
14  suspension; do you know?
15          A.          I really can't answer that.
16  I don't know, other than Ted Fox contacted me the next
17  day.
18          Q.          He didn't tell you anything
19  except, as you have described, check handling process
20  was a problem, correct?
21          A.          Check handling procedure or
22  process or something to that effect. Exact verbiage,

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1  I do not remember.
2          Q.          Did anyone describe to you
3  what the problems were before you were separated?
4          A.          No.
5          Q.          You spoke to Steve
6  Leckerman?
7          A.          Yes.
8          Q.          Did you understand that he
9  was Ted Fox's boss?
10          A.          Yes.
11          Q.          I have your January 22, 2004
12  email to him; do you remember writing that?
13          A.          I'm sure, yes.
14          Q.          You said, "I was placed on
15  suspension with pay due to two concerns: Not pulling
16  checks and recreating DCI on re-deps."
17          MR. HOMER:  I want her to
18          look at the document to answer specific
19          questions about the wording in it.
20          MR. ISRAEL:  Let me ask you
21          a couple of questions before looking at
22          the document.

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1          MR. HOMER:  If you are going
2  to ask questions about the document, she
3  has a right to look at the document.
4  You are quoting the thing from her. Who
5  knows if it is in context or not?
6          MR. ISRAEL:  Who knows? You
7  can do it yourself. I don't have to
8  give her the document. There's no such
9  rule.
10          MR. HOMER:  I disagree.
11          MR. ISRAEL:  Show me the
12  rule. I'll be happy to comply.
13          MR. HOMER:  She has a right,
14  if you refer to the document, to look at
15  it.
16          MR. ISRAEL:  I disagree, but
17  I understand your objection.
18  BY MR. ISRAEL:
19          Q.          The two concerns are: Not
20  pulling checks, what does that mean to you?
21          MR. HOMER:  I'm going to
22  object unless she has a chance to look

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1    A.        Was I surprised by the
2  accusations?  I had read his accusations from his
3  unemployment hearing, so I was not surprised.
4    Q.        Did Kathy Obenshain ever
5  make any racist comments to you?
6    A.        About me?
7    Q.        Yes.
8    A.        No, not that I'm aware of.
9    Q.        Did she ever make any
10 comments of a sexually discriminating nature?
11   A.        To me?
12   Q.        Yes.
13   A.        About men or female?
14   Q.        That's an interesting
15 question.
16   A.        I don't understand your
17 question.
18   Q.        Let us start first with
19 females. You don't believe that Kathy Obenshain
20 discriminated against you because of your sex?
21   A.        No.
22   Q.        Do you believe that Kathy

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1  Obenshain discriminated against you because of your
2  race?
3    A.        No.
4    Q.        Aside from Ted Fox.  Do you
5  believe that Ted Fox used or contrived issues
6  regarding check handling to have you fired in
7  retaliation for you complaining about Bill Savage?
8    A.        Absolutely, except for the
9  timing.
10   Q.        He never said that to you,
11 did he?
12   A.        To say, I'm going to
13 retaliate against you?
14   Q.        Or anything to that effect
15 that he was going to get back at you or retaliate
16 against you or somehow hurt you as a result of you
17 complaining about Bill Savage?
18   A.        No.
19   Q.        Did anyone ever report that
20 to you that they had heard that Ted Fox had it in for
21 you because of your reporting about Ted Savage?
22   A.        There were rumors that Ted

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1  did not like me because of what I did to Bill.  That
2  had been circulated for years.
3    Q.        Where did you hear those
4  rumors from?
5    A.        Numerous employees, past and
6  present.
7    Q.        Who would those employees
8  be?
9    A.        It would be a very long
10 list.  I would have to look at the employee roster.
11   Q.        Can you give me one?
12   A.        Rick Boudreau.
13   Q.        Rick Boudreau told you that
14 he believed Ted Fox had it in for you because of your
15 reporting about Ted Savage?
16   A.        No.
17   Q.        How did Rick Budreau report
18 something like that to you?
19   A.        He said that Ted was not
20 happy with what I had said about Bill.
21   Q.        Anyone else?
22   A.        There was a lot of empathy

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1  apparently when Bill was terminated.
2    Q.        Empathy?
3    A.        There were numerous comments
4  from especially the white males of NCO about Bill's
5  comments in that they didn't think it was right for me
6  to be terminated for such comments made in the office.
7  It was a collection agency, for God's sake.
8    Q.        Who made those comments?
9    A.        Many people did.
10   Q.        Can you name any of them?
11   A.        You are asking me to go back
12 years and reflect.  I would be, I'm paraphrasing the
13 statements, and I don't want to give the answer I'm
14 not a hundred percent sure of.
15   Q.        Can you think of one person
16 who made some comments to the effect that Bill Savage
17 shouldn't have been fired?
18   A.        Mike Scher had questioned
19 his termination at one time.
20   Q.        Okay.
21   A.        And that's all I can recall
22 at this point in time.  There was just, you know, it

DELMARVA REPORTING
(302) 653-1036

Hue - Israel

1   is just rumored, second and third hand information
2   that was going through the office. Bill was an icon
3   at that office. And it wasn't until a white male made
4   the complaint that they took it seriously. I made my
5   complaints. No one took it seriously.
6                   (Deposition Exhibit Number Hue
7                   12 was marked for
8                   identification.)
9   BY MR. ISRAEL:
10          Q.          Let me show you what I'm
11  going to mark as Hue number 12. That is what I
12  understand to be your charge of discrimination dated
13  February 3 of 04; is that correct? Is that your
14  signature?
15          A.          Yes.
16          Q.          Did you consider your
17  complaints against Mr. Savage to be sexual harassment
18  or racial harassment or both?
19          A.          Both.
20                  (A brief recess was taken.)
21                  (Deposition Exhibit Number Hue
22                  13 was marked for
                DELMARVA REPORTING
                (302) 653-1036

Hue - Israel
                    (identification.)
2   BY MR. ISRAEL:
3           Q.          Any changes from your
4   previous testimony?
5           A.          What was the previous
6   testimony?
7           Q.          Anything that you have told
8   me during the day, any changes?
9           A.          Not at this moment.
10          Q.          Okay. In your charge, you
11  wrote, "During a company conference call with all
12  collections managers of Commercial Division throughout
13  the company, the issue of redepositing checks was a
14  topic discussed. Marlow, Shaw, Nickerson were all in
15  attendance with me in response to Dover duplication."
16          Kathy Obenshain stated that she did not
17  want any checks deposited without verification?
18          A.          Mm-hmm.
19          Q.          Was that conference call
20  after the March 03 email that we have looked at from
21  corporate?
22          A.          Are we in paragraph three?
                DELMARVA REPORTING
                (302) 653-1036

Hue - Israel
1           Q.          I can show you.
2           A.          There it is. This call that
3   I'm referring to took place in 2004. And it was on a
4   conference call. It was, I think the 20th of the
5   month. I might be wrong with the date.
6           Q.          Right before you were
7   suspended?
8           A.          Yes, because she had gotten
9   bombarded with these emails and analysis reports that
10  she wanted us all to do. She at that point made that
11  statement that from this point on, and Mac McKenzie
12  made a statement.
13          Q.          Describe for me the process
14  about submitting DCI's for an NSF check; how did that
15  work?
16          A.          My administrative assistant
17  would, a DCI is just a check fax. I mean, that's what
18  we called it in our office, not so much DCI. The
19  collector would fill out a form. It was a redeposit
20  form.
21          Q.          For a previously submitted
22  check that had been returned to NSF?
                DELMARVA REPORTING
                (302) 653-1036

Hue - Israel
1           A.          Right. They would create a
2   form in our office called a redeposit form.
3           Q.          That redeposit form would be
4   validated by the debtor?
5           A.          It would be validated by the
6   collector, and then I would have to sign off on it.
7   Then I would give it to my administrative assistant.
8   And she would follow the process, email, fax up to
9   Horsham to get it posted.
10          Q.          But would the debtor sign
11  the DCI form?
12          I guess now I'm confused as to the
13  process. Debtor submits an NSF check.
14                  MR. HOMER:    What?
15  BY MR. ISRAEL:
16          Q.          A debtor submits a check
17  that goes NSF.
18          A.          Right.
19          Q.          Okay. The DCI form is used
20  to substitute for that NSF check?
21          A.          I think you are confused.
22          Q.          I'm confused. Let us start
                DELMARVA REPORTING
                (302) 653-1036

101

```
                    Hue - Israel
1   your bosses in any way criticizing your performance
2   before this suspension?
3              A.         No.  Actually, when I spoke
4   to Leckerman in December, he gave me a way-to-go-girl
5   pat on the back, as well as did Kathy, many times.
6              Q.         Acknowledged that it is hard
7   to find good collection managers; would you
8   acknowledge that?
9              A.         I would say it is hard to
10  find good collectors and managers.
11             Q.         Do you think you were a good
12  motivator of your collectors?
13             A.         I tried to be, and I believe
14  that I was.
15             Q.         Do you think you were a good
16  judge at hiring collectors?
17             A.         I learned over the years.
18  At first, no.  As I gained experience, I got better.
19             Q.         What's the hardest thing
20  about being a collection manager?
21             A.         The numbers.
22             Q.         Meeting the numbers?
            DELMARVA REPORTING
              (302) 653-1036
```

