Exhibit G

# Condensed Deposition of

# KATHY OBENSHAIN

### Date: March 16, 2006

### Case: HUE v. NCO FINANCIAL SYSTEMS
### No.:  05-225-KAJ
### Volume:  I

### Reported by: G. PAIGE ALEXANDER, CSR

D'AMICO GERSHWIN, INC.
Phone: 770.645.6111
Fax: 770.643.1317
www.AtlantaCourtReporter.com

Case 1:05-cv-00225-KAJ    Document 80-4    Filed 04/17/2006    Page 3 of 50

Hue vs. NCO Financial Systems                              3/16/06 - Kathy Obenshain

Page 33

1    A    They called it -- it's called outsourcing. I
2    don't exactly know how it works. I mean, specific
3    clients, from my understanding -- and that I was not
4    directly involved in it -- would outsource their
5    receivables to them to handle on a first-party basis.
6    Q    Who would outsource this business --
7    A    I don't know who they are, because I was not
8    involved in it. It's my understanding that is the
9    additional business that they conduct.
10    Q    Did they have that business when you were
11    there?
12    A    Did they have the business when I was there;
13    well, it was not part of my division, so it was not under
14    my purview, so, therefore, I don't know the details.
15    Q    Do you know approximately how many employees
16    NCO had when you were there?
17    A    Do I know how many employees NCO had; not
18    really.
19    Q    I don't want an exact number, obviously, but
20    was it 100, 1,000, 10,000?
21    A    No; 100,000, no, I don't think so; maybe 3 to
22    4,000. I could be wrong.
23    Q    Okay.
24    A    Probably am wrong, because I just don't know.
25    Q    Do you know how many employees there were in

Page 34

1    the commercial collection division?
2    A    How many employees were in the commercial
3    collection division --
4    Q    And I'm talking about in January 2004.
5    A    Are you talking altogether, both collectors
6    and salespeople?
7    Q    Yes.
8    A    And admins and et cetera, geez, 3 to 400,
9    somewhere in that range.
10    Q    How many different cities were -- did the
11    commercial collection division operate in January of 2004?
12    A    In January 2004, you want to know how many
13    different cities we operated in, the commercial division.
14        We had an office in Portland. We had an
15    office in Tucson, Arizona. We had an office in Metairie,
16    Louisiana, an office in Atlanta, Georgia; an office in
17    Tampa; an office in Dover, Delaware; and an office in
18    Baltimore.
19    Q    Is that Portland, Maine or Portland, Oregon?
20    A    Oregon.
21        Let me -- you are talking about strictly
22    collections?
23    Q    Right.
24    A    Okay.
25    Q    Did NCO --

Page 35

1        MR. ISRAEL: He was asking strictly
2    commercial?
3    A    Yeah.
4    BY MR. HOMER:
5    Q    Right. Yeah. Were there other offices that
6    NCO had that weren't for commercial collections?
7    A    Were there other offices that NCO had that
8    were not for commercial collections; as far as I know,
9    yes.
10    Q    How many of those were there?
11    A    I -- you are asking me if I know how many
12    there were that NCO had?
13    Q    Yes, if you know.
14    A    I don't know.
15    Q    Could you describe for me what your job
16    duties were when you were the vice president of the
17    collections division in --
18    A    What my responsibilities were, what my job
19    duties were?
20    Q    Right.
21    A    My primary responsibility, or my job duties
22    at NCO as the -- in that position were to manage the
23    collections staff for the division under the guise of my
24    immediate boss, who was Phil Weaver, under his direction.
25    Q    How long was Phil Weaver your boss?

Page 36

1    A    In what capacity? I mean, he was -- are you
2    asking me in this position or --
3    Q    Yeah. While --
4    A    When I was in this position?
5    Q    While you were the vice president of the
6    collection division, how long was Phil Weaver your boss at
7    that time?
8    A    How long was Phil Weaver my boss; almost the
9    entire time, save for a month or two.
10    Q    Was Ted Fox -- did Ted Fox succeed Phil
11    Weaver as your boss?
12    A    Did Ted Fox succeed; yes.
13    Q    When did he do that?
14    A    When did Ted Fox succeed Phil; that was in
15    December of 2003.
16    Q    What was Ted Fox's position before he became
17    your boss?
18    A    Ted Fox's position before he became my boss;
19    Ted Fox was my counterpart, responsible for the sales side
20    of the business.
21    Q    What was his title when he became your boss?
22    A    When he came my boss, what was Ted's title?
23    Q    If you remember.
24    A    Senior vice president of operations for the
25    commercial division, something in that.

Page 37

1   Q   How frequently did you have interaction with
2   Mr. Fox when he became — after he became your boss?
3   A   How frequently did I have interaction with
4   Ted Fox when he became my boss; daily. His office was
5   directly next to mine.
6   Q   Do you know who Cherie Sugg is?
7   A   Do I know who Cherie Sugg is; yes.
8   Q   Who is she?
9   A   I don't know — who is she? I don't know
10  what her current title is, but she was in human resources.
11  Q   Was she the head of human resources for NCO
12  while you were there?
13  A   Was she the head of human resources; I
14  believe she answered to — and I can't remember his name.
15  I don't remember the name of the person that she answered
16  to, but I presume — I just can't remember his name. I
17  don't remember his name.
18  Q   Did you have interaction with Cherie Sugg
19  when you worked with NCO? And by that I mean interaction
20  with respect to performing your job duties.
21  A   Did I have interaction with her?
22  Q   Not about personal interaction, but something
23  to do with business.
24  A   Did I have interaction with her having to do
25  with business; yes.

Page 38

1   Q   Can you describe what the nature of that was.
2   A   What would the nature of that interaction be;
3   at any time if we had any concerns or questions about
4   human resource issues, we were certainly able to pick up
5   the phone and ask for her direction and guidance.
6   Q   Do you know who Mike Scher is?
7   A   Do I know who Mike Scher is; yes.
8   Q   Was he the general manager of the Dover
9   office while you were at NCO?
10  A   Was he the general manager of the Dover
11  office; yes, he was.
12  Q   Do you know what his job duties were as
13  general manager of the Dover office?
14  A   Do I know what his job duties were as general
15  manager; well, he was certainly responsible for the sales
16  production in that office and the daily operations in that
17  particular branch.
18  Q   That would include the collection —
19  commercial collections?
20  A   That would include the commercial
22  Q   Yes.
23  A   To a degree. The individual GCM also
24  reported directly to me.
25  Q   So the GCM, that's the general collection

Page 39

1   manager?
2   A   General collection manager, correct.
3   Q   That's the position that Valerie Hue held?
4   A   That's the position that Valerie Hue held;
5   yes.
6   Q   So she would report both to Mike Scher and
7   you —
8   A   Report to both of us, yes, uh-huh.
9   Q   Did you visit the Dover office?
10  A   Did I visit the Dover office; yes.
11  Q   How often did you do that?
12  A   How often did I do that.
13  Q   And right now I'm talking strictly about when
14  you were the vice president of the collections division.
15  A   When I was vice president of the collections
16  division, as I recall, I was in the Dover office probably
17  once a quarter.
18  Q   Is that approximately once a quarter, or did
19  you actually every quarter make a point of visiting every
20  quarter?
21  A   You are asking if I made a scheduled
22  appointment to go there every quarter; my answer would be
23  no. I'm giving you an approximation.
24  Q   Okay.
25  A   My travel schedule was not planned out in

Page 40

1   that regard.
2   Q   But you averaged maybe a visit every quarter?
3   A   I would say yes. I would say I averaged
4   about a visit every quarter.
5   Q   How many people worked in that office in the
6   collections division?
7   A   How many people worked in that office in the
8   collection division; maybe — I would say probably 20; 25,
9   max.
10  Q   I take it you knew each of those individuals?
11  A   Did I know each of the individuals; yes.
12  Q   I take it they knew you?
13  A   You are asking me if they knew me?
14  Q   Yes.
15  A   Who I was, recognized me?
16  Q   Yes.
17  A   Yes.
18  Q   You had meetings with them from time to
19  time —
20  A   Did I have meetings with them when I was
22  Q   Yes.
23  A   Training meetings or just in general?
24  Q   Any kind of meetings.
25  A   Yes.

10 (Pages 37 to 40)

Page 41

1    Q    Would you generally have a meeting every time
2  you visited?
3    A    Would I have a meeting every time I visited;
4  yes.
5    Q    Did you have any policy about any employee
6  being able to come to you and tell you anything that they
7  wanted to about anything that was going on at the office?
8    A    Did I have a policy about anybody being able
9  to come to me and tell me anything that was going on at
10  the office?
11    Q    Some people refer to that as an open-door
12  policy.
13    A    Yes.
14    Q    Did that you have policy?
15    A    Yes, I had that policy.
16    Q    Did the employees know it?
17    A    Did the employees know it?
18        MR. ISRAEL:  Did the employees know it; you
19      can answer that.
20  BY MR. HOMER:
21    Q    The people that worked for you in the
22  commercial division.
23    A    Yes.
24    Q    Prior to January of 2004, did any employee at
25  the Dover office come to you to tell you anything about

Page 42

1  something that Valerie Hue may have done wrong?
2    A    Did any --
3        MR. ISRAEL:  I'm sorry, I didn't --
4  BY MR. HOMER:
5    Q    Did anybody come to you -- any employee of
6  the Dover office come to you, prior to January 2004, to
7  tell you that -- or inform you in some way that Valerie
8  Hue was doing something that was improper?
9    A    Did anybody come to me specifically telling
10  me that Valerie Hue was doing anything improper; no.
11    Q    Other than your visits to the Dover office,
12  did you communicate with the Dover office by other means,
13  for example, email?
14    A    Did I communicate with Dover via email; yes.
15    Q    And by phone?
16    A    Did I communicate with them by phone; yes.
17    Q    Did you communicate with Valerie Hue by
18  email?
19    A    Did I communicate with Valerie by email; yes.
20    Q    How frequently would you send her emails and
21  would she send you emails?
22    A    How frequently; whenever necessary.  I
23  preferred doing business by phone personally.
24    Q    Okay.
25    A    I prefer to pick up the phone.

Page 43

1    Q    But can you give me an approximation of how
2  many times you would have emailed her or --
3    A    Can I give you an approximation --
4    Q    Yes.
5    A    -- of how many times?
6    Q    Yes.
7    A    No.  Honestly, I can't.
8    Q    Would it be in the hundreds or tens or --
9    A    During the period of time -- are you asking
10  me for the entire period of time that she worked for me as
11  a GCM?
12    Q    Yes.
13    A    How many times I emailed her, probably 100.
14    Q    Were you involved in the promotion of Valerie
15  Hue at any point in time?
16    A    Was I involved in the promotion of Valerie
17  Hue; from -- to the GCM, the general collection manager?
18    Q    If you were involved in that.  Were you
19  involved in that?
20    A    Yes.
21    Q    What was your involvement?
22    A    What was my involvement in her promotion; I
23  was involved with Phil Weaver in making the decision.  I
24  also did the paperwork concerning her promotion.
25    Q    Did you make the decision to promote her?

Page 44

1    A    Did I make the decision to promote her; Phil
2  and I did that together.  We -- that was the general way
3  that we would make decisions about promotions in that
4  division.
5    Q    But Phil Weaver had authority over you;
6  correct?
7    A    Did Phil Weaver have authority over me; yes.
8    Q    Are you saying that you conferred and jointly
9  agreed that she should get a promotion?
10    A    Did we confer and jointly agree that she
11  should get a promotion; absolutely.
12    Q    Were you familiar with her work before she
13  got the promotion?
14    A    Was I familiar with her work; yes.
15    Q    Did you believe she was a good employee?
16    A    Did I believe she was a good employee; from
17  all that I knew, yes.
18    Q    Do you recall disciplining her one time after
19  she got promoted to general collection manager?
20    A    Do I recall disciplining her one time
21  concerning -- concerning what?
22    Q    Anything.
23    A    Do I recall disciplining her in what way?
24    Q    Do you recall her doing something that you
25  thought was improper and giving her a written reprimand

Case 1:05-cv-00225-KAJ    Document 80-4    Filed 04/17/2006    Page 6 of 50

Hue  vs.  NCO Financial Systems                    3/16/06 - Kathy Obenshain

## Page 45

1  for it?

2  A    Did I ever give her a written reprimand for
3  something she had done?

4  Q    Yes.

5  A    As in that the written reprimands would be
6  done by HR.

7  Q    Would you ever have any involvement in giving
8  any discipline to Valerie Hue that you recall?

9  A    Do I recall any discipline that I was
10  involved in; I was involved in discipline that she
11  received from human resources.

12  Q    Can you tell me what that was about.

13  A    Okay.  Specifically, she was accused by other
14  employees of having sexual toys that -- in the office,
15  which were from a -- from a client that we represented.
16  They were returns and -- from the debtors to the office in
17  Dover.  She was doing something with them
18  inappropriately --

19  Q    Okay.

20  A    -- that somebody reported to human resources.

21  Q    Was she written up for that?  Do you know?

22  A    Was she written up for that; yes.

23      MR. HOMER:  I don't think we've seen that
24  document.

25      MR. ISRAEL:  (Mr. Israel nods head up and

## Page 46

1      down.)

2      MR. HOMER:  We have?

3      MR. ISRAEL:  You have.  I think you have

4  it.

5      MR. HOMER:  All right.

6      MR. ISRAEL:  But you can ask her.  You will

7  see why.  Just ask Kathy about it.

8  A    Yeah.

9  BY MR. HOMER:

10  Q    When did that take place?

11  A    When did that take place?

12  Q    Was it while she was a general collection
13  manager?

14  A    While she was a general collection manager;
15  yes.

16  Q    What did she receive in the form of
17  discipline?

18  A    What did she receive in the form of
19  discipline; it was from Michele Przepasniak, who worked
20  for Cherie Sugg, and it was a written job discussion.

22  A    I have not seen it --

23  Q    Okay.

24  A    -- recently.

25  Q    Any other occasion you recall that there was

## Page 47

1  a problem with her -- with her work, or anything related
2  to her work, while she was a general collection manager,
3  other than the events that took place in January 2004?

