Exhibit N

Michael Scher

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                         )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )
                                     )    Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,         )    05-225-KAJ
a Delaware corporation,              )
trading as NCO FINANCIAL             )
COMMERCIAL SERVICES,                 )
                                     )
          Defendant.                 )

          Telephone Deposition of MICHAEL SCHER taken
pursuant to notice at the law offices of Parkowski,
Guerke & Swayze, P.A., 116 West Water Street, Dover,
Delaware, beginning at 10:00 a.m. on Thursday, March 23,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.

APPEARANCES:

          JEREMY W. HOMER, ESQ.
          PARKOWSKI, GUERKE & SWAYZE, P.A.
            116 West Water Street
            Dover, Delaware  19903
            for the Plaintiff,

          ELIZABETH K. FITE, ESQ. (via teleconference)
          SESSIONS, FISHMAN & NATHAN, L.L.P.
            15316 North Florida Ave - Suite 100
            Tampa, Florida  33613
            for the Defendant.

                    CORBETT & WILCOX
            Registered Professional Reporters
      1400 French Street    Wilmington, DE 19801
                   (302) 571-0510
                www.corbettreporting.com

609d23f7-81d8-40a9-bcd6-678a4ec7c39e

Michael Scher

Page 6

1    Q.  Okay.  In 2000 you were general manager, did
2  you say?
3    A.  No.  In 2001 I was general manager.
4    Q.  Okay.  How long did you hold that position?
5    A.  Until June 30th, 2005.
6    Q.  During that time period that you were general
7  manager, where did you work?
8    A.  Dover, Delaware.
9    Q.  Okay.  Then in June of 2005, you assumed a new
10 position?
11   A.  Yes.  I moved down here to Tampa, Florida to
12 assume the senior general sales manager position in
13 Tampa.
14   Q.  Okay.  Was that a promotion?
15   A.  I would call it more a lateral move.
16   Q.  Okay.
17   A.  I was no longer general manager, but I was
18 head of sales management here.
19   Q.  Okay.
20   A.  That lasted two months, three months.  And
21 then I was moved to a position called director of
22 vertical markets of NCO Financial.
23   Q.  Okay.
24   A.  That is the position I currently hold.

Page 7

1    Q.  Okay.  Where were you located prior to the
2  time during which you were the general manager of the
3  Dover office?
4    A.  I spent 13 years in the Dover office.  I was
5  located in the Dover office my entire career.
6    Q.  Okay.  During the course of your employment in
7  the Dover office, did you know an individual named Bill
8  Savage?
9    A.  Yes.
10   Q.  Did you report to him?
11   A.  At times, yes, I did.
12   Q.  Okay.  Did you also know while you worked in
13 the Dover office an individual named Ted Fox?
14   A.  Yes.
15   Q.  Okay.  Did you and Mr. Fox and Mr. Savage ever
16 socialize together while you were all in the Dover
17 office?
18   A.  Not that I recall.
19   Q.  Do you ever recall playing golf with him?
20   A.  With Bill Savage?
21   Q.  Yes.
22   A.  Yes, I've played golf with Bill Savage.
23   Q.  Okay.  Did you also play golf with Ted Fox?
24

Page 8

1    A.  I don't believe I've ever played golf with Ted
2  Fox.
3    Q.  Okay.  Did you ever have other occasions to
4  get together socially with Mr. Savage?  For example,
5  going out to dinner, playing pool -- any type of activity
6  outside the office.
7    A.  I have been to dinner with Bill Savage outside
8  the office, yes.
9    Q.  How many times did you do that?
10   A.  I could not tell you.
11   Q.  It was several times?  Would that be fair to
12 say?
13   A.  Yes.
14   Q.  Okay.  On any of those occasions, do you
15 recall whether Ted Fox was also there?
16   A.  I don't recall.  I don't believe so.
17   Q.  Okay.  Do you know whether Ted Fox and Bill
18 Savage were personal friends when they were in the Dover
19 office?
20   A.  I would not call them personal friends, no.
21   Q.  Okay.  I'd like to ask some questions about
22 your duties as general manager of the Dover office.
23   A.  Okay.
24   Q.  Could you just generally describe what your

Page 9

1  job functions were there?
2    A.  Sure.  I ran the sales department and more of
3  the day-to-day functions of the Dover branch.
4    Q.  Okay.  What did the Dover branch consist of
5  when you were the general manager?  What departments did
6  it have?
7    A.  We had a sales department, and we had a
8  collection department.
9    Q.  Okay.  The collection department:  What types
10 of collections did they do?  Did they do consumer?
11 Commercial?
12   A.  Commercial.
13   Q.  Just commercial?
14   A.  That's correct.
15      MS. FITE:  Let him finish the question.
16      THE WITNESS:  Sorry.
17 BY MR. HOMER:
18   Q.  Okay.  About how many employees did you have
19 under you when you were general manager of the Dover
20 office?  I'm looking now at the time period 2003.  I'm
21 not asking for an exact number but just a rough idea.
22   A.  The Dover office in 2003 probably had 80
23 employees, I want to say.
24   Q.  Okay.  Do you know approximately what

Corbett & Wilcox

609d23f7-81d8-40a9-bcd6-678a4ec7c39e

Exhibit O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                          )
                                      )
              Plaintiff,              )
                                      )    Civil Action
v.                                    )    No. 05-225-KAJ
                                      )
NCO FINANCIAL SYSTEMS, INC., a        )
Delaware corporation, trading as      )
NCO FINANCIAL COMMERCIAL SERVICES,    )
                                      )
              Defendants.             )


              Deposition of MATTHEW HARRISON LANE,
taken pursuant to notice at the law offices of
Parkowski, Guerke & Swayze, 116 West Water Street,
Dover, Delaware, beginning at 12:04 p.m., on
Wednesday, January 4, 2006, before Dale C. Hawkins,
Registered Merit Reporter and Notary Public.


APPEARANCES:


              JEREMY W. HOMER, ESQ.
              PARKOWSKI, GUERKE & SWAYZE, P.A.
               116 West Water Street
               Dover, Delaware   19903
               for the Plaintiff


              DAVID ISRAEL, ESQ.
              SESSIONS, FISHMAN & NATHAN, LLP
               114 Northpark Boulevard, Suite 10
               Covington, Louisiana   70433

                    -and-

              ELIZABETH K. FITE, ESQ.
              LAW OFFICES OF ELIZABETH K. FITE, P.A.
               15316 North Florida Avenue, Suite 100
               Tampa, Florida   33613
               for the Defendant

5

1    Q.    Did you eventually rise to the

2    level of large balance?

3    A.    Yes.

4    Q.    Does NCO or did NCO when you were

5    there have rules relating to how collectors were

6    responsible to conduct themselves?

7    A.    Yes.

8    Q.    Do you remember that NCO had a

9    compliance department to insure that those rules

10   were enforced?

11   A.    Yes.

12   Q.    Do you remember that there were

13   rules relating to the handling of checks from

14   debtors?

15   A.    Yes.

16   Q.    Who hired you at NCO?

17   A.    Brian Waystack, and Rick Budro,

18   and I forget who -- I do not recall who was the

19   -- Bill Savage.

20   Q.    And how long after working at NCO

21   did you come under the direction of Ms. Hue?

22   A.    Six weeks.

23   Q.    Was she responsible to train you

24   regarding how to collect debt properly?

1              A.    Yes.

2              Q.    Was she responsible to enforce the

3    compliance rules with you regarding debt

4    collection at NCO?

5              A.    Yes.

6              Q.    Was she your supervisor through

7    the time that you left NCO?

8              A.    Yes.

9              Q.    Tell me what you remember

10   regarding the process of handling checks that

11   were returned nonsufficient funds from debtors?

12             A.    I'm not sure I understand what you

13   mean.

14             Q.    Any time I ask a question that's

15   confusing, that's exactly what I want you to do.

16             A.    Okay.

17             Q.    There were times during your

18   collections that a debtor would send in a check;

19   correct?

20             A.    Yes.

21             Q.    And there were times that the

22   check that the debtor sent would be returned for

23   nonsufficient funds; correct?

24             A.    Yes.

1           Q.    When an NSF check was so returned,

2      what was the procedure that you were instructed

3      to follow regarding the handling of that NSF

4      check?

5           A.    First to try and contact the

6      debtor.

7           Q.    And why would you contact the

8      debtor?

9           A.    To understand why the check

10     bounced.

11          Q.    And if you were successful in

12     contacting the debtor, what was your

13     responsibility?

14          A.    To recollect the debt.

15          Q.    By having the collector make the

16     check good?

17          A.    Usually with certified funds.

18          Q.    And were there ever times that you

19     would submit checks without reaching a debtor?

20          A.    Yes.

21          Q.    Tell me about that?

22          A.    End of the month, trying to

23     achieve a number.

24          Q.    Now, at the end of the month when

```
 1        you were trying to achieve a number, do you mean
 2        you were trying to get as much collections in as
 3        possible?
 4               A.   Yes.
 5               Q.   Fair to say the more collections
 6        in, the better you as a collector would be
 7        judged?
 8               A.   If the check actually was made
 9        good.  If the check bounced again it didn't do
10        me any good.
11               Q.   It would come off the next month?
12               A.   Depending on how quickly it was
13        returned, yes.
14               Q.   Would you receive any credit
15        before the NSF check that you resubmitted was
16        made good?
17               A.   You don't receive any credit until
18        it's good.  I mean, it's all paper until it
19        actually clears.
20               Q.   Got you.  So what would be the
21        advantage then of submitting an NSF check
22        without confirming that the check was good?
23               A.   Hope, prayer, timing, maybe.
24               Q.   Well, were you also rated as far
```

1          Q.    Explain it.

2          A.    The relationship that I had with

3    the debtor was five months speaking on a weekly

4    basis.  She owed my client over $120,000.  So to

5    say that I didn't have permission to change a

6    check from $20,000 to $5,000 was based on the

7    limitations that the system provided to me.

8               When we initially began our very

9    first conversation with the debtor, the

10   agreement was to pay $5,000 a week.  Due to her

11   lack of funds and the fact that she had bounced

12   a check previously, by the time I got to

13   December, the only way to hold on to the account

14   without it falling out and being stripped from

15   me was to make representation of the balance

16   being paid.

17          Q.    Was that done with the permission

18   and instruction of Ms. Hue?

19          A.    I didn't have to ask anybody's

20   permission other than the debtor's.

21          Q.    Okay.  Well, let me ask it

22   differently.  You think your discharge by

23   Ms. Hue was incorrect?

24          A.    Absolutely.

1          Q.   Did Ms. Hue ever tell you to do

2     anything wrong at NCO by way of mishandling

3     checks?

4          A.   We were instructed to put checks

5     through without speaking to debtors.

6          Q.   And that was a violation of the

7     policy that you had been taught?

8          A.   Yes.

9          Q.   And did Ms. Hue instruct you to

10    put checks through without speaking to the

11    debtor?

12         A.   All of the managers, in an effort

13    to achieve a department number.

14         Q.   End of month number?

15         A.   Right.

16         Q.   And was that for as long as you

17    worked there?

18         A.   No, not as long as I worked there.

19         Q.   Well, if you can remember, you

20    were there a couple of years approximately?

21         A.   Right.

22         Q.   Was that the rule when you

23    started?

24         A.   No.

```
 1              Q.   Tell me the timing of the rule

 2    about putting checks on with no confirmation?

 3              A.   I don't know if I can give a

 4    specific date.

 5              Q.   Let me ask it differently.  Were

 6    you trained as I thought I understood your

 7    testimony that you were not permitted to put a

 8    check on without confirming from the debtor that

 9    the money was there?

10              A.   Correct.

11              Q.   At some point, were you instructed

12    by Ms. Hue and/or other managers, and we'll get

13    to which ones, that you were to put checks on

14    without being so -- I'm sorry, without receiving

15    such information from the debtor?

16              A.   Yes.

17              Q.   And how long after you started

18    working at NCO do you remember the change

19    between your training and the practice?

20              A.   I would have to say it was after

21    we received the ability to create checks on the

22    system ourselves.

23              Q.   Phone checks?

24              A.   Correct.
```

1          Q.    Did that then become the common

2    practice?

3          A.    Yes.

4          Q.    Did --

5          A.    The phone checks, yes, the phone

6    checks were the common practice.

7          Q.    What I'm asking is the creation of

8    the phone checks or the resubmission of NSF

9    checks without knowledge of the debtor.

10         A.    Yes.

11         Q.    And you mentioned that Ms. Hue and

12   other managers so instructed you?

13         A.    Yes.

14         Q.    What other managers so instructed

15   you?

16         A.    There were only two at the time,

17   Eric Shaw and Kim Marlo.

18         Q.    And who was in charge of the

19   collections?

20         A.    Ms. Hue.

21         Q.    Did you ever say anything to

22   Ms. Hue disagreeing with or objecting to her

23   instruction which was contrary to the policy you

24   had been taught?

```
 1                    Q.   That would be Eric Shaw?

 2                    A.   Yes.

 3                    Q.   And Mike Scheer?

 4                    A.   Yes.

 5                    Q.   Anybody else?

 6                    A.   Not individually, no.

 7                    Q.   And what did they tell you the

 8       reason for the termination was?

 9                    A.   It's on the sheet.

10                    Q.   Okay.  You don't disagree with --

11       they told you the same thing that's on the

12       sheet?  Let me --

13                    A.   Well, I disagree with the whole

14       thing.

15                    Q.   Let me rephrase that.

16                         Does the document that's been

17       marked Lane Exhibit 1, does that reflect what

18       was -- Mr. Scheer and Mr. Shaw explained to you

19       before you were terminated about the reasons for

20       the termination?

21                    A.   Mr. Scheer had no bearing on

22       whether I was terminated or not.

23                    Q.   Okay.

24                    A.   It was all Ms. Hue's decision,
```

```
 1        even to the point of me being asked to leave

 2        Mr. Scheer's office while Mr. Scheer and Ms. Hue

 3        conferenced called another executive in New

 4        Orleans to discuss my situation.

 5                  Q.   Did anybody at NCO, either Ms. Hue

 6        or Mr. Shaw or Mr. Scheer say anything at all to

 7        you about violating the check handling procedure

 8        by resubmitting an NSF check without verifying

 9        funds were available by the debtor?

10                  A.   The policy that was put in --

11        well, the policy that was written by Ms. Hue,

12        but the policy was continually told to be

13        broken, so, I mean, the policy really didn't

14        carry any weight if the writer tells us verbally

15        to ignore it.

16                  Q.   You said the policy was written by

17        Ms. Hue.  What do you recall about that written

18        policy?

19                  A.   The part that I remember having a

20        distinct problem with was we were to obtain the

21        debtor's permission to process or alter a check.

22                  Q.   And you say that was to alter a

23        check?

24                  A.   Yes.  So then we were told at the
```

1    end of the month to redeposit checks that had

2    been bounced and we didn't talk to the debtor,

3    we had to alter the check because we could no

4    longer use the date that we originally processed

5    the check on, we had to use a new date.

6              Q.    Let me ask you this:  What was the

7    process for determining whether or not you could

8    resubmit a check without debtor verification,

9    under what circumstances would that be done?

10             A.    The end of the month, we were told

11   to -- we were told to hold them until the first

12   business day of the following month.

13             Q.    So what you're saying is at the

14   end of the month, every NSF check would be

15   resubmitted?

16             A.    At the end of December it was.

17             Q.    Who told you to do that?

18             A.    That conversation was with Eric

19   Shaw.

20             Q.    Did Ms. Hue tell you to do that?

21   She wasn't even around then, was she?

22             A.    What do you mean by that, not

23   around?

24             Q.    The end of December she wasn't at

Exhibit P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                    )
    Plaintiff,              )
                )
    v.                      ) C.A. No.
                ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a )
Delaware corporation, trading as )
NCO FINANCIAL COMMERCIAL SERVICES,)
    Defendant.              )

      Telephone deposition of ERIC JOHN SHAW,
taken before Cheryl A. Anthony, Court Reporter, in the
law offices of Parkowski, Guerke & Swayze, 116 West
Water Street, Dover, Delaware, on Wednesday, February 1,
2006, beginning at 9:15 a.m.

APPEARANCES:

    PARKOWSKI, GUERKE & SWAYZE
    BY: JEREMY W. HOMER, ESQUIRE
    116 West Water Street
    Dover, Delaware 19901
    Attorney for Plaintiff.

    BY TELEPHONE:

    SESSIONS, FISHMAN & NATHAN
    BY: DAVID ISRAEL, ESQUIRE
    3850 North Causeway Boulevard
    Lakeway Two, Suite 1240
    Metairie, Louisiana 70002-1752
    Attorney for Defendant.

    ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

          ANTHONY REPORTING
            PO Box 234
        Dover, Delaware 19903
          (302)674-8884

---

1    (Shaw Exhibits Number 1 and 2 were marked
2  for identification and attached to the record.)
3            ERIC JOHN SHAW,
4  the witness herein, having first been
5  duly affirmed, was examined and
6  testified as follows:
7  BY MR. HOMER:
8    Q.  Mr. Shaw, my name is Jeremy Homer. I am the
9  attorney representing Valerie Hue in this case. I would
10  like to tell you that if you have any problem
11  understanding my question, don't answer it. Just ask me
12  to rephrase it so that you do understand it. Do you
13  understand that?
14    A.  Yes.
15    Q.  Okay. Is there any reason that you can't
16  testify today? Because of medication or any other
17  problem?
18    A.  No.
19    Q.  Okay. Your ability to testify isn't
20  impaired in any way; is that true? Is it true that
21  there is no impairment of your ability to testify today?
22    A.  There is no impairment.
23    Q.  Okay. Thank you. And you understand that
24  you have been placed under oath, that this is a

---

                             3
1  deposition. And I just want to make sure that you
2  understand that it is a crime not to tell the truth once
3  you are under oath. You are aware of all of that, I am
4  sure. Is that true?
5    A.  Yes.
6    Q.  Okay. Now, this deposition is being taken
7  by telephone. Is it fair to say that in the room that
8  you are in right now, it is just you and Mr. Israel?
9    A.  That's correct.
10    Q.  Okay. I would like to advise you that it is
11  not proper for you to communicate with Mr. Israel in a
12  way that I can't understand; for example, passing notes,
13  making facial gestures, that sort of thing. He's not
14  allowed to coach you regarding your answers. Do you
15  understand that?
16    A.  Yes.
17    Q.  Okay. Could you state your address and your
18  phone number, please?
19    A.  My address?
20    Q.  Yes.
21    A.  2722 Jacqueline Drive, M13 is the apartment
22  number, and that is in Wilmington, Delaware.
23    Q.  Okay. And your --
24    A.  And the ZIP is 19810.

