IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                                      )
                                                 )
            Plaintiff,                           )      Civil Action No. 05-225-KAJ
                                                 )
    v.                                           )
NCO FINANCIAL SYSTEMS, INC., a                   )
Delaware corporation, trading as NCO             )
FINANCIAL COMMERCIAL SERVICES,                   )
                                                 )
            Defendant.                           )

**ANSWERING BRIEF OF PLAINTIFF VALERIE HUE
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

PARKOWSKI, GUERKE & SWAYZE, P.A.

By:    JEREMY W. HOMER, ESQUIRE
       (Delaware Bar ID#0413)
       116 W. Water Street
       P.O. Box 598
       Dover, DE  19903
       (302) 678-3262
DATED: May 15, 2006        Attorneys for Plaintiff

# TABLE OF CONTENTS

**PAGE**

TABLE OF CITATIONS ................................................................................................ ii

I.    NATURE AND STAGE OF PROCEEDING .........................................................1

II.   SUMMARY OF ARGUMENT ..............................................................................2

III.  STATEMENT OF FACTS .....................................................................................3

IV.   ARGUMENT.........................................................................................................25

      A.    Plaintiff states a prima facie case for retaliation, and the evidence
            reflects there are genuine issues of material fact which preclude
            summary judgment....................................................................................25

      B.    Summary judgment is inappropriate because the evidence reflects
            there are genuine issues of material fact concerning defendant's
            real reasons for terminating plaintiff's employment...................................28

V.    CONCLUSION......................................................................................................31

## TABLE OF CITATIONS

**PAGE**

**Cases**

Ely v. Hall's Motor Transit Co., 590 F.2d 62 (3rd Cir. 1978) ........................................... 25

L.N. McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976) .................. 29

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .............................................. 28

Robinson v. Septa, 982 F.2d 892 (3rd Cir. 1993) ............................................................. 28

Waldron v. SL Indus., Inc., 56 F.3d 491 (3d Cir. 1995).................................................... 30

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir 1997) ......................................... 25, 28

**Other Authorities**

Advisory Committee Note to Rule 56 1963 amendments ........................................... 2, 25

Wright, Miller & Kane, Federal Practice and Procedure:  Civil 3d §2725,
   Vol. 10A, pp. 426-427 ................................................................................................. 25

## I.      NATURE AND STAGE OF PROCEEDING

This action is brought by Valerie D. Hue, the plaintiff, against her former employer, NCO Financial Systems, Inc., the defendant. Discovery is complete with the exception of two depositions that had been scheduled by plaintiff near the end of the discovery period. Both witnesses were subpoenaed and neither appeared, though one of them seems to have had a legitimate reason for not appearing, and has advised opposing counsel he will appear when the deposition is rescheduled. Neither deposition is important to the defendant's motion for summary judgment or plaintiff's opposition thereto.

Defendant has filed a motion for summary judgment and an opening brief in support of same. This is plaintiff's answering brief.

## II.    SUMMARY OF ARGUMENT

Defendant, the moving party, has not demonstrated by clear evidence (as required by Rule 56) that it's entitled to summary judgment. In fact, plaintiff's evidence of discrimination is so strong that plaintiff makes a better case for summary judgment in favor of plaintiff, than defendant makes for its motion.

Regarding the retaliation claim, the opening brief contends there is no causal connection between plaintiff's complaint against Mr. Savage and her discharge. (Opening Brief [OB], 4). However, the evidence establishes there is a genuine issue of fact regarding that contention. Defendant's argument is based almost entirely on Fox's deposition testimony to the effect he wasn't friends with Savage, but there are many reasons to doubt Fox's credibility. Plaintiff, as the party opposing summary judgment, is entitled to all reasonable inferences that can be drawn from the relevant evidence. Ultimately, a jury must determine whether Fox's testimony is credible.

Regarding the disparate treatment claim, the opening brief argues no evidence in the record "disproves NCO's legitimate reason for terminating [plaintiff's] employment..." (Id.). The following statement of facts sets forth overwhelming evidence which demonstrates defendant's proffered reasons for the termination were pretextual.

2

## III.    STATEMENT OF FACTS

### A.    Introduction.

The case arises out of a charge of discrimination, based on retaliation and disparate treatment, filed by plaintiff against the defendant, her former employer. The opening brief points out that the charge resulted in a finding of "no cause" by the Delaware Department of Labor (DOL) (OB, 20), a fact which is inadmissible at trial for numerous reasons, but is evidently included in the brief to persuade the court the case has no merit. The DOL findings were based on wildly inaccurate and otherwise misleading information. For example, the defendant's Position Statement, prepared and filed with the DOL by counsel, claims Ted Fox could not have retaliated against plaintiff because he "was not involved in this investigation [of the plaintiff] or decision." (B-128). In fact, Fox actively investigated the matter and interviewed the witnesses who provided statements in support of the decision to terminate plaintiff's employment. At his deposition, Fox testified the Position Statement "is a misrepresentation of what my involvement was." (B-274). An example of misleading information provided in the Position Statement is Mike Scher's sworn statement which asserts: "At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds." (B-153). However, at his deposition, Scher admitted that Obenshain would not have given him any instructions about check handling policies because he did not have any function related to it. (B-423).

The defendant's credibility is suspect for other reasons. The opening brief relies heavily on the affidavit of Cherie Sugg (referring to it directly or indirectly seven times)

3

in which Sugg swears when she terminated plaintiff's employment: "Ms. Hue stated that Ms. Obenshain was instructing her to violate NCO's check handling policies and that Ms. Hue knew she was wrong when she did violate the policies." (B-175). The termination conversation had been tape recorded, but initially the court reporter could not transcribe it.[1] After defendant produced the Sugg affidavit, a technician examined the tape and fixed it. The tape was then transcribed. Nothing on it remotely supports Sugg's story. (The transcript is at B-178).

