# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VALERIE HUE, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 05-225-KAJ |
| | ) |
| v. | ) |
| NCO FINANCIAL SYSTEMS, INC., a | ) |
| Delaware corporation, trading as NCO | ) |
| FINANCIAL COMMERCIAL SERVICES, | ) |
| | ) |
| Defendant. | ) |

# VOLUME I

## APPENDIX TO
## ANSWERING BRIEF OF PLAINTIFF VALERIE HUE
## IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

PARKOWSKI, GUERKE & SWAYZE, P.A.

By:   JEREMY W. HOMER, ESQUIRE
      (Delaware Bar ID#0413)
      116 W. Water Street
      P.O. Box 598
      Dover, DE 19903
      (302) 678-3262
      Attorneys for Plaintiff

DATED: May 15, 2006

## TABLE OF CONTENTS

**PAGE**

Charge of Discrimination..............................................................................B-1

Transcript of Conversation of Rick Boudreau, Phil Weaver and Ted Fox.......................B-2

Valerie Hue Memo to Ted Fox dated 10-15-01 ...............................................B-26

Valerie Hue Employee Change Authorization dated 4-18-02 ........................................B-27

Valerie Hue e-mail to Steve Leckerman and Ted Fox dated 1-22-04 ...........................B-28

Jeremy Homer letter dated 3-23-06 ...............................................................B-30

Delaware Department of Labor fax dated 4-06-06 re certified mail receipt..................B-31

Matthew Lane Job Discussion Summary dated 1-20-04 ...............................................B-33

Valerie Hue Memorandum to Kim Marlow and Kathy Obenshain dated 1-5-04..........B-34

Kathy Obenshain Memorandum to GCMs dated 12-15-03 ...........................................B-35

Phil Weaver Memorandum to all Collectors dated 6-5-01 ...........................................B-36

Phil Weaver e-mail to Commercial Ops Mgrs dated 3-25-03 ........................................B-37

Steven L. Winokur Memorandum to All Collections Management, et al.
dated 3-12-03 ........................................................................................B-39

Brian Laiche Memorandum to Kathy Obenshain dated 7-15-03 ...................................B-43

Kathy Obenshain e-mail to Brian Laiche and Commercial Ops Mgrs dated 8-20-03 ...B-44

Kathy Obenshain e-mail to Commercial Ops Mgrs, et al. dated 1-30-04......................B-45

Kathy Obenshain e-mail to Dina Loft dated 1-19-04 ...................................................B-47

Kathy Obenshain e-mail to Dina Loft dated 1-19-04 re check verification policies.....B-48

Kathy Obenshain Memo to Ginden, Leckerman, Loft dated 1-22-04 ...........................B-49

**TABLE OF CONTENTS**
**CONTINUED**

PAGE

Kathy Obenshain e-mail to Commercial Ops Mgrs, Kim Marlow dated 2-4-04...........B-50

Steve Hallam Memorandum to all Collectors dated 1-20-04 ........................................B-52

Ted Fox and Kathy Obenshain Memorandum to all Employees dated 1-21-04...........B-53

Phil Weaver Memorandum to General Collection Managers dated 7-13-00 ...............B-54

Peter Buggeln Memorandum to all Sales and Collection Managers dated 1-16-02......B-55

Kathy Obenshain Memorandum to all GCMs dated 4-4-02.........................................B-56

Phil Weaver Memorandum to all Salespeople dated 4-24-02 ......................................B-57

Mike Scher and Valerie Hue notice  re accounting closings dated 5-6-02....................B-58

Kathy Obenshain Memorandum to General Collection Managers dated 10-18-02 ......B-59

Phil Weaver Memorandum to all Managers dated 10-25-02.........................................B-60

Phil Weaver Memorandum to all Sales & Collection Managers date 10-29-02...........B-63

"Sales Dover" e-mail to Michael Scher and Valerie Hue dated 10-30-02 ...................B-64

Elizabeth K. Fite letter dated 3-3-06..........................................................................B-65

Loft NSF Report .......................................................................................................B-79

Loft Policy Violations Report.....................................................................................B-89

Fact Sheet – The Millwork Group .............................................................................B-92

Fact Sheet – Golden West, Inc...................................................................................B-96

Fact Sheet – Dynamics High Tech..............................................................................B-99

Fact Sheet – Atlantic Constr & Restoration...............................................................B-102

Fact Sheet – A – 1 Medical.......................................................................................B-104

### TABLE OF CONTENTS
### CONTINUED

<u>PAGE</u>

Fact Sheet – All Seasons Sports.................................................................B-106

Fact Sheet – Marv The Plumber ................................................................B-109

Fact Sheet – Fairview Radiology................................................................B-112

Fact Sheet – Glaze Wrecker Service..........................................................B-115

Fact Sheet – Caloosa Contracting ..............................................................B-118

Fact Sheet – Top Notch Automotive ..........................................................B-120

Fact Sheet – DX Radio Systems .................................................................B-122

Mayas S. Dabit letter to Trina R.D. Wheedleton dated 6-28-04.................B-125

Ted Fox and Kathy Obenshain Memorandum to all Employees dated 1-21-04.........B-131

Kathy Obenshain Memorandum to all General Collection Managers dated 8-2-02 ...B-132

Complaint Procedure ...................................................................................B-133

Dave McQuisten fax and witness statement to Kathy Obenshain dated 1-21-04.......B-134

Mark LeFevre fax and witness statement to Kathy Obenshain dated 1-21-04 ...........B-136

Brad Reavis fax and witness statement to Kathy Obenshain dated 1-21-04 ..............B-138

Kim Marlow fax and witness statement to Kathy Obenshain dated 1-22-04 ..............B-140

Eric Shaw fax  and witness statement to Kathy Obenshain dated 1-22-04 ................B-142

Valerie Hue Job Discussion Summary Form dated 1-28-04 ........................B-144

Valerie Hue Job Discussion Summary dated 9-23-02 .................................B-145

Brian Laiche Sworn Statement dated 6-28-04 ............................................B-146

Darrin Deech Sworn Statement dated 6-22-04 ...........................................B-147

# TABLE OF CONTENTS
## CONTINUED

**PAGE**

Steve Ross Sworn Statement dated 6-22-04 ................................................................B-148

Chris Santasiero Sworn Statement dated 6-22-04 .......................................................B-149

Lenny Ciccarone Sworn Statement dated 6-22-04 ......................................................B-150

Manny Cardozo Sworn Statement dated 6-24-04.........................................................B-151

Joe Batie Sworn Statement dated 6-22-04 ..................................................................B-152

Mike Scher Sworn Statement dated 6-24-04 ...............................................................B-153

Joe Thomas Sworn Statement dated 6-24-04...............................................................B-154

Kathy Obenshain Sworn Statement dated 6-24-04 ......................................................B-155

Matthew Lane Job Discussion Summary dated 1-20-04 ..............................................B-156

Michael Deppa Job Discussion Summary dated 6-4-03 ...............................................B-157

Hugo Guerra Job Discussion Summary dated 6-12-03..................................................B-158

Deidre Nichols Job Discussion Summary dated 7-29-03 .............................................B-159

Michael Frank Job Discussion Summary Form dated 10-16-03 ...................................B-160

Gabriel Bejancuure Voluntary Registration Form dated 1-18-04..................................B-161

Doug Smith Job Discussion Summary Form dated 1-22-04 .........................................B-162

Shazad Kobir Job Discussion Summary Form dated 5-10-04 .......................................B-163

Samone Thomas Job Discussion Summary dated 10-23-02...........................................B-164

Michael Wilson Job Discussion Summary dated 10-14-03 ...........................................B-165

William Savage Job Discussion Summary dated 10-11-01 ...........................................B-166

