LAW OFFICES

# PARKOWSKI, GUERKE & SWAYZE

PROFESSIONAL ASSOCIATION
116 WEST WATER STREET
P.O. Box 598
DOVER, DELAWARE 19903
302-678-3262
FAX: 302-678-9415

F. MICHAEL PARKOWSKI
I. BARRY GUERKE
DAVID S. SWAYZE
CLAY T. JESTER
JEREMY W. HOMER
JOHN C. ANDRADE
MARK F. DUNKLE
WILLIAM A. DENMAN
MICHAEL W. ARRINGTON
CHRISTINE P. SCHILTZ
MICHAEL W. TEICHMAN
BASIL C. KOLLIAS
ANNE HARTNETT REIGLE

GEORGE F. GARDNER, III
OF COUNSEL

WILMINGTON OFFICE
800 KING STREET, SUITE 203
WILMINGTON, DE 19801-0369
302-654-3300
FAX: 302-654-3033

August 19, 2005

Elizabeth K. Fite, Esquire
Law Office of Elizabeth Fite, P.A.
15316 North Florida Avenue, Suite 100
Tampa, Florida 33613

Jennifer C. Jauffret, Esquire
Alyssa M. Schwartz, Esquire
Richard, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

David Israel, Esquire
Mayas D. Erickson Esquire
Sessions, Fishman & Nathan L.L.P.
201 St. Charles Avenue, 35th Floor
New Orleans, LA 70170-3500

RE:    Hue v. NCO

Dear Counsel:

Attached please find the plaintiff's discovery responses in the above matter. Please note that Exhibit H to the Production of Documents includes transcripts of two tapes. A third tape was sent to the Court Reporter for transcription, but she subsequently informed me it was blank. I played it in the presence of my client before it was sent to the Reporter and it contained a short conversation between my client and Cherie Suggs during which Ms. Suggs advised our client that her employment was terminated. I don't know why the tape was blank, but hereby ask whether Ms. Suggs recorded the conversation; and, of so, that a transcript be prepared.

Also, please note that we do not plan to prepare a separate production related to Exhibit A of the notice of the plaintiff's deposition. It appears to us that all questions are the same as the ones for the production of documents requests, except there is an additional request for a copy of the plaintiff's driver's license and a request for documents referred to in answering the discovery. We object to both requests. The first provides personal information that is not needed by the defendant. The other request is overly broad.

B-176

Elizabeth K. Fite, Esquire
David Israel, Esquire
Jennifer C. Jauffret, Esquire
Alyssa M. Schwartz, Esquire
Page 2

  This letter also requests that you indicate how you intend to satisfy the local rule regarding electronic discovery. I have asked for that information previously.

  Thank you for your cooperation.

       Yours truly,

       JEREMY W. HOMER

JWHsar
e:mail: JHomer@pgslegal.com
Enclosure
H:\Hue\File10

B-177

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                                    )
        Plaintiff,                              )
                                                )
              v.                                ) C.A. No.
                                                ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a                  )
Delaware corporation, trading as               )
NCO FINANCIAL COMMERCIAL SERVICES,)
        Defendant.                              )

        Transcript of tape-recording, taken by
Cheryl A. Anthony, Court Reporter, in the
above-captioned matter.

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware  19903
(302)674-8884

B-178

1          MS. VALERIE HUE:  Cherie Sugg, who is the

2    human resource department manager of NCO in Getzville,

3    New York, she has telephoned me twice this morning,

4    wanting me to talk about some things in my letter.

5          MS. CHERIE SUGG:  Hi, Valerie.  How are you?

6          MS. HUE:  I'm good, Cherie.  How are you?

7          MS. SUGG:  I'm all right.  Thank you.

8          (Following music playing:)

9          MS. SUGG:  Valerie, thank you for holding.

10   I appreciate it.  Thank you for calling me.  I actually

11   have Carol Verbino here.  Carol was with me on the other

12   call.

13          I wanted to let you know that I did receive

14   your e-mail, and NCO -- Are you there?  Can you hear me?

15          MS. HUE:  Yes.  I can hear you.

16          MS. SUGG:  Okay.  Great.  NCO has made a

17   decision to terminate your employment, you know, based

18   on the investigation and based on the job performances.

19   So we are terminating your employment effective

20   immediately.

21          And could I ask you?  Do you have any, you

22   know, company belongings in your possession?

23          MS. HUE:  No, just my handbook.

24          MS. SUGG:  Okay.  Do you have any company

1   keys?

2           MS. HUE:  I have the keys, yes.  I told Mike

3   I would mail them back to him.

4           MS. SUGG:  Okay.  That would be great.  We

5   would appreciate that.  And then you don't have anything

6   else, you know, computers?  Phones?  Anything like that?

7           MS. HUE:  No, I do not.

8           MS. SUGG:  Okay.  All right.  And no client

9   documents, those kind of things?

10          MS. HUE:  Client documents?  No, unh-unh.

11  No, just -- I mean I've worked there for ten or 11

12  years, no.

13          MS. SUGG:  Okay.  All right.  Your final

14  paycheck will be coming in the mail to you, and everyone

15  has the ability to sign up for unemployment benefits.

16  And then it's up to the Department of Labor to make the

17  determination if you receive those benefits or not.

18  Okay?

19          MS. HUE:  And the reason for termination?

20  Could you read to me what it says?

21          MS. SUGG:  I don't have anything to read to

22  you right now.  But basically, you are being termed for

23  the fraud.  Okay?  And you will receive information in

24  the mail regarding your benefits.  It will talk to you

1    about how you can apply for COBRA to continue your

2    health and dental insurance.  And you can kind of

3    contact this office, Lisa Phelps, regarding your 401(k),

4    if you have any 401(k) questions.  Okay?

5              MS. HUE:  And what about the selling of

6    stock?  Can you tell me how that would work now that I

7    have been terminated?

8              MS. SUGG:  Yeah.  I think the office head,

9    Grant Callahan, actually, in Horsham, deals with stock,

10   you know, transactions.  But I believe that, you know,

11   an individual has a certain amount of time, if they

12   qualify, to sell the stock.  I don't know if it's 60 or

13   90 says after termination.  But I think there are some

14   qualifiers in those agreements, as well, you know, who

15   is eligible and who is not.

16             MS. HUE:  Okay.

17             MS. SUGG:  But Grant Callahan in Horsham

18   would be the best person to communicate with.

19             MS. HUE:  And the termination is effective

20   immediately?  That is today?

21             MS. SUGG:  Yes, yes.  That is today.  So we

22   will, you know, process your termination paperwork.

23   Okay.  I would ask you not to contact the office or

24   anyone at the office, you know, during our business

B-181

1    hours or after.  And if you have any questions, you can

2    contact this office.  Okay?

3              MS. HUE:  And you've asked me not to contact

4    anyone at the office after business hours?  Is that what

5    I heard you say?

6              MS. SUGG:  I said during business hours or

7    after business hours at the office.  You are basically

8    not to contact our office.

9              MS. HUE:  Oh, okay.  I thought you meant not

10   to talk to anybody.

11             MS. SUGG:  Oh, no.  That is more in people's

12   privileges.

13             MS. HUE:  Okay.  I just wanted to clarify

14   that.

15             MS. SUGG:  Okay.  All right.  Well, good

16   luck to you, Valerie.  Good-bye.

