# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VALERIE HUE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 05-225-KAJ |
| | ) | |
| v. | ) | |
| NCO FINANCIAL SYSTEMS, INC., a | ) | |
| Delaware corporation, trading as NCO | ) | |
| FINANCIAL COMMERCIAL SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

## VOLUME II

## APPENDIX TO
## ANSWERING BRIEF OF PLAINTIFF VALERIE HUE
## IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

PARKOWSKI, GUERKE & SWAYZE, P.A.

By:   JEREMY W. HOMER, ESQUIRE
      (Delaware Bar ID#0413)
      116 W. Water Street
      P.O. Box 598
      Dover, DE 19903
      (302) 678-3262
      Attorneys for Plaintiff

DATED: May 15, 2006

# TABLE OF CONTENTS

**PAGE**

Jennifer Birdsong Deposition March 8, 2006 Transcript Excerpts............................B-243

Richard Boudreau Deposition March 28, 2006 Transcript Excerpts..........................B-252

Tex Fox Deposition March 13, 2006 Transcript Excerpts..........................................B-259

Valerie D. Hue Deposition January 6, 2006 Transcript Excerpts................................B275

Matthew Harrison Lane Deposition January 4, 2006 Transcript Excerpts.................B-306

Kim Marlow Deposition March 8, 2006 Transcript Excerpts .....................................B-322

David McQuisten Deposition March 23, 2006 Transcript Excerpts...........................B-349

Kathy Obenshain Deposition March 16, 2006 Transcript Excerpts ..........................B-357

Bradford Reavis Deposition February 1, 2006 Transcript Excerpts...........................B-411

Kenneth Alan Rose Deposition March 8, 2006 Transcript Excerpts..........................B-417

Michael Scher Deposition March 23, 2006 Transcript Excerpts.................................B-422

Dina Beth Shaantiel Deposition January 31, 2006 Transcript Excerpts.....................B-425

Dina Beth Shaantiel Deposition March 28, 2006 Transcript Excerpts.......................B-440

Eric John Shaw Deposition February 1, 2006 Transcript Excerpts............................B-467

Cheryl Sugg Deposition April 3, 2006 Transcript Excerpts.......................................B-477

Phillip Weaver Deposition March 13, 2006 Transcript Excerpts................................B-503

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

    VALERIE HUE,                    )
 4                                  )
            Plaintiff,              )
 5                                  )
    v.                              )
 6                                  )    Civil Action No.
    NCO FINANCIAL SYSTEMS, INC.,    )      05-225-KAJ
 7  a Delaware corporation,         )
    trading as NCO FINANCIAL        )
 8  COMMERCIAL SERVICES,            )
                                    )
 9              Defendant.          )

10

              Deposition of JENNIFER BIRDSONG taken
11  pursuant to notice at the law offices of Parkowski,
    Guerke & Swayze, P.A., 116 West Water Street, Dover,
12  Delaware, beginning at 1:20 p.m. on Wednesday, March 8,
    2006, before Robert Wayne Wilcox, Jr., Registered
13  Professional Reporter and Notary Public.

14  APPEARANCES:

15              JEREMY W. HOMER, ESQ.
                PARKOWSKI, GUERKE & SWAYZE, P.A.
16                116 West Water Street
                  Dover, Delaware  19903
17                for the Plaintiff,

18              ELIZABETH K. FITE, ESQ.
                SESSIONS, FISHMAN & NATHAN, L.L.P.
19                15316 North Florida Ave - Suite 100
                  Tampa, Florida  33613
20                for the Defendant.

