13

Hue - Israel

1  that he had done wrong?
2        A.        Yes.
3        Q.        You also heard him testify
4  that from the time he commenced working at NCO, he as
5  a collector had been trained that he was not supposed
6  to submit NSF checks or any different check without
7  the debtor's permission; did you hear him say that?
8        A.        Not exactly, but I don't
9  recall exactly what he said, but something to that
10 effect.
11       Q.        Well, I want to try and be
12 as precise that we can remember.
13       A.        Mm-hmm.
14       Q.        I remember him saying that
15 he was trained, I am not permitted to submit NSF
16 checks or any check without confirming from the debtor
17 that I have permission?
18                 MR. HOMER:   She has already
19                 said she doesn't recall that.
20 BY MR. ISRAEL:
21       Q.        I'm trying to understand
22 what you do recall then.

DELMARVA REPORTING
(302) 653-1036

14

Hue - Israel

1        A.        I recalled him saying
2  something to the effect of I don't really recall what
3  he said about the NSF checks to be honest with you.
4  I'm not sure.
5        Q.        Do you recall him saying
6  anything to the effect that he wasn't supposed to
7  submit them unless he confirmed with the debtor that
8  the money was there, anything to that effect?
9        A.        Not that the money was
10 there, he didn't say that.  He said something to the
11 effect that he was not supposed to redeposit checks
12 unless, I don't remember, Dave, exactly what he said.
13 I'm sorry.
14       Q.        Well, what was the rule when
15 he was hired?
16       A.        The rule was on a redeposit
17 check, back in that era, all checks were automatically
18 redeposited by NCO, period.
19       Q.        And the collector had
20 nothing to do about it?
21       A.        No.  It was corporate
22 mandate.

DELMARVA REPORTING
(302) 653-1016

15

Hue - Israel

1        Q.        Did that rule ever change?
2        A.        Yes.
3        Q.        And when did that rule
4  change?
5        A.        The exact date, I do not
6  know.
7        Q.        Month?
8        A.        I would be really guessing.
9  I prefer not to.  I'm not sure if you have some
10 documents there that show that.
11       Q.        I'm going to show you a
12 bunch of documents.  I mean, I have one like from
13 Bette Capaldo in March of 03, an employee has started
14 today that is going to be responsible for the
15 redeposit process.
16       A.        The memo might have come
17 from Phil Weaver.
18       Q.        We will get to that.  At
19 some point the rule changed.  What did the rule change
20 to?
21       A.        It was office discretion on
22 how to handle the redeposits.

DELMARVA REPORTING
(302) 653-1016

16

Hue - Israel

1        Q.        Did the rule ever change
2  again after "office discretion on how to handle the
3  redeposits"?
4        A.        No.
5        Q.        What was the discretion that
6  was to be used by the office on the handling of the
7  redeposits?
8        A.        Are you asking me for my
9  procedure, or are you asking for all of NCO?
10       Q.        I'm first asking what you
11 understand what NCO's rule is; and if your procedure
12 varies from that, I want to know what your rule is.
13       A.        Rephrase the question for
14 me.
15       Q.        Sure.  You have testified
16 that, at least when Matt Lane started, NCO had an
17 automatic redeposits of all checks --
18       A.        Yes.
19       Q.        -- that were NSF.
20       A.        Mm-hmm.
21       Q.        And that had nothing to do
22 with the collector?

DELMARVA REPORTING
(302) 653-1016

17

Hue - Israel

1    A.    Correct.
2    Q.    And at some point, and we
3  will try and pin down when, before Matt Lane left, the
4  rule changed to, there was office discretion on how to
5  handle the redeposits?
6    A.    That would be correct.
7    Q.    What was the discretion that
8  was to be used by the office on how to handle the
9  redeposited NSF checks?
10    A.    Kathy left it up to each
11  office to set up a procedure on how to handle the
12  redeposits.
13    Q.    Were there new broad
14  guidelines?
15    A.    There were some
16  administrative guidelines such as them being faxed up
17  to Horsham. There was a cut off period when they had
18  to be; but as for procedurally in the office, it was
19  more or less not the individual office to establish.
20    Q.    Was there any directive at
21  the corporate level that you had to attempt and
22  validate that funds were available by confirming with

DELMARVA REPORTING
(302) 653-1036

18

Hue - Israel

1  the bank or the debtor?
2    A.    You were to try and contact
3  the bank and/or the debtor.
4    Q.    To confirm that the funds
5  were available?
6    A.    To see if the funds were
7  available and/or qualify the source of funds.
8    Q.    What does that mean, to
9  qualify the source of funds?
10    A.    When you are soliciting a
11  check from a debtor, that check is normally given
12  because he believes something is going to happen in
13  his business that will allow him to get cash flow.
14  That is called qualifying the source of funds.
15    Q.    So if I understand your
16  testimony, you would call the debtor if the debtor
17  said, look, I'm going to send you a check for moneys
18  not here now, but one of my customers is going to pay
19  me, and you believed that that would be the
20  qualification?
21    A.    That would be the
22  qualification. That would be considered source of

DELMARVA REPORTING
(302) 653-1036

19

Hue - Israel

1  funds.
2    Q.    That would be the type of
3  discretion?
4    A.    Right. The collector would
5  solicit that check based upon that information. His
6  job was to notate it in the system that that was the
7  source of funds.
8    Q.    If, in fact, it was so
9  qualified, then the NSF check would be submitted?
10    A.    That is during the initial
11  call. If we contacted the debtor towards the end of
12  the month, and we could reach him, and he said yes, it
13  is going to happen, bla, bla, bla, the money will be
14  there when the check hits the bank, then yes, we were
15  allowed to deposit that check.
16    Q.    As you were describing this
17  process, that was in place all the way to the time
18  that you left?
19    A.    That was in place from the
20  day one that I worked for Miliken Michaels/NCO.
21    Q.    That's what I'm asking. If
22  the debtor could not be reached --

DELMARVA REPORTING
(302) 653-1036

20

Hue - Israel

1    A.    Mm-hmm.
2    Q.    -- would it be appropriate
3  to deposit the check?
4    A.    Depending. Kathy would call
5  it collector gut.
6    Q.    What is collector gut?
7    A.    For an example, if the
8  collector and the debtor had an ongoing relationship
9  where there was communication back and forth, and the
10  bank, and the collector and you sat down, and you
11  spoke, and he was like, yeah, it is going to happen
12  Val, he said it, he's out of town right now, but it's
13  going to happen, we call that in our world, collector
14  gut. From that you would be allowed to deposit the
15  check.
16    Q.    I'm going to make a list.
17  First, if there's confirmation that the funds are
18  available, then for certain you could submit the
19  check, correct?
20    A.    Mm-hmm.
21    Q.    Second is if you reach the
22  debtor and the debtor qualified the source of funds or

DELMARVA REPORTING
(302) 653-1036

B-282

21

Hue - Israel

1  confirmed that the money would be available, then the
2  check could be submitted, correct?
3      A.      Yes.
4      Q.      And the third so far is if
5  the collector had a gut feeling based upon some
6  objective reasoning, like history with the debtor,
7  even if the collector hadn't specifically reached the
8  debtor at that moment, you would still allow the check
9  to be submitted?
10     A.      Right. The collector would
11 say yes, I feel good about it, and we can go ahead and
12 submit it.
13     Q.      Any other circumstances
14 other than those three relating to the discretion that
15 you used at the branch level for the submission of
16 these NSF checks?
17     A.      Sometimes bank verification,
18 if you were able to reach a person or bank. Many
19 banks now will not let you verify in those instances.
20     Q.      I put that in the first
21 category of confirmation that the funds are available.
22     A.      Okay, okay.

DELMARVA REPORTING
(302) 653-1036

22

Hue - Israel

1      Q.      That would be the best; the
2  bank confirmed that the funds are available; that
3  would be the best evidence to submit the check, right?
4      A.      Right.
5      Q.      Confirmation, debtor
6  confirming source of funds, how the collector feels
7  about it, or gut instinct; anything besides those
8  three?
9      A.      Not that I recall at this
10 moment.
11     Q.      What happens if those three
12 did not exist? Was it appropriate for the collector
13 to submit the check?
14     A.      To redeposit the check?
15     Q.      Yes.
16     A.      He would redeposit it
17 based -- no and yes.
18     Q.      All right. Well, tell me
19 why no and why yes. What part is no, if he didn't
20 meet the three rules and he wasn't supposed to submit
21 it?
22     A.      That's all I can remember at

DELMARVA REPORTING
(302) 653-1036

23

Hue - Israel

1  this time. There might be some other things as we go
2  through this that might jog my memory as to what we
3  will allow. I want to clarify that with you.
4      Q.      At this point, you only
5  remember the three rules of discussion?
6      A.      At that point.
7      Q.      If you think of any others,
8  let me know. What happens if the collector could not
9  reach the debtor, was he supposed to submit the check?
10     A.      If he could not reach the
11 debtor and he had had history with the debtor and he
12 felt confident.
13     Q.      I'm past that. I'm going
14 the other way. What happens if the three rules as you
15 currently remember them -- confirmation that the funds
16 were available, confirmation from the debtor that
17 there's a source of funds, or if the collector has a
18 history, the gut instinct -- if you didn't have those
19 three as you sit here now, he wasn't supposed to
20 submit it?
21     A.      Right. He would put a hold
22 check request form.

DELMARVA REPORTING
(302) 653-1036

24

Hue - Israel

1      Q.      What is a hold check form?
2      A.      If, for example, if the
3  check was dated for the first or the 30th of December,
4  he would submit that the check be held perhaps until
5  the first until he tried to reach various things to
6  get it okayed.
7      Q.      Were there times that
8  collectors improperly submitted checks?
9      A.      I am not aware of any times
10 in my office that collectors inappropriately submitted
11 checks other than authoring check dollar amounts.
12     Q.      Similar to what Mr. Lane
13 did?
14     A.      Yes, that is correct.
15     Q.      Do you remember Matt Lane
16 testified that he thought half of the office was
17 improperly submitting NSF checks?
18     A.      Yes.
19     Q.      You disagree with that?
20     A.      I have no idea what he is
21 referring to.
22     Q.      Do you remember that he

DELMARVA REPORTING
(302) 653-1036

25

```
                    Hue - Israel
 1   specifically said that you and your two managers,
 2   commentary as to how he was trained, gave him
 3   instructions to submit NSF checks?
 4           A.          I recall him saying
 5   something to that effect, but I do not remember his
 6   exact words.
 7           Q.          Do you remember the concepts
 8   that he was --
 9           A.          I remember something to that
10   effect.
11           Q.          Do you remember, though, he
12   was accusing you of how he understood the policy to
13   be?
14           A.          Yes.
15           Q.          Do you remember that
16   Mr. Homer asked him whether he, Matt Lane, had heard
17   that Kathy Obershain had given you such an
18   instruction?
19           A.          I believe so.
20           Q.          Do you remember he said, I
21   never heard it, but other collectors told me that
22   Miss Obenshain had so instructed Miss Hue?
                  DELMARVA REPORTING
                    (302) 651-1036
```

26

```
                    Hue - Israel
 1           MR. HOMER:   Objection.
 2   That's not a correct characterization of
 3   any of his testimony.
 4   BY MR. ISRAEL:
 5           Q.          Let us do it a different
 6   way. I'm not trying to recharacterize. Was there
 7   ever a time that Miss Obenshain instructed you that
 8   you had to improperly deposit NSF checks?
 9           A.          What would be considered
10   improper?
11           Q.          Well, you have given the
12   three rules.
13           A.          That I can think of at this
14   point.
15           Q.          Right.
16           A.          Mm-hmm.
17           Q.          Was there ever a time, for
18   example, that Miss Obenshain told you, take every NSF
19   check in the office, and regardless that you can
20   validate funds from the bank or the debtor, regardless
21   if the debtor will confirm the future source of the
22   funds or regardless of instructions from the
                  DELMARVA REPORTING
                    (302) 651-1036
```