102

```
                    Hue - Israel
1              A.         Mm, hmm.
2              Q.         You have to say yes.
3              A.         Yes.
4              Q.         Does that mean it is also
5   hard to motivate your people so that they collect a
6   debt?
7              A.         No.  Motivation is something
8   I'm good at.
9              Q.         So what do you mean, then,
10  the numbers?
11             A.         The numbers.  When you saw
12  your number that came at you, be it 60, 80, to hit for
13  your month end number, when you saw it as a manager,
14  you are like, oh, God, but you went out there and,
15  rah, rah.  That was what you were to do to get to the
16  absolute best.
17             Q.         Do you remember firing a guy
18  named Michael Denby?
19             A.         Yes.
20             Q.         He falsified check
21  information?
22             A.         May I read that?  I'm not
            DELMARVA REPORTING
              (302) 653-1036
```

103

```
                    Hue - Israel
1   sure why I terminated him.
2              Q.         You certainly may.  Number
3   13.
4              A.         Yes.
5              Q.         What did he do wrong?
6              A.         He had submitted a check in
7   the amount of a thousand 71 dollars that was
8   unauthorized from a debtor.
9              Q.         Was that a check fax?
10             A.         Yes.  Check fax, DCI.
11             MR. ISRAEL:  Did you agree
12         that you were going to produce records
13         relating to Miss Hue's business so we
14         can determine how much the gross income
15         is?
16             MR. HOMER:  You are asking
17         me if I did that today?
18             MR. ISRAEL:  I'm asking you
19         now.  If I did ask you, I'm asking
20         again, did you agree?
21             MR. HOMER:  What is it?
22             MR. ISRAEL:  I want to show
            DELMARVA REPORTING
              (302) 653-1036
```

104

```
                    Hue - Israel
1   how much income Miss Hue has from her
2   business.  I can't tell from these tax
3   returns.
4              MR. HOMER:  Yes, we can, if
5         they're available.  If we can get them,
6         we will get them to you.
7              MR. ISRAEL:  The business
8         would have had to declare income for her
9         as an employee so that she could file a
10        tax return.  They're not attached to, I
11        don't see them attached to the tax
12        returns, and W-2's.
13  BY MR. ISRAEL:
14             Q.         Let me show you what I
15  understand to be the first page of your journal dated
16  1/21; do you see that?  When did you write that?  What
17  is that, plaintiff Bates number 89?
18             A.         1/21.
19             Q.         You wrote that on
20  January 21?
21             A.         That's what it says.
22             Q.         Can you --
            DELMARVA REPORTING
              (302) 653-1036
```

113

Hue - Israel

1  commission, and I also received a bonus. I do not
2  understand the rest of your question.
3      Q.        You testified that
4  collectors who improperly were paid on an NSF check --
5      A.        Mm-hmm.
6      Q.        -- held that money until it
7  was backed off the next month?
8      A.        Mm-hmm.
9      Q.        Was there a similar dynamic
10 with your pay?
11     A.        Well, if I got a commission,
12 it would be a miracle. So it didn't affect me as GCM
13 whatsoever. I believe I got very little commission,
14 but bonus for contest.
15     Q.        You would qualify for a
16 bonus or a contest based upon end of month numbers,
17 correct?
18     A.        No.
19     Q.        Based upon end of quarter
20 numbers?
21     A.        Sometimes. Based upon post
22 date numbers, based upon three month postdate numbers,

DELMARVA REPORTING
(302) 653-1036

114

Hue - Israel

1  based upon who had the happiest office, stuff.
2      Q.        Were those bonuses ever
3  affected by the inclusion of NSF checks that
4  eventually would later be backed off?
5      A.        No.
6      Q.        In paragraph 16 of your
7  complaint you allege that defendant's management made
8  racially charged comments including one regarding the
9  number of black employees at the Dover office to the
10 effect that the office "looks like a Tarzan movie."
11 Who made that comment? Savage?
12     A.        Savage had made that
13 comment. Second hand. I had heard that Mike Scher
14 had made that comment.
15     Q.        Did you hear Mike Scher make
16 that comment?
17     A.        No, I didn't. I said second
18 hand, I heard that Mike Scher had made that comment.
19 And I believe Kim Marlow said she had heard that
20 comment. Of course, many people would not come to me
21 with such stuff. It wouldn't be wise.
22     Q.        Did you hear Savage make the

DELMARVA REPORTING
(302) 653-1036

115

Hue - Israel

1  comment?
2      A.        I did not hear Savage
3  personally make the comment.
4      Q.        Did you ever hear anyone
5  personally make the comment?
6      A.        He never made the comment to
7  me.
8      Q.        No. Did you --
9      A.        He did state.
10     Q.        That wasn't my question.
11 Did you ever hear anyone in management make that
12 comment?
13     A.        I've heard, yes.
14     Q.        Who was that?
15     A.        I was going to say Savage
16 had made a comment, but it wasn't the Tarzan movie.
17 He had said it looked like some kind of jungle bunny
18 something he had made, comment about African Americans
19 in the office. I believe Rick Boudreau made those
20 comments, I believe.
21     Q.        In your complaint you allege
22 that Savage is or was the friend and mentor of Ted

DELMARVA REPORTING
(302) 653-1036

116

Hue - Israel

1  Fox?
2      A.        Yes.
3      Q.        Why do you believe that,
4  that was he was the friend or mentor?
5      A.        When Ted was brought to our
6  office initially, he was under the mentorship of Bill
7  Savage. When Bill introduced him as a person from
8  corporate to all of us in a general employee meeting
9  many years ago, and that he was, I guess on a quick
10 start or quick, an executive program that Ted was on,
11 and etcetera. That's how he announced him to them.
12 They went and made trips together, etcetera, etcetera.
13         (A brief recess was taken.)
14 BY MR. ISRAEL:
15     Q.        How often do you see anyone
16 relating to psychiatric problems?
17     A.        Honestly. Once a week I'm
18 on what they call a hot list or lot line on a daily
19 basis because I have been quite depressed. But once a
20 week with my psychiatrist.
21     Q.        And are there any other
22 stressors in your life besides the issues relating to

DELMARVA REPORTING
(302) 653-1036

117

Hue - Israel

1  NCO?
2        A.        This issue has affected my
3  life in every capacity.  My marriage.
4        Q.        Okay.
5        A.        So I would say it has
6  filtered into every aspect of my life.
7        Q.        Are there any other
8  stressors that are independent that have affected you;
9  death of a parent, bankruptcy, things like that?
10       A.        No.
11       Q.        Just this?
12       A.        Just this.
13       Q.        What prognosis, if any, do
14 you have?
15       A.        I have post traumatic stress
16 disorder.
17       Q.        That's a diagnosis.  I am
18 asking for a prognosis.  Is anyone telling you that
19 you are going to get better?
20       A.        I'm sorry to be so ignorant.
21 I'm in therapy with a psychiatrist once a week.  He is
22 quite concerned, especially during this deposition

DELMARVA REPORTING
(302) 653-1036

118

Hue - Israel

1  period, that I was on a suicide watch.  I've had his
2  number, and he has called me three times and made sure
3  that I'm okay.  This has caused me a lot of shame,
4  embarrassment.  I don't understand.  I loved NCO.  If
5  I get emotional, it is because I was very proud of
6  what I did.  If I did anything wrong ever, Kathy
7  always would call me and reprimand me.  I would have
8  corrected that.  That's the relationship that we had.
9  She was hard.  I didn't mind that she called me up and
10 cussed me.  She did it on a regular basis.  When all
11 this happened, it, being the first African American
12 female that rose to this position, I was devastated,
13 hurtful, and shamed.  It was hurtful and.
14       Q.        Do you think Kathy is an
15 honest person?
16       A.        I am sure you have heard, I
17 think she's a bitch.
18       Q.        Is she honest?  A lot of
19 people can be difficult.  It doesn't make them
20 dishonest.
21       A.        Is she a bitch?  Is she an
22 honest bitch?  No, she's not honest.  No, she's not

DELMARVA REPORTING
(302) 653-1036

119

Hue - Israel

1  honest.
2        Q.        Until this time, she treated
3  you or did not treat you with respect?
4        A.        What you and I might
5  consider respect is not what Kathy might consider
6  respect.  She would call you up, cuss you out, call
7  you a crazy bitch, and hang up on you.  But she
8  respected you.  That's just how she was.
9        Q.        Right.  Let me ask it this
10 way.  Do you believe it would be out of character for
11 Kathy Obenshain to blindly follow instructions from
12 Ted Fox and fire you?
13       A.        I think it was Ted that did
14 the firing.  I think it was under his --
15       Q.        Right.
16       A.        -- guidelines.  I think she
17 would follow Ted 's instructions because she was under
18 the gun over checks from corporate.  As she stated,
19 heads were going to roll, and it was not going to be
20 hers.  Yes.
21       Q.        Why would heads all the
22 sudden start to role relating to checks?  What changed

DELMARVA REPORTING
(302) 653-1036

120

Hue - Israel

1  that would cause that?
2        A.        I was not, I am not in
3  Horsham or in Metairie.  I do not know what prompted
4  this internal audit of NCO.  I was not at that
5  executive level.
6        Q.        How many checks in your
7  office in December were improper, aside from Matt
8  Lane's, in your opinion?
9        A.        In my opinion, that were
10 improper, were Matt Lane's.  That was three, of Matt
11 Lane's, I believe.
12       Q.        Right.  None others?
13       A.        That were improper in my
14 opinion, were Matt lane's.  That' was three.
15       Q.        I'll pass the witness.
16   EXAMINATION BY COUNSEL FOR THE PLAINTIFF
17 BY MR. HOMER:
18       Q.        Miss Hue, towards the end of
19 your testimony, you were asked questions about
20 stressors in your life, and you indicated I think
21 that, at least currently, the NCO problem is the main
22 stressor?