4  A    Do I recall of any other previous time that
5  she had been written up; is that what you are asking?

6  Q    Yes, you can put it that way.

7  A    I believe -- and I -- and I -- that she was
8  also written up by HR for improper -- improper handling of
9  job description summaries, JDSs, written -- written in her
10  manner of handling JDSs, job description summaries, for
11  employees.

12  Q    Anything other than that, the ones you
13  mentioned already?

14  A    Anything else; not that I remember.

15  Q    From time to time did you become involved in
16  the termination of employees that worked under you?

17  A    From time to time did I become involved in
18  the termination concerning employees that worked for me;
19  yes.

20  Q    How many times did that happen while you were
21  the vice president of collections --

22  A    How many times --

23  Q    The vice president of the collections
24  division, yes.

25  A    How many times; that's going to be very

## Page 48

1  difficult to count.

2  Q    Is it that many?  Is it so many that it's
3  hard to remember how many there were?

4  A    Is there so many that it would be hard for me
5  to remember how many there were; not so many; it's just a
6  question of it's a part of conducting business on a
7  monthly basis while in a production environment.

8      MR. ISRAEL:  Off the record.

9      (Thereupon, an off-the-record discussion
10  was held.)

11  BY MR. HOMER:

12  Q    Can you give me an approximation of how many
13  times in the two-year period you were involved in
14  termination an employee?

15  A    Approximation of how many times I was
16  involved in the termination of an employee?

17      MR. ISRAEL:  This is just as the VP of
18  collections or --

19  BY MR. HOMER:

20  Q    Yes, as the VP of collections.

22  A    In the VP of collections?

23  BY MR. HOMER:

24  Q    Right.

25  A    I would say at least three to four times a

Case 1:05-cv-00225-KAJ    Document 80-4    Filed 04/17/2006    Page 7 of 50

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

Page 49

1  month.
2      Q      Were these mostly people that were terminated
3  because they couldn't collect enough debt?
4      A      Mostly they were — you are asking me if they
5  were terminated because they could not collect enough
6  debt?
7      Q      Yes, or was it just a broad range of
8  different reasons?
9      A      Mostly for that reason, but a broad range of
10  other reasons, of various other reasons having to do with
11  compliance.
12     Q      Let's go back to December of 2004.
13            Do you recall that Valerie Hue was terminated
14  and Matt Lane was terminated during that month?
15     A      Do I remember that they were terminated in
16  December of 2004?
17     Q      No, January 2004.
18     A      You said December.
19     Q      I'm sorry?
20     A      Do I recall that they were terminated in --
21  that Matt Lane and Valerie Hue were both terminated in
22  January?
23     Q      Yes.
24     A      I just want to be sure that Matt was term--
25  Matt, he may have been terminated right at the end of

Page 50

1  December; but I think probably yes, the first part of
2  January.
3      Q      Do you recall approximately how many other
4  people were terminated in that month?
5      A      How many other people were terminated in that
6  month; in December of 2004?
7            MR. ISRAEL:  In January.
8  BY MR. HOMER:
9      Q      January 2004.
10     A      In January 2004, do I remember how many
11  people were terminated during January of 2004; no.
12     Q      How about December of 2003?  Would there have
13  been some in that month?  Do you know?
14     A      Were there any in December of 2003; for
15  various production issues, for compliance, I am sure; I am
16  sure.
17     Q      All right.
18     A      As one month would end, we would make
19  decisions.
20     Q      Who was involved in deciding -- making these
21  decisions about terminating these people?  Was it
22  different at different times, or was it always the same
23  group of people that got involved with that?
24     A      Who was involved in making decisions
25  concerning terminations or --

Page 51

1      Q      Right.
2      A      -- how -- well, the termination itself had to
3  follow specific guidelines concerning write-ups,
4  concerning progression of discipline.
5      Q      I'm sorry, I probably asked you a confusing
6  question.  I didn't phrase it very well.
7      A      Uh-huh.
8      Q      The question was -- you said that there were
9  a lot of terminations.
10     A      Uh-huh.
11     Q      I'm just trying to get at what process was
12  used to do it, in terms of who was involved in it
13  generally.  For example, was it always yourself, somebody
14  from HR, somebody higher up, somebody lower?  Who would
15  generally be involved, or did it vary, depending on who it
16  was being terminated?
17     A      Who would get involved, or did it vary,
18  depending on who was being terminated; concerning the
19  termination, human resources would always be involved to
20  be certain that all documentation was proper.
21     Q      Okay.
22     A      Okay, I would be involved to make certain
23  that they had gotten — checked with HR to be sure that
24  everything was in place, generally, the general collection
25  manager or the — and the immediate manager of that

Page 52

1  person.  If it was a — if it was going to be a compliance
2  issue, a violation of compliance policies that were in
3  place, that would be Sessions & Fishman.
4      Q      Did you ever — while you were the vice
5  president of the collection division, were you ever
6  involved in the termination of a general collection
7  manager other than Valerie Hue?
8      A      Was I ever involved in the termination of a
9  general collection manager other than Valerie Hue; oh,
10  let's see, I'm not sure if you call it -- yes, I was.
11     Q      Who was that?
12     A      That would be -- good lord, he was the GCM in
13  Chicago.  I'll be honest with you, I'll telling you right
14  now here, I can't remember his name.
15     Q      Do you remember when it was?
16     A      In the year 2003, earlier 2003.
17     Q      Who was involved in the decision to terminate
18  him?
19     A      Who was involved in the decision to terminate
20  him; I was involved in the decision to terminate him,
21  Michele Przepasniak.  She works for HR.
22     Q      Can you spell her last name.
23     A      P-R-Z-P-O-S-N-I-A-K, Michele Przepasniak.
24     Q      Okay.
25     A      Cherie Sugg, both.  They had a number of

Page 53

1  different counseling sessions with him; Phil Weaver.
2     Q     What was his involvement?
3     A     As my boss.
4     Q     What did he do?
5     A     What did Phil Weaver do; we concurred
6  together as to what action needed to happen, and we
7  involved HR to make sure that --
8     Q     So you consulted with Phil Weaver?
9     A     Consulted with Phil Weaver.
10    Q     What did this general manager do that
11  resulted in his termination?
12    A     What did the general manager do that resulted
13  in his termination; I'd have to go back and look at the
14  records exactly. There was some definite wrongdoing, his
15  conduct with speaking to employees, the manner in which he
16  spoke to employees.
17    Q     Was inappropriate, how he dealt with
18  employees?
19    A     Correct.
20    Q     Can you be a little more specific as to what
21  he did.
22    A     Can I be a little more specific; not to --
23  it's in the records. I'm not trying to skirt it. It's
24  just a question that I don't recall. He was written up
25  for the manner in which he spoke to people.

Page 54

1     Q     Was he too disrespectful of people? Was
2  that --
3     A     Was he too disrespectful; yes, he was
4  disrespectful. His tone and the use of certain language
5  was inappropriate.
6     Q     Okay.
7     A     And the details are in his -- in his record,
8  if I can remember his name.
9     Q     Do you recall what was done to investigate
10  that problem?
11    A     What was done to investigate the problem;
12  human resources conducted the complete investigation.
13    Q     Okay. Did you get involved in the
14  investigation?
15    A     Did I get involved in the investigation;
16  human resources, when they decided they were going to do
17  an investigation, would conduct the investigation and give
18  you the results.
19    Q     And then --
20    A     And so I get the results.

22    A     Did I personally interview people concerning
23  these statements; no.
24    Q     It was just the HR people that did that?
25    A     Was it just the HR people; yes.

Page 55

1     Q     Do you recall if -- let me put it this way:
2  When Ted Fox became your boss, do you recall how many
3  people were terminated between December and January 2004?
4     A     Do I recall how many people were terminated
5  between December and January?
6     Q     Yes. After he became your boss, do you
7  recall how many people got terminated in that time period?
8     A     Are you asking me as a result of Ted Fox
9  becoming --
10    Q     No, not as a result. But after he became
11  your boss, how many -- if you recall, how many people were
12  terminated in that period, approximately?
13    A     How many people --
14           MR. ISRAEL: One second.
15           In collections?
16           MR. HOMER: Yes.
17  BY MR. HOMER:
18    Q     People that you were involved in the
19  termination with.
20           MR. ISRAEL: That's been asked and
21     answered, but go ahead and tell him if you know.
22    A     For sure Matt and Valerie.
23  BY MR. HOMER:
24    Q     Okay.
25    A     But beyond that, I can't honestly tell you

Page 56

1  exactly.
2     Q     Do you recall whether Ted Fox did any
3  investigation into the Matt Lane issue? In other words,
4  did he interview people about Matt Lane's -- what Matt
5  Lane did to get fired?
6     A     Did Ted Fox interview people about Matt Lane
7  specifically?
8     Q     Yes, if you know.
9     A     I know he interviewed people in the Dover
10  branch, but I don't know whether he asked them specific
11  questions about Matt Lane; I don't recall.
12    Q     He interviewed people in the Dover branch
13  about Valerie Hue; correct?
14    A     He interviewed people in the Dover branch
15  about Valerie Hue; I can't honestly say if he only asked
16  them questions about Valerie Hue. He asked them questions
17  about procedures and what was going on in the Dover
18  branch.
19    Q     He also asked questions about Valerie Hue; do
20  you recall that?

22  specifically, I wasn't on the phone with him when he did
23  the interviews.
24    Q     So you don't know whether he asked questions
25  about Valerie Hue?

14 (Pages 53 to 56)

Case 1:05-cv-00225-KAJ    Document 80-4    Filed 04/17/2006    Page 9 of 50

Hue  vs.  NCO Financial Systems                    3/16/06 - Kathy Obenshain

## Page 57

1    A    Don't I know -- I don't know.

2    Q    Are you aware of Ted Fox getting involved in

3  interviewing employees about any termination that took

4  place?

5    A    Am I aware of Ted Fox interviewing employees

6  about any termination that took place?

7    Q    Right?

8    MR. ISRAEL:  Meaning --

9    A    Where?

10  BY MR. HOMER:

11    Q    At any time while you were in this period

12  after December 2003.

13    A    Anywhere in the company, anywhere in the

14  commercial division, the collection division?

15    Q    Anybody in your division.

16    A    Am I aware of any interviews that he

17  conducted with anybody concerning terminations of -- okay,

18  that's a pretty broad question; no.

19    Q    Could you just generally describe -- and we

20  don't need a real lengthy description. I'll probably get

21  into more detail later. But could you just generally

22  describe what happened that led up to the termination of

23  Valerie Hue. What were the major events that precipitated

24  her being terminated?

25    A    You are asking me, what, the major events

## Page 58

1  that occurred prior to Valerie Hue's termination; correct?

2    Q    Yes.

3    A    Okay. During the month of 2003 -- well,

4  actually in 2004, January 2004, it was determined by Dina

5  Loft in corporate that there was an inordinate amount of

6  checks coming back in the Dover office that had not

7  received the proper documentation concerning why they were

8  redeposited.

9    There was also a specific incident --

10    Q    You are getting a little beyond me right now.

11  We will get into that, but what I am trying to get at is

12  you've told me that Dina Loft, who was also known as Dina

13  Shaantiel -- were you aware of that?

14    A    Yes.

15    Q    She reported that there were too many NSF

16  checks. Would that be the right way to say it? NSF being

17  nonsufficient funds?

18    A    Yes.

19    Q    Who did she notify of that problem?

20    A    Who did she notify of the problem?

21    Q    Yes.

22    A    She was doing research on every -- every

23  office, okay, and she notified myself.

24    Q    Okay.

25    A    She notified Ted Fox. She notified Steve

## Page 59

1  Leckerman and gave us examples so that we would have an

2  opportunity to investigate.

3    Q    Then you did the investigation, and that led

4  to Miss Hue's termination. Is that what happened? just in

5  broad terms. I realize we are going to --

6    A    In broad terms, you are asking me if that's

7  what led to her termination?

8    Q    The investigation.

9    A    The investigation of the handling of the

10  checks?

11    Q    Yes.

12    A    That would be correct.

13    Q    I'd like to read to you from the answer that

14  was filed in this case by NCO. This is paragraph 18 of

15  the answer to the Complaint.

16    It says, and this is a quote, "NCO admits to

17  terminating Plaintiff because she committed intentional

18  acts of wrongdoing, some of which were fraudulent in

19  nature, but all of which violated NCO's policies."

20    Do you agree with that statement?

21    A    Do I agree with that statement?

22    MR. ISRAEL:  Do you want to read it? It's

23  easier to read it.

24    THE WITNESS:  Yes.

25    / / /

## Page 60

1  BY MR. HOMER:

2    Q    Yes, you can read it. Let me circle it so

3  you can find it easily.

4    A    Okay. Do I agree with that?

5    Q    Yes. Is that accurate?

6    A    Yes.

7    Q    Was the result of your investigation that you

8  concluded Valerie Hue intentionally violated the check

9  handling policies? Is that a fair statement?

10    A    Was it my feelings that she intentionally

11  violated the procedures; right?

12    Q    Yes.

13    A    Yes.

14    Q    Is that why she got fired?

15    A    Is that why she got fired?

16    Q    Yes.

17    A    Yes.

18    Q    I just mentioned NSF.

19    A    Uh-huh.

20    Q    That was a term -- or those letters were used

21  to denote checks that had been returned because there

22  weren't sufficient funds in the bank account to cover the

23  check; is that correct?

24    A    Yes. Insufficient funds are checks that are

25  returned, yes.