---

                             4
1    Q.  And your phone number?
2    A.  302-529-7518.
3    Q.  Okay. Thank you. Can you tell me what you
4  did to prepare for today's deposition, if anything?
5    A.  I went over some of the problems we had with
6  the attorney. Pretty much that's about it. There
7  wasn't that much to it. Basically, we are waiting to
8  see what you have to say.
9    Q.  Did you review any documents in preparation
10  for the deposition?
11    A.  Yes.
12    Q.  And which documents did you review?
13    A.  Some of the e-mails.
14    Q.  Can you tell me approximately how many
15  documents you reviewed?
16    A.  Several.
17    Q.  More than ten?
18    A.  No.
19    Q.  Okay. What is your educational background,
20  Mr. Shaw?
21    A.  High school and about -- I guess about six
22  months of college.
23    Q.  Okay. Well, let me ask you, first of all,
24  since I can't see you, how old are you?

1    A.    53.

2    Q.    Okay. Could you just briefly run through
3 your job history? And for each job that you've had, if
4 you could, identify the approximate dates that you held
5 it and also what your job duties were. Let's start back
6 from the time you stopped going to school. And I'm not
7 interested in jobs that lasted for, you know, six months
8 or less, summer jobs and that kind of thing. I'm
9 interested in jobs that you held for at least six months
10 or longer.

11    A.    We are going way back here then. Back in
12 '67, I worked for a company called Everfast Industries.
13 I used to go out to their Everfast Mill Stores. They
14 were a fabric store. I worked with them up until -- I
15 would have to say '87 or '88. I'm not sure about the
16 year. Time starts to fly as you get older.

17    Q.    I know that problem.

18    A.    After that --

19    Q.    What did you do for that company?

20    A.    Actually, I started from the ground up. I
21 was a stock person. Then I worked my way into
22 management. I worked in South Jersey, the Marlton, New
23 Jersey location for years as the manager of a fabric
24 store. And obviously, they were sold, I believe, back

---

1 in the mid '80s. And it changed hands a few times after
2 that, so I just left.

3    Q.    And in '87, you went to work somewhere else.
4 Where was your next job?

5    A.    I worked for a collections agency, CMS, in
6 Conshohocken, Pennsylvania. I worked for them for a
7 few good years, until about '92, as a collector. And
8 from there I went to a few jobs, trying to find myself
9 with what I wanted to do.

10    And then I hooked up with Milliken &
11 Michaels back in '93. And I have been with the company
12 as a collector since that time, except for when I was a
13 manager during the Val situation. I was a manager then,
14 and then I went back into collections back to this date.
15 That is basically it, not too many jobs.

16    Q.    You mentioned Milliken & Michaels. That was
17 the company that preceded NCO, the Defendant in this
18 case; is that correct?

19    A.    There was another company that had purchased
20 Milliken & Michaels, and then NCO purchased them.

21    Q.    Okay. How long have you worked for NCO?

22    A.    Since '93, March of '93.

23    Q.    Let's take out the time that you worked for
24 Milliken & Michaels and the next purchaser. When did

---

7

1 NCO first start operating the company that you are
2 working for?

3    MR. ISRAEL:    Do you want the year, Jerry?

4    MR. HOMER:    Yes, that would be fine.

5    THE WITNESS:    May of 1999 was when
6 NCO purchased what historically had been the
7 Milliken & Michaels business.

8 BY MR. HOMER:

9    Q.    Okay. And you are a collector now; is that
10 correct?

11    A.    Yes.

12    Q.    And how long have you been a collector?

13    A.    17, 18 years.

14    Q.    And would you have been a collector for NCO
15 since 1999, May of 1999, which is when they acquired
16 Milliken & Michaels?

18    Q.    Okay. Mr. Shaw, I would ask that you look
19 at an exhibit that was premarked for this deposition
20 that is identified --

21    MR. ISRAEL:    Hold on a second. I'm pulling
22 it out. Do you want him to have Shaw 1?

23 BY MR. HOMER:

24    Q.    Yes, it has been identified as Shaw 1. We

---

8

1 have the original here. The court reporter marked it
2 yesterday and left a copy with Mr. Israel. We have the
3 original down here.

4    Do you have the exhibit in front of you,
5 Mr. Shaw?

6    A.    Yes, I do.

7    Q.    Let me ask you this: Down on the right-hand
8 corner, does it have the number 00098?

9    A.    Yes, it does.

10    Q.    And is this a January 22, 2004 letter from
11 you to Ted Fox and Kathy Obenshain?

12    A.    Yes.

13    Q.    Can you explain why you wrote this letter?

14    A.    Now, when you say explain it, pretty much it
15 is explanatory in the letter.

16    MR. ISRAEL:    He is asking you what caused

18    MR. HOMER:    Yes.

19    THE WITNESS:    Oh, I was asked to give a
20 statement by Kathy.

21 BY MR. HOMER:

22    Q.    Okay. And do you recall when she asked?
23 Was it the same day that you wrote the statement, or was
24 it earlier than that? Do you remember?

1    A.    I don't remember.
2    Q.    Do you remember why she asked you to give
3  this statement?
4    A.    Yes.
5    Q.    And what was the reason?
6    A.    To give more clarification of what was
7  happening.
8    Q.    Did she explain it in those terms, that she
9  wanted you to clarify what had happened? Or did she
10 explain it in the terms that she wanted you to confirm
11 what had happened?
12   A.    No. She wanted me to clarify what happened.
13 She didn't direct me in any way of how to write the
14 letter, if that's what you are asking.
15   Q.    No, I wasn't really asking you that. Did
16 you have conversations with Ms. Obenshain about what
17 happened before you wrote the letter? Did you have any
18 conversation with her about what happened before you
19 wrote the letter? When I say what happened, I'm talking
20 about what is in the letter.
21   A.    Honestly, I can't remember if it was before
22 or right after the letter.
23   Q.    Okay. When she asked you to write the
24 letter, wouldn't she have had an understanding of what

1  happened?
2        MR. ISRAEL: Objection. Go ahead and
3  answer.
4        THE WITNESS: Could you repeat the question?
5  BY MR. HOMER:
6    Q.    Well, you say you weren't sure whether you
7  had talked to Ms. Obenshain about the content of the
8  letter before you wrote the letter. I'm asking why.
9  Didn't she have some understanding that you knew
10 something about this? Isn't that why she asked you to
11 write the letter?
12   A.    I would have to say she wasn't sure what had
13 happened at that time, because obviously, everything
14 happened at once. She wanted to get it in writing what
15 I thought or what my feelings were on what happened.
16   Q.    Okay. Were there any drafts that you wrote
17 of the letter before you signed this one that has been
18 marked as Exhibit 1?
19   A.    No. It was just Word Perfect, because I had
20 some misspellings. I did it on the computer.
21   Q.    Did you have any discussions about the
22 letter, either before you wrote it or after it, with Ted
23 Fox?
24   A.    The letter itself was never mentioned, but I

11

1  did speak with Ted Fox after.
2    Q.    Okay. What was the substance of the
3  conversation you had with Ted Fox?
4        MR. ISRAEL: Just so I understand, you
5  talked to Ted Fox after you issued the exhibit Shaw
6  Number 1? Is that what you are saying?
7        THE WITNESS: Yes.
8        MR. ISRAEL: Okay. Now, he is asking what
9  you and Ted Fox had talked about.
10       THE WITNESS: Well, Ted wanted to know --
11 Obviously, he wanted to know why it happened, why did we
12 do that procedure when we knew that procedure was not
13 allowed at NCO? And I advised him that -- Bear with me.
14 I'm trying to collect my thoughts from something two
15 years ago.
16       All I remember is Ted, obviously, he was new
17 in his position at the time. He had just come into the
18 situation. And he just wanted to know a deeper
19 understanding of what had happened at this location, of
20 why we were running the checks.
21       And I had mentioned to Ted -- I didn't know
22 if he had seen the letter or not -- that I pretty much
23 spelled it out in the letter what I had sent to Kathy
24 and to his attention.

12

1        That is why I think it was right after I
2  wrote the letter. I don't think he had an opportunity
3  to read the letter yet that I had sent down to
4  corporate.
5  BY MR. HOMER:
6    Q.    Okay. Did he call you to talk to you about
7  it, or did you call him?
8    A.    He called me.
9    Q.    Why was the letter addressed to both Mr. Fox
10 and Kathy Obenshain?
11   A.    Kathy at the time asked me to put Ted Fox's
12 name on it also, since he was in charge at that time.
13 She wanted to make sure he got a copy of that letter.
14   Q.    When you wrote this letter, did you have any
15 understanding that it might have some importance with
16 respect to Valerie Hue keeping her job?
17   A.    Yes.
18   Q.    Would it be fair to say you were aware, when
19 you wrote the letter, that what you wrote about the
20 events that are in the letter might be used to justify
21 terminating her employment?
22   A.    Yes.
23   Q.    So would it be fair to say that you were
24 careful in writing the letter to be accurate about what

**13**

1  you put in it?
2      A.  Yes.  I wanted to be truthful.
3      Q.  Okay.  Could you take a moment now to read
4  through the entire letter?  I want to make sure it is
5  fresh in your mind, unless you read it before we just
6  started here.
7      A.  Yes.  I can read it over again.
8      Q.  Okay.  Why don't you take a few minutes and
9  read it slowly?  And make sure you have had a chance to
10  read it all carefully.
11      A.  You asked me to -- Read it to myself?
12      Q.  Yes, just read it to yourself.  It may be a
13  little quicker.  I have it in front of me, so I don't
14  need it to be read.
15      A.  Okay.
16      MR. ISRAEL:  Okay.  He's done.
17  BY MR. HOMER:
18      Q.  Okay.  You have had a chance to read it all
19  over?
20      A.  Yes.
21      MR. ISRAEL:  You know what, Jerry?  Can you
22  wait one second?  I am going to move our positions at
23  the table.
24      THE WITNESS:  Yes.  We are wired up here.

**14**

1      (Following a discussion off the record:)
2      MR. ISRAEL:  What we are trying to do,
3  Jerry, is so that we are sitting on same side of the
4  table, because I didn't make any copies of the exhibits,
5  we can both look at the exhibit.
6      (Following a discussion off the record:)
7      MR. ISRAEL:  I'm sorry.  Go ahead.
8  BY MR. HOMER:
9      Q.  Okay.  Referring to the last sentence of the
10  first paragraph of the letter, it says -- Well, let me
11  back up a bit, just to get some time framing here.
12      You say in the letter, in the first
13  paragraph, that you were given a directive by Valerie
14  Hue to acquire the list of all NSF checks to review.
15  And then it also says you were then instructed to review
16  with each collector the status of the nonsufficient
17  funds.  Those are NSF checks, as I understand it.
18      When did she give you these instructions
19  that are referenced in paragraph one?
20      A.  Actually, she was -- From what I remember at
21  that time, she had to go away.  I can't remember if it
22  was -- if she was taking a holiday or a leave of absence
23  from being sick for a few days.  She wasn't going to be
24  around at that time.

**15**

1      She did, actually, a printout of all the
2  checks that the large balance collectors had in their
3  queues or in their files.  And she had asked me to check
4  each one with each collector to see -- to get these
5  checks off prior to the end of the month.
6      Q.  This printout of checks, would that have
7  been on what is known as an NSF report?
8      A.  Yes.
9      MR. HOMER:  I didn't intend to do this, but
10  I think it would be worth it to take a moment to fax you
11  the exhibit from yesterday's deposition, which is
12  Exhibit 10.
13      MR. ISRAEL:  I have that here.
14      MR. HOMER:  You have it?
15      MR. ISRAEL:  Yes.  I have yesterday's
16  exhibits here.
18  look at Shaanhei Exhibit Number 10.
19  BY MR. HOMER:
20      Q.  Do you have that in front of you, Mr. Shaw?
21      A.  Yes, I do.
22      Q.  Down in the right-hand corner, there is the
23  number 000043.  That is four zeros and 43.
24      A.  Correct.

**16**

1      Q.  Is this the NSF report that you just talked
2  about that you were asked to review?  Can you tell?
3      MR. ISRAEL:  Don't speculate, if you don't
4  know.
5      THE WITNESS:  It doesn't look like what I
6  saw.
7  BY MR. HOMER:
8      Q.  Okay.  And is that because there are names
9  in this report that aren't even collectors from your
10  office in Dover?
11      A.  It could be.  But it doesn't look like the
12  setup that I've seen on the printouts.  It looks like a
13  different report than what I normally look at.
14      Q.  Thank you.  I just wanted to make sure that
15  we weren't talking about the same report.
16      A.  This doesn't look like a report that we
18      Q.  Okay.  So let me see if I can characterize
19  this correctly.  Valerie Hue knew she was going to be
20  out at the end of the month of December of 2003.  So she
21  asked you to go through the NSF checks with the
22  collectors, is that correct, and make a determination as
23  to which checks should be redepped, resubmitted for
24  payment?  Is that a fair characterization?

**18**

1   A.   No.
2   Q.   How have I got it wrong?
3   A.   Her directive was to get the checks on one
4   way or the other. And she wanted me to go through the
5   list with each collector and get these checks on.
6   Q.   Okay. Well, let me ask you about this. The
7   last sentence in paragraph one says: I was then
8   instructed to review with each individual collector the
9   status of their nonsufficient fund checks for the
10   purpose of locating additional fees we could add on to
11   the end of the month figures. Isn't that what it says?
12   A.   Yes.
13   Q.   Well, why would you be reviewing them and
14   trying to locate fees if you were going to put them all
15   back on?
16   A.   Counselor, if you read the next paragraph, I
17   think I answer that question for you. She instructed me
18   afterwards to inform the collectors to re-input the
19   checks on the system, just like I had put it in the
20   letter.
21   Q.   Okay. Why is it that you reviewed them with
22   the collector?
23   A.   Because obviously, what I was looking for, I
24   wanted to make sure that checks that were like stop

1   payment or the accounts were closed would not go on.
2   But the collectors were way ahead of me on this and
3   already knew what to do.
4   Q.   Okay. You say in the third paragraph that
5   in reviewing the checks with the collectors, there were
6   some judgments made for some of the checks not to run
7   do -- I think that should be D-U-E instead of D-O,
8   correct?
9   A.   Probably, yes.
10   Q.   -- due to stop payments. And then it goes
11   on to say: And/or too many NSFs in some cases. Can you
12   explain what that means? Too many NSFs in some cases?
13   A.   I would have to say that part there is
14   incorrect. What I was looking for at the time was stop
15   payments or closed accounts.
16   Q.   Well, you said before that you were careful
17   to be accurate in the letter. Of course, you wrote this
18   letter close in time to when the events took place. You
19   are saying now that that is not accurate in your letter,
20   that statement? You are sure that right now your
21   recollection is better than what it was when you wrote
22   the letter?
23   MR. ISRAEL: Objection, argumentative.
24   But go ahead and --

**19**

1   MR. HOMER: No, it's not being
2   argumentative. I just want to make sure that that is
3   what he is saying.
4   THE WITNESS: I would have to say that that
5   sentence is not complete. It is accurate, but it is not
6   complete.
7   BY MR. HOMER:
8   Q.   Okay. And how is it not complete?
9   A.   It doesn't have closed accounts written on
10   there. It should have been added into that sentence.
11   Q.   The next sentence in paragraph three states:
12   I gave Michael Scher a list of these checks that were
13   entered and not entered into the system, as I did keep a
14   record.
15   Do you know what happened to that list that
16   you gave to Mr. Scher?
17   A.   No.
18   Q.   When you say you did keep a record, what did
19   you mean by that?
20   A.   At the time it would be that list that you
21   referred to earlier, the list of nonsufficient funds --
22   you know, all the bad checks. That was that list I'm
23   referring to, and I don't have a copy of that now.
24   Q.   Okay. When did you not have the copy

**20**

1   anymore? Did you throw it away, or what happened to it?
2   A.   At the time I probably discarded it.
3   Q.   Do you know about when you discarded it?
4   A.   Probably right after the end of the month.
5   Q.   Do you know what Mr. Scher did with the
6   record?
7   A.   No.
8   Q.   And what was indicated on the list? What
9   information was on the list that you gave to Mr. Scher?
10   A.   It was a list of all the checks that ran and
11   the checks that did not run.
12   Q.   Did it contain any explanation of why ones
13   were run and why others weren't run?
14   A.   No.
15   Q.   When did you give the list to Mr. Scher?
16   A.   I can't remember now.
17   Q.   Was it given to Mr. Scher after you prepared
18   the list? Do you know whether it was done in December
19   of 2003?
20   A.   I can't remember.
21   Q.   Well, it was certainly done before this
22   letter, correct?
23   A.   Yes.
24   Q.   The next sentence in the letter states: You

**22**

1  asked me what happened at the end of December.
2      Doesn't that reflect that you did have a
3  discussion with Kathy Obenshain or Ted Fox about these
4  events before you wrote the letter?
5      MR. ISRAEL: Where are you looking, Jerry?
6      THE WITNESS: Yes, I am trying to look.
7      MR. HOMER: It is the next sentence after
8  paragraph three, after the one dealing with the list.
9  BY MR. HOMER:
10     Q.  It says: You asked me. I assume that means
11  you asked me, E-D, what happened at the end of December.
12  Isn't that true? In other words, isn't this letter
13  saying that either Obenshain or Fox or maybe both asked
14  you about what happened? And you must have had some
15  discussion with them about the events before you wrote
16  the letter?
17     A.  Kathy, like I had stated before, asked me to
18  write a letter, to write this letter so she could get a
19  better understanding. That is the only conversation I
20  had with her before that.
21     Q.  Okay.
22     A.  My recollection is Ted really didn't -- I
23  didn't have any conversations with Ted at that time yet.
24     Q.  Okay. The next statement is -- again, in

1  the bottom part of paragraph three -- this practice has
2  been going on for as long as I can remember, even as a
3  collector from passed -- and that passed word should be
4  P-A-S-T, I think -- managers, I went through the same
5  routine and was instructed to put on checks the same
6  way.
7      First of all, when you say this practice,
8  are you referring to the practice that was followed in
9  December of 2003 that you related in the letter?
10     A.  I'm trying to recollect here. Bear with me.
11  Over the years, that was a common practice with agencies
12  or with Milliken & Michaels to run checks. That was
13  just the normal procedure if you saw or you felt that
14  the check would be good. It seemed to drop as time went
15  on. Then Val herself, when she first started taking
16  over the checks, it seemed to escalate again.
17     Again, she was handling this. I did not.
18  Most of this practice I'm talking about in this letter
19  was done by her. It wasn't done by my department. You
20  have to understand, I walked in after the fact, and I
21  ran her checks. I only took care of this one time for
22  her.
23     Q.  That is really not my question. Just be
24  careful and listen to the question. When you use the

**23**

1  words, this practice, isn't it true that you are
2  referring to the practice that you have just mentioned
3  in the letter about reviewing checks with the collectors
4  and putting the checks back on?
5      A.  It was sort of routine, yes.
6      Q.  Okay. Who were the past managers? And
7  would you agree with me that that passed there should be
8  P-A-S-T, instead of P-A-S-S-E-D?
9      A.  Yes.
10     Q.  Who were the past managers that used the
11  same practice that you used in December of 2003?
12     A.  It's hard to remember all the managers
13  before me. There's been so many of them.
14     Q.  Can you remember who was before Valerie Hue?
15     A.  I believe Rick Woudreaux.
16     Q.  When was he there?