The opening brief also makes outlandish factual claims. For example, the brief contends that "All Dover collectors and administrative personnel, as well as the two managers who reported to plaintiff, confirmed that plaintiff instructed personnel to violate the policy [regarding re-depositing checks]." (OB, 5). The truth is only a handful of collectors were interviewed[2] and a number of deposition transcripts refute the brief's contention. Examples include: Rose testified the plaintiff never instructed him to violate any policy, including the check handling policy (B-421); McQuisten testified the plaintiff didn't ask him to do anything he considered to be a violation of the policy (B-356); Marlow testified her knowledge of the plaintiff not following policy was merely hearsay. (B-348).

Defendant's credibility is suspect for numerous other reasons explained below, and the case presents many issues of material fact which preclude summary judgment.

---

[1] See B-176, 184, and 186 for correspondence and affidavits which explain the transcription problem.

[2] Fox testified he selected the interviewees by seniority and because he knew them when he worked in Dover (B-263, 265). Obenshain identified Ken Rose, David McQuisten, Kim Marlow, Brad Reavis, Eric Shaw, Mark Lefevre, and Mark Lane as the witnesses Fox interviewed (B-387, 388).

B.    Debt collection jargon.

The discussion that follows employs these words which have these meanings:

(1)    NSF – Non-sufficient funds.  An NSF check is a check returned by the bank because of insufficient funds in the account.

(2)    Redip or Redep – Redipping or redepositing refers to resubmitting an NSF check for payment.

(3)    Postdate – A postdate check is a check accepted by the collector with the understanding that it will be deposited at a later date after the debtor has funded the account.  For example, the debtor might write or authorize a check by phone on December 1, to be deposited on December 8.

(4)    DCI – Debtor check information is information a debtor gives the collector, typically over the phone, to authorize the creation of a check.

(5)    EOM – End of month.

(6)    Producer – Collector.

(7)    Sandbagging – The collector withholds a debtor check for deposit until the next month because he thinks he has a better chance, based on monthly collections, of earning a bonus in the next month.[3]

C.    Plaintiff's position.

1.    The retaliation claim:

Plaintiff was a General Collection Manager (GCM) when she was fired, but in the year 2001 and before then the plaintiff worked in the Dover office as a debt collector.[4]  The general manager of the office was Bill Savage, who was appropriately

---

[3] Sandbagging is discussed in an e-mail by plaintiff (B-28).  On occasion, plaintiff directed the depositing of a check the collector didn't want deposited because she thought he was sandbagging.

[4] The opening brief contends Obenshain promoted plaintiff and fired her, but it was Ric Boudreau, and to a lesser extent, Phil Weaver, who were responsible for her promotion into management (Boudreau testimony; B-253, 254; B-258).  According to Fox's testimony the termination decision, was "executed" by Fox and "HR" (defendant's Human Relations department).  (B-266).  Fox said Obenshain, who was his subordinate, made the "recommendation" that plaintiff be terminated.  (Id.).

named. Eventually, he was fired for making racist and sexual remarks, and for sexual harassment (See the termination memo at B-166),[5] but not before he subjected the plaintiff and other subordinates to a barrage of offensive statements and unwelcome physical contact. Some of the plaintiff's problems with Savage are documented graphically in a memorandum to Fox (B-26), which she wrote at the request of management.

The Savage problems were discussed in a phone conversation which was taped, during which Ric Boudreau, then the Dover's GCM, advised Phil Weaver (Vice-President of the Commercial Division) and Fox of the extent of the problem. Among other things, Boudreau reported how Savage talked to the plaintiff about her breasts (B-17, 18, 19); that Savage referred to the office as a Tarzan movie set because of the number of African-Americans (B-21); and that Savage used racial epithets (B-12).

Weaver's reaction was ballistic; whereas Fox attempted to defend Savage. Although the transcript is somewhat unclear, Weaver apparently refers to a "racial epithet" as being "way off the charts;" whereas Fox says about it, "That is not our concern." (B-16). Fox tries to excuse the Savage comments about the plaintiff's breasts by claiming Savage and the plaintiff may have been joking, and implying that if you have a friendly relationship with a boss you deserve what you get ("Don't get comfortable with somebody. This is what you get.") (B-18).

---

[5] Defendant's Position Statement incorrectly claims Savage was terminated only for racist comments. (B-128). It also incorrectly claims the plaintiff "never reported that Mr. Savage sexually harassed her." (Id.)

It was Weaver who insisted the problems had to be documented (by the next morning) because he recognized it was a "serious issue." (B-19). Fox merely agreed to have it done:

> "MR. WEAVER:    I need that stuff documented and forwarded here first thing in the morning.
>
> MR. FOX:    Very good." (Id.).

Further, it was Weaver who chastised Boudreau for waiting too long to address the problem: "...but God damn. I mean if we have somebody making those type of litigious statements in our office, don't wait..." (B-24). Nothing on the tape indicates Fox was equally concerned.

Fox had worked in the Dover office with Savage. Fox recalled he had dinner with Savage once, might have played golf with him, and contacted him (on business) once after Savage left NCO, but he claimed that was the limit of their social contact. (B-261). The evidence suggests Fox's relationship to Savage was closer than he admits. The plaintiff attended one dinner with Fox and Savage in Dover or Rehoboth Beach, and had other opportunities to observe their relationship. She reported they had a very friendly relationship. (Plaintiff affidavit; B-242A). They had lunch together frequently; and plaintiff remembered Savage mentioning more than once that Fox was on a "fast track" and he (Savage) was responsible for helping him succeed. (B-242B). Plaintiff testified that, after Savage was fired, Fox would "not acknowledge" her when he visited the office or when she saw him on business trips. (B-277). She also testified that Ric Boudreau told her Fox "was not happy with what I [the plaintiff] had said about Bill [Savage]." (B-297).