Eric Shaw letter to Ted Fox and Kathy Obenshain dated 1-23-04 ...............................B-167

**TABLE OF CONTENTS**
**CONTINUED**

PAGE

Kimberley Marlow letter to Ted Fox and Kathy Obenshain dated 1-22-04 ...............B-168

Dave McQuisten fax to Kathy Obenshain dated 1-21-04 ...........................................B-169

Mike Scher Sworn Statement dated 6-24-04 ..............................................................B-171

Brad Reavis fax to Kathy Obenshain dated 1-21-04 ...................................................B-172

Cherie A. Sugg Affidavit dated 4-3-06.......................................................................B-174

Jeremy Homer letter to Fite, Israel, Jauffret, Schwartz dated 8-19-05 .......................B-176

Transcript of Conversation of Cherie Sugg and Valerie Hue .......................................B-178

Sandra A. Rothermel Affidavit....................................................................................B-184

Trieu H. Tran Affidavit................................................................................................B-186

Defendant's Responses to Plaintiff's First Set of Interrogatories.................................B-187

Elizabeth Fite letter to Jeremy Homer dated 9-8-05 ...................................................B-198

Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories.........B-204

Defendant's Second Supplemental Responses to Plaintiff's Interrogatory 5 and
    Request for Production No. 1....................................................................................B-218

Elizabeth Fite letter to Jeremy Homer dated 12-1-05 .................................................B-224

Chart of GCM Positions 2000-2005 ...........................................................................B-225

Defendant's Supplemental Rule 26(a)(1) Initial Disclosures ......................................B-228

Loft Policy Violations Report......................................................................................B-231

Elizabeth Fite letter to Jeremy Homer dated 2-8-06...................................................B-234

**TABLE OF CONTENTS**
**CONTINUED**

**PAGE**

Elizabeth Fite letter to Jeremy Homer dated 3-3-06 ....................................................B-236

Elizabeth Fite letter to Jeremy Homer dated 4-3-06 ....................................................B-239

Cherie Sugg Affidavit dated 4-3-06 ..........................................................................B-241

Valerie Hue Affidavit dated 5-12-06 .........................................................................B-242A

J BIRDSONG DE BRANCH

02/11/2004 13:26 FAX 3027351635

Genevieve H. Riner, RPR
Delmarva Reporting

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

**Delaware Department of Labor**

(State, or local Agency, if any)

and EEOC

| ENTER CHARGE NUMBER |
| --- |
| ☐ FEPA *0402270* |
| ☐ EEOC *17CA400265* |

NAME (Indicate Mr, Mrs, Ms)
**Ms. Valerie Hue**

HOME TELEPHONE NO. (include Area Code)
(302) 684-1291

STREET ADDRESS
**13604 Spicer Road**

CITY, STATE AND ZIP CODE
**Ellendale DE 19941**

COUNTY
Sussex

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)

NAME
**NCO Financial Commercial Services**

NO. OF EMPLOYEES OR MEMBERS 100+

TELEPHONE NUMBER (incl Area Code)
1-800-788-1007

STREET ADDRESS
**802 Silver Lake Blvd, Dover, DE 19941 - 19904 TDN**

CITY, STATE AND ZIP CODE

NAME

TELEPHONE NUMBER (include Area Code)

STREET ADDRESS

CITY, STATE AND ZIP CODE

☒ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☒ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST 12/2003
LATEST 01/29/2004
☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):

I.    I am a female individual whose race is black. I was employed by Respondent from approximately February 1995 until I was discharged from as a General Collections Manager on January 29, 2004. I was suspended and than terminated for allegedly violating a company policy. I also believe that I was retaliated against for a previous claim of sexual harassment which resulted in the termination of an associate of Ted Fox, Sr. Vice President of Commercial Services.

II.   I was suspended Ted Fox (white, male) Sr. Vice President of Commercial Services and Kathy Obenshain (white, female) for re-depositing checks without verification of funds and not removing checks from system when requested by collectors. I was later terminated while on suspension.

III.  I believe that Respondent violated Title VII of the Civil Rights Act of 1964, as amended, and the state of Delaware's Discrimination in Employment Act, as amended, when I they terminated me for allegedly violating company policy. During a company conference call with all collection managers of the commercial division throughout the country the issue of re-depositing checks was a topic discussed. Kim Marlow (white, female), Eric Shaw (white, male), Leigh Nickerson (white, female) were all in attendance with me in Respondent's Dover, Delaware location. Kathy Obenshain (white, female) Vice President of Collections, stated thatshe did not want any checks deposited without verification. A question was asked by Mack Mckenzie (white, male) if a check can it be recreated with the same check number. Kathy Obenshain asked was this going on at his branch and he stated "not as of right now" implying that he was re-depositing checks as well. After the conference call new instructions were given out about how to re-deposit checks. There was another process in place for handling re-deposits which I followed. None of my similarly situated co-workers were disciplined for following the same process I followed. I also believe that Ted Fox (white, male) actions against me were in retaliation for a previous claim of sexual harassment I filed against one of his employees Bill Savage (white, male). Bill was terminated for Sexual Harassment after the company's investigation. Ted fox previous position did not give him authority to terminate me, however two weeks after his promotion I was terminated. I believe that the actions taken by Respondent were a pretext to mask discrimination based I was the only black female General Manager in Commercial Collections Division.

☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

.....are under penalty of perjury that the foregoing is true and correct.

2/3/04

Charging Party (Signature)    *Valerie H.*

SIGNATURE OF COMPLAINANT

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

NOTARY - (When necessary to meet State and Local Requirements)

Subscribed and sworn to before me this date

(Day, month, and year)

B-1

Hue 6 COPY 1

IN THE MATTER OF                     )
                                     )
VALERIE D. HUE,                      )
            Claimant,                )
                                     )
       v.                            )
                                     ).
NCO FINANCIAL,                       )
            Employer.                )

            Conversation transcribed from tape-recording
by Cheryl A. Anthony, Court Reporter, hearing, date, and
time unknown.

PRESENT:

       MR. RICK BOUDREAU

       MR. PHIL WEAVER

       MR. TED FOX

            ORIGINAL RETAINED BY JEREMY HOMER, ESQUIRE
       _____

                     ANTHONY REPORTING
                       PO Box 234
                 Dover, Delaware  19903
                     (302)674-8884

PLAINTIFF DATE NO.

000124

B-2

2

1      MR. BOUDREAU: Whew. Let me see. Where was

2  I? I know wanted to get with Phil, and I was going to

3  tell him to make sure that you were there on the squawk

4  box so we could all chat together.

5      UNKNOWN VOICE: Okay. Hold on. Hold on a

6  second. He's just outside my door.

7      MR. BOUDREAU: Yeah, no problem.

8      UNKNOWN VOICE: Hold on.

9      Phil?

10      Rick?

11      MR. BOUDREAU: Hey.

12      UNKNOWN VOICE: I have Phil right here.

13      MR. BOUDREAU: Hey Phil.

14      MR. WEAVER: Hey, buddy.

15      MR. BOUDREAU: How are you? How are you?

16      MR. WEAVER: Good.

17      MR. BOUDREAU: I just wanted a few moments,

18  just to kind of -- I just got to combination vent,

19  combination pour my heart out here to try to understand,

20  or at least get some direction or at least smack me into

21  a sense of focus and direction.

22      Bill is driving me fucking crazy. God, that

23  felt better. Okay. You got his letter earlier in the

24  month?

PLAINTIFF BATE NO.

000125

3

1          MR. WEAVER:  Yeah.  And what you don't know,

2     Rick -- because I didn't just to circle back around to

3     you -- but once I received that letter, I kind of went

4     into a spin.