17             MS. HUE:  Bye-bye.

18

19

20

21

22

23

24

B-182

State of Delaware        )
                         )
Kent County              )

## CERTIFICATE OF REPORTER

I, Cheryl A. Anthony, Delaware Certified Shorthand
Reporter and Notary Public, do hereby certify that the
foregoing record, pages 1 through 6 inclusive, is a
stenographic transcript of a tape-recording for the
above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand
and seal at Dover, Delaware.

Cheryl A. Anthony
Delaware CSR
Certification No. 107-B
(Permanent Certification)

DATED:    4/26/06

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VALERIE HUE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-225-KAJ |
| | ) | |
| v. | ) | |
| NCO FINANCIAL SYSTEMS. INC., a | ) | |
| Delaware corporation, trading as NCO | ) | |
| FINANCIAL COMMERCIAL SERVICES. | ) | |
| | ) | |
| Defendant. | ) | |

STATE OF DELAWARE )

                 )    SS:    **AFFIDAVIT OF SANDRA A. ROTHERMEL**

COUNTY OF KENT )

I, Sandra A. Rothermel, declare under penalty of perjury under the laws of the State of Delaware that the following is true.

1.     I am a paralegal to Jeremy W. Homer, Esquire.

2.     On a date that I don't recall but at some time in the calendar year 2005, I transmitted to a court reporter. Cheryl Anthony, a tape recording for transcription. Subsequently, the court reporter told me the tape could not be transcribed because it was unintelligible. Thereafter, I attempted to play the tape and could not understand it.

3.     On April 24, 2006, I provided the same tape recording to Trieu H. Tran, a technician with Collins Business Systems, Inc., and asked him to see if he could do anything with the tape to make it intelligible. Later the same day, he explained to me that the tape was folded in a way which interfered with the playback of the tape. He fixed the tape so that it could be understood.

4.     On April 25, 2006, I provided the tape to Cheryl Anthony and asked that she transcribe it. A copy of the transcript of the tape which she made is attached.

B-184

_Sandra A. Rothermel_ (signature)

SANDRA A. ROTHERMEL

SWORN TO AND SUBSCRIBED before me this 27th day of April, A.D., 2006 as

witness my Hand and Seal of Office.

_Laura Kay Bartkelmo_ (signature)

Notary Public

1F:hue\affidavit2

LAURA KAY BARTHELMEH
NOTARY PUBLIC
STATE OF DELAWARE
MY COMMISSION EXPIRES
FEBRUARY 22, 2007

B-185

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

VALERIE HUE,            )

                         )

         Plaintiff,        )    Civil Action No. 05-225-KAJ

                         )

       v.              )

NCO FINANCIAL SYSTEMS, INC., a   )

Delaware corporation, trading as NCO   )

FINANCIAL COMMERCIAL SERVICES,   )

                         )

        Defendant.       )

STATE OF DELAWARE     )

                     )    SS:    **AFFIDAVIT OF TRIEU H. TRAN**

COUNTY OF NEW CASTLE    )

I, Trieu H. Tran, declare under penalty of perjury under the laws of the State of Delaware that the following is true.

1.    I am employed by Collins Business Systems, Inc.

2.    On April 24, 2006, I was asked to listen to a tape recording of a conversation which was too garbled to be transcribed. I was able to ascertain that the tape recording was garbled because the track A was folded over the track B in a way which resulted in the playing of the track B backwards over the track A. By straightening the tape (unfolding it), the tape became understandable. A copy of the transcript of the conversation is attached.

                                                           _____

                                             TRIEU H. TRAN

    SWORN TO AND SUBSCRIBED before me this ___ day of April, A.D., 2006 as witness my Hand and Seal of Office.

                                _____

                        Notary Public    **DEANNA A. STANLEY**

TBhue\affidavit                                   **NOTARY PUBLIC**

                                           **STATE OF DELAWARE**

                                       My Commission Expires June 6, 2007

B-186

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                          :
                                      :
      Plaintiff,               :   Civil Action No.: 05-225-KAJ
                                      :
    v.                          :
                                      :
NCO FINANCIAL SYSTEMS, INC., a        :
Delaware corporation, trading as      :
NCO FINANCIAL COMMERICAL              :
SERVICES,                             :
      Defendant.               :

## NCO FINANCIAL SYSTEMS, INC.'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES DIRECTED TO DEFENDANT

Defendant, NCO Financial Systems, Inc. (NCO), by and through undersigned counsel, and pursuant to Fed. R. Civ. P. 33, 34 and 36, hereby responds to plaintiff's discovery requests and states as follows:

## DEFINITIONS AND INSTRUCTIONS

NCO objects to plaintiff's definitions to the extent that plaintiff's definitions exceed the requirements imposed by law.

## INTERROGATORIES

INTERROGATORY NO. 1: Identify (as defined above) the person or persons who made the decision to discharge Plaintiff and identify each person who provided input regarding it, including but not limited to anyone who provided information considered by Defendant.

RESPONSE: NCO objects to this interrogatory as vague and compound. Notwithstanding such objections, Kathy Obenshain, along with NCO Corporate

B-187

Employee Relations conducted the fact-finding investigation and made the decision to terminate plaintiff's employment. As part of the investigation, NCO obtained statements from NCO employees, including but not limited to the following: Mathew Lane, Jim Sprader, Kimberly Marlow, Eric Shaw, Dave McQuisten, Brad Reavis, Brian Laiche, Darrin Deesch, Lenny Ciccarone, Manny Cardozo, Joe Batie, Mike Scher, and Joe Thomas. Contact information for the above-listed people was provided as part of NCO's initial disclosures to plaintiff. NCO reserves the right to supplement or amend this response as its investigation continues.

INTERROGATORY NO. 2: Identify (as defined above) any and all documents (as defined above) reviewed in connection with the decision to discharge Plaintiff, or utilized in making such decision. If any draft of any such document cannot be produced because it has not been retained, explain who directed that the document not be retained and the date or approximate date that such direction was made. Also, for any such draft document, identify any person who read the draft document.

RESPONSE: NCO objects to this interrogatory as vague, compound, overly broad, and burdensome. NCO has no ability to identify persons who may have "read the draft document," which may or may not exist. Notwithstanding such objections, NCO reviewed plaintiff's personnel file, JDS (disciplinary) file, the statements of the persons listed in response to interrogatory 1, the documents utilized in the termination of Mathew Lane, and NCO's records indicating that plaintiff participated in, directed, and/or instructed NCO employees to re-generate checks returned for insufficient funds without following NCO procedure.

2    B-188

INTERROGATORY NO. 3: Identify (as defined above) any and all documents on which Defendant presently relies to support the decision to discharge Plaintiff.

RESPONSE: See response to interrogatory 2 above. The documents responsive to this request that have not been sent to counsel for plaintiff as part of NCO's initial disclosures will be produced at a mutually agreeable time and place.

INTERROGATORY NO. 4: With respect to the "check handling procedures" referenced in Exhibit A, attached hereto:

    (a)    identify any document that contains any or all such procedures;

    (b)    identify any person who defendant claims was instructed by Plaintiff to violate such procedures and any witness to such instruction;

    (c)    with respect to each person instructed to violate such procedure, explain what the person was told in as much detail as known by Defendant and the approximate date(s) of such instruction;

    (d)    identify any document that evidences that such instruction was made, including, without limitation, any tape recording or any written account of the instruction.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, overly broad, and compound. Notwithstanding such objections, NCO will produce documents containing the relevant check handling policies and procedures at a mutually agreeable time and place. Furthermore, NCO has produced documents as part of its initial disclosures demonstrating that plaintiff instructed her subordinates to violate NCO's check handling policy. The statements of said persons are the best evidence of their contents.