21

22                    CORBETT & WILCOX
              Registered Professional Reporters
23      1400 French Street      Wilmington, DE 19801
                     (302) 571-0510
24              www.corbettreporting.com
```

B-243

d8a0c3cc-f939-4213-9ea3-eedbd8095680

JENNIFER BIRDSON

1   ALSO PRESENT:  VALERIE HUE
        DINA SHAALTIEL, NCO Financial Commercial
2                    Services
3        - - - - -
4        JENNIFER BIRDSONG,
5        the witness herein, having first been
6        duly sworn on oath, was examined and
7        testified as follows:
8   BY MR. HOMER:
9       Q.  My name is Jeremy Homer.  I'm the attorney for
10  the plaintiff in this deposition.  This is the Hue v. NCO
11  litigation.  It's March 8th about 1:20.
12          Ms. Birdsong, could you first state your
13  address and your phone number?
14      A.  1224 Kennedy Lane, Dover, Delaware.
15      Q.  Okay.  And phone number?
16      A.  Can I ask why my home phone number is
17  relevant?
18      Q.  Well, we never know.  We might later need it.
19          MS. FITE:  It's okay.  Go ahead and
20  answer.
21  BY MR. HOMER:
22      Q.  It's very unlikely that we would call you.  We
23  wouldn't call you as long as you're employed by NCO.
24      A.  (302) 674-0276.

1       Q.  Okay.  During the course of this deposition,
2   I'm going to be asking you a number of questions.  If I
3   ask a question that you don't understand, don't try to
4   answer it.  Okay?  Just ask me to rephrase it or explain
5   it.  Then give me an answer.
6           Do you understand that?
7       A.  Yes.
8       Q.  Okay.  Is there any reason why your ability to
9   answer questions today would be impaired?
10      A.  No.
11      Q.  Okay.  You're not on any medication that would
12  affect how you think?
13      A.  No.
14      Q.  Okay.  What's your educational background?
15      A.  High school graduate.
16      Q.  Okay.  When did you graduate from high school?
17      A.  1991.
18      Q.  All right.  Could you relate for me in
19  chronological order the jobs you've had since high
20  school?  For each job you've had, indicate what time
21  period you were at that job and what your job duties
22  were.
23      A.  In 1992 I went to work for Old-Fashioned Roy
24  Rogers Restaurant.

1       Q.  Okay.
2       A.  Then in six months became the general manager
3   there.
4       Q.  Okay.
5       A.  I was there until 1996. at which time I moved
6   to Delaware, went to work for NCO, or Milliken &
7   Michaels, formerly.
8       Q.  Okay.  Have you been working for NCO since
9   1996, then?
10      A.  Yes.  Correct.
11      Q.  Okay.  Can you go through the different
12  positions, if you've had more than one, that you've held
13  with either NCO or Milliken & Michaels?  Again, try to do
14  this chronologically and indicate the dates that you were
15  in those positions.
16      A.  I started November 25th of '96 as a
17  receptionist.  In January of '97, I was promoted to the
18  accounting department.  Maybe around -- oh, Lord.  In '97
19  I moved into the collection assistant position and in
20  2003 moved into the branch administrative manager
21  position.
22      Q.  I'm sorry.  I didn't quite catch the last --
23      A.  Branch administrative manager.
24      Q.  Okay.  Do you recall the approximate date in

1   2003 that you took that position?
2       A.  September 1st.
3       Q.  Okay.  Is that the position you're in now?
4       A.  Correct.
5       Q.  Is that part of the collections division at
6   NCO?
7       A.  It's our commercial division.  I mean, there's
8   a collection department, but I'm not the collection
9   admin.
10      Q.  Okay.  What are your duties as the branch
11  administrative manager?
12      A.  The HR contact, payroll, handling employee
13  files, sales assistant, the GM assistant.
14      Q.  Okay.
15      A.  And anything else they give me to do.
16      Q.  Okay.  I think you said from '97 to
17  September 1, 2003 you were collections assistant.
18      A.  Yeah.
19      Q.  Is that the title of the job?
20      A.  Collection admin.
21      Q.  Okay.  Collection admin administrative
22  assistant?
23      A.  Yes, sir.
24      Q.  Okay.  What were the duties in that job?

B-243A

d8a0c3cc-f939-4213-9ea3-eedbd8095680

**Page 6**

1    A.  Running reports for the GCM, handling
2  spreadsheets for the GCM and their managers' assistants.
3  We had to forward them to them in the morning.  For a
4  period of time, we entered checks or we faxed what we
5  called PTCs, direct payments, down to our corporate
6  office.
7    Q.  Okay.  When you say -- one, what are you
8  referring to there?
9    A.  GCM.  Our general collection manager.
10    Q.  Okay.  For a period of time, the GCM was
11  Valerie Hue.  Correct?
12    A.  Correct.
13    Q.  You worked in the Dover office with Valerie
14  Hue?
15    A.  Correct.
16    Q.  Okay.  For what time period were you her
17  assistant?
18    A.  I was the assistant prior to her taking that
19  position.  That's -- I can't honestly remember exactly
20  when she took the position.
21    Q.  Okay.  Was it a matter of years or just a few
22  months?
23    A.  Oh, no, no, no, no.  At least a year and a
24  half.

**Page 7**

1    Q.  Okay.  Can you tell me what preparation you
2  did for this deposition today?
3    A.  I met with our attorneys -- Ms. Fite,
4  Mr. Israel.
5    Q.  That was yesterday?
6    A.  Correct.
7    Q.  Okay.  How long did you meet with them?
8    A.  Maybe about four hours.
9    Q.  Okay.  Did you review any documents?
10    A.  Not me personally.
11    Q.  Did somebody else review the documents?  When
12  I say "review," did you look at any documents yesterday
13  when you were reviewing this?
14    A.  Not really.
15    Q.  Were there documents that other people were
16  looking at and asking you about?
17    A.  There were other people present in the room,
18  and one of them did request to see something she had
19  written.
20    Q.  Okay.
21    A.  But...
22    Q.  Are you familiar with the term "NSF"?
23    A.  Yes.
24    Q.  What does that refer to?

**Page 8**

1    A.  Insufficient funds.
2    Q.  Okay.  That's a term applied to checks that
3  have been returned from the banks as being not covered by
4  the bank account.  Is that right?
5    A.  That's correct.
6    Q.  Okay.  Do you know what NCO's policy is
7  regarding the resubmission of checks for payments that
8  have been returned NSF?
9    A.  If a collector wants to redip, as we call it,
10  back on the system, they have to verify funds.  If the
11  funds verify, they would submit the request to the
12  manager to sign off on, and then the redip would go
13  through.
14    Q.  Okay.  "Redip" is another word for
15  resubmitting the check for payment to the bank?
16    A.  Correct.
17    Q.  Okay.  You say the collector has to verify.
18  Do you know what the NCO policy is about what has to be
19  done to verify a check that's been NSF?
20    A.  At that point in time, the collector would try
21  to contact the bank or the debtor and get verification
22  that the funds would be there.
23    Q.  When you say "that point in time," what point
24  in time are you referring to?

**Page 9**

1    A.  When I was a collection assistant.
2    Q.  Okay.  Was that always the policy while you
3  were the collection assistant?
4       MS. FITE:  Objection to form.  Go ahead.
5    A.  I believe so.
6    Q.  Okay.
7    A.  It was, honestly, a long time ago.
8    Q.  Okay.  Do you recall whether there was ever a
9  time where NSF checks were just redipped automatically
10  without any verification?
11    A.  I know that there were instances where checks
12  were put on the system that -- where they couldn't get in
13  contact with the bank and their verification was through
14  the debtor.
15    Q.  Okay.  But you don't know about any automatic
16  redipping of checks?
17    A.  I know that I've overheard collectors state
18  that, you know, they had checks put on.
19    Q.  Without verifying them, you mean?
20    A.  It's something I would overhear.
21    Q.  Okay.  Were you involved yourself in the
22  process for redipping checks?
23    A.  To the degree that when they wanted a check to
24  be redipped, they were supposed to put it -- the

B-244

d8a0c3cc-f939-4213-9ea3-eedbd8095680

Page 10

1  information on a form -- who they spoke with at the bank,
2  what check they wanted to redip.  In case there was
3  multiple checks on the account, they had to list the
4  check number.  They need to list the name of the person
5  on the account.  They had to sign the Redip Form and turn
6  it in to their manager to be signed.
7      Q.  Okay.  When you say "they," you're talking
8  about the collectors?
9      A.  Yeah.
10      Q.  You've told me what the collectors were
11  supposed to do.  What was your involvement in that
12  process?
13      A.  I would not submit any check to be redipped --
14  to submit the request to our corporate office for a check
15  to be redipped if a manager had not signed off on it.
16      Q.  Okay.  So your responsibility was to make the
17  request for resubmitting the check to the corporate
18  office once you got the approval from the manager.  Is
19  that right?
20      A.  To be honest, I don't honestly remember if I'm
21  the one who was supposed to send the e-mail or if the
22  manager was supposed to send the e-mail.
23      Q.  Okay.  It could have been --
24      A.  It was a long time ago.

Page 11

1      Q.  Okay.  It could have been you.  But it was
2  done by e-mail?
3      A.  Once we had e-mail.
4      Q.  Okay.
5      A.  Prior to that it would have been faxed.
6      Q.  Okay.  Do you recall when you got e-mail
7  approximately?
8      A.  August 2002.
9      Q.  Okay.  When the redip request was sent to
10  corporate by e-mail, was there anything besides the
11  electronic mail that was sent?  Was there any
12  documentation sent with it or separately to the corporate
13  office to show that there was authorization that redipped
14  the check?
15          MS. FITE:  Object to form.  But answer
16  if you can.
17      A.  My knowledge was the only way I would submit a
18  request was if a manager signed off on it, because that's
19  supposed to mean the collector has notes in there, the
20  manager has reviewed the account, they have documented
21  the account.  All I had to do was basically submit the
22  request.
23      Q.  Okay.  You've referred to a form that you call
24  the Redip Form.

Page 12

1      A.  Mm-hmm.
2      Q.  Was that the name of the form?  Was there a
3  form that was titled Redip Form on it?
4      A.  That's how the form was labeled, yes.
5      Q.  At different times was there a form that was
6  similar to that that was titled some other way?
7      A.  We had dozens of forms titled differently.  A
8  lot of them I created just for my own personal backup to
9  keep me straight --
10      Q.  Okay.
11      A.  -- on the requests, because there was no
12  formal way for a collector to make requests.
13      Q.  Before you developed the form, you mean?
14      A.  Right.  Yes, sir.
15      Q.  Okay.  Did you develop the Redip Form?
16      A.  Yes, sir.
17      Q.  Okay.  What information was on the Redip Form?
18      A.  Collector name, account number, bank name,
19  bank account number, whom they spoke with, the date they
20  spoke with them, the amount of the check, check number.
21  And then there was a line for the collector to sign and a
22  line for the manager to sign.
23      Q.  Okay.  Was there any place on the form for
24  explaining the basis for redipping the check or was that

Page 13

1  not on the form?
2      A.  I honestly don't remember, sir.
3      Q.  Okay.  Were there any other forms that you
4  recall that were used in the process of redipping checks
5  other than the Redip Form?
6      A.  Not for redipping checks, no.
7      Q.  Okay.  Was there a spreadsheet used by the
8  manager to review the NSF checks with the collectors?
9      A.  If there was, I had no knowledge of it or
10  wasn't --
11      Q.  Okay.
12      A.  -- involved with it.
13      Q.  Did you have any involvement in trying to
14  contact banks about NSF checks to see if there were funds
15  that would cover the checks?
16      A.  No, sir.
17      Q.  Okay.  Do you know who Kathy Obenshain is?
18      A.  Yes.
19      Q.  Who is she?
20      A.  She was at -- when Valerie was employed, she
21  was her manager.
22      Q.  Okay.  Did you have contact with her from time
23  to time?
24      A.  When she'd visit the office.

B-245

d8a0c3cc-f939-4213-9ea3-eedbd8095680

Page 14

1      Q.   Okay.  Did you overhear conversations between
2   Kathy Obenshain and Valerie Hue over the telephone?
3      A.   A few times.
4      Q.   Your office was right next to Valerie Hue's,
5   wasn't it?
6      A.   Yes.
7      Q.   Could you hear through the wall sometimes what
8   phone conversations were going on?
9      A.   Not unless someone was yelling.  I wouldn't be
10   paying attention.  Sorry.
11      Q.   Sometimes they were yelling.
12           Okay.  Did you ever hear Kathy Obenshain
13   say words to the effect that Valerie Hue should put all
14   the checks on?
15      A.   I've heard her state "get them on."
16      Q.   Okay.  What do you recall about that exactly?
17   Can you give me any detail about what you heard?
18      A.   I believe it was a conference call, and she
19   told everybody to get them on.
20      Q.   Okay.  What did that mean, do you know?
21      A.   My interpretation would be that she wanted
22   them to make sure all the post dates verified and get
23   them on.  If there was any problems prior to EOM where
24   they were not verifying, that they needed to get on the

Page 15

1   phone and qualify the checks.
2      Q.   Okay.  But she didn't say that in those words.
3   Right?
4      A.   No.
5      Q.   Did she say anything other than to put the
6   checks on that gave you the understanding you just
7   expressed about what it meant?
8      A.   No.  That would be my interpretation of it.
9      Q.   Okay.  Did you ever hear her say words to the
10   effect that Valerie Hue should pull all the checks?
11      A.   No.
12      Q.   Okay.  Once that Redip Form was filled out,
13   what happened to it?
14      A.   The manager was supposed to sign off on it.
15   They would submit it to me.  As long as the manager had
16   signed off on it, I believe I sent an e-mail, I guess.  I
17   mean, I honestly don't -- I can't remember.  It's been a
18   long time, and I don't handle any of that anymore.
19      Q.   Okay.  But you do recall that they gave you
20   the form at some point?
21      A.   Mm-hmm.
22      Q.   Correct?
23      A.   Yes.
24      Q.   Do you recall whether you reviewed the form to

Page 16

1   see if it had been filled out properly, or did you just
2   see that the manager signed it and deal with it at that
3   point?
4      A.   It would have to be filled out properly
5   because I'd have to give that information to whoever
6   handled actually putting the checks back on.
7      Q.   That would be with the corporate office?  You
8   would have to give them the information?
9      A.   Correct.
10      Q.   The corporate office was in Horsham,
11   Pennsylvania?
12      A.   Yes.
13      Q.   Okay.  What information would you have given
14   to the Horsham office about the redip request?
15      A.   The account number, the amount of the check,
16   the check number, the reason it was being redipped or
17   that it had been verified.  If they needed information
18   like who they spoke with at the bank, I would give them
19   that.
20      Q.   Okay.  Are you aware that the collectors were
21   not always able to contact the debtor when they were
22   trying to verify the NSF checks?
23      A.   That wouldn't be something I would have
24   knowledge of.

Page 17

1      Q.   Okay.  Are you aware of any violation of NCO
2   policy regarding the request for resubmitting NSF checks
3   that took place before February 2004?
4           MS. FITE:  Object to form.  But answer
5   if you can.
6      A.   I'm sorry.  Could you repeat the question?
7      Q.   Are you aware of any violations of NCO
8   policies regarding the request for resubmitting NSF
9   checks that occurred before February 2004?
10           MS. FITE:  Same.  But go ahead and
11   answer if you can.
12      A.   I believe there was at least one collector
13   that was terminated for it.
14      Q.   Okay.  Would that have been Matthew Lane, do
15   you know?
16      A.   Correct.
17      Q.   Okay.  Other than Matthew Lane, are you aware
18   of any other violations?
19      A.   Not to my knowledge.
20      Q.   Okay.  Once the completed Redip Form was given
21   to you — and I'm talking about after the collector had
22   filled it out and the manager had signed it -- and you
23   provided the information to Horsham, what did you do with
24   a Redip Form when you were done with it?

B-246

d8a0c3cc-f939-4213-9ea3-eedbd8095680

Page 26

1  September 1, 2003 to August 2004?
2      A.  Yes, sir.
3      Q.  Did you ever have any discussion with Leigh
4  Ann Nickerson about the Redip Forms -- the records?
5      A.  In what manner?
6      Q.  Do you ever discuss them at all with her?
7      A.  As it pertains to her position?
8      Q.  No.  I'm sorry.  I'll try to clarify.
9          Did you ever discuss with Leigh Ann
10 Nickerson the Redip Forms that you had maintained on
11 behalf of NCO or any Redip Forms that she had maintained
12 on behalf of NCO?
13         MS. FITE:  Let me interject here and say
14 that, although this would normally be attorney-client
15 privilege, I'm going to waive the privilege because we
16 want Mr. Homer to know what we had done in order to try
17 to locate these documents.
18     A.  I just want to --
19         MR. HOMER:  Well, just to clarify that,
20 I don't think there's any attorney-client privilege for a
21 conversation she had with Leigh Ann Nickerson.
22         THE WITNESS:  It was a conference call.
23         MS. FITE:  I was a part of the
24 conversation.

Page 27

1          MR. HOMER:  Okay.
2          THE WITNESS:  It was a -- she had a
3  phone call with Leigh Ann Nickerson, and I was
4  conferenced in.  So she was speaking to us both.  And
5  Leigh Ann's response was basically she didn't know.
6  BY MR. HOMER:
7      Q.  She didn't know what?
8      A.  Where they were.
9      Q.  Okay.  Do you have any knowledge at all about
10 whether she maintained or continued to compile the Redip
11 Forms after you moved on -- after September 1, 2003?
12     A.  I don't know.
13     Q.  Okay.  I think I asked you before at what
14 point in time you were asked about the records, and I
15 think you indicated initially nobody did.  But then you
16 said the attorneys did.  When did the attorneys first
17 talk to you about --
18     A.  In January of this year.
19     Q.  This year.
20         Did anybody between December '03 and
21 January of this year ever talk to you about any of the
22 Redip Forms?
23     A.  Just the attorneys.
24     Q.  When did they talk to you about it?

Page 28

1      A.  January of this year.
2      Q.  Okay.  I meant anytime before January of '06.
3      A.  No.  No, sir.
4      Q.  Okay.  So the first time anybody asked you
5  about them after September 1, 2003 was January '06 when
6  the attorneys asked you about them?
7      A.  Correct.
8      Q.  Okay.  Do you have any knowledge about what
9  happened to the Redip Forms after September 1, 2003?
10     A.  No, sir.
11     Q.  Okay.  Is that true with the records you kept
12 and the ones that Nickerson kept as well, if she kept
13 any?
14     A.  Correct.
15     Q.  Okay.  Did anyone in NCO's management ever
16 give you any directive regarding the preservation of the
17 redip records?
18         MS. FITE:  Object to form.
19     A.  I'm not sure I understand the question.
20     Q.  In other words, did anybody in management,
21 including, for example, Mike Scher, ever give you any
22 directive about what should be done with the redip
23 records?
24         MS. FITE:  Same objection.  Answer if

Page 29

1  you can.
2      A.  No, sir.
3      Q.  Okay.  How did you know to put them in the
4  closet?  How did you know to put them in a banker box and
5  put them in storage?
6      A.  When I was in accounting, that's how we filed
7  everything.
8      Q.  And --
9      A.  I just continued the same procedures.
10     Q.  Okay.  Nobody really told you to do that?  You
11 did it because that's what you did with other records?
12     A.  Correct.
13     Q.  Okay.  Do you know whether Leigh Ann Nickerson
14 was ever given any directive about what should be done
15 about the redip records?
16     A.  I know I instructed her to basically keep
17 everything.
18     Q.  Okay.  That was during the transition period
19 when you were leaving and she was coming in?
20     A.  Correct.
21     Q.  You told her that orally?
22     A.  Yes --
23     Q.  You just said it to her?
24

B-247

Page 30

1    A.  -- sir.
2    Q.  Okay.  Was that as part of the explanation of
3  what your job duties were basically?
4    A.  Yes, sir.
5    Q.  Okay.  Did she have any questions about that
6  or did she -- did you have any understanding that she
7  knew what to do with the records, the redip records?
8         MS. FITE:  Object to form.  But go ahead
9  and answer.
10    A.  I instructed her that in all matters of
11  documents all documents should be kept.
12    Q.  Okay.
13    A.  No matter what they are.
14    Q.  Okay.  Do you have any reason to think she
15  didn't do that other than you couldn't find the redip
16  records when you looked in the closet or wherever --
17    A.  Yes, sir.
18    Q.  -- you looked for them?
19         What is your understanding?
20    A.  Because when she left, our company -- things
21  that should have been filed were thrown carelessly around
22  into drawers.  And it took the new admin weeks to sort
23  through stuff.
24    Q.  Okay.

Page 31

1    A.  So...
2    Q.  That would have been around September of 2004.
3  Correct?
4    A.  Correct.
5    Q.  Did you help at that point in trying to
6  straighten out the records?
7    A.  Actually, no.  It upset me too much.  I left
8  work.
9    Q.  Okay.  I'm trying to find the name of the
10  individual that took over for Nickerson.  I know it's
11  Marlow, but I forget her first name.  Brittany.  Brittany
12  Marlow.  Did she have any help at all -- Brittany
13  Marlow -- in trying to straighten out the records, do you
14  know?
15    A.  Not really, no.
16    Q.  You don't know or she didn't?
17    A.  No one helped her.
18    Q.  No one helped her.
19         Okay.  Do you know whether anybody gave
20  her any directives about what to do with the records?
21    A.  I did.  I told her that when she took over the
22  position that she basically should keep everything.
23    Q.  No.  I'm sorry.  That was confusing.
24         Do you know whether anybody told

Page 32

1  Kimberly Marlow when she assumed the position what she
2  should do with respect to the records?
3         MS. FITE:  You mean Brittany Marlow.
4         MR. HOMER:  I'm sorry.  Did I say --
5         THE WITNESS:  You said Kimberly.
6         MR. HOMER:  I'm sorry.  Brittany Marlow.
7         THE WITNESS:  That she should keep all
8  documents.
9         MR. HOMER:  Okay.
10         THE WITNESS:  But anything that she
11  found in like Leigh Ann's office, you know, should be
12  filed into the closets.
13  BY MR. HOMER:
14    Q.  Okay.  How do you know that she was given that
15  directive?
16    A.  Because I gave it to her.
17    Q.  Again, we're talking about --
18    A.  Brittany Marlow.
19    Q.  Brittany Marlow.  Okay.
20    A.  Yes.
21    Q.  Is Brittany Marlow the mother or the daughter
22  of --
23    A.  She's the daughter.
24    Q.  She's the daughter.  Okay.

Page 33

1    A.  But she worked under me, so...
2    Q.  She worked for you?
3    A.  Mm-hmm.
4    Q.  During what time period did she work for you?
5    A.  From the time she started in May of 2004 to
6  current.
7    Q.  Okay.  So she has two different job functions
8  now.  Is that right?  Is she still your assistant?
9    A.  Well, she's not my assistant.
10    Q.  All right.
11    A.  She works under me.
12    Q.  All right.
13    A.  She's part of our support staff.