27

```
                    Hue - Israel
 1   collector, run them all?
 2           A.          Yes. Managers have said
 3   that numerous times as well as vice-presidents of
 4   collectors.
 5           Q.          I'm confused. I thought you
 6   had testified that collectors never improperly ran
 7   checks?
 8           A.          You said vice-presidents,
 9   Kathy Obenshain. It is not improper if she does it.
10   She's vice-president of collectors.
11           Q.          Those three rules that you
12   gave me, were those your rules as to how you
13   implemented the discretion in your branch?
14           A.          Those were criteria I set up
15   in my branch.
16           Q.          Was Kathy Obenshain aware of
17   that criteria?
18           A.          Mm-hmm, yes.
19           Q.          And she approved it?
20           A.          She did not disapprove it.
21           Q.          She never told you, you are
22   violating NCO rules with the discretion of these three
                  DELMARVA REPORTING
                    (302) 651-1036
```

28

```
                    Hue - Israel
 1   points?
 2           A.          Right.
 3           Q.          And was there ever a time
 4   that Kathy Obenshain had you violate those three rules
 5   by running all the checks in the office?
 6           A.          Those were my rules. I set
 7   up in my office. She, as vice-president, took full
 8   authority over what I had set up in my office. I
 9   would do as she would instruct.
10           Q.          My question is: Was there
11   ever a time that she, Kathy Obenshain, instructed you
12   to violate those three rules as you have described
13   them?
14           A.          I do not consider that to be
15   so much of a violation. I followed her directive. It
16   was my office procedure. If she said to do something
17   different, I don't consider that to be really a
18   violation.
19           Q.          Let me change the words.
20   I'm interpreting. I'm not trying to get you to say
21   something that isn't your testimony. Did she ever
22   issue a directive that was contrary to the policy and
                  DELMARVA REPORTING
                    (302) 651-1036
```

B-284

33

```
                    Rue - Israel
1   Harkinson; that was an admin person internal that your
2   office was to deal with?
3               A.          Yes.
4               Q.          The third is. "Requests for
5   redeposits can only be made for NCF items processed
6   within the past 30 days, time frame provided by
7   executives." What does that mean?
8               A.          In some offices they call it
9   a debt check, anything past three days that you are
10  not supposed to submit for redeposit.
11              Q.          Now, once you got these
12  rules, were you following your own three rules as well
13  as these admin rules?
14              A.          Many of these were
15  administrative processes that my admin followed and
16  that had to be followed to get the checks put back on.
17              Q.          What I'm asking is: If, for
18  example, a collector had a check that was greater than
19  30 days old, but had a good gut instinct about it --
20              A.          No.
21              Q.          -- meaning they couldn't be
22  deposited once this March 4, 2000 series of rules came
                    DELMARVA REPORTING
                      (302) 653-1036
```

34

```
                    Rue - Israel
1   in, correct?
2               A.          Exactly. Even if you tried
3   it, you couldn't. Yes.
4               Q.          Requests can only be made on
5   items that have been returned only once. Does that
6   mean that if the check had been returned once for NSF,
7   you can't turn it in multiple times?
8               A.          Correct.
9               Q.          And the last point,
10  "Accounting clerk will have to do final verification,"
11  what does that statement mean?
12              A.          The accounting clerk, the
13  administrative assistant has to do final verification.
14              Q.          Of what, though?
15              A.          The accounting clerk has to
16  do final verifications on the checks.
17              Q.          Does that mean that the
18  accounting clerk was the one that had to attempt to
19  contact the bank and the debtor?
20              A.          And my office. That was
21  part of her job description.
22              Q.          So, regardless if the
                    DELMARVA REPORTING
                      (302) 653-1036
```

35

```
                    Rue - Israel
1   collector had a good feeling based upon history with a
2   debtor, after March of 03, there had to be contact by
3   the accounting clerk with the debtor?
4               A.          It was the beginning of the
5   process to get the checks to be put back on, to
6   redeposit.
7               Q.          Meaning the contacting of
8   the debtor?
9               A.          Right. It was the beginning
10  of the administrative process to have a redeposit.
11  Only the beginning.
12              Q.          And so, as of March of 03,
13  the accounting clerk had to verify that, in fact, the
14  funds were available?
15              A.          The accounting clerk and my
16  office verified if the funds were available by calling
17  the bank, would verify there was a stop payment placed
18  on the check. And she -- or in my office, she --
19  would submit a report to me, Mike Scher, the
20  collectors on those checks.
21              Q.          Now, if I understood your
22  rules previously, the number two rule was that if the
                    DELMARVA REPORTING
                      (302) 653-1036
```

36

```
                    Rue - Israel
1   collector reached the debtor, and the debtor confirmed
2   the source of funds, that was a basis to submit the
3   check?
4               A.          As I mentioned, this email
5   is the beginning of the process. There was a process.
6               Q.          That was not my question.
7   Let me reask it. Before we looked at this email in
8   the beginning of the admin process --
9               A.          Mm-hmm.
10              Q.          -- you described how you in
11  your office implemented the discretion as to when
12  checks should be redeposited, correct?
13              A.          Correct.
14              Q.          Your second rule was if the
15  debtor confirmed the source of funds to the collector,
16  then it would be appropriate to submit the NSF check,
17  correct? That was the second rule, right?
18              A.          I'm listening.
19              Q.          You have to say yes or no.
20              A.          Depending upon.
21              Q.          I'm not there yet. I'm
22  interpreting.
                    DELMARVA REPORTING
                      (302) 653-1036
```

37

Hue - Israel

1    A.    Yes, you are.
2    Q.    I want to make sure I
3  understand the history.  Then we are going to go to
4  this process.  The rule was that the debtor confirmed
5  the source of funds to the collector; and before
6  March 4 of 03, the collector was permitted to submit
7  the NSF check, correct?
8    A.    Before March of 03?
9    Q.    Before March 4, 2003,
10  correct.
11    A.    Let me get the date.
12    MR. HOMER:   You can look on
13    the last page.
14  BY MR. ISRAEL:
15    Q.    It is on the email from
16  Bette Capaldo.
17    A.    Before March the checks were
18  automatically redeposited.
19    Q.    Before March of 03, the
20  checks were automatically redeposited?
21    A.    As of February 24, 2003,
22  prior to February 24, 2003, all checks were

DELMARVA REPORTING
(302) 653-1036

38

Hue - Israel

1  automatically redeposited by NCO.  That is a second
2  part of your email.
3    Q.    When was the discretion used
4  by the collector then?
5    A.    Once Phil Weaver stopped
6  that process, then it was based upon office
7  discretion.
8    Q.    Okay.  Once Phil Weaver
9  stopped what process?
10    A.    Automatically redepositing
11  of all checks.
12    Q.    Okay.
13    A.    Mm-hmm.
14    Q.    When did Phil Weaver
15  automatically stop redepositing all checks?
16    MR. HOMER:   She has already
17    told you it is in the memo.
18    THE WITNESS:   February 24 of
19    2003, he writes, "Effective immediately
20    the automatic redeposits of return items
21    from the bank will cease."
22

DELMARVA REPORTING
(302) 653-1036

39

Hue - Israel

1  BY MR. ISRAEL:
2    Q.    Now, at that point is when
3  you started your process of the three rules as you
4  have described it?
5    A.    At that point, we were
6  advised by Miss Obenshain to come up with a procedure
7  to replace what Phil had abolished.
8    Q.    Right after February 24,
9  Kathy Obenshain asked you to come up with a procedure,
10  and you have the three rules as you have described
11  them?
12    A.    There are rules.  There
13  might be more than three, as I mentioned.
14    Q.    You told me that.
15    A.    Okay.
16    Q.    I'm not trying to trick you.
17  You have made that abundantly clear.
18    A.    Okay.  I just wanted to make
19  sure.
20    Q.    The three main rules, I am
21  not going to keep going through them, that was after
22  February 24, 03, correct?

DELMARVA REPORTING
(302) 653-1036

40

Hue - Israel

1    A.    Yes.  We had to establish
2  something in our office.
3    Q.    Okay.  So now comes an email
4  dated March 4 of 03, about a week later.  You have in
5  front of you from Bette to Phil, see that?
6    A.    Yes.
7    Q.    Now, the last point is that
8  the accounting clerk will have to do final
9  verification.  That verification was to confirm that
10  the debtor had the funds necessary before the NSF
11  check was submitted, correct?
12    A.    She was at the beginning of
13  a process that was a week long process.
14    Q.    To confirm that the debtor
15  had the funds before the NSF check was submitted,
16  correct?
17    A.    To confirm with the bank
18  that funds were available.
19    Q.    And if she couldn't confirm
20  with the bank that the funds were available, would the
21  check be submitted?
22    A.    She would prepare a report

DELMARVA REPORTING
(302) 653-1036

B-286

41

Hue - Israel

1  and give it to myself, Mike Scher, and the collectors.
2         Q.        And what would you then do
3  with that report?
4         A.        That report would be given
5  to the collectors. And their job was to qualify
6  source of funds, contact the debtors.
7         Q.        Got it. Got it.
8         A.        Etcetera.
9         Q.        Right. So after she
10 attempted to confirm that the funds were available in
11 the bank, if she wasn't able to do so, then that
12 report would be created, and you would go to your
13 collectors and have them try and confirm the source of
14 funds?
15        A.        They would be advised to get
16 the check to make it good, yes.
17        Q.        And were they also permitted
18 at that point to use their gut instinct?
19        A.        If necessary, yes.
20        Q.        Okay. So after the March 4,
21 03 memo, was there ever a time that Kathy Obenshain
22 issued a directive that all NSF checks in your office

DELMARVA REPORTING
(302) 653-1036

42

Hue - Israel

1  were to be run?
2         A.        It was. I would not call it
3  a directive. I would say she would make a statement,
4  you know, let them all get deposited and see what
5  sticks. You have heard that statement. You have been
6  in this industry long enough, I'm sure. That was a
7  vice-president's statement.
8         Q.        Right. I don't want to
9  mince words. Whether that's a directive or that's a
10 statement, you took from that statement that the
11 branch was now permitted to take all those checks and
12 to quote, redeposit them, to see if they would, quote,
13 stick?
14        A.        As long as they met certain
15 criteria, according to some of this criteria you see
16 before you.
17        Q.        Well, if it didn't meet the
18 criteria, it wouldn't be on the report, correct?
19        A.        Oh, it should be on the
20 report.
21        Q.        I said it wrong. If it
22 didn't meet the criteria, then you would not, strike

DELMARVA REPORTING
(302) 653-1036

43

Hue - Israel

1  that.
2         Was there ever a time that Kathy
3  Obenshain made a statement which you understood to be
4  in a directive that regardless, if it met the criteria
5  in this March 03 email, the checks were to be run to
6  see what sticks?
7         A.        No.
8         Q.        What would happen if the
9  accounting clerk reported that, can't reach the bank
10 and can't reach the debtor?
11        A.        Her job was not to contact
12 the debtor.
13        Q.        Only the bank?
14        A.        Only the bank.
15        Q.        And when a collector would
16 come to you and say, I can't reach the debtor, was
17 there ever a time that Kathy said, well, regardless,
18 let the check run and see if it sticks?
19        A.        Yes.
20        Q.        And is that your
21 understanding as to what NCO's proper procedure was
22 after March of 03?

DELMARVA REPORTING
(302) 653-1036

44

Hue - Israel

1         A.        She would state that, did he
2  try to contact the debtor, what's the history on the
3  account, many of those things that you just went over.
4  And if we went through the account, as we did many
5  times together, she would say, let's see if it sticks,
6  go ahead and deposit it. There is a good history on
7  it, feels good.
8         Q.        I understand that she gave
9  the instruction, but what I'm asking is: Did you
10 understand that would be in compliance with NCO's
11 policy as of March 4, 2003?
12        A.        Yes, because we did not
13 deposit checks that were over 30 days in the system
14 that were dead checks. There were not checks that had
15 been resubmitted that were done twice. So yes, she
16 would say, you know, after reviewing them together,
17 she would say, go ahead and run it.
18        Q.        I'm not being clear. We are
19 not communicating. You have made that abundantly
20 clear twice. What I am saying is: Did you understand
21 that instruction of "go ahead and run it" to be in
22 compliance with NCO's policy?