DELMARVA REPORTING
(302) 653-1036

EXHIBIT 5

04/27/02  07:52 FAX                    NCO GROUP INC          Hue S                    003/005

04-13-02
ENTERED

# NCOgroup

## Employee Change Authorization

Org. MMI                    Location: Dover - 608

| Name: Hue Valere | Social Security Number: 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 | Effective Date |

### Salary/Job Change

|  | | | | Job Title | Job Code | Exempt/Non-exempt | Grade |
|---|---|---|---|---|---|---|---|
| From | 23.08 Annual 48,000 | % of Increase |  | Mid Manager | 24 | | |
| To: 3.11 | Hourly 28.85 | Annual 60,000 | % Increased 2570 | GCM | Job Code | Exempt/non-exempt | Grade |

|  | Office Location | Cost Center | Hours PT/FT | | Non-Standard Workweek Differential |
|---|---|---|---|---|---|
| From | DOVER | 608 | | | Straight Nights ☐   Sunday ☐   Sat & Sunday ☐ |
| To | DOVER | 608 | | | |

### Name Change

|  | Last Name 5|3 56 iMo X 5.19 | Full First Name 223.12 | MI | Marital Status Change |
|---|---|---|---|---|
| From | | | | ☐ Single    ☐ Married |
| TO: | Last Name | Full First Name | MI | |

### Address Change

|  | Street Address | Apt. No. | City |
|---|---|---|---|
| | State | Zip | New Phone No. & Area Code ( ) |

### Remarks

Reason for Salary Change (Promotion/Demotion/Merit/Salary Adjustment)

From Mid Dad Manager to GCM effective immextely with Bonus Pool of 3500 for April Fees — Starting in May her Bonus Pool will be 5000

### Approvals

| Approving Signature | Date 4/19/a | Human Resources/Payroll | Date |
|---|---|---|---|
| Signature | | Signature | |
| Print Name | | Print Name | |

CEO Salary Adjustment Approval

APPROVED  4/23/02

HR/FORMS/CHGUATK.FRM   Ed. 10/98

000173

EXHIBIT 6

Hue 6 COPY 1

IN THE MATTER OF                    )
                                    )
VALERIE D. HUE,                     )
          Claimant,                 )
                                    )
      v.                            )
                                    )
NCO FINANCIAL,                      )
          Employer.                 )

          Conversation transcribed from tape-recordin
by Cheryl A. Anthony, Court Reporter, hearing, date, and
time unknown.

PRESENT:

     MR. RICK BOUDREAU

     MR. PHIL WEAVER

     MR. TED FOX

ORIGINAL RETAINED BY JEREMY HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302)674-8384

PLAINTIFF DATE NO.

000124

2

1        MR. BOUDREAU: Whew. Let me see. Where w.

2    I? I know wanted to get with Phil, and I was going to

3    tell him to make sure that you were there on the squawl

4    box so we could all chat together.

5        UNKNOWN VOICE: Okay. Hold on. Hold on a

6    second. He's just outside my door.

7        MR. BOUDREAU: Yeah, no problem.

8        UNKNOWN VOICE:  Hold on.

9        Phil?

10        Rick?

11        MR. BOUDREAU: Hey.

12        UNKNOWN VOICE: I have Phil right here.

13        MR. BOUDREAU: Hey Phil.

14        MR. WEAVER: Hey, buddy.

15        MR. BOUDREAU: How are you? How are you?

16        MR. WEAVER: Good.

17        MR. BOUDREAU: I just wanted a few moments,

18    just to kind of -- I just got to combination vent,

19    combination pour my heart out here to try to understand,

20    or at least get some direction or at least smack me into

21    a sense of focus and direction.

22        Bill is driving me fucking crazy. God, that

23    felt better. Okay. You got his letter earlier in the

24    month?

3

1          MR. WEAVER:  Yeah.  And what you don't kno

2    Rick -- because I didn't just to circle back around to

3    you -- but once I received that letter, I kind of went

4    into a spin.

5          MR. BOUDREAU:  Okay.

6          MR. WEAVER:  And I called Bill and read hi

7    the riot act and told him in no uncertain terms that -

8    you know, you don't report to him and he doesn't, you

9    know, direct or ask you for action plans or, you know,

10   anything like that, that you guys are peers.  And, you

11   know, while there is a dotted line there, because, you

12   know, we've got to take care of clients, that, that you kno

13   you report to Peter now --

14          MR. BOUDREAU:  Right.

15          MR. WEAVER:  -- first and foremost, and, y

16   know, me so -- and he was clear on that.

17          MR. BOUDREAU:  Right.

18          MR. WEAVER:  He was clear on that and was -

19          MR. BOUDREAU:  So that I guess that I would

20   throw out this proposition that I gave to -- when he

21   shows up on my LB meeting this morning, he wants LBs to

22   now provide him with their daily hit list.

23          MR. WEAVER:  What?

24          MR. BOUDREAU:  The meeting that we had this

PLAINTIFF BATE NO.

000126

4

1  morning with the --

2           MR. WEAVER:  Wait, wait, wait.  Stop.

3           MR. BOUDREAU:  Okay.

4           MR. WEAVER:  You were having an LB meeting

5           MR. BOUDREAU:  Yeah, which he attended,

6  which I'm fine; you know, take your input, blah, blah,

7  blah.  I don't mind.  Sit in and you want to critique

8  me, fine.  Let's go.  That's fine.  I have no problem

9  with, you know, peer critique, that type of a deal.

10           MR. WEAVER:  All right.  And in that

11  meeting --

12           MR. BOUDREAU:  He asked all collect -- all

13  LBs to provide him daily with a copy of the hit list

14  that they would be turning in to me to be turning in to

15  him.

16           MR. WEAVER:  And what was his purpose for

17  that?

18           MR. BOUDREAU:  Obviously, he'd be monitorin

19  and watching them and monitoring and watching me.  I'm

20  not quite sure.  He didn't really lay out --

21           MR. WEAVER:  How about the date for

22  promises?  I mean what are you talking about here?  You

23  daily projection sheets?

24           MR. BOUDREAU:  Yes.

PLAINTIFF BATES NO.
000127

5

1          MR. WEAVER:  Did he tell you he was going

2     to do this?

3          MR. BOUDREAU:  No.  He just threw it out in

4     the meeting.

5          MR. WEAVER:  Yeah.  Well, then see?  I mean

6     he should have come to you for that.  Rick, you know, i

7     you don't mind, why don't you copy me on your daily hit

8     list so I can review them and we know why --

9          MR. BOUDREAU:  Sure.  I know.  I --

10          MR. WEAVER:  But not in front of the

11     collectors.

12          MR. BOUDREAU:  Sure.

13          MR. WEAVER:  -- unless you are aware of it,

14     unless it's the two of you together.

15          MR. BOUDREAU:  Right.  I mean that was

16     the -- because my response would have been:  No.  I give

17     you my fucking projections on a daily basis.  You know

18     how to go in behind me and watch my CMA, blah, blah,

19     blah, you know.  But he decides he that wants to be part

20     of the process which, you know, is just fucking

21     bullshit.

22          So then we have our quarterly awards

23     meeting.  We coincided it with Kirk Rochell leaving

24     today.  Kirk goes and tells about how they won a sales

PLAINTIFF'S EXHIBIT NO.

6

1  award, you know, for the quarter and, you know, the

2  collectors for the sales cup, to which he made some

3  catty little sideline comments about how dismal

4  collections had been.

5           MR. WEAVER:  Who?  Kirk did?

6           MR. BOUDREAU:  No, Bill did, in the midst c

7  the whole fucking branch meeting about the collector of

8  the quarter sales cup, and all of this other blah, blah

9  And he is applauding sales, you know, for the collector

10  cup -- for the sales cup, rather.  And at the same time

11  he is making little side, under-breath comments about

12  the dismal performance of fucking collections.

13           And I am saying to myself:  You know, what

14  the fuck?  First off, do you think the collectors are

15  really appreciating this?  They know how shitty they

16  did.  And you now you are telling the fucking sales

17  people how shitty they did.  A good place to do it,

18  Bill.  You know, (unintelligible) and you are fucking

19  bad-mouthing the collections department.

20           But then he follows it up with:  Oh, and we

21  need to give them all the assistance that they can get.

22  Okay, because we don't have enough fucking programs in

23  place, action plans, follow-ups, daily schedules that w

24  already follow that we attempt to adhere to.  So now

7

1    he's got every freaking salesman sending me fucking

2    print screens.

3         And not that I don't have any problem with

4    sales managers sending me print screens that they see

5    accounts that have fallen by the wayside or a client

6    called and wanted some additional work, you know, that

7    type of thing.

8         I've got now salesmen on the freaking -- you

9    know, commenting on the accounts. Hey, do you think an

10   ADL is appropriate here? And how come this hasn't been

11   called in three weeks? And what kind of performance is

12   this for my client? And they're freaking writing these

13   notes in the collections screens --

14        MR. WEAVER: What?

15        MR. BOUDREAU: -- sending me piles of

16   fucking print screens. And Bill said: That's what I

17   want you to do. I want you to help collections, because

18   they can't get their job done. That is the essence of

19   what he said. Collections needs your help. So if you

20   see any accounts that are not being worked properly and

21   there's lost fee opportunity, why don't you get print

22   screens, give them to your managers? And I have been

23   getting fucking -- you know, small, fucking books of

24   them for the last three or four days. He's just fuckin

8

1    driving me --

2              MR. WEAVER:  He'll be reeled back in, Rick

3              MR. BOUDREAU:  No, and -- Are we in a clos

4    door --

5              MR. WEAVER:  Yes.

6              UNKNOWN VOICE:  Yes.

7              MR. BOUDREAU:  All right.  Bill, you know

8    Peter, I don't know if you know Bill.  Phil, obviously,

9    you know Bill.  He's a real colorful character.