Page 61

1  Q    Are you familiar with the term redip?
2  A    Am I familiar with the term redip?
3  Q    Yes.
4  A    Yes. It stands for redeposit.
5  Q    Isn't it spelled R-E-D-I-P, or is it D-E-P?
6  Do you know?
7  A    Is it spelled R-E-D-I-P or R-ED-E-P?
8  Q    I've seen it both ways, but I think more
9  commonly it's —
10  A    Yeah, it's spelled R-E-D-I-P. Whether that's
11  correct or not, it's just an abbreviation.
12  Q    When you say redeposit, is that term applied
13  when a check is -- had been returned NSF and then you
14  submit it back for payment again?  Is that what a redip
15  is?
16  A    When a check is returned for nonsufficient
17  funds and it's submitted for redeposit, is that what you
18  are asking me?
19        MR. ISRAEL: Yes.
20  BY MR. HOMER:
21  Q    Yes.
22  A    Yes.
23  Q    So it applies to NSF checks?
24  A    Would it apply to NSF checks; yes.
25  Q    Did NCO have any policies regarding what you

Page 62

1  had to do to redip an NSF check?  I'm talking about
2  December of 2003?
3  A    Are you asking me if we had policies in
4  what --
5  Q    Yes. Generally, what would you have to do,
6  if there was a policy in order to redip an NSF check in
7  December 2003?
8  A    What was the -- the policy that was in effect
9  during December 2003 in order to redip a check?
10  Q    Yes. And I'd like you to focus on
11  verification, if you would.  I know there were some --
12  A    Okay.
13  Q    There are various things that got done when
14  you redip. But what was the policy, if there was one, in
15  December 2003 regarding verification?
16  A    What was the policy concerning verification;
17  right?
18  Q    Of a redip NSF check.
19  A    Okay, of a redeposited check, there was to be
20  a call to the bank to verify whether or not there was

22  also be asked of the bank if there was a stop payment on
23  the item. We would have the item number. All of these
24  notes concerning that call must be recorded in the record,
25  as all notes in anything that went on with any account

Page 63

1  were to be notated in the record.
2  Q    When you say in the record, are you talking
3  about --
4  A    In the record; in the file, the collector's
5  notes, regardless of who did the verification process or
6  who worked an account, whether it was a manager, whether
7  it was me, whether it was a collector, whoever, anything
8  that went on on any account, the record — the
9  documentation had to be in the notes.
10  Q    In the year 2003, those notes were electronic
11  notes? Where were they kept?
12  A    They were kept in the file, in the actual
13  debtor record.
14  Q    Was that a hard copy file, or was that an
15  electronic file, or both?
16  A    Was that a hard copy or electronic file?
17        MR. ISRAEL: Talking about computers.
18  A    Yeah, we are talking about computers, so it's
19  part of the record. It's there permanently.
20  BY MR. HOMER:
21  Q    But when you are talking about the collector
22  noting — keeping these notes in the file, you are saying
23  that they kept them in a file drawer or --
24  A    No; no; no.
25  Q    -- or put them in a computer, or where did

Page 64

1  they go physically?
2  A    You are asking if they kept it in a file
3  drawer or in the computer; no. They were part of the
4  permanent record of the debtor information. All the
5  information — all accounts were worked in the computer.
6  Q    Okay.
7  A    So all notes are in the computer.
8  Q    Okay.
9  A    Any time you touch an account, you took any
10  action on an account, made any calls to anywhere, whoever
11  you were, you were to document the record.
12  Q    Okay.
13  A    The permanent record with regard to that
14  collection file.
15  Q    You've talked about what you had to do
16  regarding bank verification.
17  A    Uh-huh.
18  Q    Was there any other verification required to
19  redip an NSF check?
20  A    Any other bank verification required to

22  Q    No, I didn't say bank verification. Any
23  other verification —
24  A    Any other verification that needed to be done
25  in order to redeposit a check.

16 (Pages 61 to 64)

Case 1:05-cv-00225-KAJ    Document 80-4    Filed 04/17/2006    Page 11 of 50

Hue vs. NCO Financial Systems                          3/16/06 - Kathy Obenshain

Page 65

```
 1     Q      An NSF check.
 2     A      An NSF check; if you were not able to obtain
 3   the information from the bank, your job, as the collector,
 4   manager, and/or admin that was responsible for doing this
 5   was — well, if the bank could not be verified — let's
 6   put it this way: If the bank information could not be
 7   verified at all, then that information was given to the
 8   general collection manager.
 9     Q      All right.
10     A      This — I cannot verify this check; the bank
11   won't give me information; I don't have sufficient
12   information; it's not good; there's a stop payment,
13   there's a whatever, that information was to be given to
14   the general collection manager and the producer.
15     Q      The producer is the collector?
16     A      The collector, right.
17     Q      Okay.
18     A      At that point — do you want to —
19     Q      No.  Go ahead.
20     A      At that point in time, it was the
21   responsibility of the collection manager, or GCM, and/or
22   producer to get in touch with the debtor and to find out
23   what the source of funds were to make a determination as
24   to whether or not the check was going to be made good.
25     Q      So if you couldn't get bank verification, you
```

Page 66

```
 1   had to get debtor verification.  Is that a simpler way of
 2   saying it?
 3     A      Correct.
 4     Q      If you did get bank verification, did you
 5   have to also get debtor verification?
 6     A      If you received bank information that the
 7   funds were there, you would have to get debtor cooperation
 8   to redeposit the check.  If you were not going to take the
 9   original instrument and redeposit it, okay — if you were
10   going to create a different instrument, a check fax, if
11   you were going to recreate that again, you would get
12   permission from the debtor.  That's always been our
13   policy.
14     Q      So you have bank verification, but you want
15   to recreate the check.  By that, you mean electronically
16   create a check?
17     A      Uh-huh.
18     Q      You would have to get the debtor's permission
19   to do that?
20     A      That's correct.
21     Q      What if it were not a re-creation
22   electronically?  What if there was a paper check that you
23   just wanted to resubmit?  Would you have to contact the
24   debtor to do that if the bank had verified it?
25     A      If the bank had verified — you are asking me
```

Page 67

```
 1   if the bank had verified and everything was fine did they
 2   have to contact the debtor, and it was a paper item that
 3   was going to go to the bank again, the original item, did
 4   they need to get the debtor's permission; no.
 5           MR. ISRAEL:  Before you ask your next
 6       question, do you mind if we take a short break?
 7           MR. HOMER:  If you don't mind, I just have
 8       a couple more.  I'm almost done with this topic.
 9       I'll try to be quick.
10   BY MR. HOMER:
11     Q      I just have one or two more.
12     A      All right.
13     Q      Well, let's just take the break now.  I'm not
14   cruel.
15           (A brief recess was had.)
16   BY MR. HOMER:
17     Q      We were taking about what you had to do to
18   verify a NSF check.  And the next question I have for you
19   is: Was it acceptable to do debtor verification without
20   trying to do bank verification?
21     A      Was it acceptable to do debtor verification
22   without doing bank —
23     Q      Without attempting to do bank verification.
24     A      No.
25     Q      Okay.
```

Page 68

```
 1     A      No, if you had the bank information, you
 2   should always talk to the bank first, especially to
 3   determine if there's a stop payment on the item, in
 4   addition to verifying funds.
 5     Q      When the debtor called the — I'm sorry, when
 6   the collector called the debtor to verify funds, what
 7   information did the collector have to obtain from the
 8   debtor?
 9     A      What information did the collector have to
10   obtain from the debtor; would this be an instance where we
11   already attempted to verify funds at the bank?
12     Q      Yes.
13     A      Okay.
14     Q      You already tried to verify on —
15     A      Okay.
16     Q      — an NSF check.
17     A      Correct.  We would call the debtor and find
18   out — look, as of today, your check for $1,000 does not
19   verify at the bank; it's already been returned once.
20     Q      Or you might tell them that, the bank
21   wouldn't tell us.  That happened quite a lot; right?
22     A      Yes, that could happen; that would happen.
23     Q      So you called the debtor and said, it hasn't
24   verified.  Then what else would you tell them?
25     A      You're asking if we called the debtor and let
```

17 (Pages 65 to 68)

Case 1:05-cv-00225-KAJ    Document 80-4    Filed 04/17/2006    Page 12 of 50

Hue  vs.  NCO Financial Systems                    3/16/06 - Kathy Obenshain

Page 69

1   him know whether or not the check had verified; yes,
2   that's correct.  We would call him and let him know that,
3   your check has not verified, or it came back nonsufficient
4   funds; your bank will not give us information as to
5   whether or not the funds are there.  And then usually the
6   debtor would say, Well, I the funds are there; I just made
7   a deposit today.  Okay, one question you might want to ask
8   as a collector, Can you conference me in to your bank
9   officer so that we can confirm together that the funds
10  have not cleared.
11      Q      Was that required, that you conference in the
12  bank?
13      A      Was it required that we conference in the
14  bank; no, it wasn't required.  But during many weekly
15  conference calls that we had with our GCMs and when I was
16  in the branches having my meetings with the collectors,
17  which I said, Here's another way for you to get around the
18  fact that banks won't verify funds for you.  If the
19  debtor's words are good --
20      Q      Because they will talk to the debtor --
21      A      That's right.
22      Q      -- when they wouldn't talk to you?
23      A      Exactly.  You can get them on the phone and
24  do a three-way, and you can hear that the funds are good.
25  And then that information -- if you were the producer --

Page 70

1   if you were the producer, then that information would be
2   documented in the -- if you were obtaining all this
3   information, then all these notes should be in the record,
4   who you called at the bank, what the phone number is, what
5   they said.
6       Q      Would it be acceptable to call a debtor when
7   you are doing this verification and say, you don't have --
8   the bank wouldn't verify that the money is there; have you
9   put money in the bank.  A debtor says, yes, it's a good
10  check now; you can collect it.  Then you put notes into
11  the file, and then you can redip the check; is that
12  accurate?  Would that be acceptable to do that?
13      A      If the -- you are asking me if the collector
14  picked up the phone and called the debtor and the debtor
15  said, I just made a deposit today, but it isn't reflecting
16  on my bank account but you can go ahead and redeposit the
17  check, depending on the circumstances of it.  You can
18  always ask the debtor for -- and we discuss this in
19  training also with GCMs and collectors, about get a copy
20  of the deposit slip.

22  the deposit slip?
23      A      It was not required, but if you, as a general
24  collection manager, were permitting this redeposit to
25  occur, then it was ultimately your responsibility to be

Page 71

1   absolutely certain that this information was in the file.
2       Q      Okay.  I understand that would be helpful if
3   you had it.
4       A      Uh-huh.
5       Q      But what I'm really trying to get at is what
6   was required by the policy.  And I think you are telling
7   me it wasn't required, that you should have the debtor
8   produce a deposit slip.
9       A      You are asking me if it was required that the
10  debtor produce a deposit slip; no, it was not required.
11  It was strongly suggested, particularly if you are dealing
12  with -- and this is ongoing training, weekly conversations
13  with collection managers, if you have a individual who has
14  a history of -- a particular producer who has a history of
15  collecting bad checks, then it's your responsibility to
16  make sure they're verified.
17      Q      When the collector contacted the debtor and
18  got authorization or verification that the funds were
19  good, he would put a note in the computer system
20  indicating that that had happened; correct?
21      A      You are asking me if when he called and
22  verified, he was to put a note in the system; yes, he was
23  to put a note in the system to be part of the permanent
24  record, who he called, where he called.
25      Q      And what was said?

Page 72

1       A      And what was said, absolutely.
2       Q      Would he be required to have the debtor
3   indicate what the sources of the funds would be?  In other
4   words, would he have to say to the debtor, I know you've
5   told me the check is good, but I want to know what you did
6   to make the check good; for example, did you sell a lot of
7   cars this month to make it good?  Was he required to do
8   that, or could he just take the word that the check was
9   good?
10      A      Would he be required to find out what the
11  source of funds -- you know, what allowed him to have the
12  money in the bank; you are asking me that question?
13      Q      Yes.
14      A      Well, I would say that he needed to confirm
15  whether or not the money was in the bank that day.  We
16  just talked to your bank; your bank says you don't have
17  sufficient funds.  What happened today for you to have
18  sufficient funds.  Or here's another question:  Your bank
19  doesn't confirm that you have sufficient funds; well, I
20  have overdraft protection.

22  answered my question.
23      If the debtor -- does this policy -- the NCO
24  verification policy, was the debtor -- and would there be
25  notes in the computer reflecting whenever the debtor got

18 (Pages 69 to 72)

Page 105

1    A    Did they change?
2    Q    Yes.
3         MR. ISRAEL: It's been asked and answered.
4    A    No.
5    BY MR. HOMER:
6    Q    They were always the same?
7    A    They were -- it's always been that way, since
8    I came to work here in 1994.
9    Q    So those --
10   A    Pretty much so, yes.
11   Q    So those requirements that you mentioned,
12   that you've told me about with respect to resubmission of
13   NSF checks, have always been in place since 1994 at NCO,
14   from the time you were there in 1994 to the time you left
15   in 2004?
16   A    Collector, yeah; right.
17   Q    How were the general collection managers
18   notified about the policy? How did they become aware of
19   it?
20   A    How did they become aware of the policy?
21   Q    Yes. When I refer to policy --
22   A    Okay.
23   Q    -- I'm talking about the requirements that
24   NCO had for redipping a check. You understand that?
25   A    Yes.

Page 106

1    Q    How did general collection managers become
2    aware of the policy?
3    A    Number one, we had ongoing training with GCMs
4    whenever I would be in the office, okay, weekly conference
5    calls with them concerning procedures, weekly.
6    Q    Did anybody ever think to put it in writing,
7    that policy? They did all this training --
8    A    Did anybody ever think to put it in writing,
9    concerning this policy?
10   Q    You had all these weekly training sessions.
11   Did anybody ever say, hey, why don't we write this down so
12   people can see it in black and white and we can hold them
13   accountable to it?
14        MR. ISRAEL: Objection; argumentative.
15   A    I don't know. Did anybody -- I can't answer.
16   I don't know. I'm sure they did, but --
17   BY MR. HOMER:
18   Q    You're sure --
19   A    -- we had enough -- I'm sure they thought
20   about it.
21        MR. ISRAEL: Do you even know whether it
22        was written or not?
23   A    I don't know whether -- I'll be honest with
24   you, I don't know if it was written or not. If I'm not --
25   I cannot attest to it because I -- over the years, I've

Page 107

1    seen many, many, many different written statements
2    concerning the handling of bad checks.
3    BY MR. HOMER:
4    Q    Well, I assume that you wanted the collectors
5    to follow the policy; correct?
6    A    Yes.
7    Q    Why wouldn't you want to put it in writing so
8    it was clear to them what the policy is regarding --
9    A    Why wouldn't I? I wouldn't --
10        MR. ISRAEL: Stop; stop.
11        THE WITNESS: Go ahead.
12        MR. ISRAEL: Assumes facts not in evidence.
13        I think it's argumentative also.
14        But go ahead and answer.
15   A    Why wouldn't I want it in writing?
16   BY MR. HOMER:
17   Q    Why wouldn't NCO want the policy to be in
18   writing so it was clear -- let's assume the policy is not
19   writing. And I can tell you that we have interrogatory
20   answers saying that the policy is not in writing.
21        Why would NCO not want to put the policy in
22   writing so that the collectors would know what to follow
23   and also could be held accountable for it?
24   A    Why wouldn't NCO want it to be in writing; I
25   didn't know that NCO didn't want it in writing. I don't

Page 108

1    think it was an intention on anybody's part. We did
2    enough discussions concerning training, ongoing weekly
3    conference calls. We brought it up all the time. We
4    talked about checks all the time.
5    Q    Do you agree with me that if it were in
6    writing, nobody could dispute what the policy is, and the
7    collectors could held more accountable to the policy?
8    A    Would I agree with you --
9        MR. ISRAEL: One second.
10        Objection; argumentative.
11        Go ahead and answer.
12   A    Would I agree with you?
13   BY MR. HOMER:
14   Q    Yes.
15   A    No.
16   Q    You wouldn't have the ability to hold the
17   collector to the policy, better ability to do it if it
18   were in writing, rather than just oral?
19        MR. ISRAEL: Objection; asked and answered.
20   A    Just would I agree? I can't answer that.
21   BY MR. HOMER:
22   Q    Okay.
23   A    I can't answer that; I don't know.
24   Q    Was there a point in time when checks that
25   had been returned NSF were automatically redipped?