**24**

1      MR. ISRAEL: I'm not sure.
2      MR. HOMER: I think there is.
3      THE WITNESS: I always had trouble spelling
4  his name.
5  BY MR. HOMER:
6      Q.  Let's look at the last paragraph of the
7  letter. It says: In addition, I have had collectors
8  complain to me regarding checks they desire to pull
9  because they were insufficient, but were unable to,
10  because they had been told by Valerie Hue they could not
11  pull them.
12     A.  This is where it's different.
13     Q.  Okay. Do you know what the term sandbagging
14  means as it relates to processing the checks at NCO?
15     A.  I have heard the phrase sandbagging, yes.
16     Q.  What does it mean?

18  wrong on the time.
19     Q.  Okay. But he was the one that was right
20  before Valerie Hue; is that correct?
21     A.  Yes.
22     MR. ISRAEL: W-O-U-D-R-E-A-U.
23     MR. HOMER: I think there's an X on the end
24  of it, isn't there?

18  at the end of the month and they know that something is
19  going to post, they will hold it and post it the
20  following month.
21     Q.  Why would they want to hold the check and
22  post it the following month?
23     A.  For the fees.
24     Q.  Okay.

**25**

1    A.    It's just to make sure you have quotas every
2   month. Some people do that, which I never agreed to. I
3   always thought: What happens if you die the next day?
4   And then you don't get your fee.
5    Q.    Do you know whether Valerie Hue from time to
6   time refused to hold the check and instead ran it
7   because she suspected there was sandbagging going on?
8    A.    No. I can't answer that for Val.
9    Q.    Okay. You don't know if she ever did that?
10   A.    No.
11   Q.    There is nothing in this letter that you
12  wrote to Ted Fox and Kathy Obenshain that says Valerie
13  Hue asked you to create a fraudulent check, is there?
14   A.    No. I don't think that's a question here.
15   Q.    And there is nothing in here that says she
16  instructed you to redep a check that you knew wouldn't
17  clear the bank. That is correct, also, isn't it?
18   A.    Could you rephrase the question?
19   Q.    Okay. There is nothing in your letter to
20  Kathy Obenshain that says that Valerie Hue instructed
21  you to redep a check when you knew that the check
22  wouldn't clear the bank?
23   A.    But we were instructed to --
24   Q.    That is not the question. The question is:

**26**

1   Does the letter say that? Does your letter say that
2   anywhere?
3    A.    Yes, it does, at the bottom.
4    Q.    Where does it say that at the bottom?
5    A.    They just told me that Valerie Hue
6   instructed him to put in checks -- let me see -- in
7   addition, I have had collectors complain to me regarding
8   checks they desire to pull because they were
9   insufficient, but were unable to, because they had been
10  told by Valerie Hue they could not pull them.
11   Q.    Well, that doesn't answer the question I
12  asked, which was there is nothing in this letter where
13  Valerie Hue told you to submit a check that you knew
14  wouldn't clear. That is the question I had. I'm not
15  talking about what other collectors complained to me
16  about. I'm asking whether you say anything in this
17  letter about you being instructed to redep a check where
18  you knew there would not be funds available. There is
19  nothing in the letter that says you were told that, is
20  there?
21   A.    Not directly in the letter, no.
22   Q.    Okay. Did Valerie Hue ever instruct you to
23  redep a check that you knew was not going to be good?
24   A.    Yes.

**27**

1    Q.    When was that?
2    A.    On that list we had of nonsufficient fund
3   checks.
4    Q.    Well, that list that she gave you was a list
5   that you had gone over with the collectors while she was
6   out of the office, correct?
7    A.    Yes.
8    Q.    Well, how would she know when she was out of
9   the office and not participating in a conversation with
10  the collectors that a given check wouldn't be good?
11   A.    I was instructed by her to get those checks
12  on the list that I was given.
13   Q.    But you didn't put all the checks on. You
14  used judgment and, in some cases, you did not put the
15  checks on?
16   A.    It depended on the check. If it was a stop
17  payment or account closed, that would be ludicrous.
18   Q.    Okay. Any other example of at any other
19  time that Ms. Hue asked you to run a check knowing that
20  it wouldn't clear, other than what you just mentioned,
21  that being with respect to what is in your letter?
22   A.    Do you mean at another time?
23   Q.    Yes.
24   A.    No.

**28**

1    Q.    How long was Kathy Obenshain Valerie Hue's
2   supervisor, if you know?
3    A.    Since she was the manager; Kathy was the
4   manager with Rick Woudreaux. So I mean she was Val's
5   boss, also.
6    Q.    Do you know how many years that was?
7    A.    Two years; I'm just roughly guessing here.
8    Q.    Did you have any contact with Kathy
9   Obenshain in doing your job?
10   A.    Somewhat, but not as much as Val would have
11  had.
12   Q.    How frequently, if you know, did Kathy
13  Obenshain have contact with the Dover office, which is
14  where you were at this time, correct?
15   A.    Yes.
16   Q.    Okay. How frequently did Kathy Obenshain
17  have contact with the Dover office, as far as you know?
18   A.    I can't really answer that. That would be
19  between her and Kathy directly, and I wouldn't be
20  involved in that.
21   Q.    Okay. Would you know whether she was aware
22  of this practice that you mention in your letter, which
23  is Exhibit 1, that has been going on for as long as you
24  can remember? Would Kathy Obenshain have been aware of

29

1  that practice? Do you know?
2      A.   I'm not aware of it, you know.
3      Q.   Okay. The last sentence of the letter says:
4  I can only go on the direction of my manager, as she was
5  my superior.
6          Did you have an understanding, when you were
7  performing this function in December of 2003, that you
8  were doing anything that was improper? Did you
9  understand at the time that you were doing something
10 improper?
11     A.   Yes.
12     Q.   And were you aware that if you are doing
13 something improper, that you could have gone to Kathy
14 Obenshain and told her about it? Were you aware at that
15 time you could have done that?
16     A.   Yes.
17     Q.   Why didn't you do that?
18     A.   Val was my boss, and I didn't want to get
19 her in trouble. We do kind of protect each other in our
20 own offices.
21     Q.   Okay. So you knew something was wrong, and
22 you deliberately concealed that fact from Kathy
23 Obenshain. Is that a fair statement?
24     A.   Yes.

30

1      Q.   What you did wrong was something that not
2  only Valerie Hue was doing as manager, but past managers
3  did the same practice, correct?
4      A.   I can't answer for past managers.
5      Q.   Okay. But you didn't think that there was
6  any reason to go to Kathy Obenshain and ask about
7  whether this practice should be followed or not, even
8  though you knew it was wrong?
9          MR. ISRAEL: Objection; asked and answered.
10         MR. HOMER: Okay. I'll move on.
11 BY MR. HOMER:
12     Q.   What was your understanding of the check
13 handling process regarding the resubmission of NSF
14 checks as of December 2003?
15     A.   Redeposited checks had to be checked with
16 the bank to verify if the funds were available or, in
17 some cases, when you couldn't check with the bank, to
18 talk to the debtor and verify with him that it would be
19 okay to run the check. That was the procedure, and that
20 is my understanding at the time.
21     Q.   Okay. Where does that procedure come from?
22 Is it something that was in writing, or is it something
23 that you were told? How did you learn of that
24 procedure?

31

1      A.   I would say both, writing and told.
2      Q.   And do you think that procedure was in
3  writing somewhere?
4      A.   I can't remember now, to be honest with you.
5      Q.   Okay. Do you remember who told you what the
6  procedure was?
7      A.   As far as I know, that procedure has been in
8  place for years.
9      Q.   Well, isn't that procedure at odds with what
10 you did in December of 2003? Did you have the
11 collectors contact the debtors in each case to determine
12 whether the funds were available?
13     A.   No.
14     Q.   So you knew at that time there was a
15 procedure you were supposed to follow, and you didn't
16 follow it. Is that a fair statement?
18     Q.   Okay. How long was that procedure in
19 effect?
20     A.   For years.
21     Q.   Do you remember how many years it was in
22 effect?
23     A.   Right around the time of the acquisition
24 that NCO made with Milliken & Michaels or the

32

1  acquisition of Milliken & Michaels.
2      Q.   Going back to 1999 then?
3      A.   Yeah. Obviously, NCO had a lot of different
4  procedures than we had in the old schools.
5      Q.   Could you tell me approximately, if you can,
6  what percentage of the time when a collector tries or
7  somebody -- I guess it's not the collector, but it is
8  somebody else.
9          But when somebody tries to verify with the
10 bank that a check is good, what percentage of the time
11 is the bank going to tell them whether it is good or
12 not, if you can answer that?
13     A.   Well, we are going back a few years. A lot
14 more banks were more open to verifying funds than they
15 are now. Obviously, it is getting worse as time goes
16 on. But at the time, I'm just speculating 40 percent.
18     A.   I could be off.
19     Q.   And that is around the time of December of
20 2003?
21     A.   Yes.
22     Q.   Okay. And what percentage of time were the
23 collectors able to reach the debtor when they wanted to
24 redep a check?

1   A.   I can't answer that. That would be up to
2 the collectors individually.
3       Q.   What was your experience? Were you always
4 able to contact the debtor? Or sometimes you weren't
5 able to contact the debtor?
6       A.   Personally, you are asking?
7       Q.   Yes.
8       A.   Well, I never really had too many problems
9 with bad checks. My history of bad checks when I had a
10 check that went bad on myself, I usually contacted the
11 debtor first and then sometimes I would conference the
12 bank and the debtor. That is my normal procedure for
13 myself. Usually, I try to verify with both the debtor
14 and the bank. But I have just really never had that
15 major problem with checks myself.
16      Q.   Do you know what happened when the debtor
17 couldn't be contacted and the bank couldn't be
18 contacted? What happened with the resubmission of
19 checks? And I'm talking about the period December 2003.
20      A.   They were ran anyway.
21      Q.   Okay. And they were all run, or some of
22 them were run?
23      A.   Both.
24      Q.   Well, it can't be both. Are you telling me

1 that in some cases checks were run, and in some cases
2 they weren't run?
3       A.   Well, I told you originally that some checks
4 were on accounts that were closed or there were stop
5 payments. We did not rerun those.
6       Q.   How do you know which checks were rerun?
7 Were you involved in rerunning the checks?
8            MR. ISRAEL:   You are talking about December
9 of '03?
10 BY MR. HOMER:
11      Q.   I am talking about December of '03, but I am
12 also talking about before that. Were you involved in
13 running NSF checks?
14      A.   No.
15      Q.   So your only experience with what checks got
16 rerun was in the December 2003 month?
17      A.   Was I involved in that decision of what was
18 run, you are saying?
19      Q.   Well, involved in knowing what was rerun.
20           MR. ISRAEL:   He is asking what experience
21 you had before December of 2003, relating to the running
22 of checks. Is that right?
23           MR. HOMER:   Well, I'm asking whether, before
24 December of 2003, he would have knowledge of what checks

---

35

1 got rerun and what checks didn't get rerun.
2            THE WITNESS:   Not in her department.
3 BY MR. HOMER:
4       Q.   Okay. Were you in her department before
5 December of 2003?
6       A.   As a collector?
7       Q.   Yes.
8       A.   Yes.
9       Q.   And you were under Val Hue for a few years,
10 right?
11      A.   Yes.
12      Q.   Okay. By the way, were you disciplined for
13 what happened in December of 2003?
14      A.   Yes.
15      Q.   And what was the discipline?
16      A.   I was not allowed to be a manager anymore.
17 I was put back on the collections.
18      Q.   Okay. Did Kathy Obenshain ever give you any
19 written or oral instruction regarding what NSF checks to
20 run?
21      A.   No.
22      Q.   Do you have any knowledge that she
23 instructed other people on the same issue?
24      A.   No.

36

1       Q.   Okay. Do you know what happened to the NSF
2 report that you used in December of 2003 to go over the
3 checks with the collectors?
4            MR. ISRAEL:   Asked and answered.
5            MR. HOMER:   No, he hasn't answered that.
6            MR. ISRAEL:   Well, I disagree.
7            But go ahead and answer it again.
8            THE WITNESS:   Probably just -- I would say
9 they are probably discarded. Usually, after we do the
10 reports, we just throw them away, as far as paperwork.
11 It's a paper jam.
12 BY MR. HOMER:
13      Q.   What did you do with it? Do you recall?
14      A.   Usually, just discarded it.
15      Q.   Well, I understand that is what you think
16 was the practice. But do you specifically recall what
17 you did with the report when you were done with it?
18      A.   After I reviewed the checks, I would --
19 After it was said and done and the month was over with,
20 I would discard the report. We got the same report
21 every month.
22      Q.   Did Kathy Obenshain or Ted Fox or anyone
23 else connected with NCO ask for the monthly report that
24 you ran?

37

1    A.   I don't know that.
2    Q.   You don't recall, or they did not?  Do you
3  understand?
4    A.   I don't know.  I don't know if they got the
5  report or not.
6    Q.   But you didn't give it to them?  They didn't
7  ask you for it?
8    A.   No.
9    Q.   Nobody asked you for it?
10    A.   No.
11    Q.   When a check is redepped -- Let's go back.
12  We are talking again about the December of 2003 period.
13  When a check was redepped, what forms were filled out to
14  document that it was appropriate to redep?
15         MR. ISRAEL:  Objection.  I don't think this
16  is clear, Jerry.  Are you asking what he did in December
17  of '03 or what he understood the practice was?
18         MR. HOMER:  I asked him what forms were
19  used.
20         MR. ISRAEL:  But as a practice or what
21  happened in December of '03?
22         MR. HOMER:  I think that is quite clear from
23  the question.
24         MR. ISRAEL:  Is not clear from me.

38

1         But if you understand, go ahead.
2         THE WITNESS:  I don't.
3  BY MR. HOMER:
4    Q.   I am asking about the time period December
5  of 2003.  What forms were created to support a request
6  for redepping an NSF check?
7    A.   There was a form.  I can't remember what
8  type of form it is.  Obviously, it's changed since that
9  time.  I can't remember what the actual form is.  But my
10  understanding is each collector has a form that they
11  resubmit whenever they redeposit a check.
12    Q.   And you didn't have to do that yourself as a
13  collector?
14    A.   Yes.
15    Q.   Okay.
16    A.   You had to have it signed off by your
17  manager.
18    Q.   I am sorry.  I didn't hear that.
19    A.   You had to have it signed off by your
20  manager.
21    Q.   But there was a form that was filled -- what
22  information would be on the form?
23    A.   Just, from my understanding -- I'm going by
24  memory now here.  I think it would have the date that

39

1  the actual check would be resubmitted, and then it had
2  lines below it where it was verified with the bank or if
3  you talked to the debtor.  But I could be wrong on that.
4  I don't remember all of the form.  Obviously, you would
5  have the manager sign off on it, and you would have the
6  check.
7    Q.   Where would the form go to?
8    A.   The manager.
9    Q.   Do you know where it went after that?
10    A.   The manager should have filed it in their
11  records.
12         MR. ISRAEL:  Hey, Jerry?
13         MR. HOMER:  Yes.
14         MR. ISRAEL:  Can we take a very short break?
15         MR. HOMER:  Sure.  Let me remind the
16  witness:  You are not to discuss any of this with your
17
18         MR. ISRAEL:  He's not going to discuss
19  anything with me.  I'll call you back in a minute.
20         MR. HOMER:  Okay.
21         (A brief recess was taken from 10:13 a.m.
22  until 10:16 a.m.)
23  BY MR. HOMER:
24    Q.   I think I was just asking about the forms

40

1  that were used to justify a request for redepping an NSF
2  check.  And I think I asked:  Does the witness know
3  where those forms went after they were filled out by the
4  collector?
5    A.   They were given to the manager.
6    Q.   Okay.  And do you know where they went from
7  there?  Do you know whether they went to Horsham, for
8  example, for approval or review?
9    A.   I'm sorry.  No.
10    Q.   You don't know what happened after the
11  manager had them?
12    A.   No.
13         MR. ISRAEL:  They were sent to Horsham.
14         THE WITNESS:  They were sent to Horsham.  I
15  know myself, I used to keep them in a file.  Obviously,
16  they used to build up after a time, and I used to
17
18         were private.  So I would actually get mine chewed up
19  and get rid of them.
20  BY MR. HOMER:
21    Q.   But you understand there was a requirement
22  to fill out a form to justify redepping an NSF check; is
23  that true?
24    A.   Yes.

1    · Q.    And when you went through this list in
2    December of 2003 with the collectors, did you see any of
3    these forms filled out?
4        A.    Yes.
5        Q.    So the collectors did have forms for
6    requesting the redepping of the checks?
7        A.    Yes.
8        Q.    And on those forms, there would be some
9    explanation of whether they contacted the debtor or not.
10   Is that true?
11       A.    Yes.
12       Q.    Okay.  And did you review the forms when you
13   went over the NSF report with the collectors?
14       A.    Yes.
15       Q.    And why did you review those forms?
16       A.    Again, as I mentioned earlier, I was looking
17   for checks that were either stop payment or the accounts
18   were closed.  I wanted to make sure none of those checks
19   were reran myself.
20       Q.    Or where there were too many NSFs, correct?
21   Isn't that what you put in your letter?
22       A.    Yes.
23       Q.    How did you determine if there were too many
24   NSFs?