7

Fox had relatively little contact with the plaintiff while he was in the sales department (Plaintiff testimony, B-277), but on December 24, 2003, he was promoted to vice president of the commercial division (Fox testimony, B-260), which gave him authority over plaintiff. Approximately one month later the plaintiff was fired. Fox personally interviewed collectors during the course of the investigation of plaintiff's alleged violations of the check handling policy. (B-262). When Rose provided Fox exculpatory information (See 4, supra) Fox obtained no written statement. Fox's decision to terminate only plaintiff's employment, while ignoring large numbers of other "violations" of the check handling policy, is discussed below.

Finally, the opening brief makes the point that plaintiff testified she didn't believe Obenshain discriminated against her (OB, 28 n. 8). However, it is clear from the context of the testimony, that plaintiff believes Fox was the person responsible for the discriminatory decision, not that there wasn't discrimination. (See B-297).

      2.    The check handling policy:

Defendant's inconsistent explanations of the check handling policy are detailed below. Plaintiff's understanding of the policy is discussed in her deposition and in an e-mail to Fox and Steve Leckerman, sent just before her termination (See B-28).

At one time NSF checks were redipped automatically (i.e., without attempting to verify the check would be good) (B-286). That policy is evidenced in a memo by Weaver, which ended the policy on February 24, 2003 (B-38). After that, each office exercised some discretion on when redeposits were made (B-281). Plaintiff's supervisor, Obenshain, left it up to each office to establish procedures, although there

were some administrative guidelines for resubmitting redeposit requests to the defendant's central office in Horsham (B-282). In the Dover office, an administrative assistant (first Jenie Birdsong and later Leigh Nickerson) would start the process by attempting to contact the bank to verify whether the account was funded to cover the check. (B-285). If bank verification could not be obtained, the collectors would attempt to contact the debtors to determine if the funds were available (B-286, 287). Subsequently, collectors would fill out forms (redip forms) containing information to justify redippping the check (B-302). Birdsong, the plaintiff's administrative assistant up to September, 2003 and a current defendant employee, testified she submitted the NSF checks for payment to the defendant's central office only after the GCM (plaintiff) signed off on the redip form. (B-243A-245). At meetings towards the end of the month (EOM), the GCM and the collectors would meet to review checks which could be redeposited and the justification for so doing. (plaintiff deposition, B-289).

At times, the GCM or Obenshain, who occasionally was directly involved in directing redips, exercised discretion when approving redips. If the debtor couldn't be contacted, "collector gut," as Obenshain referred to it, was used (plaintiff deposition, B-282). Sometimes, Obenshain would ask questions about the history of the account to determine whether to redip (B-287).

At other times, Obenshain would direct all the NSF checks to be redeposited. (Id.). In such cases, verification wasn't required. Both Jenie Birdsong and Kimberly Marlow, current defendant employees, testified they heard Obenshain tell plaintiff to "put all the checks on" or words to that effect. (B-246; B-344). Specifically,

9

Marlow said: "Kathy [Obenshain] would tell her [plaintiff] to get them [the checks] all on...That was her famous words." (B-344). Obenshain testified that the phrase "get them all on" means to resubmit the checks without verification. (B-400).

      3.     The audit:

          Dina Loft conducted an audit of all NSF checks in all of the defendant's offices for the month of December, 2003.[6] As explained below, information resulting from the audit was Fox's alleged principal basis for the decision to terminate plaintiff. However, plaintiff was on vacation in the latter part of December, 2003 (B-280). In her absence Eric Shaw ran the December, 2003 EOM check review process. The plaintiff had instructed Shaw on the process, though she later faulted herself in the memo to Fox/Leckerman for not making it clearer that he needed to use the redip forms for verification purposes (B-28). Contrary to defendant's suggestion in its Position Statement (B-126, 127), plaintiff received no end of month (EOM) bonus for December, 2003 (plaintiff affidavit, B-242B).

          In January, 2004, Obenshain gave plaintiff information related to the audit results and asked her to review it. (plaintiff affidavit, B-279). Plaintiff learned then that Shaw hadn't used the redip forms (Obenshain testified they weren't necessary anyway (B-387)), but otherwise found that the only significant problem was that Mark Lane had falsified the amount of a check (an issue unrelated to the redipping of an NSF check). (B-28, 279, 280). She determined that by calling the debtor in the presence of Birdsong and

---

[6] "Loft" is an alias; her real name is Shaantiel," but this brief refers to the witness as "Loft" because that name appears most frequently in various documents.

Nickerson, and the debtor told her the check was not authorized. (B-279; Birdsong deposition, B-250). Plaintiff then fired Lane.[7]

Plaintiff did not violate any check handling policy or instruct anyone to violate any policy. (plaintiff deposition, B-292, 293). Moreover, the record reflects plaintiff wasn't responsible for any NSF check handling problem that predated the December 2003 audit. That month was when Shaw, not plaintiff, ran the EOM check review. Birdsong testified she reviewed redip forms after the GCM approved them, and she was unaware of any violation of defendant's policy regarding redipping of NSFs (B-246).[8] Weaver testified that when he was the vice president of collections he kept a "set of metrics" that showed by branch (office) what percentage of checks came back NSF, and he could tell from that whether "something outside the norm" had happened (B-535). He also testified that, because he left in December 2003, his metrics would have "absolutely" revealed any problem through October, 2003 (B-540). Plaintiff didn't run the EOM checks in December 2003 or November 2003 (Marlow ran the EOM checks to be redeposited in November 2003 because plaintiff was in the hospital (Obenshain deposition, B-385).