5          MR. BOUDREAU:  Okay.

6          MR. WEAVER:  And I called Bill and read him

7     the riot act and told him in no uncertain terms that --

8     you know, you don't report to him and he doesn't, you

9     know, direct or ask you for action plans or, you know,

10    anything like that, that you guys are peers.  And, you

11    know, while there is a dotted line there, because, you

12    know, we've got to take care of clients, that, you know,

13    you report to Peter now --

14         MR. BOUDREAU:  Right.

15         MR. WEAVER:  -- first and foremost, and, you

16    know, me so -- and he was clear on that.

17         MR. BOUDREAU:  Right.

18         MR. WEAVER:  He was clear on that and was --

19         MR. BOUDREAU:  So that I guess that I would

20    throw out this proposition that I gave to -- when he

21    shows up on my LB meeting this morning, he wants LBs to

22    now provide him with their daily hit list.

23         MR. WEAVER:  What?

24         MR. BOUDREAU:  The meeting that we had this

4

1   morning with the --

2           MR. WEAVER:  Wait, wait, wait.  Stop.

3           MR. BOUDREAU:  Okay.

4           MR. WEAVER:  You were having an LB meeting.

5           MR. BOUDREAU:  Yeah, which he attended,

6   which I'm fine; you know, take your input, blah, blah,

7   blah.  I don't mind.  Sit in and you want to critique

8   me, fine.  Let's go.  That's fine.  I have no problem

9   with, you know, peer critique, that type of a deal.

10          MR. WEAVER:  All right.  And in that

11  meeting --

12          MR. BOUDREAU:  He asked all collect -- all

13  LBs to provide him daily with a copy of the hit list

14  that they would be turning in to me to be turning in to

15  him.

16          MR. WEAVER:  And what was his purpose for

17  that?

18          MR. BOUDREAU:  Obviously, he'd be monitoring

19  and watching them and monitoring and watching me.  I'm

20  not quite sure.  He didn't really lay out --

21          MR. WEAVER:  How about the date for

22  promises?  I mean what are you talking about here?  Your

23  daily projection sheets?

24          MR. BOUDREAU:  Yes.

5

1          MR. WEAVER:   Did he tell you he was going

2    to do this?

3          MR. BOUDREAU:   No.   He just threw it out in

4    the meeting.

5          MR. WEAVER:   Yeah.   Well, then see?   I mean

6    he should have come to you for that.   Rick, you know, if

7    you don't mind, why don't you copy me on your daily hit

8    list so I can review them and we know why --

9          MR. BOUDREAU:   Sure.   I know.   I --

10          MR. WEAVER:   But not in front of the

11    collectors.

12          MR. BOUDREAU:   Sure.

13          MR. WEAVER:   -- unless you are aware of it,

14    unless it's the two of you together.

15          MR. BOUDREAU:   Right.   I mean that was

16    the -- because my response would have been:   No.   I give

17    you my fucking projections on a daily basis.   You know

18    how to go in behind me and watch my CMA, blah, blah,

19    blah, you know.   But he decides he that wants to be part

20    of the process which, you know, is just fucking

21    bullshit.

22          So then we have our quarterly awards

23    meeting.   We coincided it with Kirk Rochell leaving

24    today.   Kirk goes and tells about how they won a sales

PLAINTIFF DATE NO?

000123

6

1  award, you know, for the quarter and, you know, the

2  collectors for the sales cup, to which he made some

3  catty little sideline comments about how dismal

4  collections had been.

5  MR. WEAVER:  Who?  Kirk did?

6  MR. BOUDREAU:  No, Bill did, in the midst of

7  the whole fucking branch meeting about the collector of

8  the quarter sales cup, and all of this other blah, blah.

9  And he is applauding sales, you know, for the collectors

10  cup -- for the sales cup, rather.  And at the same time

11  he is making little side, under-breath comments about

12  the dismal performance of fucking collections.

13  And I am saying to myself:  You know, what

14  the fuck?  First off, do you think the collectors are

15  really appreciating this?  They know how shitty they

16  did.  And you now you are telling the fucking sales

17  people how shitty they did.  A good place to do it,

18  Bill.  You know, (unintelligible) and you are fucking

19  bad-mouthing the collections department.

20  But then he follows it up with:  Oh, and we

21  need to give them all the assistance that they can get.

22  Okay, because we don't have enough fucking programs in

23  place, action plans, follow-ups, daily schedules that we

24  already follow that we attempt to adhere to.  So now

PLAINTIFF DATE NO'

000129

7

1    he's got every freaking salesman sending me fucking

2    print screens.

3            And not that I don't have any problem with

4    sales managers sending me print screens that they see

5    accounts that have fallen by the wayside or a client

6    called and wanted some additional work, you know, that

7    type of thing.

8            I've got now salesmen on the freaking -- you

9    know, commenting on the accounts. Hey, do you think an

10   ADL is appropriate here? And how come this hasn't been

11   called in three weeks? And what kind of performance is

12   this for my client? And they're freaking writing these

13   notes in the collections screens --

14           MR. WEAVER: What?

15           MR. BOUDREAU: -- sending me piles of

16   fucking print screens. And Bill said: That's what I

17   want you to do. I want you to help collections, because

18   they can't get their job done. That is the essence of

19   what he said. Collections needs your help. So if you

20   see any accounts that are not being worked properly and

21   there's lost fee opportunity, why don't you get print

22   screens, give them to your managers? And I have been

23   getting fucking -- you know, small, fucking books of

24   them for the last three or four days. He's just fucking

8

1    driving me --

2              MR. WEAVER:  He'll be reeled back in, Rick.

3              MR. BOUDREAU:  No, and -- Are we in a closed

4    door --

5              MR. WEAVER:  Yes.

6              UNKNOWN VOICE:  Yes.

7              MR. BOUDREAU:  All right.  Bill, you know --

8    Peter, I don't know if you know Bill.  Phil, obviously,

9    you know Bill.  He's a real colorful character.

10             MR. WEAVER:  I have met him.

11             MR. BOUDREAU:  He's -- you know, we were in

12   the midst of a meeting.  They were paging -- I guess you

13   were paging Mike Scher earlier, at around 11:30, quarter

14   to 12.

15             MR. WEAVER:  Yeah, probably.

16             MR. BOUDREAU:  So he opens up the door,

17   because they page him -- Mike Scher, six-oh, blah, blah.

18   He opens the door.  He said:  Hey, do you think there

19   might be something going on important in here?  What's

20   the matter with you?

21             Great, the freaking collector of sales all

22   having a hoopla all at the freaking expense of the

23   receptionist.  It's like, how embarrassing is this for

24   this poor girl?  Mind you, she knew there was a meeting

PLAINTIFF'S 40.

9

1  going on, probably shouldn't have been paging.  But it

2  was because you guys were calling and, obviously, there

3  was a sense of importance and urgency to that and that's

4  probably why she was doing that.

5            MR. WEAVER:  We had a client issue, and we

6  didn't know that there was a meeting going on.

7            MR. BOUDREAU:  No, and the receptionist, you

8  know, passed the message on.  But more importantly, I

9  know Bill's sideline crack was really appropriate.  And

10  you know, he does these things.

11            MR. WEAVER:  No, we don't do that in front

12  of other employees, you know.

13            MR. BOUDREAU:  I mean Bill is a colorful

14  character and will certainly tell you at any point in

15  time how much of it he is.  But he's a loose cannon

16  sometimes, and I mean that was a little awkward.

17            I even had a gal just recently left us.  Her

18  name was Audrey Williams.  She was my TPA person for a

19  little while.

20            MR. WEAVER:  Yeah.

21            MR. BOUDREAU:  And I moved her into admin,

22  and she said -- you know, she was struggling, going

23  through it bits and pieces.