B-189

INTERROGATORY NO. 5: If the "check handling procedures" referenced in Exhibit A hereto are not contained in any document, explain the procedures, when they went into effect, and how Defendant communicated the procedures to its employees, including the Plaintiff.

RESPONSE: Please see response to interrogatory 4 above.

INTERROGATORY NO. 6: If Defendant has not required its employees to follow the "check handling procedures" referenced in Exhibit A at all times between January 1, 2000, and June 30, 2005, explain what other procedures employees were required to follow regarding the subject matter of the "check handling procedures," and when those other procedures were in effect.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and seeking irrelevant information. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, NCO requires (and has always required) NCO employees and managers to abide by the check handling policies and procedures in effect at that time.

INTERROGATORY NO. 7: With respect to the "check handling procedures" referenced in the next to the last paragraph of page 2 of Exhibit B, attached hereto, are such procedures the same ones referenced in Exhibit A? If not, please provide the information requested in Interrogatories 4-6, but substituting "Exhibit B" for "Exhibit A" for Interrogatories 4-6.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and compound. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections,

and based upon NCO's interpretation of this interrogatory, on August 2, 2002, Kathy Obenshain informed all General Collection Managers that collectors would be allowed to use a "direct check" form to obtain payments over the telephone from debtors. The debtors could authorize the transaction by telephone instead of fax as stated within Exhibit 1B to NCO's position statement, said document being the best evidence of its contents. On January 21, 2004, upon learning that plaintiff was violating/abusing this process and directing her subordinates to violate/abuse the process, Kathy Obenshain sent a memorandum to all NCO employees stating that the company was returning to the pre-August, 2, 2002 policy of obtaining debtor authorization by fax as explained in Exhibit 1A to NCO's position statement, said document being the best evidence of its contents. NCO's position statement and attached Exhibits will be produced at a mutually agreeable time and place.

INTERROGATORY NO. 8:  Explain the facts that support the statement that Plaintiff "fraudulently violated NCO's check handling procedures," as alleged in Exhibit B, page 2, next to the last paragraph.

RESPONSE:  An investigation revealed that plaintiff was violating NCO's check handling policies by improperly re-depositing non-sufficient funds (NSF) checks without debtor and/or bank authorization, and/or instructing subordinates to do the same. The improper re-depositing without debtor and/or bank authorization was assumedly to create additional fees at the end of the month, which would in turn increase plaintiff's commission and/or bonus.

INTERROGATORY NO. 9: For what month and year was the "routine monthly audit" referenced in the last paragraph of page 2 of Exhibit B undertaken?

RESPONSE: On or between December 2003 and January 2004 a routine monthly audit occurred, and a large number of NSF checks were found in plaintiff's office. A fact-finding investigation by Kathy Obenshain was completed, which revealed that the large number of NSF checks were due to plaintiff and/or her subordinates re-depositing NSF checks without debtor authorization or bank verification that funds were available.

INTERROGATORY NO. 10: For each month from January 2003 through January 2004, provide the amount of the bonus awarded to or earned by Plaintiff and identify any document that evidences such bonus. For purposes of this question, "bonus" refers to the bonus paid by Defendant which depended on the Plaintiff's performance, as explained in Exhibit B.

RESPONSE: NCO will produce copies of documents containing the relevant bonus information regarding plaintiff at a mutually agreeable time and place.

INTERROGATORY NO. 11: With respect to the assertion that "charging party was aware that these checks would not clear the respective bank accounts," contained in Exhibit B, page 3:

(a)    identify any person who has knowledge of any fact that supports the assertion and explain what knowledge he/she has;

(b)    identify any document that supports the assertion, including, without limitation, each of the checks referenced in the assertion;

6    B-192

(c)    explain, with respect to each check referenced in the assertion, the facts which support Defendant's claim that Plaintiff knew the check would not clear the account.

RESPONSE:  NCO objects to this interrogatory as vague, ambiguous, and compound. Notwithstanding such objections, plaintiff knew or should have known that the checks would not clear the debtors' accounts because she was re-depositing and/or directing her subordinates to re-deposit NSF checks without debtor authorization and/or verification from the bank that funds were available.

INTERROGATORY NO. 12:  Provide the name, address, phone number, name of employer, race and gender of all individuals employed by Defendant during any time between January 1, 2000 and June 30, 2005, who held a position equivalent to the position held by Plaintiff when Defendant discharged her.

RESPONSE:  NCO objects to this request as vague, ambiguous, overly broad, and seeking irrelevant information.  Notwithstanding such objections, plaintiff correctly asserts in her Complaint that at the time of her termination plaintiff was the only African American and female individual in her job position.

INTERROGATORY NO. 13:  Identify (as defined above) the top ten debt collectors in terms of total money collected in each year for calendar year 2002, 2003, and 2004, in each of the Defendant's following offices: Dover, Delaware; Louisiana; Atlanta, Georgia; San Diego, California; and Chicago, Illinois.

RESPONSE:  NCO objects to this interrogatory as vague, ambiguous, overly broad, burdensome, seeking irrelevant information, and harassing in nature.  Notwithstanding

B-193

such objections, NCO has no ability to identify "the top ten debt collectors in terms of total money collected in each year for calendar year 2002, 2003, and 2004, in each of the Defendant's following offices: Dover, Delaware; Louisiana; Atlanta, Georgia; San Diego, California; and Chicago, Illinois" because NCO does not keep national records containing such statistics.

INTERROGATORY NO. 14: Explain (as defined above) the use of the cash journal ledger, and state the code number used in the ledger to indicate that a payment has been "re-dipped" (i.e., redeposited after being returned for insufficient funds).

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and compound. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, re-dipping is when a NSF check is re-submitted with proper debtor authorization and bank validation that the funds are available. Re-generating is when a NSF check is re-submitted to the bank as if it was never submitted before. Re-generating a check violates NCO procedure because it bypasses the requirements that collectors receive debtor authorization to re-submit the NSF check and bank validation that funds are available in the debtor's account.

INTERROGATORY NO. 15: For each affirmative defense set out in the answer to the complaint, explain each of the facts which support the defense, identify who has knowledge of such facts, and identify any document which supports the defense.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and compound. Notwithstanding such objections, NCO's affirmative defenses are largely based upon the facts that (1) NCO did not discriminate or retaliate against plaintiff on the basis of her

8    B-194

race or any other protected characteristic, and (2) plaintiff caused her own termination by violating NCO's check handling procedures and/or directing her subordinates to do the same.

INTERROGATORY NO. 16:    Identify (as defined above) any individual who has or may have knowledge of facts relevant to any disputed fact in the case and explain (as defined above) those facts.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and overly broad. NCO cannot respond to this interrogatory as worded.

INTERROGATORY NO. 17:    Identify (as defined above) any individual the Defendant plans to call or may call as a witness in the trial of this case.

RESPONSE: NCO objects to this interrogatory as premature.  NCO has not determined who it will call as a witness in the trial of this case.  NCO reserves the right to supplement this response as discovery and investigation continue.

INTERROGATORY NO. 18: Identify the person or persons who made the decision to discharge Bill Savage and identify the person who provided input regarding such decision, including but not limited to anyone who provided any information considered by Defendant.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, compound, and overly broad.  Notwithstanding such objections, Mr. Savage was terminated from employment on October 11, 2001 as a result of offensive language and/or behavior as outlined in the termination document attached as Exhibit 9 to NCO's position statement, said document being the best evidence of its contents.  The decision to terminate Mr.