14    Q.  Okay.  But part of her job still is to be the
15  admin assistant to the general collections manager?
16    A.  Correct.
17    Q.  Okay.  Do you know when, if ever, she began to
18  keep records about redipping checks?
19         MS. FITE:  Object to form.  You can
20  answer, if you understand.
21    A.  We don't use the form anymore.
22    Q.  Okay.  When was the form stopped?  When did
23  you stop using the form?
24    A.  I don't honestly know.  I don't believe

B-248

d8a0c3cc-f939-4213-9ea3-eedbd8095680

Page 34

1  Leigh Ann was actually using it at all, so -- at least
2  because all we've been able to locate are e-mails from
3  her. So I don't know if she was using it at all. But
4  when Brittany took over the position, collectors had told
5  her that they didn't use it anymore.
6      Q. Well, do you know what process is used to
7  verify funds or document the verification of funds?
8      A. I'm not exactly sure. It all goes to the
9  managers now.
10     Q. Well, it all went through the managers when
11 you had the Redip Forms. Didn't it? Didn't the manager
12 have to sign off on the Redip Form?
13     A. Yeah. But now I don't believe the admins have
14 any involvement in it at all.
15     Q. Okay. As far as you know, Brittany Marlow
16 never had any involvement in it?
17     A. I don't believe so.
18     Q. Okay. Are you aware of what NCO's records
19 retention policy was when you were the admin assistant?
20         MS. FITE: Object to form. Answer if
21 you understand.
22     A. I don't understand.
23     Q. I'll rephrase it.
24         When you were the admin assistant, did

Page 35

1  NCO have a records retention policy?
2          MS. FITE: Same objection. Answer if
3  you can.
4      A. I've always been told from every manager I've
5  had to keep everything, and that's just all I've ever
6  done.
7      Q. Okay. You mentioned before during this period
8  that you were looking for the records, the redip records,
9  with Brittany Marlow that you checked with the storage to
10 see if it had been sent to storage.
11     A. Mm-hmm.
12     Q. Can you tell me what storage you're referring
13 to?
14     A. It's called records storage. It's -- I
15 believe it's in Dover. I know it's in Delaware. And
16 when we were Milliken & Michaels, we were sending boxes
17 of documents there because our building wasn't equipped
18 to store that many hard copy documents. When we changed
19 over to NCO, we would continue to send things over up
20 until, they told me, the end of 2001. At that point in
21 time, I believe the contract actually terminated, but
22 they still house our -- the documents from the end of
23 2001 and back.
24     Q. Okay. So there has been nothing sent to

Page 36

1  storage since the end of 2001 as far as you understand
2  it?
3      A. Yes, sir.
4      Q. When you were maintaining the redip records,
5  they were put into a closet?
6      A. Yes, sir.
7      Q. What else was in that closet?
8      A. All of our PDC backup, which is the records
9  that show our payments to our clients, our DCI check
10 forms, which are the checks that the collectors take over
11 the phone, our purged settlement letters.
12     Q. I take it this is a fairly large closet.
13     A. It is a very large closet.
14     Q. Okay. Was there room in the closet for more
15 boxes of records when you --
16     A. Yes.
17     Q. -- stopped being the admin assistant?
18     A. Absolutely.
19     Q. Okay. Was there lots more room for more
20 records?
21     A. At least three or four more banker boxes.
22     Q. Okay. How fast was this closet filling up
23 with records, if you know?
24     A. Well, I was averaging two boxes in a year. So

Page 37

1  it wasn't that bad.
2      Q. Okay.
3      A. I had a fairly large office. So I could keep
4  a good amount of records in my office before I had to
5  purge them out.
6      Q. Okay. When did you last see the redip records
7  that you maintained?
8      A. I last saw the boxes in the closet, you know,
9  maybe December of '03, because we had started -- I had
10 given labels to Leigh Ann and telling her that there had
11 to be a label on every box in the collection closet that
12 had her office number on it so that the movers would know
13 to deliver those boxes to her office so that she could
14 then file them in the closet she was issued.
15     Q. Okay. When was the office moved?
16     A. Friday, February 13th of 2004.
17     Q. Okay. Do you have any understanding of where
18 the redip records might have been between December '03
19 and February 13, 2004?
20     A. No, sir.
21     Q. Okay. When you told Leigh Ann that she had to
22 label the boxes, you were talking about the boxes in the
23 closet?
24     A. Yes, sir.

B-249

d8a0c3cc-f939-4213-9ea3-eedbd8095680

Page 38

1    Q.  Now, that was labeling for the purposes of the
2    move.  Right?
3    A.  Yes, sir.
4    Q.  The boxes already had a label on them that
5    indicated some of the records were redip records.  Right?
6    A.  Yes, sir.
7         MS. FITE: Sorry, I think I told you
8    this, but there were two moves.
9         MR. HOMER:  Right.
10   BY MR. HOMER:
11   Q.  Let's ask about that.
12        The first move was February 13, 2004.
13   Is that correct?
14   A.  Yes, sir.
15   Q.  When was the second move?
16   A.  January 24th, 2006.
17   Q.  Okay.  When were you first aware that the
18   redip records were missing?
19   A.  Beginning of January 2006 when asked to pull
20   them.
21   Q.  Okay.  Do you know any of the administrative
22   assistants in other NCO offices?
23   A.  Yes, sir.
24   Q.  Okay.  What kind of interaction would you have

Page 39

1    with those assistants?
2    A.  Friendly, daily e-mail, phone.  I mean...
3    Q.  Okay.  So you had a fair amount of interaction
4    with the other assistants?
5    A.  Yes, sir.
6    Q.  When you were developing the Redip Form, did
7    you have any discussions with any of the other offices
8    about what forms they were using?
9    A.  No, sir.
10   Q.  Did you ask to see anybody else's forms so
11   that you could use the same ones or anything of that
12   nature?
13   A.  No, sir.
14   Q.  When you were putting together the form, did
15   you ever have any discussion about the process that other
16   offices were using for redipping checks?
17   A.  No, sir.
18   Q.  Okay.  What do you know about the processes
19   that other offices at NCO, other than the Dover offices,
20   were using for processing redips?
21   A.  I don't know.
22        MS. FITE: Object to form.
23        THE WITNESS:  I don't know.
24

Page 40

1    BY MR. HOMER:
2    Q.  You don't have any knowledge at all?
3    A.  Uh-uh.
4    Q.  Even though you had this involved interaction,
5    the discussion never came up about how they did the
6    redipping of checks?
7    A.  No, sir.
8    Q.  Okay.  Do you know who Matthew Lane is?
9    A.  Yes, sir.
10   Q.  Who is he?
11   A.  He was a large balance collector with the
12   Dover office.
13   Q.  Okay.  Were you present when NCO fired him?
14   A.  No, sir.
15   Q.  You don't recall being present when he was
16   terminated?
17   A.  No, I don't.
18   Q.  Okay.  Do you recall being present when
19   Valerie Hue phoned debtors to question them about checks
20   that Matthew Lane had said they had authorized?
21   A.  Yes.  I was present for one phone call.
22   Q.  Okay.  Can you relate the substance of what
23   that phone call was about?
24        MS. FITE: Object to form.  But answer

Page 41

1    if you can.
2         MR. HOMER:  What are you talking about
3    objecting to the form?  Can you relate the substance of
4    the conversation?  Why is that objectionable?
5         MS. FITE: I've seen the transcript and
6    it's voluminous.  There's a lot of different things that
7    go on in the conversation.
8         MR. HOMER:  I just --
9         MS. FITE: I just thought that your
10   question was a little bit overbroad and vague.
11        But answer it if you can.
12        MR. HOMER:  I asked her just to relate
13   the substance of that.  There's nothing improper about
14   that.
15        MS. FITE: Answer if you can.
16   A.  The conversation I was present for was -- had
17   Valerie Hue and Leigh Ann Nickerson both in the office.
18   Valerie placed a call to a debtor to follow up in regards
19   to an account that Matthew Lane was working on and asked
20   him about post dates on the system.  She read off check
21   numbers to him that he stated were not his check
22   numbers --
23   Q.  Okay.
24   A.  -- that they were basically fraudulent.

B-250

d8a0c3cc-f939-4213-9ea3-eedbd8095680

**Page 42**

1  Q.  Okay.
2  A.  And she repeated it -- you know, all the check
3  numbers to him more than once to verify that they were
4  definitely not his checks and he had not authorized them.
5  And that was basically the gist of the conversation.
6  Q.  Okay.  You're aware, I take it, that Valerie
7  Hue's employment was also terminated by NCO.  Correct?
8  A.  Yes, sir.
9  Q.  Do you have any knowledge of the investigation
10 into the practices that she was alleged to be engaged in
11 that led to her termination?
12 A.  I was only told that it had to do with
13 violation of the cash processing.
14 Q.  Okay.  Who told you that?
15 A.  Mike Scher.
16 Q.  Okay.  Did you have any other involvement in
17 that investigation?
18 A.  No, sir.
19 Q.  Nobody questioned you about the check handling
20 practices?
21 A.  No, sir.
22 Q.  Okay.  Did anybody question you about the
23 forms that were used to verify checks?
24 A.  No, sir.

**Page 43**

1  Q.  Did you ever complain to Valerie Hue about
2  sexual harassment by Mike Scher?
3  MS. FITE:  Object to form to the term
4  "sexual harassment."  But you can answer.
5  A.  I made a complaint to my friend that I felt
6  that he had acted inappropriately.  But by the next day,
7  he and I had discussed it as adults and resolved it.
8  Q.  Okay.
9  A.  I later that year went to work for him.
10 Q.  Okay.  Did you go to Valerie Hue about what he
11 had said?
12 A.  Yes, sir.
13 Q.  Okay.  What was the substance of what he said
14 to you?
15 A.  It was more that I felt he touched me
16 inappropriately.
17 Q.  Okay.  What did Valerie Hue do about it?
18 A.  It was a conversation between her, myself and
19 Ms. Marlow, and she taped the conversation.  I thought
20 that was pretty much the end of it.  I didn't want
21 anything more to go forth with it until I had discussed
22 it with Mike Scher.
23 Q.  And what -- I'm sorry.
24 A.  But to my knowledge, his boss was contacted --

**Page 44**

1  or her -- she had contacted her boss.
2  Q.  Okay.  Do you know what happened as a result
3  of the problem?
4  A.  Nothing.
5  Q.  Okay.
6  A.  Mr. Scher and I discussed it and resolved it,
7  and it was a dead issue.
8  Q.  Okay.  Mr. Scher, was he your boss at the
9  time?
10 A.  No.
11 Q.  Did he run the whole Dover office?
12 A.  Yes.
13 Q.  Okay.  So he wasn't your direct boss, but he
14 did manage the whole office.  Correct?
15 A.  Correct.
16 MR. HOMER:  Okay.  I don't have any
17 other questions.
18 MS. FITE:  We'll step outside and be
19 right back.
20 (A brief recess was taken.)
21 - - - - -
22 MS. FITE:  We don't have any questions.
23 (The deposition concluded at 2:15 p.m.
24 this same day.)

**Page 45**

1  (I HAVE READ THE FOREGOING DEPOSITION,
2  AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)
3
4
5
6  _____
7  WITNESS NAME
8
9  - - - - -
10
11 INDEX TO TESTIMONY
12
JENNIFER BIRDSONG          PAGE
13
Examination by Mr. Homer          2
14
15
16 - - - - -
17
(There were no exhibits marked during this deposition.)
18
19
20 - - - - -
21
22
23
24

B-251

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                          )
    Plaintiff,                   )
                                      )
          v.                    )  C.A. No.
                                      )  05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a        )
Delaware corporation, trading as      )
NCO FINANCIAL COMMERCIAL SERVICES,    )
    Defendant.                   )

        Telephone deposition of **RICHARD BOUDREAU**, taken before Cheryl A. Anthony, Court Reporter, in the law offices of Parkowski, Guerke & Swayze, 116 West Water Street, Dover, Delaware, on Tuesday, March 28, 2006, beginning at 12:05 p.m.

APPEARANCES:

    PARKOWSKI, GUERKE & SWAYZE
    BY:  JEREMY W. HOMER, ESQUIRE
    116 West Water Street
    Dover, Delaware  19901
    Attorney for Plaintiff.

    SESSIONS, FISHMAN & NATHAN
    BY:  DAVID ISRAEL, ESQUIRE
    3850 North Causeway Boulevard
    Lakeway Two, Suite 1240
    Metairie, Louisiana  70002-1752
    and ELIZABETH FITE, ESQUIRE
    15316 North Florida Avenue
    Suite 100
    Tampa, Florida  33613
    Attorneys for Defendant.

ALSO PRESENT:
    MS. VALERIE HUE

      **ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
(302)674-8884.

B-252

1    A.    As a large balance collector, she would have

2    been responsible to report to me, that is correct.

3    Q.    And did I understand you correctly to say

4    that you had that position for about two years?

5    A.    Yes, approximately.

6    Q.    And Valerie Hue would have reported to you

7    for that two-year period; is that correct?

8    A.    The first year she was reporting to me as a

9    collector.  The second year she was reporting to me as

10    a collector/MIT, as an MIT manager in training, because

11    after the first year of -- she was already in large

12    balance.

13    But after that first year, Phil Weaver, as

14    the company has always wanted to do, was always looking

15    to put new people into managerial roles.  It has always

16    been my position, apparently, as well as the company's,

17    if I needed to move on to other opportunities in the

18    company, I needed to be able to find my replacement.

19    And Valerie was the person that I gave nod

20    to and dropped her name, suggested her name in the

21    process, and was given the go-ahead to, you know,

22    involve her in daily projects and that kind of thing.

23    So during the second year, she was not only a collector

24    for me, but she was also a student, if you will, of mine

1    during that MIT stage.

2        Q.    Okay.  You have already mentioned Bill

3    Savage's name.  Who was he at NCO?  What was his

4    position?

5        A.    When I first went to NCO back in '95, or

6    when I first went to Milliken & Michaels in '95, Bill

7    was the general manager at this branch.  At that time

8    there was only one manager on both sides of sales and

9    collections.  Bill was the general manager of the whole

10   branch, both facilities, both sides of the fence, if you

11   will.  He was the guy that hired people or he was the

12   guy that gave the nod if someone was recommended to be

13   hired, that kind of thing.  Bill was instrumental in the

14   firsthand hiring of myself.

15       Q.    Okay.  Was Mr. Savage involved in the

16   promotions that you received while you were at NCO?

17       A.    He -- The first promotion, where I was taken

18   from collections and brought over to sales -- I

19   considered that to be a promotion -- yes, he was

20   involved with that, because it was a recommendation

21   from, I believe, Joe Scudari, who was my mid balance

22   collector at that time.

23            Subsequent to that was my move back from

24   sales back into collections and into the small balance

1       Q.    Do you recall ever having a telephone

2  conversation between yourself, Mr. Weaver, and Mr. Fox

3  regarding a discrimination issue involving Bill Savage

4  and Valerie Hue?

5       A.    I had a conversation regarding Phil Weaver,

6  Ted -- with regards to Phil and Ted and Bill Savage.

7  I'm not quite sure how it impacted Valerie, because my

8  issues and complaints at that time were regarding

9  statements made by Savage over a week and a half's

10  period of time, either in the front or presence of my

11  collectors or in the presence of my managers.  That was

12  the conversation that I had.

13       But I'm not -- I mean my understanding of

14  the relationship with Valerie was not part of that

15  conversation.  As far as I knew, Valerie and Bill were

16  cousins.  That's the way I always understood it, and

17  that was the way they half jokingly stated it.

18       Q.    So your testimony is you had a discussion

19  with Phil Weaver and Ted Fox about Bill Savage --

20       A.    Yes.

21       Q.    -- but not necessarily Valerie Hue?

22       A.    Correct.

23       Q.    Okay.  What was the discussion you had with

24  Fox and Weaver about Bill Savage?

1      A.      Is that he was making inappropriate

2   statements over a period of time in meetings or coming

3   into collectors' offices -- I believe there are some

4   statements that have been attested to.  He would come

5   into a collector's office and want to know things like,

6   are we making or having auditions, rather, for Tarzan

7   movies, because I had hired a good crowd of black

8   collectors, which were more than capable of it.

9           But while Bill probably recognized that,

10  too, he utilized a cheap shot opportunity to make what

11  he believed to be, you know, an old boy joke that went

12  off terribly.  There were other situations, you know,

13  similar in nature, where he would make, you know,

14  comments about the race of somebody because they were

15  black.

16     Q.      Do you ever recall talking to either Fox or

17  Weaver or both about a complaint that Valerie Hue had

18  about Bill Savage?

19     A.      No.

20     Q.      Do you ever recall Valerie Hue making a

21  complaint about Bill Savage?

22     A.      No.  I said my comment earlier was that Bill

23  was an off-color guy, and you can't throw him far enough

24  away from you to be -- he just keeps coming back,

1        Q.    How long were you in the office from when

2    your conversation occurred with Savage and Fox until you

3    left the business?  And I'm going to represent --

4        A.    Do you mean Weaver and Fox?

5        Q.    Yes.  I'm sorry.  And I'm going to represent

6    to you that I understand your conversation with them was

7    during October 2001.

8            MR. HOMER:  I will object to that.  You

9    might as well testify for him.

10           THE WITNESS:  In April of 2002, I was gone.

11    BY MR. ISRAEL:

12        Q.    So a year later?

13        A.    Well, four months.

14        Q.    Oh, I'm sorry.  In April of 2002?

15        A.    I left.

16        Q.    Did you ever see Ted Fox take any

17    retaliatory measures of any kind, after Savage was

18    fired, against Valerie Hue?

19        A.    Negative.  I never heard from Ted.  Again,

20    other than Phil, I've never had conversation one with

21    Ted regarding that.  Val, as far as I knew, was a

22    selection that they approved.  They liked her.  They

23    thought she was intelligent.  She thought she was

24    assertive.  They thought she was cunning.  They thought

1    she had the ability to do the job and gave me the nod to

2    bring her on line as my protege.

3         Q.    Got it.

4         A.    Never did I ever get a sense that that was

5    in question.

6         Q.    Did you ever get a sense that there was any

7    question from Ted Fox relating to your observations as

8    you have just described them?

9         A.    That is correct.  I never heard anything

10   from -- Never did Ted necessarily call me up and say:

11   By the way, Rick nice deal, blah, blah, blah.  His

12   conversations would have been with salespeople, not with

13   me.  Phil's conversations were with me.  But to say that

14   Ted ever called up and said that he -- gave me some

15   concerns over this, that, and the other thing, no, I

16   never had a conversation like that with him.

17        Q.    Do you believe after Savage was fired and

18   before you left, you had a good relationship with

19   Ms. Hue?

20        A.    With who?

21        Q.    With Valerie Hue?

22        A.    Yes, absolutely.  I've always had a good

23   relationship with Valerie --

24        Q.    During that time --

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                     )
                                 )
          Plaintiff,             )
                                 )
v.                               )
                                 )   Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,     )     05-225~KAJ
a Delaware corporation,          )
trading as NCO FINANCIAL         )
COMMERCIAL SERVICES,             )
                                 )
          Defendant.             )


          Telephone Deposition of TEX FOX taken
pursuant to notice at the law offices of Parkowski,
Guerke & Swayze, P.A., 116 West Water Street, Dover,
Delaware, beginning at 2:30 p.m. on Monday, March 13,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.


APPEARANCES:


          JEREMY W. HOMER, ESQ.
          PARKOWSKI, GUERKE & SWAYZE, P.A.
            116 West Water Street
            Dover, Delaware  19903
            for the Plaintiff,


          CORBETT & WILCOX
        Registered Professional Reporters
   1400 French Street     Wilmington, DE 19801
              (302) 571-0510
            www.corbettreporting.com

Page 6

1 By that, I mean, could you just state what different jobs
2 you've had, the approximate dates that you held the jobs
3 and what your responsibilities were?
4     A. When I graduated from college, I worked for a
5 newspaper in the Washington, D.C. area. I did that for
6 roughly two years before I migrated to radio where I sold
7 sports marketing broadcasting. And, additionally, I sold
8 promotions for the Howard Stern Show, the G. Gordon Liddy
9 Show with Don and Mike. I did that for about three years
10 until I then went to work for a guy who I did work for on
11 the newspaper, which is an environmental risk and
12 information database company. I worked there for about
13 five and a half years, which led me to become employed
14 with Milliken and Michaels. And then once the
15 acquisition from NCO in 1998, I've been with them ever
16 since.
17     Q. Okay.
18     A. '99.
19     Q. Milliken & Michaels was acquired by the
20 defendant in this case, correct, NCO?
21     A. Correct.
22     Q. Could you just now, again, briefly go through
23 the different positions you've held with Milliken &
24 Michaels and NCO since you started working there?

Page 7

1     A. The first position I was with Milliken &
2 Michaels -- and I'll refer to Milliken & Michaels as
3 M&M -- Milliken & Michaels --
4     Q. Okay.
5     A. -- I was an executive recruit.
6         I was brought in mainly to learn the
7 business with the intent to become a branch manager. I
8 spent roughly three and a half months in the Dover,
9 Delaware office. Then I was swiftly promoted way ahead
10 of schedule to the branch manager of the credit services
11 division of Milliken & Michaels. After the acquisition I
12 was then promoted to the senior vice president of sales
13 and --
14     Q. Do you recall what the approximate date of
15 that was?
16         MR. ISRAEL: You're talking SVP of
17 sales, Jerry?
18         MR. HOMER: When he was senior vice
19 president of sales.
20     A. 2001. I apologize, Jerry. I just --
21     Q. That's all right. If you can't remember,
22 that's okay.
23     A. Well --
24     Q. Was that position -- sales -- for the whole

Page 8



1 organization or was it just the commercial division?
2     A. It was just the commercial division, which
3 included credit services, that I had run previously,
4 which is outside of the commercial collections industry.
5     Q. Okay. How long were you in that position?
6     A. I was in that position for three years.
7     Q. Okay. What was the next position that you
8 took?
9     A. The one I presently hold, which is running the
10 commercial division.
11     Q. What's your title now?
12     A. It has -- we just reorganized. My title
13 presently is vice president of the commercial division.
14     Q. When did you get promoted into that position
15 even if it was by a different name in those days? I
16 understand you got a new name now for the title. But
17 when did you first receive this position?
18     A. That's easy to remember because it was
19 Christmas Eve -- December 24th, 2003.