DELMARVA REPORTING
(302) 653-1036

B-287

45

```
                 Hue - Israel
1          A.          I believe I've answered
2  that.
3          Q.          Is the answer yes?
4          A.          I've explained the answer.
5          Q.          Let me make it yes or no.
6  Was it in compliance with NCO's policy when
7  Miss Obenshain issued you the directive after
8  questioning you about the check to have the check run?
9          A.          If it met this criteria,
10 yes, it was in compliance.
11         Q.          Okay.  Is it your
12 understanding that that process was used by everyone?
13         A.          Can you rephrase that?
14         Q.          Absolutely.  Is it your
15 understanding that that process, as you have described
16 it, was used, not only by you in your office, but by
17 other GCM's, general collection managers, in other
18 commercial division offices?
19         A.          I believe other collection
20 managers, GCM's, had a process in place.
21         Q.          Okay.  Was it the same
22 process that you had?
                 DELMARVA REPORTING
                   (302) 653-1036
```

46

```
                 Hue - Israel
1          A.          I don't know.
2              (Deposition Exhibit Number Nine
3              9 was marked for
4              identification.)
5  BY MR. ISRAEL:
6          Q.          Okay.  Let me show you what
7  I will mark as Hue Number Nine.  And this is a
8  document that you produced to us.  We identified it as
9  Plaintiff's Bates Number 20.  Do you know what that
10 document is?
11         A.          Mm-hmm.
12         Q.          What is that?
13         A.          It is a policy that was
14 initiated after my termination.
15         Q.          After your termination.
16 Okay.  Can I see that for a second?
17              Do you know who signed it?  It is
18 blocked out.
19         A.          Mm-hmm.
20         Q.          Who signed it?  Is there a
21 problem?  Who signed it?
22         A.          I didn't know that was a
                 DELMARVA REPORTING
                   (302) 653-1036
```

47

```
                 Hue - Israel
1  question.
2          Q.          Who signed it?
3          A.          It might have been, I want
4  to say it might have been Barry Lee that had submitted
5  this.  Yes.  It says Mr. Lee at the top.  I would say
6  Barry Lee.
7          Q.          Where did you get it?
8          A.          He faxed it to me.
9          Q.          Mr. Lee faxed it to you?
10         A.          Yes.  He was an employee of
11 NCO.
12         Q.          I want to read to you number
13 six, and I'll be happy to give it back.  "All checks
14 over one thousand dollars with an NSF on file needs to
15 be verified by the bank or proof of funds need to be
16 validated; i.e., deposits slips/bank statement.  Get a
17 second voice or conference in, a lead/supervisor or
18 manager."
19              Was that a rule that was in place when
20 you were in the Dover branch?
21         A.          No.
22         Q.          Number eight says, "All
                 DELMARVA REPORTING
                   (302) 653-1036
```

48

```
                 Hue - Israel
1  checks received via mail with an NSF will be verified
2  before posting.  If the payment cannot post a Y-mail,
3  will go to chain so a call can be made to the debtor."
4  Was that a rule in place in the Dover office when you
5  were there?
6          A.          Please reread that.
7          Q.          In fact, let me show it to
8  you.  It is number eight.
9          A.          No.
10         Q.          Meaning that it wasn't a
11 ruling in your office?
12         A.          No, not that I was aware of.
13         Q.          How often between March of
14 03 and when you left in January of 04 would
15 Miss Obenshain make any request that all NSF checks
16 should be run?
17         A.          May I have the dates again?
18         Q.          Sure.  How often between
19 March of 03, specifically after Miss Capaldo's email
20 that we have looked at in Hue number Eight, and when
21 you left in January of 04, did Miss Obenshain issue a
22 directive that all checks should be run?
                 DELMARVA REPORTING
                   (302) 653-1036
```

B-288

49

Hue - Israel

1    A.    I don't have the exact times
2  and/or dates for that.
3    Q.    Was it a common occurrence
4  that you would expect at the end of each month
5  Obenshain would make a statement or give a directive
6  that all NSF's were to be run?
7    A.    Not every month.
8    Q.    Every other month; can you
9  estimate for me?
10    A.    I wouldn't say every other
11  month. I would not be able to estimate properly for
12  you.
13    Q.    Was there ever a time where
14  she had you run all of the checks without doing any
15  type of due diligence under the rules as you have
16  described, those three rules?
17    A.    Not that I can recall. And
18  if I may ask you to repeat that question.
19    Q.    Was there ever a time that
20  Miss Obenshain asked you to run all of the NSF checks
21  in the office at the end of the month without you
22  doing any due diligence or scrub as to the likelihood

DELMARVA REPORTING
(302) 653-1036

50

Hue - Israel

1  of those checks being collected?
2    A.    I'm not sure what you mean
3  by scrub.
4    Q.    You have your three rules?
5    A.    Right.
6    Q.    Was there ever a time that
7  she asked you to run all of the checks without
8  supplying any of those three rules?
9    A.    I would say, she would say.
10  Valerie, deposit, go ahead and redeposit checks and
11  see what sticks. And that would be normally the way
12  she would speak to me.
13    (Whereupon the reporter read
14    back the previous answer.)
15  BY MR. ISRAEL:
16    Q.    When she would give you that
17  directive or make that statement --
18    A.    Mm-hmm.
19    Q.    -- was she talking about one
20  check or all the checks?
21    A.    One or maybe two or three.
22  What we would do is go over the checks on the phone

DELMARVA REPORTING
(302) 653-1036

51

Hue - Israel

1  together.
2    Q.    That is what I'm trying to
3  understand. Was there ever a time when you wouldn't
4  make the effort with her to go over the one or two or
5  three checks at issue, and then she issues the
6  statement, letting it stick, and that she just said
7  run all of the checks?
8    A.    We would sit on the phone
9  and we would go over the checks and I would tell her
10  what was and was not done. She would say, Val, go
11  ahead and see what sticks. She would say, go ahead
12  and deposit it.
13    Q.    Who is Dave McQuisten?
14    A.    He is or was a collector at
15  the local branch in Dover.
16    Q.    You were requiring to
17  collectors to come see you to confirm verification
18  before running NSF's?
19    A.    Before redepositing?
20    Q.    That's what I'm asking.
21  Before redepositing NSF's.
22    A.    They would have to meet with

DELMARVA REPORTING
(302) 653-1036

52

Hue - Israel

1  their various managers to go over why, what was going
2  to be going to allow that check to be deposited.
3    (Deposition Exhibit Number Hu-
4    10 was marked for
5    identification.)
6  BY MR. ISRAEL:
7    Q.    Let me show you what I've
8  marked as Hue Ten. It is a memo from you to
9  Mr. McQuisten.
10    A.    Mm-hmm.
11    Q.    You were instructing him to
12  see you before checks being redeposited?
13    A.    I was responding to Kathy's
14  request, yes. I issued a memo to him.
15    Q.    What was the reason that
16  Kathy Obenshain made a request that you issue a memo?
17    A.    She had gotten some inquires
18  on all NSF's that happened in December, as mentioned
19  earlier, that were in the email, and for all branches.
20  And she had wanted the perpetrators so much to speak,
21  have some kind of memos put in the file and written
22  up. I issued this memo to David about his NSF's.

DELMARVA REPORTING
(302) 653-1036

B-289

53

Hue - Israel

1  Q.        He was in your office, David
2  McQuisten?
3          A.        Yes.
4          Q.        I thought I heard your
5  previous testimony that, except for improper checks
6  run by Matt Lane, there were no other improper checks
7  in your office per that report; did I misunderstand
8  you?
9          A.        This was not what we
10 consider improper. Improper in my mind's eye are
11 collectors that take checks and alter dollar amounts.
12 That would be what I would consider improper. I gave
13 David a supplemental memo.
14         Q.        Well, if a collector ran an
15 NSF check without following your three rules --
16         A.        Mm-hmm.
17         Q.        -- wasn't that improper?
18         A.        I was not in the office in
19 December.
20         Q.        First answer that question.
21 If a collector ran an NSF check without following the
22 three rules as you have described them, wouldn't that

54

Hue - Israel

1  have been improper?
2          A.        Yes, or the rules that had
3  been present.
4          Q.        Did this relate to
5  activities in the office?
6          A.        Yes.
7          Q.        What did Mr. McQuisten do?
8          A.        I don't know. I don't
9  recall.
10         Q.        When you were out in
11 December, did Eric Shaw issue improper instructions
12 about running checks?
13         A.        I do not know. Whatever
14 Rick said, as I was out of the office. I gave him
15 instructions that I asked him to follow.
16         Q.        What were your instructions
17 to him?
18         A.        My instructions to him were
19 to speak to the collectors, to get the report from me,
20 which is always on a week in advance.
21         Q.        That's the NSF report?
22         A.        To see what checks are in

55

Hue - Israel

1  the office, to get with the collectors to see what
2  checks would, could go in again or what checks could
3  not, verify source of funds, collector gut, normal
4  procedure.
5          Q.        Who was the administrator?
6          A.        Who was my office
7  administrator?
8          Q.        Yes.
9          A.        At time it was Lee
10 Nickerson.
11         Q.        When you were suspended, who
12 told you about that?
13         A.        Ted.
14         Q.        Over the phone?
15         A.        Yes.
16         Q.        What did he tell you as to
17 why you were being suspended?
18         A.        He said you are being, we
19 have spoken with collectors, and you are being
20 suspended for improper check verifications.
21         Q.        What, if anything, did you
22 say?

56

Hue - Israel

1          A.        "What?" That was my
2  response.
3          Q.        Then what happened?
4          A.        Are you kidding me? And he
5  said, "No, leave." That was it.
6          Q.        Okay. Did you speak with
7  anyone besides Mr. Fox relating to this investigation?
8          A.        Kathy Obenshain.
9          Q.        What, if anything, did you
10 and she discuss?
11         A.        She came to the Dover office
12 and met with me, asked me to give a statement. And I,
13 you know, as I mentioned, in a cold, dark room. I
14 said I would not. I asked her what had I done, let me
15 see some evidence. She would not produce anything.
16         Q.        Did she tell you that you
17 were being accused of improperly running checks or
18 directing others to run checks?
19         A.        She just kept saying
20 improper check procedures. I'm like, what improper
21 check procedures?
22         Q.        It is your testimony that

B-290

57

Hue - Israel

1  Ted Fox was the decision maker, or you believed Ted
2  Fox was the decision maker regarding your suspension
3  and discharge?
4              A.              Ted was the one that
5  contacted me. It was not Kathy.
6              Q.              My question was --
7              A.              Yes.
8              Q.              -- why do you believe he is
9  the decision maker other than the fact that he was in
10  charge of the Commercial Division? Any other
11  division?
12             A.              Because he personally
13  contacted me.
14             Q.              He delivered the message?
15             A.              Yes.
16             Q.              Any other reasons besides he
17  was in charge of Commercial and he personally
18  contacted you?
19             A.              No.
20             Q.              Do you know Mark Lefevre?
21             A.              Yes.
22             Q.              Who is he?

DELMARVA REPORTING
(302) 651-1016

58

Hue - Israel

1              A.              He was a collector in Dover.
2              Q.              Did you have a bad
3  relationship with him?
4              A.              As a general collection
5  manager, you have interesting relationships with your
6  collectors. You have been in the industry long enough
7  to know how it works.
8              Q.              They lie all the time?
9              A.              Yes.
10             Q.              What would you expect him to
11  lie about?
12             A.              Additionally, checks have
13  been re-dep-ed with no hope of cashing. I don't know
14  who signed it because they're not signed.
15             Q.              This one is.
16             A.              Okay.
17             Q.              I'll show it to you.
18             A.              Please.
19             Q.              This one is signed by him.
20  I believe it's signed by him.
21             A.              There is one that I read
22  that we thought was quite funny, considering Mark's

DELMARVA REPORTING
(302) 651-1016

59

Hue - Israel

1  history. That was, indeed, Mark.
2              Q.              I think it's Mark. That's
3  what I understood. That's what I was told to me.
4              Assuming for the moment it is Mark,
5  would he have any reason to lie about you as far as
6  you know?
7              A.              I was told that it was Ted
8  that contacted the individual collectors. And I'm
9  going to say that I would only imagine how I would
10  feel if I had the person running the corporate office
11  calling me asking me for information. I would be very
12  cooperative to keep my own job.
13             Q.              Mm-hmm. Same thing for Brad
14  Reavis, R-E-A-V-I-S?
15             A.              Mm, mm.
16             Q.              You have to say yes.
17             A.              Yes.
18             Q.              Same thing for Kim Marlow?
19             A.              Absolutely.
20             Q.              Well, what about, have you
21  seen Eric Shaw's statement?
22             A.              Yes.