10             MR. WEAVER:  I have met him.

11             MR. BOUDREAU:  He's -- you know, we were ir

12   the midst of a meeting.  They were paging -- I guess yo

13   were paging Mike Scher earlier, at around 11:30, quarte

14   to 12.

15             MR. WEAVER:  Yeah, probably.

16             MR. BOUDREAU:  So he opens up the door,

17   because they page him -- Mike Scher, six-oh, blah, blah

18   He opens the door.  He said:  Hey, do you think there

19   might be something going on important in here?  What's

20   the matter with you?

21             Great, the freaking collector of sales all

22   having a hoopla all at the freaking expense of the

23   receptionist.  It's like, how embarrassing is this for

24   this poor girl?  Mind you, she knew there was a meeting

9

1   going on, probably shouldn't have been paging.  But it

2   was because you guys were calling and, obviously, there

3   was a sense of importance and urgency to that and that'

4   probably why she was doing that.

5              MR. WEAVER:  We had a client issue, and we

6   didn't know that there was a meeting going on.

7              MR. BOUDREAU:  No, and the receptionist, yo

8   know, passed the message on.  But more importantly, I

9   know Bill's sideline crack was really appropriate.  And

10  you know, he does these things.

11             MR. WEAVER:  No, we don't do that in front

12  of other employees, you know.

13             MR. BOUDREAU:  I mean Bill is a colorful

14  character and will certainly tell you at any point in

15  time how much of it he is.  But he's a loose cannon

16  sometimes, and I mean that was a little awkward.

17             I even had a gal just recently left us.  He

18  name was Audrey Williams.  She was my TPA person for a

19  little while.

20             MR. WEAVER:  Yeah.

21             MR. BOUDREAU:  And I moved her into admin,

22  and she said -- you know, she was struggling, going

23  through it bits and pieces.

24             But you know, Bill just decided to target

10

1   her. And at one point in time, he walks by her door,

2   bangs on the window, because we've got these little

3   fishbowl windows type deal. He bangs on the door. And

4   he's halfway down the hallway and says to Val: Hey, do

5   you think you can get that fat ass to wake herself up?

6          It's, you know, like a day and a half later

7   that Audrey put in her notice. Now, did she talk all

8   about that?

9          MR. WEAVER: Did you hear that first person

10         MR. BOUDREAU: No, I did not.

11         MR. WEAVER: Did Valerie?

12         MR. BOUDREAU: Valerie did --

13         MR. WEAVER: Huh?

14         MR. BOUDREAU: Valerie, I believe, will give

15   you that first person.

16         MR. WEAVER: I want her to document that.

17         MR. BOUDREAU: You know, I even made a point

18   of telling her: You need to go to talk to Bill.

19         MR. WEAVER: No, I don't want her to go to

20   Bill. I want her to document that to me.

21         MR. BOUDREAU: It's shit like that. And

22   there are a couple of other little ditties that I'm not

23   at liberty right now to talk about. But --

24         MR. WEAVER: Like what? I mean, what --

PLAINTIFF EXHIBIT

000133

11

1              MR. BOUDREAU:  I'm talking --

2              MR. WEAVER:  What are you talking about?

3              MR. BOUDREAU:  It's just stupid shit that

4    gets around and says.  I want to make sure nobody is

5    around hearing this stuff.

6              But he on occasion will use racial epithet

7    inside offices that probably are not even called for.

8    But more importantly, he does it in front of producers

9    It gets a little, you know, stupid.

10             MR. WEAVER:  Like what?  Like what did he

11   say?

12             MR. BOUDREAU:  Like, you know, when he was

13   talking about Audrey, you know, how long is it going t

14   take for us to get this N word, you know, back on the

15   phone and woken up?

16             MR. WEAVER:  Who did he say that to?

17             MR. BOUDREAU:  Well, he said that definite

18   to me and Eric Shaw.

19             MR. WEAVER:  All right.  I need that

20   documented.

21             MR. BOUDREAU:  I was like:  Hey, how stupi

22   is -- Bill, hey, come on.  I mean this is not even coo

23             MR. WEAVER:  Hold on, Rick.  I need to get

24   Ted down here.

PLAINTIFF'S
EXHIBIT NO.

000134

12

1          UNKNOWN VOICE:  Hold on a second.  That's

2    off the charts.  That will get us in a lot of trouble.

3          MR. BOUDREAU:  You know, it's like -- I

4    don't know.  He's just like driving me freaking crazy,

5    and I don't know how to -- Look, I've got to -- I've go

6    to work on that.

7          MR. WEAVER:  Yeah, this is Ted.

8          (Unintelligible).

9          MR. WEAVER:  Audrey Williams, GPA collector

10   (unintelligible) good boy, bad boy, whatever, that --

11   how long ago, Rick?

12         MR. BOUDREAU:  Let's see.  She left us two

13   weeks ago, on a Friday.

14         MR. WEAVER:  A couple of days before she

15   quit?

16         MR. BOUDREAU:  Absolutely.  You know, it

17   was like on that Tuesday or Wednesday, because it was

18   like -- you know, it was less than a week after that

19   event.

20         MR. WEAVER:  -- down the hall, raps on her

21   window --

22         MR. BOUDREAU:  Yeah.

23         MR. WEAVER:  -- yells at Val:  Hey, do you

24   think we can get this fat ass on the phone?

13

1          MR. BOUDREAU:  Right.

2          MR. WEAVER:  It was --

3          MR. BOUDREAU:  No.  Get the fat ass awake

4   and on the phone.

5          MR. WEAVER:  Awake and on the phone.

6          MR. BOUDREAU:  Yeah.  And on occasion --

7          MR. WEAVER:  Eric Shaw, who is a producer

8   and Rick, what was the racial thing?

9          MR. BOUDREAU:  Well, you know, he came in

10  the office and said:  What do you think there is a

11  chance of getting the fat --

12               (Unintelligible).

13          MR. BOUDREAU:  -- N word, you know, awake

14  enough to be able to dial the phone?

15          MR. WEAVER:  In front of a producer.

16          MR. FOX:  How many people?  How many?  Jus

17  one?

18          MR. BOUDREAU:  It was just me and Eric.  H

19  came -- I was in Eric's office doing a (unintelligible

20  and he came in when he saw me in there and --

21          MR. WEAVER:  Now, first of all, this whole

22  meeting thing that happened today --

23          MR. BOUDREAU:  Yeah.

24          MR. WEAVER:  -- go back over that, Rick.

PLAINTIFF BATE NU.

000136

14

1           MR. BOUDREAU: Yeah. I mean he was

2     obviously applauding his collections, his sales

3     department, for having achieved their sales cup, to

4     which he then threw a couple of little side chops about

5     the fact that collections obviously had a dismal month

6     and that it is the salespeople who need to take some

7     responsibility to that and help collections along.

8           MR. WEAVER: Right, in half.

9           MR. BOUDREAU: Yeah. And to the end that w

10    need -- they need to be able to watch for those account

11    that they think they can assist us in.

12           So now I've got, you know, a parade of

13    collectors, of salespeople giving me commentary on wher

14    I should work an account. It's like they've got nothir

15    else better --

16           MR. WEAVER: Well, why (unintelligible?)

17           MR. FOX: What direction is the

18    (unintelligible)?

19           MR. WEAVER: On the collectors notes, not

20    just the --

21           MR. BOUDREAU: Right. I've already got a

22    couple of salesmen that, you know, I've got -- you know

23    that have had issues, Bob Garrett, in particular. And

24    I've had --

PLAINTIFF EXHIB.
000137

15

1          MR. WEAVER:  (Unintelligible) racial

2    epithet --

3          MR. FOX:  That is not our concern.

4          MR. WEAVER:  That's way off the charts.

5          MR. BOUDREAU:  I've got salesmen that are

6    now, you know, deciding they know best.  I had one sal

7    kid that came in here today, and he did -- and this is

8    probably a customer service deal, although I'm not

9    really certain that the salesman has the right to pick

10   and choose this thing -- because then it says:  Oh,

11   well, look, you took the account.  It was a disconnect

12   telephone account number, SOS, metroed.  And we sent o

13   a letter, closed it in about eight or nine days.  It

14   was an 1,100, $1,200 deal.

15          About three weeks later, the client gets a

16   check.  Timing it to the time that the letter went out

17   until the time the client got it, it made some sense.

18   But he walked in and said:  Oh, look at that.  You guys

19   only worked it for eight days, so I'm not going to bil

20   the client.

21          MR. WEAVER:  I never circled back around

22   with Rick and told him that Bill and I talked about his

23   memo to Rick earlier this month.

24          But this morning, Rick had a large balance

16

1    meeting with his large balance collectors.  Bill wants

2    to sit in on it.  Rick's fine with that.

3            Bill tells the collectors, without talking

4    to Rick about it, in the fucking LB meeting, effective

5    immediately, he needs to start forwarding me all of yo

6    daily hit lists.

7            MR. FOX:  After your conversation?

8            MR. WEAVER:  Yeah.  This is today.

9            MR. FOX:  Without telling Rick about it

10   beforehand?  I mean --

11           MR. BOUDREAU:  Yeah.  There is another one

12   that I'm just thinking of.  And I kept thinking -- I'm

13   trying, because I know Val's run into little, awkward

14   issues with Bill pointing out her assets, if you will.