27 (Pages 105 to 108)

Case 1:05-cv-00225-KAJ     Document 80-4     Filed 04/17/2006     Page 14 of 50

Hue vs. NCO Financial Systems                          3/16/06 - Kathy Obenshain

**Page 109**

1  A     Was there a time when checks were
2  automatically redeposited; correct.
3  Q     There was a time?
4  A     Correct.
5  Q     When was that?
6  A     When was that time?
7  Q     Yes.
8  A     That time was when Horsham took over our
9  accounting functions.
10  Q     Who explained that to you?
11  A     Who explained that to me; it was explained by
12  Bette Capaldo.
13  Q     When did she explain it?
14  A     I'm trying to remember. She explained it
15  directly to Phil Weaver, and we provided the information
16  directly to all our GCMs. When we converted to the facts
17  system; I have to say 2003, early 2003.
18  Q     When did you first learn about that policy?
19  A     When did I first learn about that policy;
20  early 2003.
21  Q     When that policy was in effect, there wasn't
22  any verification required at all, right, the checks just
23  got redeposited, the NSF checks?
24  A     When that policy was — when that was going
25  on, there was no policy. Is that what you are asking me?

**Page 110**

1  There was no —
2  Q     Well, I'm saying there wasn't any
3  verification. An NSF check would come in, and then it
4  would be automatically redipped with the bank, without
5  anybody trying to verify if the check was good or calling
6  the debtor or doing anything else to verify the funds?
7  A     That's correct.
8  Q     Was that fraudulent to do that?
9  A     Was it fraudulent to do that?
10  Q     Yes.
11  A     It's not my place to determine. It was a
12  standard accounting practice in the -- in the retail
13  division.
14  Q     So it wasn't fraudulent?
15  A     It wasn't fraudulent, not to my knowledge,
16  no.
17  Q     Even though when the check was redipped,
18  nobody knew whether it was going to be good or not?
19  MR. ISRAEL: That's been asked and
20  answered.
22  not the same question.
23  MR. ISRAEL: I think it is.
24  But go ahead and answer.
25  A     I think it is too but -- no.

**Page 111**

1  BY MR. HOMER:
2  Q     Can you tell me what the importance of this
3  redip policy was. Why did you have the policy?
4  A     What was the importance of the redip policy;
5  the importance of the redeposit policy was to make certain
6  that we were putting on good solid revenue for our
7  clients; so the collectors would be paid accurately, based
8  on numbers that were good; so that general collection
9  managers who were earning bonuses would be paid correctly;
10  so there was no falsification of records.
11  Q     Okay.
12  A     So the debtors weren't — you know, debtors
13  are charged for redeposits of nonsufficient funds, checks.
14  Q     Can you tell me what a postdated check is?
15  A     Can I tell you what a postdated check is; a
16  postdated check is a check that is written for a specific
17  date in the future. It's for an amount of money agreed
18  upon with the debtor.
19  Q     Why do you use a postdated check?
20  A     Why do we use a postdated check; if, indeed,
21  the debtor says he's going to pay the money and he's not
22  going to have the funds until the 20th of the month,
23  that's fine. I can only explain that to my client, if you
24  are willing to sit down today and write out a check dated
25  for that specific date.

**Page 112**

1  Q     Okay.
2  A     I would then fax a copy of that check to my
3  client showing them why we are not proceeding with the
4  collection.
5  Q     So let's say on January 1, the debtor tells
6  you they don't have the funds now, but on January 20th,
7  they will, and it will be in the bank. So he gives you a
8  check dated January 20th on January 1.
9  A     Right.
10  Q     Before that check is submitted, does NCO
11  policy require that anything be done to verify that he
12  actually did make the funds good?
13  A     Does NCO policy require that anything be done
14  to verify postdated checks; is that what you are asking?
15  Q     Yes.
16  A     Or on that particular item?
17  Q     Right.
18  A     We had a procedure in place that we would
19  start verifying postdated checks usually three to four
20  days before end of month.
22  verifying redipped NSF checks?
23  A     Was it the same policy?
24  Q     Same procedure.
25  A     It was similar, yes, very similar.

28 (Pages 109 to 112)

Exhibit H

David McQuisten

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                      )
                                  )
         Plaintiff,               )
                                  )
v.                                )
                                  )    Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,      )    05-225-KAJ
a Delaware corporation,           )
trading as NCO FINANCIAL          )
COMMERCIAL SERVICES,              )
                                  )
         Defendant.               )

        Telephone Deposition of DAVID MC QUISTEN taken
pursuant to notice at the law offices of Parkowski,
Guerke & Swayze, P.A., 116 West Water Street, Dover,
Delaware, beginning at 2:00 p.m. on Thursday, March 23,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.

APPEARANCES:

        JEREMY W. HOMER, ESQ.
        PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware  19903
          for the Plaintiff,

        ELIZABETH K. FITE, ESQ. (via teleconference)
        SESSIONS, FISHMAN & NATHAN, L.L.P.
          15316 North Florida Ave - Suite 100
          Tampa, Florida  33613
          for the Defendant.

ALSO PRESENT:  LENNY CICCARONE, NCO

                    CORBETT & WILCOX
              Registered Professional Reporters
        1400 French Street    Wilmington, DE 19801
                    (302) 571-0510
                 www.corbettreporting.com

David McQuisten

Page 10

1   BY MR. HOMER:
2       Q.   Well, let me back up a minute.
3           You said that the check handling policy
4   for resubmission of NSF checks required verification
5   before the check was resubmitted.  Do I have that right?
6       A.   Yes.
7       Q.   My next question is:  What was the requirement
8   for verification?  What did you have to do to satisfy the
9   verification requirement?
10      A.   I confirm from the check writer that it's
11  good.  I confirm from the bank that the funds are
12  available.
13      Q.   Okay.  Do you have to do both in order to
14  satisfy the verification requirement or do you have to do
15  one of those?
16      A.   Either or.
17      Q.   Okay.  Is it satisfactory to just call the
18  debtor and get him to say the check is good, or do you
19  have to first try with the bank before you contact the
20  debtor?
21      A.   Well, I contact the debtor first.
22      Q.   Okay.  The verification practice, has this
23  also been in effect since you can remember going back to
24  2001?

Page 11

1       A.   Yeah.  I believe so.
2       Q.   Okay.  Was it in effect in the Dover office in
3   the year 2003 when you were there?
4       A.   Correct.
5       Q.   Okay.  How did you learn about this policy
6   that requires verification before you resubmit an NSF
7   check for payment?
8       A.   Morning stand-up meetings.
9       Q.   Okay.  Could you elaborate a little bit on
10  that?
11      A.   In the morning we would have a meeting.
12      Q.   Who is "we"?
13      A.   The collectors.  The collections department.
14      Q.   Okay.  It was at one of those meetings that
15  you learned about the verification policy?
16      A.   Correct.
17      Q.   Okay.  When you contacted the debtor for
18  purposes of verification, was there anything specifically
19  he was supposed to tell you in terms of satisfying the
20  verification requirement?
21      A.   Why the call was necessary in the first place,
22  why the funds were not there and are they there now.
23      Q.   Okay.  If he told you they were there now,
24  then you would have satisfied the verification

Page 12

1   requirement?
2       A.   Correct.
3       Q.   Do you recall whether there were any forms
4   utilized in the Dover office when you were there that
5   related to this contact that you had with the debtor to
6   verify the funds?
7       A.   Yes.  There were.
8       Q.   Can you tell me what they were?
9       A.   It was a form requesting a resubmission of the
10  nonsufficient fund check.
11      Q.   Okay.  What kind of information was on the
12  form?
13      A.   Did I verify the funds were available and who
14  I verified it with, the bank phone number.  And it was
15  submitted to management.
16      Q.   Okay.  Management would be the -- who would it
17  be?
18      A.   That could be either one of the two managers
19  in the collections department.  One of the collection
20  managers.
21      Q.   Okay.  In the Dover, Delaware office, who was
22  that?
23      A.   Well, there's several different managers.
24          You want them all?

Page 13

1       Q.   Well, just the ones you might have given these
2   forms to after you contacted the debtor.
3       A.   Val Hue, Kim Marlow, Eric Shaw.  I can't
4   remember some of the other names.
5       Q.   Okay.  Do you know what they did with the
6   forms after you submitted them?
7       A.   No, I do not.
8       Q.   Did you have to request approval for
9   resubmitting a check for deposit that was an NSF check?
10      A.   Correct.
11      Q.   Was the approval given by one of those
12  managers that you just mentioned?
13      A.   Correct.
14      Q.   Did they require the form be filled out before
15  they would approve it?
16          MS. FITE:  Object to form.
17          THE WITNESS:  Do I answer this one?
18          MS. FITE:  Yes.  Go ahead and answer.
19          THE WITNESS:  You're asking again,
20  please.  Rephrase that.
21  BY MR. HOMER:
22      Q.   You've indicated you filled out this form,
23  that one of the managers would get the form.  You've
24  indicated that you had to have the manager's approval

4  (Pages 10 to 13)

3ab43509-a3d4-4210-bc2b-e75945053e35

David McQuisten

Page 46

1    Q.  Okay.  Were you disciplined more than one
2  time, if you recall?
3    A.  Maybe.  I can't remember.  I'm sorry.
4    Q.  Okay.  Mr. McQuisten, can you tell me what
5  your earnings were from NCO in the year 2003?
6      MS. FITE:  Object to form.
7    A.  How much I made?
8    Q.  Yes.  From NCO.  Just a ballpark figure.  I
9  know you probably don't remember the exact amount.
10    A.  I don't know.  $40,000, 50-.  I don't know.
11  30-.
12    Q.  You don't have a good recollection, I guess.
13    A.  2003?  Not off the top of my head, no.
14    Q.  Okay.  Do you know what you earned in the year
15  2005?
16    A.  Yeah.
17    Q.  How much was that?
18    A.  Gosh, that seems like kind of a private and
19  personal question.
20    Q.  Well, I'll assure you that I'm not going to be
21  telling people about this, but it is a relevant fact in
22  the case.
23      MS. FITE:  I'd like to note in the
24  record that I have a continuing objection to this line of

Page 47

1  questioning.
2      MR. HOMER:  I understand.
3    A.  So you want me to answer the question how much
4  I made in 2005?
5    Q.  Yes.
6    A.  65,000.  64,000, maybe.
7    Q.  Okay.  My last question, Mr. McQuisten:  Have
8  you ever been convicted of a crime?
9    A.  DWI.
10    Q.  Anything else?
11    A.  Motor vehicle violations.
12    Q.  Anything else?
13    A.  No.  I don't believe so.
14    Q.  Any crime that would involve honesty?
15    A.  Nope.
16      MR. HOMER:  Okay.  I don't have any
17  other questions.
18  BY MS. FITE:
19    Q.  Mr. McQuisten, I'm going to ask you just a
20  couple of questions.
21      Earlier when you were asked whether
22  Ms. Hue had done anything improper, you answered
23  "integrity."  Then Mr. Homer went back and asked you to
24  answer it in a yes or no form.  What did you mean when

Page 48

1  you answered "integrity"?  Is that what you said:
2  Integrity?
3      (The witness provided an unintelligible
4  response.)
5      THE REPORTER:  I'm sorry.  I didn't hear
6  that answer.
7      THE WITNESS:  I haven't answered.
8      MR. HOMER:  Well, you said something.
9  We couldn't hear it.
10      MS. FITE:  I asked if that was what he
11  said -- "integrity."  And he said yes.
12      THE WITNESS:  You want to know what I
13  meant by that?
14      MS. FITE:  Yes.
15      THE WITNESS:  I was asked to do
16  something that I thought was a violation of my integrity.
17  BY MR. FITE:
18    Q.  What was that?
19    A.  I was informed -- let's put it this way --
20  that something was going to happen that I considered a
21  violation of integrity.
22    Q.  I'm asking you what that something was.
23    A.  That was to -- well, I informed Ms. Hue, my
24  manager, that a check had to be pulled.  We have to pull

Page 49

1  this check.  The money is not available.  And I --
2  because I was called by the writer of the check advising
3  me that the funds did not come in.  Hold that check for
4  another week.  And when I filled out a form to hold the
5  check, I was told nothing is being held.  They're
6  running.  You just have to make it up next month.
7    Q.  Ms. Hue told you that nothing is being held?
8    A.  Correct.
9    Q.  Your understanding of nothing is being held
10  means that everything that's on is going to run
11  regardless of whether or not the funds are verified?
12    A.  Well, yeah.  Let's -- let me refer to
13  everything.  We're talking one check.  I want to pull the
14  check.  The check is not getting pulled.  The check is
15  running.
16    Q.  Do you remember her saying that nothing was
17  being pulled?
18    A.  Yeah, yeah.  Whether it was the exact word
19  "nothing" -- but, yeah, that's what it was.
20    Q.  Is it your understanding that that is a
21  violation of NCO's policy?
22    A.  Absolutely.
23    Q.  Did Ms. Hue ask you at that point whether you
24  were just trying to sandbag?