1        A.    Judgment call.
2        Q.    Why was it that you were unwilling to run
3    the check again if there were too many NSFs?
4        A.    Could you repeat the question?
5        Q.    Why is it that you were unwilling to run the
6    check again if there were too many NSFs?
7        A.    In some cases, they might have been put in
8    three or four times.  And I just thought -- It was like:
9    Why kill a dead horse?  So I stopped it.
10       Q.    So based on the number of NSFs, you were
11   afraid they wouldn't clear again?  Is that what you were
12   saying?
13       A.    I just thought it was overkill.
14       Q.    Could you answer my question?
15       A.    It was overkill.  That's why I didn't run
16   the check.
17       Q.    Well, is it because you thought that it was
18   unlikely it would clear again, since they had already
19   gone NSF a number of times?
20       A.    It was --
21       Q.    Let me finish -- since they had already gone
22   NSF a number of times?
23       A.    Yes.  But there is a problem here.  A lot of
24   those checks went on anyway, because Val made them put

---

43

1    it off.
2        Q.    When you did your review in December of
3    2003, you exercised your judgment not to run some of
4    those checks that had already been run several times,
5    correct?
6        A.    Yes.  But I was told by my boss to put them
7    on anyway.
8        Q.    But you didn't?
9        A.    In some cases, some of them did go on.
10       Q.    All right.  So even though your boss that
11   you are loyal to told you to put them all on, you made
12   judgments not to put them on when there were too many
13   NSFs, among other things?
14       A.    Yes.
15       Q.    I would like you to look now at what has
16   been marked as Exhibit Number 2, Shaw Exhibit Number 2.
17       MR. ISRAEL:  Do you want him to read it?
18       MR. HOMER:  I just want him to look at it
19   for the time being.
20       MR. ISRAEL:  Okay.
21   BY MR. HOMER:
22       Q.    First, let's make sure we are looking at the
23   same document.  This one is a January 22, 2004 letter
24   from Kimberly Marlow to Ted Fox and Kathy Obenshain,

---

44

1    correct?
2        A.    Yes.
3        Q.    And down at the bottom of the right-hand
4    corner there is the number 00096, correct?
5        A.    Correct.
6        Q.    When did you last see this letter before you
7    just got it out today or before just a minute ago?
8        A.    I briefly looked at it yesterday.  That is
9    the first time I saw it.  But I didn't really read it.
10   I just kind of like looked over it.
11       Q.    Okay.  Have you discussed this letter with
12   anybody?
13       A.    No.  Like I say, I just briefly looked at it
14   yesterday.  I didn't really discuss it.
15       Q.    Okay.  Looking at the second paragraph of
16   the letter, in the third sentence there it says -- and I
17   will quote this -- then we pulled each collector in one
18   by one and discussed the checks that were to be run and
19   the level of comfort of them.
20       MR. ISRAEL:  Well, is it okay if he reads
21   the paragraph first?
22       MR. HOMER:  Well, if he needs to.
23       THE WITNESS:  Yes, yeah.  I would like to.
24       MR. HOMER:  Why don't you go ahead and read

45

1    the whole letter?
2         MR. ISRAEL: All right. He read it.
3    BY MR. HOMER:
4         Q.   Okay. That third sentence of the second
5    paragraph says, quote: Then we pulled each collector in
6    one by one and discussed the checks that were to be run
7    and the level of comfort with them, end quote.
8             This is a description of what Valerie Hue
9    did when they were running the NSF checks, correct?
10        A.   I wasn't with Val when she would question
11   the collectors. That was something she did with them
12   indirectly. I wasn't involved in that.
13        Q.   Well, is this description apt for what you
14   did? Pulling in the collector and discussing the checks
15   that were to be run with them and the level of comfort
16   with them? Does it describe what you did with the
17   collectors at the end of December of 2003?
18        A.   No.
19        Q.   Okay. But you did discuss each check with
20   each collector?
21        A.   No.
22        Q.   Well, what did you do? I thought you said
23   you did do that.
24        A.   No. I asked them about the checks when I

46

1    went in and talked to them. A lot of them already knew
2    what they were doing with the checks, already had their
3    forms filled out, because they said they went through
4    the same procedure every month with Val. And I was told
5    by the collectors they were going on one way or another.
6             And in some instances, as I had mentioned
7    before, some of the checks I did not put in because of
8    the status that they were in. And that is the only
9    thing I did, actually, was change some of the statuses
10   so the checks would not go in. That is what I am trying
11   to point out here, Counselor. This was one month that I
12   handled for her department.
13        Q.   In the next department there, it says in the
14   second sentence: She (Val) stated that she had a
15   directive from Kathy Obenshain that, "we are not pulling
16   any checks off the system and to make this happen".
17            Did Val Hue ever tell you that she had a
18   directive from Obenshain to run all the checks?
19        A.   No.
20        Q.   Okay. Did you ever get a directive like
21   that from Kathy Obenshain?
22        A.   No.
23        Q.   Do you recall being present for a
24   conversation between Kimberly Marlow and Ted Fox about

47

1    this written statement that she gave to Mr. Fox?
2         A.   Could repeat the question?
3         Q.   Do you recall being present when Kimberly
4    Marlow and Ted Fox were discussing a written statement
5    about these events that was given by Kimberly Marlow to
6    Mr. Fox?
7         A.   No.
8         Q.   Do you recall ever seeing another version of
9    a letter from Kimberly Marlow to Ted Fox or Kathy
10   Obenshain about this matter that is in Exhibit 2?
11        A.   No.
12        Q.   Just to switch gears a little bit, Mr. Shaw,
13   do you know who Mike Scher is?
14        A.   Yes.
15        Q.   And who is he?
16        A.   Today at present? He's a sales manager in
17
18        Q.   Okay. And what involvement did he have with
19   the Dover office when you were there?
20        A.   He was the general manager.
21        Q.   Okay. He ran the whole office? Is that a
22   fair statement?
23        A.   Yeah, that's a fair statement.
24        Q.   Well, what time period was he there in which

48

1    you were there?
2         A.   Actually, I think Mike started at the same
3    time or right before I did at Milliken & Michaels.
4         Q.   When did he leave the Dover office?
5         A.   I believe just in November of last year, he
6    transferred to the Florida office.
7         Q.   And is that when you transferred from Dover
8    up to the Horsham office?
9         A.   No.
10        Q.   When did you transfer?
11        A.   January 2nd.
12        Q.   Of this year?
13        A.   Uh-huh.
14        Q.   Okay. Is the Dover office closed now?
15        A.   Yes.
16        Q.   And when was it closed?
17
18        Q.   Okay. During the course of your time at
19   Dover, did you ever hear Mike Scher make any comment
20   that could be construed as racist?
21        A.   Mike, no.
22        Q.   Did you hear anybody else make a comment
23   that could be construed as racist?
24        A.   No.

1  · Q.  And how about a sexist remark? Did you ever
2  hear Mike Scher make any comments that could be
3  construed as sexist? And by that, I mean something that
4  would be possibly unwelcome or an offensive type of
5  comment to a woman?
6      A.  Not Mike Scher.
7      Q.  Okay. Did anybody else make those kinds of
8  comments?
9      A.  Are you just talking about common talk with
10  everybody in the office?
11     Q.  Well, anybody else that you can recall? Do
12  you remember anybody making racist or sexist comments?
13         MR. ISRAEL: At any time, the whole time he
14  worked there in 16 years?
15  BY MR. HOMER:
16     Q.  I'm asking about the time you were there in
17  Dover.
18     A.  Yes. I mean I have a friend that rides with
19  me, and we have been driving together for 15 years. We
20  make racist remarks to each other all the time. I mean
21  I don't understand the question.
22     Q.  That is a good answer. Did you provide to
23  Ms. Obenshain, Mr. Fox, or anybody else any documents
24  related to the investigation of Valerie Hue?

1         MR. ISRAEL: Other than his statement?
2         MR. HOMER: Other than his statement.
3         THE WITNESS: No.
4  BY MR. HOMER:
5      Q.  Did they ask for any other documents that
6  might be related to what was in your statement?
7      A.  No.
8      Q.  Mr. Shaw, have you ever been charged with a
9  crime?
10     A.  Ever been charged?
11         MR. ISRAEL: You don't have to answer that.
12         Has he ever been convicted?
13         MR. HOMER: I am asking if he has ever been
14  charged with a crime?
15         MR. ISRAEL: No, he doesn't have to answer
16  that.
17         MR. HOMER: Are you saying you are refusing
18  to let him answer?
19         MR. ISRAEL: Right. I am saying you know it
20  is an inappropriate question.
21         MR. HOMER: No, I don't know it is an
22  inappropriate question.
23         MR. ISRAEL: I believe that asking a witness
24  whether he has ever been charged with a crime is nothing

---

51

1  more than to oppress, harass, and embarrass. And it is
2  not admissible, even if he answered --
3         MR. HOMER: Well, it may lead to relevant
4  evidence.
5         MR. ISRAEL: I will leave it this way. If
6  he wants to answer that, fine. I object to the
7  question, because I think that you are doing nothing
8  more than unfairly treating this witness, and it is in
9  violation of the Federal Rules. It is up to him if he
10  wishes to answer.
11         THE WITNESS: I don't wish to answer.
12         MR. HOMER: Let's make this clear. You are
13  instructing him not to answer the question?
14         MR. ISRAEL: Not at all --
15         THE WITNESS: I don't wish to --
16         MR. ISRAEL: Let's talk one at a time. I am
17  not instructing him. I think your question is improper.
18         I am going to tell you that if you have ever
19  been convicted of a crime, he is, in my opinion,
20  permitted to ask that.
21         MR. HOMER: Well, you are splitting hairs
22  here. You are saying you are not instructing him, but
23  you are telling him he doesn't have to answer the
24  question.

52

1         MR. ISRAEL: What I am telling him is I
2  think your question is improper. I believe that you are
3  doing it for no other reason than to harass, embarrass,
4  and oppress. I disagree that it could lead to something
5  discoverable. And I think that you know it is improper.
6  But regardless, he is not subject to an instruction.
7  I'm just telling you my opinion and what my objection
8  is.
9         So why don't you ask a different question,
10  unless he changes his mind and he wants to answer that?
11         MR. HOMER: Well, first, I don't know that
12  it is an improper question. I have the right to ask a
13  broad range of questions of things that could lead to
14  discoverable information. People can be charged with
15  crimes and not be convicted of them, and there may be
16  things that do bear a need for some investigation to
17  find out more about the credibility of the witness.
18         MR. ISRAEL: That's fine.
19         MR. HOMER: And if you are telling the
20  witness that he doesn't have to answer the question --
21  which I'm sure that is what you have told him, and that
22  is why he is saying he's not going to answer it -- I am
23  going to say that you are making an improper instruction
24  to the witness.

53

1    MR. ISRAEL: The record says what I have
2  said. I am not instructing him not to answer. I am not
3  going to repeat the objections.
4    MR. HOMER: Well, when a lawyer tells his
5  client that a question has been asked and that he
6  doesn't have to answer, that is an instruction. You are
7  in effect instructing him not to answer the question if
8  he doesn't want to.
9    MR. ISRAEL: I disagree with your
10  characterization. I don't think that the question is
11  fair. I'm not going to repeat all of this again. If he
12  is standing on his position that he doesn't want to
13  answer whether or not he has been charged, that is his
14  position. I have already made clear -- and I will state
15  it again -- that I don't think it is proper to ask him
16  if he has been convicted of a crime.
17    MR. HOMER: I didn't realize witnesses can
18  take positions whether or not they are going to answer
19  questions in a deposition. That is a new concept to me.
20  BY MR. HOMER:
21    Q.  Let me ask this question, Mr. Shaw. Have
22  you ever been convicted of a crime?
23    A.  No.
24    Q.  And Mr. Shaw, what income did you make last

54

1  year at NCO? What was your gross shown on your W-2 form
2  for your payment from NCO?
3    MR. ISRAEL: Objection, relevance.
4    THE WITNESS: I am going by memory, because
5  obviously, my wife handles a lot of this. But I believe
6  it was around $78,000 that I made last year.
7  BY MR. HOMER:
8    Q.  Okay. Do you recall what you made the year
9  before last?
10    A.  It was right around there. I am usually
11  pretty close every year.
12    MR. HOMER: Okay. I don't have any other
13  questions.
14    THE WITNESS: I give a lot to my IRA, so I'm
15  not sure about the figure.
16    MR. HOMER: Okay. Do you have any cross,
17  Dave?
18    MR. ISRAEL: Hold on one moment.
19  BY MR. ISRAEL:
20    Q.  Mr. Shaw, when you completed your memo, Shaw
21  Number 1, did you receive any specific instructions from
22  Kathy Obenshain to in any way -- Strike that.
23    When you completed Shaw Number 1, did
24  Ms. Obenshain give you any instructions regarding what

55

1  the contents of the document was to be?
2    A.  None whatsoever.
3    Q.  From your experience, do you have any basis
4  to believe that anything relating to Valerie Hue's
5  separation from NCO related to her race?
6    A.  It had nothing to do with race.
7    Q.  Do you believe, from anything you learned in
8  any way relating to the investigation of Ms. Hue, that
9  she was subjected to retaliation by Mr. Fox?
10    A.  I was never aware of that. I didn't know
11  anything.
12    Q.  You testified that Valerie Hue wanted you to
13  violate policy during December of '03.
14    A.  Yes.
15    Q.  What do you mean by that?
16    A.  Val knew that these checks were not going to

56

1  of it.
2    Q.  When you say it was routine and it went
3  through the procedure, specifically, what did you
4  understand that was routine and they would take care of?
5    A.  That the checks would go on regardless, per
6  Val.
7    MR. ISRAEL: Pass the witness.
8  BY MR. HOMER:
9    Q.  You say that Val knew the checks weren't
10  going to clear. How do you know that?
11    MR. ISRAEL: It's been asked and answered.
12    Go ahead and tell him again.
13    THE WITNESS: Because in some cases, the
14  checks had bounced frequently, and there was no checking
15  with the banks or with the debtors. And the checks were
16  put back on anyway.

18  on anyway.
19    Q.  When you met with the collectors relating to
20  any of the checks, what response, if any, did you get
21  from them?
22    A.  The response from them was most of them were
23  that it was routine. They went through this procedure
24  every month, and they had already arranged to take care

18    Q.  Well, how do you know that Val knew that the
19  checks hadn't been verified with the bank? Well, she
20  wasn't around. Do you know how long she was out in
21  December of 2003?
22    A.  I can't remember.
23    Q.  Well, how do you know that she was aware
24  that the checks couldn't be verified at the bank and the

1  debtors hadn't been contacted? How were you aware of
2  that? If she wasn't there, how would she even know the
3  things that had happened with each check?
4       A. Because the collectors didn't follow
5  procedure per Val; they were told every month.
6       Q. Well, you are assuming then that --
7       MR. ISRAEL: Wait. He didn't --
8  BY MR. HOMER:
9       Q. I am sorry. Finish your question.
10       MR. ISRAEL: The collectors didn't follow
11  procedure and what?
12       THE WITNESS: The collectors didn't follow
13  procedure per the directive they were given by Val.
14  BY MR. HOMER:
15       Q. Is that the only basis for your
16  understanding that she knew the checks weren't going to
17  clear?
18       A. Well, the statement she made to me was to
19  make sure all the checks get on regardless. That pretty
20  much answers it right there. If the checks are going to
21  be good, bad, or indifferent, it is going to go on.
22       Q. I thought you testified earlier that you
23  didn't know of any check that she asked to be redepped
24  that she knew was not valid. Did I get that wrong?

1       A. I don't understand the question.
2       Q. Let me back up. When you reviewed these
3  matters, when you reviewed the checks with the
4  collectors in December of 2003, they presented forms to
5  you which indicated the reasoning for resubmitting them.
6  And some of these forms would have on them an
7  explanation of debtors being contacted, correct?
8       A. Yes. It would have information on there.
9       Q. Okay. Now, do you know whether Valerie Hue
10  ever saw those forms in December of 2003?
11       A. Yes.
12       Q. How do you know that?
13       A. Well, they were left for her. They were her
14  files. They weren't mine; they were hers.
15       Q. But how do you know she saw them? You know
16  when she was out at the end of December of 2003, but
17  yet, you are sure she saw these forms?
18       A. She had to.
19       Q. How do you know that?
20       A. Because they were put in her personal bin;
21  they were put in her own file.
22       Q. Do you know when they were put in her file?
23       A. That would be up to her when she came in.
24  She would have to do that herself.