D.    Defendant's statements re violations of check handling policy.

Plaintiff's interrogatories asked defendant what check handling policy plaintiff allegedly violated. Plaintiff asked for the policy document, if it was in writing; if not, she

---

[7] The opening brief cites Lane's testimony several times to support its position. In addition to being fired for falsifying a check, Lane has a conviction for public urination on his resume. (B-315).
[8] Birdsong was the administrative assistant until September, 2003 (B-243A). She thought the Lane problem might have been a redip problem but he was fired for check falsification. (B-246).

asked for an explanation of the policy. Defendant's responses initially indicated the policy was in writing.[9] Later, defendant admitted:

> "It is NCO's position that plaintiff was terminated for violating and/or directing others to violate NCO's policies prohibiting the automatic re-deposit of NSF checks. See Exhibit A. NCO acknowledges that the written outline for redipping NSF checks within Exhibit A does not contain the specific procedure that collectors are expected to follow to obtain debtor authorization and attempt to obtain bank verification that funds are available. However, Exhibit A is clear that NCO policies prohibit the automatic re-dipping of NSF checks." (emphasis added) (B-221).

Nearly all, if not all, the audit problems (discussed below) which Loft allegedly uncovered, dealt with verification issues. Thus, plaintiff attempted in discovery to identify the so-called "specific procedure" (referenced in the discovery response) required for verification. Numerous inconsistent explanations were supplied. Kim Marlow, a collector and current defendant employee, testified even if the bank verified the funds, the debtor would have to be contacted for verification (but the GCM could approve the redip if the debtor couldn't be contacted) (B-326). David McQuisten, a collector and current defendant employee, testified the policy was verification could be with the bank or the debtor and that he contacted the debtor first. (B-350). Brad Reavis, a collector and current defendant employee, testified the policy was the check could be redipped only if there was bank verification or a certified check, but sometimes a manager would approve a redip if the debtor said they "were putting the money in." (B-413). Ken Rose, a current defendant employee, said verification could be with the bank

---

[9] See B-208. The answer to Interrogatory 5 (which asks for an explanation of the policy if not in writing) refers plaintiff to the answer to Interrogatory 4 (the request for the documents).

or debtor, but for the latter the debtor had to "qualify the source of the funds," i.e., solicit a debtor statement that explained the funds would be good.  (B-418).  He also testified a check couldn't be redeposited without using the redip form.  (B-419).  Dina Loft, a current defendant employee, who presumably needed to know the policy to perform the audit, discussed below, testified the policy was bank verification had to be attempted first and, if that failed, debtor verification was attempted.  (B-444).  Further, according to Loft, an attempt was made to obtain from the debtor some proof the funds were good (such as a deposit slip) (Id), but the manager had discretion to approve the redeposit even if debtor provided no proof.  (B-446).  Phil Weaver testified the GCM had discretion to approve a redip, based on what the debtor said (B-527, 528).  He also testified no verification process for a postdate check was required, but was required for an NSF check.  (B-529).[10]

Obenshain testified the policy required debtor verification if you couldn't get bank verification, and it wasn't acceptable to get debtor verification without attempting bank verification.  (B-368).[11]  Bank verification was required first. (Id.).  She said the debtor wasn't asked about the source of the funds (B-370, 371).  However, it wasn't enough for the debtor to state the funds were there; proof had to be supplied in the form of a deposit slip; a conference all between collector, debtor and the bank; or overdraft protection.  The check couldn't be redipped without one of those forms of verification (B-375-377).  Also, the GCM had to approve all redips and couldn't approve a redip

---

[10] Obenshain testified the verification process for postdates and NSF checks was the same.  (B-379-380, 401).  The Loft audit addressed postdate check problems (see discussion below).

[11] Obenshain's understanding of the policy carries special relevance because, as explained below, defendant relies heavily on her analysis of the check handling policy violations.

based on a debtor statement alone. (B-371; 376-377).    Moreover, the information supporting verification had to be inputted by the collector into the computer account (B-367, 376).    It was the computer accounts which both Loft and Obenshain used to assess whether the check handling policies had been followed.    Their assessment is discussed below.

Various documents cast additional doubts about what check handling verification policy was in effect when the audit was done in December, 2003.    There are numerous written policies about check handling practices, but none of them states Obenshain's version of the check verification policy.    Examples include a March 4, 2003, memo from Bette Capaldo to Weaver which explains the redeposit procedure (B-37).    The memo was forwarded by Weaver to the GCMs with the statement, "The following outlines the policy for re-deposit of NSF checks.    Read carefully and adhere accordingly."    (Id.).    Less than two weeks earlier Weaver stopped the automatic redip policy and stated, by memo to the GCMs and others, "Shortly I will be publishing a process for collectors to utilize for re-deposit of items only returned on a case-by-case basis."    (B-38).    The Capaldo memo which followed (and which Weaver forwarded to the GCMs) doesn't contain Obenshain's deposition explanation of the policy.

A July 15, 2003 memo form Brian Laiche, a GCM in the Metairie office, to Obenshain advises her how his office is going to address the "EOM (end of month) check verification process."    (B-43).    The memo reflects that GCMs exercised discretion for establishing policies.