24            But you know, Bill just decided to target

PLAINTIFF BATE NO.
000132

10

1    her.  And at one point in time, he walks by her door,

2    bangs on the window, because we've got these little

3    fishbowl windows type deal.  He bangs on the door.  And

4    he's halfway down the hallway and says to Val:  Hey, do

5    you think you can get that fat ass to wake herself up?

6              It's, you know, like a day and a half later

7    that Audrey put in her notice.  Now, did she talk all

8    about that?

9              MR. WEAVER:  Did you hear that first person?

10             MR. BOUDREAU:  No, I did not.

11             MR. WEAVER:  Did Valerie?

12             MR. BOUDREAU:  Valerie did --

13             MR. WEAVER:  Huh?

14             MR. BOUDREAU:  Valerie, I believe, will give

15   you that first person.

16             MR. WEAVER:  I want her to document that.

17             MR. BOUDREAU:  You know, I even made a point

18   of telling her:  You need to go to talk to Bill.

19             MR. WEAVER:  No, I don't want her to go to

20   Bill.  I want her to document that to me.

21             MR. BOUDREAU:  It's shit like that.  And

22   there are a couple of other little ditties that I'm not

23   at liberty right now to talk about.  But --

24             MR. WEAVER:  Like what?  I mean what --

PLAINTIFF'S
DATE NO:

Anthony Reporting
(302) 674-8884

B-11

11

1          MR. BOUDREAU:  I'm talking --

2          MR. WEAVER:  What are you talking about?

3          MR. BOUDREAU:  It's just stupid shit that he

4   gets around and says.  I want to make sure nobody is

5   around hearing this stuff.

6          But he on occasion will use racial epithets

7   inside offices that probably are not even called for.

8   But more importantly, he does it in front of producers.

9   It gets a little, you know, stupid.

10          MR. WEAVER:  Like what?  Like what did he

11   say?

12          MR. BOUDREAU:  Like, you know, when he was

13   talking about Audrey, you know, how long is it going to

14   take for us to get this N word, you know, back on the

15   phone and woken up?

16          MR. WEAVER:  Who did he say that to?

17          MR. BOUDREAU:  Well, he said that definitely

18   to me and Eric Shaw.

19          MR. WEAVER:  All right.  I need that

20   documented.

21          MR. BOUDREAU:  I was like:  Hey, how stupid

22   is -- Bill, hey, come on.  I mean this is not even cool.

23          MR. WEAVER:  Hold on, Rick.  I need to get

24   nailed down here.

PLAINTIFF'S EXHIBIT NO.

000134

12

1          UNKNOWN VOICE:  Hold on a second.  That's

2     off the charts.  That will get us in a lot of trouble.

3          MR. BOUDREAU:  You know, it's like -- I

4     don't know.  He's just like driving me freaking crazy,

5     and I don't know how to -- Look, I've got to -- I've got

6     to work on that.

7          MR. WEAVER:  Yeah, this is Ted.

8          (Unintelligible).

9          MR. WEAVER:  Audrey Williams, GPA collector,

10    (unintelligible) good boy, bad boy, whatever, that --

11    how long ago, Rick?

12          MR. BOUDREAU:  Let's see.  She left us two

13    weeks ago, on a Friday.

14          MR. WEAVER:  A couple of days before she

15    quit?

16          MR. BOUDREAU:  Absolutely.  You know, it

17    was like on that Tuesday or Wednesday, because it was

18    like -- you know, it was less than a week after that

19    event.

20          MR. WEAVER:  -- down the hall, raps on her

21    window --

22          MR. BOUDREAU:  Yeah.

23          MR. WEAVER:  -- yells at Val:  Hey, do you

24    think we can get this fat ass on the phone?

13

1              MR. BOUDREAU: Right.

2              MR. WEAVER: It was --

3              MR. BOUDREAU: No. Get the fat ass awake

4    and on the phone.

5              MR. WEAVER: Awake and on the phone.

6              MR. BOUDREAU: Yeah. And on occasion --

7              MR. WEAVER: Eric Shaw, who is a producer --

8    and Rick, what was the racial thing?

9              MR. BOUDREAU: Well, you know, he came in

10   the office and said: What do you think there is a

11   chance of getting the fat --

12              (Unintelligible).

13              MR. BOUDREAU: -- N word, you know, awake

14   enough to be able to dial the phone?

15              MR. WEAVER: In front of a producer.

16              MR. FOX: How many people? How many? Just

17   one?

18              MR. BOUDREAU: It was just me and Eric. He

19   came -- I was in Eric's office doing a (unintelligible),

20   and he came in when he saw me in there and --

21              MR. WEAVER: Now, first of all, this whole

22   meeting thing that happened today --

23              MR. BOUDREAU: Yeah.

24              MR. WEAVER: -- go back over that, Rick.

PLAINTIFF'S EXHIBIT NO.
000136

14

1           MR. BOUDREAU:  Yeah.  I mean he was

2    obviously applauding his collections, his sales

3    department, for having achieved their sales cup, to

4    which he then threw a couple of little side chops about

5    the fact that collections obviously had a dismal month

6    and that it is the salespeople who need to take some

7    responsibility to that and help collections along.

8           MR. WEAVER:  Right, in half.

9           MR. BOUDREAU:  Yeah.  And to the end that we

10   need -- they need to be able to watch for those accounts

11   that they think they can assist us in.

12          So now I've got, you know, a parade of

13   collectors, of salespeople giving me commentary on when

14   I should work an account.  It's like they've got nothing

15   else better --

16          MR. WEAVER:  Well, why (unintelligible?)

17          MR. FOX:  What direction is the

18   (unintelligible)?

19          MR. WEAVER:  On the collectors notes, not

20   just the --

21          MR. BOUDREAU:  Right.  I've already got a

22   couple of salesmen that, you know, I've got -- you know,

23   that have had issues, Bob Garrett, in particular.  And

24   I've had --

FLAINTIFF
000137

B-15

15

1       MR. WEAVER:  (Unintelligible) racial

2    epithet --

3           MR. FOX:  That is not our concern.

4           MR. WEAVER:  That's way off the charts.

5       MR. BOUDREAU:  I've got salesmen that are

6    now, you know, deciding they know best.  I had one sales

7    kid that came in here today, and he did -- and this is

8    probably a customer service deal, although I'm not

9    really certain that the salesman has the right to pick

10   and choose this thing -- because then it says:  Oh,

11   well, look, you took the account.  It was a disconnected

12   telephone account number, SOS, metroed.  And we sent out

13   a letter, closed it in about eight or nine days.  It

14   was an 1,100, $1,200 deal.

15       About three weeks later, the client gets a

16   check.  Timing it to the time that the letter went out

17   until the time the client got it, it made some sense.

18   But he walked in and said:  Oh, look at that.  You guys

19   only worked it for eight days, so I'm not going to bill

20   the client.

21       MR. WEAVER:  I never circled back around

22   with Rick and told him that Bill and I talked about his

23   memo to Rick earlier this month.

24       But this morning, Rick had a large balance

16

1   meeting with his large balance collectors.  Bill wants

2   to sit in on it.  Rick's fine with that.

3           Bill tells the collectors, without talking

4   to Rick about it, in the fucking LB meeting, effective

5   immediately, he needs to start forwarding me all of your

6   daily hit lists.

7           MR. FOX:  After your conversation?

8           MR. WEAVER:  Yeah.  This is today.

9           MR. FOX:  Without telling Rick about it

10  beforehand?  I mean --

11          MR. BOUDREAU:  Yeah.  There is another one

12  that I'm just thinking of.  And I kept thinking -- I'm

13  trying, because I know Val's run into little, awkward

14  issues with Bill pointing out her assets, if you will.

15          MR. WEAVER:  About what?

16          MR. BOUDREAU:  Her assets, her breasts.

17          MR. WEAVER:  Her --

18          MR. BOUDREAU:  Not in so many words, but

19  just her breasts.