9    B-195

Savage was made by NCO Human Resources, and NCO managers, including but not limited to, Ted Fox. The decision was based upon the input and observations of NCO employees, including but not limited to, plaintiff, Ric Boudreau, and Eric Shaw,

Respectfully submitted,

Elizabeth K. Fite, Esq.
Florida Bar No.: 0644439
LAW OFFICE OF ELIZABETH FITE, P.A.
15316 N. Florida Avenue, Suite 100
Tampa, Florida 33613
Telephone No.: (813) 908-6121
Facsimile No.: (813) 908-6126

David Israel (La Bar No. 7174)
SESSIONS, FISHMAN & NATHAN, L.L.P.
201 St. Charles Ave., Suite 3500
New Orleans, Louisiana 70170-350
Telephone: (504) 582-1500
Facsimile: (504) 582-1555

And

Jennifer C. Jauffret, Esq.
Delaware Bar No.: 3689
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
Wilmington, DE 19899
Telephone No.: (302) 651-7700
Facsimile No.: (302) 651-7701

B-196

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the _19th_ day of August, 2005 a copy of the foregoing

was sent via United States Mail First Class to the following:

Jeremy Homer, Esq.
116 W. Water Street
Dover, DE  19903

Attorney

H:\DR\CO HR FILES\Hoe, Valerie\Pleadings\NCO's Responses to Interrogatories from Plaintiff.doc

11    B -197



LAW OFFICE OF
ELIZABETH FITE, P.A.
A T T O R N E Y

15316 N. Florida Avenue
Suite 100
Tampa, Florida 33613-1257
Tel (813) 908-6121
Fax (813) 908-6126

September 8, 2005

Jeremy Homer, Esq.
Parkowski, Guerke & Swayze
116 W. Water Street
Dover, DE  19903

        RE:   *Valerie Hue vs. NCO Financial Systems, Inc.*
               Case No.: 05-225-KAJ

Dear Mr. Homer,

I am responding to your August 24, 2005 letter expressing concerns regarding NCO's discovery responses. I apologize for the delays, but with Katrina, David Israel and I have been very busy regarding numerous firm issues and re-setting the email system.

Below I will attempt to elaborate on certain responses that you specifically mentioned in your letter.

Interrogatory No. 14 requests: "Explain (as defined above) the use of the cash journal ledger, and state the code number used in the ledger to indicate that a payment has been "re-dipped" (i.e., redeposited after being returned for insufficient funds)."

NCO responded: "NCO objects to this interrogatory as vague, ambiguous, and compound. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, re-dipping is when a NSF check is re-submitted with proper debtor authorization and bank validation that the funds are available. Re-generating is when a NSF check is re-submitted to the bank as if it was never submitted before. Re-generating a check violates NCO procedure because it bypasses the requirements that collectors receive debtor authorization to re-submit the NSF check and bank validation that funds are available in the debtor's account."

You have expressed concern that NCO's response may not describe the policy correctly. The documents attached to this letter as Exhibit A best explain the policy. These documents are extracted from plaintiff's production and NCO's

B-198

production, thus, you should already have copies of them. From these documents, which are the best evidence of their contents, "re-dipping" required debtor authorization and an attempt to achieve verification from the bank that funds were available. Plaintiff instructed her subordinates to re-submit checks returned for insufficient funds (NSF) without obtaining the debtor's authorization and without attempting to verify with the bank that funds are available. As we have discussed, this wrongful practice permitted Ms. Hue to have inflated revenue and collection numbers for the month-end when this was done.

Interrogatory No. 4 requests: "With respect to the "check handling procedures" referenced in Exhibit A, attached hereto:

    (a)    identify any document that contains any or all such procedures;

    (b)    identify any person who defendant claims was instructed by Plaintiff to violate such procedures and any witness to such instruction;

    (c)    with respect to each person instructed to violate such procedure, explain what the person was told in as much detail as known by Defendant and the approximate date(s) of such instruction;

    (d)    identify any document that evidences that such instruction was made, including, without limitation, any tape recording or any written account of the instruction."

NCO responded: "NCO objects to this interrogatory as vague, ambiguous, overly broad, and compound. Notwithstanding such objections, NCO will produce documents containing the relevant check handling policies and procedures at a mutually agreeable time and place. Furthermore, NCO has produced documents as part of its initial disclosures demonstrating that plaintiff instructed her subordinates to violate NCO's check handling policy. The statements of said persons are the best evidence of their contents."

You have expressed concern that the statement "will produce documents containing the relevant check handling policies and procedures at a mutually agreeable time and place" violates the letter and spirit of the discovery rules. I again direct your attention to the documents attached as Exhibit A. These documents outline NCO's check handling policy, and were produced along with NCO and/or plaintiff's discovery responses. Because NCO produced documents contemporaneously with the written responses, I do not see that the phrase, "at a mutually agreeable time and place," either violates the spirit of the discovery rules, or has in any way postponed the production of documents.

Your concerns regarding Interrogatory No. 5 are likewise unfounded. NCO produced copies of the relevant check handling documents along with the discovery responses.

B-199

Interrogatory No. 6 requests: "If Defendant has not required its employees to follow the "check handling procedures" referenced in Exhibit A at all times between January 1, 2000, and June 30, 2005, explain what other procedures employees were required to follow regarding the subject matter of the "check handling procedures," and when those other procedures were in effect."

NCO responded: "NCO objects to this interrogatory as vague, ambiguous, and seeking irrelevant information. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, NCO requires (and has always required) NCO employees and managers to abide by the check handling policies and procedures in effect at that time."

You express concern that NCO's response is non-responsive because the question is "what were the other policies." The documents attached as Exhibit A explain how the check handling policy evolved between 2001 and 2005.

As demonstrated by Exhibit A, on December 26, 2001, Peter Buggelin sent a memorandum to all collection personnel instructing that "[m]anipulation of the timing of recoveries for any reason is strictly prohibited . . . breeches of our fundamental responsibility . . . will result in either a final warning or termination of employment depending upon the circumstances." On February 23, 2003, Phil Weaver clearly articulated the check handling policy by stating in an e-mail to Commercial Ops Managers: **"Effective immediately, the automatic re-deposit of returned items from the bank will cease."** On March 4, 2003, the new process for re-depositing checks was detailed, and states in relevant part: "Requests can only be made on items that have been returned only once . . . [a]ccounting clerk will have [sic] do a final verification and only items meeting the above criteria will be posted and redeposited." Additionally, on August 7, 2003, Mike Scher reiterated that the practice of "manipulating" the check-by-phone process would not be tolerated because it "opens us up to huge liability issues and we cannot have that."

In Ms. Hue's e-mail to Mr. Leckerman, dated January 22, 2004, she argues that "[w]e had a policy under Phil Weaver that all checks were re-dipped two times automatically. When that policy went away it was mgt discretion on re-dipping checks." *See* Exhibit A. Mr. Weaver's February 23, 2003 e-mail to managers stating that the "automatic de-posit of returned items from the bank will cease," clearly negates Ms. Hue's argument.

Interrogatory No. 11 requests: "With respect to the assertion that "charging party was aware that these checks would not clear the respective bank accounts," contained in Exhibit B, page 3:

B-200

(a)    identify any person who has knowledge of any fact that supports the assertion and explain what knowledge he/she has;

(b)    identify any document that supports the assertion, including, without limitation, each of the checks referenced in the assertion;

(c)    explain, with respect to each check referenced in the assertion, the facts which support Defendant's claim that Plaintiff knew the check would not clear the account."