20     Q. Okay. Who do you report to?
21     A. I currently report to Arthur Page.
22     Q. What's his title?
23     A. This is -- I mean, this is -- just so you
24 know, Jerry, this is for the last week I have been



Page 9

1 reporting to him. They've reorganized and created a
2 whole new division.
3     Q. Okay.
4     A. I do not know what title they gave him. I
5 believe it is somewhere on the senior vice president
6 level now.
7     Q. Okay.
8     A. But I don't know the exact title they've given
9 him.
10     Q. Okay. Going back to January of 2004, who did
11 you report to then?
12     A. I reported to Steve Leckerman.
13     Q. Okay. What was his title?
14     A. His title is executive vice president of
15 U.S. operations.
16     Q. Okay. Do you know who he reported to?
17     A. He reports to the board, I believe.
18     Q. You said he reports to.
19         But is that who he reported to in
20 January of '04?
21     A. I believe he reports to the CEO, Michael
22 Barrist, but, you know, his direct responsibilities are
23 to the board of the company.
24     Q. The CEO, what was his name again?

Tex  Fox

## Page 18

1  this, but just I want to put on the record: You
2  understand that even though we're doing this by telephone
3  it doesn't change the fact that you really can't talk to
4  the attorney during any kind of sidebar conversations
5  with your attorney or get other communication from him by
6  way of written notes or gestures or anything like that?
7      A.  I understand.
8      Q.  Okay.  Was Mr. Savage involved in any way in
9  you receiving any promotion?
10     A.  No.  My contract was written very specific
11 that I was to move from primary to CFD on the first day
12 of the fourth month.  It was written that I was supposed
13 to move on the first day of the seventh month into
14 management.  We never got that far into the deal because
15 they had terminated their relationship with the branch
16 manager of the credit services division down here in
17 Metairie, Louisiana.
18     Q.  Okay.
19     A.  And Lou Molitiere and Tray Cefalu were the
20 only ones involved in that promotion.
21     Q.  Okay.  Can we get a spelling for that name you
22 just gave as Tray --
23     A.  C-e-f-a-l-u.
24     Q.  Was Mr. Savage ever involved in instructing

## Page 19

1  you as to how to do your job?
2      A.  All of my sales and management meetings were
3  held by Mike Gibson.  The only involvement I had with
4  Bill Savage was whenever he would hold a branch meeting
5  or an awards meeting.  I would -- if I had to explain it,
6  it was more or less a secret that I was an executive
7  recruit in the branch.  So anytime that I needed to get
8  something from corporate, which is where Lou and Tray
9  Cefalu were located, I would have to do that through Bill
10 Savage.  So there was an occasion where I would have to
11 go to his office and have him call Lou or get something
12 to Lou or to Tray for me during that three-month period.
13 And that goes back to the expense reports, my corporate
14 housing.  I had a lot of questions, especially in the
15 early months when they were putting that together.
16     Q.  Okay.  Were you ever involved in any way in
17 Mr. Savage receiving a promotion?
18     A.  For as long as I knew Bill, he was a branch
19 manager.  Never anything more.  We did move him from
20 Dover to the Boone location.  And then when we reduced
21 the size of the Boone location, we moved him back to
22 Dover.
23     Q.  Okay.
24     A.  But he never got a promotion.  He got moved.

## Page 20

1      Q.  Okay.  Did you at any time socialize with
2  Mr. Savage outside the office?
3      A.  You know, I've been thinking about this for a
4  while because, obviously, we're going back several years.
5  Bill is an avid golfer.  And I am trying to recall -- and
6  I can't recall if I ever did golf with him one time.  I
7  know that he had invited me on several occasions.  And if
8  I had, it would have been one time, mainly because my
9  free time -- I did still live in Virginia when I had the
10 Dover office.  I did not stay in Dover on any weekends.
11 So I really -- Jerry, I can't recall.  And if I had, it
12 would have been one time.  And it would have been with
13 other people from that office.
14     Q.  Would this jar your recollection?  Did you
15 ever make a trip to Hilton Head to golf where Savage was
16 present?
17     A.  No.  Never.
18     Q.  Okay.  To get back to the question I asked
19 before, you mentioned the possibility that you golfed
20 with him.  Were there any other times that you socialized
21 with Bill Savage outside the office?  For example, did
22 you go out to dinner with him or engage in any other
23 contact with him outside the office?
24     A.  When he was the Boone manager, I did often do

## Page 21

1  branch visits.  When I do a branch visit, I take the
2  managers out to dinner.  I did have dinner with him and
3  Cliff Scales back when -- this was one visit prior to us
4  reducing the branch.  So, again, this was back somewhere
5  in the late 1990s.
6      Q.  Okay.  Anything other than the dinner where
7  you would have had contact with Bill Savage outside the
8  office?  I understand there's a possibility that you
9  golfed with him at least one time.
10     A.  No.
11     Q.  Okay.  Did you consider Bill Savage a friend
12 of yours while you worked with him at NCO?
13     A.  No.
14     Q.  Okay.  Have you had any contact with him since
15 he left NCO?
16     A.  I think that I talked to him one time, and it was a
17 business-related issue about a crossover of clients.
18     Q.  Okay.
19     A.  And that was one time and one time only.
20     Q.  Okay.  Did you know Valerie Hue before
21 December '03?
22     A.  Yeah.  Valerie -- she, I believe, at the time
23 I was in Dover was a collector.
24     Q.  Okay.

B-261

Page 34

1   on if you were -- you know, you did not improve based on
2   the things that were outlined over that period of time.
3   And that was all controlled and really directed through
4   our HR department. They wrote most of, if not all of the
5   JDS's. That's the general job discussion summary.
6       Q.  Okay. Let me try to refocus you a little bit.
7   Let's say we're talking about the termination of a
8   manager which didn't fall in the progressive discipline
9   mold. It was something that was serious enough so that
10  they were terminated without doing progressive
11  discipline. How many times would that situation have
12  come up?
13      A.  I can think of several.
14      Q.  Okay. What was the process used when that
15  happened? I think you've described what happened with
16  Bill Savage. You were consulted. HR was involved. No
17  attorney involvement. But the decision was jointly made.
18  Was that the process that was followed usually? Was that
19  typical of the process followed if you terminated a
20  manager when it wasn't progressive discipline?
21      A.  The process that existed and exists today is:
22  If there's something that is out there that affects a
23  manager and they are suspended, HR is involved. Some
24  type of investigation will be conducted, either by HR or

Page 35

1   by myself or by our vice president of operations. That
2   information is collected. Then decisions are made based
3   on what is discovered. And typically, HR and myself or
4   HR and my vice president of operation, depending on what
5   type of manager we're talking about, would do the
6   termination over the phone.
7       Q.  Okay. How would you determine whether you
8   would become personally involved in an investigation?
9       A.  It would depend on the situation.
10      Q.  How many times have you been involved in
11  personally investigating a situation?
12      A.  A few.
13      Q.  Okay. How many times have you interviewed
14  witnesses as part of an investigation into a manager's
15  wrongdoing?
16      A.  Again, a few.
17      Q.  Okay. All right.
18      A.  Each one of those that I was involved with I
19  would have done that.
20      Q.  Okay. I'm aware that Valerie Hue was one of
21  them. What other ones can you tell me that you were
22  involved in?
23      A.  That I can remember, Tom Lynch, who was our
24  branch manager of our Metairie location.

Page 36

1       Q.  Okay. Anybody else?
2       A.  George Kearne. He was in the San Diego
3   location. Steve Ross.
4       Q.  These are all situations where you've
5   interviewed people to determine whether the manager did
6   anything wrong or not?
7       A.  Absolutely.
8       Q.  Okay. What did Lynch do wrong?
9           MR. ISRAEL:  One second, Jerry. Hold on
10  a second, Jerry. He's trying to come up with names.
11          THE WITNESS:  The guy in Tampa --
12  Fuchs, Doug Fuchs.
13  BY MR. HOMER:
14      Q.  Okay. In what time period did these
15  situations where you actually interviewed witnesses in
16  connection with an investigation of a manager take place?
17  Was it when you were in your previous position or in your
18  current position or both?
19      A.  Both.
20      Q.  Okay. Which ones were in your current
21  position?
22      A.  All four that I just mentioned there were when
23  I was in my previous position. I'm trying to think in
24  the last couple of years. I know we've had others. I

Page 37

1   apologize, Jerry.
2       Q.  That's all right.
3       A.  I can definitely produce it, I just can't --
4   I'm trying to separate production issues versus other
5   issues. Craig Calvacante was -- it was kind of a
6   combination of production and technical issue.
7       Q.  When was Calvacante terminated?
8       A.  He was more -- I think we let him go and then
9   we brought him back and then we demoted him. There were
10  several instances where Craig went up or down or out.
11      Q.  Okay. Did you investigate what he did wrong
12  before you were promoted to your current position?
13      A.  No. This was while I was in this position.
14      Q.  Okay. Anybody besides Calvacante and Valerie
15  Hue where you would have investigated the situation by
16  personally interviewing witnesses?
17      A.  I can't recall.
18      Q.  Okay. What prompted the investigation of
19  Valerie Hue that led to her termination here in this
20  case?
21      A.  Kathy was very -- what prompted it was that we
22  had a process that was put in place by our Horsham office
23  who was taking a very hard look at NSF checks, DCIs,
24  redips -- that's what we call them. And I was really

Tex Fox

Page 42

1    A.  A couple days. I don't know. I really don't
2 know, Jerry.
3    Q.  Okay. What prompted you to get personally
4 involved? You said you turned it over to Kathy. Why did
5 you decide you needed to be involved in it?
6    A.  If I recall correctly, HR was involved as
7 well. This was the determination -- that I would do some
8 of the interviews. Kathy and Dina were working very hard
9 on the files. And HR, I want to recall, asked me to do
10 that.
11    Q.  Okay. Do you recall what HR's involvement was
12 in the investigation?
13    A.  I know HR was talking to our executive team.
14 They were relying on our interviews and what Kathy was
15 finding out on the files as far as documentation. They
16 were more an ear. And they helped to implement the
17 decision.
18    Q.  When you say "HR," do you recall who it was in
19 HR that asked you to get involved in it?
20    A.  I want to say it was Cherie Sugg.
21    Q.  You're not sure?
22    A.  I'm about 99 percent positive that it was
23 Cherie.
24    Q.  Okay. Did she have the authority to tell you

Page 43

1 to get involved in an investigation?
2    A.  Yes.
3    Q.  Okay. Do you recall what documents you had at
4 the time that you started doing the investigation that
5 you personally held regarding this matter?
6    A.  The only document that was created for this
7 matter would be what Dina was working off of. And I know
8 we had something from her. But our system is really the
9 place where we look for all our information. If
10 something happened on the file, it would be noted there.
11    Q.  Yeah. I'm really not asking about the
12 documentation that she found. I'm just wondering what it
13 was that you got when you started your investigation.
14        Did you have a list of problems? Did
15 you have just an oral understanding of what was going on
16 or did you actually look at some documents before you
17 started interviewing people?
18    A.  I looked at everything Kathy brought to me,
19 and at that time that was file reviews. Kathy was
20 really -- I really believed Kathy was looking to find
21 that there was nothing wrong there.
22    Q.  Okay. I don't want to get too sidetracked.
23        Do you recall what documents she brought
24 to you?

Page 44

1    A.  It wouldn't be a document. I mean, the only
2 document would be a print screen. It would be a copy of
3 what she was working with Dina on.
4    Q.  Do you recall if you saw a report that listed
5 various NSF checks and collectors and indicated problems
6 in it with each check? Did you see anything like that?
7    A.  Not that that -- no.
8    Q.  Did you see an end-of-the-month NSF report?
9 By "NSF," I'm sure you know what I mean --
10    A.  Right.
11    Q.  -- the not sufficient fund report check.
12    A.  Kathy had all of that. I didn't have it.
13    Q.  So when you started the investigation, you
14 hadn't seen those documents. Is that right?
15    A.  My role was -- you've got to remember. This
16 is about two weeks after I had taken over the division.
17 I'm really getting introduced to the collections side,
18 because I had no involvement on the collections side.
19 Kathy, as the vice president of operations, who also
20 worked on the collections side her whole career -- I was
21 very reliant on her professionalism of what was to
22 transpire on the collections side. I truly did think
23 those interviews with the collectors were very reliant on
24 what Kathy gained with what she did on her side and

Page 45

1 really respect the decision she came to and actually
2 implemented the termination of Valerie.
3    Q.  Okay. I have seen in this case various
4 witness statements, and a number of them indicate they
5 talked to you. Do you recall how you selected who you
6 were going to interview regarding this matter?
7    A.  If I do any type of investigation in an
8 office, I'm going to look at the most senior people
9 there, the ones that I believe are the most trusted
10 people, ones that don't have any type of history of
11 showing me that they're not an honest individual. So I
12 went to, in that office, particular people like Mark
13 Lefevre and Dave McQuisten, Kim Marlow, Eric Shaw. I
14 mean, I went to the people I saw would give me the most
15 accurate type of information. I also sampled across the
16 board several different people so that -- and I knew that
17 they weren't connected in any way so that I could -- and
18 what came out of this was a clear straight same thing.
19    Q.  So --
20    A.  So it was the same thing.
21    Q.  So this was sort of a judgment that you used?
22 You just didn't go out and interview all the large
23 balance collectors?
24    A.  I think I interviewed three of them. I can't

13 (Pages 46 to 49)

Page 46

1  recall, Jerry, how many we had in the office at the time.
2      Q.  When you interviewed them, do you recall what
3  you asked them?
4      A.  I'm certain -- I don't recall exactly how I
5  phrased it, but I'm certain I asked them what was their
6  interpretation of redipping, what's the DCI policy in the
7  Dover branch.
8      Q.  What's the DCI policy?
9      A.  Direct checks.
10     Q.  Right.
11         You're aware that the case involves the
12  resubmission of NSF checks.  Correct?
13     A.  Correct.
14     Q.  By "resubmission," I mean resubmission to the
15  bank for payment after a check was initially returned as
16  not having insufficient funds.  Correct?
17     A.  I'm sorry.  Can you -- the last part you went
18  out on the phone.
19     Q.  Okay.  As I understand it, the check handling
20  policy that is involved in this case has to do with
21  redipping NSF checks.  Well, let me try it from another
22  tact here.
23     A.  Okay.
24     Q.  When you did these interviews, did you ask

Page 47

1  what Valerie Hue had instructed them to do regarding the
2  implementation of check handling policies?
3      A.  I might have phrased it that way.  I do not
4  recall my exact words.
5      Q.  Okay.  Who was present when you were having
6  these interviews?
7      A.  I apologize, Jerry.  I don't recall if I had
8  HR on the phone or not.  I think it was as simple as I
9  called them.  I asked them the question.  I asked them to
10  submit a statement about what they knew.
11     Q.  Okay.
12     A.  And once I received those statements, they
13  went to HR.
14     Q.  Was Kathy Obenshain present during some of the
15  conversations?
16     A.  I don't recall.  I believe she was.
17     Q.  Can you tell me what notes were kept that you
18  made about the conversations?
19     A.  No reason for notes.
20     Q.  You didn't make any notes of the conversations
21  at all?
22     A.  No.  Because I was requesting them to give me
23  a statement.  That was going to be the documentation of
24  the call.

Page 48

1      Q.  Well, did you think that everything they told
2  you would be in the statement when you didn't take notes?
3      A.  I didn't know what was going to be in the
4  statement.  It was going to be what they wanted to tell
5  me.  Don't forget.  At that time if I asked a question,
6  their statement could have been, no, she didn't.
7      Q.  Okay.  Well, some of the statements I looked
8  at are really short.  You say you didn't keep notes
9  because you were going to get a statement.
10         Am I to believe that these statements
11  contained everything that was said in the conversation
12  that you had with the collectors?
13     A.  No.  I really believe that the heavy weight
14  came from what Kathy was doing.  Kathy's recommendation
15  and Kathy's investigation to the files, to the checks,
16  that's truly what pushed it over the edge to really go
17  the way we went.
18     Q.  So you didn't think the statements had much
19  importance regarding -- relatively didn't have much
20  importance to the termination decision?
21     A.  The statements for me showed that there was
22  multiple people saying the same thing -- that -- in my
23  opinion, there wasn't a way that that many people would
24  be blind, if that's the right word for it.  But

Page 49

1  that's -- those are just statements and opinions of those
2  people.  What I really had to rely on, again, was what
3  Kathy had been investigating on the files.  Because if
4  it's not documented, it didn't happen.  And that's
5  where -- with the amount of checks that she had, that's
6  where the information came where Kathy had to have come
7  to -- the only decision Kathy could come to was we could
8  not keep Valerie as a general collection manager in
9  Dover.
10     Q.  What did you tell the collectors who gave you
11  written statements they should do in terms of writing the
12  statements?
13     A.  I didn't tell them anything.
14     Q.  Well, how did they know what to put in the
15  statement?
16     A.  There are certain -- I mean, when I say I
17  didn't tell them anything, I didn't direct them what to
18  put in there.  I asked them a question.  Give me your
19  opinion of it.  And that's what they did.
20     Q.  Okay.  Well, when you told them to give you a
21  written statement, did you give them any direction at all
22  about what the scope of the statement should be?
23     A.  I don't recall.  I mean, if I say something to
24  a collector like, "Can you please give me your

**Page 50**

1  interpretation of the NSF policy for your branch?" they
2  would write what their interpretation of the NSF policy
3  for their branch is. If I say to a collector, "Tell me
4  what your general collection manager teaches you about
5  NSF check policies for your branch" -- write it down.
6  And, then, that's what I got. Everyone in that branch
7  knew there was an issue or a problem because at the same
8  time we had a collector, I believe, by the name of Matt
9  Lane that was having his own issue with what he was doing
10 with a file and was being terminated for that.
11     Q.  What did you understand the purpose of the
12 statements was -- the written statements? Did you
13 understand that they were going to be used to help
14 justify the termination of Valerie Hue?
15     A.  I guess.
16     Q.  Okay. When you interviewed these witnesses,
17 did you ask people to give you written statements if they
18 didn't give any information to you that supported any
19 wrongdoing on the part of Valerie Hue?
20     A.  Can you --
21     Q.  Let me ask it a different way.
22     A.  Please.
23     Q.  Did you get a written statement from everybody
24 that you interviewed?

**Page 51**

1     A.  I believe I did.
2     Q.  Did you interview Ken Rose?
3     A.  I don't recall.
4     Q.  Well, he's testified in a deposition that you
5  did interview him, and he didn't supply a written
6  statement.
7     A.  Okay.
8     Q.  Do you recall interviewing anybody and not
9  getting a written statement from them?
10     A.  No. I just -- I don't recall talking to
11 anybody and I don't recall not getting a written
12 statement. I don't recall that.
13     Q.  Well, do you recall that when you were doing
14 this investigation you were looking only for negative
15 information about Valerie Hue? In other words --
16     A.  Not at all.
17        I'm just trying to give you an idea of
18 where my mind was at the time. I had just recently taken
19 over as, you know, the senior vice president of the
20 division, not knowing much about the collections side
21 other than what I have seen from a sales perspective. I
22 did know that we had no replacement for Valerie as a
23 general collection manager in Dover. This, in my
24 opinion, at that time was probably one of the worst

**Page 52**

1  things that could have happened to that office at the
2  time.
3     Q.  Okay. Prior to you interviewing these
4  collectors for purposes of the investigation, had you had
5  contact with these -- apparently, you did. You said you
6  selected the interviewees because you knew that they were
7  responsible collectors, if I characterized that
8  correctly. Do you base that on the fact that you knew
9  the collectors while you were in Dover and afterwards?
10     A.  I would say I represented that statement
11 because, yes, I did know from my time in Dover, but also
12 over the years as the head of the sales department. You
13 do have lots of interaction with collectors, and, you
14 know, you really need to know the large balance
15 collectors because they truly are the ones who are
16 generating most of the revenue that I got paid off of.
17     Q.  Okay. Did you visit the Dover, Delaware
18 office in December of 2003?
19     A.  I don't recall.
20     Q.  Okay.
21     A.  I know I visited the branch on several
22 occasions. I don't recall the dates.
23     Q.  Okay. When you visited the branch on several
24 occasions, did any of the collectors there come to you

**Page 53**

1  and tell you that Valerie Hue was asking them to violate
2  any policy?
3     A.  I don't recall.
4     Q.  Well, is that something you would have
5  recalled?
6     A.  If somebody violated -- if someone came to me
7  and they had said someone was violating a policy, I would
8  absolutely recall it.
9     Q.  Okay. So the answer is, no, no collector ever
10 told you prior to your investigation that?
11     A.  The only thing that I recall was -- and I
12 can't give this to you for exact. But Mike Scher had
13 been sending me different things -- different files to
14 review at the time. But it wasn't anything that raised a
15 flag that somebody was doing something inappropriate. It
16 was issues that are -- that, you know, I run into them
17 today. Someone will say look at this file or look at
18 that file. Look at this file. That's the only thing I
19 ever had that was getting on my radar pertaining to the
20 Dover branch.
21     Q.  Okay.
22     A.  And until Kathy brought it to my attention or
23 Dina brought it to my collection did I really realize
24 that there was potentially something really wrong going

Page 58