DELMARVA REPORTING
(302) 651-1036

60

Hue - Israel

1              Q.              Dated January 22, 04.
2              A.              Yes.
3              Q.              It said, this statement is
4  false, also?
5              MR. HOMER:   Let her look at
6              the statement.
7  BY MR. ISRAEL:
8              Q.              Of course. If you are
9  familiar with the statement. He is making
10  acquisitions. I understood that your office, through
11  your collectors, are improperly putting checks on the
12  system. That's what I get from the statement. Did
13  you also get that?
14             MR. HOMER:   She hasn't even
15             seen it.
16             MR. ISRAEL:   Oh, yes, she
17             has. She just testified she did.
18             MR. HOMER:   How long ago?
19             MR. ISRAEL:   I don't know.
20  BY MR. HOMER:
21             Q.              When was the last time you
22  saw the statement, Miss Hue?

DELMARVA REPORTING
(302) 651-1036

61

Hue - Israel

1    A.          Okay. What was your
2  question?
3    Q.          Is Eric Shaw making unfair
4  allegations?
5    A.          What do you consider unfair
6  allegations?
7    Q.          Well, I'm asking you. You
8  have read the statement now. Are his statements
9  correct? I gleaned from that statement that he is
10 saying that your office is improperly redepositing
11 checks, and that's the practice.
12           MR. HOMER:   Wouldn't it be
13       simpler to ask her the question in that
14       form rather than make her characterize
15       every sentence in the statement?
16           MR. ISRAEL:   That was my
17       question to begin with. You made her
18       read the statement. That was my
19       question.
20           MR. HOMER:   She has to read
21       it line by line.
22

DELMARVA REPORTING
(302) 653-1036

62

Hue - Israel

1  BY MR. ISRAEL:
2    Q.          Let me ask it this way. I
3  understand Mr. Shaw is improperly accusing you
4  indirectly as being responsible for your office in
5  depositing checks, that it was done wrongly?
6    A.          I don't gage that from
7  reading this.
8           MR. HOMER:   Wait until he
9       asks a question that makes some sense.
10          THE WITNESS:   Okay.
11          MR. ISRAEL:   You don't have
12      to be nasty. I'll rephrase the
13      question.
14          MR. HOMER:   It is getting a
15      little frustrating, Dave.
16          MR. ISRAEL:   It is a little
17      frustrating. You keep interpreting.
18          MR. HOMER:   I interrupt only
19      when you ask a question that is not
20      understandable.
21 BY MR. ISRAEL:
22   Q.          I disagree. You interrupt

DELMARVA REPORTING
(302) 653-1036

63

Hue - Israel

1  plenty of times when they are fully understandable
2  even though I will withdraw the last one as not
3  understandable.
4    Q.          First of all, did you read that
5  statement before today?
6    A.          I have read it, yes.
7    Q.          Do you understand that
8  Mr. Shaw in that statement to be suggesting that your
9  office is improperly depositing checks? Yes or no.
10          MR. HOMER:   I'm going to
11      object on the grounds that the document
12      does speak for itself. You go ahead and
13      answer it.
14          THE WITNESS:   Yes and no.
15 BY MR. ISRAEL:
16   Q.          Well, what part is yes and
17 what part is no?
18   A.          He followed the procedure
19 where he was to contact the collectors. He will go
20 over them individually. He followed the procedure
21 where no stop payment, too many NSF's would go on. He
22 followed the procedure and had given it to Mike Scher.

DELMARVA REPORTING
(302) 653-1036

64

Hue - Israel

1  He followed many of the procedures. This practice has
2  been going on as long as I can remember, even as a
3  collector from past managers. That's how we did it in
4  the office. We had to go through this procedure.
5    Q.          Well, before February of 03,
6  you are saying they were all just deposited regardless
7  if there was verification?
8    A.          When he was speaking of past
9  managers, he was speaking of former GCF's.
10   Q.          So as you sit here now, you
11 have no earthly idea as to why you were fired; is that
12 fair?
13          MR. HOMER:   Objection. She
14      has never said that.
15 BY MR. ISRAEL:
16   Q.          Well, is that a fair
17 summary, though? Let me say it differently then. In
18 your opinion, the allegations that you were violating
19 NCO's check handling procedures are totally absurd?
20   A.          Yes.
21   Q.          At no time did you ever do
22 anything, directly or indirectly, in violation of

DELMARVA REPORTING
(302) 653-1036

B-292

65

```
                    Hue - Israel
1    NCO's procedures regarding the submission of NSF
2    checks?
3              A.           No.
4              Q.           And at no time do you have
5    any recollection that any of your collectors violated
6    NCO procedure regarding the submission of NSF checks?
7              A.           I cannot answer that.
8              Q.           As you sit here, you don't
9    know of any?
10             A.           I do not, I can't answer
11   that. I don't know what they did or did not do.
12             Q.           To the best of your
13   knowledge.
14             A.           I will not answer that. I
15   do not know.
16             Q.           Do you have any knowledge
17   that they violated the procedure?
18             A.           Obviously, Matt Lane
19   violated the procedure. I'm not sure of other
20   collectors that have not been caught yet through
21   investigation, so I don't feel comfortable answering
22   that question.
                  DELMARVA REPORTING
                     (302) 653-1036
```

66

```
                    Hue - Israel
1              Q.           Have you seen the sworn
2    statements of Brian Laiche, Darron DeEsch, Steve Ross,
3    Chris Salasiero, Lenny Ciccarone, Mannie Cardozo, Joe
4    Batie, and Mike Scher?
5              A.           I read those yesterday.
6              Q.           And Joe Thomas?
7              A.           Yes.
8                   MR. HOMER:   Are those all
9              the identical statements? Can I get one
10             of them to look at?
11                  MR. ISRAEL:   Sure. They're
12             not quite identical, but they're very
13             similar.
14   BY MR. ISRAEL:
15             Q.           Do you have, which statement
16   in front of you?
17             A.           Brian.
18             Q.           Paragraph two, take a look
19   at that. At any time did Kathy Obenshain ever
20   instruct you to redeposit checks without verification
21   of funds?
22             A.           Mm-hmm.
                  DELMARVA REPORTING
                     (302) 653-1036
```

67

```
                    Hue - Israel
1              Q.           Yes; is that what you are
2    saying?
3              A.           I'm reading the statement.
4              Q.           Oh.
5              A.           You are asking me a question
6    about that?
7              Q.           Yes.
8                   At any time did Kathy Obenshain instruct
9    you to redeposit checks without verification of funds?
10             A.           If you cannot reach a bank,
11   which is verification of funds, yes.
12             Q.           Okay. Did you ever witness
13   Miss Obenshain instruct any other managers to
14   redeposit checks without verification of funds?
15             A.           No.
16             Q.           I'm talking about in a
17   general meeting, where you would have conference calls
18   with other GCM's and Miss Obenshain. You participated
19   in that?
20             A.           Yes.
21             Q.           Did she ever say, I want you
22   to redeposit checks without verification of funds?
                  DELMARVA REPORTING
                     (302) 653-1036
```

68

```
                    Hue - Israel
1              A.           She would say, go through
2    and see what you can get on the system, in her normal
3    flip little way.
4              Q.           Okay.
5                   (Whereupon an off-the-record
6                   discussion was held.)
7    BY MR. ISRAEL:
8              Q.           Do you believe that Kathy
9    Obenshain had any influence relating to the decision
10   you be discharged?
11             A.           Very little.
12             Q.           What is the basis of that
13   belief?
14             A.           A conversation I had with
15   Kathy.
16             Q.           When was this conversation?
17             A.           The day before I was
18   suspended.
19             Q.           What did Miss Obenshain and
20   you discuss?
21             A.           The firing of Matt Lane, the
22   analysis that I had done, and her response to me that
                  DELMARVA REPORTING
                     (302) 653-1036
```

B-293

69

Hue - Israel

1  I had done a great job.
2              Q.         Well, at the time that you
3  had that discussion with Kathy Obenshain, do you know
4  whether issues relating to check handling in your
5  branch had been brought to Miss Obenshain's attention?
6              A.         Yes, I do.
7              Q.         How do you know that?
8              A.         Because she was referring to
9  Matt Lane and to my analysis, which was in response to
10 an email that she had gotten from corporate, and
11 regarding check handling throughout all of Commercial
12 because there were many, many checks from other
13 offices, not just Dover.
14             Q.         Now I'm confused on what you
15 told me. Were there other checks that were
16 problematic so far as corporate was concerned in your
17 office for December of 03 besides Matt Lane's?
18             A.         There was a list that was
19 generated by someone in Horsham or wherever that had
20 checks from all offices that were on a spreadsheet.
21 And as I stated earlier, all the GCM's were to give an
22 analysis.

                    DELMARVA REPORTING
                      (302) 653-1036

70

Hue - Israel

1              Q.         For the checks that related
2  to your office, aside from Matt Lane's, were there
3  other problem checks so far as corporate was concerned
4  in December of 03?
5              A.         I'd have to give an
6  explanation.
7              Q.         Did the explanations you
8  gave for those checks, did Miss Obenshain accept those
9  explanations as satisfactory?
10             A.         Yes.
11             Q.         What changed between your
12 explanations to Miss Obenshain regarding those
13 problematic checks and your discharge, or your
14 suspension; do you know?
15             A.         I really can't answer that.
16 I don't know, other than Ted Fox contacted me the next
17 day.
18             Q.         He didn't tell you anything
19 except, as you have described, check handling process
20 was a problem, correct?
21             A.         Check handling procedure or
22 process or something to that effect. Exact verbiage,

                    DELMARVA REPORTING
                      (302) 653-1036

71

Hue - Israel

1  I do not remember.
2              Q.         Did anyone describe to you
3  what the problems were before you were separated?
4              A.         No.
5              Q.         You spoke to Steve
6  Leckerman?
7              A.         Yes.
8              Q.         Did you understand that he
9  was Ted Fox's boss?
10             A.         Yes.
11             Q.         I have your January 22, 2004
12 email to him; do you remember writing that?
13             A.         I'm sure, yes.
14             Q.         You said, "I was placed on
15 suspension with pay due to two concerns: Not pulling
16 checks and recreating DCI on re-deps."
17             MR. HOMER:   I want her to
18             look at the document to answer specific
19             questions about the wording in it.
20             MR. ISRAEL:   Let me ask you
21             a couple of questions before looking at
22             the document.

                    DELMARVA REPORTING
                      (302) 653-1036

72

Hue - Israel

1              MR. HOMER:   If you are going
2  to ask questions about the document, she
3  has a right to look at the document.
4  You are quoting the thing from her. Who
5  knows if it is in context or not?
6              MR. ISRAEL:   Who knows? You
7  can do it yourself. I don't have to
8  give her the document. There's no such
9  rule.
10             MR. HOMER:   I disagree.
11             MR. ISRAEL:   Show me the
12 rule. I'll be happy to comply.
13             MR. HOMER:   She has a right,
14 if you refer to the document, to look at
15 it.
16             MR. ISRAEL:   I disagree, but
17 I understand your objection.
18 BY MR. ISRAEL:
19             Q.         The two concerns are: Not
20 pulling checks, what does that mean to you?
21             MR. HOMER:   I'm going to
22             object unless she has a chance to look

                    DELMARVA REPORTING
                      (302) 653-1036

B-294

73

```
                    Hue - Israel
1            at the document.
2   BY MR. ISRAEL:
3              Q.          What does that mean to you,
4   not pulling checks?
5              A.          Can I look at the document?
6              Q.          You can in a minute. Just
7   try to --
8              MR. HOMER:   She has
9   requested to look at the document. You
10  have asked her a question about what the
11  document says. You are not going to let
12  her look at the document?
13             MR. ISRAEL:  What I'm asking
14  is for you to stop interrupting and
15  coaching your witness.
16             MR. HOMER:   I'm not coaching
17  the witness.
18             MR. ISRAEL:  If she can't
19  answer the question, then she can't
20  answer it. She will say, "I don't
21  know."
22             MR. HOMER:   Can we take a
                DELMARVA REPORTING
                  (302) 653-1016
```