15           MR. WEAVER:  About what?

16           MR. BOUDREAU:  Her assets, her breasts.

17           MR. WEAVER:  Her --

18           MR. BOUDREAU:  Not in so many words, but

19   just her breasts.

20           MR. WEAVER:  Her breasts?

21           MR. BOUDREAU:  Her breasts.  You know, the

22   importance of --

23           MR. WEAVER:  That comment wasn't towards

24   her.  It was towards another employee.

PLAINTIFF'S
BAILRU.

17

1           MR. BOUDREAU:  No, that was directed at he.

2    That was -- Valerie relayed the story about how Bill w

3    so impressed with her, you know, assets.

4           (Unintelligible).

5           MR. WEAVER:  Now, that was towards one of

6    Val's employees.

7           MR. FOX:  Okay.  Because, you know, Val and

8    Bill have had a joking relationship that their -- I

9    don't know if they were joking or not -- but they are

10   related.

11          MR. BOUDREAU:  Yeah, they're related,

12   exactly.

13          MR. FOX:  (Unintelligible) apparently, I

14   mean there's black heritage in Bill's family, going bac

15   to the Civil War time or whatever.

16          MR. BOUDREAU:  And at one point in time,

17   Brian had had --

18          MR. FOX:  Don't get comfortable with

19   somebody.  This is what you get.

20          MR. WEAVER:  Okay.  Again, I want the -- I

21   want it documented.  I want some screen prints, althoug

22   the documentation from you and Eric on the racial

23   thing --

24          MR. BOUDREAU:  Right.

PLAINTIFF EXERO.

000140

Anthony Reporting

18

1           MR. WEAVER:  -- and from Val on the fat ass

2  thing.

3           MR. BOUDREAU:  Right.

4           MR. WEAVER:  I need that stuff documented

5  and forwarded here first thing in the morning.

6           MR. FOX:  Very good.

7           MR. BOUDREAU:  I mean it's just -- and you

8  know, it's just a -- I mean I'm all concerned,

9  obviously.  It's all a concern, and it's a problem.

10          MR. WEAVER:  Rick?

11          (Unintelligible).

12          MR. WEAVER:  Rick?

13          MR. BOUDREAU:  Yeah, I'm listening.

14          MR. WEAVER:  Obviously, you know, this is a

15 serious issue.  And you know, I guess my question is I

16 understand you are a little bit sidewhipped today

17 because of the quarterly meetings.  But why didn't you

18 bring this to me when it was happening?  I mean you know

19 that those types of comments can get this organization

20 in so much trouble.

21          MR. BOUDREAU:  And it has -- and it has

22 percolated over the last two weeks.  And I am telling

23 you, it just absolutely just blew up on me today.  I

24 just --

PLAINTIFF DATE NO.

19

1          MR. WEAVER: Yeah, but Rick --

2          MR. BOUDREAU: I know, I know, Phil, I kno

3   I know; no excuse.

4          MR. WEAVER: All right. Are you intimidat

5   by him a little bit?

6          MR. BOUDREAU: You know Bill. It's a hard

7   sell. He wants it his way, or fuck you becomes his

8   response, you know. This is the way it gets done. He

9   has no problems in telling us, you know, the way he

10  feels in no uncertain terms. And sometimes when he

11  doesn't want to listen, he absolutely does not want to

12  listen. You know, no amount of logic or reason is goir

13  to work with him.

14         MR. WEAVER: Do I really want this?

15         MR. BOUDREAU: That is crazy. I mean, you

16  know --

17         MR. WEAVER: Hey, Rick.

18         MR. BOUDREAU: I mean I had better

19  communications with Ron.

20         MR. WEAVER: How close -- oh, God.

21         MR. BOUDREAU: A comical figure.

22         MR. WEAVER: How close is Eric Shaw to Bill

23         MR. BOUDREAU: Other than the fact that the

24  have been here for forever together?

PLAINTIFF

Anthony Reporting

20

1          MR. WEAVER:  Well, I mean if we ask Eric

2     Shaw to document that --

3          MR. BOUDREAU:  He even came around the

4     corner after that.  He said:  Man, you've got to talk

5     Bill.  He can't be saying shit like that.

6          MR. WEAVER:  All right, then good.  I want

7     it documented from Eric.  I want it separately

8     documented from you.  And I want Valerie to document t

9     other incident and also any other regarding her

10    uncomfortableness with his comments about her assets.

11         MR. BOUDREAU:  Yeah.

12         (Unintelligible).

13         MR. WEAVER:  And yes, definitely don't say

14    anything to anybody else.

15         MR. BOUDREAU:  I know.  You know, there are

16    other incidents with Brian.  And you know, we had had a

17    series of African-American, if you will, folks

18    interviewing here.  And Bill asked him on the side -- h

19    says:  Now, what's the chance that you are filming a

20    Tarzan movie here, you know?

21         MR. WEAVER:  Who did he say that to?

22         MR. BOUDREAU:  Brian.

23         MR. WEAVER:  What?

24         MR. BOUDREAU:  Bill had said that to Brian.

PLAINTIFF BATE NO.

000143

21

1    Bill had said that to Brian a couple of weeks back.

2         MR. WEAVER:  Now, Rick, before you have

3    everybody document this, I am going to reach out to

4    HR --

5         MR. BOUDREAU:  Yeah.

6         MR. WEAVER:  -- because I don't know

7    necessarily that it's in our best interest -- and Ted

8    makes a good point to document and go on record with a

9    of this shit that is going to get us in a great deal c

10   trouble if a producer came back us.

11        MR. BOUDREAU:  Right.

12        MR. WEAVER:  But I mean I think it is all

13   very clear.

14             (Unintelligible).

15        MR. WEAVER:  I just want to make sure, tha

16   yeah, I am asking for it in the right manner.

17        MR. BOUDREAU:  Right.

18        MR. WEAVER:  It may just be -- and I don't

19   know.  I just -- I'll reach out in the morning --

20        MR. BOUDREAU:  Yeah.

21        MR. WEAVER:  -- and then call you back and

22   give you some direction.

23        MR. FOX:  I don't want anything said to Bil

24   either.

22

1          MR. BOUDREAU: No, no, no, fuck, no. I me

2   him and I had a --

3               (Unintelligible).

4          MR. BOUDREAU: -- increased (unintelligible

5   of doing and the results of his sales manager and

6   collective sales people sending all of this shit, he's

7   just -- it's become a Spanish inquisition.

8          MR. WEAVER: So you are not going to go to

9   Eric. You're not going to go to Val. You are not goi

10  to go to anybody until you hear back from me.

11         MR. BOUDREAU: We'll work it out in the

12  morning.

13         MR. WEAVER: I'm sorry?

14         MR. BOUDREAU: I said until we work it out

15  in the morning.

16         MR. WEAVER: Until you hear back from me.

17         MR. BOUDREAU: Very good.

18         MR. WEAVER: And Rick?

19         MR. BOUDREAU: Yes.

20         MR. WEAVER: Don't, you know -- You know

21  what is right and what is wrong.

22         MR. BOUDREAU: I know.

23         MR. WEAVER: Don't let it all build up. As

24  issues come up, communicate with us.

PLAINTIFF FRIEND

23

1              MR. BOUDREAU:  I know.  That's always the

2    direction I need to go.  And that's why I said I had to

3    make the call, because today was just the -- just the

4    top of it all.

5              MR. WEAVER:  Yeah, but God damn.  I mean if

6    we have somebody making those types of litigious

7    statements in our office, don't wait until it's

8    something that you happen to take personal to bring up

9    those other issues.

10             MR. BOUDREAU:  I know.  They were all -- I

11   mean yeah.  It's been like two weeks, and it's just out

12   of control and --

13             MR. WEAVER:  (Unintelligible) man.  I am

14   counting on you for you, you know --

15             MR. FOX:  (Unintelligible).

16             MR. WEAVER:  Yeah, that high level of, you

17   know, knowledge (unintelligible) and, you know --

18                  (End of tape-recorded conversation.)

19

20

21

22

23

24

PLAINTIFF BATE NO.

24

1    State of Delaware    )
                         )

2    Kent County        )

3

4                CERTIFICATE OF REPORTER

5         I, Cheryl A. Anthony, Delaware Certified
Shorthand Reporter, Cert. No. 107-PS, and Notary Public

6    in the State of Delaware, do hereby certify that the
foregoing is a true and correct transcript, transcribed

7    from tape-recording to the best of my ability, in the
matter of Valerie Hue v. NCO Financial, date of

8    tape-recording unknown.

9         I further certify that I am not counsel,
attorney, or relative of either party, or otherwise

10   interested in the event of this proceeding.

11

12

13                    Cheryl A. Anthony
                          Delaware Certified

14                   Shorthand Reporter
                          Cert. No. 107-PS

15

16   DATED: _____

17

18

19

20

21

22

23

24

PLAINTIFF ALLEN'S
000147

Exhibit E

Bill Savage, general manager
Milliken -n- Michaels
802 Silverlake Blvd
Dover, De, 19941

Re: Resignation

Dear Bill,

Effective 1/10/98, I resign my position
with Milliken -n- Michaels.

With life comes challenges for one to
conquer and my latest challenge allows me
to expand and grow my personal goals.
These goals would seem unattainable if not
for the M+M experience and discipline.

I am grateful to Mike, Trey and you for
believing and trusting me. The road hasn't
always been smooth but each obstacle has pushed
me just a little bit futher to better understand
and prepare myself for what lies ahead.

One day my mother might just call you again
and I pray you answer favorable. Until Then ....