Corbett & Wilcox

3ab43509-a3d4-4210-bc2b-e75945053e35

Exhibit I

# NCO FINANCIAL SYSTEMS, INC.

## EMPLOYEE HANDBOOK ACKNOWLEDGMENT

I acknowledge by my signature that I have received the NCO Financial Systems, Inc. Employee Policy Manual.

I also acknowledge that is my responsibility to read and ask questions if I do not understand, and to observe and follow the policies and procedures in this handbook. I understand that the policies and employee benefit programs stated in this handbook are guidelines only and are subject to change at the sole discretion of NCO and from time to time, I may receive updated information concerning changes in policy and benefits.

I also understand and acknowledge that this handbook is not a contract, express or implied, guaranteeing employment for any specific duration. Likewise I have the right to terminate my employment at any time and the company may terminate my employment at any time, for any reason and with or without cause or notice.

The policies set forth herein are adopted as policy to take effect immediately (except the PTO Policy) and to supersede all policies previously adopted, whether written or verbal.

Name: _Valerie Hue_
Please print

Date: _12/14/99_

Employee's Signature _Valerie Hue_

Social Security: _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_

Location: _Dover_

Please note this handbook is the property of NCO Financial Systems, Inc. and is required to be returned prior to an employee leaving the company.

**001671**

# NCO FINANCIAL SYSTEMS, INC.

## EMPLOYEE HANDBOOK ACKNOWLEDGMENT

I acknowledge by my signature that I have received the NCO Financial Systems, Inc. Employee Policy Manual.

I also acknowledge that is my responsibility to read and ask questions if I do not understand, and to observe and follow the policies and procedures in this handbook. I understand that the policies and employee benefit programs stated in this handbook are guidelines only and are subject to change at the sole discretion of NCO and from time to time, I may receive updated information concerning changes in policy and benefits.

I also understand and acknowledge that this handbook is not a contract, express or implied, guaranteeing employment for any specific duration. Likewise I have the right to terminate my employment at any time and the company may terminate my employment at any time, for any reason and with or without cause or notice.

The policies set forth herein are adopted as policy to take effect immediately (except the PTO Policy) and to supersede all policies previously adopted, whether written or verbal.

Name: _Valerie Hine_

Please print /

Date: _4/16/01_

Employee's Signature _Val Hw_

Social Security: _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_

Location: _Dover_

Please note this handbook is the property of NCO Financial Systems, Inc. and is required to be returned prior to an employee leaving the company.

001684

Exhibit J

+3227351835    MILLIKEN & MICHAELS    654 P02    OCT 11 '21  15:

# NCO®

## Job Discussion Summary

**\*\* PLEASE PRINT OR TYPE \*\***

| LAST NAME | FIRST NAME | SOCIAL SECURITY NUMBE: |
|---|---|---|
| Savage | William | 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 |

| LOCATION (CITY, STATE) | ACQUISITION NAME | |
|---|---|---|
| Dover, Delaware | | October 11, 2001 |

**Nature of Discussion (check one):**
Verbal Warning      Written Warning      Final Warning      ☒ Termination

**Topic of Discussion (check one):**
Attendance    Performance      ☒ Violation of Co Policy - Harassment & Unprofessional Conduct/Workplace Behavior

**Written Summary (use separate sheet if necessary, include dates, times, who, what, when, why, etc.):**

Management was recently informed of your offensive and harassing behavior in the workplace relating to sexist remarks, racism, and offensive comments to employees. As a member of NCO Management, you are required to promote a positive work environment, free from discrimination and harassment. NCO policy clearly states that physical violence, threats, intimidation or harassment of another associate including but not limited to racial harassment will result in immediate dismissal. A fact-finding was conducted and found these allegations to be true. There are several witnesses to your unprofessional conduct.

Consistent feedback is that your management style is witnessed as unprofessional conduct to include but not limited to use of offensive language and /or behavior that causes disruption in the work setting. This type of behavior has created an offensive environment that constitutes racial and sexual harassment in the workplace. The behaviors you display question your ability to adequately perform the tasks assigned to you, and will not be tolerated.

**Action To Be Taken (results of discussion, follow up, dates of follow up, etc.):**

Due to the violation of NCO's EEO and Harassment and Unprofessional Conduct policies, your employment is terminated effective immediately.

**Employee Comments:**

_____
_____
_____
_____
_____
_____

Employee Signature (Your signature does not indicate
Agreement, only receipt of discussion.)

Manager/Supervisor Signature/Date

Copy – Human Resources

000189    EmpRelatJobDiscussionSummaryForm.doc  edited 3/00

Exhibit K

A MONTH OR SO AGO MY MANAGER RIC BOUDREAU
WAS IN MY OFFICE GOING OVER A FILE WITH
ME. MR Bill SAVAGE INTERUPTED OUR MEETING
BY WALKING IN AND STATING TO MR BOUDREAU
"WHATS THAT NIGGER DOING THERE POINTING TO THE
SMALL BALANCE COLLECTION DEPARTMENT", AT THAT
POINT MR SAVAGE AND MR. BOUDREAU LEFT
MY OFFICE.

ERIC SHAW

10-15-01

000190

**NCO Financial Systems, Inc**

# Memo

**To:**   Ted Fox

**From:** Valerie Hue

**CC:**   Ric Boudreau

**Date:** 10/15/01

**Re:**   Comments of Bill Savage

---

I have been asked to document comments made to me by Bill Savage.  The following are only some of the comments made.

I have been the only African American female large balance collector/manager the Dover branch has had.  Over my tenure with Milliken & Michael's/ NCO Financial System, Inc  Bill has made numerous comments.

While completing a sit-with, Mr. Savage yells to me to come here.  When I reached his location he states, " Tell Her to wake her fat ass up".  He was referring to Audrey Williams, apparently she was sleep in her office.  24 hrs later she resigned.  I told Mr. Savage he can't say those things and his response was and I quote "fuck her"

At the award ceremony he yells at the receptionist. "Don't you thing he is fucking busy." He was referring to a call from Phil Weaver and Ted Fox to Mike Scher.

At the receptionist counter he stated he loved black pussy in context to a conversation to my mixed heritage

I was wearing a tee shirt that has Dollar bills printed on it.  He comments "Val walking around with fucking money on her tits"

I was walking around the corner and ran into him.  He put his arms around me and said nice tits.  I told him to get his hands off of me.

At a large balance meeting he made a comment to one of the collectors to stop being a wet pussy and put their numbers on the board.

There are many other comments that Bill has made over the years. To make a complaint against Mr. Savage would only result in me loosing my job.

000191

TO: Ted Fox
From: Ric Boudreau

**RE:  Bill Savage**

The following is events are for the record:

**Incident 1.**    In mid September 2001, I was reviewing a collection account in Eric Shaw's office when Mr. Savage came in.  He said to me in a "Matter of Fact" voice, "Do you think that that "N>>" (Audrey Williams) can stay on the phone" and collect some fee? I responded to him that she was on the phone and collecting fee and that his commentary about her lineage was uncalled for.  I escorted him out of the collectors office and away from the collection floor.

**Incident 2.**    Early in the following week, Mr. Savage came up to me in the hall and asked if I was "casting for a Tarzan movie".  My small balance manager Brian Waystack had been interviewing a few African American collectors that day and was noticeably taken back by the comment.

WITNESS TO INCIDENT #2

Exhibit L

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,
  Plaintiff,     )
          )
          )
    v.     ) C.A. No.
          ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a )
Delaware corporation, trading as )
NCO FINANCIAL COMMERCIAL SERVICES,)
  Defendant.     )

    Telephone deposition of **RICHARD BOUDREAU**,
taken before Cheryl A. Anthony, Court Reporter, in the
law offices of Parkowski, Guerke & Swayze, 116 West
Water Street, Dover, Delaware, on Tuesday, March 28,
2006, beginning at 12:05 p.m.

APPEARANCES:

    PARKOWSKI, GUERKE & SWAYZE
    BY: JEREMY W. HOMER, ESQUIRE
    116 West Water Street
    Dover, Delaware  19901
    Attorney for Plaintiff.

    SESSIONS, FISHMAN & NATHAN
    BY: DAVID ISRAEL, ESQUIRE
    3850 North Causeway Boulevard
    Lakeway Two, Suite 1240
    Metairie, Louisiana  70002-1752
    and ELIZABETH FITE, ESQUIRE
    15316 North Florida Avenue
    Suite 100
    Tampa, Florida  33613
    Attorneys for Defendant.

ALSO PRESENT:
    MS. VALERIE HUE

    **ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302) 674-8884.

15

1    divided up that responsibility.

2         Q.    Do you recall approximately when you first

3    met Ted Fox or was aware that he worked for NCO?

4         A.    The only time I ever ran across Ted was on a

5    sales collection sales conference that I went to

6    Metairie on.  I understand Ted had been -- and I never

7    met him once.  I understand that he had spent time at

8    the Dover Branch during the time that I was there.  But

9    I had little or no contact.  My understanding was that

10   he was on some sort of fast tracking deal and kind of

11   came through the company and moved up the ranks.

12              I had little or no contact with him, because

13   even when I heard about him down and taking over

14   responsibilities in Metairie, they said:  Oh, he had

15   been here for a year.  Well, it was totally a shock to

16   me.  I really had not known of him whatsoever, other

17   than meeting him when I went to Metairie for general

18   managers' meetings.  That's when I ran across him.

19        Q.    Okay.  I think you already said you had

20   dinner at least once with Valerie Hue.  Did you ever

21   have dinner with Bill Savage?

22        A.    The only time I have had dinner with Bill --

23   Well, I shouldn't say the only time.  The times I had

24   with Bill Savage was when he was recruiting me, and then

16

1    his wife and my wife went out to dinner at that time.  I

2    have been to his house at New Year's Eve with 25 other

3    people, that type of a situation.

4                And often managers would go to

5    lunch/breakfast meetings with Bill.  He would come into

6    town, you know, on a Saturday morning, and we were

7    obligated to sort of meet him for breakfast at the Blue

8    Hen Restaurant.  And our morning meetings were held

9    there.  When we would have lunch, they would be over

10   at, I guess, the Sheraton, that big hotel.  I don't

11   remember the place anymore.  But that is where we would

12   go for lunch, me and three other managers, sales

13   managers, collection managers, that type of thing.  And

14   we would have business lunches in that scenario.

15         Q.    Do you recall whether Ted Fox was at any of

16   those lunches or dinners?

17         A.    No.   I don't recall it.   Ted Fox was never

18   at any of those meetings.

19         Q.    Okay.   Did you ever play golf with Bill

20   Savage?

21         A.    The only time I ever go near those -- I know

22   this is a -- no.

23         Q.    Okay.   How about pool?   Did you ever play

24   pool with him?

17

1        A.      No, no, never played pool with him.  And

2    then business stuff, as far as I know, Savage would

3    leave the state and most of the country to go golfing in

4    some God forsaken place, because it had the name that

5    the US Open was there.  My only opinion about golfing is

6    the Three Stooges, play golf with your friends type of

7    thing.  And a good golf course is a field, as far as I

8    am concerned, so no golf.

9        Q.      You sound kind of bitter about golf.  Have

10   you ever had a bad golf experience?  You can strike that

11   question.

12       A.      In my days prior, at Textron, I was

13   responsible for golf course financing.  So the only time

14   I ever ran across a golf course was because their

15   clubhouse was in foreclosure or their irrigation system

16   needed to be ripped out.  So I never gained a whole lot

17   of affinity for golf.

18       Q.      Okay.  Do you have any knowledge of whether

19   or not Mr. Savage and Mr. Fox might have socialized

20   together outside the office?

21       A.      Because I had no contact and didn't even

22   know Ted Fox was in Dover during that time that he was

23   there, I couldn't even begin to tell you that there was

24   any contact there.  And once Ted was gone, he was in

21

1    because he is just that doggedness.  But my

2    understanding about the whole Valerie thing, you know,

3    Valerie often commented about how Bill and her were

4    cousins.  You know, they had this relationship that

5    suggested that, you know, in the South people were

6    related somehow or another.  So their half joke was that

7    they were cousins.

8            After that, I never perceived anything out

9    of the ordinary.  I never heard anything being said out

10   of the -- off color.  I certainly never, you know, had a

11   conversation where someone came back and said:  He said

12   this to me and I can't believe it.  And I need to cry.

13   I'm going to report it.

14           I never heard anything like that.  There was

15   nothing ever reported to me about that.  I would have

16   done something about it, as I did with this one.

17           MR. HOMER:  Okay.  I don't have any other

18   questions.

19   BY MR. ISRAEL:

20       Q.    Rick, this is Dave Israel.

21       A.    Yes, sir.

22       Q.    Can you hear me okay?

23       A.    Yes, I can.

24       Q.    Do you remember, after your conversations

22

1    with Phil Weaver and Ted Fox, what, if anything, they

2    asked you to do?  Let me go back.  Remember you were

3    just describing a conversation with Weaver and Fox

4    relating to inappropriate comments by Bill Savage?

5         A.    Yes.

6         Q.    Do you remember what, if anything, they

7    asked you to do?

8         A.    Write it down, start making times and dates

9    and things of that nature.  They wanted to be able to

10   have it detailed, I mean who was there, who was present,

11   and could I detail it out?

12              I mean actually, now that you say that, my

13   recollection was that for like two hours after that, I

14   spent memo writing and jotting down notes so that I

15   could keep track of all of this, in the midst of also

16   trying to run a branch.  That is what I was asked to do,

17   I believe.

18        Q.    You are aware that immediately after that

19   conversation or some short time after that conversation,

20   Savage was fired?

21        A.    Yes.  I had left for a week.  And when I

22   came back, lo and behold, it was done.  I mean I had

23   already scheduled a vacation type of thing.  And when I

24   came back, I was informed that that had happened.

23

1          Q.     How long were you in the office from when

2     your conversation occurred with Savage and Fox until you

3     left the business?  And I'm going to represent --

4          A.     Do you mean Weaver and Fox?

5          Q.     Yes.  I'm sorry.  And I'm going to represent

6     to you that I understand your conversation with them was

7     during October 2001.

8                 MR. HOMER:  I will object to that.  You

9     might as well testify for him.