---

### 59

1       Q. So you don't know when they were put in her
2  file?
3       A. No.
4       Q. And you don't know when she was in her
5  office in December of 2003?
6       A. We are going back a couple of years. I
7  can't remember when she actually came back into the
8  office.
9       Q. So you don't know when she came back in the
10  office, and you don't know when they were put in her
11  file. But you know she did see the forms. Is that your
12  testimony?
13       A. Yes.
14       Q. Okay. Can you explain that testimony? How
15  do you know she saw them when you don't know when she
16  was there and you don't know when she got the forms?
17       A. Well, if she didn't get the forms, she
18  should have asked me for them. It is policy or
19  procedure that we have these forms in our own files. So
20  if she didn't have the forms, she would have asked me
21  for them.
22       Q. So you are acknowledging now that maybe she
23  didn't see the forms?
24       A. No. You are misunderstanding me. If she

### 60

1  didn't see the forms, she would have asked me for them.
2  She didn't ask me for them, so she didn't get them. She
3  didn't have the forms.
4       Q. So you don't know when she was out in
5  December of 2003, correct?
6       MR. ISRAEL: Well, I'm --
7       MR. HOMER: I've just got to make this
8  clear. I have to lay this as a foundation question.
9  BY MR. HOMER:
10       Q. You don't know when she was there?
11       MR. ISRAEL: He said that's correct. He
12  doesn't know when she left or when she came back.
13  BY MR. HOMER:
14       Q. Okay. So isn't it possible that when she
15  left, she hadn't seen the forms? She asked you to run
16  the checks. You were to meet with the debtors. What
17  you did is go through the checks. And Valerie Hue had
18  no knowledge, at the time that you ran the checks with
19  the debtors, whether the debtor had said the checks
20  would be good and whether they wouldn't be good. Isn't
21  that all possible?
22       MR. ISRAEL: Objection; compound. Well, I
23  mean if it will save time, Jerry, we will stipulate that
24  if at the point in time the form was submitted, to the

**62**

1  extent Valerie wasn't in the office, she wouldn't have
2  known --
3          MR. HOMER: That is not what I'm asking.
4          MR. ISRAEL: Well, that is what you are
5  asking. We are stipulating --
6          MR. HOMER: No. You just cut off a question
7  and interrupted the question.
8          MR. ISRAEL: I didn't cut off anything.
9          MR. HOMER: I don't want you to offer
10 something to me. I want the witness to answer the
11 question.
12         MR. ISRAEL: Let me ask this: Don't ask
13 multiple compound questions with facts not in evidence.
14         MR. HOMER: Let me tell you, Dave. You are
15 not allowed to interrupt the question. If the witness
16 doesn't understand it, let him tell me that.
17         MR. ISRAEL: I understand exactly what I am
18 supposed to do. I have already stipulated to what you
19 are trying to get the guy to say.
20         MR. HOMER: No. You are telling me what I
21 want, instead of letting the witness answer my question.
22         MR. ISRAEL: The witness couldn't answer the
23 last question, because -- and you don't have the benefit
24 of seeing him -- he was totally confused. Why don't you

1  try it again?
2          MR. HOMER: All right. Let me try to
3  rephrase the question.
4          MR. ISRAEL: Sure.
5  BY MR. HOMER:
6      Q.  Let me back up. Valerie Hue is out of the
7  office towards the end of December of 2003. She leaves
8  with you the task of running the NSF checks with the
9  collectors.
10     A.  Yes.
11     Q.  That is all true so far, right?
12     A.  Yes.
13     Q.  Isn't it possible that she hadn't seen any
14 of the forms that had been submitted by the collectors
15 for justification of running the checks again and that
16 she didn't have any knowledge of what checks would run
17 and what checks would be good and what checks wouldn't
18 be good. Isn't that possible?
19     A.  She would have had knowledge, because she
20 gets the list that I had. She gave me the copies of the
21 bad checks that were going to be run. She had the same
22 list that I had.
23     Q.  She had the list of checks, but she didn't
24 necessarily see the forms or didn't hear the collector's

**63**

1  explanation of whether the debt was collectible or not,
2  right? All she had was the list of NSF checks?
3      A.  Well, in this case she violated procedure,
4  because the forms were given to her. And she didn't
5  come back to me later and tell me she never got them.
6      Q.  So you are saying that there was a procedure
7  that she should have come to you to get the forms?
8      A.  If she didn't have them, yes.
9      Q.  Okay. But can you answer the question?
10 Isn't it possible that she didn't have knowledge of what
11 checks that were rerun in December of 2003, whether they
12 would be good or bad checks? Isn't that possible?
13     A.  Like I stated before, she didn't care if
14 they were good or bad.
15     Q.  Would you please answer the question? Isn't
16 it possible that she didn't know whether the checks that
18     A.  I don't know the answer to that.
19     Q.  You don't know whether it is possible?
20     A.  I don't know.
21     Q.  Okay. Do you know which checks actually did
22 clear that were run again? The NSF checks?
23     A.  I can't remember.
24     Q.  Did you know at the time? When I say at the

**64**

1  time, the time period December 2003, January of 2004.
2  Did you find out which checks that were rerun, the NSF
3  checks, which checks cleared and which didn't?
4      A.  I wouldn't have followed it.
5      Q.  So the answer is you don't know?
6      A.  I don't know.
7      Q.  Were you involved in the decision to
8  terminate Valerie Hue's employment?
9      A.  No.
10     Q.  Did you participate in discussions of the
11 reasoning for the discharge?
12     A.  No.
13     Q.  Do you even know who made the decision to
14 terminate her employment?
15     A.  I was told later that Kathy did.
16     Q.  Who told you that?
18 mean I talked to her afterwards, and Val told me she was
19 suspended by Kathy. And I heard later -- Well, I talked
20 to Val after she was fired. She said: Well, I have
21 been fired by Kathy. I mean --
22     Q.  So that is the source of information
23 regarding who fired her?
24     A.  Yeah. I heard it from Val, and then I heard

Exhibit Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                    )
    Plaintiff,              )
                )
      v.            ) C.A. No.
             ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a  )
Delaware corporation, trading as )
NCO FINANCIAL COMMERCIAL SERVICES,)
    Defendant.              )

Deposition of DINA BETH SHAANTIEL, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of NCO Financial Commercial Services,
Prudential Drive, Horsham, Pennsylvania, on Tuesday,
January 31, 2006, beginning at 1:15 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiff.

SESSIONS, FISHMAN & NATHAN
BY: DAVID ISRAEL, ESQUIRE
3850 North Causeway Boulevard
Lakeway Two, Suite 1240
Metairie, Louisiana 70002-1752
Attorney for Defendant.

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

---

**2**

1    DINA BETH SHAANTIEL,
2    the witness herein, having first been
3    duly affirmed, was examined and
4    testified as follows:
5    BY MR. HOMER:
6    Q.   Good afternoon.  My name is Jeremy Homer.
7    I am the attorney representing Valerie Hue in this case.
8    Could you first state your name again?
9    A.   It's Dina Beth Shaantiel.
10   Q.   Okay.  At one time did you go by the name of
11   Dina Loft, L-O-F-T?
12   A.   Yes.
13   Q.   Could you explain why you changed -- First
14   of all, could you explain during what time period you
15   used that name, Dina Loft?
16   A.   I have been using Dina Loft since I went
17   into the collection industry back in 1985 as an alias.
18   Q.   And when did you change it to your present
19   name?
20   A.   About a year, year and a half ago, give or
21   take, NCO required everybody to stop using their aliases
22   and start using our real names.
23   Q.   I may refer to you as Dina Loft or Ms. Loft
24   during the course of this, only because I don't feel I

---

**3**

1    can pronounce your name correctly.  So please bear with
2    me when I do that.
3         I would like to instruct you that if I ask a
4    question today that you don't understand, I would ask
5    you not to try to answer, but instead ask me to rephrase
6    it so that you do understand it.  Do you understand
7    that?
8    A.   Yes.
9    Q.   Okay.  Is there any reason why your ability
10   to answer today would be impaired in any way?  For
11   example, have you had any medication?
12   A.   No.  I'm fine.
13   Q.   Okay.  And there isn't any other reason why
14   you can't testify today?
15   A.   No.
16   Q.   Okay.  Do you understand that this is a
17   deposition, that you are under oath, that it is a crime
18   not to tell the truth, and that you do need to make your
19   best efforts to tell the truth?
20   A.   I understand.
21   Q.   Okay.  What is your educational background?
22   A.   I went to high school, college.
23   Q.   Okay.  Where did you go to college?
24   A.   Johnson & Wales.

---

**4**

1    Q.   Where is that?
2    A.   Providence, Rhode Island.
3    Q.   Okay.  When did you graduate?
4    A.   I didn't graduate from there.  I did a
5    two-year program.
6    Q.   Okay.  What was the program in?
7    A.   Culinary arts and business administration.
8    Q.   Okay.  And you got a degree there?  A
9    two-year degree?
10   A.   Back then they didn't have a two-year
11   degree.  Back then it was a certificate of completion.
12   Q.   Okay.  Could you relate your work history,
13   going back to the time you began the collection
14   business?  And if you could, identify each job you have
15   had, approximately what dates you had that job, and, if
16   you could, just briefly describe what your duties were.
17   A.   I started in I want to say '83, working in
18   Florida for a collection agency as a collector, called
19   Credit Control.
20   Q.   Okay.  How long were you there?
21   A.   Oh, I want to say -- Was it '82 or '83?  I'm
22   sorry.  I want to say somewhere in '83 to '85, and I at
23   that time did part-time work for a mortgage company at
24   night as a collector, also.  And then from there, I came

## 5

1   up to visit my parents for the holidays in the
2   Philadelphia area and liked it. So I stayed up here and
3   got a job working collections again for FCA.
4       Q.   And that was around '86?
5       A.   I worked there from '86 until I got a call
6   from NCO, would I want to work for them. And I said
7   sure, and I have been here ever since.
8       Q.   When was that?
9       A.   I came here in July of '87. And I did have
10  some time off from here for a short period of time due
11  to some family issues.
12      Q.   And what positions have you held with NCO?
13  And let's do this chronologically, starting with the
14  first position you had.
15      A.   I worked as a medical collector, as a
16  medical supervisor, and at that time I took over
17  salvage.
18      Q.   And how long were you in those positions?
19      A.   I was in the medical side of NCO up until
20  '90 or the early '90s. A lot of things overlapped,
21  because there were a lot of transitions in the type of
22  work that we did.
23      Q.   Okay. What was the next position?
24      A.   I was a supervisor and then the manager of

## 6

1   the medical division and salvage, and then I helped out
2   with the financial, also. I was the backup for the
3   financial department.
4       Q.   When did you start doing that?
5       A.   I don't remember; I really don't. Back then
6   you did a lot of crossover, because we were very small.
7       Q.   Did you eventually move to the financial
8   department?
9       A.   No. What happened was my son got ill, and I
10  took a leave of absence. When I came back, they asked
11  me to help out part-time doing -- developing a PPA unit,
12  which is a partial pay unit. And at that point I also
13  took -- into that was financial, medical, utilities. It
14  was everything a company did. And I worked with Cross
15  Country Bank and Mellon Bank and a few other banks,
16  getting everything into our PPA world.
17      Q.   What time period was that in?
18      A.   That was in '97, and I worked -- At that
19  point, then I started taking over at the end of '97,
20  reviewing all the checks for NCO that had a previous
21  balance before we started posting payments. And that
22  started in, I want to say, July or August.
23      MR. ISRAEL: This is in '97?
24      THE WITNESS: Of '97. Now, remember, I have

## 7

1   been here a long time. I could be wrong with some of
2   the dates.
3   BY MR. HOMER:
4       Q.   I understand. You are giving me
5   approximations. That is good enough.
6       A.   I really don't remember exact dates.
7       Q.   How long have you been doing that job?
8       A.   I am still doing it.
9       Q.   What is the title of your position?
10      A.   Compliance auditing manager.
11      Q.   Can you explain in a little more detail what
12  your responsibilities are?
13      THE WITNESS: I'm sorry?
14      MR. ISRAEL: Nothing. I was just hearing
15  the question.
16      THE WITNESS: My responsibilities at this
18  them to review accounts for NSF's, compliance for
19  policies within the company for credit cards,
20  communications with debtors, research accounts. I deal
21  with clients who might have compliance issues with NCO.
22  BY MR. HOMER:
23      Q.   Okay. Anything else?
24      A.   We do a lot of things. It's all to govern

## 8

1   whether or not we are in compliance, reviewing accounts,
2   verifying check payments over, depending on the unit, a
3   certain dollar value.
4       Q.   When you say in compliance, do you mean
5   within compliance with the law or within compliance with
6   NCO policies or both?
7       A.   Both.
8       MR. ISRAEL: Let him finish completely,
9   because she will never get it down.
10      THE WITNESS: Okay. I am sorry. I
11  apologize.
12  BY MR. HOMER:
13      Q.   How big is the staff that is under you?
14      A.   I have three full-time people and two
15  part-time people.
16      Q.   And let's go back to the year 2003. Do you
18  still the manager of that one in the year 2003?
19      A.   In the year 2003, I stepped into the -- I
20  stepped into the position, and I had brought over one
21  person with me. So there was a staff of two.
22      MR. ISRAEL: Including you?
23      THE WITNESS: Right.
24

10

```
1   BY MR. HOMER:
2       Q.   When did you get a bigger staff?
3       A.   We have been expanding the staff since --
4   when did I -- Within the last year, year and a half, we
5   have expanded.
6       Q.   Through all of 2003, did you just have the
7   two of you there?
8       A.   Yes, sir.
9       Q.   And during the year 2003, did you have the
10  same job responsibilities that you just described to me
11  for your position?
12      A.   Yes, I did.
13      Q.   Okay.  What did you do to prepare for
14  today's deposition, if you did anything at all?
15      A.   We met this morning and reviewed possible
16  questions that would be here today and some of the
17  e-mails that we had sent back then.
18      Q.   Okay.  When you say we met, you are talking
19  about you met with your attorney, Mr. Israel?
20      A.   Yes.
21      Q.   Did you do anything on any other day to
22  prepare for your deposition?
23      A.   No, I did not.
24      Q.   Okay.  Do you recall what documents you
```

10

```
1   looked at?
2       A.   I remember looking at several e-mails and a
3   fax and one policy violation report.
4       Q.   We are about to get into those.
5            MR. HOMER:  Could we mark this Exhibit
6   Number 1, please?
7            (Shaantiel Exhibit Number 1 was marked for
8   identification and attached to the record.)
9   BY MR. HOMER:
10      Q.   I'm going to hand to you the exhibit that
11  has been marked as Exhibit 1 and ask if you can identify
12  it.
13      A.   This appears to be an e-mail from Valerie
14  Hue from Phil Weaver and with Bette Capaldo originally
15  sending it, concerning NSF checks and redeposits.
16      Q.   Okay.  Do you see where it says at the top
17  there, the following outlines of policy for redeposit of
18  NSF checks?
19      A.   Yes.
20      Q.   And that is Mr. Weaver saying that; is that
21  correct?
22      A.   Yes.
23      Q.   And what was his position?  It says right
24  there --
```

11

```
1       A.   It says right here he was senior vice
2   president of commercial services.
3       Q.   And below that is an e-mail to Phil Weaver,
4   correct, which explains what the policy for redepositing
5   NSF checks is, right?
6       A.   Yes.
7       Q.   And you are familiar with this policy that
8   is Exhibit 1?
9       A.   Yes.
10      Q.   It says here that the request should be
11  e-mailed to Laura Harkinson, in care of ncogroup.com.
12  I understand that later there was a change to that, and
13  they were e-mailed somewhere else, to a Vera Megulares.
14  Was Laura Harkinson somebody that worked for you?
15      A.   No, she was not.
16      Q.   Who did she work for?
17      A.   She worked for Bette Capaldo.
18      Q.   And whose function was it to review these
19  requests for redeposit that are referenced here in
20  Exhibit 1?
21      A.   For this?
22      Q.   Yes.
23      A.   I'm sorry.
24           MR. ISRAEL:  I didn't --
```

12

```
1            THE WITNESS:  Yes.
2   BY MR. HOMER:
3       Q.   Let me back up.  It says on Exhibit 1 that
4   requests should be e-mailed to Laura Harkinson.  Are
5   those the requests for redeposit?
6            MR. ISRAEL:  The second bullet?
7            THE WITNESS:  Right here.
8            MR. ISRAEL:  I got you.
9            MR. HOMER:  Yes.
10  BY MR. HOMER:
11      Q.   It is the second bullet on the exhibit.
12      A.   Right here?
13      Q.   Yes.
14      A.   She is the clerk that would post the payment
15  once all the processes would be completed.
16      Q.   Let's back up a little bit.  It says this is
17  the policy for redepositing NSF checks, right?
18      A.   For this specific area.
19      Q.   What do you mean by that?
20      A.   What I mean by that is there are many
21  divisions of NCO.  Depending on the dollar value of the
22  check, depending on the division, the client criteria,
23  there might be different types of requests made in
24  different policies and different procedures for these
```

---

**13**

1   deposits of checks.
2      Q.   Okay. Well, with respect to the commercial
3   ops programming, it says at the top, this is the policy
4   for NSF checks. Are you saying that this policy didn't
5   apply to all of the commercial ops?
6      A.   This policy applied at this time for them.
7   This was before my time with commercial.
8      Q.   Okay. What did Laura Harkinson and her
9   group do with these requests once they were received?
10     A.   To the best of my knowledge, Laura Harkinson
11  was a cash posting clerk. She would take an e-mail and,
12  based on what the e-mail was, either post or destroy a
13  check, to my knowledge.
14     Q.   Okay.
15     A.   But again, I was not involved at that time
16  with this.
17     Q.   And what request is being made here, to your
18  understanding? In the second bullet point, what is the
19  request --
20     A.   You have several here. Which one are you
21  referring to?
22     Q.   I'm talking about the one in bullet point
23  two.
24     A.   Requests should be e-mailed to Laura

---

**14**

1   Harkinson.
2      Q.   Yes. What kinds of requests are they
3   talking about there?
4      A.   I wasn't a part of this at that time, so I
5   was not involved and I wouldn't want to give you an
6   exact answer.
7      Q.   Okay. Do you know what the third bullet
8   point is, requests for redeposits can only be made for
9   NSF items processed within the past 30 days?
10     A.   Repeat that question.
11     Q.   Well, just read the third bullet.
12     A.   Request for redeposits can only be made for
13  NSF items processed within the past 30 days (time frame
14  provided by executives).
15         MR. ISRAEL: I think he's asking: Do you
16  know what that means?
17         MR. HOMER: Yes.
18         THE WITNESS: Yes. I do know what that
19  means.
20  BY MR. HOMER:
21     Q.   Okay. What does that mean?
22     A.   Anytime we have a check that is returned
23  NSF, we have 30 days to make that same check good. We
24  have to go through a verification process before we do

---

**15**

1   that, and that would be -- if it's not within that time
2   frame, you cannot redeposit the check.
3      Q.   Okay. And that policy is stated in this
4   Exhibit 1, correct?
5      A.   Right here.
6      Q.   At the third bullet point, that is what that
7   is saying; is that correct?
8      A.   Uh-huh.
9          MR. ISRAEL: You have to say yes.
10         THE WITNESS: I'm sorry. Yes. I am sorry.
11         MR. ISRAEL: That is okay. You are doing
12  good.
13  BY MR. HOMER:
14     Q.   So a clerk would get a request. Who would
15  submit the request? Do you know?
16     A.   I apologize; I do not know who requested

18     Q.   Would it be collectors? Do you know?
19     A.   I don't know. I really don't want to answer
20  a question I don't have information on.
21         MR. ISRAEL: I don't know is fine. There is
22  no rush. She has all day.
23  BY MR. HOMER:
24     Q.   What was your involvement in 2003 in

---

**16**

1   reviewing NSF requests, if you had any involvement at
2   all?
3      A.   Steve Leckerman came to me in I want to say
4   sometime early October, maybe September, October. And
5   he said to me that he wanted me to start reviewing all
6   the NSFs across the board.
7      Q.   Who is Steve Leckerman?
8      A.   Steve Leckerman is the senior vice president
9   of operations.
10     Q.   Did he explain why he wanted to do that?
11     A.   He explained that he wanted to make sure
12  that we were following policy and that we were putting
13  good money in and we weren't chasing bad money.
14     Q.   Okay. Did he explain anything else about
15  why he was doing it?
16     A.   I don't recall.