14

A December 3, 2003 memo from Loft states "I had several managers call me in the last week of the month questioning 59 (a code for NSF checks, see B-426) checks and what the criteria was [sic] to determine the destroy or nonposting of an item? [sic]  Here is what I go by..."[12]  (B-45, 46).  What follows is detailed information, some of which relates to bank verification and debtor contacts, but none of which states the Obenshain explanation of the policy. (Id.)  Obenshain forwarded the memo to the GCMs on January 30, 2004, by an e-mail stating, "Please know and understand thanks." (Id.).

On January 19, 2004, a few days before plaintiff's termination, Obenshain sent Loft a memo under a subject heading titled "Check Verification Policies" which explains the verification process (See B-48).  The memo discusses bank and debtor verification in detail, but nothing about requiring debtor verification in the form of a deposit slip or bank conference call.  The memo reflects the GCM had discretion-"Any check that does not verify is given to the immediate manager, who is to make a decision about whether or not to run [deposit] the check." (Id.).

During the latter part of January 2004, more memos related to check verification were generated, suggesting that the problems with the verification policy were not isolated to one GCM (the audit results, discussed below, reflect widespread non-compliance with the policy).  New policies were announced (by Obenshain) regarding her review of re-dips over $500, etc. (See B-49); a January 20, 2004 memo to "All Collectors" states bank verification (not just an attempt to verify) is required for NSF

---

[12] Plaintiff's 1-22-04 e-mail to Fox/Leckerman points out, "I am being disciplined because the direction from upper management was not clear on numerous occasions." (B-29).  That "several managers" called Loft asking about the NSF policy in late November 2003 supports plaintiff's statement.

redeposits (B-52); and a January 21, 2004 Fox/Obenshain memo reinstates an approval process for DCI checks (B-53).

The most significant documents related to the check verification process, however, are the NSF report and computer account notes (Fact Sheets) discussed in the next section.

E.    The Loft audit.

Loft a current defendant employee, testified that Leckerman, the senior vice president of operations, asked her to audit all the NSFs "across the board" to "make sure that we were following policy." (B-425A).[13]  Specifically, Leckerman asked her to see if the banks and debtors were contacted and the accounts documented accordingly. (B-426). Loft testified she audited all the collectors in all of defendant's offices (B-439).  The audit covered all accounts that came back NSF, "whether it was a redep or not, to determine if we had made contact with the debtor or followed the proper procedure to do so." (B-427).  Consequently, postdate checks that came back NSF were picked up in the audit. (B-443).

Loft didn't review the redip forms used to explain the justification for redipping NSF checks which were signed off by the GCMs. (B-438).[14]  Instead she reviewed so-called "Fact Sheets," that contained detailed account information, recorded in and retained by computer.  That information was inputted by the collectors and is supposed to

[13] The defendant's Position Statement represented that Loft's audit was a "routine audit" (B-126) which was untrue; Weaver (who was there until December 2003) testified the commercial division didn't "run audits to check regarding whether NSF checks were being properly put into the system." (B-535).
[14] Defendant failed to retain and produce in this litigation the redip forms which would have provided information important to plaintiff's case.  Plaintiff testified how the forms would show she complied with the redip procedure (B-302).  A jury instruction will be requested regarding the resulting presumption.

track various events, including debtor verification documentation. (B-444, 445). As Fox put it, "if it's not documented [in the computer], it didn't happen" (B-264).

If the Fact Sheets reflected a problem with the NSF check handling process, Loft recorded it on an NSF report which also identified Loft's assessment of the "root of problem," i.e., whether it was the collector's fault or the debtor's. (Id.) The NSF report reflects that collectors in numerous offices failed to follow verification policies (B-79-88). For example, the first two pages (B-79, 80) lists eleven accounts in the Atlanta office which the report indicates were collector problems.[15] Although space does not allow for a detailed analysis of the NSF report and the Fact Sheets, a few examples illustrate (1) how alleged check handling verification policy was not followed in offices other than Dover's; and (2) that Loft's assessment incorrectly faulted Dover collectors for problems they didn't cause and failed to fault collectors of other offices for problems they did cause. Consequently the NSF report doesn't accurately portray the relative amount of "wrongdoing" in each office. That is relevant, in part, because Obenshain testified she reviewed all the accounts and Fact Sheets (B-383), and Loft testified it was Obenshain who determined what violations were committed (B-441, 446). Thus, the following examples illustrate that Obenshain's review of the accounts should have revealed that other offices engaged in a substantial amount of "wrongdoing," and even more than suggested by the NSF report.

---

[15] The Atlanta office is identified by the fifth column, titled "Unit." The first letter in the unit identifies the location. "A" represented Atlanta.

17

1.     The Fact Sheets at B-92-95 comprise Loft deposition Exhibit 13.  The account no. at the top of B-92 is S78713; it is the first account listed in the NSF report at B-79.  The NSF report identifies the unit as A11, which is the Atlanta office (the first letter in the unit identifies the office).  Loft testified that the collector didn't follow the verification policy three times on that one account.  (B-448, 449).  The account illustrates offices other than Dover didn't comply with the verification policy.

2.     The Fact Sheets at B-99-101 comprise Loft deposition Exhibit 15.  The account no. is S13415, and the NSF report (at B-79) reflects it is an Atlanta office account.  Loft testified the collector improperly submitted a check because the debtor had informed him before submission that the check wouldn't be good.  (B-452).  Again, the account illustrates noncompliance by the Atlanta office.

3.     Another Atlanta office collector "ran" (submitted) a check she knew was not going to clear in account no. R49535 (See B-102, B-79, B-452).  The same collector violated the verification policy in account number S09400 (See B-104, B-80, B-452).  Again, the account illustrates noncompliance by the Atlanta office.