20          MR. WEAVER:  Her breasts?

21          MR. BOUDREAU:  Her breasts.  You know, the

22  importance of --

23          MR. WEAVER:  That comment wasn't towards

24  her.  It was towards another employee.

PLAINTIFF

000139

17

1          MR. BOUDREAU:  No, that was directed at her.

2   That was -- Valerie relayed the story about how Bill was

3   so impressed with her, you know, assets.

4              (Unintelligible).

5          MR. WEAVER:  Now, that was towards one of

6   Val's employees.

7          MR. FOX:  Okay.  Because, you know, Val and

8   Bill have had a joking relationship that their -- I

9   don't know if they were joking or not -- but they are

10  related.

11         MR. BOUDREAU:  Yeah, they're related,

12  exactly.

13         MR. FOX:  (Unintelligible) apparently, I

14  mean there's black heritage in Bill's family, going back

15  to the Civil War time or whatever.

16         MR. BOUDREAU:  And at one point in time,

17  Brian had had --

18         MR. FOX:  Don't get comfortable with

19  somebody.  This is what you get.

20         MR. WEAVER:  Okay.  Again, I want the -- I

21  want it documented.  I want some screen prints, although

22  the documentation from you and Eric on the racial

23  thing -- .

24         MR. BOUDREAU:  Right.

PLAINTIFF BATES NO.

000140

18

1          MR. WEAVER:  -- and from Val on the fat ass
2     thing.

3          MR. BOUDREAU:  Right.

4          MR. WEAVER:  I need that stuff documented
5     and forwarded here first thing in the morning.

6          MR. FOX:  Very good.

7          MR. BOUDREAU:  I mean it's just -- and you
8     know, it's just a -- I mean I'm all concerned,
9     obviously.  It's all a concern, and it's a problem.

10         MR. WEAVER:  Rick?

11         (Unintelligible).

12         MR. WEAVER:  Rick?

13         MR. BOUDREAU:  Yeah, I'm listening.

14         MR. WEAVER:  Obviously, you know, this is a
15    serious issue.  And you know, I guess my question is I
16    understand you are a little bit sidewhipped today
17    because of the quarterly meetings.  But why didn't you
18    bring this to me when it was happening?  I mean you know
19    that those types of comments can get this organization
20    in so much trouble.

21         MR. BOUDREAU:  And it has -- and it has
22    percolated over the last two weeks.  And I am telling
23    you, it just absolutely just blew up on me today.  I
24    just --

PLAINTIFF BATES NO.

000141

Anthony Reporting
(302) 674-8884

B-19

19

1          MR. WEAVER:  Yeah, but Rick --

2          MR. BOUDREAU:  I know, I know, Phil, I know.

3    I know; no excuse.

4          MR. WEAVER:  All right.  Are you intimidated

5    by him a little bit?

6          MR. BOUDREAU:  You know Bill.  It's a hard

7    sell.  He wants it his way, or fuck you becomes his

8    response, you know.  This is the way it gets done.  He

9    has no problems in telling us, you know, the way he

10   feels in no uncertain terms.  And sometimes when he

11   doesn't want to listen, he absolutely does not want to

12   listen.  You know, no amount of logic or reason is going

13   to work with him.

14         MR. WEAVER:  Do I really want this?

15         MR. BOUDREAU:  That is crazy.  I mean, you

16   know --

17         MR. WEAVER:  Hey, Rick.

18         MR. BOUDREAU:  I mean I had better

19   communications with Ron.

20         MR. WEAVER:  How close -- oh, God.

21         MR. BOUDREAU:  A comical figure.

22         MR. WEAVER:  How close is Eric Shaw to Bill?

23         MR. BOUDREAU:  Other than the fact that they

24   have been here for forever together?

PLAINTIFF'S EXHIBIT

000142

20

1          MR. WEAVER:  Well, I mean if we ask Eric

2    Shaw to document that --

3          MR. BOUDREAU:  He even came around the

4    corner after that.  He said:  Man, you've got to talk to

5    Bill.  He can't be saying shit like that.  .

6          MR. WEAVER:  All right, then good.  I want

7    it documented from Eric.  I want it separately

8    documented from you.  And I want Valerie to document the

9    other incident and also any other regarding her

10   uncomfortableness with his comments about her assets.

11         MR. BOUDREAU:  Yeah.

12         (Unintelligible).

13         MR. WEAVER:  And yes, definitely don't say

14   anything to anybody else.

15         MR. BOUDREAU:  I know.  You know, there are

16   other incidents with Brian.  And you know, we had had a

17   series of African-American, if you will, folks

18   interviewing here.  And Bill asked him on the side -- he

19   says:  Now, what's the chance that you are filming a

20   Tarzan movie here, you know?

21         MR. WEAVER:  Who did he say that to?

22         MR. BOUDREAU:  Brian.

23         MR. WEAVER:  What?

24         MR. BOUDREAU:  Bill had said that to Brian.

PLAINTIFF BATE NO.

000143

Anthony Reporting  B-21
(302) 674-8884

21

1    Bill had said that to Brian a couple of weeks back.

2                MR. WEAVER:  Now, Rick, before you have

3    everybody document this, I am going to reach out to

4    HR --

5                MR. BOUDREAU:  Yeah.

6                MR. WEAVER:  -- because I don't know

7    necessarily that it's in our best interest -- and Ted

8    makes a good point to document and go on record with all

9    of this shit that is going to get us in a great deal of

10   trouble if a producer came back us.

11               MR. BOUDREAU:  Right.

12               MR. WEAVER:  But I mean I think it is all

13   very clear.

14               (Unintelligible).

15               MR. WEAVER:  I just want to make sure, that

16   yeah, I am asking for it in the right manner.

17               MR. BOUDREAU:  Right.

18               MR. WEAVER:  It may just be -- and I don't

19   know.  I just -- I'll reach out in the morning --

20               MR. BOUDREAU:  Yeah.

21               MR. WEAVER:  -- and then call you back and

22   give you some direction.

23               MR. FOX:  I don't want anything said to Bill

24   either.

22

1        MR. BOUDREAU: No, no, no, fuck, no. I mean

2   him and I had a --

3            (Unintelligible).

4        MR. BOUDREAU: -- increased (unintelligible)

5   of doing and the results of his sales manager and

6   collective sales people sending all of this shit, he's

7   just -- it's become a Spanish inquisition.

8        MR. WEAVER: So you are not going to go to

9   Eric. You're not going to go to Val. You are not going

10  to go to anybody until you hear back from me.

11       MR. BOUDREAU: We'll work it out in the

12  morning.

13       MR. WEAVER: I'm sorry?

14       MR. BOUDREAU: I said until we work it out

15  in the morning.

16       MR. WEAVER: Until you hear back from me.

17       MR. BOUDREAU: Very good.

18       MR. WEAVER: And Rick?

19       MR. BOUDREAU: Yes.

20       MR. WEAVER: Don't, you know -- You know

21  what is right and what is wrong.

22       MR. BOUDREAU: I know.

23       MR. WEAVER: Don't let it all build up. As

24  issues come up, communicate with us.

PLAINTIFF EXHIBIT

Anthony Reporting
(302) 674-8884   B-23

23

1        MR. BOUDREAU:  I know.  That's always the

2    direction I need to go.  And that's why I said I had to

3    make the call, because today was just the -- just the

4    top of it all.

5        MR. WEAVER:  Yeah, but God damn.  I mean if

6    we have somebody making those types of litigious

7    statements in our office, don't wait until it's

8    something that you happen to take personal to bring up

9    those other issues.