NCO responded: "NCO objects to this interrogatory as vague, ambiguous, and compound. Notwithstanding such objections, plaintiff knew or should have known that the checks would not clear the debtors' accounts because she was re-depositing and/or directing her subordinates to re-deposit NSF checks without debtor authorization and/or verification from the bank that funds were available."

You are concerned that NCO may possess additional factual information that supports the allegation that plaintiff knew there were insufficient funds to cover a certain check. Plaintiff re-submitted or directed her subordinates to re-submit NSF checks without debtor authorization and without attempting to obtain verification from the debtor's bank that the funds were available. This is not a situation where plaintiff knew for certain that the re-submitted NSF checks would bounce for a second (or third) time. Plaintiff re-submitted (or directed her subordinates to re-submit) NSF checks without following the check handling procedure, which resulted in a higher number of NSF checks bouncing for a second (or third) time. Once the check was re-submitted, my understanding is that NCO recognized any related commission as income. Plaintiff's practice would artificially inflate income if the check was returned NSF, until the following month when the check would be "backed off." There were times that improperly submitted checks would clear- but again- plaintiff still violated her obligations to ensure that NCO's policies were followed. NCO will supplement this response as necessary as discovery and investigation continue.

Interrogatory No. 12 requests: "Provide the name, address, phone number, name of employer, race and gender of all individuals employed by Defendant during any time between January 1, 2000 and June 30, 2005, who held a position equivalent to the position held by Plaintiff when Defendant discharged her."

NCO responded: "NCO objects to this request as vague, ambiguous, overly broad, and seeking irrelevant information. Notwithstanding such objections, plaintiff correctly asserts in her Complaint that at the time of her termination plaintiff was the only African American and female individual in her job position."

B-201

The chart attached as Exhibit B expands on NCO's response by listing other individuals employed by NCO in plaintiff's position at any time during the period of January 1, 2000 to June 30, 2005. This chart may be amended as discovery continues.

Interrogatory No. 15 requests: "For each affirmative defense set out in the answer to the complaint, explain each of the facts which support the defense, identify who has knowledge of such facts, and identify any document which supports the defense."

NCO's response states: "NCO objects this interrogatory as vague, ambiguous, and compound. Notwithstanding such objections, NCO's affirmative defenses are largely based upon the facts that (1) NCO did not discriminate or retaliate against plaintiff on the basis of her race or any other protected characteristic, and (2) plaintiff caused her own termination by violating NCO's check handling procedures and/or directing her subordinates to do the same."

More specifically, NCO's first affirmative defense is based on NCO's belief that plaintiff has not attempted to find work with comparable pay. NCO will supplement this answer as discovery continues. NCO's second, sixth, and eighth affirmative defenses are based upon the fact that NCO terminated plaintiff's employment because plaintiff violated company policy and instructed her subordinates to violate company policy, which are legitimate business reasons. NCO's third, fourth, fifth, and tenth affirmative defenses are based upon the fact that plaintiff caused her own termination by violating company policy and instructing her subordinates to violate company policy. NCO's seventh and ninth affirmative defenses are based upon the fact that any complaints by plaintiff of sex and/or race discrimination were rapidly investigated and resolved by such measures as the termination of Bill Savage. NCO's eleventh affirmative defense is based upon the fact that plaintiff files this action against NCO with knowledge that the facts and law do not support her claims, and that NCO has not violated state or federal laws with respect to her employment. NCO's twelfth affirmative defense is based upon the fact that some of the same NCO managers/employees who participated in promoting plaintiff to a manager's position were also instrumental in terminating plaintiff's employment. Please see the statements of NCO managers, including Kathy Obenshain, produced as part of NCO's initial disclosures.

With respect to plaintiff's request for documents from NCO, plaintiff's request for all documents to or from Ms. Kathy Obenshain for a number of years was overly broad and too burdensome for NCO to attempt a response prior to plaintiff narrowing the request. This request would yield tens of thousands of

B-202

irrelevant e-mails.   Likewise, NCO will attempt to respond to other requests after plaintiff has drastically confined the scope of the requests.

I hope this letter has alleviated your concerns regarding NCO's discovery responses.   I have reviewed Delaware's default standard for discovery of electronic documents. We need to discuss drastically limiting the scope of the electronic searches (*e.g.*, time frames, fields, document types) as soon as practicable to avoid overly burdensome/harassing requests by plaintiff to NCO for vast amounts of documents and e-mails. Please call me when you would like to discuss.

Kind regards,

Elizabeth K. Fite

EKF/mjm
Enclosures:    Discovery Documents
cc:    David Israel, Esq.
       Alyssa Schwartz, Esq.

B-203

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                              :
                                          :
            Plaintiff,                 :          C.A. No. 05-225-KAJ
                                          :
    v.                                  :
                                          :
NCO FINANCIAL SYSTEMS, INC., a            :
Delaware corporation, trading as          :
NCO FINANCIAL COMMERCIAL                  :
SERVICES,                                 :

            Defendant.

## NCO FINANCIAL SYSTEMS, INC.'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES DIRECTED TO DEFENDANT

Defendant, NCO Financial Systems, Inc. ("NCO"), by and through its undersigned counsel, and pursuant to Federal Rules of Civil Procedure 26 and 33, hereby responds to plaintiff's discovery requests by providing the following original and supplemental responses as follows:

## DEFINITIONS AND INSTRUCTIONS

NCO objects to plaintiff's definitions to the extent that plaintiff's definitions exceed the requirements imposed by law.

## INTERROGATORIES

INTERROGATORY NO. 1: Identify (as defined above) the person or persons who made the decision to discharge Plaintiff and identify each person who provided input regarding it, including but not limited to anyone who provided information considered by Defendant.

RESPONSE: NCO objects to this interrogatory as vague and compound. Notwithstanding such objections, Kathy Obenshain, along with NCO Corporate Employee Relations conducted the

RLF1-2934119-1                                    B-204

fact-finding investigation and made the decision to terminate plaintiff's employment. As part of the investigation, NCO obtained statements from NCO employees, including but not limited to the following: Mathew Lane, Jim Sprader, Kimberly Marlow, Eric Shaw, Dave McQuisten, Brad Reavis, Brian Laiche, Darrin Deesch, Lenny Ciccarone, Manny Cardozo, Joe Batie, Mike Scher, and Joe Thomas. Contact information for the above-listed people was provided as part of NCO's initial disclosures to plaintiff. NCO reserves the right to supplement or amend this response as its investigation continues.

SUPPLEMENTAL RESPONSE:    NCO objects to this interrogatory as vague and compound. Notwithstanding such objections, Kathy Obenshain, along with NCO Corporate Employee Relations, including Cherie Sugg and Carol Murray, conducted the fact-finding investigation and made the decision to terminate plaintiff's employment. As part of the investigation, NCO obtained statements from NCO employees, including but not limited to the following: Mathew Lane, Jim Sprader, Kimberly Marlow, Eric Shaw, Dave McQuisten, Brad Reavis, Brian Laiche, Darrin Deesch, Lenny Ciccarone, Manny Cardozo, Joe Batie, Mike Scher, and Joe Thomas. Contact information for the above-listed people was provided as part of NCO's initial disclosures to plaintiff. NCO reserves the right to supplement or amend this response as its investigation continues.