```
 1      Q.  Okay.  Were any attorneys involved at this
 2   point in time when the suspension was made?  Up to that
 3   point in time, had you had any involvement with attorneys
 4   about this matter?
 5      A.  No.  We typically do not go to our attorneys
 6   until there is some type of legal issue.
 7      Q.  Okay.
 8      A.  At this point of the suspension, we're
 9   truly -- you know, you've got to look at a suspension as
10   we're protecting not only the employee but we're
11   protecting the company.  So at this juncture, you know,
12   we're making a decision that we can conduct the most
13   thorough and proper investigation.  So there's no reason
14   for an attorney.
15      Q.  Who was involved in making the decision to
16   terminate the plaintiff?
17      A.  The decision was made mainly by Kathy, who
18   conferred with me, HR and the executive team.  And there
19   was no other decision to be made other than to terminate
20   Valerie Hue from her position.
21      Q.  Okay.
22      A.  You cannot have -- and this is across the
23   board -- a manager violating the rules.  You can't have
24   it.
```

Page 59

```
 1      Q.  You say primarily by Kathy.
 2          It wasn't a joint decision?
 3      A.  I guess you could call it anything you want to
 4   call it.  It's not a joint decision on any level.  The
 5   rules were violated.  She knew she was fired.
 6      Q.  Well, I know.  But I'm trying to find out who
 7   it was that decided it.  You said you didn't remember if
 8   there was a discussion about it.  Do you remember whether
 9   there was a joint decision to suspend her or do you not
10   remember that?
11          MR. ISRAEL:  One second.  You're asking
12   suspension now or termination?
13          MR. HOMER:  I'm talking about suspension
14   right now.
15          MR. ISRAEL:  Now we're back to
16   suspension.
17          THE WITNESS:  Okay.  That was confusing.
18   I thought you were on to termination.
19          MR. HOMER:  Okay.  I'm sorry if I said
20   that.  We'll get to termination in a minute here.
21          THE WITNESS:  Suspension is -- if I
22   remember correctly, that was made based on what Kathy was
23   finding out with the conversations with me and HR that
24   okay, yeah, let's get her out of there.  There is
```

Page 60

```
 1   something serious.  Let's go do a further investigation.
 2   BY MR. HOMER:
 3      Q.  So was it a joint decision with you and HR?
 4      A.  Most likely.
 5      Q.  Okay.
 6      A.  And it wouldn't be just me.  Again, I had
 7   Kathy highly involved because -- from the time of me just
 8   taking over for two weeks.
 9      Q.  Okay.  At that stage do you recall what
10   documents had been reviewed in conjunction with the
11   decision to suspend her?
12      A.  At that point I really -- I mean, the
13   suspension was done.  I went on to do what I had to do to
14   run the division.  It was really all in Kathy's hands at
15   that point.  Any documents that were going back and forth
16   were between Dina Loft and Kathy Obenshain.
17      Q.  Okay.
18      A.  The documents I had come in my direction were
19   the ones that I had requested from the collectors or the
20   collection managers of the Dover office.
21      Q.  Okay.  Let's talk about the termination now.
22          First of all, who was involved in the
23   decision to terminate Valerie Hue?
24      A.  Everybody that I've represented so far --
```

Page 61