74

```
                    Hue - Israel
1            five-minute break?
2              (Whereupon a recess was held.)
3   BY MR. ISRAEL:
4              Q.          What I'm asking you for
5   first, do you see where it says the two points, second
6   line, not pulling checks; do you see that statement?
7              A.          I was actually reading the
8   full document. What point did you want me to read
9   back?
10             Q.          Second paragraph, 121, see
11  that? Not pulling checks, see that?
12             A.          Mm-hmm.
13             Q.          What do you mean by that?
14             MR. HOMER:   You need to look
15  at the whole document to understand the
16  context of that.
17             THE WITNESS:  I'm okay with
18  that one paragraph. There are times
19  when a collector will come to you and
20  ask to move checks to another month.
21  BY MR. ISRAEL:
22             Q.          Okay.
                DELMARVA REPORTING
                  (302) 653-1036
```

75

```
                    Hue - Israel
1              A.          And your job as GCM is to
2   identify why.
3              Q.          Okay.
4              A.          As a collector, and as you
5   know dealing with collectors, their mind set is to
6   recover funds for their commission checks. There's
7   normally a reason why. It could be sand bagging is a
8   reason, or is there an actual legitimate reason. My
9   job was to investigate and find out. You can never, I
10  never said to a collector in his face, you are sand
11  bagging. But when I looked at where he was at month
12  to date, and again this is by individuals, when I look
13  at the collector month to date to see where his number
14  was, when I looked at the notes on the file, I would
15  say, there's no reason to pull this. You haven't
16  called the debtor to verify the funds or anything.
17  You haven't verified the check.
18             Q.          Pulling means not submitting
19  it?
20             A.          Why don't you pull it? Call
21  the debtor first. Do you want to pull the check off
22  the system?
                DELMARVA REPORTING
                  (302) 653-1016
```

76

```
                    Hue - Israel
1              Q.          What was the complaint
2   against you, that sometimes you were or were not
3   permitting collectors to pull checks?
4              A.          Apparently, sometimes I was
5   not letting collectors pull things off the system.
6              Q.          Meaning that a check was
7   being left on the system that someone at NCO felt
8   should not have been?
9              A.          That a collector might have
10  asked to be pulled. The other instance was by
11  corporate mandate that no checks could be pulled off
12  the system unless they were put on within 24 hours.
13  You had to give them notice many times, especially
14  EOM.
15             Q.          End of month?
16             A.          End of month, it is too
17  late, you can't pull it.
18             Q.          Because it is within 24
19  hours?
20             A.          Mm-hmm. That was nine times
21  out of ten. Collectors, being a collector myself, it
22  would make them upset. There was nothing I could
                DELMARVA REPORTING
                  (302) 653-1036
```

B-295

77

Hue - Israel

1  physically do about it.
2          Q.          Could you read the second
3  part that says and, read it out loud.  Two things, it
4  says right here, "not pulling checks and" --
5          A.          "Recreating DCI's on
6  re-deps."
7          Q.          What does that mean?
8          A.          That means redepositing of
9  nonsufficient fund checks.
10         Q.          Is that what Matt Lane did?
11         A.          No.  Matt Lane was
12 terminated for changing dollar amounts without
13 authorization.  This is about redepositing checks.
14         Q.          In violation of whatever
15 policy there was?
16         A.          This is about redepositing
17 checks.
18         Q.          And what specifically were
19 you accused of doing wrong about redepositing checks;
20 do you know?
21         A.          What I heard was check
22 handling, verification, not verifying, something like

DELMARVA REPORTING
(302) 653-1036

78

Hue - Israel

1  that.
2          Q.          Not verifying that the funds
3  were there?
4          A.          Mm-hmm.
5          Q.          You have to say yes.
6          A.          Yes.
7          Q.          Who told you that?
8          A.          Correction.  I was told for
9  improper check handling procedures.  I was told why I
10 was terminated for the first time at my unemployment
11 hearing by Mike Scher who made that statement.  That
12 was the reason why.
13             (Deposition Exhibit Number Hue
14             11 was marked for
15             identification.)
16 BY MR. ISRAEL:
17         Q.          Can I see that back for a
18 moment?  When you talked to Leckerman, did you talk
19 about the substance of this memo?
20         A.          No.
21         Q.          How did you know to write
22 all of these issues if nobody had told you why you

DELMARVA REPORTING
(302) 653-1036

79

Hue - Israel

1  were being suspended?
2          A.          I am not an idiot.
3          Q.          Okay.  So you surmised these
4  were the issues?
5          A.          When I received Kathy
6  Obenshain's email about checks and the issue of checks
7  throughout NCO Corporate Commercial Division, these
8  were the issues of many branches.  And it was not, as
9  said, until an unemployment hearing that I was told
10 the exact reason.
11         Q.          Well, again, I'm not being
12 flip with you, and I'm not suggesting that you are an
13 idiot.  There's an awful lot of specific information
14 that you are providing to Leckerman?
15         A.          Yes.  I'm fighting for my
16 job.
17         Q.          Again, when you say you are
18 not an idiot, how did you know that all of those types
19 of issues were a problem?
20             MR. HOMER:  She has answered
21             the question once already.  You are
22             asking for other information?

DELMARVA REPORTING
(302) 653-1036

80

Hue - Israel

1  BY MR. ISRAEL:
2          Q.          Yes.
3          A.          I don't recall it being all
4  that information.  There's two things that I'm
5  explaining.  Those were the two things that Kathy had
6  asked explanations for via her email.  I am actually
7  just going with the flow explaining what happened.
8  And as I stated, I was told that I was terminated for
9  not verifying checks, not for not pulling checks, not
10 for, not DCI's, for not verifying checks.
11         Q.          What does DCI stand for?
12         A.          Direct check information,
13 also known as check fax forms.
14         Q.          In your statement, in the
15 5th paragraph you say, "Yes, I should have given Eric
16 clearer direction."  What did you mean about that?
17 That was the month that you were gone?
18         A.          Yes.
19         Q.          What clear direction should
20 you have given Eric Shaw?
21         A.          I should have made sure Eric
22 had all the hold check or redeposit forms filled out.

DELMARVA REPORTING
(302) 653-1036

85

Hue - Israel

1    A.        Was I surprised by the
2  accusations?  I had read his accusations from his
3  unemployment hearing, so I was not surprised.
4    Q.        Did Kathy Obenshain ever
5  make any racist comments to you?
6    A.        About me?
7    Q.        Yes.
8    A.        No, not that I'm aware of.
9    Q.        Did she ever make any
10  comments of a sexually discriminating nature?
11    A.        To me?
12    Q.        Yes.
13    A.        About men or female?
14    Q.        That's an interesting
15  question.
16    A.        I don't understand your
17  question.
18    Q.        Let us start first with
19  females.  You don't believe that Kathy Obenshain
20  discriminated against you because of your sex?
21    A.        No.
22    Q.        Do you believe that Kathy

DELMARVA REPORTING
(302) 653-1036

86

Hue - Israel

1  Obenshain discriminated against you because of your
2  race?
3    A.        No.
4    Q.        Aside from Ted Fox.  Do you
5  believe that Ted Fox used or contrived issues
6  regarding check handling to have you fired in
7  retaliation for you complaining about Bill Savage?
8    A.        Absolutely, except for the
9  timing.
10    Q.        He never said that to you,
11  did he?
12    A.        To say, I'm going to
13  retaliate against you?
14    Q.        Or anything to that effect
15  that he was going to get back at you or retaliate
16  against you or somehow hurt you as a result of you
17  complaining about Bill Savage?
18    A.        No.
19    Q.        Did anyone ever report that
20  to you that they had heard that Ted Fox had it in for
21  you because of your reporting about Ted Savage?
22    A.        There were rumors that Ted

DELMARVA REPORTING
(302) 653-1036

87

Hue - Israel

1  did not like me because of what I did to Bill.  That
2  had been circulated for years.
3    Q.        Where did you hear those
4  rumors from?
5    A.        Numerous employees, past and
6  present.
7    Q.        Who would those employees
8  be?
9    A.        It would be a very long
10  list.  I would have to look at the employee roster.
11    Q.        Can you give me one?
12    A.        Rick Boudreau.
13    Q.        Rick Boudreau told you that
14  he believed Ted Fox had it in for you because of your
15  reporting about Ted Savage?
16    A.        No.
17    Q.        How did Rick Budreau report
18  something like that to you?
19    A.        He said that Ted was not
20  happy with what I said about Bill.
21    Q.        Anyone else?
22    A.        There was a lot of empathy

DELMARVA REPORTING
(302) 653-1036

88

Hue - Israel

1  apparently when Bill was terminated.
2    Q.        Empathy?
3    A.        There were numerous comments
4  from especially the white males of NCO about Bill's
5  comments in that they didn't think it was right for me
6  to be terminated for such comments made in the office.
7  It was a collection agency, for God's sake.
8    Q.        Who made those comments?
9    A.        Many people did.
10    Q.        Can you name any of them?
11    A.        You are asking me to go back
12  years and reflect.  I would be, I'm paraphrasing the
13  statements, and I don't want to give the answer I'm
14  not a hundred percent sure of.
15    Q.        Can you think of one person
16  who made some comments to the effect that Bill Savage
17  shouldn't have been fired?
18    A.        Mike Scher had questioned
19  his termination at one time.
20    Q.        Okay.
21    A.        And that's all I can recall
22  at this point in time.  There was just, you know, it

DELMARVA REPORTING
(302) 653-1036

B-297

89

```
                    Hue - Israel
 1   is just rumored, second and third hand information
 2   that was going through the office.  Bill was an icon
 3   at that office.  And it wasn't until a white male made
 4   the complaint that they took it seriously.  I made my
 5   complaints.  No one took it seriously.
 6                    (Deposition Exhibit Number Hue
 7                    12 was marked for
 8                    Identification.)
 9   BY MR. ISRAEL:
10            Q.        Let me show you what I'm
11   going to mark as Hue number 12.  That is what I
12   understand to be your charge of discrimination dated
13   February 3 of 04; is that correct?  Is that your
14   signature?
15            A.        Yes.
16            Q.        Did you consider your
17   complaints against Mr. Savage to be sexual harassment
18   or racial harassment or both?
19            A.        Both.
20                    (A brief recess was taken.)
21                    (Deposition Exhibit Number Hue
22                    13 was marked for
                 DELMARVA REPORTING
                    (302) 653-1036
```

90

```
                    Hue - Israel
 1                    Identification.)
 2   BY MR. ISRAEL:
 3            Q.        Any changes from your
 4   previous testimony?
 5            A.        What was the previous
 6   testimony?
 7            Q.        Anything that you have told
 8   me during the day, any changes?
 9            A.        Not at this moment.
10            Q.        Okay.  In your charge, you
11   wrote, "During a company conference call with all
12   collections managers of Commercial Division throughout
13   the company, the issue of redepositing checks was a
14   topic discussed.  Marlow, Shaw, Nickerson were all in
15   attendance with me in response to Dover duplication."
16            Kathy Obenshain stated that she did not
17   want any checks deposited without verification?
18            A.        Mm-hmm.
19            Q.        Was that conference call
20   after the March 03 email that we have looked at from
21   corporate?
22            A.        Are we in paragraph three?
                 DELMARVA REPORTING
                    (302) 653-1036
```

91

```
                    Hue - Israel
 1            Q.        I can show you.
 2            A.        There it is.  This call that
 3   I'm referring to took place in 2004.  And it was on a
 4   conference call.  It was, I think the 20th of the
 5   month.  I might be wrong with the date.
 6            Q.        Right before you were
 7   suspended?
 8            A.        Yes, because she had gotten
 9   bombarded with these emails and analysis reports that
10   she wanted us all to do.  She at that point made that
11   statement that from this point on, and Mac McKenzie
12   made a statement.
13            Q.        Describe for me the process
14   about submitting DCI's for an NSF check; how did that
15   work?
16            A.        My administrative assistant
17   would, a DCI is just a check fax.  I mean, that's what
18   we called it in our office, not so much DCI.  The
19   collector would fill out a form.  It was a redeposit
20   form.
21            Q.        For a previously submitted
22   check that had been returned to NSF?
                 DELMARVA REPORTING
                    (302) 653-1036
```

92

```
                    Hue - Israel
 1            A.        Right.  They would create a
 2   form in our office called a redeposit form.
 3            Q.        That redeposit form would be
 4   validated by the debtor?
 5            A.        It would be validated by the
 6   collector, and then I would have to sign off on it.
 7   Then I would give it to my administrative assistant.
 8   And she would follow the process, email, fax up to
 9   Horsham to get it posted.
10            Q.        But would the debtor sign
11   the DCI form?
12            I guess now I'm confused as to the
13   process.  Debtor submits an NSF check?
14            MR. HOMER:   What?
15   BY MR. ISRAEL:
16            Q.        A debtor submits a check
17   that goes NSF.
18            A.        Right.
19            Q.        Okay.  The DCI form is used
20   to substitute for that NSF check?
21            A.        I think you are confused.
22            Q.        I'm confused.  Let us start
                 DELMARVA REPORTING
                    (302) 653-1036
```