I Remain,

Cuz
Valerie Nic  1/10/98

Exhibit F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                        )
                                    )
        Plaintiff,                  )
                                    )
v.                                  )
                                    )    Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,        )      05-225-KAJ
a Delaware corporation,             )
trading as NCO FINANCIAL            )
COMMERCIAL SERVICES,                )
                                    )
            Defendant.              )

            Deposition of KIM MARLOW taken pursuant
to notice at the law offices of Parkowski, Guerke &
Swayze, P.A., 116 West Water Street, Dover, Delaware,
beginning at 9:15 a.m. on Wednesday, March 8, 2006,
before Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

            JEREMY W. HOMER, ESQ.
            PARKOWSKI, GUERKE & SWAYZE, P.A.
              116 West Water Street
              Dover, Delaware  19903
              for the Plaintiff,

            ELIZABETH K. FITE, ESQ.
            SESSIONS, FISHMAN & NATHAN, L.L.P.
              15316 North Florida Ave - Suite 100
              Tampa, Florida  33613
              for the Defendant.


            CORBETT & WILCOX
        Registered Professional Reporters
1400 French Street      Wilmington, DE 19801
            (302) 571-0510
            www.corbettreporting.com

Kimberly Marlow

2 (Pages 2 to 5)

Page 2

1  ALSO PRESENT: VALERIE HUE
        DINA SHAALTIEL, NCO Financial Commercial
2            Services
3        - - - - -
4        KIM MARLOW,
5    the witness herein, having first been
6    duly sworn on oath, was examined and
7    testified as follows:
8  BY MR. HOMER:
9    Q.    Good morning. My name is Jeremy Homer. I'm
10  the attorney representing Valerie Hue in this matter.
11  This is the case of Valerie Hue v. NCO. It's March 8,
12  2006, a little bit after 9 a.m., and we're at our Dover
13  offices in Delaware.
14        Ms. Marlow, what's your address and
15  phone number?
16    A.    My address is 170 Cantwell Drive, Dover,
17  Delaware. My phone number is (302) 677-0558.
18    Q.    Okay. During the course of this deposition,
19  I'm going to be asking you a series of questions. If you
20  don't understand the question, I'd ask that you just make
21  me repeat it --
22    A.    Okay.
23    Q.    -- or rephrase it to make sure that you don't
24  try to answer a question that you don't understand.

Page 3

1    A.    Okay.
2    Q.    Is that clear?
3    A.    Sure.
4    Q.    Is there any reason why your ability to answer
5  the questions today would be impaired for any reason?
6    A.    No.
7    Q.    Okay. Are you on any medication, for example?
8    A.    I'm on medication, yes.
9    Q.    But it wouldn't affect your ability to answer?
10    A.    No.
11    Q.    Okay. What's your educational background?
12    A.    I graduated from high school, did a technical
13  college course. And that's basically it.
14    Q.    Okay. Could you just briefly run through your
15  employment history from the time you got out of high
16  school to the present? For each position you have, just
17  briefly tell me how long you were at the job and what
18  your job duties were.
19    A.    Right out of high -- while I was working -- in
20  high school I worked for a beauty shop, because that's
21  what my trade was.
22    Q.    Okay.
23    A.    And I worked for a couple of beauty shops, as
24  a matter of fact. And maybe four years of that.

Page 4

1    Q.    This was after you graduated from high school?
2    A.    During and after graduation.
3    Q.    Okay.
4    A.    I worked part-time for a little restaurant.
5  At the same time, I was working at the beauty -- at a
6  beauty shop. Then I went to work for Masten Lumber
7  Company, which went out of business.
8    Q.    What time period was that in?
9    A.    That was -- gosh. That was 20 years ago.
10    Q.    Okay. You don't know if --
11    A.    I worked there for four years.
12    Q.    Okay.
13    A.    And then they went out of business.
14    Q.    Okay.
15    A.    And then I worked for -- I'm trying to think
16  if it was before or after that. I worked for Metal
17  Masters in Smyrna. It was a part-time position. That
18  wasn't full-time. So I tried to find a full-time job and
19  went to work for J.C. Hammond. And I did collections --
20  a little bit of collections there. Not really. It was
21  just kind of like the girl Friday there. And then I came
22  to NCO.
23    Q.    Okay. When did you start at NCO?
24    A.    In '97.

Page 5

1    Q.    Okay. Was it named NCO at that time?
2    A.    No. It was Milliken & Michaels.
3    Q.    Okay. Have you worked for that entity ever
4  since 1997, either Milliken & Michaels or NCO?
5    A.    Yes. I did.
6    Q.    Okay.
7    A.    Yes. I am.
8    Q.    Could you, from the time that you worked at
9  Milliken & Michaels, run through the different jobs that
10  you had, approximately when you had them, and what the
11  job duties were at each position?
12    A.    The first job when I got hired there, I was in
13  collections. It was a small balance at that time. Then
14  I went to a mid balance position approximately maybe a
15  year after the small balance position. And then I went
16  to a -- it's called a quality control position. Then I
17  went to a worldcom position, which is like a -- it's
18  like a little portfolio that they had that -- they put me
19  on a special program. And that's what I worked for
20  probably three years.
21    Q.    At each of these positions, these were
22  basically positions where you would attempt to collect
23  debts?
24    A.    Yes.

Kimberly Marlow

Page 6

1    Q.  Okay.
2    A.  Yes.
3    Q.  What after that?
4    A.  The last position before I was a collector was
5    a small balance management position.
6    Q.  When did you have that?
7    A.  That was four -- approximately four years ago.
8    Q.  How long did you have that position?
9    A.  Probably a year. Maybe a little bit longer.
10    Q.  Okay. Then after that what position did you
11    have?
12    A.  It was a mid balance management position.
13    Q.  What did you do in that position?
14    A.  Oversaw a collection group of mid balance
15    collectors.
16    Q.  How long did you have that job?
17    A.  I guess about two years. Maybe a little bit
18    more.
19    Q.  Okay. Can you give me approximate dates now
20    that you're talking about?
21    A.  Probably 2003. I was in small balance at that
22    time. 2004 to 2005 I was in mid balance.
23    Q.  What was the responsibilities of a mid balance
24    manager that you had in 2004 and 2005?

Page 7

1    A.  It was to oversee a group of collectors in a
2    certain range of dollar fee amount collected, and I was
3    to oversee their accounts, them themselves, policies and
4    procedures, system. That's basically it.
5    Q.  Did you have collection responsibilities
6    yourself? Did you collect debts yourself or did you just
7    oversee other people's efforts?
8    A.  At times I would collect debts myself. I
9    didn't essentially have a unit to work from, but I did
10    help in collections, yes.
11    Q.  Okay. Who did you report to during this
12    period that you were the mid balance manager --
13    collection manager?
14    A.  At that point it was Brian Laiche.
15    Q.  When you say "that point," what do you mean?
16    A.  My last mid balance position was I was
17    reporting to Brian Laiche at that time.
18    Q.  When was that?
19    A.  I had fluctuated back and forth under Valerie
20    and Rick, so it was -- when Valerie got promoted, I was
21    small balance collection manager.
22    Q.  When you say "Valerie," you mean Valerie Hue,
23    the plaintiff in this case?
24    A.  Correct.

Page 8

1    Q.  When you say "Rick," who do you mean?
2    A.  Rick Boudreau, who was the general collections
3    manager at the time.
4    Q.  That was back in what time period?
5    A.  2001.
6    Q.  Okay. So you worked for --
7    A.  Several.
8    Q.  -- Rick Boudreau as a small balance manager,
9    and then you worked for a time for Valerie Hue in that
10    same position.
11    A.  Yes.
12    Q.  In 2003 what job did you have? Was that with
13    small balance management still?
14    A.  Yes.
15    Q.  Okay. You reported to Valerie Hue, is that
16    correct, during 2003?
17    A.  That's correct.
18    Q.  Then in 2004 you reported to Brian Laiche?
19    A.  That's correct.
20    Q.  Okay. Did you ever, for any point in time,
21    actually hold the position even on a temporary basis that
22    Valerie Hue held before her termination?
23    A.  Before her termination?
24    Q.  After her termination.

Page 9

1    After she was terminated, did you do her
2    job for a time period?
3    A.  Yes.
4    Q.  When was that?
5    A.  Directly right after she was let go.
6    Q.  Okay. For how long did you perform that job?
7    A.  Probably up until maybe six months or better.
8    And then they changed the position to senior management.
9    And I was labeled senior management instead of
10    collection -- general collections manager.
11    Q.  Okay. Did the function change after that six-
12    month period was over?
13    A.  Yes.
14    Q.  Did your job duties change? How did they
15    change?
16    A.  We would report -- I would have to report
17    to -- just like if I was reporting to Valerie Hue, I
18    would have to report to someone else.
19    Q.  Okay.
20    A.  I had different things and schedules and
21    programs that I'd have to do that had to be reported to
22    someone else.
23    Q.  When you --
24    A.  I wasn't the final decision-maker.

Kimberly Marlow

4-(Pages 10 to 13)

Page 10

1    Q.  Okay.  When you held the job that Valerie Hue
2  had performed in that six-month period, who did you
3  report to during that time period?
4    A.  Kathy Obenshain.
5    Q.  Okay.  Was that for the whole six-month
6  period, or did she leave at some point during that
7  period?
8    A.  She left during that period of time.
9    Q.  Then who did you report to?
10    A.  Brian Laiche.
11    Q.  Okay.  Can you tell me what you did to prepare
12  for the deposition today, if anything at all?
13    A.  Just reviewed significant pieces of the check
14  handling policy.
15    Q.  Okay.  Were these documents that you reviewed?
16  Did you review documents?
17    A.  My statement that I reviewed.
18    Q.  Anything else?
19    A.  No.
20    Q.  Okay.  Did you have any discussions with NCO's
21  attorneys?
22    A.  Yes.
23    Q.  Okay.  How long were those discussions?
24    A.  A couple hours.