10                THE WITNESS:  In April of 2002, I was gone.

11    BY MR. ISRAEL:

12         Q.     So a year later?

13         A.     Well, four months.

14         Q.     Oh, I'm sorry.  In April of 2002?

15         A.     I left.

16         Q.     Did you ever see Ted Fox take any

17    retaliatory measures of any kind, after Savage was

18    fired, against Valerie Hue?

19         A.     Negative.  I never heard from Ted.  Again,

20    other than Phil, I've never had conversation one with

21    Ted regarding that.  Val, as far as I knew, was a

22    selection that they approved.  They liked her.  They

23    thought she was intelligent.  She thought she was

24    assertive.  They thought she was cunning.  They thought

26

1          She was the person that we heard from

2   regularly.  She was the person that even came to Dover a

3   couple of different times so that we could have our

4   hands-on conferences.  We went to lunch with her so

5   that, you know, it was a smooth transition from what I

6   was doing in my scenario to what she wanted, as the new

7   player, to do with Kathy or I mean with Valerie.

8          You know, everything was positive and moving

9   forward so that, you know, I could get in the game plan

10  and train somebody so that she can move into your

11  position.  And that is what we were doing.

12      Q.    You made a reference that Valerie Hue

13  described that she and Bill Savage were cousins.

14      A.    Yes.

15      Q.    What was that about?

16      A.    It would just be that.  The reference, I

17  guess, is to the fact that they are both Southerners,

18  and they -- you know, you can have blacks and whites in

19  the same families, because of, you know, just the nature

20  of the social relationships.  And that was sort of half

21  the giggle, you know, that they would use.  You know, we

22  are not a black and white deal.  Well, we are cousins.

23  That would be the half comments that had been made.

24          It's not like it was thrown out every time

27

1    you turned around, but that was -- when asked about any

2    comments that were made in overtones of a sexual nature,

3    no, I never heard that.

4              Did I hear of a relationship between Valerie

5    and Savage?  And that is the relationship.  That is what

6    I had heard.  That is what Valerie used to use.  She

7    used to say:  We are cousins.

8         Q.    Got it.  Mr. Boudreau --

9         A.    Yes, sir.

10        Q.    -- did you ever see Mr. Savage treat Ms. Hue

11   in any inappropriate or discriminatory manner?

12        A.    Say again?

13        Q.    Did you ever see Mr. Savage treat Ms. Hue in

14   an inappropriate or a discriminatory manner?

15        A.    Negative.

16        Q.    If I understood your testimony, Hue never

17   complained to you that Savage treated her badly or in a

18   discriminatory manner?

19        A.    Right, right.

20              MR. HOMER:  He didn't say that.  If you want

21   to ask all of these leading questions, feel free.

22   BY MR. ISRAEL:

23        Q.    Did Ms. Hue ever complain to you about

24   anybody discriminating against her when you worked with

Anthony Reporting
(302) 674-8884

28

1    her?

2        A.    No, no.   Valerie would never have let

3    anybody do that.

4        Q.    What do you mean by that?

5        A.    Valerie, as I indicated earlier, is an

6    intelligent, smart, assertive personality.  That is what

7    her strengths as a manager were.  That is what her

8    strengths is a collector were.  And to suggest that

9    somebody on a personal nature would make a comment that

10   Valerie would not turn around and not only defend

11   herself, but rightly put that person in their place, you

12   know, simply suggests that no one is going to try to do

13   that.

14           And they would have to run some mayungo up

15   to a big dog and try to smack it in the face, because

16   you will like get your arm ripped off.

17           Valerie has the kind of personality that you

18   treated that woman with respect and she wouldn't take

19   anything but respect.  And that is the strength that I

20   saw.  I knew a woman walking into an all collector, all

21   majority male collector scenario, she was a tough woman

22   to work with.  And she would command her respect, and

23   that's the way it would go.  That is why she was a

24   perfect selection candidate.

29

1       Q.    When you worked with Ms. Hue, did you ever

2  discuss with her or train her relating to check

3  validation procedures?

4       A.    Yes.

5       Q.    Were you permitted to run NSF checks or

6  redep them without validating them?

7       A.    No.

8       Q.    Why not?

9       A.    For many reasons; first off, it is policy.

10  The second reason is that we are trained not to hang

11  paper.  The branches are unable to make projections

12  based on numbers going up, going down.  And clients are

13  not being paid in those same scenarios.  So we would

14  have client relations we were concerned about,

15  bookkeeping concerns we were concerned about, and paying

16  collectors for monies that they are not entitled to.  So

17  dropping checks without validation is just a foolish

18  move.  It is in our training sessions.  It was in our

19  action plans as managers to monitor those things.

20       Q.    Did you ever train Valerie Hue to violate

21  those policies?

22       A.    Negative.

23       Q.    Did you see anyone train Valerie Hue to

24  violate those policies?

Exhibit M

Tex Fox

Page 1

                IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF DELAWARE


VALERIE HUE,                    )
                                )
        Plaintiff,              )
                                )
v.                              )
                                )   Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,    )     05-225-KAJ
a Delaware corporation,         )
trading as NCO FINANCIAL        )
COMMERCIAL SERVICES,            )
                                )
        Defendant.              )



        Telephone Deposition of TEX FOX taken
pursuant to notice at the law offices of Parkowski,
Guerke & Swayze, P.A., 116 West Water Street, Dover,
Delaware, beginning at 2:30 p.m. on Monday, March 13,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.


APPEARANCES:


            JEREMY W. HOMER, ESQ.
            PARKOWSKI, GUERKE & SWAYZE, P.A.
              116 West Water Street
              Dover, Delaware  19903
              for the Plaintiff,




                CORBETT & WILCOX
            Registered Professional Reporters
    1400 French Street     Wilmington, DE 19801
                (302) 571-0510
            www.corbettreporting.com

544afc8b-2727-4477-97ce-2f37ff6e4c2e

Tex Fox

Page 10

1    A. Michael Barrist.
2    Q. B-a-r-i-s-t?
3    A. B-a-r-r-i-s-t, correct.
4    Q. Okay. When you became the head of the
5  commercial division in December 2003 -- or the vice
6  president of the commercial division, what was your title
7  at that time? Or did you already tell me? I don't think
8  you did.
9    A. I was a senior vice president of sales. The
10  day they promoted me they made me the senior vice
11  president of the commercial division.
12    Q. Okay. How many people worked under you at
13  that time?
14    A. When I took over the division, I believe we
15  had 605 or 600 -- somewhere in that neighborhood. We're
16  forever changing the size of our staff.
17    Q. Okay.
18    A. Currently, it's 600.
19    Q. Can you tell me approximately how many
20  employees there were company-wide at that time?
21      MR. ISRAEL: You're asking for NCO
22  Financial?
23      MR. HOMER: Yes. The entity that's the
24  defendant in this case.

Page 11

1    A. I would really be speculating, Jerry. I think
2  the company at that time had 15,000 employees.
3    Q. Okay. What were your responsibilities as the
4  senior vice president of sales?
5    A. My responsibilities were to manage the
6  complete operations of our sales departments, manage
7  their success, their budgets, their hirings, their
8  firings. Anything that was related to sales fell under
9  my control there, which meant every branch manager
10  reported directly to me.
11    Q. Okay. Did you have any supervisory
12  responsibility over the commercial collection division
13  while you were senior vice president of sales?
14    A. None.
15    Q. What were your responsibilities once you
16  became a senior vice president of the commercial
17  division?
18    A. What rolled up under me when I became a head
19  of the division was the operation side of the business
20  which was controlled by the vice president of operations
21  at the time, which was Kathy Obenshain.
22    Q. Okay. Did you have the sales and the
23  collection divisions under you at that time?
24    A. Yeah. I had the branch managers. Basically

Page 12

1  who reported directly to me was the branch managers and
2  the vice president of operations.
3    Q. Okay. But you had responsibilities for both
4  sales and collections at that point?
5    A. Correct.
6    Q. Okay. That was when you had 600 people under
7  you approximately?
8    A. Correct.
9    Q. Okay. Did your responsibilities when you
10  became senior vice president of commercial division
11  include responsibilities related to human resource
12  issues? I'm going to refer to human resource hereafter
13  as HR.
14    A. I would have to say I didn't have
15  responsibility for HR mainly because we have an HR
16  department, but what I did have responsibility to was
17  that if something was deemed to be in violation of any
18  type of company policy, rules or laws that I would have
19  the HR department -- notify the involvement of those.
20  So, basically, I would be reporting to our HR department.
21    Q. Okay. The HR department served more that just
22  the commercial division. Would that be correct?
23    A. That would be correct.
24    Q. What other components of NCO did the HR

Page 13

1  department serve other than the collection division?
2    A. HR --
3      MR. ISRAEL: You mean other than the
4  commercial division?
5      MR. HOMER: Yeah. Other than the
6  commercial division.
7      THE WITNESS: You have the consumer
8  division. You have the portfolio management division.
9  You got the E-Payment division. The have the PAC credit
10  reporting division. You would have --
11      MR. HOMER: You might want to slow down
12  a little bit because the court reporter has to try to get
13  all this down.
14      THE WITNESS: I apologize.
15  BY MR. HOMER:
16    Q. Did you say PAC?
17    A. PAC is -- basically, it's outside of the
18  collections. They resell credit bureaus.
19    Q. Okay.
20    A. It's a type of mortgage lender.
21    Q. Now, are all these different entities part of
22  NCO Financial Systems, Inc., or are they part of some
23  other entity?
24    A. They all make up what is known as NCO Group.

4  (Pages 10 to 13)

Corbett & Wilcox

Tex Fox

Page 14

1    Q.  Okay.
2    A.  E-Payments is outside of NCO Financial
3  Systems, Inc.
4    Q.  You need to speak up.
5    A.  I'm sorry.  I was just clarifying that
6  E-Payments is part of NCO Financial Systems.  It's part
7  of NCO Group.  And Portfolio Management is not part of
8  Financial Systems.  It's part of NCO Group.
9    Q.  All these entities are serviced by the same HR
10  department.  Is that true?
11    A.  True.
12    Q.  Okay.  Would the employees in these different
13  entities share a 401 (k) plan, have the same benefits and
14  so forth, or are all there distinctions among the
15  different entities for those types of programs?
16    A.  Again, Jerry, I think I'd be speculating if I
17  told you I knew exactly what benefits were offered to
18  each division.  I do know in commercial every employee is
19  offered the same package of what benefits are available
20  to them.  I really truly don't know -- I believe that
21  it's the same package for all the other divisions, but I
22  can't really tell you that for sure.
23    Q.  Okay.  You know who Bill Savage is.  Correct?
24    A.  I do know who Bill Savage is.

Page 15

1    Q.  When did you first become acquainted with him,
2  assuming you did become acquainted with him?
3    A.  I was hired by Lou Molitiere, who was at the
4  time the person who was heading up the sales and
5  marketing for Milliken & Michaels.  When Lou --
6        MR. ISRAEL:  Go slow.
7        THE WITNESS:  I'm sorry.
8        When Lou hired me to work for the
9  organization as an executive recruit, I was living in the
10  Northern Virginia area.  And they decided they did not
11  want me to do my training down in Louisiana.  It would
12  make more sense to do it in the closest geographic
13  branch, which was Dover.
14        So the first time that I ever met Bill
15  Savage was after I was offered the job.  Lou had asked me
16  to take a ride over to Dover to meet Bill Savage, to take
17  a look at the branch and see if that was something I'd be
18  comfortable to do.  So that was back somewhere in the
19  fall of 1997.
20  BY MR. HOMER:
21    Q.  Okay.  Is Molitor spelled M-o-l-i-t-o-r?
22    A.  I don't recall.
23    Q.  Okay.
24    A.  I would have to take a guess at it.

Page 16

1    Q.  When you went to work in the Dover branch, I
2  think you said you did that for about three and a half
3  months.  Is that right?
4    A.  Yeah.  It was three and a half -- a little
5  over -- maybe a couple days over three and a half
6  months.
7    Q.  Okay.  Who did you report to when you worked
8  there?
9    A.  I reported to Lou Molitiere.
10    Q.  Did he work --
11    A.  I'm sorry.  I reported to Lou Molitiere, but
12  when I was in Dover, my first direct manager on a daily
13  basis was Mike Gibson.
14    Q.  Okay.  Who ran the office?  Who was the branch
15  manager at that time?
16    A.  The branch manager was Bill Savage.
17    Q.  Okay.  Other than that three-and-a-half-month
18  period that you worked at the Dover office, was there any
19  other time where you and Bill Savage were located in the
20  same geographical location?
21    A.  No.
22    Q.  Okay.  Can you describe for me what types of
23  things you interacted with Bill Savage on at the time
24  that you worked in the Dover office?

Page 17

1    A.  I interacted with Bill on coordination of some
2  expense reports I had, in coordination with following
3  my -- I'll call it a contract I had with Lou Molitiere
4  that at the end of three months I was to move from the
5  primary department to the CFD department.
6    Q.  To the what department?
7    A.  The CFD department.  It was essentially their
8  customer service department.
9    Q.  Okay.
10    A.  That was my interaction with Bill.
11    Q.  Okay.  How many people were in the Dover
12  office?  How many employees did they have during that
13  time you were there?
14    A.  At that time?  Fifty.
15    Q.  Okay.  Would you see Bill Savage every day
16  that you went to work?  I realize there were days that
17  you may have been on vacation or he may have been sick.
18  But in the normal course of things, if you were both
19  working, would you normally see each other every day?
20    A.  Yes.  It was Bill's practice to walk the
21  floor.  Any day he was in the branch, he would walk not
22  only the sales floor but the collection floor to make his
23  presence known.
24    Q.  Okay.  Incidentally, I forgot to tell you

Corbett & Wilcox

544afc8b-2727-4477-97ce-2f37ff6e4c2e

Page 18

1  this, but just I want to put on the record: You
2  understand that even though we're doing this by telephone
3  it doesn't change the fact that you really can't talk to
4  the attorney during any kind of sidebar conversations
5  with your attorney or get other communication from him by
6  way of written notes or gestures or anything like that?
7      A.  I understand.
8      Q.  Okay.  Was Mr. Savage involved in any way in
9  you receiving any promotion?
10     A.  No.  My contract was written very specific
11 that I was to move from primary to CFD on the first day
12 of the fourth month.  It was written that I was supposed
13 to move on the first day of the seventh month into
14 management.  We never got that far into the deal because
15 they had terminated their relationship with the branch
16 manager of the credit services division down here in
17 Metairie, Louisiana.
18     Q.  Okay.
19     A.  And Lou Molitiere and Tray Cefalu were the
20 only ones involved in that promotion.
21     Q.  Okay.  Can we get a spelling for that name you
22 just gave as Tray --
23     A.  C-e-f-a-l-u.
24     Q.  Was Mr. Savage ever involved in instructing

Page 19

1  you as to how to do your job?
2      A.  All of my sales and management meetings were
3  held by Mike Gibson.  The only involvement I had with
4  Bill Savage was whenever he would hold a branch meeting
5  or an awards meeting.  I would -- if I had to explain it,
6  it was more or less a secret that I was an executive
7  recruit in the branch.  So anytime that I needed to get
8  something from corporate, which is where Lou and Tray
9  Cefalu were located, I would have to do that through Bill
10 Savage.  So there was an occasion where I would have to
11 go to his office and have him call Lou or get something
12 to Lou or to Tray for me during that three-month period.
13 And that goes back to the expense reports, my corporate
14 housing.  I had a lot of questions, especially in the
15 early months when they were putting that together.
16     Q.  Okay.  Were you ever involved in any way in
17 Mr. Savage receiving a promotion?
18     A.  For as long as I knew Bill, he was a branch
19 manager.  Never anything more.  We did move him from
20 Dover to the Boone location.  And then when we reduced
21 the size of the Boone location, we moved him back to
22 Dover.
23     Q.  Okay.
24     A.  But he never got a promotion.  He got moved.