18  doing this, or did you work independent?
19     A.   I worked independent.
20     Q.   Okay. And did you review the NSF requests
21  to see if they complied with this policy that is in
22  Exhibit 1?
23     A.   I did not go by this specific set of
24  details. I went with the details that were given to me

---

**17**

1   by Steve Leckerman.
2     Q.   What details were those?
3     A.   He wanted me to check to see if we contacted
4 the debtors. He wanted to see if we contacted the
5 banks. He wanted to see if the checks were verified,
6 and he wanted to see that the accounts were documented
7 accordingly. And he wanted to check for a time frame.
8 I do know that.
9     Q.   When you say time frame, what do you mean by
10 that?
11     A.   The 30-day policy, that has always been our
12 rule.
13     Q.   Did he tell you that he wanted you to focus
14 on any one office? Or was it across the board, that he
15 wanted all offices or some specific offices?
16     A.   He expressed that he wanted every office
17 across the board.
18     Q.   Okay. And did you have anybody helping you
19 with this job?
20     A.   At that time I did not, and it took a long
21 time.
22     Q.   And you started this in October of 2003?
23     A.   I actually started it in the beginning of
24 November.

**18**

1     Q.   Okay. You say it took a long time. How
2 long did it take?
3     A.   I don't remember.
4     Q.   Was it a matter of months or years or weeks,
5 if you recall that?
6     A.   By the end of December I said I couldn't do
7 it by myself, and they told me to go ahead and get
8 somebody right away.
9     Q.   How far had you gotten at that point?
10     A.   I was pretty much through all of AmEx, all
11 of Buffalo. And I want to say Credit Trust and
12 Baltimore, but don't quote me on which ones. I know
13 that I was probably about halfway through, maybe, give
14 or take.
15     Q.   AmEx is a client, or is that a location?
16     A.   American Express is our client.
17     Q.   So you did it by client, and then you did it
18 by office location?
19     A.   No. AmEx is actually a whole division, just
20 like our commercial division. So I did their whole
21 division. They were first.
22     Q.   Do you recall when you did Dover?
23     A.   Not the exact date.
24     Q.   Was it before the end of December?

**19**

1     A.   I started Dover I want to say somewhere
2 maybe -- I don't remember the dates. I really don't
3 remember.
4       MR. ISRAEL: You don't have to guess.
5       THE WITNESS: Yeah, I really don't remember.
6 BY MR. HOMER:
7     Q.   You say that Mr. Leckerman told you that he
8 wanted you to check to see that the debtor had been
9 contacted and the bank had been contacted and there was
10 verification from the bank. Did he give you anything in
11 writing that set out these requirements?
12     A.   He did not give me anything in writing. We
13 had discussed the issue back when I first started doing
14 this for him. And we put it in writing for us as a
15 guideline, what we would consider good to post and what
16 would not be good to post. And I used that as my
17 guideline.
18     Q.   Where is this document kept?
19     A.   This document is now in my folder on my
20 desk. I have a copy of it on my bulletin board, I
21 think. We have since modified it a couple of times.
22     Q.   Do you know what the title of this document
23 is?
24     A.   It's called the 59 Checks.

**20**

1       MR. ISRAEL: 59 Checks?
2       THE WITNESS: The 59 Checks.
3 BY MR. HOMER:
4     Q.   59 is a code for NSF checks; is that
5 correct?
6     A.   Yes.
7     Q.   And do you know what the date of the
8 document is?
9     A.   No.
10     Q.   Is there a date on it? Do you know?
11     A.   I don't remember.
12     Q.   Okay. But this is a document you drew up or
13 Steve Leckerman drew up?
14     A.   It's a document that I drew up and sent to
15 Steve Leckerman.
16     Q.   And what did he do with it? Did he tell you
17 it was okay, or did he give you any feedback on it?
18     A.   He said that was fine.
19     Q.   Now, you said there were guidelines. What
20 do you mean by guidelines?
21     A.   There is no cut-and-dry in anything that you
22 do, so sometimes you just have to read the collector
23 notes, decipher them. Sometimes the collectors will put
24 things in there that tells you right there they didn't

**21**

1   call the bank or they did call the bank or they will
2   document.
3           And based on what you might read in the
4   notes, the guidelines might not apply. Where we
5   might -- say, we were given a proof of deposit, well,
6   then you don't need to go to the guidelines, because we
7   know the money is in the bank.
8       Q.   What are some of the other examples of when
9   the guidelines might apply?
10      A.   Each case scenario might be different. It
11  would be very hard for me to go through this at this
12  time. If I had an account in front of me, I could go
13  through it.
14      Q.   But there are a number of other examples you
15  could come up with if you had documents in front of you?
16      A.   Yes.
17      Q.   Is it fair to say that in some cases
18  collectors aren't able to contact debtors?
19          MR. ISRAEL: You are talking about NSF
20  checks?
21          MR. HOMER: I am talking about an NSF check
22  that has been sent up for redeposit or if there is no
23  request for redeposit.
24          THE WITNESS: Okay. I just want to make

**22**

1   sure I understand this question. Can you repeat that,
2   please?
3   BY MR. HOMER:
4       Q.   Yes. You were giving me examples of where
5   the guidelines of Mr. Leckerman wouldn't apply; that is,
6   you wouldn't necessarily have all the points that he
7   mentioned in place. For example, there might not be
8   debtor authorization or maybe the debtor wasn't
9   contacted. That is just an example.
10          What I'm asking you is: Were there
11  situations that you are aware of where the collector
12  tried to contact debtors but couldn't get a hold of them
13  but still submitted the request form for NSF?
14          MR. ISRAEL: I don't understand. I'm going
15  to object. I think the question is unclear. Are you
16  asking where collectors would request that an NSF check
17  be put in, even though the guidelines, as written, is
18  what they would have followed?
19  BY MR. HOMER:
20      Q.   What I am asking -- Let me try again.
21      A.   Sure.
22      Q.   Your job was to review checks that had gone
23  in for redeposit that had been NSF checks, correct? Is
24  that correct?

**23**

1       A.   After -- From when? This time with
2   Leckerman, right?
3       Q.   Right.
4       A.   Okay. Repeat that.
5       Q.   Why don't you just explain it to me? What,
6   again, did Mr. Leckerman charge you to do?
7       A.   He asked me to review all the accounts
8   across the board that had NSFs to see if they were
9   handled properly.
10      Q.   When you say they had NSFs, are you saying
11  where there were NSFs that were redeposited?
12      A.   No. It was all NSFs, whether they were
13  redeposited or not.
14      Q.   And with respect to the debtor authorization
15  point that Mr. Leckerman made with you, that had to do
16  not only with redepping an NSF check, but also with any
18      A.   That is correct.
19      Q.   Okay. So you were trying to find out
20  whether a collector or someone else had obtained the
21  debtor's authorization to submit the check that came
22  back NSF?
23      A.   I reviewed the accounts that came back NSF,
24  whether it was a redep or not, to determine if we had

**24**

1   made contact with the debtor or followed the proper
2   procedure to do so.
3       Q.   Now my question for you is: Were there
4   situations where the collector, or whoever else was
5   working on the case for NCO, didn't obtain debtor
6   authorization because they couldn't get a hold of the
7   debtor? Did you see that situation arise?
8       A.   Are you talking about for the redep or not
9   for the redep?
10      Q.   Either way.
11      A.   Yes, there were.
12      Q.   Okay. And was that, to your understanding,
13  improper in all cases? Or were there situations where
14  the collector was allowed to do that?
15      A.   On first contact, when the check went in on
16  the first time and there was no contact with the debtor,
18  you authorization to take a check, you can't take a
19  check. In a redep situation, because we already have
20  the authorization to post the check, if we can verify
21  the funds are good at the bank and we cannot make
22  contact with the debtor, we have put the check through.
23      Q.   Okay. Well, let's say that nobody could
24  verify with the bank that the check was good. Are you

**25**

1 saying that in all cases, when that happens, the check
2 should not be submitted on a redep unless the debtor is
3 contacted?
4     A.   Repeat that question.
5     MR. HOMER: Could you read that back?
6     (The following was read:
7     "Question: Okay. Well, let's say that
8 nobody could verify with the bank that the check was
9 good. Are you saying that in all cases, when that
10 happens, the check should not be submitted on a redep
11 unless the debtor is contacted?")
12     THE WITNESS: Okay. You would either have
13 to contact the debtor, the bank, or verify the funds
14 were good on any type of redep. If there was no contact
15 with any of those sources or we were unable to prove
16 that the funds were good, we should not redep the
17 account.
18 BY MR. HOMER:
19     Q.   Okay. Now, was that the guideline that you
20 talked about before that you put in writing and sent to
21 Mr. Leckerman? Was that the source of that policy?
22     A.   That was not the original source of the
23 policy.
24     Q.   What was the original source? Let me back

**26**

1 up before I ask that question. Does the memo to
2 Leckerman reflect that policy? Does it state that, what
3 you just told me?
4     A.   I believe that it does not. That memo was
5 way before this became an issue. You are going back
6 several years that that was set up. And the redep
7 policy came into effect after. In the commercial world,
8 that is pretty much the only place that we redep the
9 same check.
10     Q.   Okay. Well, this memo that you sent to
11 Steve Leckerman couldn't be any earlier than October of
12 2003, correct, because he didn't ask you until then to
13 start doing this work?
14     A.   The memo that went through was the guideline
15 for the 59 Checks --
16     Q.   Right.
17     A.   -- what you had asked me about.
18     Q.   Right. And that, you are saying, didn't
19 have the policy that we have been talking about, about
20 having to verify with the debtor -- I'll put it this
21 that way -- having to verify with the debtor. That is
22 not in that memo?
23     A.   Excuse me. In the memo it doesn't pertain
24 exactly to the commercial accounts, because at that time

**27**

1 we did not do the commercial accounts as in a redep
2 issue. At that time it referred to that if there was no
3 contact made, the check would not -- we would not put in
4 future checks.
5     Q.   But didn't you say it didn't apply to the
6 commercial division, this memo?
7     A.   This was before commercial was on our board.
8     Q.   Okay. Well, the Dover office, wasn't that a
9 commercial division?
10     A.   Yes, that was.
11     Q.   So you are saying this memo that you sent to
12 Leckerman didn't apply to the Dover office?
13     A.   I did not say that.
14     Q.   Okay.
15     A.   As I've said, NCO was growing. As we grew,
16 we took on new offices. This was part of a new office
17 that we had taken on, which was a commercial division.
18 The policy guidelines were set up before commercial came
19 on board with NCO. At the time when Leckerman came to
20 me, I had been looking in other areas. And he said:
21 Check everything.
22     So I checked everything, and I used the
23 policy. And obviously, I knew that when you deal with
24 checks -- I mean it's the same across the board. If the

**28**

1 money is not there, you don't put the check in.
2     Q.   I am getting lost. I am sorry I don't
3 understand this better. Let me try to back up. The
4 memo that you sent to Leckerman, you say, didn't apply
5 to the commercial division? Am I right about that,
6 first of all?
7     A.   At the time the memo was created --
8     Q.   And that was in --
9     A.   -- Milliken & Michaels, which we bought out
10 and was our commercial division, didn't exist at NCO.
11     MR. ISRAEL: How old was that memo?
12     THE WITNESS: It was old.
13     MR. ISRAEL: See, I thought you said that
14 that memo was created in September, October.
15     THE WITNESS: The copy that you have was the
16 one that I had forwarded to that memo. Originally, the
17 guidelines were set up years ago.
18     MR. ISRAEL: Okay.
19     THE WITNESS: But I just reissued that memo
20 at the time. I just recycled the memo.
21     MR. ISRAEL: Okay. Is it this?
22     THE WITNESS: No.
23 BY MR. HOMER:
24     Q.   Is it this document?

## 29

1    A.   Yes.

2    Q.   All right. We will get to it in a few

3  minutes.

4         MR. ISRAEL: Can I see it one second?

5  BY MR. HOMER:

6    Q.   All right. We will turn to that. We will

7  come back to that in a bit here. When Mr. Leckerman

8  told you to start reviewing all checks, all NSF checks

9  to determine whether or not they were verified or that

10 the debtor had been contacted -- and I'm talking now

11 about redepped checks -- that policy or that requirement

12 that the debtor be contacted, was that in writing

13 anywhere that you are aware of when Leckerman first came

14 to you? And I think you said that was around October of

15 2003.

16   A.   I know it's in writing. I don't know where

17 it is in writing at this point.

18   Q.   Had you been asked to look for that document

19 or any policy statements that governed the handling of

20 checks at NCO?

21   A.   Can you clarify that?

22   Q.   Well, as I understand it, you've given your

23 attorney certain documents that relate to check handling

24 procedures; isn't that so?

## 30

1    A.   That is correct.

2    Q.   Were you asked to look for the documents

3  that dealt with check handling procedures?

4    A.   Nobody came to me and said to look for the

5  documents. They already had it.

6    Q.   Have you seen the document?

7    A.   You have that document there.

8    Q.   The one I just showed you?

9    A.   Uh-huh.

10   Q.   Were there any other documents that you are

11 aware of, other than that one which we will get to in a

12 minute? It is a document that is an e-mail, January 30,

13 2004, from Kathy Obershain. And then beneath that,

14 there is, on the same document, a December 3, 2003

15 e-mail from Dina Loft to a number of people. That is

16 the document you just mentioned; isn't that right?

17   A.   This is the document.

18   Q.   Okay.

19   A.   But I don't understand your question.

20   Q.   Well, the question is: Is there any other

21 document that you are aware of that contains any written

22 policy regarding check handling policies of NCO that

23 were in effect in 2003?

24   A.   Yes.

## 31

1    Q.   And what documents are they?

2    A.   You have the DCI policy, originally called

3  the I-check policy. And it gave you the information on

4  how, when, and what to do when taking a check.

5    Q.   Would that be contained in a memo from Brian

6  Laiche to Kathy Obenshain, dated July 15, 2003?

7    A.   This is the end-of-month check verification

8  policy.

9    Q.   Okay. I'm sorry. That is the wrong one.

10 Other than those two documents, is there any policy that

11 you are aware of that deals with check handling

12 procedures that were in effect in 2003?

13   A.   The DCI, I-check, and check handling policy.

14        MR. ISRAEL: He said other than that.

15        THE WITNESS: Oh, other than that, no.

16 BY MR. HOMER:

18 accounts for compliance with these points that

19 Mr. Leckerman arranged with you, what forms were

20 submitted for you to look at by collectors?

21        MR. ISRAEL: If any.

22        THE WITNESS: There are no forms submitted

23 to me at all by any collector.

24

## 32

1  BY MR. HOMER:

2    Q.   Okay. Isn't it true that when collectors

3  submitted the request forms to Bette Capaldo's group,

4  that they did send in certain information about the

5  check?

6    A.   It was my knowledge that they were supposed

7  to be sending them in, but they were not sending them

8  in.

9    Q.   Okay. And who told you that?

10   A.   I don't remember.

11   Q.   Okay. Is that true of all the offices, or

12 is it true of only some of the offices?

13   A.   No other department, other than the

14 commercial division, redeps checks. So this policy only

15 applies now to the commercial.

16   Q.   That is not my question. The question was:

18 offices -- and there are a lot of different offices,

19 correct?

20   A.   Yes.

21   Q.   Back then there were 11 different offices

22 that did commercial collections, correct?

23        MR. ISRAEL: If you know; you don't have to

24 guess on numbers.

33

1    THE WITNESS: Right. I don't know.
2  BY MR. HOMER:
3    Q.    Is that an approximate number?
4    A.    I apologize. I don't know.
5    Q.    You don't need to apologize. If you don't
6  know, you don't know. But there were several collection
7  offices within NCO back in 2003, correct?
8    A.    Yes.
9    Q.    And Dover was one of them, right?
10   A.    Yes.
11         MR. ISRAEL: One second. Are all of these
12 questions going to be about commercial so that you
13 don't --
14         MR. HOMER: Yes.
15         MR. ISRAEL: I don't want to interrupt you.
16 But if you are asking about commercial and the witness
17 understands, then that is fine.
18         MR. HOMER: Yes. That is what I am talking
19 about.
20         MR. ISRAEL: Okay.
21 BY MR. HOMER:
22   Q.    With respect to all of the offices, was
23 nobody submitting forms to support redepping checks, to
24 your knowledge?

34

1    A.    I don't know.
2    Q.    Well, you said a minute ago that your
3  understanding was that they weren't. What was the basis
4  for that understanding?
5         MR. ISRAEL: That is a mischaracterization,
6  but start over. What do you know about who was or was
7  not by office, I think, is his question?
8         THE WITNESS: I know that forms were
9  supposed to be sent. I was told that they were not
10 getting all of them. I was told -- When I went through
11 to look for everything, I was being told that policies
12 were not being followed, people weren't doing what they
13 were supposed to be doing. People were not sending in
14 the appropriate paperwork, and to look for it.
15 BY MR. HOMER:
16   Q.    And did you find any paperwork? Strike
17 that. I assume you knew what the appropriate paperwork
18 that you were looking for was. Is that fair to say?
19   A.    My job was to review the notes to see if it
20 was documented, to see if the paperwork was sent.
21   Q.    Okay. And did you know what the paper was
22 that was supposed to be sent to support the redepping of
23 NSF checks?
24   A.    It's what they called the check -- It was a

35

1  form, a check form.
2    Q.    A check verification form?
3    A.    That was one of the names that it went by,
4  yes.
5    Q.    And did you look for these forms that
6  supported the request for redepping NSF checks when you
7  did your audit?
8    A.    I did not look for the forms.
9    Q.    And why is that?
10   A.    Because they were supposed to be documented
11 on the account, and if they were not documented on the
12 account, it didn't happen.
13   Q.    What do you mean it didn't happen?
14   A.    If you do not put a transaction in the notes
15 that you did something, then you didn't do it.
16   Q.    Well, are you saying it would have been
17 impossible for somebody to have submitted the form and
18 not checked on the account, the information on the
19 account? Do you understand the question?
20   A.    No.
21   Q.    Okay. You were saying you didn't look for
22 the forms that supported the redepping of NSF because
23 the accounts didn't show the forms had been used. Is
24 that what you are saying?