4.     For account no. S85957, the NSF report indicates the <u>debtor</u>, not the (Atlanta office) collector, was the root of the problem.  (B-80).  The Fact Sheets reflect that a postdated check was given on 11-18-03, dated 1-1-04, and came back NSF on 1-9-04 (Loft deposition, B-456).  No bank or debtor verification was undertaken.  (Id.).[16]  The

---

[16] Loft testified the verification wasn't required if there was no NSF history (Id.), but Obenshain testified the postdate verification policies were the same as the NSF policies. (B-401).

18

account illustrates Atlanta office noncompliance <u>and</u> the NSF report's understatement of the Atlanta problem.

5.      For account no. S60834, the NSF report indicates the <u>debtor</u>, not the (Atlanta office) collector, was the root of the problem. (B-80).  Again a postdate check was taken, and deposited nearly a month later without any bank or debtor verification (B-48) (the testimony concerns Loft deposition Exhibit 20 (B-452), which are Fact Sheets appearing at B-112).  Loft conceded it could have been a collector problem (Id.), and agreed the collector was required to put into the computer information showing bank and debtor verification.      (B-457).      Again, the account reflects the NSF report's understatement of the Atlanta problem.

6.      For account no. T16561, the NSF report indicates the root of the problem was the <u>debtor</u>, not the (Atlanta Office) collector. (B-79).  The Fact Sheets comprise Loft deposition Exhibit 21 (B-115).  The account notes reflect a check was posted on 12-17-03 without the requisite verification, and Loft conceded the collector should have verified with the debtor that the check was going to be good (B-460).  Again, the account illustrates the NSF report's understatement of the Atlanta problem.

7.      For account no. T14251, the NSF report reflects the (Dover office) "collector/debtor" was the root of the problem. (B-83).  However, the Fact Sheets (Loft deposition Exhibit 22; B-118) reflect the collector obtained <u>bank</u> verification (precluding the need for debtor verification) and submitted the redip form the next day.   (Loft deposition, B-461).  Loft testified there was no problem with the redip "at this point," but goes on to assert unpersuasively that the account notes were vague about resolution of a

problem that surfaced after the redip. (B-462). The account illustrates the NSF report overstates the Dover office problem.

8. For account no. S51701, the NSF report indicates the (Dover office) collector was the root of the problem. (B-83). The Fact Sheets at B-120 (Loft deposition Exhibit 23) reflect the collector received authorization from the debtor to submit the check, which the collector submitted right then (Loft deposition, B-462). Loft lamely testified she flagged it as a collector problem because it didn't make sense to her that a collector would call the debtor back 15 minutes after he couldn't reach the debtor the first time. (B-463). Again, the account reflects the NSF report overstates the Dover office problem.

F.    The Obenshain investigation.

Obenshain was defendant's vice president of collections for the commercial division from 2002-2004.[17] (B-359). When she was with defendant, her division had approximately 300-400 employees. (B-362). She reported to Weaver, until he was replaced in Fox in December 2003 (Id.). Other than plaintiff, the only GCM she was involved in firing was the Chicago GCM who is also African-American (B-365, 406).

Loft gave the NSF report (Exhibit 15, B-79) to Obenshain. Obenshain investigated, and then gave Loft information to put into a policy violation report (B-441; the report is at B-89). Obenshain testified she used the Loft spreadsheet and personally investigated every account in all the offices, by reviewing the Fact Sheets (B-383, 384,

---

[17] Obenshain currently works for another collection company, but testified defendant's counsel, David Israel, has been a friend of hers for many years (B-361), and that she spent 3.5 hours before her deposition reviewing documents and discussing the case with him. (B-359-360).

406). The accounts reviewed dealt only with the December 2003 checks (B-384), the month when Shaw handled Dover's EOM check handling process. Obenshain made clear that the check verification required the collector to input the verification information into the Fact Sheets. (B-376, 377).

According to Fox, Obenshain's review was the critical part of the investigation that resulted in plaintiff's termination:

> "...the heavy weight came from what Kathy was doing. Kathy's recommendation and Kathy's investigation to the files, to the checks, that's truly what pushed it over the edge to really go the way we went.
>
> Q.    So you didn't think the [witness] statements had much importance regarding - - relatively didn't have much importance to the termination decision?
>
> A.    The statements for me showed that there was multiple people saying the same that - - that - - in my opinion, there wasn't a way that that many people would be blind, if that is the right word for it. But that's - - those are just statements and opinions of those people. What I really had to rely on, again, was what Kathy had been investigating on the files." (B-264).

Thus, Fox downplayed the significance of the witness statements (and questioned them as mere "opinion"), and attributed the termination decision to Obenshain's investigation of the Fact Sheets.

G.    The Fox investigation.

Fox interviewed a handful of Dover collectors, and obtained written statements from those he thought would help justify termination (but not from those who provided exculpatory information, such as Rose). Perhaps the most important witness statement is Shaw's. It acknowledges the plaintiff instructed him to review the NSF checks with the collectors to locate additional fee (B-143). It also states he exercised judgment on which

21

NSF checks to submit, and that such EOM practices had been going on for as long as he could remember (and were followed by past managers). The statement is consistent with plaintiff's understanding of the policy, and inconsistent with Marlow's written statement (B-141), suggesting that plaintiff instructed Shaw to redeposit all the checks without verification. Obenshain's sworn statement (B-155) claims she never instructed plaintiff to redeposit checks without verification, but her testimony and the Birdsong/Marlow testimony discussed, supra, at 9-10, undermines the credibility of the affidavit. They said Obenshain told plaintiff to "get them all on," which Obenshain testified meant redipping without verification.