10        MR. BOUDREAU:  I know.  They were all -- I

11    mean yeah.  It's been like two weeks, and it's just out

12    of control and --

13        MR. WEAVER:  (Unintelligible) man.  I am

14    counting on you for you, you know --

15        MR. FOX:  (Unintelligible).

16        MR. WEAVER:  Yeah, that high level of, you

17    know, knowledge (unintelligible) and, you know --

18        (End of tape-recorded conversation.)

19

20

21

22

23

24

24

1    State of Delaware     )
                           )
2    Kent County           )

3

4                CERTIFICATE OF REPORTER

5         I, Cheryl A. Anthony, Delaware Certified
     Shorthand Reporter, Cert. No. 107-PS, and Notary Public
6    in the State of Delaware, do hereby certify that the
     foregoing is a true and correct transcript, transcribed
7    from tape-recording to the best of my ability, in the
     matter of Valerie Hue v. NCO Financial, date of
8    tape-recording unknown.

9         I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
10   interested in the event of this proceeding.

11

12

13                         _____
                           Cheryl A. Anthony
                           Delaware Certified
14                         Shorthand Reporter
                           Cert. No. 107-PS

15

16   DATED: _____

17

18

19

20

21

22

23

24

PLAINTIFF'S EXH. NO.

000147

Anthony Reporting     B-25
(302) 674-8884

*Hue 7*


**NCO Financial Systems, Inc**

# Memo

**To:**  Ted Fox

**From:** Valerie Hue

**CC:**  Ric Boudreau

**Date:** 10/15/01

**Re:**  Comments of Bill Savage

---

I have been asked to document comments made to me by Bill Savage.  The following are only some of the comments made.

I have been the only African American female large balance collector/manager the Dover branch has had.  Over my tenure with Milliken & Michael's/ NCO Financial System, Inc  Bill has made numerous comments.

While completing a sit-with, Mr. Savage yells to me to come here.  When I reached his location he states, " Tell Her to wake her fat ass up".  He was referring to Audrey Williams, apparently she was sleep in her office. 24 hrs later she resigned.  I told Mr. Savage he can't say those things and his response was and I quote "fuck her"

At the award ceremony he yells at the receptionist. "Don't you thing he is fucking busy." He was referring to a call from Phil Weaver and Ted Fox to Mike Scher.

At the receptionist counter he stated he loved black pussy in context to a conversation to my mixed heritage

I was wearing a tee shirt that has Dollar bills printed on it.  He comments "Val walking around with fucking money on her tits"

I was walking around the corner and ran into him.  He put his arms around me and said nice tits.  I told him to get his hands off of me.

At a large balance meeting he made a comment to one of the collectors to stop being a wet pussy and put their numbers on the board.

There are many other comments that Bill has made over the years. To make a complaint against Mr. Savage would only result in me loosing my job.

14. 27 '02   07:52 FAX          NCO GROUP INC         Hue s              ☒003.00F

# NCOgroup

## Employee Change Authorization

Org. MMJ          Location: Dover — 608

Name: Hue Valere

Social Security Number: 221 - 56 - 1357

Effective Date

### Salary / Job Change

| | From | Annual 48,000 | % of Increase | Job Title: A. Holding | Job Code 24 | Exempt/Non-Exempt | Grade |
|---|---|---|---|---|---|---|---|
| | To | Hourly 28.85 | Annual 50,000 | 3500 | Job Title: 6CM | Job Code | Exempt/Non-Exempt | Grade |

| | Office Location | Cost Center | Hours | PT/FT | Non-Standard Workweek Differential |
|---|---|---|---|---|---|
| From | DOVER | 608 | Hours PT/FT | | Straight Nights ☐  Sunday ☐  Sat & Sunday ☐ |
| To | DOVER | 608 | | | |

### Name Change

| From | Last Name 5/3 56 hrs X 5.19 Full First Name 323.12 | MI | | Marital Status Change |
|---|---|---|---|---|
| To | Last Name | Full First Name | MI | ☐ Single   ☐ Married |

### Address Change

| Street Address | Apt. No. | City |
|---|---|---|
| State | Zip | New Phone No. & Area Code ( ) |

### Remarks

Reason for Salary Change (Promotion/Demotion/Merit/Salary Adjustment)

From Mid Level Manager to 6CM effective immediately with Bonus Pool of 3500 for April Fees — Starting in May per Bonus Pool will be 5000

### Approvals

| Approvals | | Date 4/19/0 | Human Resources/Payroll | | Date |
|---|---|---|---|---|---|

Signature U

Print Name: R.A. Oberdin

Print Name

NCEO Salary Adjustment Approval

APPROVED
4/23/02

B-27

Genevieve H. Ritter, RPR
Delmarva Reporting

---

belly dance

From:      "belly dance" <cbellydance01@msn.com>
To:        <steve.leckerman@ncogroup.com>
Cc:        <ted.fox@ncogroup.com>
Sent:      Thursday, January 22, 2004 9:08 AM
Subject:   Valarie Hue

Dear Mr. Leckerman,

First, let me thank you for speaking to me this morning. I am stating for the records that I have
not committed fraud nor, was my intent to commit fraud.

1/21. I was placed on suspension with pay due to 2 concerns: Not pulling checks and recreating
dci on redips

**Not pulling checks:** I, as well as my mgt staff were given directives by Kathy on some months
not to pull any checks. She would state they need to start working supp right away. I remember
this being directed either June or July. This directive was given many different times during my
2 yrs as GCM. When a collector has asked me to pull or move check into next month. I look
at where the producer is mtd. Is he sand bagging? Usually that is the case. I wouldn't tell the
producer he is sand bagging but, no to his request. There has been hundreds of times when I
have pulled check with out the producers okay because of stop pay, etc.

**Recreating DCI redips:** We had a policy under Phil Weaver that all checks were redipped 2
times automatically. When that policy went away it was mgt discretion on redipping checks. I
have a redip policy in my branch with a form that the producer fills out. This form asks for
verification method and once it is signed then it is redipped. If that form isn't filled out then it
wasn't approved.

My manager, under my direction went to the producers with cash journal in December and
discussed nsf if we could redip any checks. The same paper work had to be completed however,
I did notice numerous checks were redipped without the form being signed after I returned from
vacation. Yes, I should have given Eric clearer direction. The managers and producers always
talked together about this. I never advised any producer they HAD to redip a check if we knew
there was no chance to recover. If the banks won't verify which is 80% of the time then the
decision is made based on that collector gut and discussion with the debtors.

In the beginning mgt were given a directive from upper management that on
redipping dci we would have to recreate them with the same check number. I believe there are
emails to that effect. That directive was never officialy changed by upper management. I have
reviewed cash journals from all offices and noticed dci being created on nsf.

Kathy, on the conference call on 1/20/04 did clarify we had to redip the dci not recreate another
one. Mac MacKenzie, asked the question on the conference call if dci comes back could we
recreate it with same check number. Kathy asked him is that going on in his branch and he
stated not as of right now. Yesterday, Kathy stated I was the only branch that recreated checks
on dci. I was surprised since she knew Atlanta also had done the same thing. I know there was
no fraud attempt as she alleged. The direction that was given wasn't clear by upper
management.

Kathy had stated on calls to my office to redip everything except stop pay. I believe this was in
June or July.

B-28

000029

Brian Laiche stated to me that he was upset not bonusing and he redipped many of his checks in Jan or Feb of last year to make a bonus. He said Kathy knew.

I am being disciplined because the direction from upper management was not clear on numerous occasions. I believe I am being singled out for things alll gcm have done not because we are stealing but, due to direction that wasn't clear.

My attempt in this email is for you to understand as gcm we have not always had clear direction. I don't deserve to be treated in this manner.