INTERROGATORY NO. 2: Identify (as defined above) any and all documents (as defined above) reviewed in connection with the decision to discharge Plaintiff, or utilized in making such decision. If any draft of any such document cannot be produced because it has not been retained, explain who directed that the document not be retained and the date or approximate date that such direction was made. Also, for any such draft document, identify any person who read the draft document.

RLF1-2934119-1                                            13-205

RESPONSE: NCO objects to this interrogatory as vague, compound, overly broad, and burdensome. NCO has no ability to identify persons who have "read the draft document," which may or may not exist. Notwithstanding such objections, NCO reviewed plaintiff's personnel file, JDS (disciplinary) file, the statements of the persons listed in response to interrogatory 1, the documents utilized in the termination of Mathew Lane, and NCO's records indicating that plaintiff participated in, directed, and/or instructed NCO employees to re-generate checks returned for insufficient funds without following NCO procedure.

SUPPLEMENTAL RESPONSE:    NCO objects to this interrogatory as vague, compound, overly broad, and burdensome. NCO has no ability to identify persons who have "read the draft document," which may or may not exist. Notwithstanding such objections, NCO reviewed plaintiff's personnel file, JDS (disciplinary) file, the statements of the persons listed in response to interrogatory 1, the documents utilized in the termination of Mathew Lane, and NCO's records indicating that plaintiff participated in, directed, and/or instructed NCO employees to re-generate checks returned for insufficient funds without following NCO procedure. NCO has already produced correspondence and documents reviewed in relation to plaintiff's termination.

INTERROGATORY NO. 3: Identify (as defined above) any and all documents on which Defendant presently relies to support the decision to discharge Plaintiff.

RESPONSE:  See response to interrogatory 2 above. The documents responsive to this request that have not been sent to counsel for plaintiff as part of NCO's initial disclosures will be produced at a mutually agreeable time and place.

SUPPLEMENTAL RESPONSE:    As stated in interrogatory 2 above, NCO reviewed plaintiff's personnel file, JDS (disciplinary) file, the statements of the persons listed in response to interrogatory 1, the documents utilized in the termination of Mathew Lane, and NCO's records

3

B-206

indicating that plaintiff participated in, directed, and/or instructed NCO employees to re-generate checks returned for insufficient funds without following NCO procedure. These documents, records, and/or correspondence have already been produced.

INTERROGATORY NO. 4: With respect to the "check handling procedures" referenced in Exhibit A, attached hereto:

(a)    identify any document that contains any or all such procedures;

(b)    identify any person who defendant claims was instructed by Plaintiff to violate such procedures and any witness to such instruction;

(c)    with respect to each person instructed to violate such procedure, explain what the person was told in as much detail as known by Defendant and the approximate date(s) of such instruction;

(d)    identify any document that evidences that such instruction was made, including, without limitation, any tape recording or any written account of the instruction.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, overly broad, and compound. Notwithstanding such objections, NCO will produce documents containing the relevant check handling policies and procedures at a mutually agreeable time and place. Furthermore, NCO has produced documents as part of its initial disclosures demonstrating that plaintiff instructed her subordinates to violate NCO's check handling policy. The statements of said persons are the best evidence of their contents.

SUPPLEMENTAL RESPONSE:    NCO objects to this interrogatory as vague, ambiguous, overly broad, and compound. Notwithstanding such objections, NCO has produced documents containing the relevant check handling policies and procedures. Furthermore, NCO has

B-267

produced documents as part of its initial disclosures demonstrating that plaintiff instructed her subordinates to violate NCO's check handling policy.

INTERROGATORY NO. 5: If the "check handling procedures" referenced in Exhibit A hereto are not contained in any document, explain the procedures, when they went into effect, and how Defendant communicated the procedures to its employees, including the Plaintiff.

RESPONSE: Please see response to interrogatory 4 above.

SUPPLEMENTAL RESPONSE: NCO produced copies of the relevant check handling documents along with the discovery responses.

INTERROGATORY NO. 6: If Defendant has not required its employees to follow the "check handling procedures" referenced in Exhibit A at all times between January 1, 2000, and June 30, 2005, explain what other procedures employees were required to follow regarding the subject matter of the "check handling procedures," and when those other procedures were in effect.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and seeking irrelevant information. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, NCO requires (and has always required) NCO employees and managers to abide by the check handling policies and procedures in effect at that time.

SUPPLEMENTAL RESPONSE: NCO has produced documents that explain how the check handling policy evolved between 2001 and 2005. As stated in the documents, on December 26, 2001, Peter Buggelin sent a memorandum to all collection personnel indicating that "[m]anipulations of the timing of recoveries for any reason is strictly prohibited . . . breeches[sic] of our fundamental responsibility . . . will result in either a final warning or termination of employment depending upon the circumstances." On February 23, 2003, Phil Weaver clearly

5

B-208

articulated the check handling policy by stating in an e-mail to Commercial Ops Managers: "Effective immediately, the automatic re-deposit of returned items from the bank will cease." On March 4, 2003, the new process for re-depositing checks was detailed, and states in relevant part: "Requests can only be made on items that have been returned only once . . . [a]ccounting clerk will have[sic] do a final verification and only items meeting the above criteria will be posted and redeposited." Additionally, on August 7, 2003, Mike Scher reiterated that the practice of "manipulating" the check-by-phone process would not be tolerated because it "opens us up to huge liability issues and we cannot have that." In Ms. Hue's e-mail to Mr. Leckerman, dated January 22, 2004, she argues that "[w]e had a policy under Phil Weaver that all checks were re-dipped two times automatically. When that policy went away it was mgt discretion on re-dipping checks." Mr. Weaver's February 23, 2003 e-mail to managers stating that the "automatic de-posit[sic] of returned items from the bank will cease," clearly negates Ms. Hue's argument.

INTERROGATORY NO. 7: With respect to the "check handling procedures" referenced in the next to the last paragraph of page 2 of Exhibit B, attached hereto, are such procedures the same ones referenced in Exhibit A? If not, please provide the information requested in Interrogatories 4-6, but substituting "Exhibit B" for "Exhibit A" for Interrogatories 4-6.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and compound. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, on August 2, 2002, Kathy Obenshain informed all General Collection Managers that collectors would be allowed to use a "direct check" form to obtain payments over the telephone from debtors. The debtors could authorize the transaction by telephone instead of fax as stated within Exhibit 1B to NCO's position statement, said document

6

B-209

being the best evidence of its contents. On January 21, 2004, upon learning that plaintiff was violating/abusing this process and directing her subordinates to violate/abuse the process, Kathy Obenshain sent a memorandum to all NCO employees stating that the company was returning to the pre-August 2, 2002 policy of obtaining debtor authorization by fax as explained in Exhibit 1A to NCO's position statement, said document being the best evidence of its contents. NCO's position statement and attached Exhibits will be produced at a mutually agreeable time and place.

SUPPLEMENTAL RESPONSE:    NCO's position statement and attached Exhibits have already been produced.

INTERROGATORY NO. 8: Explain the facts that support the statement that Plaintiff "fraudulently violated NCO's check handling procedures," as alleged in Exhibit B, page 2, next to the last paragraph.

RESPONSE: An investigation revealed that plaintiff was violating NCO's check handling policies by improperly re-depositing non-sufficient funds (NSF) checks without debtor and/or bank authorization, and/or instructing subordinates to do the same. The improper re-depositing without debtor and/or bank authorization was assumedly to create additional fees at the end of the month, which would in turn increase plaintiff's commission and/or bonus.