```
 1   Kathy Obenshain, myself, HR, Steve Leckerman, Dina Loft.
 2      Q.  Okay.  Were all those people participants in
 3   making the decision, then?  All of them had some say in
 4   the decision?
 5      A.  Again, there isn't really a decision.  When
 6   you violate a rule that is really your main rule, the
 7   decision is already made.  It's not as if -- I mean, I
 8   can only -- if you kill somebody, that's murder.  Okay?
 9   There's no decision to be made there.  You're going to
10   jail.
11      Q.  Well, that may be.
12          But before somebody is fired somebody
13   has to say you're fired.  Correct?
14      A.  Well, yeah.
15      Q.  Somebody is going to have to decide that that
16   statement has got to be made.  Correct?
17      A.  Once Kathy made the recommendation to
18   terminate her and we saw all that we had, that was the
19   absolute decision that was made.  You can call it a joint
20   decision, a Kathy decision, an HR decision -- the
21   decision that was made was executed by myself and HR.
22      Q.  I don't want to call it anything.  I'm just
23   asking you if you recall who is was that decided that she
24   was going to be terminated.  Now, it could have been a
```

17 (Pages 62 to 65)

Page 62

1  joint decision. If that's the case, fine. But I'm try
2  just trying to find out since you were involved in it who
3  it was that was involved in --
4      A.  I recall Kathy being very upset and angry at
5  the fact that she had to make that decision. I remember
6  a conversation with her about how she -- if you remember,
7  Kathy promoted Valerie. Valerie was in a lot of ways
8  very -- this is my opinion. Valerie might think
9  differently. But I think Kathy and Valerie were very
10 close over the time that they worked together.
11     Q.  Well, you said that Kathy recommended that she
12 be terminated. Were you the one who had authority to
13 make the termination decision?
14     A.  I ran the division at the time, so, yes, I had
15 the authority. But I would never make that decision
16 unless I had HR's involvement and/or my executive, Steve
17 Leckerman, involved.
18     Q.  Okay.
19     A.  But it came to something like this. This was
20 a policy that had to do with posting money. It always
21 involved our executive and HR team.
22     Q.  So you took, then, account.
23        But was it you that actually made the
24 decision to terminate her, or are you the one that --

Page 63

1      A.  No.
2      Q.  Again, can you tell me who it was, then? Was
3  it a group of people?
4        MR. ISRAEL:  Wait. This has been asked
5  and answered now.
6        MR. HOMER:  Well, I'm having a problem
7  understanding. Still I don't know if it was a joint
8  decision. I've heard that Kathy recommended it.
9        MR. ISRAEL:  Then, Jerry, just go read
10 the -- I'm not trying to be flip with you. But I'm
11 objecting because it's been asked four times. The
12 transcript couldn't be clearer.
13        MR. HOMER:  Well, it's still not
14 clear --
15        MR. ISRAEL:  The question is:  Was it a
16 joint decision? Is that your question?
17        MR. HOMER:  The question is:  Who made
18 the decision? If it was a joint decision, who --
19     A.  Kathy made the decision to terminate the
20 employment of Valerie Hue. I agreed with it. HR agreed
21 with it. The executive team agreed with it. I and HR
22 executed the termination.
23     Q.  Okay. That's good enough. Thanks.
24        What documents did you review before you

Page 64

1  accepted the recommendation to terminate her?
2      A.  If I recall the documents that I reviewed, I'm
3  certain that it was the file reviews, the memos from the
4  producers in the branch. That's what I can recall at
5  this point.
6      Q.  What was the first thing you mentioned? The
7  file? What was that?
8      A.  The file reviews that Kathy did.
9      Q.  Okay.
10     A.  Again, I would --
11     Q.  Can you explain what they are -- the file
12 reviews?
13     A.  File reviews would be something -- you know,
14 let's say you have a check that went NSF.
15        MR. ISRAEL:  Are you talking about
16 collection notes?
17        THE WITNESS:  I'm talking about
18 collection notes.
19        MR. ISRAEL:  Okay.
20 BY MR. HOMER:
21     Q.  Okay. So you would have looked at the
22 collection notes that Kathy looked at?
23     A.  I didn't look at them, no. I took Kathy's
24 recommendation. Kathy did all the investigation with

Page 65

1  Dina.
2      Q.  Okay. What I'm trying to get at is:  What
3  documents did you personally review? I know you got the
4  written statements. Did you personally review any other
5  documents --
6      A.  No.
7      Q.  -- before you accepted the recommendation --
8      A.  No.
9      Q.  -- to terminate the plaintiff?
10     A.  No.
11     Q.  Okay. Did you have an understanding before
12 you made the termination decision that Valerie Hue had
13 violated the check handling procedures required by NCO?
14        MR. ISRAEL:  Can you repeat that? I
15 didn't understand the question.
16        MR. HOMER:  Okay. Can you read that
17 back?
18        (The reporter read the requested
19 portion.)
20        THE WITNESS:  Yes.
21 BY MR. HOMER:
22     Q.  Okay. Did you have an understanding that the
23 policy was in writing that she violated?
24     A.  This policy is not one that's in writing.

Page 66

1   It's one that is implemented from the day you walk in the
2   door. If you're a collector, you hear from the day you
3   start with this company you do not post money that you
4   know could possibly be bad.
5       Q.  Okay. So you understood that the policy that
6   she was alleged to have violated wasn't in writing?
7       A.  In writing or not, I know there's memos. I
8   know there's e-mails. I know there's lots of things over
9   the years. And I'll go back to the statement that from
10  day one when you work here you know not to post bad
11  money.
12      Q.  Okay. What did you think when you made this
13  decision to terminate Valerie Hue? What did you think
14  her motive was for violating the policy?
15      A.  I think you're giving me credit for thinking a
16  little bit more than I would have. I don't think I ever
17  thought about her motive or why she would have done it.
18      Q.  Okay.
19      A.  I was disappointed in the fact that it was
20  done, that she violated our company rule, that she was
21  teaching others to do that as well. As a manager she was
22  instructing. I'd say that's probably a better word than
23  teaching. I was disappointed. I don't think I really
24  thought about her motive for it. Hindsight, 20/20, the

Page 67

1   motive could have been simply as to try to make your
2   number. Maybe not to make money but to make your number.
3       Q.  So you made the decision to terminate Valerie
4   Hue without having any understanding of why she would
5   have violated the policies?
6       A.  Again, this was, in my opinion, Kathy
7   Obenshain's area. That's what she was investigating.
8   That's what she was responsible for. I took -- and,
9   again, Kathy Obenshain is not someone who I distrusted
10  or -- she was and has worked in the industry forever.
11          When Kathy Obenshain came to the
12  conclusion that, wow, this is bad and, yeah, she did it,
13  and I'm going to tell you that we cannot keep her as
14  general collection manager, I, Ted Fox, as the guy who
15  took over the division for two weeks said, okay, Kathy,
16  then that's what we're going to go do.
17      Q.  So you didn't have any understanding of what
18  the motive would have been?
19          Let me ask you --
20          MR. HOMER: Could you read my last
21  question back again, because I don't think that was
22  responsive?
23          (The reporter read the requested
24  portion.)

Page 68

1           MR. ISRAEL: Objection. That's a
2   mischaracterization.
3           MR. HOMER: Well --
4           MR. ISRAEL: He didn't make that
5   decision.
6   BY MR. HOMER:
7       Q.  Can you answer the question?
8       A.  Well, I'll restate it. I didn't make the
9   decision. I relied on what Kathy Obenshain -- what she
10  had discovered, what she was telling me. Again, I relied
11  on my boss, Steve Leckerman, and our HR department.
12      Q.  Let me try again.
13          At the time that Valerie Hue was
14  terminated, did you have any understanding of what motive
15  she had for violating the policy that led to her
16  termination?
17          MR. ISRAEL: Objection. Asked and
18  answered. You just went through that, Jerry.
19          MR. HOMER: No. I haven't gotten an
20  answer to it.
21          THE WITNESS: I said --
22          MR. ISRAEL: Wait, wait, wait.
23          You did get an answer. You do this with
24  witnesses. You got an answer you may not have liked, but

Page 69

1   he answered.
2           MR. HOMER: What was the answer? Did he
3   say yes or no?
4           MR. ISRAEL: He didn't say either.
5           MR. HOMER: That's right. I'd like to
6   know yes or no. Did he have an understanding or didn't
7   he? It's very simple.
8           MR. ISRAEL: Let me finish my objection,
9   because you're arguing with the witness or arguing with
10  me is what's also unfair. He was unequivocal that he
11  didn't know why she did it, nor did he think about it.
12  And then he explained that answer.
13  BY MR. HOMER:
14      Q.  Okay. Do you agree with that, Mr. --
15          MR. ISRAEL: You don't have to agree or
16  not. He also already said it.
17          MR. HOMER: Well, I've heard you say it.
18  I just want to see if Mr. Fox agrees with what you just
19  said.
20          MR. ISRAEL: No. I'm not going to
21  permit you in this deposition to ask the same question
22  five, six and seven times.
23          MR. HOMER: Listen, listen. If you want
24  to take this to a judge, we'll do that. And we'll have

Page 70

1  to do Mr. Fox again. I've got a right to get an answer.
2  Not from you but from the witness.
3          MR. ISRAEL: Let me finish my objection.
4          Yes, you have a right to get answers.
5  No, you don't have a right to continue to ask the same
6  questions. If you want to use this as an example,
7  certify this question, because in my opinion it's been
8  asked and answered twice now previously, and bring it to
9  the judge and then continue this phone deposition on that
10 question. That's fine.
11         MR. HOMER: Why won't you let him either
12 agree or disagree with what you just said?
13         MR. ISRAEL: Why do you keep asking the
14 same questions over and over?
15         MR. HOMER: Because I haven't gotten a
16 clear answer. I've gotten --
17         MR. ISRAEL: Well, I disagree. You just
18 don't have an answer that you like, and that's what's
19 inappropriate.
20         MR. HOMER: No. I don't see why it
21 is -- if you say that's what he said, why can't he just
22 agree that's what he said?
23         MR. ISRAEL: If you disagree, then why
24 don't you go read the transcript. And let's talk --

Page 71

1  Mr. Court Reporter, can you go back to where that
2  question was previously asked and read the answer.
3          MR. HOMER: Yeah. We'll do that.
4          MR. ISRAEL: Okay.
5          MR. HOMER: I mean, this is going to
6  take a long time, Dave. You're going to be here very
7  late. All he's got to do is say, yes, he had an
8  understanding or he didn't. I mean, it's that simple, or
9  he can say what Dave just said is correct. That's all
10 he's got to do.
11         MR. ISRAEL: Or you can acknowledge that
12 he's already answered it and not keep asking him over and
13 over.
14         MR. HOMER: Well, if you're telling me
15 that the defendant's position is as you characterized it,
16 I'll move on.
17         MR. ISRAEL: I'm not telling you
18 anything, Jerry. I'm telling you to go read --
19         MR. HOMER: All right. We'll read it
20 back. We'll spend the time to do this. This is
21 nonsense, but we'll do it.
22         MR. ISRAEL: Wait, wait, wait.
23         Can you do me a favor? While you're
24 doing that, I'm going to go use the bathroom. So you can

Page 72

1  go look at it and review it, and I'll be back in a
2  moment.
3          MS. FITE: Okay. And I'm hopping off.
4          (A recess was taken.)
5          - - - - -
6          (The reporter read the requested
7  portion.)
8          MR. HOMER: There's nothing in that
9  answer that tells me whether he had the understanding at
10 the time the termination was made of what the motive was
11 at all. All he does is tell me that he was relying on
12 Kathy Obenshain.
13         MR. ISRAEL: Well, what was the next
14 question?
15         MR. HOMER: All right. Go to the next
16 question.
17         (The reporter read the requested
18 portion.)
19         MR. HOMER: Let's go on the record.
20         MR. ISRAEL: That's fine. But you're
21 missing a question and an answer. There was a question
22 and an answer where he specifically used the words "I did
23 not know her motivation." He used those words in his
24 answer. You asked him the question. Maybe it was

Page 73

1  earlier than those two. But his words were "I did not
2  know her motivation. I wasn't thinking about her
3  motivation. I was only concerned that I had heard of
4  somebody who was teaching collectors to do wrong." He
5  went through all that.
6          Do you remember that part of his answer?
7          MR. HOMER: Dave, why do you object to
8  him just giving me an answer to the question?
9          MR. ISRAEL: Okay.
10         MR. HOMER: Wouldn't that want be easier
11 than doing this?
12         MR. ISRAEL: I guess it would be easier.
13 But my objection is it's been asked and answered. I'll
14 permit him to answer the question one more time.
15         Go ahead.
16         THE WITNESS: If I understand the
17 question right -- I'm not trying to be confusing to you,
18 Jerry. If you're asking me did I understand what her
19 motive was at the time --
20         MR. HOMER: At the time she was
21 terminated.
22         THE WITNESS: My answer to that is I did
23 not think of a motive. I wouldn't think of a motive. I
24 was more in the thinking of why, you know, do I have to

Page 74

1 replace a general collection manager? Why am I in this
2 position? This is just not the type of situation that I
3 would want to have at the time. Again, it was not --
4 this was not a good thing to happen two weeks after
5 taking over the division. Kathy wasn't happy about it.
6 I wasn't happy about it. So, again, I was not thinking
7 of anything that was related to motive.
8       And I had offered up in my earlier
9 answer that possibly if I was to think of it now maybe
10 she was doing something to get to her number, satisfy her
11 boss's needs. I don't think it was anything to do with,
12 hey, it might have been, but I don't think so, because,
13 again, I don't know the severity of how long this went on
14 for or how much it really was.
15 BY MR. HOMER:
16      Q. Okay. The time period that Dina Loft looked
17 at in her audit was at least part of December of 2003.
18 Isn't that correct?
19      A. Yeah. But -- that sounds right.
20      Q. Were you aware that when Valerie Hue was
21 terminated that she was on vacation during the latter
22 part of December 2003?
23      A. Who was on vacation? Dina or Valerie?
24      Q. Valerie Hue.

Page 75

1      A. I wasn't aware of that.
2      Q. You weren't aware of that when you made the
3 decision to terminate?
4      A. Oh, oh, oh. I'm sorry. This was when --
5 yeah. I was aware of that, because that was when I want
6 to say Eric Shaw was in management and he was running the
7 office at the time.
8      Q. Okay. The policy about check handling that
9 was violated was done when Eric Shaw was running the
10 redepositing of the checks, isn't that right, because
11 Valerie Hue was absent? At least the ones that Dina Loft
12 looked at.
13      A. If I recall, he ran the checks based on
14 instructions by Valerie. From what I have seen and read
15 since then, I can see that Eric didn't run all the
16 checks. He used his own -- I don't know if you want to
17 use the word ethics, but he used his own judgment not to
18 run some checks.
19      Q. But the month that Dina Loft looked at was a
20 month in which the checks were run at the end of the
21 month not by Valerie Hue, because she was on vacation,
22 but by Eric Shaw, correct, at her direction?
23      A. Correct.
24      Q. Okay. Did it ever cross your mind before

Page 76

1 Valerie Hue was terminated to look at any other months
2 where actually it was Valerie Hue that ran the end of the
3 month and decided which checks should be redipped or not?
4      A. No. I think you're possibly characterizing
5 what we would have looked at the time wrong. What we
6 were looking at was a violation of a rule -- a very, very
7 important rule -- that everyone in our business or at
8 least works for this company knows that if you violate it
9 you're going to be terminated. So there was no need to
10 go look at individual checks at that point because we
11 learned that a manager was telling other people to
12 violate the rules.
13      Q. Would it have been relevant if you had looked
14 back to previous months and found when Valerie Hue was
15 running the end-of-the-month checks for redeposit and
16 found no evidence at all that any checks had been
17 redeposited in violation of the policy? Would that have
18 been relevant at all to you?
19      A. No. We found that she did it the one time.
20 One time was enough. And there's a no tolerance policy
21 that this organization has. And Valerie is not the only
22 general collection manager that's ever been caught up in
23 that.
24      Q. So Valerie Hue's prior record of performance

Page 77

1 had really nothing to do with a decision to terminate
2 her. What it was was what happened in December of 2003?
3 Is that a fair statement?
4          MR. ISRAEL: Could you just repeat that?
5 BY MR. HOMER:
6      Q. Well, what I'm trying to get at is: The prior
7 record of Valerie Hue wasn't something that needed to be
8 considered to do the termination decision. You were just
9 focusing on what Dina Loft had found and what happened in
10 that window in December of 2003. Is that a correct
11 characterization?
12      A. Put it this way. When you work for NCO, if
13 you violate the rule of posting money that should not be
14 posted one time -- you could have worked here for 25
15 years or 25 days -- you're going to get terminated.
16      Q. So the answer would be yes to my question?
17      A. The answer would be yes.
18      Q. Okay. Are you aware that Dina Loft found that
19 there were violations of the check handling policies at
20 NCO in other offices during the same time period that was
21 looked at for the ones that resulted in Valerie Hue's
22 termination?
23      A. What I recall is that Dina Loft gave us a list
24 of all NSF checks by branch -- that Valerie Hue is the

Page 78

1  only general collection manager violating the rule and
2  telling other employees to do what they did. The other
3  ones that were NSF checks were investigated, and they
4  were done by a collector. But that collector was not
5  instructed by that general collection manager in that
6  office to do it the wrong way.
7      Q.  Okay. You say you got a list.
8          Can you describe what that list had on
9  it?
10     A.  Every month -- just so you understand, every
11 month I will get -- and it's typically not me. It's my
12 vice president of operations -- will get a list of NSF
13 checks.
14         The reason for getting a list of NSF
15 checks are two things. We want to see if there's a
16 pattern with a collector or to go recoup the money back
17 from the debtor. Get back with the debtor to see if
18 they've got a loan, see if there's other funds, see if
19 there's something that went wrong, something we missed,
20 something they missed to try to recreate the money.
21         So every month there is something that
22 comes from our accounting area to our vice president of
23 operations, which in today's world is Brian Laiche,
24 because he's going to go investigate and make sure that,

Page 79

1  you know, we do not have someone that is running checks
2  the wrong way. And we want also want to look to see if
3  we can recreate the money.
4      Q.  Before Valerie Hue was terminated, did you see
5  a list of checks that had a column in it that said "Root
6  of Problem"?
7      A.  No. Because as senior vice president of
8  sales, I would have no need to ever see that list. And,
9  again, I'm working as the person who was running the
10 division for roughly, I think, two to three weeks at this
11 time. I believe Kathy Obenshain was the one who was
12 working with Dina Loft. I don't know if she had that
13 list or if she was just getting individual feeds of
14 checks to look at.
15     Q.  Okay. In discussing this whole problem with
16 Kathy Obenshain, did she ever indicate to you there were
17 also problems with the NSF check handling procedures used
18 in other offices besides Dover's?
19     A.  No.
20     Q.  Is it fair to say, then, before Valerie Hue
21 was terminated you didn't have any understanding that
22 there were other problems in the other offices that had
23 been identified by Dina Loft when she did her audit?
24     A.  Well, my understanding -- and I'll restate it

Page 80

1  again. Valerie Hue was the only general collection
2  manager violating a rule and telling others to do it. In
3  the other offices, we did have individual collectors that
4  did run NSF checks, and those were investigated by
5  Kathy -- none of which brought a termination of any of
6  the collectors.
7      Q.  Why is that? Why were no collectors
8  terminated?
9      A.  Because if they ran a check and it went NSF,
10 that doesn't mean they violated a rule.
11     Q.  Okay.
12     A.  A check can go bad for a lot of different
13 reasons.
14     Q.  I'll represent to you that we took Kathy
15 Obenshain's deposition yesterday and she indicated -- we
16 went through several examples of NSF checks that had been
17 processed. We looked at a document that we can get out
18 now if you want to look at it. But we looked at a
19 document that did have a column that said "Root of
20 Problem." In numerous cases a collector was identified
21 as the root of the problem.
22         Then in another column it indicated in
23 some cases what the collector had done wrong to process
24 the check. In some cases, for example, it indicated that

Page 81

1  he put the check through even though there was a stop
2  payment on the check.
3          Were you aware of any of that before
4  Valerie Hue was terminated?
5          MR. ISRAEL:  Are you asking whether he's
6  aware of the form that you --
7  BY MR. HOMER:
8      Q.  Well, what I'm asking is this: You suggested
9  to me at least in your answer before that the collectors
10 might not have been at fault for violating the check
11 handling policies in other offices. But what I'm telling
12 you is yesterday Kathy Obenshain testified or admitted
13 that collectors were at fault in other offices for how
14 they did the check handling policies.
15         MR. ISRAEL:  That's a
16 mischaracterization. That's not what she said, Jerry.
17         MR. HOMER:  Okay. All right.
18         Let me ask another question, then.
19 BY MR. HOMER:
20     Q.  You never learned from Kathy Obenshain before
21 Valerie Hue was terminated that collectors in other
22 offices were violating the check handling policies. Is
23 that a true statement?
24     A.  I can tell you that I know that collectors

Page 82

1  before Valerie was terminated and after Valerie was
2  terminated have violated our NSF check policies. I have
3  a compliance department that regulates that. We have a
4  whole system in place that, if they do it, they get
5  points. Depending on the severity of it, they'll get
6  terminated. So, yes, that does occur in other offices.
7  And that's for the collectors. The difference that I
8  would state for this situation is we're talking about a
9  general collection manager. This is management, not
10 producers.
11    Q.  Okay. Well, as I understand it -- and, again,
12 this comes from Kathy Obenshain's deposition and some of
13 the other depositions as well -- the procedure for
14 redepositing NSF checks included a point in the process
15 where the general collection manager had to approve the
16 resubmission of the check. There had to be documentation
17 of certain types to show that verification with the
18 debtor or verification with the bank had taken place.
19    Do you agree with all that, or is that
20 your understanding of it?
21    A.  The process is that general collection
22 managers are to do the final reviews. This might shock
23 you, but some collectors do lie, do put wrong notes, and
24 do catch their general collection managers in situations

Page 83

1  they don't want to be in. Again, those are all
2  independently verified through our accounting department.
3  So we flush them out very quickly. Our general
4  collection managers learn very quickly who they can
5  actually trust or who needs to be disciplined, trained,
6  terminated, addressed, because there is a checks and
7  balance system in place today for that.
8    Q.  Wasn't the purpose of the audit to look at
9  problems in all the offices -- the audit that Dina Loft
10 did?
11    A.  Yes.
12    Q.  Didn't Dina Loft give information to both you
13 and Kathy Obenshain about the results of her
14 investigation?
15    A.  Did she give me something? She -- and, again,
16 I'll go back. Kathy was the one dealing with Dina. I
17 was aware of the problem via telephone conversation from
18 Dina. I had -- because I didn't have the experience to
19 review the collection files -- that was all done by
20 Kathy. Kathy would have had any type of report, any type
21 of information from Dina.
22    Q.  Was anybody --
23    A.  I was aware of the concept of the problem.
24    Q.  Was anybody other than Valerie Hue and Matt

Page 84

1  Lane disciplined in any of the offices as a result of the
2  audit that Dina Loft undertook?
3    A.  The only other move that I recall was Eric
4  Shaw being demoted back to a producer desk.
5    Q.  Okay.
6    A.  And I don't recall anything at any of the
7  other offices.
8    Q.  Okay. Can you tell me whether you ever had a
9  discussion with Kathy Obenshain or anybody else about the
10 possibility of bringing some kind of disciplinary action
11 against any other individual other than Valerie Hue, Matt
12 Lane or Eric Shaw as a result of the Dina Loft audit?
13    A.  I don't recall. I'm not sure.
14    Q.  Was Kathy Obenshain deemed to be at fault for
15 any of the problems that dealt with this check handling
16 policy and the audit that Dina Loft did?
17    A.  I would say no. I don't recall any
18 conversation or anything about that ever.
19    Q.  Okay. Do you know why she left NCO?
20    A.  Yeah, I know why she left.
21    Q.  Why did she leave?
22    A.  We had eliminated the vice president of
23 operations position and offered her back to a general
24 collection manager for the Metairie floor, and she chose

Page 85

1  not to take that demotion.
2    Q.  Can you tell me why that position was
3  eliminated?
4    A.  At the time it was Steve Leckerman's belief
5  that commercial could be run by one sole senior manager,
6  which was me.
7    MR. ISRAEL: Didn't you agree with that
8  opinion?
9    THE WITNESS: Not one bit.
10 BY MR. HOMER:
11    Q.  You're aware that Valerie Hue filed a charge
12 of discrimination in this case. Correct?
13    A.  I'm aware of what I read. And I believe,
14 yeah, that's part of it.
15    Q.  Okay. When did you first learn that she had
16 filed a charge of discrimination?
17    A.  Whenever Dave's office called me and said that
18 it was filed. I don't recall the time frame.
19    Q.  Did you say Dave's office?
20    A.  Sessions Fishman.
21    Q.  Okay. You're talking about Dave Israel?
22    A.  Yes. Sorry.
23    Q.  So you learned about the charge of
24 discrimination from Dave Israel or his office?

Tex Fox

23 (Pages 86 to 89)

Page 86

1      A.  I truly don't remember.  It might have been
2  HR.  It might have been Dave's office – Dave Israel's
3  office.  I don't recall.
4      Q.  Okay.  Do you recall how soon after Valerie
5  Hue was terminated that you heard that she had filed a
6  charge of discrimination?
7          MR. ISRAEL:  I'm sorry.  Your voice
8  dropped.  Say that again.
9  BY MR. HOMER:
10     Q.  How soon after Valerie Hue was terminated did
11  you learn that she had filed a charge of discrimination?
12         THE WITNESS:  What's the date on that
13  thing?
14         MR. ISRAEL:  This is just a position
15  statement.  He's looking at the position statement.
16     A.  Jerry, I don't know.  It had to be sometime
17  months after – a couple months after.  I really don't
18  know.
19     Q.  Well, I'll represent to you she filed the
20  charge very soon after the termination.  Would you have
21  gotten the copy of the charge as soon as the company
22  received it?
23     A.  No.  That -- again, they wouldn't bring me
24  into that until at a point where the company was

Page 87

1  determined that I would need to be either the corporate
2  representative for a lawsuit or be deposed.  Or, you
3  know, sometimes I do get -- I'll get a package that says,
4  you know, this is going on.  Just so you know, this is
5  out there.  This belongs to commercial.
6      Q.  Do you know when NCO first got the charge of
7  discrimination?
8      A.  No idea.
9      Q.  Who would have a record of that?
10     A.  I want to say it would probably be Josh
11  Gindin's office in our Horsham office or possibly our HR
12  department in Buffalo.
13     Q.  Okay.
14     A.  And I would guess -- if I had to put a weight
15  or percentage on it, I would say it would be Buffalo.
16     Q.  Okay.  After the charge of discrimination was
17  filed, did you have any discussions with anyone about the
18  rationale for terminating Valerie Hue or anything else
19  related to Valerie Hue?
20     A.  No.  My only discussions were when -- again,
21  when I knew that I was going to have to be deposed.
22     Q.  Okay.  So the charge of discrimination was
23  filed.  No one discussed with you the charge at all until
24  what point in time?

Page 88

1      A.  I think I -- I want to say that I read about
2  it before I had any discussions about it.  And I don't
3  recall the time frame.
4      Q.  Did anybody ask you about what happened?
5      A.  Yeah.  I'm certain that someone asked me.
6          MR. ISRAEL:  If you're going to get into
7  discussions that you had with any lawyers, then, before
8  you recount the substance of those discussions, ask me.
9  But you can confirm, if you did, that you had discussions
10  with lawyers or people from my office or HR.  HR you can
11  freely talk about but not breach the privilege between
12  attorneys from my office in preparation for the defense
13  of the charge.
14  BY MR. HOMER:
15     Q.  What I'm –
16     A.  I'm not trying to be vague.  I don't recall
17  having any conversations with HR about this.  And I do
18  recall having conversations with Dave or one of his
19  attorneys, Mayas.
20     Q.  Did you ever discuss the charge of
21  discrimination with anybody in HR?
22         MR. ISRAEL:  That's been asked and
23  answered.  Tell him again.
24     A.  I do not recall talking to anybody in HR about

Page 89

1  it.
2      Q.  At any time?
3      A.  I don't recall talking to anybody in HR about
4  it.
5      Q.  Okay.  Have you reviewed the position
6  statement that was filed by NCO in response to the charge
7  of discrimination?
8      A.  I haven't read it.
9          MR. ISRAEL:  I've got it in front of
10  him.  He was pointing to it saying I haven't read it.
11  BY MR. HOMER:
12     Q.  Okay.  You've never read it before?
13     A.  I don't recall.
14         MR. ISRAEL:  It's very well written.
15         THE WITNESS:  I'm sure it was.
16  BY MR. HOMER:
17     Q.  Okay.  You say you have it in front of you?
18         MR. ISRAEL:  It is in front of him.
19  BY MR. HOMER:
20     Q.  Okay.  Could you take a look at page 11 of the
21  statement?
22         MR. ISRAEL:  Page 11 of the statement?
23         MR. HOMER:  It's page 83 of the Bates
24  stamp.

Corbett & Wilcox          B-273

Page 90

1         MR. ISRAEL: Okay. It's a statement.
2   Well, the Bates stamp is page 4 of the statement.
3         MR. HOMER: You need to look at 83.
4         MR. ISRAEL: Oh. 83 of the statement?
5   That's page 4 of the EEOC position statement or the
6   Delaware Department of Labor position statement.
7         Is that what you're asking?
8         MR. HOMER: Yes.
9         MR. ISRAEL: Okay.
10  BY MR. HOMER:
11        Q. Do you have that page in front of you?
12        A. Yes.
13        Q. Could you look at the next to last paragraph
14  that starts "The charging party's claim...?
15        Could you read that paragraph?
16        A. "The charging party's claim that Mr. Fox
17  retaliated against her by" —
18        Q. Let me read it, because it's easier for him to
19  hear me than you.
20        It says, "The charging party's claim
21  that Mr. Fox retaliated against her by terminating her
22  ignores the fact that Mr. Fox did not independently make
23  the decision to terminate the charging party. Kathy
24  Obenshain conducted a fact-finding investigation and

Page 91

1   recommended Corporate Employee Relations to review and
2   prepare the charging party's termination paperwork.
3   Mr. Fox was not involved in this investigation or
4   decision."
5         That's not a true statement, is it,
6   Mr. Fox, that you weren't involved in the investigation
7   or the decision?
8         A. Well, you're asking my opinion, because I
9   didn't write this — if calling the individuals to get
10  their statements is part of the investigation, which I
11  think it is, then that would be a misrepresentation.
12  That statement is a misrepresentation of what my
13  involvement was.
14        Q. You were also involved in the decision?
15        A. Well, again, I would go back to my earlier
16  statements where it wasn't a decision. You break the
17  rule. You go to jail.
18        Q. Okay.
19        A. So if you're saying that I'm the only one
20  solely responsible for the decision, no, I was not.
21        Q. Do you have any understanding of what
22  information was relied upon to make this statement that I
23  just read to you — Mr. Fox was not involved in this
24  investigation or decision? Do you know what the source

Page 92

1   of the information to put that in the response was?
2         A. I have no idea.
3         Q. Okay. I'd like to go back now to a topic we
4   were on earlier. That has to do with this entity NCO
5   Financial Systems, Inc., which I'm going to refer to
6   hereinafter as the "defendant" just to try to keep these
7   entities straight. When I refer to the defendant, I'm
8   referring to that entity, NCO Financial Systems, Inc.
9         Can you tell me what the relationship
10  between the defendant and NCO Group, Inc. is?
11        A. I'm not an expert in this, Jerry. I apologize
12  if I do misrepresent this in any way. NCO Group, I
13  believe, is the parent company. NCO Financial Systems,
14  Inc., is a division within NCO Group.
15        Q. Okay.
16        A. You have NCO Portfolio. You have NCO
17  E-Payment. So, again, when they talk about the group,
18  they're talking about the group of divisions.
19        Q. Okay. Mr. Weaver testified that he thought
20  that the two entities were one and the same. I don't
21  think that's right. But I would like to try to
22  understand what degree of interconnectedness there is.
23        MR. ISRAEL: Jerry, if it'll save
24  time —

Page 93

1         MR. HOMER: Yes.
2         MR. ISRAEL: — I'll stipulate.
3         The Group is the corporate parent.
4   Financial Systems, Inc., is a separately-owned
5   subsidiary. And there are a number of intervening
6   corporations that owned Financial Systems before. Those
7   intervening subsidiaries are owned by Group.
8         MR. HOMER: I think I understood that
9   from your Rule 8 disclosure statement, but I'm really
10  looking for a little more information than that.
11  BY MR. HOMER:
12        Q. I'll tell you I looked just recently at some
13  information that's on the Internet about NCO Group. It
14  says that they're headquartered in Horsham. Is that
15  where the defendant is also headquartered?
16        A. Yes.
17        Q. It says on this website that NCO Group has
18  20,000 employees. Would you know how many employees the
19  defendant has?
20        MR. ISRAEL: Has now?
21        MR. HOMER: Yes.
22        A. I know what you're looking at too. It's kind
23  of old data. I think even before this most recent
24  acquisition.

Hue                                    v.                    NCO Financial Systems, Inc.
Valerie D. Hue    Case 1:05-cv-00225-KAJ    Document 84    C.A. # 05-225-KAJ    Filed 05/16/2006    Page 36 of 41    January 4, 2006

Page 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
VALERIE D. HUE,                    )
                                   )
              Plaintiff,           )
                                   )   Civil Action
v.                                 )   No. 05-225-KAJ
                                   )
NCO FINANCIAL SYSTEMS, INC.,       )
a Delaware corporation,            )
trading as NCO FINANCIAL           )
COMMERCIAL SERVICES,               )
              Defendant.           )
```