B-298

93

Hue - Israel

1  over because I'm totally confused now. Describe for
2  me a check fax.
3          A.          A check fax is, and slash
4  DCI, is where a collector speaks to a debtor over the
5  phone. They take the check information over the
6  phone. They submit, they input the information into
7  the computer system. They would drop a form into my
8  clerical bin and the check would be created on the
9  date that that check was daled for by Horsham.
10         Q.          That would be with the
11 debtor's permission?
12         A.          Yes.
13         Q.          In fact, in the Commercial
14 Division, it would be taped?
15         A.          Yes.
16         Q.          If that form went NSF, what
17 would happen?
18         A.          Then the collector would
19 submit a redeposit form.
20         Q.          For the DSI or the check
21 fax?
22         A.          For that check to be

DELMARVA REPORTING
(302) 653-1016

94

Hue - Israel

1  resubmitted to go back off, yes.
2          Q.          Before the collector was
3  permitted to do so, that's where the procedure would
4  be in place to verify funds would be available?
5          A.          They would have to go
6  through several steps, calling the debtor, verify
7  source of funds, qualify the source of funds, bla,
8  bla, bla. They would put it on the form as the reason
9  why the check should be resubmitted. And it would be
10 given to my administrative assistant. She would take
11 care of administrative process, whatever it would be.
12         Q.          Did you understand that you
13 were being accused in part for collectors not
14 following that process relating to the resubmission of
15 bounced check faxes?
16         A.          I understood that I was
17 terminated for nonverification of checks.
18         Q.          Would this issue of
19 nonverified DCI or check fax forms fit into that same
20 reason?
21         A.          No.
22         Q.          That's different?

DELMARVA REPORTING
(302) 653-1016

95

Hue - Israel

1          A.          Mm-hmm. That sounds
2  different to me as what you are saying.
3          Q.          What I'm trying to
4  understand is what I understood as to why you were
5  fired versus what I understand from the documents.
6          A.          I still don't understand why
7  I was fired. However from what I read from Mike
8  Scher, I was terminated for not verifying funds.
9          Q.          Whether it be from an NSF
10 check or a return DCI form?
11         A.          Those are one and the same.
12         Q.          Because the check fax, DCI
13 form creates a check?
14         A.          Right.
15         Q.          Which, in effect, can then
16 go NSF?
17         A.          Right.
18         Q.          Now, in this January 20th,
19 2004 meeting, which I understand you estimated to be
20 the exact time when Kathy Obenshain said that she
21 didn't want any checks deposited without verification,
22 did she explain what she meant by that?

DELMARVA REPORTING
(302) 653-1016

96

Hue - Israel

1          A.          Yes. She explained it, and
2  she followed up with an email to all general
3  collection managers, which I believe you might have a
4  copy of.
5          Q.          How did she explain during
6  the conversation what she wanted at that point?
7          A.          I don't recall specifically
8  what she said. She filed an email. I believed, and I
9  might be incorrect about this, she said that she would
10 follow up with an email for all of us to follow from
11 that point forward.
12         Q.          Here you say, "There was
13 another process in place for handling redeposits,
14 which I followed. None of my similarly situated
15 coworkers were disciplined for following the same
16 process I followed."
17         A.          Mm, hmm.
18         Q.          You have to say yes.
19         A.          Yes.
20         Q.          What was the process that
21 they followed? The reason I'm asking is I understood
22 from your previous testimony that you didn't know what

DELMARVA REPORTING
(302) 653-1016

B-299

97

```
                    Hue - Israel
1   the validation process was for the other offices.
2              A.         The reason I put that
3   statement in there was because on the conference call,
4   Mac McKenzie stated on the conference call that he did
5   not verify any of his checks that were deposited in
6   December. He stated that. So I recanted and put that
7   in there about Mac McKenzie. So --
8              Q.         I didn't mean to interrupt.
9              A.         That's okay. I'm done.
10             Q.         Do you believe that Joe
11  Batie was violating the rules the same as you?
12             A.         I do not believe I violated
13  a rule, number one. Number two, Joe Batie is not a
14  collection manager. He is a general manager over the
15  branch.
16             Q.         You know he had collectors
17  working for him in December of 2004?
18             A.         No, I did not know.
19             MR. HOMER:   Are you talking
20  about December 2003?
21             MR. ISRAEL:   I'm sorry.
22  December 2003.
                DELMARVA REPORTING
                (302) 653-1036
```

98

```
                    Hue - Israel
1   BY MR. ISRAEL:
2              Q.         What about Joe Thomas; do
3   you know he is African American?
4              A.         He wasn't, there was no
5   African American males that I knew of that were GCM's
6   when I was present in 2003.
7              Q.         Okay. Can I see that back?
8              A.         Sure.
9              Q.         You say Bill was terminated
10  for sexual harassment after the company's
11  investigation. You told me you mean harassment and
12  improper treatment on the basis of race, correct?
13             A.         I believed one thing when I
14  wrote that document. Since this process began, I have
15  learned move information, so I clarified it.
16             Q.         Why did you believe that
17  Savage was terminated for sexual harassment?
18             A.         Because he had made sexual
19  comments.
20             Q.         Okay. But what I'm asking
21  is: You had previously told me that no one had ever
22  had confirmed to you why Savage was terminated.
                DELMARVA REPORTING
                (302) 653-1036
```

99

```
                    Hue - Israel
1              A.         I guess one and one is two.
2   I just assumed.
3              Q.         He had also made racial
4   comments?
5              A.         Yes.
6              Q.         In your opinion, were you
7   doing a good job as a general collections manager?
8              A.         Yes.
9              Q.         Was that based upon the
10  numbers in your office?
11             A.         That was based on numerous
12  things.
13             Q.         Kathy Obenshain had said
14  complementary things to you?
15             A.         Yes, and emailed, and
16  verbally.
17             Q.         Had others?
18             A.         Yes.
19             Q.         Was there anybody who had
20  been criticizing you before you had been suspended
21  relating to your performance?
22             MR. HOMER:   At any time
                DELMARVA REPORTING
                (302) 653-1036
```

100

```
                    Hue - Israel
1   before she was suspended or what time
2   frame?
3   BY MR. ISRAEL:
4              Q.         As the GCM.
5              A.         Can you repeat your
6   question?
7              Q.         Before your suspension, was
8   there anyone at NCO who had been criticizing your
9   performance as a GCM?
10             A.         Collectors, as always,
11  complained when they don't get their way.
12             Q.         Anyone in management?
13             A.         I heard that, and this is
14  rumor. I shared that Mike Scher was not very happy
15  because there was rumor that I was going to take his
16  job because Leckerman didn't like him. I don't know.
17  So there was just rumors.
18             Q.         Anything direct?
19             A.         Direct from people, written?
20  No.
21             Q.         Like from Leckerman or from
22  Phil Weaver, or from Kathy Obenshain, or from any of
                DELMARVA REPORTING
                (302) 653-1036
```

B-300

113

Hue - Israel

1  commission, and I also received a bonus. I do not
2  understand the rest of your question.
3          Q.          You testified that
4  collectors who improperly were paid on an NSF check --
5          A.          Mm-hmm.
6          Q.          -- held that money until it
7  was backed off the next month?
8          A.          Mm-hmm.
9          Q.          Was there a similar dynamic
10 with your pay?
11         A.          Well, if I got a commission,
12 it would be a miracle. So it didn't affect me as GCM
13 whatsoever. I believe I got very little commission,
14 but bonus for contest.
15         Q.          You would qualify for a
16 bonus or a contest based upon end of month numbers,
17 correct?
18         A.          No.
19         Q.          Based upon end of quarter
20 numbers?
21         A.          Sometimes. Based upon post
22 date numbers, based upon three month postdate numbers,

114

Hue - Israel

1  based upon who had the happiest office, stuff.
2          Q.          Were those bonuses ever
3  affected by the inclusion of NSF checks that
4  eventually would later be backed off?
5          A.          No.
6          Q.          In paragraph 16 of your
7  complaint you allege that defendant's management made
8  racially charged comments including one regarding the
9  number of black employees at the Dover office to the
10 effect that the office "looks like a Tarzan movie."
11 Who made that comment? Savage?
12         A.          Savage had made that
13 comment. Second hand. I had heard that Mike Scher
14 had made that comment.
15         Q.          Did you hear Mike Scher make
16 that comment?
17         A.          No, I didn't. I said second
18 hand, I heard that Mike Scher had made that comment.
19 And I believe Kim Marlow said she had heard that
20 comment. Of course, many people would not come to me
21 with such stuff. It wouldn't be wise.
22         Q.          Did you hear Savage make the

115

Hue - Israel

1  comment?
2          A.          I did not hear Savage
3  personally make the comment.
4          Q.          Did you ever hear anyone
5  personally make the comment?
6          A.          He never made the comment to
7  me.
8          Q.          No. Did you --
9          A.          He did state.
10         Q.          That wasn't my question.
11 Did you ever hear anyone in management make that
12 comment?
13         A.          I've heard, yes.
14         Q.          Who was that?
15         A.          I was going to say Savage
16 had made a comment, but it wasn't the Tarzan movie.
17 He had said it looked like some kind of jungle bunny
18 something he had made, comment about African Americans
19 in the office. I believe Rick Boudreau made those
20 comments, I believe.
21         Q.          In your complaint you allege
22 that Savage is or was the friend and mentor of Ted

116

Hue - Israel

1  Fox?
2          A.          Yes.
3          Q.          Why do you believe that,
4  that was he was the friend or mentor?
5          A.          When Ted was brought to our
6  office initially, he was under the mentorship of Bill
7  Savage. When Bill introduced him as a person from
8  corporate to all of us in a general employee meeting
9  many years ago, and that he was, I guess on a quick
10 start or quick, an executive program that Ted was on,
11 and etcetera. That's how he announced him to them.
12 They went and made trips together, etcetera, etcetera.
13                 (A brief recess was taken.)
14 BY MR. ISRAEL:
15         Q.          How often do you see anyone
16 relating to psychiatric problems?
17         A.          Honestly. Once a week I'm
18 on what they call a hot list or lot line on a daily
19 basis because I have been quite depressed. But once a
20 week with my psychiatrist.
21         Q.          And are there any other
22 stressors in your life besides the issues relating to

B-301

129

Hue - Homer

1         MR. HOMER:    All these were
2  in one location?
3         THE WITNESS:    They were
4  normally in a file cabinet to the left.
5  They kept those forms for years.
6  BY MR. HOMER:
7        Q.       Would it be fair to say that
8  they could retrieve the forms by opening a file drawer
9  and pulling out the forms, where they collect those
10  forms?
11        A.       If that same system is being
12  used in location, yes, it should not be hard to
13  retrieve.
14        Q.       Okay.  Do you know whether
15  this form was used in other offices other than the
16  Dover office?
17        A.       I know other offices use
18  similar types of documents. I'm not sure if they
19  called it a hold check request form. But they used
20  something that they had, they were required to use
21  something that the collector would have to fill out to
22  move around fees off the system.  We just happened to

DELMARVA REPORTING
(302) 653-1036

130

Hue - Homer

1  call it, Paul called it a hold check request form.
2        Q.       Do you have any idea of how
3  many of these forms there might have been in say a
4  6-month period back in 2003, the last 6-month period?
5        A.       There might be perhaps maybe
6  a few hundred from my office.
7        Q.       And they would have been
8  arranged chronologically?
9        A.       Yes.
10        MR. ISRAEL:   Is it one per
11  collector per month, or one per day?
12        MR. HOMER:   You know what?
13  You can ask redirect questions.  That's
14  not appropriate. You can't step into my
15  questioning.  You know that.
16        MR. ISRAEL:   I am just
17  trying to help so I can get the forms.
18  BY MR. HOMER:
19        Q.       Let us turn to the re-dep
20  form.  Was that also called U-deposit?
21        A.       It was, sometimes you called
22  it U-deposit or re-dep form. It was, again, that was

DELMARVA REPORTING
(302) 653-1036

131

Hue - Homer

1  created in our office. That's what we labeled it.
2        Q.       What does this form, what
3  was this form used for?
4        A.       This was for when checks
5  came back nonsufficient funds via check fax or checks
6  that were mailed directly to corporate.  The collector
7  had to go through these various steps and submit this
8  form to me for signature to put the check back on.
9  And my admin would sent it off to corporate to have
10  that check processed again.
11        Q.       What would that show
12  regarding your compliance with the check handling
13  process?
14        A.       It would show that the
15  collectors should have put on there the account
16  numbers. It would show why they wanted the checks
17  redeposited, VI, the source of funds, what was the
18  story.
19        Q.       These are forms that were
20  prepared by whom?
21        A.       They were prepared by the
22  individual collector.