Page 11

1    Q.  Okay.  When was that?  Just before today?
2    A.  Yesterday.
3    Q.  Yesterday.
4        Okay.  Are you familiar with the term
5  "NSF"?
6    A.  Yes.
7    Q.  What is that?
8    A.  That's a nonsufficient funds check.
9    Q.  Okay.
10    A.  That's when a check comes back from the bank
11  for nonsufficient funds.
12    Q.  Okay.  Are you familiar with a policy that NCO
13  had for processing checks that had been returned NSF.
14    A.  Yes.
15    Q.  Okay.  Did the policy change over time?
16    A.  It was tweaked over time.
17        MS. FITE:  Object to form.  Go ahead.
18  You can answer.
19        THE WITNESS:  It was tweaked over time.
20  I mean, there was things that were added to the policy to
21  change it a little bit, but for the most part, it was the
22  same policy.
23  BY MR. HOMER:
24    Q.  Okay.  Can you tell me what the policy was in

Page 12

1  December of 2003?
2    A.  It's the same policy.  If you're talking about
3  the NSF correlation, it is — you would call the debtor
4  to verify the funds, call the bank to make sure the funds
5  were available, and then to get your manager to find out
6  if it was something that needed to be processed at that
7  time.  We didn't have what was called a redeposit at the
8  time, nor do we still.
9    Q.  Well, I think you just sort of explained a
10  little bit about the process.  But can you tell me
11  specifically, if you recall, what the policy itself was
12  in terms of what checks could be redeposited that had
13  been returned NSF?  What criteria were used to determine
14  whether you could redeposit them or not?  I'm talking
15  again about December of 2003.
16    A.  That's pretty much what I said.  It would have
17  to be — the collector would have to call the debtor to
18  verify the fund -- to make sure there was sufficient
19  funds in order for the check to be redeposited and/or
20  they would call the bank to make sure there were funds
21  available at that time to represent the check.
22    Q.  When you say "and/or," which was it?  Do you
23  have to do both or do you just have to do one —
24    A.  You had to do both, but —

Page 13

1    Q.  — or the other?
2        Excuse me.  Don't talk over my question.
3  Okay?
4    A.  Sorry.
5    Q.  The court reporter needs to get it down.
6        Okay.  The question, again, was:  You
7  said "and/or."  Did you mean you have to do both those
8  two things, or could you do either one?  By that I'm
9  talking about verifying with the bank or contacting the
10  debtor.
11    A.  You had to do both, but at --
12    Q.  And — I'm sorry.  Go ahead.
13    A.  But at times there was where a bank did not
14  verify the check or the funds.  There was certain banks
15  that wouldn't verify.  You could call them up, and they
16  wouldn't verify over the phone.  So then you would only
17  have the debtor's word that the check was, you know, okay
18  for the deposit.
19    Q.  Okay.  Was it the collectors that contacted
20  the bank or someone else?
21    A.  The collector was responsible to contact the
22  bank.
23    Q.  Okay.  This was in the period of December of
24  2003?

Page 46

1   month and we were trying to get as much fee on the books
2   as we probably could.
3       Q.   But why would you need to do that?  Why would
4   you need to get a level of comfort?
5       A.   To assure that the check would clear.
6       Q.   Let's say that the bank had been contacted and
7   the check had been verified.  The collector had told you
8   they contacted the debtor and that there were funds
9   available.  Why do you need to have a meeting to go over
10  and obtain another level of comfort before you submit the
11  check?
12      A.   That's actually just something that we did as
13  a group just to make sure that everything was, you know,
14  completed correctly.
15      Q.   When Mr. Shaw talked about exercising
16  judgment, what was he talking about there?
17           MS. FITE:  Object to form.  Answer if
18  you know.
19      A.   Like if -- as far as Eric's judgment, I can't
20  say what his judgment is.  But if you're asking me for my
21  judgment, that's a whole different story.
22      Q.   Well, you testified that the process that you
23  were talking about was the same one that Eric talked
24  about, and he does talk about sitting down and going

Page 47

1   through -- you just mentioned yourself you were trying to
2   get a level of comfort.
3       A.   Mm-hmm.
4       Q.   Was there any judgment involved in whether you
5   resubmitted the checks or not?
6       A.   At times there was.
7       Q.   How did judgment come into it?
8       A.   For an example, if you had a debtor that
9   actually made a deposit that day and the funds were going
10  to be available that night, that was a judgment call.
11  That was something that you, as a management group, would
12  sit down and talk about.  Do you think we should go ahead
13  and put this on or do you think we should wait?  And at
14  that point it's the manager's discretion whether to go
15  ahead and properly put that.  But it was proper
16  documentation and you had to have it signed off by a
17  manager.
18      Q.   Any other examples of when you used judgment?
19      A.   Possibly the bank won't verify and the debtor
20  is saying that he did make a deposit and/or there is some
21  affiliation that the check would clear at -- what we had
22  was EOM2.  So now we don't have that.  But EOM2 was if it
23  was cleared up or made up within that five-day period of
24  time.  I know it's confusing to you, but...

Page 48

1       Q.   Well, let's take an example.  Let's say the
2   bank didn't verify.
3       A.   Okay.
4       Q.   The collector indicated he contacted the
5   debtor and the debtor verified the funds.  What judgment
6   would come into play at that point in time for
7   resubmitting the check.  Isn't that all you really needed
8   to know -- that he had verified the funds?
9       A.   That would be a manager's discretion.  Not
10  exactly, because it actually didn't clear through -- it
11  wouldn't have cleared through the bank, because you just
12  told me that the bank told you that there was no funds
13  available but the debtor said there was.  So that was the
14  judgment.
15      Q.   No.  I just said the bank didn't verify.
16      A.   Oh.  They won't verify.
17      Q.   They couldn't --
18      A.   I'm sorry.
19      Q.   They couldn't get a verification from the
20  bank.
21      A.   That's a judgmental call to the manager at
22  that point.
23      Q.   Isn't it true that all the NSF checks that you
24  reviewed with the collectors in this process with Ms. Hue

Page 49

1   and Mr. Shaw -- all those checks -- had there been an
2   attempt to verify with the bank whether the funds were
3   available?
4            MS. FITE:  Object to form.  Answer if
5   you understand.
6       A.   In some cases.  In some cases.  I don't -- in
7   my group I only did mine.  So if there was anything else
8   in another group, I wouldn't primarily have that
9   authority.
10      Q.   Wasn't there somebody else in the Dover office
11  that tried to contact the banks to verify funds?
12           MS. FITE:  Object to form.
13      A.   It could have been at that point an admin, but
14  that would be the only person that I know that would
15  actually have called the bank.
16      Q.   Do you know --
17      A.   Other than the collector.
18      Q.   Would that have been at that time
19  Ms. Nickerson?
20      A.   Yes.  She was our admin at that time.
21      Q.   Before that it would have been Jenie Birdsong?
22      A.   Yes.
23      Q.   Do you know whether they had any role in
24  trying to verify funds with the bank?

Kimberly Marlow

14 (Pages 50 to 53)

Page 50

1    A.  I – the only rule that I know of is a
2  deposit.  They would do post dates at the end of the
3  month to make sure that they were going to clear.  Now, I
4  do know that that was a policy that the admins were
5  responsible for.  But as far as clearing an NSF check, it
6  was primarily up to the collector to do that.  But at
7  times we did ask the admins to call the banks.
8    Q.  Mm-hmm.
9    A.  And I don't recall if that's one of those
10  times or not, to be honest.
11    Q.  What do you mean at times?  You mean for the
12  whole month or just for specific checks or –
13    A.  No.  Just the end of the month run.
14    Q.  For the whole run?
15    A.  It might not be for the whole run.  It might
16  be a couple of checks here or there.
17    Q.  Okay.
18    A.  It depends on if – it depends on how busy we
19  were at that point in time.
20    Q.  Okay.  What did you work from when you brought
21  in the collectors?  Did you have some documents you had
22  in hand that you knew were the NSF checks?
23    A.  Yes.  We would – there was a spreadsheet that
24  we had actually.  I believe that admins put together that

Page 51

1  spreadsheet.  Or we might have as managers.  I don't
2  remember at that point in time.  And it would list all
3  the NSFs.
4    Q.  You don't know whether the admin had already
5  contacted the bank and couldn't get verification for the
6  list of those checks?
7    A.  I have no idea.
8    Q.  Okay.  You don't know whether they did or not?
9    A.  I don't know.
10    Q.  So you don't really know what the process was.
11  Is that what you're telling me?
12    MS. FITE:  Object to form.
13    A.  No.  I don't know if she helped in that
14  process or not at that point in time.
15    Q.  Well, I just want to get this clarified,
16  because before you told me that you had to do both bank
17  verification and debtor verification, but now you're
18  telling me you don't know whether the checks that you got
19  a list of had already been run through the bank
20  verification process and not passed.
21    MS. FITE:  Object to form.  She said
22  and/or.
23    A.  Yeah.  I don't believe I said that.  I said
24  that you could either have the debtor verify funds.  And

Page 52

1  then that was a judgment call to the manager.  Or you
2  could call the bank and find out if the funds were
3  available.  But your policy – the policy is to call
4  both.  You might not get a hold of the bank, and they
5  might not verify.
6    Q.  What you said before was that the policy was
7  the collector was to call the debtor for verification
8  even if the bank had already verified.
9    A.  Yes.
10    MS. FITE:  Jerry, do you mind if we take
11  a break?
12    MR. HOMER:  That's fine.
13    (A brief recess was taken.)
14    - - - - -
15    KIM MARLOW, resumes
16  BY MR. HOMER:
17    Q.  Referring back to Exhibit 2, which is your
18  statement to Fox, the last paragraph says, quote, last
19  month before Valerie left for vacation, she gave the
20  directive to Eric Shaw (mid balance manager) and handed
21  him all the cash journals of the collectors that she
22  found multiple NSFs – and there's a – I'm not sure if
23  that word is "or not" – but it goes on and says and told
24  to get them all on, quote/end quote.