Page 20

1      Q.  Okay.  Did you at any time socialize with
2  Mr. Savage outside the office?
3      A.  You know, I've been thinking about this for a
4  while because, obviously, we're going back several years.
5  Bill is an avid golfer.  And I am trying to recall -- and
6  I can't recall if I ever did golf with him one time.  I
7  know that he had invited me on several occasions.  And if
8  I had, it would have been one time, mainly because my
9  free time -- I did still live in Virginia when I had the
10 Dover office.  I did not stay in Dover on any weekends.
11 So I really -- Jerry, I can't recall.  And if I had, it
12 would have been one time.  And it would have been with
13 other people from that office.
14     Q.  Would this jar your recollection?  Did you
15 ever make a trip to Hilton Head to golf where Savage was
16 present?
17     A.  No.  Never.
18     Q.  Okay.  To get back to the question I asked
19 before, you mentioned the possibility that you golfed
20 with him.  Were there any other times that you socialized
21 with Bill Savage outside the office?  For example, did
22 you go out to dinner with him or engage in any other
23 contact with him outside the office?
24     A.  When he was the Boone manager, I did often do

Page 21

1  branch visits.  When I do a branch visit, I take the
2  managers out to dinner.  I did have dinner with him and
3  Cliff Scales back when -- this was one visit prior to us
4  reducing the branch.  So, again, this was back somewhere
5  in the late 1990s.
6      Q.  Okay.  Anything other than the dinner where
7  you would have had contact with Bill Savage outside the
8  office?  I understand there's a possibility that you
9  golfed with him at least one time.
10     A.  No.
11     Q.  Okay.  Did you consider Bill Savage a friend
12 of yours while you worked with him at NCO?
13     A.  No.
14     Q.  Okay.  Have you had any contact with him since
15 he left NCO?
16     A.  I think I talked to him one time, and it was a
17 business-related issue about a crossover of clients.
18     Q.  Okay.
19     A.  And that was one time and one time only.
20     Q.  Okay.  Did you know Valerie Hue before
21 December '03?
22     A.  Yeah.  Valerie -- she, I believe, at the time
23 I was in Dover was a collector.
24     Q.  Okay.

544afc8b-2727-4477-97ce-2f37ff6e4c2e

Tex Fox

Page 22

1    A.  I met Valerie when I first came to the Dover
2  office.  Maybe not right away, because I was on the sales
3  side.  But, yeah, I knew Valerie.
4    Q.  Okay.  After you left the Dover office, did
5  you retain any contact with her in connection with your
6  job?
7    A.  The time that I would see Valerie would be
8  when I did a Dover branch visit.  I do recall seeing
9  Valerie when we were doing CRS straining where Valerie
10  and a couple others came down here to Metairie.  Really
11  that's most of -- all of the involvement I've ever had
12  with Valerie after I left Dover.
13    Q.  Okay.  So it would be fair to say that you had
14  very infrequent contact with her after you left the Dover
15  office?
16    A.  Yeah.  That would be very fair to say.
17    Q.  Okay.  Were you involved in any way in the
18  termination of employment of Bill Savage at NCO?
19    A.  I was his direct manager, and I was involved
20  in firing Bill Savage, correct.
21    Q.  Okay.  Could you describe for me the process
22  that was used to terminate Bill Savage?
23    A.  I'm going to do this from recollection, Jerry.
24  If I recall, we received a call, "we" being Phil Weaver,

Page 23

1  who was then -- was then senior vice president and
2  general manager of the commercial division.  We received
3  a call from the then general collection manager, Rick
4  Boudreau, about what Bill had been saying in -- or had
5  done to Val -- said or done to Valerie, if I call.  We
6  then got a statement from Valerie learning what things
7  offensive that were said and done.  There was no
8  hesitation.  The only consideration was to terminate his
9  employment with our organization.
10    Q.  Okay.  You mentioned a phone conversation with
11  Boudreau.  Were you on that conversation, and was Phil
12  Weaver on the conversation and Boudreau?  Were those the
13  three that were on the conversation?
14    A.  I recall that the conversation was in my
15  office on a speakerphone with Phil Weaver in my office.
16  And I believe Boudreau in his office in Dover.
17    Q.  Okay.  Have you seen a transcript of that
18  phone conversation?
19    A.  I saw -- yeah, I have.  Yes.
20    Q.  Okay.  Who was the decision-maker regarding
21  the termination of Bill Savage?
22    A.  The decision-making -- I mean, it really was
23  a -- it was a no-brainer.  I mean, you know, we have
24  specific things that you can do or you can't do.  And

Page 24

1  based on what we learned, our HR department, Phil Weaver
2  and myself all agreed that that was the only thing to do.
3  So it wasn't a one person -- it was a such an obvious
4  thing that he needed to go.
5    Q.  Okay.  So HR was involved in the decision as
6  well as you and Phil Weaver?
7    A.  HR is involved in every termination.
8    Q.  Okay.  What was the extent of their
9  involvement?  Can you describe what they did in
10  connection with it?
11    A.  Again, I'm going to go from memory.  I believe
12  they received the information that we gathered.  I want
13  to say we did suspend Bill.  We did -- I believe it
14  was -- I want to say it was Cherie Sugg over the phone.
15  And that was it.  You know, they keep the documentation.
16  And I truly don't know what they do on their end with
17  that.
18    Q.  Okay.  Was there an attorney involved in it,
19  do you remember?
20    A.  No.  Truthfully, I remember us calling Bill,
21  saying, Bill, you said this.  You did this.  And he said
22  yeah, I did.  We said, okay, you're done.
23    Q.  Okay.  Would it be fair to say that, given
24  what Bill Savage did, NCO had some concern about the

Page 25

1  legality of the situation and its possible liability if
2  it didn't fire him?
3    A.  I can't speak for -- yeah.  Absolutely.  I
4  mean --
5    Q.  Okay.
6    A.  -- it was offensive.
7       It was offensive on every level.
8    Q.  Okay.  Your position when Bill Savage was
9  fired was vice president of sales in the collection
10  division?
11    A.  At the time I was called senior vice president
12  of sales.
13    Q.  Okay.  Bill Savage was the branch manager and
14  reported to you at that time.  Correct?
15    A.  Yes.  He was.
16    Q.  Okay.  I'd like to refer to that transcript
17  that we just talked about.  I don't know if you got a
18  copy of it there or not.
19       MR. ISRAEL:  Hold on a second.
20       MR. HOMER:  It was Weaver Exhibit 1.
21       MR. ISRAEL:  I have it.
22  BY MR. HOMER:
23    Q.  Okay.  If you turn to page 17 --
24       MR. ISRAEL:  Hold on one moment.

Page 38

1  unaware of the situation going on for about a month.
2  Kathy was -- Kathy -- when I refer to Kathy, I'm talking
3  about Kathy Obenshain.
4      Q.  Yes.
5      A.  Kathy was dealing directly with Dina Loft
6  investigating the files, really looking at -- this was
7  across the board -- all branches.  It really came out in
8  that first month -- and, of course, this is hindsight now
9  that I'm telling you this -- because Kathy was dealing
10 with Dina and discovered that there was an issue in our
11 Dover office.  I -- and Kathy brought that to my
12 attention.  Because she was the vice president of
13 operations, all collectors fell under her.  Kathy went to
14 do basically -- you know, she was the one that would
15 promote or not promote a general collection manager.  I
16 know Kathy got along with Valerie very well.  I really
17 think in the early days of this Kathy was looking for
18 some reason this was happening other than what we
19 discovered in the end.
20     Q.  Okay.  When did you first learn about there
21 being an audit done by the Horsham office?
22     A.  I'm trying to remember.  It was really right
23 after I was promoted.  It was --
24     Q.  Okay.

Page 39

1      A.  It was in January of '04, I know that.  But I
2  can't -- I don't know if it was the beginning or the
3  middle of the month.
4      Q.  Okay.  Do you know why the audit was being
5  done?
6      A.  Yeah.  Because when you have something that
7  is, in my opinion, so against the rules, you're
8  absolutely going to do an audit.  You're going to find
9  out if that stuff is true for a lot of reasons.  This is
10 a manager we're talking about.
11     Q.  Well, did they know that something was wrong
12 before they did the audit, or was this just a routine
13 audit?
14     A.  It was a routine audit.  They didn't know what
15 was being done.
16     Q.  So the purpose of the audit wasn't to find
17 anything specific.  It was just a routine audit.
18         My question was:  Why was the audit
19 done, if you know?
20     A.  If you go back in time and look at was
21 happening out in the world, you had things like Enron.
22 You had things like Tyco happening.
23     Q.  Are you trying to guess what the reason for it
24 was?  Do you actually know why they did the audit or are

Page 40

1  you just saying it made sense to do the audit?
2      A.  No.  I'm telling you why they did the audit.
3      Q.  Okay.
4      A.  Our organization, as a company, was complying
5  with laws and regulations that were out there.  One of
6  those -- and mainly because we do work for very large
7  banks, like Bank One, Bank of America, Capital One.  They
8  require us to do certain things.
9      Q.  Okay.
10     A.  And we were already doing this practice on the
11 consumer side.
12     Q.  When did you first learn that there was a
13 problem as a result of the audit?  In other words, when
14 did you first find out that the audit had disclosed
15 information that signaled there was a problem?
16     A.  I want to say that early part or mid part of
17 January '04.
18     Q.  Okay.  How did you find it out?
19     A.  I believe -- my recollection -- I got a phone
20 call from Dina Loft.  And I don't know if I called Kathy
21 into my office or I hung up the phone and then got with
22 Kathy.  But it was somewhere in that method.
23     Q.  Okay.  What did you do once you found out
24 about it?

Page 41

1      A.  Well, I gave it to Kathy and said, "Kathy,
2  this is your general collection manager.  Research it.
3  Once you find out what you find out, get back with me."
4      Q.  Okay.  Did you give her any specific
5  instruction on what she should do?
6      A.  No.
7      Q.  Did you determine at that time you needed to
8  be personally involved in the investigation?
9      A.  At that time, no.
10     Q.  Okay.  Did you talk to Mike Scher about the
11 situation when you found out about the problem from Dina
12 Loft?
13     A.  Jerry, I don't recall when I brought Mike in
14 the loop.  I might have done it right then.  Or I would
15 have done it when we made the decision about the general
16 collection manager in that office.  And she was at the
17 time the branch manager who was going to affect him.
18     Q.  Okay.  What involvement did you have in the
19 investigation?
20     A.  From recollection, I did several telephone
21 interviews with several of the collectors -- ones that I
22 knew when I spent time in Dover.
23     Q.  How long was it you started doing that after
24 you told Kathy Obenshain to investigate it?

Tex Fox

Page 42

1    A. A couple days. I don't know. I really don't
2  know, Jerry.
3    Q. Okay. What prompted you to get personally
4  involved? You said you turned it over to Kathy. Why did
5  you decide you needed to be involved in it?
6    A. If I recall correctly, HR was involved as
7  well. This was the determination -- that I would do some
8  of the interviews. Kathy and Dina were working very hard
9  on the files. And HR, I want to recall, asked me to do
10  that.
11    Q. Okay. Do you recall what HR's involvement was
12  in the investigation?
13    A. I know HR was talking to our executive team.
14  They were relying on our interviews and what Kathy
15  finding out on the files as far as documentation. They
16  were more an ear. And they helped to implement the
17  decision.
18    Q. When you say "HR," do you recall who it was in
19  HR that asked you to get involved in it?
20    A. I want to say it was Cherie Sugg.
21    Q. You're not sure?
22    A. I'm about 99 percent positive that it was
23  Cherie.
24    Q. Okay. Did she have the authority to tell you

Page 43

1  to get involved in an investigation?
2    A. Yes.
3    Q. Okay. Do you recall what documents you had at
4  the time that you started doing the investigation that
5  you personally held regarding this matter?
6    A. The only document that was created for this
7  matter would be what Dina was working off of. And I know
8  we had something from her. But our system is really the
9  place where we look for all our information. If
10  something happened on the file, it would be noted there.
11    Q. Yeah. I'm really not asking about the
12  documentation that she found. I'm just wondering what it
13  was that you got when you started your investigation.
14    Did you have a list of problems? Did
15  you have just an oral understanding of what was going on
16  or did you actually look at some documents before you
17  started interviewing people?
18    A. I looked at everything Kathy brought to me,
19  and at that time that was file reviews. Kathy was
20  really -- I really believed Kathy was looking to find
21  that there was nothing wrong there.
22    Q. Okay. I don't want to get too sidetracked.
23    Do you recall what documents she brought
24  to you?