36

1    A.    Correct.
2    Q.    Okay. So are you saying that nobody could
3  have submitted the forms without noting it on the
4  account?
5    A.    It's a possibility.
6    Q.    Okay. And what did you find when you did
7  your audit about the compliance with the requirement
8  that debtors be contacted for redepping NSF?
9    A.    When I did the audit for this division, we
10 had found that there was a specific area that did not
11 document the accounts, that contact was made with the
12 debtor or the bank and that they went ahead and had the
13 checks redepped.
14   Q.    Okay. And how widespread was that practice?
15   A.    It was pretty much isolated to one specific
16 area.
17   Q.    What area was that?
18   A.    The Dover office.
19         MR. HOMER: Let's go to the next exhibit.
20         (Shaantiel Exhibit Number 2 was marked for
21 identification and attached to the record.)
22         MR. HOMER: Before we get to that, though, I
23 would like a copy of this memo to Mr. Leckerman, if I
24 haven't already gotten it. I guess that is the one we

## 37

1  are coming to. It's really not addressed to Leckerman,
2  so I'll ask some questions about that when we get to it.
3  BY MR. HOMER:
4  Q.  Can you identify Exhibit 2, please?
5  A.  This is the policy violation, a part of the
6  policy violation report that was submitted.
7  Q.  Did you prepare this document?
8  A.  I did.
9  Q.  When did you prepare it?
10  A.  This was done the first week of February of
11  '04.
12  Q.  Of '04? And why did you do this report?
13  A.  I had started submitting these reports in
14  November, as I completed each unit at the beginning of
15  each month from the previous month.
16  Q.  Okay. The report identifies three different
17  offices -- well, I guess there are three different
18  offices on here or four different offices, Tampa, Dover,
19  Getzville, Horsham, as ones where there were policy
20  violations. Is that correct?
21  A.  That is correct.
22  Q.  Okay. Let's look at the one on the first
23  page, where Horsham was the location. Do you know
24  whether the collector's employment was terminated as a

## 38

1  result of this or not? The reason I ask is that the
2  Getzville block, which is right below it, you do
3  indicate that the collector was terminated. But it is
4  not indicated in the block for Silverstein.
5  A.  At the time I did not know, when I submitted
6  my report, whether he was terminated.
7  Q.  Okay. Do you know whether he was terminated
8  or not?
9  A.  I don't know. I can tell you that he no
10  longer works here now.
11  Q.  Okay. Who would know whether he was
12  terminated for this?
13  A.  Human resources.
14  Q.  Pardon?
15  A.  Human resources.
16  Q.  Okay. Turn to the next page. In the
17  right-hand block at the top, this is a description of
18  the resolution, I guess is the title of it. And this is
19  the one from McQuisten, M-C-Q-U-I-S-T-E-N. Do you see
20  where I am referring to?
21  A.  The top one here?
22  Q.  The top one there. Do you see that block?
23  It says there that all the checks were returned. Do you
24  know that to be a true statement? That every single

## 39

1  check that was submitted by these collectors was
2  returned?
3  A.  The accounts that I reviewed only that were
4  on the NSF report.
5  Q.  Did you review all of the accounts?
6  A.  On the NSF report?
7  Q.  Yes.
8  A.  Yes, sir.
9  Q.  And where are the documents that show that
10  this is the case?
11  A.  The NSF report?
12  Q.  Well, wouldn't you have to have the checks
13  showing that the checks cleared the bank? Wouldn't that
14  be something you would be looking at?
15  A.  We have the Met Share. It is a scanned
16  image file that you can look at for all the NSF checks.

18  review the checks that would come back on a daily basis.
19  I can also run a report off the system by putting in the
20  time frame. And based on the cash posting of the NSF,
21  it will spit it out on the report and give me the data.
22  Q.  When you say here that all the checks were
23  returned, are you saying that every NSF check that was
24  resubmitted for payment, none of them cleared? Is that

## 40

1  what you saying there?
2  A.  No.
3  Q.  What are you saying?
4  A.  What I'm saying is the checks that I had
5  reviewed as already coming back from the redep had not
6  cleared.
7  Q.  What do you mean by coming back from the
8  redep? What do you mean by that?
9  A.  The accounts that I reviewed had an NSF on
10  the file. And the checks that I reviewed that had come
11  back NSF were NSF. They had come back.
12  MR. ISRAEL: Do you mean the redep check
13  went in, and it came back again NSF?
14  THE WITNESS: Right.
15  BY MR. HOMER:
16  Q.  Let me ask it a different way. For these

18  they tried to redep for payment that was previously an
19  NSF check, you are saying that you reviewed every check
20  that they submitted?
21  MR. ISRAEL: Oh, I see your question.
22  THE WITNESS: I did not review every check
23  that they resubmitted. I reviewed the checks that were
24  returned NSF.

BY MR. HOMER:

Q.   So you were only reviewing checks that had been returned NSF?

A.   That is correct.

Q.   So you had to find that they all were returned NSF?

A.   Yes.

Q.   So how many checks did they submit that weren't returned NSF that had been NSF before?

A.   I don't know.

Q.   You say you have no idea how many checks were resubmitted or redepped NSF by Reavis, Lane, and McQuisten that actually were valid checks that had cleared? You don't know the answer to that?

A.   Could you please repeat that?

Q.   Am I right in saying that you don't know how many checks Mr. Reavis, Mr. Lane, and Mr. McQuisten requested redepping on that actually cleared the bank?

A.   I do not know that.

Q.   Okay. Do you have any idea?

A.   I don't know.

Q.   Okay. Do you have any idea how many were returned? And when I say that, I mean that didn't clear the bank after they had been redepped.

---

A.   All of the checks that I had reviewed that were returned from the redep came back as an NSF. Other ones, I couldn't speak for. I didn't see them.

Q.   I understand that. But I'm asking if you have any idea what the number was that were returned that did not clear the bank?

A.   It was a long time ago. I don't remember.

Q.   Okay.

MR. ISRAEL:  Ten? Twenty? A hundred? Two Five?

THE WITNESS:  It was a lot. I don't remember the exact amount.

MR. ISRAEL:  Okay. That is fine. You can ask her.

BY MR. HOMER:

Q.   Well, what do you mean by a lot?

(Following a discussion off the record:

BY MR. HOMER:

Q.   You say a lot were returned. How many is a lot?

A.   I would say if you put in ten checks and five came back, that is a lot. Depending on the file that you work, knowing the business, it's all based on the --

---

MR. ISRAEL:  Stop, stop. You can't guess as to the quantity. You don't have to guess.

THE WITNESS:  Okay. I don't know. I really don't.

BY MR. HOMER:

Q.   Okay. Can you tell me in what order you reviewed these different offices for redepping of NSF checks?

MR. ISRAEL:  Did you say in what order?

MR. HOMER:  In what order?

MR. ISRAEL:  These are all commercial divisions he is talking about.

BY MR. HOMER:

Q.   Again, I am talking about the commercial division.

A.   We went by unit code, and that was done by alphabetical order.

Q.   So Dover was first?

A.   You didn't do it by office code. You did it by collector code. Every collector is assigned a code. They come out in alphabetical order. It is called the master collector unit chain count. And it lists units by AA-1, AA-2, AA-3, AA-4, and it went right down the list. And then what I did afterwards is then we

---

identified the user and then the division. We did not -- meaning the division, the Dover office, the Tampa office, the Metairie office.

Q.   Are you saying then that you did go through every collector in one office, or are you saying that you went through different collectors from different offices?

A.   I took the complete list of all of the collectors in the commercial division. And I went through it, not by collector name, by unit code, every unit. And I went through it alphabetically.

Q.   What does unit code refer to?

A.   It is an assignment of work. You have a unit -- for example, you have A, B, C, D. Each collector has -- A has 100 accounts. B has 100 accounts. C has 100 accounts. D has 100 accounts. A collector is assigned to A. A collector is assigned to B. It is their work responsibility or their workload. And I went and just took the list of the unit. So they are all listed in alphabetical order, numeric order, and I just went from top to bottom.

Q.   Does that result in you going through all the collectors in your office, or does it result in you taking the collectors from different offices?

**45**

1    A.   Different offices.

2    Q.   When you prepared this report for January,
3 do you know how many collectors you reviewed at that
4 point?

5    A.   At this point in here?

6    Q.   Yes.

7    A.   We had reviewed the complete commercial
8 file, I think. I mean 90 -- I'm almost 100 percent sure
9 we went through all of commercials for that time frame.

10    Q.   Well, I thought you had said before that by
11 the end of December, you were crying for help, that you
12 couldn't get through it, and you mentioned only four
13 that you had gone through, Baltimore, Buffalo, AmEx, and
14 one other.

15    A.   Right. This is the February report. We did
16 this in January.

17    Q.   I understand that. You are saying that in
18 the next month, you finished all the rest of them in
19 January 2004? You only had four done by the end of
20 December. And then in January, you got everything else
21 done in the commercial division?

22    MR. ISRAEL:   Can we go off the record for a
23 second?

24    (Following a discussion off the record:)

**46**

1 BY MR. HOMER:

2    Q.   Let's back up a little bit. When did you
3 start reviewing, pursuant to Mr. Leckerman's directive,
4 the commercial offices and the collector practices
5 regarding redepping NSF checks?

6    A.   It was the beginning of the year.

7    Q.   January?

8    A.   Yes, sir.

9    Q.   Okay. January of 2004, you are talking
10 about?

11    A.   Yes.

12    Q.   Okay. And when did you complete that
13 review?

14    A.   In the month of January.

15    Q.   Okay.

16    MR. ISRAEL:   You believe?

17    THE WITNESS:   I believe.

18 BY MR. HOMER:

19    Q.   You are not sure about that? Apparently
20 not. Is that true? You are not sure?

21    MR. ISRAEL:   By the time we are done, you
22 won't be sure of anything.

23    THE WITNESS:   I have to tell you, give me a
24 rubber band.

**47**

1    MR. ISRAEL:   You are 99 percent sure?

2    THE WITNESS:   Yes.

3 BY MR. HOMER:

4    Q.   Let's get back to Exhibit 2. It says all
5 the checks were returned.

6    MR. ISRAEL:   Still on that first block?

7    MR. HOMER:   Right.

8 BY MR. HOMER:

9    Q.   What time period are you talking about
10 there?

11    A.   I reviewed the checks from the end of
12 December through the middle of January.

13    Q.   And you say at the end of December. Do you
14 mean December 31st or --

15    A.   No. I would say from the 15th, give or take
16 a few days.

18 the collectors you were looking at in that one-month
19 period, December 15th to January 15th?

20    A.   I would say that would be true.

21    Q.   Okay. It says here that Valerie Hue put
22 through the checks. Again, I'm referring to Exhibit 4.

23    A.   Absolutely.

24    Q.   How do you know she put through the checks?

**48**

1    A.   At the time I didn't know it was Valerie
2 Hue, until I actually did the final report. I went by
3 user code. At that time I only identified user codes.
4 And then I went through and I was able to get the
5 information, what user code related to what person to
6 identify what went on the report.

7    Q.   Can you find the specific checks that she
8 put through that you claim or you indicate here were
9 returned? Can you find those checks?

10    A.   Not today.

11    Q.   Well, can you find them?

12    A.   I can get access to them.

13    Q.   Okay. Do you have any way of knowing
14 whether someone else might have used her user code when
15 the checks were put through?

16    A.   To my knowledge, nobody uses anybody's user

18    (A recess was taken from 2:14 p.m. until
19 2:18 p.m.)

20 BY MR. HOMER:

21    Q.   What documentation have you kept to show
22 that the authorization procedures weren't followed and
23 that people put these checks through that were returned?
24 What do you have in terms of records that show it?

65

1   phone on setting up the way we wanted it done.
2       Q.   December of 2003? You said throughout the
3   month. What month?
4       A.   In 2003 we started setting up guidelines.
5       Q.   And what guidelines are you talking about?
6       A.   How the report would be created, what was to
7   go on the report, and it was during the beginning and
8   the defining time of how we were going to do this.
9       Q.   And all of this took place in December of
10  2003?
11      A.   It is ongoing.
12      Q.   Well, what do you mean it is ongoing?
13      A.   I still report to Josh. We still talk about
14  these reports. We have modified them since.
15      Q.   Okay. You started in December talking to
16  him about the report that was going to be done. When
17  did you decide upon what was going to be in the report
18  in terms of formatting it? When was that decision made?
19  We are talking now about the Exhibit 2 report.
20      A.   I couldn't give you an exact date.
21      Q.   Was it done in December -- do you know -- of
22  2003, or was it done in January of 2003?
23      A.   January of 2003?
24      Q.   2004, I'm sorry.

66

1       A.   I couldn't give you the exact date.
2       Q.   It could have been either month?
3       A.   It could have been.
4       Q.   And what kind of communications did you have
5   with him? Were they by e-mail? Were they by phone or
6   some other means of communicating?
7       A.   In the beginning, it was mostly by phone.
8   We had meetings in his office. I don't think there were
9   many e-mails in the beginning.
10      Q.   To your knowledge, when did Kathy Obenshain
11  first learn about the work you were doing?
12      A.   Because of this incident, I became aware of
13  it --
14          MR. ISRAEL: You are talking about Dover?
15          THE WITNESS: The Dover office, the
16  commercial report; when I became aware of the situation,
17  I went through the channels. I obviously notified
18  Leckerman. He told me to go to Moore. Moore told me to
19  go --
20          MR. ISRAEL: Go slow.
21          THE WITNESS: I went to Leckerman, and he
22  told me to call Carolyn. I called Carolyn, and she told
23  me to call Ted Fox. Ted Fox told me to call Kathy, that
24  she was handling the commercial division. And at that

67

1   point I started talking to Kathy, and I told her of my
2   findings. She told me that she would research it, get
3   back to me, and that is where --
4   BY MR. HOMER:
5       Q.   Okay. When did you talk to Obenshain?
6       A.   I don't remember the exact date and time.
7       Q.   Do you remember what month it was?
8       A.   I think it was in January. I know it was in
9   January.
10      Q.   And did you correspond with her by e-mail at
11  all?
12      A.   There were some e-mails that went back and
13  forth.
14      Q.   Have you supplied all of those e-mails to
15  your attorney?
16      A.   I don't know.
17      Q.   Have you been asked to supply them?
18      A.   I think so.
19      Q.   But you don't know whether you gave them to
20  him or not?
21          MR. ISRAEL: I believe she has. I don't
22  have any more e-mails. You have asked.
23          THE WITNESS: I have to be honest with you.
24  I went through my e-mails and tried to sort what I could

68

1   and come up with what was -- what I had in my archives
2   and what I had in my personal folders. And I supplied
3   them with what I had there.
4   BY MR. HOMER:
5       Q.   Okay. Well, are you sure that there aren't
6   any other e-mails between you and Kathy Obenshain in the
7   December, January period? I am talking about 2003 and
8   2004.
9       A.   I'm not sure.
10          MR. ISRAEL: Well, you didn't talk with her
11  in December of '03 about this, did you?
12          THE WITNESS: Not in December.
13          MR. ISRAEL: Well, just so we are clear, if
14  you have any e-mails between you and Kathy Obershain
15  relating to this and that you haven't given to us, that
16  is what we are still looking for.
17          THE WITNESS: I can try searching again.
18          MR. ISRAEL: Well, we asked and you gave.
19  If you have more, we want them. If you don't, we don't.
20          MR. HOMER: Just to be clear, I am looking
21  for all of the correspondence. I don't care if it
22  relates to this or not. I don't know if you were making
23  judgments about what you thought was relevant and what
24  wasn't. But if you had any e-mail correspondence with

## 69

1   Kathy Obenshain --

2       MR. ISRAEL: We made it broader than that.

3   We asked about anything relating to her investigation

4   that touched upon commercial. I think we have produced

5   everything. But if you have more, we can certainly

6   produce it.

7       THE WITNESS: Yeah. I will go back and look

8   again, and I will have somebody else double-check me.

9   BY MR. HOMER:

10     Q. I'm looking back again at this December 15th

11   to January period, 2003, 2004. Do you have any idea of

12   what the percentage of redepped NSF checks came back NSF

13   again?

14     A. No.

15     Q. You didn't look at that question at all?

16     A. No.

17     Q. How do you know that a collector would have

18   just noted on the paperwork that you reviewed that he

19   contacted the debtor? How would you know that he

20   actually did contact the debtor?

21     A. We can run phone reports to see if there was

22   actually a phone call made.

23     Q. And did you do that in all cases? When you

24   did your audit, when you found in your accounts that the

## 70

1   collector indicated he had contacted the debtor, did you

2   then check to see if he had actually done it in all

3   cases?

4     A. Not in all cases.

5     Q. And what percentage of cases would you have

6   checked?

7     A. I don't know.

8     Q. No idea?

9     A. No.

10     Q. Is it fair to say that all the offices that

11   were involved in commercial collections would have been

12   requesting the redeposit of NSF checks?

13     A. Yes.

14     Q. Can you explain what a DCI check is?

15     A. A DCI check is check information that is

16   entered into our system that we obtain from the debtor.

17   It's called debtor check information.

18     Q. And essentially, it is an authorization to

19   create a check for the debtor, correct?

20     A. That's correct.

21     Q. Was it proper, going back to the 2000 year

22   period --

23       MR. ISRAEL: The 2003?

24

## 71

1   BY MR. HOMER:

2     Q. 2003, I'm sorry, the 2003 period, was it

3   proper to recreate a DCI check that had been returned

4   NSF as opposed to redepping the same check?

5     A. It's not -- At that time it was not common

6   practice to recreate the DCI to redep a check. In

7   certain cases, collectors would do that if the microline

8   was invalid or any certain set of circumstances that it

9   did not allow to clear at the bank after verification.

10     Q. Okay. And in your audit, did you try to

11   determine whether that practice was being followed? Let

12   me back up a little bit. Was there a written policy

13   back in 2003 regarding any requirement to redep DCI

14   checks returned NSF as opposed to recreating a DCI check

15   returned NSF?

16     A. I want to make sure that I understand you

18     Q. Okay.

19     A. And again, it goes back to your definition

20   of what an NSF check is. If we are talking about a true

21   NSF, the policy was that you had to contact the debtor

22   or you had to contact and you would not recreate the

23   check. You would actually take the check that was

24   returned as an NSF and put it through. The only way

## 72

1   that you would not put it through is if the bank put

2   holes in the bottom of the check in the microline.

3     If the check is returned to a utility which

4   is unable to locate the account, if the check is

5   returned stop payment -- there are other examples here

6   that are considered NSF when we back it off the system,

7   that although it is a true NSF because the check is

8   returned, it could be because of a key stroke error

9   where somebody entered it into a system where it should

10   have been a three and it was a two, and the bank

11   returned it.

12     Q. So then you could recreate under certain

13   circumstances?

14     A. Under certain circumstances, you could

15   recreate the check.

16       MR. ISRAEL: Let him finish his question. I

18   him finish his question.

19       THE WITNESS: Okay.

20   BY MR. HOMER:

21     Q. You could in certain circumstances recreate

22   a DCI check that had been returned NSF, correct?