  H. Outcome of the audit/investigation.

  Although Loft's audit encompassed all collectors, company-wide, and Obenshain's review examined all the accounts in Loft's NSF report, only three individuals received any discipline, namely the plaintiff who was fired; Matt Lane who plaintiff fired when plaintiff determined he had falsified the amount of a check; and Eric Shaw who was demoted. (Fox testimony, B-272; Defendant's counsel letter, B-239). Defendant's disciplinary response to the problems uncovered by the audit should be considered in the context of the following facts:

  (1) Plaintiff was the only African-American GCM and only female GCM employed by defendant in January 2004 (plaintiff affidavit, B-242B);

  (2) Cherie Sugg testified even "very minor" violations (ones "that were not deemed very serious") of a defendant policy were subject to disciplinary action

(B-483); and violation of well known policies by experienced employees would generally start at a relatively high level of discipline (B-486);

        (3)    Weaver referred to collector failure to follow the check verification process as "one of the ultimate sins," and testified collectors were terminated for doing it (B-533, 534);

        (4)    Fox testified: he received Loft's "list of NSF checks by branch" (office) (B-270) (proving he had ample reason to know there were multiple violations in other offices); and the redepositing of NSF checks required GCMs to review the verification documentation and approve the redips (B-272) (proving he knew GCMs had accountability for the violations);

        (5)    Obenshain testified: the GMC had to review and approve all redips, and the collector would be at fault (if the check came back NSF) if he had falsified the computer notes (on which the GCM relied for approval) (B-380, 381); the only examples of where the collector would be at fault for an improper redip are where he falsifies the computer information or arbitrarily deposits NSFs at the direction of his GCM (B-382); she reviewed the role of GCMs in other offices regarding the violations (B-406); collectors were disciplined for violations of the check verification process for redips of NSF and postdates (B-380); she was in a position to know in January 2004 there were violations of the check handling policy in offices other than Dover (B-406); she was upset when she learned collectors in other offices violated the policies (B-409); all the collectors knew the policies (B-410); and intentional violations by collectors were punished by "up to and including termination" (B-381);

(6)    Fox testified that "one violation" of policy justified plaintiff's termination because "there's a no tolerance policy that this organization has...When you work for NCO, if you violate the rule of posting money that should not be posted one time - - you could have worked here 25 years or 25 days - - you're going to get terminated." (B-270).

(7)    Fox testified he was aware at the time of the plaintiff's termination that Shaw ran the EOM redip check process for December 2003, which was the month covered by Loft's audit. (B-270). He testified it would not have been relevant to look at any previous month during which plaintiff actually ran the EOM process herself, and that the prior (to December 2003) record of plaintiff wasn't relevant (Id.).

(8)    Finally, Obenshain testified plaintiff was a good manager and able to perform her job capably (B-393, 394).

## IV.    ARGUMENT

### A.    Plaintiff states a prima facie case for retaliation, and the evidence reflects there are genuine issues of material fact which preclude summary judgment.

On a motion for summary judgment, the moving party has the burden of proving the truth of what it asserts is clear; it must "[demonstrate] a right to judgment with such clarity as to leave no room for controversy and [show] affirmatively that the opposing party cannot prevail under any circumstances." Wright, Miller & Kane, Federal Practice and Procedure:  Civil 3d §2725, Vol. 10A, pp. 426-427; 455, citing, inter alia, Ely v. Hall's Motor Transit Co., 590 F.2d 62 (3rd Cir. 1978).  The opposing party is given the benefit of all favorable inferences that can be drawn from the evidence.  Id. at 459. Facts asserted by the opposing party are regarded as true if supported by evidentiary material.  Id. at 461-462.  Moreover, "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."   (Id. at 443, citing Advisory Committee Note to Rule 56 1963 amendments).

The critical factual issue regarding plaintiff's retaliation claim is whether Fox's decisions related to the investigation and termination of plaintiff were motivated by plaintiff's complaints against Savage.  Plaintiff must establish a causal link between the protected activity and the discharge. Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir 1997).  The opening brief suggests plaintiff's problems with Savage weren't a significant reason for his termination because it was "After Mr. Savage had already been terminated," that plaintiff provided her written statement. (emphasis in original) (OB, 9).

25

However the Boudreau, Fox, Weaver transcript contains substantial discussion about the plaintiff's problems with Savage. The conversation precipitated Savage's termination the next day. The tape also reflects that it was Weaver, not Fox, who demanded that written statements be procured (B-19). Fox attempted to defend Savage's treatment of plaintiff. (B-18).

Nearly all of defendant's argument rests on testimony Fox gave at his deposition. There he claimed he hadn't been friends with Savage; hadn't socialized (much) except for dinner and possibly golf; had recommended (along with Weaver) that Savage be terminated; and that it was a "no brainer" to fire Savage. (See OB, 10-11).

Fox's credibility is certainly important. This is a defendant which, through counsel, filed a Position Statement with DOL asserting Fox played no role in the plaintiff investigation or decision, an assertion Fox himself characterized as a "misrepresentation" (understandably so given the quantity of evidence reflecting that Fox was heavily involved in the investigation). It is a defendant which has provided an affidavit from the head of its human resources department claiming plaintiff admitted her wrongdoing when the witness terminated her, although the transcript shows nothing of the kind. This is a defendant who in the opening brief claimed "All Dover collectors...confirmed plaintiff instructed personnel to violate the policy (OB, 5)," when in fact some of the collectors who were deposed swore to just the opposite.