Thank you,


Valerie Hue

000924

B-29

LAW OFFICES

# PARKOWSKI, GUERKE & SWAYZE

PROFESSIONAL ASSOCIATION
116 WEST WATER STREET
P.O. BOX 598
DOVER, DELAWARE 19903
302-678-3262
FAX: 302-678-9415

F. MICHAEL PARKOWSKI
I. BARRY GUERKE
DAVID S. SWAYZE
CLAY T. JESTER
JEREMY W. HOMER
JOHN C. ANDRADE
MARK F. DUNKLE
WILLIAM A. DENMAN
MICHAEL W. ARRINGTON
CHRISTINE P. SCHILTZ
MICHAEL W. TEICHMAN
BASIL C. KOLLIAS
ANNE HARTNETT REIGLE

GEORGE F. GARDNER, III
OF COUNSEL

WILMINGTON OFFICE
800 KING STREET, SUITE 203
WILMINGTON, DE 19801-0369
302-654-3300
FAX: 302-654-3033

March 23, 2006

Julie Cutler, Administrator
Delaware Department of Labor
Division of Industrial Affairs
4425 North Market Street
Wilmington, DE 19802

RE:    **Valerie Hue v. NCO**
       **Case No.: 0402270/17CA400265**

Dear Ms. Cutler:

Our firm represents Valerie Hue in connection with the above matter. Pursuant to this letter and the Delaware Freedom of Information Act I am hereby requesting that we be provided with a copy of the document which reflects that the respondent in the above matter received the charge of discrimination. It is my understanding that the charges are sent by certified mail and that the agency retains a copy of the receipt indicating the respondent has received the charge.

If you have any questions, please contact me at the above number. Also, if there is any charge for the copy please let me know. Thank you for your assistance.

Yours truly,

JEREMY W. HOMER

JWHsar
e:mail: Jhomer@pgslegal.com
H\Hue\Cutler10

B-30



4425 NORTH MARKET STREET
WILMINGTON, DE 19802

Telephone (302) 761-8200
Fax (302) 761-6601

# STATE OF DELAWARE
# DIVISION OF INDUSTRIAL AFFAIRS

## *FACSIMILE TRANSMITTAL SHEET*

DATE: 4/06/06   FAX NO: (302) 678-9415   NO. OF PAGES: 2      (including cover)

TO:      Sandy
         Parkowski, Guerke, & Swayze

FROM:    Nelly Muñoz, Administrative Specialist II
         Office of Labor Law Enforcement

This facsimile is intended for the use of the addresses named herein and may contain privileged and confidential information.

| COMMENTS | |
|---|---|
| Per your request, attached is a copy of the certified mail receipt in the matter of Hue v. NCO. | |
| | |
| | |
| If you have any questions, please contact me at (302) 761-8200. | |
| | |

B-31

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

NCO Financial Com. Services
Personnel/EEOC Manager
802 Silver Lake Blvd. Suite 200
Dover, DE 19904

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Chaal Chores_    ☐ Agent
                    ☐ Addressee

B. Received by (Printed Name)    C. Date of Delivery
DIRECTOR OF LABORTUS 2-1-04

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
LABOR ENFORCEMENT
INDUSTRIAL AFFAIRS
OFFICE OF LABOR

FEB 1 3 2004

☐ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)

7002 2410 0000 3065 5144

PS Form 3811, August 2001         Domestic Return Receipt         102595-02-M-1035

B-32

01/21/2004 05:58 FAX 3027354891          NCO Group          Lane #1          ☒005



## Job Discussion Summary

## ** PLEASE PRINT OR TYPE **

| LAST NAME | FIRST NAME | SOCIAL SECURITY NUMBER |
|---|---|---|
| Lane | Matthew | 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 |

| LOCATION (CITY, STATE) | ACQUISITION NAME | DATE |
|---|---|---|
| Dover, DE | MMI | 1/20/04 |

**Nature of Discussion (check one):**

☐ Verbal Warning     ☐ Written Warning     ☐ Final Warning     ☒ Termination

**Topic of Discussion (check one):**

☐ Attendance     ☐ Performance     ☐ Insubordination     ☒ Violation of Co Policy     ☐ Other _____

**Written Summary (use separate sheet if necessary, include dates, times, who, what, when, why, etc.):**

NCO policy states that falsification of company records, including but not limited to the misrepresentation or omission of pertinent facts in client or debtor records, phone activity reports, time cards, medical forms, claim or benefits, employment applications or other documents will result in immediate termination.

NCO policy also states that employees who have access to customer records are responsible for ensuring that all customer records placed in NCO's trust are maintained completely and accurately, with full confidentiality. NCO employees shall not knowingly submit a false, fraudulent or fictitious claim for payment or reimbursement.

NCO's Business Conduct and Work Rules policy states that violation of federal, state or local law will not be tolerated. When such violations occur on the job, relate to work performance, or adversely affect NCO, you will be subject to progressive discipline, up to and including termination.

NCO's Business Conduct and Work Rules policy also states that engaging in any immoral, indecent, or similar conduct during working or non-working hours, whether or not involving NCO or its clients, vendors, or employees, that could potentially result in damage to the reputation of NCO, its clients, or employees will not be tolerated.

On June 4, 2003, you were trained, and agreed to abide by NCO's Commercial Service Compliance Policies.

On December 9, 2004, you changed the direct check (check number 18704) for account S13917 to $19,000.00. On December 18, 2004 you changed this same check number to $15,000.00. On December 19, 2004 you changed this amount once again to $11,000.00. On December 29th, you moved the date ahead to the 31st of December, and then finally on December 31st, 2004 you changed the amount for a final time to $5,000.00. On January 20, 2004 you admitted to your manager, Valerie Hue & Eric Shaw, that you did not have authorization from the debtor to change the amounts of the direct check number 18704 until the December 31, 2004, for the amount of $5,000.00.

**Action To Be Taken (results of discussion, follow up, dates of follow up, etc.):**
Immediate Termination.

**Employee Comments:**

_____

_____

_____

_Employee refused to sign_
Employee Signature

_Valerie Hue_ 1/20/04
Manager/Supervisor Signature/Date

Copy – Human Resources
Copy – Retained by Department Manager

_____
Human Resources Signature/Date

B-33

Lane
EXHIBIT NO. 1
1-4-06
D. HAWKINS

000057

Corporate Employee Relations
Revised 7/02

# MEMORANDUM

To:        Kim Marlow

From.      Valerie Hue

CC:        Kathy Obenshain

Date:      January 5, 2004

Re:        Fee Moves / file transferred

---

Kim, as you are aware, we have had two conversations today regarding moving fee from other branches (S57055 & S10668) and files being transferred to P67.

Giving fee that's unearned to any producer is a policy NCO will not tolerate. To complicate that matter you moved fee from another branch to our branch. Certainly you, nor the collection management staff of this office wants or deserves the reputation of moving fee without permission. Under no circumstances are you to move fee from one collector to another or branch-to-branch, this includes house units. If there is a legitimate reason fee needs to be moved (Example Do – D2), then email me first and I will forward it to Kathy for approval.

The only accounts that are to be in P67 are Saskatchewan skip accounts. We are responsible for all inventory in this branch and it must not get confused. We have a letter series file for Dover skips. All of that inventory must be cleaned out today. Please do not hesitate to see me if you have any questions.


Valerie Hue



B-34

# NCO

**NCO Financial Systems, Inc.**

Commercial Services
3850 N. Causeway Blvd., 2nd Floor
Metairie, LA 70002
Phone 504-834-8800
Fax 504-837-3230
www.ncogroup.com

## MEMORANDUM

**TO:**    GCMs

**FROM:**  Kathy Obenshain

**DATE:**  December 15, 2003

**RE:**    1st Quarter Postdate Contest

It's that time again!  To help motivate our focus to get the 1st quarter postdates up, we're going to have the 1st Quarter Postdate contest again this quarter – again, the money goes to the GCMs.