SUPPLEMENTAL RESPONSE:    NCO has produced documents demonstrating that plaintiff was violating NCO's check handling policy.

INTERROGATORY NO. 9: For what month and year was the "routine monthly audit" referenced in the last paragraph of page 2 of Exhibit B undertaken?

RESPONSE: On or between December 2003 and January 2004 a routine monthly audit occurred, and a large number of NSF checks were found in plaintiff's office. A fact-finding

B-210

investigation by Kathy Obenshain was completed, which revealed that the large number of NSF checks were due to plaintiff and/or her subordinates re-depositing NSF checks without debtor authorization or bank verification that funds were available.

SUPPLEMENTAL RESPONSE:     No further response is required.

INTERROGATORY NO. 10:     For each month from January 2003 through January 2004, provide the amount of the bonus awarded to or earned by Plaintiff and identify any document that evidences such bonus. For purposes of this question, "bonus" refers to the bonus paid by Defendant which depended on the Plaintiff's performance, as explained in Exhibit B.

RESPONSE: NCO will produce copies of documents containing the relevant bonus information regarding plaintiff at a mutually agreeable time and place.

SUPPLEMENTAL RESPONSE:     NCO has produced copies of documents containing information regarding plaintiff's bonuses.

INTERROGATORY NO. 11:     With respect to the assertion that "charging party was aware that these checks would not clear the respective bank accounts," contained in Exhibit B, page 3:

　　　(a)     identify any person who has knowledge of any fact that supports the assertion and explain what knowledge he/she has;

　　　(b)     identify any document that supports the assertion, including, without limitation, each of the checks referenced in the assertion;

　　　(c)     explain, with respect to each check referenced in the assertion, the facts which support Defendant's claim that Plaintiff knew the check would not clear the account.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and compound. Notwithstanding such objections, plaintiff knew or should have known that the checks would not

RLF1-2934119-1

B-211

clear the debtors' accounts because she was re-depositing and/or directing her subordinates to re-deposit NSF checks without debtor authorization and/or verification from the bank that funds were available.

SUPPLEMENTAL RESPONSE:    Plaintiff re-submitted or directed her subordinates to re-submit NSF checks without debtor authorization and without attempting to obtain verification from the debtor's bank that the funds were available. This is not a situation where plaintiff knew for certain that the re-submitted NSF checks would bounce for a second time (or third) time. Plaintiff re-submitted (or directed her subordinates to re-submit) NSF checks without following the check handling procedure, which resulted in a higher number of NSF checks bouncing for a second (or third) time.   Once the check was re-submitted, NCO recognized any related commission as income.  Plaintiff's practice would artificially inflate income if the check was returned NSF, until the following month when the check would be "backed-off."  There were times that improperly submitted checks would clear -- but again- plaintiff still violated her obligations to ensure that NCO's policies were followed.  NCO will supplement this response as necessary as discovery and investigation continue.

INTERROGATORY NO. 12:    Provide the name, address, phone number, name of employer, race and gender of all individuals employed by Defendant during any time between January 1, 2000 and June 30, 2005, who held a position equivalent to the position held by Plaintiff when Defendant discharged her.

RESPONSE: NCO objects to this request as vague, ambiguous, overly broad, and seeking irrelevant information.   Notwithstanding such objections, plaintiff correctly asserts in her Complaint that at the time of her termination plaintiff was the only African American and female individual in her job position.

9

B-212

SUPPLEMENTAL RESPONSE:    NCO has produced a chart demonstrating the race and gender of other individuals employed by NCO in plaintiff's same job position.

INTERROGATORY NO. 13    Identify (as defined above) the top ten debt collectors in terms of total money collected in each year for calendar year 2002, 2003, and 2004, in each of the Defendant's following offices: Dover, Delaware; Louisiana; Atlanta, Georgia; San Diego, California; and Chicago, Illinois.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, overly broad, burdensome, seeking irrelevant information, and harassing in nature. Notwithstanding such objections, NCO has no ability to identify "the top ten debt collectors in terms of total money collected in each year for calendar year 2002, 2003, and 2004, in each of the Defendant's following offices: Dover, Delaware; Louisiana; Atlanta; Georgia, San Diego, California, and Chicago, Illinois" because NCO does not keep national records containing such statistics.

SUPPLEMENTAL RESPONSE:    The information sought is irrelevant to plaintiff's claims and is not likely to lead to the discovery of relevant evidence.

INTERROGATORY NO. 14:    Explain (as defined above) the use of the cash journal ledger, and state the code number used in the ledger to indicate that a payment has been "re-dipped" (i.e., redeposited after being returned for insufficient funds).

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and compound. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of this interrogatory, re-dipping is when a NSF check is re-submitted with proper debtor authorization and bank validation that the funds are available. Re-generating is when a NSF check is re-submitted to the bank as if it was never submitted before. Re-generating a check violates NCO procedure because it bypasses the requirements that collectors

10

B-213

receive debtor authorization to re-submit the NSF check and bank validation that funds are available in the debtor's account.

SUPPLEMENTAL RESPONSE:    No further response is necessary.

INTERROGATORY NO. 15:    For each affirmative defense set out in the answer to the complaint, explain each of the facts which support the defense, identify who has knowledge of such facts, and identify any document which supports the defense.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and compound. Notwithstanding such objections, NCO's affirmative defenses are largely based upon the facts that (1) NCO did not discriminate or retaliate against plaintiff on the basis of her race or any other protected characteristic, and (2) plaintiff caused her own termination by violating NCO's check handling procedures and/or directing her subordinates to do the same.

SUPPLEMENTAL RESPONSE:    NCO's first affirmative defense is based on NCO's belief that plaintiff has not attempted to find work with comparable pay. NCO will supplement this answer as discovery continues. NCO's second, sixth, and eighth affirmative defenses are based upon the fact that NCO terminated plaintiff's employment because plaintiff violated company policy and instructed her subordinates to violate company policy, which are legitimate business reasons. NCO's third, fourth, fifth and tenth affirmative defenses are based upon the fact that plaintiff caused her own termination by violating company policy and instructing her subordinates to violate company policy. NCO's seventh and ninth affirmative defenses are based upon the fact that any complaints by plaintiff of sex and/or race discrimination were rapidly investigated and resolved by such measures as the termination of Bill Savage. NCO's eleventh affirmative defense is based upon the fact that plaintiff files this action against NCO with knowledge that the facts and law do not support her claims, and that NCO has not violated state

11

B-214

or federal laws with respect to her employment. NCO's twelfth affirmative defense is based upon the fact that some of the same NCO managers/employees who participated in promoting plaintiff to a manager's position were also instrumental in terminating plaintiff's employment Please see the statements of NCO managers, including Kathy Obenshain, produced as part of NCO's initial disclosures.

INTERROGATORY NO. 16:     Identify (as defined above) any individual who has or may have knowledge of facts relevant to any disputed fact in the case and explain (as defined above) those facts.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, and overly broad. NCO cannot respond to this interrogatory as worded.

SUPPLEMENTAL RESPONSE:     NCO objects to this interrogatory as vague, ambiguous, and overly broad. NCO cannot respond to this interrogatory as worded. Notwithstanding such objections, and based upon NCO's interpretation of interrogatory no. 16, Kathy Obenshain, along with NCO Corporate Employee Relations, including Cherie Sugg and Carol Murray, have knowledge of plaintiff's violation(s) of NCO policy because they conducted the fact-finding investigation and made the decision to terminate plaintiff's employment. Additionally, Mathew Lane, Jim Sprader, Kimberly Marlow, Eric Shaw, Dave McQuisten, Brad Reavis, Brian Laiche, Darrin Deesch, Lenny Ciccarone, Manny Cardozo, Joe Batie, Mike Scher, and Joe Thomas have knowledge of plaintiff's claims, NCO's defenses, and plaintiff's violation(s) of company policy.