Deposition of VALERIE D. HUE taken pursuant to
notice at the law offices of Parkowski, Guerke &
Swayze, 116 West Water Street, Dover, Delaware,
beginning at 9:41 a.m. on Wednesday,
January 4, 2006, via telephone before
Lucinda M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

          JEREMY W. HOMER, ESQ.
          PARKOWSKI, GUERKE & SWAYZE, P.A.
            116 West Water Street
            Dover, Delaware  19901
            for the Plaintiff,

          ELIZABETH FITE, ESQ.
          THE LAW OFFICE OF ELIZABETH FITE
            15316 North Florida Avenue, Suite 100
            Tampa, Florida  33613
              - and -
          DAVID B. ISRAEL, ESQ.
            3850 N. Causeway Boulevard, Suite 1240
            Metairie, LA  70002
            for the Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -

WILCOX & FETZER, LTD.
1330 King Street - Wilmington, Delaware  19801
(302) 655-0477

Hue
v.
NCO Financial Systems, Inc.
Valerie D. Hue
C.A. # 05-225-KAJ
January 4, 2006
Case 1:05-cv-00225-KAJ    Document 84    Filed 05/16/2006    Page 37 of 41

Page 54

1    Q.  Meaning that you were capable in convincing
2  debtors to pay the debts that they owed?
3    A.  Yes.
4    Q.  Meaning you also understood the rules relating
5  to compliance?
6    A.  That were effective, yes.
7    Q.  Meaning that you followed those rules that were
8  effective?
9    A.  Yes.
10    Q.  Meaning that you understood that if you
11  violated those rules that you could be fired?
12         MR. HOMER:  Are you saying every single
13  rule?  Could you identify what you are talking about
14  with rules?
15  BY MR. ISRAEL:
16    Q.  Well, I am talking about the collectors
17  compliance program.  You understood that if you
18  violated rules, you could be fired?
19    A.  Up to and including termination.
20    Q.  Good point.  It would be progressive up to and
21  including termination.  Correct?
22    A.  Correct.
23    Q.  And there were certain violations that were
24  more serious and certainly violations that were less

Page 55

1  serious.  Correct?
2    A.  Yes.
3    Q.  Were you in the Dover branch when taping
4  occurred?
5    A.  I'm sorry.  Repeat the question.
6    Q.  Were you in the Dover branch when taping of
7  debtors occurred?
8    A.  Yes.
9    Q.  Do you remember when you became a manager?
10    A.  I do not recall the date.
11    Q.  I am not positive, but does November 2001 sound
12  right?  I have a memo to you from Rick Boudreau, re:
13  small balance manager compensation, dated November
14  2001.  Does that ring a bell?
15    A.  No.  Can I see the document?
16    Q.  Sure.  Do you think it was earlier?  This is
17  number 175.
18         MR. HOMER:  Is there a question?
19    Q.  I am trying to establish the date.  The
20  question is whether that refreshes your recollection
21  as to when you might have become a manager.  If it
22  doesn't, it doesn't.
23         MR. HOMER:  It doesn't say anything about
24  when she became a manager.