DELMARVA REPORTING
(302) 653-1036

132

Hue - Homer

1        Q.       And they were maintained by
2  whom?
3        A.       They were maintained by an
4  administrative assistant in my office.
5        Q.       And you say, were they sent
6  on to some other office?
7        A.       She will compile the data,
8  and then on a daily basis, if she got any of this, she
9  would send it up to Horsham -- I'm not sure of the
10  method, via email or fax -- that she would compile
11  that information and send it off.
12        Q.       Would she compile
13  information from the forms, or would she actually send
14  the forms themselves?
15        A.       I believe she compiled the
16  information.  I do not believe she put down what
17  verification method was used. It was just that,
18  please submit this check, please redeposit this check,
19  please redeposit this check. I don't believe she
20  actually sent the actual form. I could be mistaken.
21        Q.       Do you know how the forms
22  were maintained? Was there a separate file for these

DELMARVA REPORTING
(302) 653-1036

B - 302

133

Hue - Homer

1  forms?
2          A.          Yes. They were a separate
3  file. One of my admins made payment by collector.
4  Then I think they started maintaining on a monthly
5  basis. But for the most part they were maintained by
6  collectors.
7          Q.          How difficult would it be to
8  go to the file and pull out these forms for any given
9  period of time?
10         A.          It should not be difficult
11 at all. They used to keep these forms going back
12 years, when I was a producer, so it shouldn't be hard
13 at all.
14         Q.          Were they filed
15 chronologically?
16         A.          Yes, they were. Of course,
17 I don't know where they are now.
18         Q.          Okay. Would other offices
19 use the same form?
20         A.          They would use something
21 similar, perhaps not called the same exact thing. But
22 there was a process they had to follow in order to

DELMARVA REPORTING
(302) 653-1036

134

Hue - Homer

1  verify that the checks have been going through the
2  various steps.
3          Q.          Let us turn to the post date
4  check report. What is that document?
5          A.          That is ran off of CRS, the
6  computer system of NCO. My admin would pull it by
7  collector, and it will list all the post dates for
8  collector for that given month. She would add two or
9  three months, but for that month. She would use that
10 report to start verifying the checks.
11         Q.          Oh, so she would, this was a
12 report that she, the admin prepared?
13         A.          Right. She prepared the
14 report off the system.
15         Q.          How frequently did she
16 prepare the reports?
17         A.          I believe in my office it
18 was ran on a, I want to say a weekly basis, but I know
19 towards the end of the month, it was done almost on a
20 daily basis. And her directive from me was it had to
21 be pulled a week before EOM to start the process, end
22 of month to start the process.

DELMARVA REPORTING
(302) 653-1036

135

Hue - Homer

1          Q.          What would this report show
2  with respect to whether or not you followed the check
3  handling procedures at NCO?
4          A.          This would show that she
5  contacted the banks, if the bank said yes or no, that
6  the checks were good, the checks were not good. She,
7  this was done by collector. She would then compile
8  the data, give it to me, cc Mike Scher on it. Then I
9  would use that information with the individual
10 collector. And I would sit down with them. Okay,
11 this check is good, this check isn't, you got to get
12 them on the phone, etcetera, to try to qualify the
13 source of funds, try to get the check good for
14 deposit.
15         Q.          Do you have any idea how
16 many there would be for a 6-month period in the Dover
17 office? Let us go specifically to the last six months
18 of the year 2003.
19         A.          There were probably one page
20 per collector. It is, you know, they didn't have
21 hundreds and hundreds of post dates. So probably one
22 page per collector in each office.

DELMARVA REPORTING
(302) 653-1036

136

Hue - Homer

1          Q.          Again, these would be
2  arranged chronologically in one file drawer?
3          A.          I don't think she even kept
4  those reports. You could pull them constantly,
5  whenever you wanted them, just go in and pull them. I
6  don't think she kept them, but that I'm not a hundred
7  percent sure. But you could just go in to, in CRS and
8  input it in the system and pull the reports up.
9          Q.          So you don't know whether
10 those reports would even be maintained?
11         A.          Right. The actual report
12 itself. The log itself, yes; but the actual report,
13 I'm not sure.
14         Q.          What is the log you are
15 speaking of?
16         A.          The log is, there was a
17 document that was shown to me earlier. And it would
18 have been an example of the log that she might have
19 used.
20         Q.          Let me show you a document
21 and ask if this is a log. It's been Bates stamped
22 00014, plaintiff's Bates stamp number.

DELMARVA REPORTING
(302) 653-1036

B-303

149

Hue - Israel

```
1         Q.          Can you tell from this
2  report whether the check was re-dep-ed?
3         A.          There are codes, but I do
4  not remember what the codes are. There is various
5  codes, and it is, of course, I do not remember.
6                 MR. HOMER:  You may recall
7         the interrogatories asked for the codes.
8                 THE WITNESS:  So I could
9         decipher them.
10                MR. ISRAEL:  These are
11        telling us that there is no code that
12        shows.
13  BY MR. ISRAEL:
14        Q.          Let me ask it this way. Do
15  you believe that there was a code to show that a check
16  was re-dep-ed?
17        A.          I believe there is a code
18  that shows a check that was redeposited.
19        Q.          Because we asked and we were
20  told there wasn't? That's why I am asking you.
21        A.          I believe there is a code.
22  My admin assistant used to have in my office all the
```

DELMARVA REPORTING
(302) 653-1036

150

Hue - Israel

```
1  various codes because there are so many codes on that.
2  It would show whether it was a check that was mailed
3  to corporate or whether it was a check fax or re-dep,
4  something of that nature. There were supposed to be
5  some kind of codes.
6         Q.          Where would it be on this
7  form, the code?
8         A.          May I review the form?
9         Q.          Of course.
10        A.          Again, I don't really recall
11  because it has been so long ago.
12                MR. HOMER:  Do we know this
13        is the whole ledger? It might be cut
14        off. I don't know. There's more to it.
15                MR. ISRAEL:  I think it
16        goes.
17                THE WITNESS:  It goes side
18        by side. Some checks. Where you see,
19        it has clients. I think there's
20        something about the coding over here.
21        Again, I'm not really sure where the
22        code would be, GVMS, GVMS.
```

DELMARVA REPORTING
(302) 653-1036

151

Hue - Israel

```
1  BY MR. ISRAEL:
2         Q.          To the extent that that was
3  codes, that's based upon your recollection as to the
4  work you had done with your admin?
5         A.          Right. It just helps us to,
6  everything is coded. So just a little code sheet that
7  she broke down for me. I'm not sure where it is any
8  more.
9         Q.          In the summary page, there's
10  no reference to any check being re-dep-ed that I see.
11        A.          No. It just has NSF. It
12  has total NSF's. Right.
13        Q.          Did you produce a copy of
14  the postdated check report that was run off by CRS
15  that you testified to?
16        A.          I believe I did.
17        Q.          Let me show you what I think
18  is Bates number 54. Is this it?
19        A.          That is not the report
20  that's run off of CRS. That's the report that the
21  admin compiles once she gathers information off of
22  CRS.
```

DELMARVA REPORTING
(302) 653-1036

152

Hue - Israel

```
1         Q.          That's the summary?
2         A.          That's the summary. That is
3  not the actual report itself.
4         Q.          A postdated check is a check
5  that's got a future date yet to be deposited?
6         A.          Yes. As an example, we
7  started taking checks for April when it was only
8  December.
9         Q.          And was there an obligation
10  before submitting a postdated check to insure that
11  there were funds?
12        A.          No.
13        Q.          So how would the postdated
14  check record play into any accusations against you
15  that you weren't handling checks properly?
16        A.          Because it would go back to
17  the verification. The report itself is just a report
18  showing all postdates on this system.
19        Q.          Okay.
20        A.          The postdate check form
21  that, postdate check request form that I have my
22  collectors fill out, when it is about to be verified
```

DELMARVA REPORTING
(302) 653-1036

B-304

153

Hue - Israel

1 and deposited, is what I would use to show whether
2 they followed the proper procedure or not, did they
3 call the debtor or the bank. For example, a check
4 that's solicited in January is not going to be
5 qualified -- let me correct myself. A check that is
6 solicited in January, obviously, that is dated for
7 April, is not going to have, not going to have any
8 quality or source of funds on it. It is just to go
9 into the system. But when that day, when the day that
10 the check is due to be deposited, then we go through
11 this process of verification.
12             Q.           That's what I was asking.
13 So a postdated check, before it was deposited, it
14 would have to be validated and verified?
15             A.           It would either go through
16 that system that we spoke of earlier.
17             Q.           Were there accusations you
18 understood against you that for postdated checks you
19 were not following the rules right?
20             A.           I heard that I did not
21 follow verification of funds is all I kept hearing.
22             Q.           Okay. Would the postdate

DELMARVA REPORTING
(302) 653-1036

154

Hue - Israel

1 report show whether or not there was any proper
2 verification or validation of the check before it was
3 deposited?
4             A.           No.
5             Q.           What report, if any, would
6 show that?
7             A.           It was a report that you had
8 out earlier that I just handed back. It was a funny
9 looking one. It had -- that report, that one.
10             Q.           Before we leave this, there
11 was no system generated report that would show whether
12 there was proper validation or not relating to any
13 check, correct?
14             A.           Not that I'm aware of in
15 CRS.
16             Q.           I don't have any more
17 questions at this time.
18             MR. HOMER:   Okay.
19             MR. ISRAEL:   I would keep
20 the deposition open pending the
21 production of documents relating to her
22 business as well as any documents

DELMARVA REPORTING
(302) 653-1036

155

Hue - Israel

1 relating to medical records. Do you
2 want me to just send you a form that
3 she can complete so that we can get the
4 medical records directly from the
5 provider?
6             MR. HOMER:   If you want to
7 do that, that's fine. I think probably
8 all it would take is a phone call to get
9 them.
10             MR. ISRAEL:   Not now days.
11             MR. HOMER:   You are probably
12 right with HIPPA.
13             MS. FITE:   Instead of
14 getting your signature and going that
15 way, if you go visit them and get them
16 and send them to us.
17             MR. HOMER:   That's fine. We
18 will get them to you some way, shape, or
19 form. We are going to want to read.
20 (Signature is not waived.)
21
22

DELMARVA REPORTING
(302) 653-1036

156

Hue - Israel

CERTIFICATE OF NOTARY

1
2
3     I, Genevieve N. Ritter, a Notary Public, do
hereby certify that the witness, Valerie Hue, was by
4 me first duly sworn to testify the truth, the whole
truth, and nothing but the truth; that the foregoing
5 deposition was taken at the time and place stated
herein; and that the said deposition was recorded
6 stenographically by me and then reduced to typewriting
under my direction, and constitutes a true record of
7 the testimony given by said witness.
8     I further certify that the inspection, reading,
and signing of said deposition was not waived by
9 counsel for the respective parties and by the witness.
10     I further certify that I am not a relative,
employee, or attorney of any of the parties, or a
11 relative or employee or either counsel, and that I am
in no way interested directly or indirectly in this
12 action.
13     IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my seal of office this _____ day of
14 January, 2006.
15
16                         _____
17                              NOTARY PUBLIC
18 DE PS 130 qr
19
20
21
22

DELMARVA REPORTING
(302) 653-1036

B-305

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                          )
                                      )
              Plaintiff,              )
                                      )     Civil Action
       v.                             )     No. 05-225-KAJ
                                      )
NCO FINANCIAL SYSTEMS, INC., a        )
Delaware corporation, trading as      )
NCO FINANCIAL COMMERCIAL SERVICES,    )
                                      )
              Defendants.             )


              Deposition of MATTHEW HARRISON LANE,
taken pursuant to notice at the law offices of
Parkowski, Guerke & Swayze, 116 West Water Street,
Dover, Delaware, beginning at 12:04 p.m., on
Wednesday, January 4, 2006, before Dale C. Hawkins,
Registered Merit Reporter and Notary Public.