Page 53

1    Do you recall making that statement?
2    A.  Yes.
3    Q.  Could you tell me, where did you learn that
4  this directive had been given to Mr. Shaw to get them all
5  on?
6    A.  That's what he told me.
7    Q.  Okay.  You don't have independent knowledge of
8  it?  You weren't present when he was told to?
9    A.  No.
10    Q.  Okay.  It goes on to say in the letter right
11  after that, "I know this because we were in our morning
12  managers meeting..."  What does that mean?  Why would you
13  know that because you were in the morning managers
14  meeting?
15    A.  Managers meetings we held every morning, and
16  she would give us things to do as per the day goes on.
17  And as she was leaving, she would give me things to do
18  that day, and she would have things to do that day.
19    Q.  Okay.  All right.  Referring again to your
20  statement, Exhibit 2, in the second paragraph, it says,
21  "On a monthly basis, we were given the directive to run
22  checks that we knew were not going to clear the bank."
23  Who does "we" refer to there?
24    A.  Our management staff.

Page 54

1    Q.  Would that be collectors?  Would that be just
2  you and Mr. Shaw?  Who was the management staff?
3    A.  That would be me, Val Hue and Eric Shaw.
4    Q.  Okay.  So it says on a monthly basis you were
5  given the directive.  Who gave you the directive to run
6  checks that you knew weren't going to clear the bank?
7    A.  Our directive was from Val.
8    Q.  She told you to run checks that she knew and
9  you knew weren't going to clear the bank?
10    A.  At times.
11    Q.  Okay.  When did she do that?
12    A.  It could have been any time at the end of the
13  month.
14    Q.  Okay.  She did it several times?
15    A.  Several months?
16    Q.  Yes.
17    A.  It could have been, yes.
18    Q.  Well, you say "could have been."  You wrote
19  the statement.  It says on a monthly basis we were given
20  the direction to do this.  Did you mean by that statement
21  that at the end of every month she told you to run checks
22  that you knew weren't going to clear?  What does that
23  statement mean?
24    A.  The statement means that each month that we

Page 55

1  would have an overview of what was going on that month.
2  It might not happen exactly every month, but there were
3  times that it did happen.  But our preface for our
4  meeting is -- was to get everything on at that point in
5  time.
6    Q.  Well, the next sentence says, quote, we were
7  directed to pull the cash journals and put the checks
8  back on that were from the previous months.  Then we
9  pulled each collector in one by one and discussed the
10  checks that would be run and the level of comfort of them
11  clearing.  Right?
12    A.  Correct.
13    Q.  So when you say it in the first sentence that
14  you were given the directive to run checks that weren't
15  going to clear the bank, is that qualified by the later
16  discussion there that says that you would get a level of
17  comfort by talking to the collector about it?
18        MS. FITE:  Object to form.  Answer if
19  you understand.
20    A.  Can you repeat that question for me?
21  BY MR. HOMER:
22    Q.  You say in the first sentence that we're given
23  a directive to run checks that we knew weren't going to
24  clear, but right after that you're talking about calling

Page 56

1  in the collectors and going through one by one and trying
2  to get a comfort level.
3        My question is:  The statement that you
4  were given a directive to run checks that you knew
5  weren't going to be put on, is that qualified by the fact
6  that you would try to find out with the collectors
7  whether they would clear or not?
8        MS. FITE:  Same objection.
9  BY MR. HOMER:
10    Q.  Or are those just two totally different
11  concepts?
12        MS. FITE:  Same objection.
13    A.  As far as the checks that weren't going to
14  clear the bank, would we discuss them with another --
15    Q.  Would you discuss it with --
16    A.  Would we discuss that with a collector?
17    Q.  Right.
18        Would you discuss those with the
19  collectors to try to get a comfort level?
20    A.  At times.
21    Q.  Now, why would you have that discussion if you
22  knew they weren't going to clear the bank?
23    A.  Because they could have talked to the debtor
24  after that point.  They might not clear at this point,

Page 57

1  which is EOM1, but it might have cleared on EOM2.
2    Q.  Okay.  You would have that second discussion
3  at EOM2 about whether the check would clear?
4    A.  It was actually before EOM2.
5    Q.  Okay.  Well, let's get back to the first
6  sentence.  In the first sentence, you say, on a monthly
7  basis we were given the directive, you say, by Valerie
8  Hue to run checks that we knew were not going to clear
9  the bank.  You're personally aware of Valerie Hue telling
10  you to run checks that she knew weren't going to clear
11  the bank?
12    A.  She didn't personally tell me to put checks on
13  that were not going to clear the bank, but I know of
14  instances where I've been told by the collectors that she
15  told them.
16    Q.  Okay.  So it's hearsay.  She never actually
17  told you to do that.
18    A.  No.  She never actually told me to do that.
19    Q.  Okay.  Who told you that she told them to do
20  that?
21    A.  Dave McQuisten was one of those people.
22    Q.  But Dave McQuisten wouldn't be the one that
23  runs the checks, would he?
24    A.  Yes.

Kimberly Marlow

16 (Pages 58 to 61)

Page 58

1    Q. What was the process for resubmitting the NSF
2  check?
3    A. The process would be -- running an NSF, you
4  would contact the debtor, as I stated before, the bank,
5  or -- and/or get the notification from the manager, have
6  the manager notate on the account whether this can be run
7  or not run. And then it's sent to corporate to run -- to
8  our accounting division to run.
9    Q. Okay. In your Exhibit 2, your statement, when
10  you say "...we were given the directive to run checks
11  that we knew were not going to clear the bank," the basis
12  for that information was something that the collectors
13  told you, not something that Valerie Hue told you.
14  Correct?
15       MS. FITE: Object to form.
16    A. Can you repeat that again?
17       MR. HOMER: Could you read that back?
18       THE WITNESS: Sorry.
19       (The reporter read the requested
20  portion.)
21       THE WITNESS: That's a yes and no
22  question. And the reason why I'm saying that is, yes, I
23  did hear that from the collectors, but I've also heard
24  her say that. She didn't directly say that to me. She

Page 59

1  might have said that to -- I'm sure she said it to Eric.
2  It was...
3  BY MR. HOMER:
4    Q. You say you're sure she said it to Eric.
5       Were you present when she said it to
6  Eric?
7    A. No, I was not present.
8    Q. Okay. Were you ever present when she gave a
9  directive to run a check that she knew wasn't going to
10  clear the bank?
11    A. At that time if we were running checks, I
12  wouldn't know which ones she approved and which ones she
13  didn't approve. So I wouldn't know which check -- she
14  wouldn't have -- she would have known that weren't going
15  to clear and what would clear.
16    Q. So the answer to that question would be --
17    A. No.
18    Q. -- no?
19    A. Is no.
20    Q. Okay. Are you familiar with the term
21  "sandbagging"?
22    A. Yes, I am.
23    Q. What does that term refer to?
24    A. That's when a collector knows that they're not

Page 60

1  going to hit threshold and make any money that month. So
2  they hold their debtors for another month so that they
3  can put them on at the beginning of the month to hit
4  their quota for the following month.
5    Q. So just let me see if I can characterize. You
6  can tell me if I got it right or not.
7    A. Okay.
8    Q. You're towards the end of the month. The
9  collector realizes he's not going to get enough money
10  that month to get a bonus. So he doesn't want to submit
11  a check that might be good because he won't get any bonus
12  from it. He would rather wait until the next month when
13  he has a chance to get a bonus. So he holds back the
14  check until the following month. Is that a correct
15  statement of it?
16    A. That is correct.
17    Q. Okay. Referring now to the third paragraph of
18  Exhibit 2, I'd like to read from that again: I know for
19  a fact that collectors have asked for some checks to be
20  pulled at the end of the month because they knew they
21  would not clear. She, Val, stated that she had a
22  directive from Kathy Obenshain that we are not pulling
23  any checks off the system and to make this happen.
24  Collectors have complained several times about having to

Page 61

1  put on bad checks at the end of the month that they knew
2  would not clear and would put them at a negative at the
3  beginning of the following month.
4       You say in the first sentence: I know
5  for a fact that collectors have asked for some checks to
6  be pulled at the end of the month because they knew they
7  would not clear. What's the factual basis of that
8  statement?
9    A. Because I've had collectors at times come up
10  to me and say, "This is not going to clear. There's no
11  funds in the account to clear, and I don't want this to
12  run."
13    Q. Is that what a collector would do if they were
14  going to sandbag? Let's assume that there were funds
15  available. Would a collector come to you and say that
16  they wouldn't clear so that they could get credit for the
17  next month?
18       MS. FITE: Object to form. Answer if
19  you can.
20    A. Can you repeat that question for me?
21    Q. Would a collector come to you towards the end
22  of the month and tell you that a check wasn't going to
23  clear so that he could get credit for it the next month?
24  Isn't that what sandbagging is?