Page 44

1    A. It wouldn't be a document. I mean, the only
2  document would be a print screen. It would be a copy of
3  what she was working with Dina on.
4    Q. Do you recall if you saw a report that listed
5  various NSF checks and collectors and indicated problems
6  in it with each check? Did you see anything like that?
7    A. Not that that -- no.
8    Q. Did you see an end-of-the-month NSF report?
9  By "NSF," I'm sure you know what I mean --
10    A. Right.
11    Q. -- the not sufficient fund report check.
12    A. Kathy had all of that. I didn't have it.
13    Q. So when you started the investigation, you
14  hadn't seen those documents. Is that right?
15    A. My role was -- you've got to remember. This
16  is about two weeks after I had taken over the division.
17  I'm really getting introduced to the collections side,
18  because I had no involvement on the collections side.
19  Kathy, as the vice president of operations, who also
20  worked on the collections side her whole career -- I was
21  very reliant on her professionalism of what was to
22  transpire on the collections side. I truly did think
23  those interviews with the collectors were very reliant on
24  what Kathy gained with what she did on her side and

Page 45

1  really respect the decision she came to and actually
2  implemented the termination of Valerie.
3    Q. Okay. I have seen in this case various
4  witness statements, and a number of them indicate they
5  talked to you. Do you recall how you selected who you
6  were going to interview regarding this matter?
7    A. If I do any type of investigation in an
8  office, I'm going to look at the most senior people
9  there, the ones that I believe are the most trusted
10  people, ones that don't have any type of history of
11  showing me that they're not an honest individual. So I
12  went to, in that office, particular people like Mark
13  Lefevre and Dave McQuisten, Kim Marlow, Eric Shaw. I
14  mean, I went to the people I saw would give me the most
15  accurate type of information. I also sampled across the
16  board several different people so that -- and I knew that
17  they weren't connected in any way so that I could -- and
18  what came out of this was a clear straight same thing.
19    Q. So --
20    A. So it was the same thing.
21    Q. So this was sort of a judgment that you used?
22  You just didn't go out and interview all the large
23  balance collectors?
24    A. I think I interviewed three of them. I can't

Tex Fox

Page 46

1  recall, Jerry, how many we had in the office at the time.
2      Q.  When you interviewed them, do you recall what
3  you asked them?
4      A.  I'm certain -- I don't recall exactly how I
5  phrased it, but I'm certain I asked them what was their
6  interpretation of redipping, what's the DCI policy in the
7  Dover branch.
8      Q.  What's the DCI policy?
9      A.  Direct checks.
10      Q.  Right.
11          You're aware that the case involves the
12  resubmission of NSF checks.  Correct?
13      A.  Correct.
14      Q.  By "resubmission," I mean resubmission to the
15  bank for payment after a check was initially returned as
16  not having insufficient funds.  Correct?
17      A.  I'm sorry.  Can you -- the last part you went
18  out on the phone.
19      Q.  Okay.  As I understand it, the check handling
20  policy that is involved in this case has to do with
21  redipping NSF checks.  Well, let me try it from another
22  tact here.
23      A.  Okay.
24      Q.  When you did these interviews, did you ask

Page 47

1  what Valerie Hue had instructed them to do regarding the
2  implementation of check handling policies?
3      A.  I might have phrased it that way.  I do not
4  recall my exact words.
5      Q.  Okay.  Who was present when you were having
6  these interviews?
7      A.  I apologize, Jerry.  I don't recall if I had
8  HR on the phone or not.  I think it was as simple as I
9  called them.  I asked them the question.  I asked them to
10  submit a statement about what they knew.
11      Q.  Okay.
12      A.  And once I received those statements, they
13  went to HR.
14      Q.  Was Kathy Obenshain present during some of the
15  conversations?
16      A.  I don't recall.  I believe she was.
17      Q.  Can you tell me what notes were kept that you
18  made about the conversations?
19      A.  No reason for notes.
20      Q.  You didn't make any notes of the conversations
21  at all?
22      A.  No.  Because I was requesting them to give me
23  a statement.  That was going to be the documentation of
24  the call.

Page 48

1      Q.  Well, did you think that everything they told
2  you would be in the statement when you didn't take notes?
3      A.  I didn't know what was going to be in the
4  statement.  It was going to be what they wanted to tell
5  me.  Don't forget.  At that time if I asked a question,
6  their statement could have been, no, she didn't.
7      Q.  Okay.  Well, some of the statements I looked
8  at are really short.  You say you didn't keep notes
9  because you were going to get a statement.
10          Am I to believe that these statements
11  contained everything that was said in the conversation
12  that you had with the collectors?
13      A.  No.  I really believe that the heavy weight
14  came from what Kathy was doing.  Kathy's recommendation
15  and Kathy's investigation to the files, to the checks,
16  that's truly what pushed it over the edge to really go
17  the way we went.
18      Q.  So you didn't think the statements had much
19  importance regarding -- relatively didn't have much
20  importance to the termination decision?
21      A.  The statements for me showed that there was
22  multiple people saying the same thing -- that -- in my
23  opinion, there wasn't a way that that many people would
24  be blind, if that's the right word for it.  But

Page 49

1  that's -- those are just statements and opinions of those
2  people.  What I really had to rely on, again, was what
3  Kathy had been investigating on the files.  Because if
4  it's not documented, it didn't happen.  And that's
5  where -- with the amount of checks that she had, that's
6  where the information came where Kathy had to have come
7  to -- the only decision Kathy could come to was we could
8  not keep Valerie as a general collection manager in
9  Dover.
10      Q.  What did you tell the collectors who gave you
11  written statements they should do in terms of writing the
12  statements?
13      A.  I didn't tell them anything.
14      Q.  Well, how did they know what to put in the
15  statement?
16      A.  There are certain -- I mean, when I say I
17  didn't tell them anything, I didn't direct them what to
18  put in there.  I asked them a question.  Give me your
19  opinion of it.  And that's what they did.
20      Q.  Okay.  Well, when you told them to give you a
21  written statement, did you give them any direction at all
22  about what the scope of the statement should be?
23      A.  I don't recall.  I mean, if I say something to
24  a collector like, "Can you please give me your

Corbett & Wilcox

544afc8b-2727-4477-97ce-2f37ff6e4c2e

Tex Fox

Page 50

1  interpretation of the NSF policy for your branch?" they
2  would write what their interpretation of the NSF policy
3  for their branch is. If I say to a collector, "Tell me
4  what your general collection manager teaches you about
5  NSF check policies for your branch" -- write it down.
6  And, then, that's what I got. Everyone in that branch
7  knew there was an issue or a problem because at the same
8  time we had a collector, I believe, by the name of Matt
9  Lane that was having his own issue with what he was doing
10 with a file and was being terminated for that.
11     Q. What did you understand the purpose of the
12 statements was -- the written statements? Did you
13 understand that they were going to be used to help
14 justify the termination of Valerie Hue?
15     A. I guess.
16     Q. Okay. When you interviewed these witnesses,
17 did you ask people to give you written statements if they
18 didn't give any information to you that supported any
19 wrongdoing on the part of Valerie Hue?
20     A. Can you --
21     Q. Let me ask it a different way.
22     A. Please.
23     Q. Did you get a written statement from everybody
24 that you interviewed?

Page 51

1      A. I believe I did.
2      Q. Did you interview Ken Rose?
3      A. I don't recall.
4      Q. Well, he's testified in a deposition that you
5  did interview him, and he didn't supply a written
6  statement.
7      A. Okay.
8      Q. Do you recall interviewing anybody and not
9  getting a written statement from them?
10     A. No. I just -- I don't recall talking to
11 anybody and I don't recall not getting a written
12 statement. I don't recall that.
13     Q. Well, do you recall that when you were doing
14 this investigation you were looking only for negative
15 information about Valerie Hue? In other words --
16     A. Not at all.
17         I'm just trying to give you an idea of
18 where my mind was at the time. I had just recently taken
19 over as, you know, the senior vice president of the
20 division, not knowing much about the collections side
21 other than what I have seen from a sales perspective. I
22 did know that we had no replacement for Valerie as a
23 general collection manager in Dover. This, in my
24 opinion, at that time was probably one of the worst

Page 52

1  things that could have happened to that office at the
2  time.
3      Q. Okay. Prior to you interviewing these
4  collectors for purposes of the investigation, had you had
5  contact with these -- apparently, you did. You said you
6  selected the interviewees because you knew that they were
7  responsible collectors, if I characterized that
8  correctly. Do you base that on the fact that you knew
9  the collectors while you were in Dover and afterwards?
10     A. I would say I represented that statement
11 because, yes, I did know from my time in Dover but also
12 over the years as the head of the sales department. You
13 do have lots of interaction with collectors, and, you
14 know, you really need to know the large balance
15 collectors because they truly are the ones who are
16 generating most of the revenue that I got paid off of.
17     Q. Okay. Did you visit the Dover, Delaware
18 office in December of 2003?
19     A. I don't recall.
20     Q. Okay.
21     A. I know I visited the branch on several
22 occasions. I don't recall the dates.
23     Q. Okay. When you visited the branch on several
24 occasions, did any of the collectors there come to you

Page 53

1  and tell you that Valerie Hue was asking them to violate
2  any policy?
3      A. I don't recall.
4      Q. Well, is that something you would have
5  recalled?
6      A. If somebody violated -- if someone came to me
7  and they had said someone was violating a policy, I would
8  absolutely recall it.
9      Q. Okay. So the answer is, no, no collector ever
10 told you prior to your investigation that?
11     A. The only thing that I recall was -- and I
12 can't give this to you for exact. But Mike Scher had
13 been sending me different things -- different files to
14 review at the time. But it wasn't anything that raised a
15 flag that somebody was doing something inappropriate. It
16 was issues that are -- that, you know, I run into them
17 today. Someone will say look at this file or look at
18 that file. Look at this file. That's the only thing I
19 ever had that was getting on my radar pertaining to the
20 Dover branch.
21     Q. Okay.
22     A. And until Kathy brought it to my attention or
23 Dina brought it to my collection did I really realize
24 that there was potentially something really wrong going

14 (Pages 50 to 53)

544afc8b-2727-4477-97ce-2f37ff6e4c2e

Tex Fox

Page 58

1    Q.  Okay.  Were any attorneys involved at this
2  point in time when the suspension was made?  Up to that
3  point in time, had you had any involvement with attorneys
4  about this matter?
5    A.  No.  We typically do not go to our attorneys
6  until there is some type of legal issue.
7    Q.  Okay.
8    A.  At this point of the suspension, we're
9  truly -- you know, you've got to look at a suspension as
10  we're protecting not only the employee but we're
11  protecting the company.  So at this juncture, you know,
12  we're making a decision that we can conduct the most
13  thorough and proper investigation.  So there's no reason
14  for an attorney.
15    Q.  Who was involved in making the decision to
16  terminate the plaintiff?
17    A.  The decision was made mainly by Kathy, who
18  conferred with me, HR and the executive team.  And there
19  was no other decision to be made other than to terminate
20  Valerie Hue from her position.
21    Q.  Okay.
22    A.  You cannot have -- and this is across the
23  board -- a manager violating the rules.  You can't have
24  it.

Page 59

1    Q.  You say primarily by Kathy.
2        It wasn't a joint decision?
3    A.  I guess you could call it anything you want to
4  call it.  It's not a joint decision on any level.  The
5  rules were violated.  She knew she was fired.
6    Q.  Well, I know.  But I'm trying to find out who
7  it was that decided it.  You said you didn't remember if
8  there was a discussion about it.  Do you remember whether
9  there was a joint decision to suspend her or do you not
10  remember that?
11        MR. ISRAEL:  One second.  You're asking
12  suspension now or termination?
13        MR. HOMER:  I'm talking about suspension
14  right now.
15        MR. ISRAEL:  Now we're back to
16  suspension.
17        THE WITNESS:  Okay.  That was confusing.
18  I thought you were on to termination.
19        MR. HOMER:  Okay.  I'm sorry if I said
20  that.  We'll get to termination in a minute here.
21        THE WITNESS:  Suspension is -- if I
22  remember correctly, that was made based on what Kathy was
23  finding out with the conversations with me and HR that
24  okay, yeah, let's get her out of there.  There is

Page 60

1  something serious.  Let's go do a further investigation.
2  BY MR. HOMER:
3    Q.  So was it a joint decision with you and HR?
4    A.  Most likely.
5    Q.  Okay.
6    A.  And it wouldn't be just me.  Again, I had
7  Kathy highly involved because -- from the time of me just
8  taking over for two weeks.
9    Q.  Okay.  At that stage do you recall what
10  documents had been reviewed in conjunction with the
11  decision to suspend her?
12    A.  At that point I really -- I mean, the
13  suspension was done.  I went on to do what I had to do to
14  run the division.  It was really all in Kathy's hands at
15  that point.  Any documents that were going back and forth
16  were between Dina Loft and Kathy Obenshain.
17    Q.  Okay.
18    A.  The documents I had come in my direction were
19  the ones that I had requested from the collectors or the
20  collection managers of the Dover office.
21    Q.  Okay.  Let's talk about the termination now.
22        First of all, who was involved in the
23  decision to terminate Valerie Hue?
24    A.  Everybody that I've represented so far --

Page 61

1  Kathy Obenshain, myself, HR, Steve Leckerman, Dina Loft.
2    Q.  Okay.  Were all those people participants in
3  making the decision, then?  All of them had some say in
4  the decision?
5    A.  Again, there isn't really a decision.  When
6  you violate a rule that is really your main rule, the
7  decision is already made.  It's not as if -- I mean, I
8  can only -- if you kill somebody, that's murder.  Okay?
9  There's no decision to be made there.  You're going to
10  jail.
11    Q.  Well, that may be.
12        But before somebody is fired somebody
13  has to say you're fired.  Correct?
14    A.  Well, yeah.
15    Q.  Somebody is going to have to decide that that
16  statement has got to be made.  Correct?
17    A.  Once Kathy made the recommendation to
18  terminate her and we saw all that we had, that was the
19  absolute decision that was made.  You can call it a joint
20  decision, a Kathy decision, an HR decision -- the
21  decision that was made was executed by myself and HR.
22    Q.  I don't want to call it anything.  I'm just
23  asking you if you recall who it was that decided that she
24  was going to be terminated.  Now, it could have been a

Corbett & Wilcox

544afc8b-2727-4477-97ce-2f37ff6e4c2e