23     A. Correct.

24     Q. To get back to my original question, was

73

1  there, in 2003, any written NCO policy regarding the
2  recreation of a DCI check versus redepping a DCI check
3  that had been returned NSF?
4      A.   To my knowledge, I did not see it. But I
5  was told there was one there.
6      Q.   Who told you that there was?
7      A.   When I started the investigation and had
8  started talking to Kathy, she had told me that it was
9  written policy for her division.
10     Q.   But you never saw the policy?
11     A.   No.
12     Q.   Okay. To your knowledge, did Kathy
13 Obenshain do anything that was improper in terms of the
14 check handling policies?
15     A.   No.
16     Q.   Do you know anything about the reason she
17 left NCO?
18     A.   No.
19     Q.   You have no knowledge at all of why she
20 left?
21     A.   No.
22     Q.   Going back to Exhibit 2, is there any
23 violation that you are reporting in this exhibit that
24 is a violation of any of the policies that are in

74

1  Exhibit 1?
2      A.   Referring to the commercial, yes.
3      Q.   And what violations are there in Exh
4  that are reported in Exhibit 2?
5      A.   I don't have the account in front of me
6  here, so I couldn't give you an exact example.
7      Q.   Well, can you tell me what policy was
8  violated? I'm talking about what policy in Exhibit 1
9  was violated?
10     A.   The checks that were invalid or NSF were put
11 through.
12     Q.   Can you tell me which bullet it went by?
13     A.   Requests can only be made on true NSF items
14 and not refer to makers, invalid accounts, et cetera.
15     Q.   Refer to maker and invalid account, what do
16 those two terms refer to?
17     A.   An invalid account is where the check was
18 returned because the account number was invalid. And a
19 refer to maker could be several different reasons,
20 depending on how the bank stamps the check. It says
21 refer to maker, and then there is a tag on there.
22     Q.   Well, there is nothing in Exhibit 1 that
23 refers to verification by the debtor or verification by
24 the bank, is there?

75

1      MR. ISRAEL: I mean that document speaks for
2  itself. It is right --
3      MR. HOMER: I know. I need this question
4  for foundation.
5  BY MR. HOMER:
6      Q.   There is nothing in there that refers to
7  debtor contact or bank verification?
8      A.   Well, where?
9      MR. ISRAEL: He is asking.
10     THE WITNESS: Show me where you are -- Right
11 here and here?
12     MR. ISRAEL: Yes.
13     THE WITNESS: Requests can only be made on
14 true NSF items --
15     MR. ISRAEL: No, no. Listen to his
16 question. He is asking: Do any of these bullets read
17 verification? Read each one. No rush, there is no
18 rush.
19     THE WITNESS: Right here, it says
20 verification. It says: Accounting clerk will have the
21 final verification in all items meeting the above
22 criteria.
23 BY MR. HOMER:
24     Q.   Yes. But what the clerk does is verify the

76

1  other bullets have been approached. They are not
2  verifying that the other banks have been contacted,
3  right? Didn't you testify before that you didn't even
4  use this policy when you did your review? What you were
5  looking for was bank verification and debtor contact?
6      A.   Correct.
7      Q.   And when you did your report, you weren't
8  looking to cite anybody for a violation under this
9  Exhibit 1 policy. You were looking to cite or find
10 violations of this alleged policy of having to contact
11 the debtor or verify with the bank, correct?
12     MR. ISRAEL: Mischaracterization,
13 argumentative. Go ahead.
14     THE WITNESS: Correct.
15 BY MR. HOMER:
16     Q.   Okay. So my question again is: Did your
17 report in Exhibit 2 reflect any violations of the
18 Exhibit 1 policy? And by that policy, I'm referring to
19 the bullet points.
20     MR. ISRAEL: Do you mean other than what she
21 has told you?
22     MR. HOMER: She hasn't told me of any yet
23 that I'm aware of. She talked about the last one being
24 verification. But it is clear that verification isn't a

## 77

bank verification. It's a verification that the other
2  bullet points have been followed.
3           MR. ISRAEL: Well --
4           THE WITNESS: Can I ask a clarification?
5           MR. HOMER: Sure.
6           MR. ISRAEL: You should. And just because
7  he makes a statement in his question doesn't mean that
8  that is what you said. So go ahead and ask away.
9           THE WITNESS: If what you are asking me
10  is -- and I want to make sure I understand this -- did I
11  use this to create this? The answer is no.
12  BY MR. HOMER:
13      Q.   That is not what I am asking. I understand
14  you didn't use that at all. When you did your work, you
15  didn't use the Exhibit 1 policy. You weren't looking
16  for Exhibit 1 violations. You were looking for problems
17  where the debtor hadn't been contacted or where the bank
18  hadn't verified the funds, correct?
19           MR. ISRAEL: Or there wasn't an independent
20  verification.
21           MR. HOMER: Or there wasn't an independent
22  verification.
23  BY MR. HOMER:
24      Q.   Wasn't that the scope of your review?

## 78

1      A.   That was a part of it.
2      Q.   And you weren't looking for whether any of
3  these policies were being followed, correct, that are in
4  Exhibit 1?
5      A.   Part of our policy that we looked for, for
6  example, requests for NSF within the past 30 days --
7      Q.   Right.
8      A.   -- that is part of something.
9      Q.   You mentioned that before. But does your
10  table --
11      A.   So your --
12           MR. ISRAEL: Let her finish. Go ahead. I
13  am sorry. You are confusing me. I apologize. But you
14  are getting ambiguous, and I apologize.
15  BY MR. HOMER:
16      Q.   It's okay. Maybe I am confused, and that is
17  part of my problem. But here in your description of
18  four, you are saying proper authorization procedures
19  were not followed. That is what you were looking for,
20  whether the check was authorized, correct?
21      A.   Yes.
22      Q.   Either by the bank --
23      A.   By the bank --
24      Q.   -- or the debtor? You weren't looking to

## 79

1  establish whether these bullet points that are in
2  Exhibit 1 were being followed, correct?
3      A.   I wasn't looking for that. Some of these
4  overlap.
5      Q.   Okay. Which ones overlap?
6      A.   The 30-day rule.
7      Q.   Well, there is nothing in Exhibit 4 that
8  talks about a 30-day rule.
9      A.   No. I understand that.
10      Q.   Okay. And you recall that there were 30-day
11  violations?
12      A.   I don't recall.
13      Q.   So you don't know whether or not there were
14  any violations of the Exhibit 1 policy reported in your
15  Exhibit 2 report, correct?
16      A.   Correct.

18           (Shaantiel Exhibit Number 3 was marked for
19  identification and attached to the record.)
20  BY MR. HOMER:
21      Q.   Can you identify Exhibit 3?
22      A.   It's an e-mail from Michele Moore. It
23  actually originated from Kathy Obenshain. It was sent
24  on January 19th, and it was sent directly to me

## 80

1  concerning LeFevre and McQuisten.
2      Q.   Okay. Exhibit 3 says -- and I will quote --
3  I am sending you over a synopsis of out check -- I think
4  that should be our check policy shortly. Do you see
5  where it says that?
6      A.   Uh-huh.
7           MR. ISRAEL: I don't. Where is it?
8           THE WITNESS: Right here.
9           MR. ISRAEL: I'm sorry. I got it.
10  BY MR. HOMER:
11      Q.   Why was it that Kathy Obenshain was going to
12  be sending you a synopsis of the check policies?
13      A.   I don't remember.
14      Q.   Did you know what the policies were as of
15  January 19th?
16      A.   I knew what we had used as our guidelines as

18      Q.   And you don't recall why Kathy Obenshain
19  would be telling you that she was going to be sending
20  you the check policies?
21      A.   I cannot remember.
22           MR. HOMER: Okay. Let's get this marked as
23  Exhibit 4.
24           (Shaantiel Exhibit Number 4 was marked for

81

1    identification and attached to the record.)
2    BY MR. HOMER:
3        Q.   Can you identify this next exhibit,
4    Exhibit 4?
5        A.   This was an e-mail from Kathy to me.
6        Q.   What was the purpose of this e-mail, if you
7    can recall?
8        A.   That I can recall, I think Kathy wanted me
9    to understand that they were implementing and going
10   forward, that they were going to become more stringent
11   so that the issues that I had brought forth to her would
12   not happen again.
13       Q.   Well, doesn't this Exhibit 4 explain to you
14   what verification policies had been in place?  Isn't
15   that what it is doing?
16       A.   It does.
17       Q.   Doesn't this apply to all of the offices?
18   This doesn't relate to any one office, does it?
19             MR. ISRAEL:  If you know, go ahead and
20   testify.
21             THE WITNESS:  This is related to the
22   commercial division.
23   BY MR. HOMER:
24       Q.   Okay.  Because that is what she was in

82

1    charge of, correct?
2        A.   That's correct.
3        Q.   And is it fair to say that you didn
4    about any of these policies before you receive
5    memo?  I'm referring then to Exhibit 4.
6        A.   I was not aware that anything over $10,
7    had to be recovered with the commission issue of
8        Q.   How about what is in paragraph one of the
9    memo?  She goes on, and it is quite an elaborate
10   discussion.  Were you aware of what she was telling y
11   there before you got the memo?
12       A.   I am aware, as in every office, that we make
13   all serious attempts to verify all money and we try to
14   verify all payments.
15       Q.   Let me interrupt you there.  It says over
16   one K gross, correct?
17       A.   That's correct.
18       Q.   Is the policy not to have to verify if it is
19   less than one K?  By that, 1,000?
20       A.   Depending on the division, it is a different
21   dollar value, and it is client specific.
22       Q.   I am talking about in the collection
23   division.
24             MR. ISRAEL:  Commercial.

83

1    BY MR. HOMER:
2        Q.   Commercial, I'm sorry.
3        A.   In this one, over $1,000.
4        Q.   So it wasn't required in the commercial
5    division to verify with the bank if the check was less
6    than a thousand dollars?
7        A.   After the NSF or before the NSF?  It says
8    here anything over.  This was their policy.
9             MR. ISRAEL:  Well, are you talking about
10   postdates?
11             THE WITNESS:  Postdates, postdates, that is
12   a different thing completely.
13             MR. ISRAEL:  Well, you are not talking about
14   that.
15   BY MR. HOMER:
16       Q.   What does postdate refer to?
17       A.   Postdated checks are checks that we receive
18   in our office throughout a period of time that is
19   scheduled to post at a future date.  So if I call you up
20   on the phone and I say to you, you have a bill that
21   needs to be paid, and he says, I won't have the money
22   until I get paid at the end of the month, we can take a
23   check postdated today for the end of the month.
24             So anything over a thousand dollars that is

84

1    postdated, they go back and they run the report and the
2    try to verify whether the funds are good.
3        Q.   Would it be correct then to say that if it
4    is less than a thousand dollars, they wouldn't try to
5    verify if the funds were good?
6             MR. ISRAEL:  For postdates?
7             MR. HOMER:  For postdates.
8             THE WITNESS:  Normally, that is not
9    necessary.
10   BY MR. HOMER:
11       Q.   So normally, there is an exception to the
12   policy of less than a thousand dollars?
13       A.   It isn't an exception, because there is a
14   policy.  And it doesn't --
15             MR. ISRAEL:  It doesn't cover.
16             MR. HOMER:  Okay.  All right.
17             THE WITNESS:  It doesn't cover anything
18   under what we have here.  So it is not an exception, bu
19   you know, it is what it is.
20   BY MR. HOMER:
21       Q.   Let's go on to the next part of this memo.
22   It says -- and again, I will quote -- for live checks.
23   What is a live check?  What does that mean?
24       A.   A live check is a presently dated check

185

1    MR. HOMER: Well, she has identified what it
2  is. She said she is not sure she used it or what the
3  date is or she knows there is something missing. That
4  is what she said. But I don't want to debate that.
5    MR. ISRAEL: Well, that is a fair summary of
6  what the witness said.
7    MR. HOMER: Okay.
8  BY MR. HOMER:
9    Q.  Have you ever been charged with a crime?
10    A.  No.
11    Q.  Okay. And what is your salary?
12    MR. ISRAEL: I don't think that is relevant.
13  BY MR. HOMER:
14    Q.  You can answer the question.
15    A.  At that time, or what is it now?
16    Q.  How much are you paid now? Let me ask it
17  this way: How much money did you make last year from
18  NCO? What is your gross?
19    MR. ISRAEL: Let me object. I don't think
20  that is relevant. I am not instructing her not to
21  answer. But I don't think it is fair to use this to
22  harass or intimidate or to somehow press the witness.
23    MR. HOMER: I am not trying to press the
24  witness. I have a right to know how important her job

186

1  is to her and what her salary is. It's a routine
2  question.
3    MR. ISRAEL: I don't think it's routine at
4  all. But go ahead and answer.
5    THE WITNESS: I make over $70,000 a year.
6  BY MR. HOMER:
7    Q.  That is how much you made last year?
8    A.  I don't remember the exact figure. It's
9  somewhere in the 75, 76 range.
10    Q.  All right.
11    A.  I got my W-2, and I haven't opened it yet.
12  I am being honest. It is within a thousand dollars, I
13  am telling you, between 75 and 76.
14    Q.  That is a salary? You are not on commission
15  or anything?
16    A.  No.
17    MR. ISRAEL: You don't get paid to find bad
18  guys?
19    THE WITNESS: I asked to; I asked for a
20  commission.
21    MR. HOMER: I don't have any other
22  questions.
23    (A recess was taken from 5:24 p.m. until
24  5:31 p.m.)

187

1    MR. HOMER: I have only a couple of exhibits
2  I want to use tomorrow. I am going to give them to the
3  court reporter now, have them marked, and I will give
4  them to Mr. Israel to hand to the witness tomorrow.
5    MR. ISRAEL: That is fine.
6    MR. HOMER: So then we will have a good
7  record of it.
8    (Following a discussion off the record:)
9  BY MR. ISRAEL:
10    Q.  Dina, when you were assigned the tasks by
11  Leckerman to go check policies regarding check handling,
12  as you have described in this deposition today, did he
13  in any way indicate that he wanted you to check on
14  commercial?
15    MR. HOMER: I will object to the question.
16  I think that is a mischaracterization of her testimony.
17    But go ahead. You can answer.
18    THE WITNESS: Did he ask me specifically to
19  go to commercial?
20    MR. ISRAEL: Yes.
21    THE WITNESS: He said across the board
22  everywhere; he did not say one office or another or one
23  division or another.
24

188

1  BY MR. ISRAEL:
2    Q.  Once you hit the commercial division, as you
3  have described, did anyone from commercial -- whether i
4  be Ted Fox, Kathy Obenshain, or any other member of
5  management -- in any way direct what you were to do?
6    A.  No.
7    Q.  Once you started to find information, did
8  anyone from commercial interfere with that process?
9    A.  No.
10    Q.  At any time when you communicated with Kath
11  Obenshain, did you discuss Valerie Hue?
12    A.  No.
13    Q.  Did Kathy Obenshain indicate to you any
14  opinion relating to the GCM in Dover?
15    A.  No.
16    Q.  Did you ever discuss the GCM's race?
17    A.  No.
18    Q.  Was there ever any type of racial overtone
19  or any type of discriminatory aspect relating to your
20  review of check handling?
21    MR. HOMER: I will object to the form of the
22  question.
23  BY MR. ISRAEL:
24    Q.  You can answer.

---

### 189

1  A.  No. We did it by unit codes.
2  Q.  Does that mean you were blind as to the race
3  and sex of the people you were checking?
4  A.  I didn't even know. I was totally blind.
5  It was unit codes only. When the audit was done, it was
6  all unit codes.
7  Q.  Once you reported the information, did
8  anyone try to influence your report?
9  A.  No.
10  Q.  And that includes Kathy Obenshain?
11  A.  No. She didn't try to influence it at all.
12  Q.  Did she cooperate with you?
13  A.  Yes.
14  Q.  Same question for Ted Fox, did he cooperate
15  with you?
16  A.  Yeah. I had very little dealing with him.
17  Q.  You mentioned that the Dover office had a
18  problem.
19  A.  Uh-huh.
20  Q.  What do you mean by that? Why would you say
21  that?
22  A.  It was obvious in the report that the number
23  of NSFs and redeps were much higher in that office than
24  any other office or unit codes across the board that

---

### 190

1  were assigned to them.
2  Q.  Did anyone from commercial ever eventually
3  give you an explanation as to why that phenomenon that
4  you just described happened for Dover?
5  A.  It was determined at a later date that the
6  processes were not followed, and they agreed. Everybody
7  agreed that they weren't doing their job right. And
8  then Kathy later told me that I would be dealing
9  directly with Kim Marlow to help them. And they set up
10  a process at a later date that instead of going through
11  the old process, they would come to our department to
12  redep any payments and we would have to review them.
13  Q.  Do you understand that Valerie Hue
14  eventually lost her job as a result of your audit?
15  A.  Well, I found that out.
16  MR. HOMER: Objection.
17  THE WITNESS: I found that out recently. I
18  was not -- I knew she was terminated, because I saw the
19  report. But I didn't know if it was completely or not.
20  I would assume, based on the facts, but it is an
21  assumption. It was, you know, based on the fact that
22  her office was wrong and they were doing the wrong
23  things.
24

---

### 191

1  BY MR. ISRAEL:
2  Q.  In your experience, does NCO fire managers
3  who violate company procedures?
4  A.  Yes.
5  Q.  In your experience, if a manager has
6  employees violate policies, what happens?
7  MR. HOMER: Objection.
8  Go ahead. You can answer.
9  THE WITNESS: Depending on the severity of
10  the matter; normally, from my experience, usually the
11  manager and/or the collector would either one or both be
12  terminated.
13  BY MR. ISRAEL:
14  Q.  Have you seen those policies or procedures
15  affected based upon the individual's race or sex or age?
16  A.  I wouldn't know. I don't see these people,
18  couldn't answer that, because I don't know, no.
19  Q.  No one has ever indicated that to you, that
20  that was a factor for your audit?
21  A.  No.
22  MR. ISRAEL: Pass the witness.
23  BY MR. HOMER:
24  Q.  When you say from your experience a manager

---

### 192

1  collector would be terminated for violating policy -- is
2  that what you said?
3  A.  Have they been in the past for violating
4  policy?
5  Q.  Yes.
6  A.  Yes. My experience has been that they have.
7  Q.  And you have been with the company for --
8  A.  Since '97; there was a small break there.
9  Q.  Is it fair to say that you would have had
10  that understanding in December of 2003, that if managers
11  violated policies, they would be terminated?
12  A.  Yes.
13  Q.  Okay. You said, I think, that they --
14  without identifying who they was -- they agreed they
15  were not doing their job right. Did you mean to say
16  that Valerie Hue at some point agreed that she didn't do
18  A.  Meaning -- repeat that, please.
19  Q.  Let me ask it in a different way. When you
20  said they agreed they didn't do their job right, who
21  were you referring to when you said they?
22  A.  This is out of context, so I don't remember
23  which context we are saying this. I'm sorry.
24  Q.  Okay. Well, you said during your testimony

---