Defendant wants (and needs) but is not entitled to a presumption that Fox is telling the truth. However, as indicated above, it is the party who opposes a motion for summary judgment that is entitled to the presumption that its evidence is true. The

following evidence raises doubt about Fox's credibility; thus, a jury should have an opportunity to observe his demeanor, etc.:

      1.    Plaintiff testified that Fox ignored her in Dover and when she saw him on business trips, after Savage was fired; and that Boudreau told her Fox was unhappy with what plaintiff had said about Savage. Plaintiff's affidavit states she observed Fox and Savage were friends, went to lunch together, and that Savage boasted he was responsible for Fox's progress;

      2.    Fox admitted he had at least some social contact with Savage outside the office (dinner and possibly golf);

      3.    Fox attempted to defend Savage's treatment of plaintiff when Boudreau brought it to Weaver's attention;

      4.    Plaintiff was fired soon after Fox was in a position to do it;

      5.    Fox personally conducted the "witness" interviews and disregarded information (e.g., Rose's) that benefited plaintiff.

      6.    Fox received Loft's report of violations company-wide and Fox knew GCMs were accountable for overseeing the check handling verification process;

      7.    Obenshain testified collectors knew the policy and she was upset when she learned collectors in other offices had violated the policy.

      8.    Sugg testified even minor violations of policy were subject to discipline and Weaver testified violation of the check handling policy was the "ultimate sin." Fox testified if you violate the rule of posting money that shouldn't be posted just one time you are going to get terminated;

9.    Fox didn't discipline a single employee in any other office;

10.    Plaintiff was the only employee fired, except Lane who was terminated (by plaintiff) because he falsified the amount of a check, not because he violated the check verification policy.

11.    Fox was aware plaintiff didn't conduct the EOM check review for December, 2003, the month covered by the audit, but said it wouldn't have mattered if a review of the previous months showed plaintiff had followed the policy.

12.    Fox testified he didn't rely much on the witness statements, but did rely "heavily" on Obenshain's review of the account notes.

The opening brief argues the passage of time between plaintiff's complaints against Savage and her termination preclude the retaliation claim, but in Woodson, supra, the court states, "We have also held that the 'mere passage of time is not legally conclusive proof against retaliation' *Robinson v. Septa, 982 F.2d 892, 894 (3rd Cir. 1993)...*" Id. at 920.  Moreover, because Fox wasn't in a position to terminate plaintiff until shortly before she was terminated, the passage of time between Savage's termination and her's has little relevance.

B.    Summary judgment is inappropriate because the evidence reflects there are genuine issues of material fact concerning defendant's real reasons for terminating plaintiff's employment.

The opening brief references McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) for the proposition that plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination or retaliation."  (OB, 26, 27).  Of course, such

28

standard of proof would apply to the jury's determination, not the motion for summary judgment which requires the moving party to show clearly there are no genuine issues of fact.

>    The opening brief argues:

>    "Plaintiff's theory is without merit because the undisputed evidence establishes that in January 2004, Dover had more NSF checks due to 'collector error' than any other commercial office, and only Dover had NSF checks caused by 'management' instructions, as documented in the relevant account notes. *See* Composite Exhibits P and Q." (OB, 27).

It is difficult to follow the argument because the quoted sources "Exhibit P and Q" are long excerpts from deposition testimony, and the brief fails to cite any specific passages supporting the statement. In any event, plaintiff obviously does dispute whether Dover had more NSF checks due to collector error than other offices, which is why it went to the trouble at Loft's deposition to show she mischaracterized the extent of the Atlanta and Dover problems by incorrectly attributing collector/debtor error. In fact, Loft's analysis places her credibility in doubt.

However, the critical question is not which office had the most NSF check problems, but why plaintiff, perhaps the least culpable of the GCMs because of her absence from the office in December 2003, was the only one disciplined. In L.N. McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273 (1976), the Court held discipline that is meted out unevenly gives rise to a discrimination claim even where the race treated unfavorably is white.

The opening brief also argues ("Even if the NSF report was incorrect") because Obenshain allegedly hired and fired the plaintiff, the "same actor" defense applies. (OB,

27, 28). The brief cites <u>Waldron v. SL Indus., Inc.</u>, 56 F.3d 491, 496 (3d Cir. 1995) for its argument. However, <u>Waldron</u> states:

> "..we agree with the position advanced by the Equal Employment Opportunity Commission as amicus curiae: 'Where, as in <u>Proud</u>, the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the fact finder that it should not find discrimination. But this is simply evidence like any other and should not be accorded any presumptive value." Id. at 496 n. 6.

Here Obenshain wasn't the hirer or firer (and plaintiff wasn't fired shortly after her promotion), and it will be up to the jury to determine what her roles and motivations were. If she truly had been the decision maker, it is certainly hard to understand why she was upset to learn collectors in other offices were intentionally violating the policy and none of them was disciplined. Likewise, it is hard to understand why the GCMs were not held accountable for allowing checks to be deposited without the proper verification.

Finally, the last two paragraphs of the opening brief each reference plaintiff's alleged admission of wrongdoing. Perhaps the defendant believes it should close on what it hopes is its strongest point. Unfortunately, Ms. Sugg's affidavit and the transcript which refutes it merely illustrate the great extent to which the case raises credibility issues which must be decided by the jury.

## V.    CONCLUSION

For the above stated reasons, plaintiff respectfully requests the court deny defendant's motion for summary judgment.

Respectfully submitted,

PARKOWSKI, GUERKE & SWAYZE, P.A.

By:  _____

JEREMY W. HOMER, ESQUIRE
(Delaware Bar ID#0413)
116 W. Water Street
P.O. Box 598
Dover, DE  19903
(302) 678-3262

DATED:  May 15, 2006                    Attorneys for Plaintiff

31