The rules are the same, we will establish a pool and you gain shares in that pool by exceeding your above goal.  You will get 50 shares for reaching your goal, and an additional share for every tenth of a percentage point that you exceed your goal. If you achieve 102.25% you will get 72 shares (50+22).  The pool will be divided according to the total shares earned.  The amount of the pool will depend upon the total postdates we can attain. $998-$1.1=$3,000 pool; $1.2k –1.4k=$4000 pool; $1.5k plus =$6,000 .

| | |
|---|---|
| Metairie | $189,447 |
| Boone/Tucson | $99,174 |
| Dover | $161,221 |
| Portland | $140,369 |
| Atlanta | $217,673 |
| Odenton | $165,289 |
| Tampa | $168,341 |
| Finals | $58,487 |
| Total | $1,200,000 |

cc: Phil Weaver
    Payroll

KAO:tl



DEPOSITION EXHIBIT

B-35

# Memorandum



To:        All Collectors

From:      Phil Weaver

Re:        Re-deposits

Date:      June 5, 2001


Effective in June, and continuing indefinitely, the following policy is in place. Any request for **re-deposits** must be directed to your immediate supervisor for scrutiny and approval. Once they have approved it at their level, they will then forward requests for any re-deposit that is over $1,000 gross to me so that I may personally review it to ensure we are not "hanging paper".

As always, if you have any questions, or if I may be of any assistance please do not hesitate to call.


PW:mm

Cc:        Ted Fox
           Ed Trahan
           Rodney Wild
           Branch Managers
           Collection Managers

DEPOSITION
EXHIBIT
PENGAD 800 631-6989

B-34

Hue, Valerie

## 60 days

From:   Weaver, Phil
Sent:   Wednesday, March 05, 2003 10:02 AM
To:     Commercial Ops Mgrs
Subject: FW: NSF's

The following outlines the policy for re-deposit of NSF checks. Read carefully and adhere accordingly!

Phillip Weaver
Senior VP Commercial Services
NCO Financial Systems, Inc
3850 N Causeway Blvd
Metairie, LA 70002
Work-800 725 6908
Cell-985 807 7445
Phil.Weaver@NCOgroup.com

Notice of Confidentiality:  The information included and/or attached in this electronic mail transmission may
contain confidential or privileged information and is intended for the addressee.  Any unauthorized disclosure,
reproduction, distribution or the taking of action in reliance on the contents of the information is
prohibited.  If you believe that you have received the message in error, please notify the sender by reply
transmission and delete the message without copying or disclosing it.

——Original Message——
From: Capaldo, Bette
Sent: Tuesday, March 04, 2003 12:28 PM
To: Weaver, Phil
Cc: McGowan, Meghan; Harkinson, Laura
Subject: RE: NSF's

Phil

An employee has started today that is going to be responsible for the redeposit process. Please inform your staff of the below process which can begin tomorrow:

- Items that were posted on/after 2/25/03 are eligible for redeposit request
- Requests should be emailed to laura.harkinson@ncogroup.com
- Requests for redeposits can only be made for NSF items processed within the past 30 days (time frame provided by executives)
- Requests can only be made on items that have been returned only once
- Requests can only be made on true NSF items and not refer to makers, invalid accounts, etc. (this information can be found in the transactions on the debtor record)
- Emails will be processed in the order received
- Accounting clerk will have do a final verification and only items meeting the above criteria will be posted and redeposited

If you have any questions, please feel free to give me a call.

Bette

——Original Message——
From: Weaver, Phil

3/5/2003



B-37

000002

Sent: Monday, February 24, 2003 9:40 AM
To: Commercial Ops Mgrs
Cc: Commercial Sales Mgrs; Capaldo, Sette; Leckerman, Steve; Winchur, Steven
Subject: NSF's

Effective immediately, the automatic re-deposit of returned items from the bank will cease. This will prevent items being returned after client remittance has been issued.

Shortly, I will be publishing a process for collectors to utilize for re-deposit of items only returned once on a case by case basis.

Phillip Weaver
Senior VP Commercial Services
NCO Financial Systems, Inc
3850 N Causeway Blvd
Metairie, LA 70002
Work-800 735 6008
Cell-985 807 7445
Phil.Weaven@NCOgroup.com

Notice of Confidentiality: The information included and/or attached in this electronic mail transmission may contain confidential or privileged information and is intended for the addressee. Any unauthorized disclosure, reproduction, distribution or the taking of action in reliance on the contents of the information is prohibited. If you believe that you have received the message in error, please notify the sender by reply transmission and delete the message without copying or disclosing it.

000003

B-38

## MEMORANDUM

To:     All Collections Management
        All Cash Processing Department Management

Cc:     Steven Leckerman
        Michael J. Barrist
        William Fischer

From:   Steven L. Winokur

Date:   March 12, 2003


**Recently there have been several questions regarding our month-end close process and how we handle certain issues in the "crunch" of the end of the month. While there has been no change in NCO's existing policies and the Corporate Policy Manual spells out all of the policies in detail, I thought I would take a moment to reiterate and clarify some of the policies and the procedures that are in place to ensure compliance:**

**All systems are to be closed the first business day after the month-end.**

Revenue attributable to payments received at NCO on the first business day of a particular month is recorded in the preceding month since the Company has already expended the costs to effect these collections in the preceding month. The assumption is that funds received on the first business day of the next month were mailed in the prior month.

We have traditionally kept our phone-pays, Western Union Quick Collects, and credit card processes open until 6:00 PM, on the first business day after month end, to allow time for all checks authorized prior to the month-end to be processed and credited to the proper month. As the Cash Processing Department has become significantly more efficient at this process, that time is currently being adjusted to 12:00 Noon. This will help ensure that our phone-pays and credit cards are processed and credited to the month in which the work to collect those funds was performed. This cut-off time may continue to be shortened as electronic transfers narrow the processing window.

The only exception to this is in certain directories (e.g. Healthcare), where the directory is kept open to allow the posting of directs reported by clients to NCO after month-end, but received by the client before month end. In these instances,



DEPOSITION
EXHIBIT
Leckerman-11
Leckerman 3.13.06

B-39

cash processing is still required to be closed on the first business day after the month-end.

**Post-dated checks will be run based on their deposit date.**

Another way to put this is that all post-dated checks will be processed such that they are actually deposited to the bank on the day the check is dated.

During the month, volumes allow us to do "same day deposits." Accordingly, post-dated checks are run through the current day. At month-end, volumes are higher, and accordingly, deposits occur first thing on the next business day. Accordingly, at month-end, post-dated checks are run through the next day.

There are two exceptions to these rules:
1) Any client prohibiting us from posting ahead (i.e. the check can not be *processed* before the check date) will remain day current (NDSLs, etc.)
2) Any client that requires us to post more then one additional day must provide their request *in writing*. Without a written request this cannot be done. Email from the appropriate party at a client will suffice for this purpose. A copy of the written request must be maintained in the Horsham cash-processing department.

Any employee who changes a date of a post-dated check without authorization from the debtor will be subject to immediate dismissal.

**We will "pull" a post-dated check only up until 24 hours of when it is deposited.**

Our policy, in accordance with the FDCPA, is that we will "pull" a post-dated check only up until 24 hours of when it is deposited. Accordingly, once a post-dated check has been posted as a payment, it cannot be pulled.

Debtors may request a "pull" only up to 24 hours of when the check is deposited. Outside this window, the debtor is to be told that the check has been processed so that it will be at the bank for deposit on the day the check is dated.

Collectors must adhere to the "24 hours before" rule. This accomplishes two things:
1) It ensures that the earnings process is complete when the check is processed, and,
2) It ensures that deposits are made timely to the bank (the date that the check is dated)

B-40