INTERROGATORY NO. 17:     Identify (as defined above) any individual the Defendant plans to call or may call as a witness in the trial of this case.

B-215

RESPONSE: NCO objects to this interrogatory as premature. NCO has not determined who it will call as a witness in the trial of this case. NCO reserves the right to supplement this response as discovery and investigation continue.

SUPPLEMENTAL RESPONSE:    No further response is necessary.

INTERROGATORY NO. 18:    Identify the person or persons who made the decision to discharge Bill Savage and identify the person who provided input regarding such decision, including but not limited to anyone who provided any information considered by Defendant.

RESPONSE: NCO objects to this interrogatory as vague, ambiguous, compound, and overly broad. Notwithstanding such objections, Mr. Savage was terminated from employment on October 11, 2001 as a result of offensive language and/or behavior as outlined in the termination document attached as Exhibit 9 to NCO's position statement, said document being the best evidence of its contents. The decision to terminate Mr. Savage was made by NCO Human Resources, and NCO managers, including but not limited to, Ted Fox. The decision was based upon the input and observations of NCO employees, including but not limited to, plaintiff, Ric Boudreau, and Eric Shaw.

SUPPLEMENTAL RESPONSE:    No further response is necessary.

As to Objections:

Of Counsel:
David Israel
Sessions, Fishman & Nathan, L.L.P.
201 St. Charles Ave., Suite 3500
New Orleans, Louisiana 70170-350

Jennifer C. Jauffret (#3689)
jauffret@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, DE 19899
Telephone (302) 651-7700

Elizabeth K. Fite
Law Office of Elizabeth Fite, P.A.
15316 N. Florida Avenue, Suite 100
Tampa, Florida 33613

Dated: October 14, 2005

13

B-216

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of October, 2005, true and correct copies of the

foregoing were caused to be served on counsel of record at the following address as indicated:

### BY FEDERAL EXPRESS

Jeremy W. Homer, Esq.
Parkowski, Guerke & Swayze, P.A.
116 West Water Street, P.O. Box 598
Dover, DE 19903

Alyssa M. Schwartz (#4351)

B-217

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                                    )
                                                )
                Plaintiff,                      )        C.A. No. 05-225-KAJ
                                                )
        v.                                      )
                                                )
NCO FINANCIAL SYSTEMS, INC., a                  )
Delaware corporation, trading as NCO            )
FINANCIAL COMMERCIAL SERVICES,                  )
                                                )
                Defendant.                      )

### NCO' FINANCIAL SYSTEMS, INC.'S SECOND
### SUPPLEMENTAL RESPONSES TO PLAINTIFF'S CONTENTION
### INTERROGATORY NO. 5 AND REQUEST FOR PRODUCTION NO. 1

Defendant, NCO Financial Systems, Inc. ("NCO"), by and through its undersigned

counsel and pursuant to Federal Rules of Civil Procedure 26, 33, and 34 hereby provides a

detailed response to plaintiff's contention interrogatory no. 5 regarding NCO's check handling

policy. NCO further provides a detailed supplemental response to plaintiff's request for

production no. 1 regarding cash journal ledgers, hold check request forms, u-deposit forms, post-

date check reports, and NSF reports.

CONTENTION INTERROGATORY NO. 5: If the "check handling procedures" referenced in

Exhibit A hereto are not contained in any document, explain the procedures, when they went into

effect, and how Defendant communicated the procedures to its employees, including the

Plaintiff.

RESPONSE: From February 24, 2003 until plaintiff's termination, NCO's Commercial Division

maintained a policy whereby representatives were not permitted to re-submit (in industry lingo,

"re-dip") bounced checks (in industry lingo, "NSF checks") to a debtor's bank account until the



B-218

representative (1) received authorization from the debtor to re-dip the NSF check, and (2) attempted to verify with the debtor's bank that funds were available.

The process for re-dipping was disseminated in two e-mails from Phil Weaver to Commercial Managers. First, on February 24, 2003, Mr. Weaver sent an e-mail to Commercial Ops Mgrs, Commercial Sales Mgrs, and others stating: **"Effective immediately, the automatic re-deposit of returned items from the bank will cease. This will prevent items from being returned after client remittance has been issued. Shortly, I will be publishing a process for collectors to utilize for re-deposit of items only returned once on a case by case basis."** *See* 2/24/03 e-mail attached as Exhibit A, p. 2 (emphasis in original).

On March 5, 2003, Mr. Weaver sent another e-mail stating: **"The following outlines the policy for re-deposit of NSF checks. Read carefully and adhere accordingly!"** *See* 3/5/03 e-mail attached as Exhibit A, p. 1. The policy is outlined as follows:

- "Items that were posted on/after 2/25/03 are eligible for re-deposit request
- Requests should be e-mailed to laura.harkinson@ncogroup.com
- Requests for redeposits can only be made for NSF items processed within the past 30 days (time frame provided by executives)
- Requests can only be made on items that have been returned only once
- Requests can only be made on true NSF items and not refer to makers, invalid accounts, etc. (this information can be found in the transactions on the debtor record)
- E-mails will be processed in the order received
- Accounting clerk will have do [sic] a final verification and only items meeting the above criteria will be posted and redeposited . . . ."

B-219

2

*See* 3/4/03 e-mail attached as Exhibit A, p. 1.  Plaintiff, as a Commercial Manager, would have received these e-mails.

Between March 5, 2003 and January 16, 2004, the re-dip procedure was changed slightly in that re-deposit requests were to be e-mailed to Vera Migliarese instead of Laura Harkinson. *See* 1/21/04 e-mail attached as Exhibit B.  Additionally, re-deposit requests had to be approved by NCO's Horsham Compliance Department under the supervision of Dina Shaaltiel, Compliance Auditing Manager.

On August 7, 2003, plaintiff and others were reminded of the importance of following check handling policies in a memorandum from Mike Scher to IT Checks, cc'ing Valerie Hue. In the memorandum, Mr. Scher states: "I hate to discuss an issue that shouldn't need to be addressed but I have absolutely no choice.  This is regarding check faxes, check by phones etc. . . . I will refer you all to the memo that Kathy Obenshain put out 1 year ago, and again in March 2003 which you all signed, that clearly states, 'Any collector manipulating this process . . . will be grounds for immediate termination." *See* 8/7/03 memorandum attached as Exhibit C.

Beginning on January 16, 2004, Kathy Obenshain changed the re-dip policy because she discovered "an inordinate amount of NSf's [sic] from Dec 03 were a result of previously returned DCI's recreated by the collectors without the permission of the debtor and re-deposits that were run by producers and managers without talking to the debtor or making any attempt to verify funds with the bank." *See* 1/22/04 Memo for Record attached as Exhibit D.  Ms. Obenshain published the changes to the re-dip policy in an e-mail to Commercial Ops Mgrs and Shawna McHugh, stating: "All NSF checks for 5k or greater gross must be approved by me before any check is redeposited, and I will send that approval to Shawna Mchugh [sic] for processing.  Under no circumstances should anyone request a redeposit of a check without clear

3

B - 220