Page 56

1    A.  It doesn't say when I became a manager nor does
2  it have the proper department I was promoted to
3  manager, so I --
4    Q.  Who promoted you as a manager?
5    A.  Rick Boudreau.
6    Q.  You don't remember what year?
7    A.  No, I don't.
8    Q.  Now, I have a record that says from mid balance
9  manager to GCM effective immediately.  This is dated
10  April 19, '02.  Does that refresh your recollection as
11  to April of '02?
12         MR. HOMER:  Can you give her the document?
13    Q.  Sure.  Does that refresh your recollection,
14  April of '02, as to when you were promoted to GCM?
15  This is number 173.
16    A.  Yes.
17    Q.  Do you remember who promoted you?
18    A.  Rick Boudreau.
19    Q.  And Kathy Obenshain approved this, number 173?
20  Do you see that, lower left-hand side?
21    A.  Yes.
22    Q.  Was Kathy Obenshain involved in that decision?
23    A.  I do not know.
24    Q.  Well, after you were promoted, you reported to

Page 57

1  Ms. Obenshain?
2    A.  Yes.
3    Q.  Did you talk with her about becoming the GCM in
4  Dover before you were promoted?
5    A.  No.
6    Q.  Before you were the GCM, what other collection
7  departments did you supervise?
8    A.  Mid balance department.
9    Q.  Did you also supervise the small balance
10  department?
11    A.  No.
12    Q.  Did you go from large balance to the mid
13  balance manager?
14    A.  Yes.
15    Q.  Then from the mid balance manager to GCM
16  effective April of 2002?
17    A.  Yes.
18         MR. ISRAEL:  I am going to make this one
19  Hue No. 5.
20         (Hue Deposition Exhibit No. 5 was marked
21  for identification.)
22  BY MR. ISRAEL:
23    Q.  Nothing discriminatory about you being
24  promoted.  Was there?

15 (Pages 54 to 57)

Page 74

1   A.  No.
2   Q.  Meaning he never asked anybody?
3   A.  No.
4   Q.  Do you remember if your memo was sent to
5   Mr. Fox after Savage was gone?
6   A.  No, I don't recall.
7   Q.  Were you aware that Rick Boudreau gave a
8   statement regarding Mr. Savage's inappropriate
9   conduct?
10   A.  I was aware yesterday.
11   Q.  Did you ever have discussions with Eric Shaw
12   regarding Mr. Savage's wrongful conduct?
13   A.  No.
14   Q.  Okay.  Now, after Mr. Savage was gone from the
15   business, who was the general manager in the office?
16   A.  I am not sure.
17   Q.  At some point after Mr. Savage was gone
18   Mr. Batie was the general manager?
19   A.  Right.
20   Q.  He took Mr. Savage's place or spot?
21   A.  Right.
22   Q.  Mr. Davies is African-American?
23   A.  Right.
24   Q.  You are not suggesting in any way that he,

Page 76

1   A.  When he visited the office, he would not
2   acknowledge me.  When I saw him on business trips, he
3   would not acknowledge me.
4   Q.  Okay.  So he would ignore you?
5   A.  Mm-hmm.
6   Q.  And in addition or aside from him ignoring you
7   from October of 2001 until your January 2004
8   suspension, what else, if anything else, did he do?
9   A.  Nothing.  I had no direct contact with Ted as
10   he was in sales.  Only when he became the
11   vice-president or president of operations.
12   Q.  Only when he became the head of the commercial
13   division?
14   A.  Right.
15   Q.  Once he became head of the commercial division,
16   aside from ignoring you, anything else?
17   A.  He called me and terminated me and suspended
18   me.
19   Q.  I am only asking for the time period between
20   October of 2001 when you made your report, which is
21   Hue 7 in front of you, and January of 2004 when you
22   were suspended and then terminated.  That's the time
23   period I'm looking for.  Aside from Mr. Fox ignoring
24   you during that time as head of the commercial

Page 75

1   Mr. Davies, retaliated against you or treated you
2   badly as a result of anything you did regarding
3   Savage.  Are you?
4   A.  No.
5   Q.  It's your testimony that Mr. Fox retaliated or
6   has treated you badly over Mr. Savage being fired and
7   your report regarding Mr. Savage?
8   A.  Yes.
9   Q.  What aside from your discharge, if anything,
10   did Mr. Fox do of a retaliatory or discriminatory
11   nature after Savage was gone?
12   A.  He suspended me, and he terminated me.
13   Q.  And that all relates to the issue of improper
14   handling of checks.  Correct?
15   A.  That's what he claimed.
16   Q.  Between October of 2001 when you made your
17   report about Savage and when you were suspended and
18   terminated regarding improper handling of checks, as claimed by
19   NCO and Ted Fox, what, if anything, did Ted Fox do of
20   a retaliatory or discriminatory nature against you?
21   A.  Other than my suspension and termination?
22   Q.  Yes.
23   A.  And ignoring me.  That would be basically it.
24   Q.  When you say ignoring you, what do you mean?

Page 77

1   division, anything else?
2        MR. HOMER:  You just asked the question.
3   She answered it she was suspended and fired.  That was
4   in January of 2004.  That's the time period you asked
5   about.
6        MR. ISRAEL:  Come on.
7        MR. HOMER:  What do you mean "come on?"
8        (Discussion off the record.)
9   BY MR. ISRAEL:
10   Q.  To make sure that, we're only dealing with the
11   time period of your October 2001 report -- and Hue 7
12   in front of you.  Correct?
13   A.  Yes.
14   Q.  -- and prior to your suspension and then
15   termination in January 2004, once Mr. Fox became the
16   head of the commercial division, did he do anything
17   wrong except ignore you?
18   A.  Once he became the head of commercial division,
19   within two weeks, he fired me -- he suspended me and
20   terminated me.
21   Q.  Is it your belief that Mr. Fox was the
22   decision-maker relating to you being suspended and
23   fired?
24   A.  I believe he was.

20 (Pages 74 to 77)

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              OF THE STATE OF DELAWARE
 3           IN AND FOR THE DISTRICT OF DELAWARE
 4   VALERIE HUE
 5           Plaintiff
 6     vs.                  Civil Action No.
 7                          05-225-KAJ
     NCO FINANCIAL SYSTEMS, INC.
 8   a Delaware corporation,
     trading as NCO FINANCIAL
 9   COMMERCIAL SERVICES
10           Defendant
11
12           -------------
13        Continuation of the deposition of Valerie
14   Hue, taken before Genevieve Ritter, a Notary Public and
15   Registered Professional Reporter, on January 4, 2006 at
16   1:45 p.m. at 116 West Water Street, Dover, Delaware.
17           -------------
18            DELMARVA REPORTING
19          217-A North DuPont Boulevard
             Smyrna, Delaware 19977
20              302-653-1036
21           delmarva@prodigy.net
22
             DELMARVA REPORTING
              (302) 653-1036
```

2

```
 1   APPEARANCES:
 2
 3        Jeremy W. Homer, Esquire
          PARKOWSKI, GUERKE & SWAYZE, P. A.
 4        116 West Water Street
          Dover, DE 19903-0598
 5        302-678-3262,   fax 678-9415
          Attorney for the Plaintiff
 6
 7        David Israel, Esquire
          SESSIONS, FISHMAN & NATHAN, LLP
 8        New Orleans, LA
          Attorney for the Defendant
 9
          Elizabeth K. Fite, Esquire
10        LAW OFFICE OF ELIZABETH FITE, PA
          15316 North Florida Avenue
11        Suite 100
          Tampa, FL 33613
12        Attorney for the Defendant
          813-748-2684 cell
13
14           TABLE OF CONTENTS
15                                         PAGE
16   Deposition of Valerie Hue
17   BY MR. ISRAEL:  . . . . . . . . . . . . . .    4
18   BY MR. HOMER:  . . . . . . . . . . . . . .   120
19   BY MR. ISRAEL:  . . . . . . . . . . . . . .  143
20
21
22
             DELMARVA REPORTING
              (302) 653-1036
```

3

```
 1           EXHIBITS   (retained by counsel)
 2
 3   Hue 8      series of                       30
               emails
 4
 5   Hue 9      Pl. Bates no. 20                46
               policy after Ms. Hue's termination
 6
     Hue 10     memo from Ms. Hue               52
 7             to Mr. McQuisten
 8   Hue 11     memo written                    78
               by Ms. Hue
 9
     Hue 12     discrimination charge           89
10             dated Feb. 3, 2004
11   Hue 13                                     90
12   Hue 14     first page of the journal      106
               number 89
13
     Hue 15     Bates numbers                  146
14             17 through 19
15   Certificate Page  . . .  . . . . . . . .  156
16
17
18
19
20
21
22
             DELMARVA REPORTING
              (302) 653-1036
```

4

```
 1                 VALERIE HUE,
 2        The Plaintiff herein, having previously
 3   been called for examination by the Defendant, having
 4   previously been duly sworn to tell the truth, the whole
 5   truth, and nothing but the truth, was examined and
 6   testified as follows:
 7        EXAMINATION BY COUNSEL FOR THE DEFENDANT
 8   BY MR. ISRAEL:
 9        Q.        You understand that you are
10   still under oath?
11        A.        Yes.
12        Q.        Do you have any changes to
13   your previous testimony?
14        A.        No.
15        Q.        And you heard the testimony
16   of Mr. Matt Lane?
17        A.        Yes.
18        Q.        I'm going to come back to
19   Hue Number Seven. I want to talk a little bit about
20   what you heard from Mr. Lane's testimony.
21        Now, let me show you what was identified
22   as Lane Number One, which was signed by you
             DELMARVA REPORTING
              (302) 653-1036
```

5

Rue - Israel

1 January 20, 2004. And I understood from his testimony
2 it represents the job discussion summary that you gave
3 him, correct?
4     A.     Yes.
5     Q.     And is that your signature?
6     A.     Yes, yes.
7     Q.     Before issuing this JDS to
8 Mr. Lane, did you investigate the facts and
9 allegations against him?
10    A.     Yes.
11    Q.     Did you find that he had
12 done wrong?
13    A.     Yes.
14    Q.     And what did you determine
15 he had done wrong?
16    A.     He had taken checks that
17 were given him over the phone for one amount and
18 changed those amounts.
19    Q.     And he had done that without
20 the debtor's permission?
21    A.     Yes.
22    Q.     Is that what was wrong?

6

Rue - Israel

1     A.     Yes.
2     Q.     Changing the checks without
3 the debtor's permission?
4     A.     It was wrong to take a
5 debtor's check, for example, of ten thousand that he
6 authorized and changed it to $19,000. That's as an
7 example. That was wrong.
8     Q.     I missed that. It was wrong
9 to take a check for what and change it to what?
10    A.     As an example, I said ten
11 thousand dollars and changed that check to $19,000.
12    Q.     Did he change them up by way
13 of an amount, or down?
14    A.     I don't recall. We need to
15 look at the document again. I think there was both
16 actually up and down. He had changed the dollar
17 amounts.
18    Q.     Had it always been NCO's
19 check handling policy that, absent specific permission
20 from a debtor, it was improper to change the check
21 amount?
22    A.     Yes. You needed to get the

7

Rue - Israel

1 debtor's approval to change the check amount.
2     Q.     And was that always how you
3 had trained your collectors?
4     A.     Yes.
5     Q.     Was that always the uniform
6 rule?
7     A.     Yes.
8     Q.     When you met with Mr. Lane
9 relating to his violation of this check changing rule,
10 is that a fair characterization of it? Check changing
11 rule? Or what would you call it?
12    A.     I would call it there are
13 changes.
14    Q.     Okay.
15    A.     Mm-hmm.
16    Q.     When you met with Mr. Lane
17 regarding his improper dollar changing of these
18 checks, did he deny wrong doing?
19    A.     Yes, he denied it.
20    Q.     He confirmed that he had
21 permission from the debtor?
22    A.     Yes.

8

Rue - Israel

1     Q.     You called the debtor and
2 confirmed that there was no permission, correct?
3     A.     Correct.
4     Q.     In fact, I've seen some of
5 those transcripts; have you seen those tapes?
6     A.     I saw them yesterday,
7 correct.
8     Q.     Who was the one that learned
9 of Mr. Lane's wrongful conduct?
10    A.     Kathy Obenshain and myself.
11    Q.     How did you come to learn
12 about Mr. Lane's wrongful conduct?
13    A.     When I returned from
14 vacation Kathy had emailed me and asked me to look at
15 some checks that were deposited in the month of
16 December while I was on vacation and to give her an
17 explanation as to what had happened. Through that
18 analysis, this was discovered that Matt Lane had
19 altered dollar amounts on the checks without debtor's
20 approval.
21    Q.     Was Matt Lane's wrongful
22 conduct while you were out of the office in December?

B-279

9

```
                 Hue - Israel
1          A.           From what I can gather, yes.
2  I am not sure when he first began to do that practice,
3  but I know it was in November/December.
4          Q.           When were you gone in
5  December?
6          A.           I was on vacation the
7  middle, towards the end of December.  I do not know
8  the exact dates.
9          Q.           Do you know how Kathy
10 Obershain came to learn that there may have been
11 issues regarding improper checks during December of
12 2004?
13         A.           Kathy has sent me an email
14 that I believe came from corporate.  I'm not sure
15 Corporate Metairie or Corporate Horsham.
16         Q.           Kathy had gotten an email
17 either from Corporate Metairie or Corporate Horsham?
18         A.           And there were numerous
19 account numbers from various offices of checks that
20 were to be investigated by GCM's and those various
21 branches.
22         Q.           Well, this addition to the
                DELMARVA REPORTING
                  (302) 653-1036
```

10

```
                 Hue - Israel
1  checks that were related to Mr. lane which resulted in
2  his discharge?
3          A.           Mm-hmm.
4          Q.           Were there other checks
5  related to your office?
6          A.           Yes.
7          Q.           And did you come to learn
8  that some of those other checks were improperly
9  processed?
10         A.           No.
11         Q.           So except for the checks
12 with Matt Lane, everything else was okay?
13         A.           From what I knew, yes.
14         Q.           Ed says on this form on
15 January 20, 2004, you, and it is directed to Mr. Lane,
16 admitted to your manager, Valerie Hue and Eric Shaw,
17 that you did have not have the authorization from the
18 debtor to change the amounts, and it goes on.  Do you
19 remember him making that admission to you?
20         A.           Yes.
21         Q.           Do you remember more
22 precisely what he said?
                DELMARVA REPORTING
                  (302) 653-1036
```

11

```
                 Hue - Israel
1          A.           When I had spoken with the
2  debtors, I had made Matt aware that these
3  conversations took place.  He admitted that yes, the
4  dollar amounts were changed.
5          Q.           But did he deny wrongdoing
6  regardless that he admitted that he changed the
7  amounts?
8          Let me rephrase.  You saw him testify
9  today, correct?
10         A.           Yes.
11         Q.           You saw him deny that he had
12 done anything wrong relating to his termination,
13 correct?
14         A.           Correct.
15         Q.           I gathered from his
16 explanation, that even though he had changed the
17 amounts, that was based upon a previous history and
18 permission from the debtor?
19         A.           Mm-hmm.
20         Q.           Did you also understand
21 that's what he was saying?
22         A.           From what he was saying,
                DELMARVA REPORTING
                  (302) 653-1036
```

12

```
                 Hue - Israel
1  yes.
2          Q.           Today?
3          A.           Yes.
4          Q.           Did he have a different
5  story back in January of 2004 when you fired him?
6          A.           Yes, with Eric Shaw and my
7  office.
8          Q.           Was his different story that
9  he confessed that he unilaterally and without debtor
10 permission changed the amounts of these checks?
11         A.           He said that he had gotten
12 authorization for some of the checks, but not all.  I
13 do not recall what accounts he was referring to.
14         Q.           Did he explain that for
15 those checks that he had not received authorization
16 that he considered to previously have been given
17 authorization based upon the history with the debtor?
18         A.           Something like that, he
19 might have said.  I really do not recall specifically
20 him saying that.
21         Q.           Did you leave those
22 conversations with him with the unequivocal belief
                DELMARVA REPORTING
                  (302) 653-1036
```

B-280