APPEARANCES:


         JEREMY W. HOMER, ESQ.
         PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware   19903
          for the Plaintiff


         DAVID ISRAEL, ESQ.
         SESSIONS, FISHMAN & NATHAN, LLP
          114 Northpark Boulevard, Suite 10
          Covington, Louisiana   70433

                   -and-

         ELIZABETH K. FITE, ESQ.
         LAW OFFICES OF ELIZABETH K. FITE, P.A.
          15316 North Florida Avenue, Suite 100
          Tampa, Florida   33613
          for the Defendant

B-306

1          Q.    When an NSF check was so returned,

2    what was the procedure that you were instructed

3    to follow regarding the handling of that NSF

4    check?

5          A.    First to try and contact the

6    debtor.

7          Q.    And why would you contact the

8    debtor?

9          A.    To understand why the check

10   bounced.

11         Q.    And if you were successful in

12   contacting the debtor, what was your

13   responsibility?

14         A.    To recollect the debt.

15         Q.    By having the collector make the

16   check good?

17         A.    Usually with certified funds.

18         Q.    And were there ever times that you

19   would submit checks without reaching a debtor?

20         A.    Yes.

21         Q.    Tell me about that?

22         A.    End of the month, trying to

23   achieve a number.

24         Q.    Now, at the end of the month when

1  you were trying to achieve a number, do you mean

2  you were trying to get as much collections in as

3  possible?

4          A.   Yes.

5          Q.   Fair to say the more collections

6  in, the better you as a collector would be

7  judged?

8          A.   If the check actually was made

9  good.  If the check bounced again it didn't do

10 me any good.

11         Q.   It would come off the next month?

12         A.   Depending on how quickly it was

13 returned, yes.

14         Q.   Would you receive any credit

15 before the NSF check that you resubmitted was

16 made good?

17         A.   You don't receive any credit until

18 it's good.  I mean, it's all paper until it

19 actually clears.

20         Q.   Got you.  So what would be the

21 advantage then of submitting an NSF check

22 without confirming that the check was good?

23         A.   Hope, prayer, timing, maybe.

24         Q.   Well, were you also rated as far

1    as your total number of collections submitted at

2    the end of the month?

3            A.    I don't understand what you mean.

4            Q.    Sure.   Every month collectors had

5    numbers next to their name as to the amount of

6    collections; correct?

7            A.    Uh-huh.   Yes.

8            Q.    At the end of the month, checks

9    would be submitted that at that time had not yet

10    been returned NSF; correct?

11            A.    Yes.

12            Q.    So until that check was returned

13    NSF, your number would be that much higher?

14            A.    Yes.

15            Q.    By way of example, if a $1,000

16    check was submitted the end of January '06 --

17            A.    Uh-huh.

18            Q.    -- then until that check bounced,

19    that number would stay by your name?

20            A.    Correct.

21            Q.    Do you remember being compensated

22    on that number until that check bounced?

23            A.    No.

24            Q.    Now, do you remember that you were

1    separated from NCO?

2            A.    Yes.

3            Q.    Do you remember why you were

4    separated from NCO?

5            A.    Not specifically.

6            Q.    Okay.

7            A.    I'm sure you could --

8            Q.    I have a copy of the termination

9    notice that's dated January 2004.  Let me

10   identify this as Lane Number 1.  I'm going to

11   show it to the lawyer for Ms. Hue first.  And

12   while he's looking at it, it says refused to

13   sign, but it's signed by Ms. Hue.

14           A.    Okay.

15           Q.    Do you remember receiving a

16   notice?

17           A.    Yes.

18           Q.    Do you remember reading it at the

19   time you saw it?

20           A.    Yes.

21           Q.    Again, you'll look at it in

22   detail, but do you remember the concept as to

23   why you were separated?

24           A.    It had to do with paperwork that

B-310

1   wasn't filed.

2          Q.    Okay.  Do you remember issues

3   relating to how you created and/or submitted

4   checks improperly?  And you can look at it.  Do

5   you have it in front of you?

6                (Lane Deposition Exhibit No. 1 was

7   marked for identification.)

8                THE WITNESS:  Okay.  I'm done

9   reading it.

10         Q.    Can I see it for a moment.  Does

11  that refresh your recollection better as to what

12  you were accused of doing wrong?

13         A.    Yes.

14         Q.    And what do you remember that you

15  did wrong?

16         A.    There was a form to fill out each

17  time a check was to be modified.

18         Q.    Okay.   And did you not follow

19  that form?

20         A.    Correct.

21         Q.    And did you not have permission

22  from the debtor to submit checks?

23         A.    That's not correct.

24         Q.    The debtor gave you permission?

12

```
1              A.   Yes.

2              Q.   But you didn't fill out the form

3    confirming the permission?

4              A.   Correct.

5              Q.   Now, it says on this form, on

6    January 20, 2000 --

7                   MR. HOMER:   Excuse me, I would

8    like to get a copy of the form.

9                   MR. ISRAEL:   You have it, it's

10   number --

11                  MR. HOMER:   I don't have it with

12   me.  Let me make a copy.  I'll be right back

13   with it.

14                  (A brief recess was taken.)

15   BY MR. ISRAEL:

16             Q.   It says on the form, "On January

17   20, 2004, you admitted to your manager, Valerie

18   Hue and Eric Shaw, that you did not have

19   authorization from the debtor to change the

20   amounts of the direct check number 18704 until

21   the December 31, 2004, for the amount of

22   $5,000."

23                  Did you make such an admission?

24             A.   That is slanted.
```

1    Q.    Explain it.

2    A.    The relationship that I had with

3    the debtor was five months speaking on a weekly

4    basis.  She owed my client over $120,000.  So to

5    say that I didn't have permission to change a

6    check from $20,000 to $5,000 was based on the

7    limitations that the system provided to me.

8    When we initially began our very

9    first conversation with the debtor, the

10   agreement was to pay $5,000 a week.  Due to her

11   lack of funds and the fact that she had bounced

12   a check previously, by the time I got to

13   December, the only way to hold on to the account

14   without it falling out and being stripped from

15   me was to make representation of the balance

16   being paid.

17   Q.    Was that done with the permission

18   and instruction of Ms. Hue?

19   A.    I didn't have to ask anybody's

20   permission other than the debtor's.

21   Q.    Okay.  Well, let me ask it

22   differently.  You think your discharge by

23   Ms. Hue was incorrect?

24   A.    Absolutely.

```
1              Q.   Did Ms. Hue ever tell you to do

2      anything wrong at NCO by way of mishandling

3      checks?

4              A.   We were instructed to put checks

5      through without speaking to debtors.

6              Q.   And that was a violation of the

7      policy that you had been taught?

8              A.   Yes.

9              Q.   And did Ms. Hue instruct you to

10     put checks through without speaking to the

11     debtor?

12             A.   All of the managers, in an effort

13     to achieve a department number.

14             Q.   End of month number?

15             A.   Right.

16             Q.   And was that for as long as you

17     worked there?

18             A.   No, not as long as I worked there.

19             Q.   Well, if you can remember, you

20     were there a couple of years approximately?

21             A.   Right.

22             Q.   Was that the rule when you

23     started?

24             A.   No.
```

1      A.   I owned a rental property that I

2   received a citation for weeds being too high.

3      Q.   Anything else?

4      A.   University of Delaware I received

5   a public urination citation.

6      Q.   Anything else?

7      A.   But beyond motor violations, no,

8   sir.

9      Q.   Have you ever been charged with

10   anything that relates to your honesty?

11      A.   No.

12      Q.   Let's go back to December of

13   2003/January of 2004, that time period.  Do you

14   recall whether during that time period you were

15   having any financial problems?

16      A.   I don't understand.

17      Q.   During that time period I just

18   mentioned, were you having personal financial

19   problems?

20      A.   No.

21      Q.   Do you recall your car being

22   repossessed at NCO's offices?

23      A.   Yes.

24      Q.   When was that?

```
 1              A.    December.

 2              Q.    Of 2003?

 3              A.    No, it wasn't during December.   It

 4       was during the beginning of November.

 5              Q.    Of 2003?

 6              A.    Yes.

 7              Q.    And were you delinquent on your

 8       mortgage payments during that time period,

 9       November/December/January of 2004?

10              A.    I don't recall.

11              Q.    Well, did you default on a

12       mortgage?

13              MR. ISRAEL:    Objection.

14       Relevance.

15              Go ahead and answer.

16              A.    No, I didn't default on a

17       mortgage.

18              Q.    Okay.

19              A.    We went through...

20              Q.    Were you ever delinquent on your

21       mortgage payments that you recall?

22              A.    Yes.

23              Q.    When was that, and during what

24       time period?
```

1          Q.   Do you know whether she was aware

2     of the practice?

3          A.   I didn't have any direct

4     conversations with her about it.

5          Q.   I understand that, but aside from

6     what your direct conversation with her might

7     have been, do you have any understanding about

8     whether she was aware that practice was a common

9     practice in her office?

10         A.   Yes.

11         Q.   She was aware of it?

12         A.   Yes, she was.

13         Q.   How do you know that?

14         A.   Hearsay.

15         Q.   Who told you that, if you

16    remember?

17         A.   Other collectors in the office.

18         Q.   Do you remember who they were?

19         A.   No.

20         Q.   Was there an open door policy with

21    Ms. Obenchain, that is did you feel you could go

22    to her at any time with any kind of a problem

23    that you might have had?

24         A.   It was said that there was an open

1     end of the month to redeposit checks that had

2     been bounced and we didn't talk to the debtor,

3     we had to alter the check because we could no

4     longer use the date that we originally processed

5     the check on, we had to use a new date.

6           Q.   Let me ask you this:  What was the

7     process for determining whether or not you could

8     resubmit a check without debtor verification,

9     under what circumstances would that be done?

10          A.   The end of the month, we were told

11    to -- we were told to hold them until the first

12    business day of the following month.

13          Q.   So what you're saying is at the

14    end of the month, every NSF check would be

15    resubmitted?

16          A.   At the end of December it was.

17          Q.   Who told you to do that?

18          A.   That conversation was with Eric

19    Shaw.

20          Q.   Did Ms. Hue tell you to do that?

21    She wasn't even around then, was she?

22          A.   What do you mean by that, not

23    around?

24          Q.   The end of December she wasn't at

```
 1    the office, was she?
 2              A.   I don't recall.
 3              Q.   Are you saying that same practice
 4    applied to every month, at the end of the month
 5    every NSF check would be resubmitted
 6    automatically?
 7              A.   I don't recall.
 8              Q.   You don't recall when that was
 9    done?
10              A.   I recall November and December.
11              Q.   Okay.
12              MR. ISRAEL:   November and December
13    you submitted all the checks?
14              A.   Right.  Right.
15              Q.   You say that there was a written
16    instruction from Ms. Hue.  Are you sure of that?
17    I mean, we have asked for all the documents, we
18    haven't seen any written instructions from
19    Ms. Hue that related to this policy.
20              A.   If the software package that we
21    had came on in August or July, someone got fired
22    because they ordered a copy of a check from a
23    client, we were collecting a bad check and this
24    collector without speaking to the debtor used
```

1     that check and created another check and that

2     individual was fired.  Shortly after that,

3     that's when --

4               Q.   I don't know if that's a response

5     to the question.  Could you tell me again?

6               MR. ISRAEL:  One second.  Did you

7     finish?

8               THE WITNESS:  I guess.

9               MR. HOMER:  You did finish.  Could

10    you explain?

11              MR. ISRAEL:  One moment.  I got

12    the idea that you were in mid sentence.

13              A.   Well, that's when the policy came

14    out, after that individual was fired.

15              Q.   What policy is that now you're

16    talking about?

17              A.   That we -- I mean, it was

18    referenced in my termination that I signed --

19              Q.   Are you sure that wasn't a policy

20    by Kathy Obenchain?

21              A.   Absolutely.

22              Q.   And this is a policy that Valerie

23    Hue wrote?

24              A.   Uh-huh.  Yes.