1          Q.    And when do you think that policy

2     came out?

3          A.    It had to have been after we

4     received the capability to process checks on the

5     computer.

6          Q.    You don't have a copy of that

7     policy?

8          A.    I don't have any copy of anything

9     that I did at NCO.  My desk was cleaned out

10    while I was in an afternoon conference call.

11         Q.    And what did this written policy

12    say again?

13         A.    It discussed the obtaining of

14    check information by -- from debtors as well as

15    altering checks.

16         Q.    Did it say anything about the

17    procedure used to resubmit an NSF check?

18         A.    I don't recall.

19         Q.    You don't recall that it did say

20    that?

21         A.    There was a form that we would use

22    if we were altering a check.

23         Q.    But as far as you recall, the

24    policy that you're talking about, this written

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3

VALERIE HUE,                    )
4                               )
         Plaintiff,             )
5                               )
v.                              )
6                               )    Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,    )       05-225-KAJ
7   a Delaware corporation,     )
trading as NCO FINANCIAL        )
8   COMMERCIAL SERVICES,         )
                                )
9              Defendant.        )

10              Deposition of KIM MARLOW taken pursuant
to notice at the law offices of Parkowski, Guerke &
11  Swayze, P.A., 116 West Water Street, Dover, Delaware,
beginning at 9:15 a.m. on Wednesday, March 8, 2006,
12  before Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.
13
APPEARANCES:
14
              JEREMY W. HOMER, ESQ.
15            PARKOWSKI, GUERKE & SWAYZE, P.A.
                116 West Water Street
16              Dover, Delaware  19903
                for the Plaintiff,
17
              ELIZABETH K. FITE, ESQ.
18            SESSIONS, FISHMAN & NATHAN, L.L.P.
                15316 North Florida Ave - Suite 100
19              Tampa, Florida  33613
                for the Defendant.
20

21

22                  CORBETT & WILCOX
              Registered Professional Reporters
23       1400 French Street      Wilmington, DE 19801
                  (302) 571-0510
24              www.corbettreporting.com

B-322

Page 2

1  ALSO PRESENT:  VALERIE HUE
         DINA SHAALTIEL, NCO Financial Commercial
2              Services
3          - - - - -
4      KIM MARLOW,
5      the witness herein, having first been
6      duly sworn on oath, was examined and
7      testified as follows:
8  BY MR. HOMER:
9      Q.    Good morning.  My name is Jeremy Homer.  I'm
10  the attorney representing Valerie Hue in this matter.
11  This is the case of Valerie Hue v. NCO.  It's March 8,
12  2006, a little bit after 9 a.m., and we're at our Dover
13  offices in Delaware.
14      Ms. Marlow, what's your address and
15  phone number?
16      A.    My address is 170 Cantwell Drive, Dover,
17  Delaware.  My phone number is (302) 677-0558.
18      Q.    Okay.  During the course of this deposition,
19  I'm going to be asking you a series of questions.  If you
20  don't understand the question, I'd ask that you just make
21  me repeat it --
22      A.    Okay.
23      Q.    -- or rephrase it to make sure that you don't
24  try to answer a question that you don't understand.

Page 3

1      A.    Okay.
2      Q.    Is that clear?
3      A.    Sure.
4      Q.    Is there any reason why your ability to answer
5  the questions today would be impaired for any reason?
6      A.    No.
7      Q.    Okay.  Are you on any medication, for example?
8      A.    I'm on medication, yes.
9      Q.    But it wouldn't affect your ability to answer?
10      A.    No.
11      Q.    Okay.  What's your educational background?
12      A.    I graduated from high school, did a technical
13  college course.  And that's basically it.
14      Q.    Okay.  Could you just briefly run through your
15  employment history from the time you got out of high
16  school to the present?  For each position you have, just
17  briefly tell me how long you were at the job and what
18  your job duties were.
19      A.    Right out of high -- while I was working -- in
20  high school I worked for a beauty shop, because that's
21  what my trade was.
22      Q.    Okay.
23      A.    And I worked for a couple of beauty shops, as
24  a matter of fact.  And maybe four years of that.

Page 4

1      Q.    This was after you graduated from high school?
2      A.    During and after graduation.
3      Q.    Okay.
4      A.    I worked part-time for a little restaurant.
5  At the same time, I was working at the beauty -- at a
6  beauty shop.  Then I went to work for Masten Lumber
7  Company, which went out of business.
8      Q.    What time period was that in?
9      A.    That was -- gosh.  That was 20 years ago.
10      Q.    Okay.  You don't know if --
11      A.    I worked there for four years.
12      Q.    Okay.
13      A.    And then they went out of business.
14      Q.    Okay.
15      A.    And then I worked for -- I'm trying to think
16  if it was before or after that.  I worked for Metal
17  Masters in Smyrna.  It was a part-time position.  That
18  wasn't full-time.  So I tried to find a full-time job and
19  went to work for J.C. Hammond.  And I did collections --
20  a little bit of collections there.  Not really.  It was
21  just kind of like the girl Friday there.  And then I came
22  to NCO.
23      Q.    Okay.  When did you start at NCO?
24      A.    In '97.

Page 5

1      Q.    Okay.  Was it named NCO at that time?
2      A.    No.  It was Milliken & Michaels.
3      Q.    Okay.  Have you worked for that entity ever
4  since 1997, either Milliken & Michaels or NCO?
5      A.    Yes.  I did.
6      Q.    Okay.
7      A.    Yes.  I am.
8      Q.    Could you, from the time that you worked at
9  Milliken & Michaels, run through the different jobs that
10  you had, approximately when you had them, and what the
11  job duties were at each position?
12      A.    The first job when I got hired there, I was in
13  collections.  It was a small balance at that time.  Then
14  I went to a mid balance position approximately maybe a
15  year after the small balance position.  And then I went
16  to a -- it's called a quality control position.  Then I
17  went to a worldcom position, which is like a -- it's
18  like a little portfolio that they had that -- they put me
19  on a special program.  And that's what I worked for
20  probably three years.
21      Q.    At each of these positions, these were
22  basically positions where you would attempt to collect
23  debts?
24      A.    Yes.                    B-323

KIM MARLOW

Page 6

1    Q.   Okay.
2    A.   Yes.
3    Q.   What after that?
4    A.   The last position before I was a collector was
5  a small balance management position.
6    Q.   When did you have that?
7    A.   That was four -- approximately four years ago.
8    Q.   How long did you have that position?
9    A.   Probably a year. Maybe a little bit longer.
10   Q.   Okay. Then after that what position did you
11 have?
12   A.   It was a mid balance management position.
13   Q.   What did you do in that position?
14   A.   Oversaw a collection group of mid balance
15 collectors.
16   Q.   How long did you have that job?
17   A.   I guess about two years. Maybe a little bit
18 more.
19   Q.   Okay. Can you give me approximate dates now
20 that you're talking about?
21   A.   Probably 2003. I was in small balance at that
22 time. 2004 to 2005 I was in mid balance.
23   Q.   What was the responsibilities of a mid balance
24 manager that you had in 2004 and 2005?

Page 7

1    A.   It was to oversee a group of collectors in a
2  certain range of dollar fee amount collected, and I was
3  to oversee their accounts, them themselves, policies and
4  procedures, system. That's basically it.
5    Q.   Did you have collection responsibilities
6  yourself? Did you collect debts yourself or did you just
7  oversee other people's efforts?
8    A.   At times I would collect debts myself. I
9  didn't essentially have a unit to work from, but I did
10 help in collections, yes.
11   Q.   Okay. Who did you report to during this
12 period that you were the mid balance manager --
13 collection manager?
14   A.   At that point it was Brian Laiche.
15   Q.   When you say "that point," what do you mean?
16   A.   My last mid balance position was I was
17 reporting to Brian Laiche at that time.
18   Q.   When was that?
19   A.   I had fluctuated back and forth under Valerie
20 and Rick, so it was -- when Valerie got promoted, I was
21 small balance collection manager.
22   Q.   When you say "Valerie," you mean Valerie Hue,
23 the plaintiff in this case?
24   A.   Correct.                    B-324

Page 8

1    Q.   When you say "Rick," who do you mean?
2    A.   Rick Boudreau, who was the general collections
3  manager at the time.
4    Q.   That was back in what time period?
5    A.   2001.
6    Q.   Okay. So you worked for --
7    A.   Several.
8    Q.   -- Rick Boudreau as a small balance manager,
9  and then you worked for a time for Valerie Hue in that
10 same position.
11   A.   Yes.
12   Q.   In 2003 what job did you have? Was that with
13 small balance management still?
14   A.   Yes.
15   Q.   Okay. You reported to Valerie Hue, is that
16 correct, during 2003?
17   A.   That's correct.
18   Q.   Then in 2004 you reported to Brian Laiche?
19   A.   That's correct.
20   Q.   Okay. Did you ever, for any point in time,
21 actually hold the position even on a temporary basis that
22 Valerie Hue held before her termination?
23   A.   Before her termination?
24   Q.   After her termination.

Page 9

1         After she was terminated, did you do her
2  job for a time period?
3    A.   Yes.
4    Q.   When was that?
5    A.   Directly right after she was let go.
6    Q.   Okay. For how long did you perform that job?
7    A.   Probably up until maybe six months or better.
8  And then they changed the position to senior management.
9  And I was labeled senior management instead of
10 collection -- general collections manager.
11   Q.   Okay. Did the function change after that six-
12 month period was over?
13   A.   Yes.
14   Q.   Did your job duties change? How did they
15 change?
16   A.   We would report -- I would have to report
17 to -- just like if I was reporting to Valerie Hue, I
18 would have to report to someone else.
19   Q.   Okay.
20   A.   I had different things and schedules and
21 programs that I'd have to do that had to be reported to
22 someone else.
23   Q.   When you --
24   A.   I wasn't the final decision-maker.

Page 10

1    Q.  Okay.  When you held the job that Valerie Hue
2  had performed in that six-month period, who did you
3  report to during that time period?
4    A.  Kathy Obenshain.
5    Q.  Okay.  Was that for the whole six-month
6  period, or did she leave at some point during that
7  period?
8    A.  She left during that period of time.
9    Q.  Then who did you report to?
10   A.  Brian Laiche.
11   Q.  Okay.  Can you tell me what you did to prepare
12  for the deposition today, if anything at all?
13   A.  Just reviewed significant pieces of the check
14  handling policy.
15   Q.  Okay.  Were these documents that you reviewed?
16  Did you review documents?
17   A.  My statement that I reviewed.
18   Q.  Anything else?
19   A.  No.
20   Q.  Okay.  Did you have any discussions with NCO's
21  attorneys?
22   A.  Yes.
23   Q.  Okay.  How long were those discussions?
24   A.  A couple hours.

Page 11

1    Q.  Okay.  When was that?  Just before today?
2    A.  Yesterday.
3    Q.  Yesterday.
4        Okay.  Are you familiar with the term
5  "NSF"?
6    A.  Yes.
7    Q.  What is that?
8    A.  That's a nonsufficient funds check.
9    Q.  Okay.
10   A.  That's when a check comes back from the bank
11  for nonsufficient funds.
12   Q.  Okay.  Are you familiar with a policy that NCO
13  had for processing checks that had been returned NSF.
14   A.  Yes.
15   Q.  Okay.  Did the policy change over time?
16   A.  It was tweaked over time.
17       MS. FITE:  Object to form.  Go ahead.
18  You can answer.
19       THE WITNESS:  It was tweaked over time.
20  I mean, there was things that were added to the policy to
21  change it a little bit, but for the most part, it was the
22  same policy.
23  BY MR. HOMER:
24   Q.  Okay.  Can you tell me what the policy was in

Page 12

1  December of 2003?
2    A.  It's the same policy.  If you're talking about
3  the NSF correlation, it is -- you would call the debtor
4  to verify the funds, call the bank to make sure the funds
5  were available, and then to get your manager to find out
6  if it was something that needed to be processed at that
7  time.  We didn't have what was called a redeposit at the
8  time, nor do we still.
9    Q.  Well, I think you just sort of explained a
10  little bit about the process.  But can you tell me
11  specifically, if you recall, what the policy itself was
12  in terms of what checks could be redeposited that had
13  been returned NSF?  What criteria were used to determine
14  whether you could redeposit them or not?  I'm talking
15  again about December of 2003.
16   A.  That's pretty much what I said.  It would have
17  to be -- the collector would have to call the debtor to
18  verify the fund -- to make sure there was sufficient
19  funds in order for the check to be redeposited and/or
20  they would call the bank to make sure there were funds
21  available at that time to represent the check.
22   Q.  When you say "and/or," which was it?  Do you
23  have to do both or do you just have to do one --
24   A.  You had to do both, but --

Page 13

1    Q.  -- or the other?
2        Excuse me.  Don't talk over my question.
3  Okay?
4    A.  Sorry.
5    Q.  The court reporter needs to get it down.
6        Okay.  The question, again, was:  You
7  said "and/or."  Did you mean you have to do both those
8  two things, or could you do either one?  By that I'm
9  talking about verifying with the bank or contacting the
10  debtor.
11   A.  You had to do both, but at --
12   Q.  And -- I'm sorry.  Go ahead.
13   A.  But at times there was where a bank did not
14  verify the check or the funds.  There was certain banks
15  that wouldn't verify.  You could call them up, and they
16  wouldn't verify over the phone.  So then you would only
17  have the debtor's word that the check was, you know, okay
18  for the deposit.
19   Q.  Okay.  Was it the collectors that contacted
20  the bank or someone else?
21   A.  The collector was responsible to contact the
22  bank.
23   Q.  Okay.  This was in the period of December of
24  2003?                   B-335

KIM MARLOW

Page 14

1   A.  Yes.
2   Q.  Okay.  If the bank verified the funds, they
3 would still call the debtor, or would that be enough?
4   A.  At times it would be enough if a manager
5 signed off on it.  If the debtor had talked to the
6 collector and the debtor had stated there was funds going
7 to be available at this time -- we had just made a big
8 deposit -- the collector would ask for a deposit slip to
9 show that there was a deposit actually definitive to make
10 that actual check good.  If that didn't happen, they
11 would go to the manager and talk about the situation.
12 And it was up to the manager at that time to either say,
13 yes, it was okay to go ahead and try it or, no, we're not
14 going to do it until we get authorization.
15   Q.  When you say "authorization," do you mean --
16   A.  From the bank.
17   Q.  From the bank.
18   A.  And the debtor can also three-way the
19 collector on the phone at that time and get a three-way
20 conversation with the bank to make sure that the funds
21 were available at that time.
22   Q.  Okay.  But is it your testimony that even if a
23 bank verified the funds you still had the collector call
24 the debtor to see if the funds were good?

Page 15

1   A.  If they could get a hold of them, yes.
2   Q.  Well, what if they couldn't get a hold of
3 them?
4   A.  Then they would make the decision to -- that
5 was a manager decision to make that decision to run that
6 check or not.
7   Q.  Okay.  Where did you learn about this policy?
8   A.  Through corporate.
9   Q.  When you say that, can you be a little more
10 specific?  Who told you that that was the policy?
11   A.  It was done in e-mail form or written form at
12 some point.  I don't like that with me.  But we had memos
13 that come out quite frequently and e-mails that came out
14 quite frequently.  And we were to tell the group of any
15 changes in policy or procedure.  And we had morning
16 meetings every morning that would discuss policy and
17 procedure.  Or we'd have meetings during the afternoon if
18 there was something that came up periodically through the
19 day.
20   Q.  Well, I can represent to you that we've asked
21 for this written policy that dealt with check handling
22 policies and procedures, and we've been told that there
23 isn't any written policy about it.
24      MS. FITE:  Object to form.  B-326

Page 16

1 BY MR. HOMER:
2   Q.  But you're telling me there was a written
3 policy that states what you just told me about?
4   A.  Yes.  There has been.
5   Q.  Can you tell me what document is that in?  Do
6 you know?  Is it an e-mail?  Is it a written memorandum?
7 In what form was that document?
8   A.  I'm sure it was done in an e-mail form, but it
9 was definitely in a memorandum form as probably an
10 attachment to something that was sent over speaking about
11 the check handling policy and what policy and procedures
12 are and if there was any changes.  We got -- we had
13 e-mails all the time.  We had memos all the time on
14 policy and procedures.  They were sent -- I can't even
15 tell you -- every day.
16   Q.  You say the policy changed from time to time.
17 There were tweaks to it.  Can you tell me what you know
18 about that -- what you recall about the changes to it?
19   A.  Sure.  Status changes where you would put a
20 check -- if it's an NSF check, it would be in a 59
21 status.  That would be from accounting -- to put it in a
22 59 status.  We had a memo on policy and procedure about
23 not being able to change that status -- that no one other
24 than accounting could change that status.

Page 17

1   Q.  When you say "that status," what are you
2 talking about?
3   A.  It's actually a status code that we put on it
4 so that we can identify if it's been NSF or not.  There's
5 paying codes.  There's other -- gosh.  There's paying
6 codes.  There's hold codes.  There's check codes.
7 There's all kinds of different codes that we have.  And
8 this particular code of 59 was an NSF code.  And that NSF
9 code was not to be changed by anyone other than
10 accounting.
11   Q.  Well, how did that affect the policy you just
12 described to me, which is, if I can characterize it --
13   A.  Sure.
14   Q.  -- that the collector had to verify with both
15 the bank and the debtor that the funds were available.
16      If they couldn't get the verification
17 from the bank, sometimes they went by just what the
18 debtor said.  Have I stated the policy correctly?
19   A.  Correct.
20   Q.  Okay.  How did what you just describe modify
21 that policy in any way about the 59 checks?
22   A.  With the 59 status, you could not put a check
23 on.  You could not recreate.  You could not redip.  You
24 could not do any of those functions without that status

KIM MARLOW

Page 18

1  being changed. It would be a hold for that policy. So a
2  collector could actually go in and change that status.
3  And if there was a post date on that account, it would
4  run that check through because of the status change.
5      Q.  When was that policy in effect?
6      A.  Oh, geez. Sometime in the last couple of
7  years.
8      Q.  Was it in effect in December of '03?
9      A.  I think that it was.
10     Q.  What --
11     A.  I can't be sure, but I think that it was.
12     Q.  Was there a document that shows that?
13     A.  Yes.
14         MR. HOMER:  Okay. I'm going to ask that
15  this memorandum from Phil Weaver dated June 5, 2001 be
16  marked as Exhibit 1.
17         (Marlow Deposition Exhibit No. 1 was
18  marked for identification.)
19  BY MR. HOMER:
20     Q.  Ms. Marlow, could you review the document
21  that's been marked Exhibit 1, please?
22     A.  (The witness complied with counsel's request.)
23     Q.  Do you remember the document?
24     A.  No. I can't say. I know the policy.

Page 19

1      Q.  Okay. It says here with respect to request
2  for redeposits. Would that refer to NSF checks?
3      A.  Yes.
4      Q.  Okay. It says that they have to be directed
5  to immediate supervisor for approval, and then, once
6  they're approved at that level, any deposit redeposited
7  over $1,000 gross had to go to Phil Weaver so he could
8  personally review it. Was that the policy?
9      A.  Yes.
10     Q.  When was Phil Weaver working for NCO?
11     A.  Up until -- and don't quote me on this,
12  because I don't really remember when he was let go or he
13  decided to leave. Or I don't even know what the
14  parameters of that was. I would say 2004. Sometime in
15  2004.
16     Q.  Okay. Was this policy in effect, then, that
17  no NSF check could be redeposited without Phil Weaver's
18  approval for as long as he worked there? Was that policy
19  in effect all that time?
20     A.  I can't answer that. It could have changed
21  after that. I don't know.
22     Q.  To your recollection, was it in effect all the
23  time that he worked there?
24     A.  Up until the next policy change.  B-327

Page 20

1      Q.  Okay. Do you know when that was?
2      A.  I have no idea.
3      Q.  Well, do you know when at what point in time
4  you stopped having to get Phil Weaver's approval for
5  checks over $1,000?
6      A.  No. I can't recall.
7      Q.  Were you ever involved in a review process of
8  a check for over a thousand dollars while Phil Weaver was
9  there?
10     A.  Was I personally?
11     Q.  Yes.
12     A.  Not to my knowledge.
13     Q.  Okay. Do you know that this policy that's
14  stated in this Exhibit 1 was followed by the NCO offices?
15     A.  I assumed it was.
16     Q.  I'm not asking for your assumption.
17     A.  Yes.
18     Q.  Do you know?
19         You said you weren't involved yourself
20  in any checks over a thousand dollars. So how would you
21  know that the policy was followed?
22         MS. FITE:  Object to form. You can
23  answer.
24     A.  I don't know if other offices did it, but I'm

Page 21

1  sure that we did it in our office. I was a small balance
2  manager, so my checks were primarily under a thousand
3  dollars. So I didn't have that much of a situation with
4  anything over a thousand dollars in fee.
5      Q.  Did you ever have a situation when you were
6  involved in the review of an NSF check of over a thousand
7  dollars?
8      A.  Not to my recollection.
9      Q.  Okay. Now, I take it you never had to have a
10  check that was over a thousand dollars reviewed by Phil
11  Weaver for approval.
12     A.  Not to my knowledge, no.
13     Q.  Okay. So how would you know that Dover
14  followed this policy that's in Exhibit 1?
15     A.  I would think that any policy and procedure
16  that came across to Ms. Hue or any other supervisor at
17  that time would have been followed properly. I can't say
18  that they were, but...
19     Q.  So you don't have any personal knowledge that
20  the policy was followed?
21     A.  I have no idea.
22     Q.  Okay. Isn't it true that at one time NSF
23  checks were automatically redeposited without any kind of
24  review process at all?

Page 38

1    Q.  Okay.  What do you recall about the
2  discussions with him?
3    A.  I have no clue.
4    Q.  Did you have any discussion with Kathy
5  Obenshain about it?
6    A.  When I had this discussion with Ted Fox, Kathy
7  Obenshain was present, yes.
8    Q.  Okay.  Did you have any other discussions with
9  her other than the one you had with Ted Fox about the
10  subject matter of Exhibit 2?
11    MS. FITE:  Object to form.  I don't
12  understand the question because I don't think that she
13  was having a conversation with them about her statement.
14  I think that their conversation --
15    MR. HOMER:  I said about the subject
16  matter of the statement.
17    MS. FITE:  Did you understand the
18  question?
19    A.  Can you repeat that for me?
20    Q.  Did you have any discussions with Kathy
21  Obenshain other than the one that you just said you had
22  with both Ted Fox and Kathy Obenshain regarding the
23  subject matter of your statement which is Exhibit 2?
24    A.  I recall that I did.  I spoke to her about --

Page 39

1  she asked me about what do you mean by "get them all on."
2  And I told her that I heard her say to Val to get --
3  Ms. Hue to get those checks on.
4    Q.  So after you wrote this statement --
5    A.  Yes.
6    Q.  -- that's Exhibit 2, you had a discussion with
7  Kathy Obenshain about the statement?
8    A.  I did with Ted Fox present.  They were both
9  there at the time.  It wasn't just a one-on-one
10  conversation with her.
11    Q.  So, then, when you did talk with Mr. Fox, you
12  did have a discussion about Valerie Hue.  There was some
13  discussion about Valerie Hue.
14    A.  I didn't talk to Ted Fox about Valerie Hue.
15  Ms. Obenshain asked me about my statement about "get them
16  all on."
17    Q.  Okay.  That was in the presence of Mr. Fox?
18    A.  I assumed it was in the presence of Mr. Fox.
19  I don't know for sure that he was there or not.
20    Q.  Okay.  Well, I thought you told me before that
21  the only conversation you had with Ted Fox was when he
22  requested the statement that became Exhibit 2.
23    A.  Was when he asked me to --
24    Q.  Right.            B - 328

Page 40

1    A.  -- do that, yes.
2    Q.  Now you're telling me that perhaps Fox was
3  present when you had another discussion with Kathy
4  Obenshain.  Is that right?
5    MS. FITE:  Object to form.
6    Are these telephone discussions where
7  you didn't know who was listening in?
8    THE WITNESS:  Yes.  I mean, this
9  happened all the time.  We had conference calls, and
10  people would listen that you didn't know that were there.
11  And I can't be for sure if Ted Fox was available or on
12  that call at that time.
13  BY MR. HOMER:
14    Q.  But he might have been?
15    A.  He could have been.
16    Q.  Okay.  Other than that, though, you're not
17  aware that --
18    A.  No.
19    Q.  -- Fox was involved in any other -- you had no
20  other discussion with Fox --
21    A.  No.
22    Q.  -- about this?
23    A.  No.
24    Q.  Okay.  Well, the answer to that would be yes,

Page 41

1  not no.  Right?
2    Let me restate the question for you.
3    A.  Okay.
4    Q.  Again, if you could, tell me how many times
5  did you have any discussion with Mr. Fox about the
6  subject matter of Exhibit 2 regarding the policies and
7  procedures that were used to handle checks at the Dover
8  office.
9    A.  Once to my knowledge.
10    Q.  That was when he requested that you give the
11  statement?
12    A.  That is correct.
13    Q.  But there's a possibility he might have been
14  listening in on a phone conversation you had with Kathy
15  Obenshain?
16    A.  That is correct.
17    Q.  Okay.
18    A.  That is possible.
19    Q.  How many conversations did you have with Kathy
20  Obenshain about this other than the one where you know
21  Ted Fox was present?
22    A.  Just the one right after when she asked me
23  about what I had stated in the memo.
24    Q.  Okay.  Other than Kathy Obenshain and Eric

Page 42

1 Shaw and Ted Fox, did you have any discussions with
2 anybody else at NCO? I guess also you mentioned you had
3 some discussion with Valerie Hue about it. Did you have
4 any discussion with anybody else at NCO about the subject
5 matter of this Exhibit 2?
6    A. I don't recall, other than my husband
7 probably. But other than that, I don't recall that
8 I've -- I did.
9    Q. Okay. Did you discuss it with any attorney of
10 NCO at any time before Valerie Hue was fired?
11    A. No.
12       MR. HOMER: Okay. Can we have that
13 marked as Marlow 3, please?
14       (Marlow Deposition Exhibit No. 3 was
15 marked for identification.)
16 BY MR. HOMER:
17    Q. Ms. Marlow, I'm handing you now Exhibit
18 Marlow 3. It's also Shaw Exhibit 1.
19       Ms. Marlow, have you seen this document
20 before?
21    A. I don't recall seeing this document, no.
22    Q. Okay. I'm going to read to you a couple
23 passages from it, and I'm going to ask you some questions
24 about it. The first paragraph, it says, "You have asked

Page 43

1 me to explain to you the incidents that occurred toward
2 the end of the month of December 2003. I was given a
3 directive by Valerie Hue to acquire a list of all NSF
4 checks to review with the large and super mid collectors.
5 I was to advise her of how much net fee was available in
6 nonsufficient funds checks. I was then instructed to
7 review with each individual collector the status of their
8 nonsufficient funds checks for the purpose of locating
9 additional fees we could also add on to the end of the
10 month figures."
11       Then skipping down to the third
12 paragraph, it says, "In reviewing the checks with the
13 collectors, there was some judgments made for some of the
14 checks not to run due to stop payments and/or too many
15 NSFs in some cases. I myself did not allow those to
16 run."
17       Now, going back to your memo, which is
18 Exhibit 2, you say there in the second paragraph -- and
19 I'll quote again -- then we pulled each collector in one
20 by one and discussed the checks that were to be run and
21 the level of comfort of them clearing, end quote.
22       You see where it says that in the second
23 paragraph?
24    A. Where are you seeing it? *13-329*

Page 44

1    Q. The second --
2    A. Oh, I'm sorry.
3    Q. In the second paragraph, you write, "Then we
4 pulled each collector in one by one and discussed the
5 checks that were to be run and the level of comfort of
6 them clearing."
7    A. Mm-hmm.
8    Q. Okay. I guess the first question is: When
9 you say "we" there, are you referring to yourself and
10 Eric Shaw?
11    A. No.
12    Q. Who are you referring to?
13    A. That was our policy. That was what we did as
14 a group. That would be -- each month we would get
15 together and do a round robin table theme. And Val,
16 myself and Eric would be present, and we would sit with
17 the collector and we'd find out if this check would
18 actually clear or not clear.
19    Q. So "we" refers to --
20    A. All. All managers.
21    Q. That would be you, Valerie, Eric Shaw?
22    A. Mm-hmm.
23    Q. Anybody else?
24    A. Just the collector that we pulled in at the

Page 45

1 time.
2    Q. Okay. So you would have one collector and
3 three of you reviewing each check --
4    A. Correct.
5    Q. -- that was returned NSF?
6    A. Correct.
7    Q. Okay. Is it your understanding that what you
8 described here about running through the NSF checks one
9 by one is consistent with what Eric Shaw described in his
10 memorandum that we just read about?
11    A. Yes.
12    Q. Okay. Was there something improper about that
13 process that you and Eric and Valerie Hue ran when they
14 brought in the collectors and you went through the
15 checks, the NSF checks?
16    A. No.
17    Q. Okay. What was the purpose of going through
18 the checks one by one?
19    A. To get a sense of comfort if the check was
20 available to run or not, meaning did they talk to the
21 debtor or the bank at that time, inquisitioning the
22 collector at the time to find out if there were
23 sufficient or ample funds in order to run the check at
24 that point. Because at that time it was the end of the

Page 46

1    month and we were trying to get as much fee on the books
2    as we probably could.
3        Q.   But why would you need to do that?  Why would
4    you need to get a level of comfort?
5        A.   To assure that the check would clear.
6        Q.   Let's say that the bank had been contacted and
7    the check had been verified.  The collector had told you
8    they contacted the debtor and that there were funds
9    available.  Why do you need to have a meeting to go over
10   and obtain another level of comfort before you submit the
11   check?
12       A.   That's actually just something that we did as
13   a group just to make sure that everything was, you know,
14   completed correctly.
15       Q.   When Mr. Shaw talked about exercising
16   judgment, what was he talking about there?
17            MS. FITE:  Object to form.  Answer if
18   you know.
19       A.   Like if -- as far as Eric's judgment, I can't
20   say what his judgment is.  But if you're asking me for my
21   judgment, that's a whole different story.
22       Q.   Well, you testified that the process that you
23   were talking about was the same one that Eric talked
24   about, and he does talk about sitting down and going

Page 47

1    through -- you just mentioned yourself you were trying to
2    get a level of comfort.
3        A.   Mm-hmm.
4        Q.   Was there any judgment involved in whether you
5    resubmitted the checks or not?
6        A.   At times there was.
7        Q.   How did judgment come into it?
8        A.   For an example, if you had a debtor that
9    actually made a deposit that day and the funds were going
10   to be available that night, that was a judgment call.
11   That was something that you, as a management group, would
12   sit down and talk about.  Do you think we should go ahead
13   and put this on or do you think we should wait?  And at
14   that point it's the manager's discretion whether to go
15   ahead and properly put that.  But it was proper
16   documentation and you had to have it signed off by a
17   manager.
18       Q.   Any other examples of when you used judgment?
19       A.   Possibly the bank won't verify and the debtor
20   is saying that he did make a deposit and/or there is some
21   affiliation that the check would clear at -- what we had
22   was EOM2.  So now we don't have that.  But EOM2 was if it
23   was cleared up or made up within that five-day period of
24   time.  I know it's confusing to you, but...  B-340

Page 48

1        Q.   Well, let's take an example.  Let's say the
2    bank didn't verify.
3        A.   Okay.
4        Q.   The collector indicated he contacted the
5    debtor and the debtor verified the funds.  What judgment
6    would come into play at that point in time for
7    resubmitting the check.  Isn't that all you really needed
8    to know -- that he had verified the funds?
9        A.   That would be a manager's discretion.  Not
10   exactly, because it actually didn't clear through -- it
11   wouldn't have cleared through the bank, because you just
12   told me that the bank told you that there was no funds
13   available but the debtor said there was.  So that was the
14   judgment.
15       Q.   No.  I just said the bank didn't verify.
16       A.   Oh.  They won't verify.
17       Q.   They couldn't --
18       A.   I'm sorry.
19       Q.   They couldn't get a verification from the
20   bank.
21       A.   That's a judgmental call to the manager at
22   that point.
23       Q.   Isn't it true that all the NSF checks that you
24   reviewed with the collectors in this process with Ms. Hue

Page 49

1    and Mr. Shaw -- all those checks -- had there been an
2    attempt to verify with the bank whether the funds were
3    available?
4            MS. FITE:  Object to form.  Answer if
5    you understand.
6        A.   In some cases.  In some cases.  I don't -- in
7    my group I only did mine.  So if there was anything else
8    in another group, I wouldn't primarily have that
9    authority.
10       Q.   Wasn't there somebody else in the Dover office
11   that tried to contact the banks to verify funds?
12            MS. FITE:  Object to form.
13       A.   It could have been at that point an admin, but
14   that would be the only person that I know that would
15   actually have called the bank.
16       Q.   Do you know --
17       A.   Other than the collector.
18       Q.   Would that have been at that time
19   Ms. Nickerson?
20       A.   Yes.  She was our admin at that time.
21       Q.   Before that it would have been Jenie Birdsong?
22       A.   Yes.
23       Q.   Do you know whether they had any role in
24   trying to verify funds with the bank?

KIM MARLOW

Page 50

1    A.  I -- the only rule that I know of is a
2  deposit.  They would do post dates at the end of the
3  month to make sure that they were going to clear.  Now, I
4  do know that that was a policy that the admins were
5  responsible for.  But as far as clearing an NSF check, it
6  was primarily up to the collector to do that.  But at
7  times we did ask the admins to call the banks.
8    Q.  Mm-hmm.
9    A.  And I don't recall if that's one of those
10  times or not, to be honest.
11    Q.  What do you mean at times?  You mean for the
12  whole month or just for specific checks or --
13    A.  No.  Just the end of the month run.
14    Q.  For the whole run?
15    A.  It might not be for the whole run.  It might
16  be a couple of checks here or there.
17    Q.  Okay.
18    A.  It depends on if -- it depends on how busy we
19  were at that point in time.
20    Q.  Okay.  What did you work from when you brought
21  in the collectors?  Did you have some documents you had
22  in hand that you knew were the NSF checks?
23    A.  Yes.  We would -- there was a spreadsheet that
24  we had actually.  I believe that admins put together that

Page 51

1  spreadsheet.  Or we might have as managers.  I don't
2  remember at that point in time.  And it would list all
3  the NSFs.
4    Q.  You don't know whether the admin had already
5  contacted the bank and couldn't get verification for the
6  list of those checks?
7    A.  I have no idea.
8    Q.  Okay.  You don't know whether they did or not?
9    A.  I don't know.
10    Q.  So you don't really know what the process was.
11  Is that what you're telling me?
12    MS. FITE:  Object to form.
13    A.  No.  I don't know if she helped in that
14  process or not at that point in time.
15    Q.  Well, I just want to get this clarified,
16  because before you told me that you had to do both bank
17  verification and debtor verification, but now you're
18  telling me you don't know whether the checks that you got
19  a list of had already been run through the bank
20  verification process and not passed.
21    MS. FITE:  Object to form.  She said
22  and/or.
23    A.  Yeah.  I don't believe I said that.  I said
24  that you could either have the debtor verify funds.  And

Page 52

1  then that was a judgment call to the manager.  Or you
2  could call the bank and find out if the funds were
3  available.  But your policy -- the policy is to call
4  both.  You might not get a hold of the bank, and they
5  might not verify.
6    Q.  What you said before was that the policy was
7  the collector was to call the debtor for verification
8  even if the bank had already verified.
9    A.  Yes.
10    MS. FITE:  Jerry, do you mind if we take
11  a break?
12    MR. HOMER:  That's fine.
13    (A brief recess was taken.)
14    - - - - -
15    KIM MARLOW, resumes
16  BY MR. HOMER:
17    Q.  Referring back to Exhibit 2, which is your
18  statement to Fox, the last paragraph says, quote, last
19  month before Valerie left for vacation, she gave the
20  directive to Eric Shaw (mid balance manager) and handed
21  him all the cash journals of the collectors that she
22  found multiple NSFs -- and there's a -- I'm not sure if
23  that word is "or not" -- but it goes on and says and told
24  to get them all on, quote/end quote.

Page 53

1    Do you recall making that statement?
2    A.  Yes.
3    Q.  Could you tell me, where did you learn that
4  this directive had been given to Mr. Shaw to get them all
5  on?
6    A.  That's what he told me.
7    Q.  Okay.  You don't have independent knowledge of
8  it?  You weren't present when he was told to?
9    A.  No.
10    Q.  Okay.  It goes on to say in the letter right
11  after that, "I know this because we were in our morning
12  managers meeting..."  What does that mean?  Why would you
13  know that because you were in the morning managers
14  meeting?
15    A.  Managers meetings we held every morning, and
16  she would give us things to do as per the day goes on.
17  And as she was leaving, she would give me things to do
18  that day, and he would have things to do that day.
19    Q.  Okay.  All right.  Referring again to your
20  statement, Exhibit 2, in the second paragraph, it says,
21  "On a monthly basis, we were given the directive to run
22  checks that we knew were not going to clear the bank."
23  Who does "we" refer to there?
24    A.  Our management staff.  B - 341

KIM MARLOW

Page 54

1  Q.  Would that be collectors? Would that be just
2  you and Mr. Shaw? Who was the management staff?
3  A.  That would be me, Val Hue and Eric Shaw.
4  Q.  Okay. So it says on a monthly basis you were
5  given the directive. Who gave you the directive to run
6  checks that you knew weren't going to clear the bank?
7  A.  Our directive was from Val.
8  Q.  She told you to run checks that she knew and
9  you knew weren't going to clear the bank?
10 A.  At times.
11 Q.  Okay. When did she do that?
12 A.  It could have been any time at the end of the
13 month.
14 Q.  Okay. She did it several times?
15 A.  Several months?
16 Q.  Yes.
17 A.  It could have been, yes.
18 Q.  Well, you say "could have been." You wrote
19 the statement. It says on a monthly basis we were given
20 the direction to do this. Did you mean by that statement
21 that at the end of every month she told you to run checks
22 that you knew weren't going to clear? What does that
23 statement mean?
24 A.  The statement means that each month that we

Page 55

1  would have an overview of what was going on that month.
2  It might not happen exactly every month, but there were
3  times that it did happen. But our preface for our
4  meeting is -- was to get everything on at that point in
5  time.
6  Q.  Well, the next sentence says, quote, we were
7  directed to pull the cash journals and put the checks
8  back on that were from the previous months. Then we
9  pulled each collector in one by one and discussed the
10 checks that would be run and the level of comfort of them
11 clearing. Right?
12 A.  Correct.
13 Q.  So when you say it in the first sentence that
14 you were given the directive to run checks that weren't
15 going to clear the bank, is that qualified by the later
16 discussion there that says that you would get a level of
17 comfort by talking to the collector about it?
18 MS. FITE:  Object to form. Answer if
19 you understand.
20 A.  Can you repeat that question for me?
21 BY MR. HOMER:
22 Q.  You say in the first sentence that we're given
23 a directive to run checks that we knew weren't going to
24 clear, but right after that you're talking about calling

Page 56

1  in the collectors and going through one by one and trying
2  to get a comfort level.
3  My question is:  The statement that you
4  were given a directive to run checks that you knew
5  weren't going to be put on, is that qualified by the fact
6  that you would try to find out with the collectors
7  whether they would clear or not?
8  MS. FITE:  Same objection.
9  BY MR. HOMER:
10 Q.  Or are those just two totally different
11 concepts?
12 MS. FITE:  Same objection.
13 A.  As far as the checks that weren't going to
14 clear the bank, would we discuss them with another --
15 Q.  Would you discuss it with --
16 A.  Would we discuss that with a collector?
17 Q.  Right.
18 Would you discuss those with the
19 collectors to try to get a comfort level?
20 A.  At times.
21 Q.  Now, why would you have that discussion if you
22 knew they weren't going to clear the bank?
23 A.  Because they could have talked to the debtor
24 after that point. They might not clear at this point,

Page 57

1  which is EOM1, but it might have cleared on EOM2.
2  Q.  Okay. You would have that second discussion
3  at EOM2 about whether the check would clear?
4  A.  It was actually before EOM2.
5  Q.  Okay. Well, let's get back to the first
6  sentence. In the first sentence, you say, on a monthly
7  basis we were given the directive, you say, by Valerie
8  Hue to run checks that we knew were not going to clear
9  the bank. You're personally aware of Valerie Hue telling
10 you to run checks that she knew weren't going to clear
11 the bank?
12 A.  She didn't personally tell me to put checks on
13 that were not going to clear the bank, but I know of
14 instances where I've been told by the collectors that she
15 told them.
16 Q.  Okay. So it's hearsay. She never actually
17 told you to do that.
18 A.  No. She never actually told me to do that.
19 Q.  Okay. Who told you that she told them to do
20 that?
21 A.  Dave McQuisten was one of those people.
22 Q.  But Dave McQuisten wouldn't be the one that
23 runs the checks, would he?
24 A.  Yes.                    B-342

KIM MARLOW

Page 58

1    Q.   What was the process for resubmitting the NSF
2  check?
3    A.   The process would be -- running an NSF, you
4  would contact the debtor, as I stated before, the bank,
5  or -- and/or get the notification from the manager, have
6  the manager notate on the account whether this can be run
7  or not run.  And then it's sent to corporate to run -- to
8  our accounting division to run.
9    Q.   Okay.  In your Exhibit 2, your statement, when
10  you say "...we were given the directive to run checks
11  that we knew were not going to clear the bank," the basis
12  for that information was something that the collectors
13  told you, not something that Valerie Hue told you.
14  Correct?
15          MS. FITE:  Object to form.
16    A.   Can you repeat that again?
17          MR. HOMER:  Could you read that back?
18          THE WITNESS:  Sorry.
19          (The reporter read the requested
20  portion.)
21          THE WITNESS:  That's a yes and no
22  question.  And the reason why I'm saying that is, yes, I
23  did hear that from the collectors, but I've also heard
24  her say that.  She didn't directly say that to me.  She

Page 59

1  might have said that to -- I'm sure she said it to Eric.
2  It was...
3  BY MR. HOMER:
4    Q.   You say you're sure she said it to Eric.
5          Were you present when she said it to
6  Eric?
7    A.   No, I was not present.
8    Q.   Okay.  Were you ever present when she gave a
9  directive to run a check that she knew wasn't going to
10  clear the bank?
11    A.   At that time if we were running checks, I
12  wouldn't know which ones she approved and which ones she
13  didn't approve.  So I wouldn't know which check -- she
14  wouldn't have -- she would have known that weren't going
15  to clear and what would clear.
16    Q.   So the answer to that question would be --
17    A.   No.
18    Q.   -- no?
19    A.   Is no.
20    Q.   Okay.  Are you familiar with the term
21  "sandbagging"?
22    A.   Yes, I am.
23    Q.   What does that term refer to?
24    A.   That's when a collector knows that they're not

Page 60

1  going to hit threshold and make any money that month.  So
2  they hold their debtors for another month so that they
3  can put them on at the beginning of the month to hit
4  their quota for the following month.
5    Q.   So just let me see if I can characterize.  You
6  can tell me if I got it right or not.
7    A.   Okay.
8    Q.   You're towards the end of the month.  The
9  collector realizes he's not going to get enough money
10  that month to get a bonus.  So he doesn't want to submit
11  a check that might be good because he won't get any bonus
12  from it.  He would rather wait until the next month when
13  he has a chance to get a bonus.  So he holds back the
14  check until the following month.  Is that a correct
15  statement of it?
16    A.   That is correct.
17    Q.   Okay.  Referring now to the third paragraph of
18  Exhibit 2, I'd like to read from that again:  I know for
19  a fact that collectors have asked for some checks to be
20  pulled at the end of the month because they knew they
21  would not clear.  She, Val, stated that she had a
22  directive from Kathy Obenshain that we are not pulling
23  any checks off the system and to make this happen.
24  Collectors have complained several times about having to

Page 61

1  put on bad checks at the end of the month that they knew
2  would not clear and would put them at a negative at the
3  beginning of the following month.
4          You say in the first sentence:  I know
5  for a fact that collectors have asked for some checks to
6  be pulled at the end of the month because they knew they
7  would not clear.  What's the factual basis of that
8  statement?
9    A.   Because I've had collectors at times come up
10  to me and say, "This is not going to clear.  There's no
11  funds in the account to clear, and I don't want this to
12  run."
13    Q.   Is that what a collector would do if they were
14  going to sandbag?  Let's assume that there were funds
15  available.  Would a collector come to you and say that
16  they wouldn't clear so that they could get credit the
17  next month?
18          MS. FITE:  Object to form.  Answer if
19  you can.
20    A.   Can you repeat that question for me?
21    Q.   Would a collector come to you towards the end
22  of the month and tell you that a check wasn't going to
23  clear so that he could get credit for it the next month?
24  Isn't that what sandbagging is?       B-343

Page 62

1    A. Yes, that is what sandbagging is.
2    Q. Okay. When you say here that collectors came
3  at the end of the month telling you that the checks
4  wouldn't clear, my question is: Isn't it possible that
5  they were sandbagging when they told you that?
6    A. Could very well be.
7    Q. Okay. Would you have knowledge of which
8  checks were going to clear and which checks wouldn't
9  clear for a given collector regarding this statement that
10  you have in this paragraph 3 of your statement,
11  Exhibit 2?
12    A. If I looked up the account and saw that it was
13  documented on the account, then I would -- yes. I would
14  think that they had called the debtor or -- it's a tape-
15  recorded line. So I would think that they would not put
16  something on there that wasn't -- you know, wasn't
17  correct.
18    Q. Okay. But you're telling me now there is a
19  way to look into that. But when you made this statement
20  that's in Exhibit 2 about knowing that collectors have
21  asked for checks to be pulled at the end of the month
22  because they knew they would not clear, had you gone and
23  verified that the checks would have cleared, or are you
24  just taking the collector's word for that?

Page 63

1    MS. FITE: Object to form.
2    A. Can you repeat the first part of that question
3  for me?
4    Q. Well --
5    A. Because it's kind of --
6    Q. -- what I'm trying to get at is: You've said
7  there wasn't means for determining whether the check
8  would clear or not. You could go look at the account.
9  You could go see if the debtor had been called,
10  blah-blah-blah.
11      But what I'm asking for is: When you
12  made this statement that collectors would come to you and
13  tell you that a check would clear or wouldn't clear, did
14  you actually verify what he was telling you or did you
15  just take his word for it? How do you know he wasn't
16  sandbagging, to make it simple?
17    A. You didn't know that he wasn't sandbagging
18  unless he was not at threshold -- if he wasn't at
19  threshold. But as a manager, that's your job and duty --
20  to go behind the collector and make sure that that is
21  what they're supposed to do.
22    Q. Okay. Did you ever do that? When a collector
23  came to you and said we should pull this check because
24  their funds aren't available but Valerie wants to run it,

Page 64

1  did you go check the documentation to see if it should
2  have been run?
3    A. I've never had a collector personally come to
4  me and ask me to pull something off, because I wasn't
5  their manager. They would only go to their manager to do
6  that. And if that manager wasn't available, they would
7  go to the next person in command, and that was not me at
8  the time.
9    Q. Okay. But do you have any basis for
10  concluding that when collectors told you that a check
11  wasn't going to clear that it wasn't sandbagging? In
12  other words, you've made this statement that they came to
13  you and told you that the check wasn't going to clear.
14  But did you have any basis for knowing that that actually
15  was true?
16    MS. FITE: Object to form. She just
17  said she had no capability of pulling the check. So they
18  couldn't sandbag through Kim.
19    A. They wouldn't -- if they were to come to me, I
20  couldn't -- I wouldn't pull the check without the other
21  manager's approval or the other manager looking into it.
22  Unless it was something that was definitely -- something
23  that we had to pull because there was a closed account or
24  such thing like that.

Page 65

1    Q. So the answer would be no to the question?
2    A. No.
3    Q. Is the answer no?
4    A. The answer is no.
5    Q. Okay. Did you ever overhear conversations
6  between Kathy Obenshain and Valerie Hue regarding running
7  of the checks?
8    A. Yes.
9    Q. What do you recall about anything that Kathy
10  Obenshain said about running checks?
11    MS. FITE: Object to form. You can
12  answer.
13    A. Particularly about this end of the month? Is
14  that what you're asking me? Or about anything?
15    Q. Anything at all.
16      Do you recall any conversations where
17  Kathy Obenshain discussed with Valerie Hue the running of
18  the checks?
19    A. Yes.
20    Q. What do you recall about that?
21    A. Kathy would tell her to get them all on.
22    Q. Okay.
23    A. That was her famous words.
24    Q. What did she mean by that?

*B-344*

Page 66

1    A.   To get them all on.  Make sure they're
2  verified.  Make sure that we call the debtors, the banks,
3  or do any -- all the verification that's necessary and to
4  make a decision to get them on.
5    Q.   Okay.  So to get them all on didn't
6  necessarily mean not to follow the policy.  It meant just
7  follow the process for getting verification.
8    A.   Correct.
9    Q.   That's the way you took it --
10    A.   Correct.
11    Q.   -- when she said that.
12    A.   Correct.
13    Q.   Okay.  Do you recall any other conversations
14  that you overheard between Kathy Obenshain and Valerie
15  Hue about processing checks?
16    A.   There was several conversations.  Are you
17  asking me a specific conversation or --
18    Q.   I'm looking for anything that had to do with
19  running the NSF checks.
20    A.   Every month they had a conversation --
21    Q.   Okay.
22    A.   -- about NSF checks.
23    Q.   Okay.  Why is it that in your letter to Ted
24  Fox, your memorandum -- I guess it is a letter -- or

Page 67

1  memorandum to Ted Fox, Exhibit 2 -- why is it that you're
2  telling Mr. Fox that Valerie gave the directive to Eric
3  Shaw to get them all on?  Why is that significant?
4    A.   He asked me who was doing the check handling
5  policy at that time when Valerie was out, and that was my
6  statement to him.
7    Q.   Did he understand what you meant by that, do
8  you know?
9    A.   I have no idea.  He didn't ask me otherwise.
10    Q.   Did you think it was significant in terms of
11  following the policy that Valerie Hue told Eric Shaw to
12  get them all on?
13    A.   I just knew that's what was said.
14    Q.   What was your understanding of the
15  significance of that?
16    A.   Make sure we got everything on that we could
17  possibly get on.
18    Q.   Why was that important to put in the letter to
19  Mr. Fox?
20    A.   Because that's what our policy and procedures
21  were.
22    Q.   Is it possible that he might have misconstrued
23  that to think that what you meant was to put all the
24  checks back through redipping, in other words, submit

Page 68

1  them without verification?
2    MS. FITE:  Object to form.  Answer if
3  you understand.
4    A.   Repeat the question.
5    Q.   Isn't it possible that Mr. Fox would have
6  construed this statement -- "get them all on" -- that's
7  in your letter to mean that Valerie Hue told Eric Shaw to
8  resubmit all the checks without doing verification?
9  Isn't that one way he might have construed that
10  statement?
11    A.   I have --
12    MS. FITE:  Object to form.  I don't
13  think that she said that Valerie Hue didn't order them to
14  get them all on without verification.  She just said that
15  she took Kathy Obenshain's directive as to --
16    Q.   You can answer the question.
17    A.   I don't know what he thought that was.  He
18  didn't ask me, and I didn't clarify it.  If he asked me,
19  I would have clarified.
20    Q.   What was the purpose of you putting that in
21  the letter?
22    A.   It was just a statement that was made to us
23  all the time.  So it was just something I put in there.
24    Q.   But as far as you were concerned, it didn't

Page 69

1  mean that Valerie had violated any policy.  Correct?
2    A.   Not to my knowledge.
3    Q.   Okay.  Did Valerie Hue ever tell you to
4  violate any NCO policy that you're aware of?
5    A.   Not that I'm aware of.
6    Q.   How much contact did you have with Kathy
7  Obenshain in 2003?  How often would you have interaction
8  with her?
9    A.   Myself?
10    Q.   Yes.
11    A.   As little as possible.
12    Q.   Well, if you could be a little more specific.
13    A.   I only talked to Kathy when Kathy had a
14  problem with me.
15    Q.   Okay.
16    A.   That was primarily the only time I talked to
17  her.  And hopefully, that was not very many times.
18    Q.   So she would have phoned you if you had done
19  something that she thought might be wrong?
20    A.   Yeah.  I think she would phone me.
21    Q.   Okay.  That's about the limit of your contact
22  with her?  You didn't have much contact with her other
23  than that?
24    A.   No.          B-345

KIM MARLOW

Page 70

1    Q.   Okay.  At the end of November 2003, were you
2    entrusted with running the end-of-month NSF checks with
3    the collectors?
4        A.   I can't recall, to be honest with you.  I
5    don't know.
6        Q.   Let me see if I can refresh your recollection.
7            Do you recall Valerie Hue being absent
8    from the office in November because of an illness?
9        A.   She possibly could have been.  I really don't
10   recall.
11       Q.   Okay.  So you don't have any recollection that
12   you ran NSF checks at the end of the month with the
13   collectors?
14       A.   No.  I really don't.
15       Q.   Would you know who did do that in November of
16   2003?
17            MS. FITE:  Object to form.
18       A.   I have no clue.
19       Q.   Okay.  Can you describe what forms, if any,
20   were used in this process where collectors would attempt
21   to verify checks either with a bank or with the debtors?
22   I'm talking about NSF checks.
23       A.   Yes.  We had a redipping form that
24   Ms. Birdsong, our administrative assistant at the time,

Page 71

1    made up for her personal use.
2        Q.   What was that form called?  Do you remember
3    the title of it?
4        A.   Redipping form.
5        Q.   It said "Redipping Form" on it?
6        A.   Yes.
7        Q.   Okay.  What information was on it?
8        A.   The debtor number, who they spoke to, if they
9    called the bank, what the bank said, amount deposited.
10   It would have debtor information on it, and it would have
11   a place for a signature for a manager.
12       Q.   Would it have information about contacts with
13   a debtor?
14       A.   Yes.
15       Q.   Would it supply information about whether the
16   debtor had been contacted or not?
17       A.   Yes.
18       Q.   Okay.  That was information that the collector
19   would fill out or put into the form whether or not the
20   debtor had been contacted?
21       A.   Yes.  It was definitely a collector's form.
22       Q.   Okay.  Then the manager, that would be Valerie
23   Hue in 2003 or a good part of 2003.  She would be
24   reviewing that form and signing it.  Is that right?

Page 72

1        A.   She would review the form and then -- it
2    should have gone to the admin.  And then the admin
3    e-mailed to accounting whether it could be on or off at
4    that time.
5        Q.   So the admin, that would be Ms. Nickerson,
6    December of 2003.  Correct?
7        A.   Yes.
8        Q.   And Jenie Birdsong before that time at some
9    point in time?
10       A.   Yes.
11       Q.   They would take the redip form that had been
12   signed off by the manager, and based on that they would
13   send an e-mail requesting the check to be resubmitted.
14   Does that state the process correctly?
15       A.   Yes.
16       Q.   Okay.  Do you know what became of the redip
17   forms?
18       A.   No.
19       Q.   Who maintained them?
20       A.   At that time it would have been Leigh Ann
21   Nickerson.
22       Q.   Okay.  You're talking about December of 2003?
23       A.   Yes.
24       Q.   Before that it would have been Jenie Birdsong?

Page 73

1        A.   Yes.
2        Q.   Do you know where they kept them?
3        A.   It could have been all over the office.  But
4    there was a closet in the back of our office that -- I'm
5    pretty sure that's where they were kept at that time.
6        Q.   Do you recall when the last time you saw those
7    forms was?
8        A.   I don't know after each month that I ever saw
9    them after that.
10       Q.   You see them in the closet?
11       A.   No.
12       Q.   You just know that they put them there?
13       A.   Yeah.
14       Q.   Okay.  Other than the redip form, what forms
15   were used in this check verification process, if any?
16       A.   None that I know of.
17       Q.   Wasn't there a form?
18            You talked about a spreadsheet that was
19   put together by the admin assistant.
20       A.   Yes.
21       Q.   What was that called, if you remember?
22       A.   It wasn't called anything.  It was just a form
23   that they actually pulled from a report of NSFs.  They
24   did a collector report of NSFs and just put it on a

B-348

KIM MARLOW

Page 74

1  spread -- an Excel spreadsheet and then just gave it to
2  us.
3      Q.  That would list all the NSF checks for the
4  month?
5      A.  By collector.
6      Q.  By collector.
7          Okay.  Who put that together?  The
8  admin?
9      A.  Yes.
10     Q.  That would be Leigh Ann Nickerson the latter
11 part of 2003, and then Jenie Birdsong before that?
12     A.  Yes.
13     Q.  Okay.  Do you know whether Kathy Obenshain was
14 familiar with the process used by the Dover office which
15 you've described and Eric Shaw described in his memo
16 where you'd sit down with the collectors and go through
17 the checks one by one, the NSF checks?
18     A.  Yes.  She knew that policy.
19     Q.  She knew that's how the process worked?
20     A.  Yes.
21     Q.  Okay.  Over what period of time did she know
22 that from the time she -- for a period of years?
23         MS. FITE:  Object to form.  Answer if
24 you know.

Page 75

1      A.  I have no idea how long she knew that was
2  going on.
3      Q.  But she knew in December of 2003 what the
4  process was?
5      A.  Yes.
6      Q.  Okay.  She would have been aware that there
7  were forms, the redip form, for example, that were used
8  in the process?
9          MS. FITE:  Object to form.
10     A.  I don't know if she would have known about a
11 redip form or not.  That was something that our admin had
12 created just for our benefit.
13     Q.  Okay.
14     A.  So I don't know if she knew.
15     Q.  Just to switch gears a little bit here, have
16 you ever had any discussion with Valerie Hue regarding
17 Mike Scher and sexual harassment that he was involved in
18 of Jenie Birdsong?
19     A.  Yes.
20     Q.  What was that discussion, if you recall?
21     A.  I know she came to Val and told Val about -- I
22 don't even remember what he did.  I don't -- talk, I
23 guess.  And she was very uncomfortable with it.  And she
24 came to Val as a friend and told Val, you know, she

Page 76

1  didn't appreciate what he was doing.  And I was there as
2  a witness.  And that was pretty much all I know.  I guess
3  they talked about it afterwards, and it was taken care
4  of.
5      Q.  Okay.  Is that all you know about any sexual
6  harassment that Mr. Scher was involved in --
7          MS. FITE:  Object to form.
8  BY MR. HOMER:
9      Q.  -- in terms of what he actually perpetrated?
10     A.  That's the only thing I know.
11     Q.  Okay.  How about racial comments?  Have you
12 ever heard Mr. Scher make any racial comments?
13     A.  No.
14         MR. HOMER:  Can we have this marked as
15 Exhibit 4, please?
16         (Marlow Deposition Exhibit No. 4 was
17 marked for identification.)
18 BY MR. HOMER:
19     Q.  Ms. Marlow, can you identify Exhibit 4?  Can
20 you identify that document, Exhibit 4?
21     A.  Mm-hmm.
22     Q.  What is this?
23         Well, let me ask a different question.
24 This memo talks about moving fees.  Can you tell me in

Page 77

1  the context of this memo what that means -- to move a
2  fee?
3      A.  It means taking fee from an account that sits
4  in a collector's -- a manager's unit and moving it to a
5  collector or the person that had the account last.
6      Q.  Can you be a little more specific?
7          Well, first of all, is there something
8  wrong with doing that?
9      A.  Yeah, there is something wrong with doing
10 that.  And at that point I wasn't aware of that at the
11 time.  That's why we had a discussion about it.  And
12 that's the only real bad discussion I had with Kathy
13 Obenshain at the time.
14     Q.  Did you have the discussion with Kathy or with
15 Valerie Hue?
16     A.  I think Valerie actually got the call, and
17 then I was called --
18     Q.  Okay.
19     A.  -- at that time.
20     Q.  Do you understand what the purpose of the memo
21 is?
22     A.  Not really, but...
23     Q.  Was it to advise you not to move fee?
24     A.  Oh, yes.  B-347

Page 82

1  violation of NCO's check handling policy?
2          MR. HOMER: Objection --
3          MS. FITE: You can answer.
4          MR. HOMER: -- to form.
5      A.  Yes.
6      Q.  Do you have any knowledge, whether it's from
7  viewing account notes or speaking with collectors in the
8  office or from sitting in the morning meetings, that
9  Ms. Hue was putting on checks where there was no debtor
10  authorization or verification that the funds were there?
11         MR. HOMER: Objection to form.
12     A.  Yes.
13     Q.  What is that knowledge? How do you know that
14  Ms. Hue was violating the check handling policy?
15     A.  Because we were putting on checks that didn't
16  have proper authorization.
17     Q.  I understand.
18         But what I'm asking for is: How do you
19  know that? Because during your deposition, I heard you
20  say that you were in small balance. Therefore, you
21  wouldn't be dealing with the large balance checks that
22  were being redipped. So how do you know that things were
23  going on end of month without any debtor authorization or
24  bank verification. If there's multiple reasons, then

Page 83

1  tell me all of them.
2          MR. HOMER: Objection to the form of the
3  question again.
4  BY MS. FITE:
5      Q.  Go ahead.
6      A.  Through hearsay. Through other collectors.
7      Q.  Were there any other collectors besides Dave
8  McQuisten? I know you mentioned him. Any other
9  collectors that told you that things were going on that
10  shouldn't have gone on?
11     A.  Yes. Brad Reavis.
12     Q.  Anyone else?
13     A.  Mark Lefevre. Mostly the LBs.
14     Q.  Any other way you knew other than speaking
15  with collectors? Like did you ever see account notes
16  where you saw that a check had gone on without debtor
17  authorization or bank verification?
18     A.  Not until the review of the notes that we
19  reviewed.
20     Q.  So not until the preparation?
21     A.  Yeah. Not until the preparation. I would
22  have never looked back at an account for any reason. I
23  wouldn't have any reason too.
24     Q.  Could somebody tell by reviewing the account

Page 84

1  notes -- I think they're called fact sheets -- when you
2  print them out -- and these fact sheets, if my
3  understanding is correct, have footprints of everything
4  that the debtor or the manager has done on the account.
5  From these fact sheets, could someone tell whether a
6  collector or manager had redipped an account without
7  proper authorization or verification?
8      A.  Yes. If there was no documentation on it and
9  it was done, it had to be done by the manager. So that
10  would be one way to look at it. Unless there was
11  notations on there from the manager themselves.
12     Q.  So if there's no notation that they got debtor
13  authorization or they attempted verification with the
14  bank, then it wasn't done?
15     A.  You assume that it was not done. That's
16  correct.
17         MS. FITE: Okay. No further questions.
18  BY MR. HOMER:
19     Q.  You indicated that various collectors told you
20  that the policies were being violated. Correct?
21     A.  Correct.
22     Q.  Did you feel any obligation to tell NCO
23  management about that?
24     A.  Obligation? I should have but I didn't.

Page 85

1      Q.  Why didn't you?
2      A.  Because Valerie was my manager.
3      Q.  You were also a manager at NCO at the time.
4  Correct?
5      A.  Correct.
6          MR. HOMER: Okay. I don't have any
7  other questions.
8          MS. FITE: We're done.
9          We will read.
10         (The deposition concluded at 11:15 p.m.
11  this same day.)
12
13         - - - - -
14
15         (I HAVE READ THE FOREGOING DEPOSITION,
16  AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.)
17
18
19
20  _____
21         WITNESS NAME
22
23         - - - - -
24         B-348

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                    )
                               )
        Plaintiff,             )
                               )
v.                             )
                               )   Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,   )     05-225-KAJ
a Delaware corporation,        )
trading as NCO FINANCIAL       )
COMMERCIAL SERVICES,           )
                               )
        Defendant.             )

        Telephone Deposition of DAVID MC QUISTEN taken
pursuant to notice at the law offices of Parkowski,
Guerke & Swayze, P.A., 116 West Water Street, Dover,
Delaware, beginning at 2:00 p.m. on Thursday, March 23,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.

APPEARANCES:

        JEREMY W. HOMER, ESQ.
        PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware  19903
          for the Plaintiff,

        ELIZABETH K. FITE, ESQ. (via teleconference)
        SESSIONS, FISHMAN & NATHAN, L.L.P.
          15316 North Florida Ave - Suite 100
          Tampa, Florida  33613
          for the Defendant.

ALSO PRESENT:  LENNY CICCARONE, NCO


                CORBETT & WILCOX
        Registered Professional Reporters
   1400 French Street     Wilmington, DE 19801
                (302) 571-0510
            www.corbettreporting.com

David McQuisten

Page 10

BY MR. HOMER:
1  BY MR. HOMER:
2      Q.  Well, let me back up a minute.
3          You said that the check handling policy
4  for resubmission of NSF checks required verification
5  before the check was resubmitted.  Do I have that right?
6      A.  Yes.
7      Q.  My next question is:  What was the requirement
8  for verification?  What did you have to do to satisfy the
9  verification requirement?
10     A.  I confirm from the check writer that it's
11 good.  I confirm from the bank that the funds are
12 available.
13     Q.  Okay.  Do you have to do both in order to
14 satisfy the verification requirement or do you have to do
15 one of those?
16     A.  Either or.
17     Q.  Okay.  Is it satisfactory to just call the
18 debtor and get him to say the check is good, or do you
19 have to first try with the bank before you contact the
20 debtor?
21     A.  Well, I contact the debtor first.
22     Q.  Okay.  The verification practice, has this
23 also been in effect since you can remember going back to
24 2001?

Page 11

1      A.  Yeah.  I believe so.
2      Q.  Okay.  Was it in effect in the Dover office in
3  the year 2003 when you were there?
4      A.  Correct.
5      Q.  Okay.  How did you learn about this policy
6  that requires verification before you resubmit an NSF
7  check for payment?
8      A.  Morning stand-up meetings.
9      Q.  Okay.  Could you elaborate a little bit on
10 that?
11     A.  In the morning we would have a meeting.
12     Q.  Who is "we"?
13     A.  The collectors.  The collections department.
14     Q.  Okay.  It was at one of those meetings that
15 you learned about the verification policy?
16     A.  Correct.
17     Q.  Okay.  When you contacted the debtor for
18 purposes of verification, was there anything specifically
19 he was supposed to tell you in terms of satisfying the
20 verification requirement?
21     A.  Why the call was necessary in the first place,
22 why the funds were not there and are they there now.
23     Q.  Okay.  If he told you they were there now,
24 then you would have satisfied the verification

Page 12

1  requirement?
2      A.  Correct.
3      Q.  Do you recall whether there were any forms
4  utilized in the Dover office when you were there that
5  related to this contact that you had with the debtor to
6  verify the funds?
7      A.  Yes.  There were.
8      Q.  Can you tell me what they were?
9      A.  It was a form requesting a resubmission of the
10 nonsufficient fund check.
11     Q.  Okay.  What kind of information was on the
12 form?
13     A.  Did I verify the funds were available and who
14 I verified it with, the bank phone number.  And it was
15 submitted to management.
16     Q.  Okay.  Management would be the -- who would it
17 be?
18     A.  That could be either one of the two managers
19 in the collections department.  One of the collection
20 managers.
21     Q.  Okay.  In the Dover, Delaware office, who was
22 that?
23     A.  Well, there's several different managers.
24          You want them all?

Page 13

1      Q.  Well, just the ones you might have given these
2  forms to after you contacted the debtor.
3      A.  Val Hue, Kim Marlow, Eric Shaw.  I can't
4  remember some of the other names.
5      Q.  Okay.  Do you know what they did with the
6  forms after you submitted them?
7      A.  No, I do not.
8      Q.  Did you have to request approval for
9  resubmitting a check for deposit that was an NSF check?
10     A.  Correct.
11     Q.  Was the approval given by one of those
12 managers that you just mentioned?
13     A.  Correct.
14     Q.  Did they require the form be filled out before
15 they would approve it?
16          MS. FITE:  Object to form.
17          THE WITNESS:  Do I answer this one?
18          MS. FITE:  Yes.  Go ahead and answer.
19          THE WITNESS:  You're asking again,
20 please.  Rephrase that.
21 BY MR. HOMER:
22     Q.  You've indicated you filled out this form,
23 that one of the managers would get the form.  You've
24 indicated that you had to have the manager's approval

Page 14

1  before the check could be redipped or resubmitted.
2       My question is: Did they have to have
3  the form filled out before they would approve the
4  resubmittal of the check for payment?
5       MS. FITE: Again, I object to form. But
6  go ahead and answer if you can, Dave.
7       A. I have to say no.
8       Q. Okay. Can you explain your answer?
9       A. The form was a standard policy or a standard
10  procedure. But it didn't mean the form was always filled
11  out.
12      Q. Okay. Can you explain what you mean by that?
13      A. A $75 check on a company that has been paying
14  checks for months has one check bounce. Confirmation on
15  the phone. I have seen checks go through without having
16  the forms filled out.
17      Q. Okay. That's just one example, I suppose.
18  Is that right?
19      A. Yeah.
20      Q. Okay. When you tried to contact the debtor
21  for purpose of ascertaining whether funds were available
22  to cover an NSF check, were you always able to contact
23  the debtor?
24      A. No.

Page 15

1       Q. What would you do if you couldn't?
2       A. Call the bank.
3       Q. Okay. What would happen if the bank wouldn't
4  verify for you that funds were available?
5       A. You take a look at their past history.
6       Q. Why would you do that?
7       A. Again, if they paid 25 payments in a row
8  without missing a payment, then it would be given to the
9  manager to use their discretion.
10      Q. Okay.
11      A. That was not my call.
12      Q. Okay. Did you ever meet at the end of the
13  month with the managers to go over NSF checks -- or
14  towards the end of the month?
15      A. To go over NSF checks, no.
16      Q. Okay. Did you ever receive any direction from
17  a Kathy Obenshain about this policy for resubmitting NSF
18  checks for payment?
19      A. Please rephrase that.
20      Q. Let me back up.
21          Do you know who Kathy Obenshain is?
22      A. I do.
23      Q. Who is she?
24      A. She was the vice president of operations, I

Page 16

1  believe was her title, for NCO collections.
2       Q. Did she ever give you any direction about the
3  check handling policies of NCO?
4       A. Myself personally?
5       Q. Yes.
6       A. No.
7       Q. Okay. Did she ever meet with you to discuss
8  how you were doing your job?
9       A. I know we've had informal conversations --
10  "Hi, how you doing?"
11      Q. Okay. Do you ever recall any substantive
12  discussion with her about the procedures you were using?
13      A. No, I have not. That would not be something I
14  would be involved in.
15      Q. Okay. I think you testified that the forms
16  might not be used for debtor verification if there's a
17  history of the debtor making the check good. I'm talking
18  about an NSF check.
19          Did I get that right?
20      A. That I wouldn't necessarily always use the
21  form? Is that what you're saying?
22      Q. Yes.
23          In other words, you might resubmit an
24  NSF check for a payment and might ask the manager to

Page 17

1  resubmit the check without filling out the form because
2  the prior history of the debtor suggested that payment
3  would be good.
4          Did I get that right?
5       A. I need to clarify that.
6       Q. Okay.
7       A. The form is something that was established
8  because of an NSF problem. Was the form always used?
9  No. We didn't always have the form. While the form
10  policy was in place was it used? I had no control over
11  that. I take the form. I fill it out and I turn it in.
12  And then it was beyond my control.
13      Q. Okay. But didn't you say that on occasion you
14  wouldn't fill out the form depending on the history of
15  the debtor? I think you talked about a $75 check in
16  which you might not fill out the form when you asked for
17  the redeposit of a check.
18      A. Right. I said that there was times that we
19  used the forms. Then there was times we didn't use the
20  forms. Then there was times we used the form. But as
21  I'm thinking here, to be totally honest, I -- if I
22  submitted a redip on a check, the form was used. When we
23  used the form, the form was submitted.
24      Q. Okay. Now, let's talk about the situation

Page 18

1  again where there's a $75 check and the debtor had a long
2  history of having funds to cover the check. Were there
3  times when you would request that the check be
4  resubmitted for deposit -- I'm talking about an NSF
5  check -- based on your knowledge of the debtor's history
6  as opposed to just contacting the debtor?
7      A.  Give me that question again. I'm sorry.
8      Q.  Were there times when you would request the
9  resubmission of an NSF check for payment based on your
10 knowledge of the debtor's history as opposed to actually
11 calling him and getting verification? I know there's
12 some cases you can't reach the debtor, for example.
13     A.  So did I resubmit a check without the approval
14 of the debtor or the verification of the bank? Is that
15 what you're saying?
16     Q.  Yes.
17     A.  I would resubmit a form. I would have no
18 control over that happening. That wasn't my position.
19     Q.  Okay. But would the form say you weren't able
20 to contact the debtor or the bank but you want to
21 resubmit it because the debtor has a good history? Would
22 the form say something like that?
23     A.  I can't exactly tell you what happened.
24 Ninety-nine percent of the time or more I got a hold of

Page 19

1  somebody. But did the form say something like that? I
2  don't know that there was a place on the form to say
3  that.
4      Q.  Okay. Let's forget about the form for a
5  moment. Let's say you've got a situation where the
6  debtor had a really good history of making good these
7  checks, these NSF checks, and you weren't able to get up
8  with him. For whatever reason, you just can't reach him.
9  Under that case would you possibly request the
10 resubmission of the check based on the history of the
11 debtor?
12         MS. FITE: I'm going to object to form
13 based upon asked and answered. Go ahead and answer,
14 Dave.
15     A.  What you just said is what I said. I would
16 advise that, if I couldn't confirm it, these are the
17 scenarios. I left it up to management to make the
18 decision.
19     Q.  Okay. Was it your understanding that if you
20 requested a check be resubmitted under those
21 circumstances that the manager had the discretion to do
22 that --
23     A.  Right.
24     Q.  -- to approve it?

Page 20

1      A.  Correct.
2      Q.  Okay. You're aware that Valerie Hue was fired
3  by NCO. Correct?
4      A.  Correct.
5      Q.  Before NCO fired Valerie Hue, were you
6  contacted by either Kathy Obenshain or Ted Fox about
7  NCO's check handling policies and your compliance with
8  them?
9      A.  Before she was fired was I contacted?
10 Indirectly.
11     Q.  Okay. Can you explain that?
12     A.  I was called into Mike Scher's office.
13     Q.  Okay. What transpired then?
14     A.  There was discussion about it. That's what's
15 in that document we talked about earlier.
16     Q.  Okay. Who was present when you had this
17 discussion in Mike Scher's office?
18     A.  Physically, it was myself and Mike Scher.
19     Q.  Okay. You discussed the check handling
20 policies at that time with Mike Scher?
21     A.  Well, I didn't discuss the check handling
22 policies. They asked me some questions regarding this --
23 Mike and Ted Fox by phone.
24     Q.  Okay. So Mike was there and Ted Fox was on

Page 21

1  the phone?
2      A.  Correct.
3      Q.  Do you recall about when this was?
4          Let's try to put it relative to the time
5  that Valerie Hue got fired. Do you recall approximately
6  when you had this conversation with Ted Fox?
7      A.  Oh. What was that? Two years ago? I don't
8  know. A day or two or week or so. Somewhere in that
9  period. I can't recall.
10     Q.  Okay. Your statement is directed to Kathy
11 Obenshain. We'll get it out here in a minute. But it
12 says, "Per your request, the following is a summary of
13 the phone conversation this morning with Ted Fox."
14         How did Kathy Obenshain get involved in
15 this with respect to your involvement? Why was it that
16 you're writing to her as opposed to Ted Fox or Scher?
17     A.  I believe that we were asked. Whether by
18 e-mail or by Ted Fox requesting, I don't know. I can't
19 remember that. But it was a request that was made of us,
20 hence my wording.
21     Q.  Okay. Do you recall talking to Kathy
22 Obenshain about any of these matters related to Valerie
23 Hue's termination?
24     A.  No.

Page 22

1   Q.  I'm sorry.  I had a hard time hearing.
2         Was that no?
3   A.  Yes.  That's a no.
4   Q.  Okay.  What do you recall about the phone
5   conversation that you had with Ted Fox in the presence of
6   Mike Scher?
7   A.  What I recall was that it was quick.  I don't
8   remember the bulk of the conversation.
9   Q.  Okay.  During the course of the conversation
10  you were asked questions, I guess.  That's what you said
11  before.
12  A.  Yes.
13  Q.  Did Mr. Fox tell you that he wanted you to
14  make a written statement about what you had said?
15  A.  I can't remember if he told me that.
16  Q.  Okay.  I would like to refer to the statement
17  now.  I'm going to have it marked as this end.  I realize
18  that you may not have it at your end.  But just for the
19  record, it's Bates stamped 00090.  It's a letter to Kathy
20  Obenshain.  It's not signed.  But it's the second page of
21  a fax.  The first page of the fax does say from Dave
22  McQuisten to Kathy Obenshain.  That's Bates stamped 0089.
23  I'm going to have them both identified as one exhibit.
24  It will be McQuisten Exhibit 1.

Page 23

1         We'll take a moment to get the document
2   marked.
3         (McQuisten Deposition Exhibit No. 1 was
4   marked for identification.)
5   BY MR. HOMER:
6   Q.  You don't happen to have that document with
7   you, do you, Mr. McQuisten?
8   A.  No.
9   Q.  Okay.  Fortunately, it's not very long.  So
10  I'm just going to read you the entire second page of the
11  document so it's in the record.  This is a quote.
12         "Kathy Obenshain,
13         "Per your request, the following is a
14  summary of the phone conversation this morning with Ted
15  Fox.
16         "In conversations with debtors
17  requesting a check not be deposited, have resulted in the
18  check not being pulled per manager direction.
19         "Checks that have been returned NSF have
20  been directed to be 'put back on.'  Attempts to contact
21  the debtor have and have not happened.
22         "We, as a group, have at times been told
23  'no checks are being pulled,' which led to no attempt to
24  pull or change check dates, knowing they would possibly

Page 24

1   be returned.  Hold check request or deletions have gone
2   unsigned in some cases.
3         "This has been a 'semi' practice for
4   some time, and I only have started notating the accounts
5   in my que the last few months."
6         That's the entire letter.
7         How long ago was it that you had seen
8   that statement that I just read to you, Mr. McQuisten?
9   A.  Outside of the time I probably typed it, I
10  haven't seen it.
11  Q.  Okay.  I'm going to read to you again from the
12  third paragraph of the letter.  It says, quote, checks
13  that have been returned NSF have been directed to be 'put
14  back on', end quote.  That's the end of the first
15  sentence.  Do you know what that phrase "put back on"
16  means?
17  A.  Redeposited.
18  Q.  Okay.  Could it also mean something else?
19  Could it mean just run the checks through the system
20  again and try to verify the checks?
21  A.  You're asking me if it could mean something
22  else and what you said is just the same thing in
23  different words.
24  Q.  Well, let me see if I can make the

Page 25

1   distinction.  If a check is put back on in the sense that
2   you just try to contact the bank and the debtor to do
3   verification, that's one thing.  But if you actually just
4   take the check and try to resubmit it, isn't that
5   different?
6         MS. FITE:  I'm going to object here that
7   "put back on" means redeposited.
8         MR. HOMER:  Right.  That's fine.
9   BY MR. HOMER:
10  Q.  You can answer the question.
11        Isn't there a distinction between just
12  redepositing the check and trying to run the check
13  through the verification process again?
14  A.  I'm unclear what you're saying.
15  Q.  Well, I'll tell you that in another deposition
16  that the term "put back on" was -- it was explained to me
17  that that meant you just run the checks through the
18  system.  You try to verify the checks with the bank.  You
19  try to contact the debtor to see if the check should be
20  resubmitted.
21        MS. FITE:  I'm going to have a
22  continuing objection because he's already testified that
23  in this statement "put back on" means redeposited.
24        MR. HOMER:  Well, I'm just asking if

Page 26

1  that term might have been used differently at different
2  times.
3  BY MR. HOMER:
4     Q.  Mr. McQuisten, have you ever heard that phrase
5  "putting the checks back on" refer to just running the
6  checks through the verification process? Have you ever
7  heard the term used for that reason?
8     A.  I've heard the term.  How it was used?  I
9  can't testify to what somebody else said how they
10  referred to it.
11    Q.  Okay.  Going to the next paragraph of the
12  letter, it says, "We, as a group, have at times been told
13  'no checks are being pulled'..."  What does that phrase
14  "no checks are being pulled" mean?
15    A.  The check is being deposited.
16    Q.  Okay.  It goes on to say "Hold check requests
17  or deletions have gone unsigned in some cases."  What did
18  you mean by that?
19    A.  I requested a hold check.  Debtor Jones said
20  the money is not there, don't put the check through.  I
21  filled in the hold check request, gave it to my manager,
22  and they were not signed.
23    Q.  Okay.
24    A.  That's what it meant.

Page 27

1     Q.  Okay.  Then the last paragraph says, "This has
2  been a 'semi' practice for some time, and I have only
3  started notating the accounts in my que the last few
4  months."  Does that refer to all the practices in the
5  memo, do you know, or just the last one you talked about
6  which dealt with the hold check request?
7     A.  I don't think that was all the practice.  I'd
8  have to look at the memo and read it.
9     Q.  Okay.  Well, let me run through it again for
10  you.
11        The first sentence just says, "Per your
12  request, the following is a summary of the phone
13  conversation with Ted Fox."
14        The second paragraph, it says -- for
15  each one of these, maybe you can tell me, as we go
16  through them, was this the semi practice for some time or
17  not.  It says, "In conversations with debtors requesting
18  a check not be deposited have resulted in the check not
19  being pulled per manager direction."
20    A.  Was that a semi practice?
21    Q.  Yes.
22        Was that a semi practice for some time
23  when you wrote this memo?
24    A.  It had been occurring.  I can't say as to how

Page 28

1  long that time was at this point.
2     Q.  Okay.  Did you know at the time what you meant
3  by "for some time"?
4     A.  Well, certainly.
5     Q.  Okay.  You don't recall how long it was at
6  this point in time, though.  Is that right?
7     A.  It was not years, but it was not days.  I
8  can't recall exactly, no.  I'm sorry.
9     Q.  Okay.  Was it a matter of several months, do
10  you know, or weeks?  Can you pinpoint it at all?
11    A.  As I indicated, no, I can't at this point.
12    Q.  Okay.  What did you mean by "semi" practice?
13    A.  It was at the discretion of the manager.
14    Q.  Okay.  Going to the next paragraph, it says,
15  "Checks that have been returned NSF have been directed to
16  be 'put back on.'  Attempts to contact the debtor have
17  and have not happened."
18        Do you recall how long that practice was
19  followed at the time that you wrote the memo?
20    A.  I'm sorry.  Please rephrase that.  I'm sorry.
21    Q.  At the time that you wrote the memo -- this is
22  January 21, 2004 -- was this practice that you
23  mentioned -- and I'll read to you again -- how long was
24  this practice going on?  Here's what the statement is.

Page 29

1  "Checks that have been returned NSF have been directed to
2  be 'put back on.'  Attempts to contact the debtor have
3  and have not happened."
4     A.  The practice I can't say exactly how long, but
5  it had been becoming more and more frequent.
6     Q.  Okay.  Was it a matter of several months that
7  it had been happening or a matter of a year?  Do you have
8  any idea at all?
9     A.  I can't give you a good answer on that.  I'm
10  sorry.
11    Q.  Okay.  Then the next one is: "We, as a group,
12  have at times been told 'no checks are being pulled,'
13  which led to no attempt to pull or change check dates
14  knowing they would possibly be returned."
15        Can you tell me how long that practice
16  had been going on at the time you wrote the memo?
17    A.  Again, I can't be definitive on that.  I'm
18  sorry.
19    Q.  Okay.  I'm not asking to be definitive.
20        Can you give me any idea at all
21  ballpark?  Was it months?  Years?  Days?  If you can.
22  I'm not asking you to speculate.
23    A.  I would say months.
24    Q.  Okay.  When you wrote this memorandum which

Page 38

1    Q. Okay. I'm talking about the resubmission of
2  checks for deposit, an NSF check. I think we've
3  established that you filled out a form to do that. That
4  was submitted to the manager. Then the manager had the
5  check resubmitted. Correct?
6    A. Correct.
7    Q. Okay. Did Valerie Hue ever ask you to submit
8  an NSF check for payment?
9    A. There -- yes. Actually, yes. In a sense,
10 yes, because checks had been put back through.
11   Q. Okay. Well, can you explain what you mean by
12 that?
13   A. I've got a form to fill -- like I said, the
14 forms weren't always used. I have a check that I
15 verified. I want to put the check back through. I
16 verified the money is there. The debtor has already
17 verified it. I filled out a form, and I gave it to
18 Valerie Hue and/or Kim or whoever the manager was. But I
19 gave it to Valerie Hue. And that form would be
20 submitted. And the redipping, as we called it, was done.
21 There were checks that were a problem where -- were put
22 back on.
23         Now, did -- was Valerie asking me to
24 fill out a form and resubmit it instead of my asking her

Page 39

1  to do it? I can't remember if that happened or not. I'm
2  sorry.
3    Q. Okay. Well, what I'm trying to get at is:
4  What did Valerie Hue instruct you to do, if anything at
5  all, that you believe was a violation of the resubmission
6  of NSF check policy?
7    A. To basically do nothing on checks that I knew
8  were no good that I wanted to pull.
9    Q. Okay. So it had to do with checks that you
10 believed were not going to be good. Isn't that something
11 different than the resubmission of an NSF check?
12   A. Correct.
13   Q. Okay. I'm not asking about that. We haven't
14 talked about sandbagging and that whole issue. What
15 we've talked about is -- and what I'd like to know about
16 is whether Valerie Hue ever instructed you to violate the
17 policy regarding the resubmission of NSF checks for
18 payment.
19   A. I can't say yes or no. I'm sorry. I can't
20 recall.
21   Q. Okay. I want to refer back to the exhibit
22 again and read this sentence to you: "Checks that had
23 been returned NSF have been directed to be 'put back on.'
24 Attempts to contact the debtor have and have not

Page 40

1  happened."
2         Does that refresh your recollection
3  about anything that Valerie Hue told you to do that
4  violated the policy regarding resubmission of NSF checks
5  for payment?
6    A. Well, yes, it does. And that was on my mind.
7  However, I don't have a good recollection of that. I
8  can't state whether I -- the precise issues about that or
9  not. I remember something about that happening, but I
10 can't give you direct information on it. I can't recall
11 that. I'm sorry.
12   Q. Okay. Again, the way I understand this is
13 that the request for redipping the check came from the
14 collector, but it was actually the manager that approved
15 it. I understand through another deposition someone else
16 actually sent the approved request onto another office
17 where the check actually was redipped.
18         What I'm trying to get at here is: It
19 says that checks had been directed to be put back on.
20 But it wouldn't have been you that resubmitted a check.
21 It would only be you that attempted to do the
22 verification. Correct? That was your role in it -- to
23 attempt to do the verification and then submit the form.
24 Then the manager would decide.

Page 41

1         Is all that correct?
2    A. I believe so.
3    Q. Okay. So when you say in your statement
4  checks had been directed to be put back on, can you
5  explain what you mean by that vis-a-vis anything that
6  Valerie Hue might have told you that was improper?
7    A. I mean -- you're referring to NSF checks.
8  Correct?
9    Q. Yes.
10   A. I can't recall. I'm sorry.
11   Q. Okay. I'm really not asking you to recall at
12 this point. I'm just asking if you can tell me what your
13 understanding of this is -- why you would be saying that
14 she directed you to put the checks back on.
15         MS. FITE: Object to form. If we're
16 going to keep talking about the document, maybe we should
17 fax over a copy to the witness, especially if we're not
18 going to read it verbatim.
19         MR. HOMER: Well, I'll read it verbatim.
20 BY MR. HOMER:
21   Q. It says, "Checks that have been returned NSF
22 have been directed to be 'put on back.'"
23   A. When I wrote that, I knew what I was talking
24 about. I'm not saying I don't know. I don't recall.

Page 42

1  I'm sorry.
2      Q.  Okay.
3      A.  When I wrote that, I have to assume that I was
4  instructed to put checks back on.
5      Q.  I understand you may not recall all the detail
6  about it. But do you have an understanding now of how
7  Valerie Hue was directing you to put the check on when in
8  fact she was the one that had to approve the check?
9          MS. FITE: Object to form. It's a
10 mischaracterization. "Have been directed to be put back
11 on" doesn't mean that she directed him to put them back
12 on.
13         MR. HOMER: Okay. Well, let's clear
14 that up.
15 BY MR. HOMER:
16     Q.  Does this statement refer to something that
17 Valerie Hue told you to do to put the checks back on?
18     A.  The statement -- read the statement again.
19 I'm sorry.
20     Q.  It says, "Checks that have been returned NSF
21 have been directed to be 'put back on.'" Were you saying
22 in that statement that Valerie Hue told you to put the
23 checks back on?
24     A.  Based on the statement, I can't recollect.

Page 43

1  But based on the statement, Valerie Hue would have been
2  the one to tell me. She would have been the only one
3  authorized.
4      Q.  Okay. So if she told you to put the checks
5  back on, what's your understanding now of what that means
6  given the fact that she was the one that actually
7  approved the resubmission of the checks?
8          MS. FITE: Object to form. He's already
9  said he doesn't recollect.
10         MR. HOMER: I'm not asking for
11 recollection. I'm just asking if he has any
12 understanding of what that might mean.
13         THE WITNESS: What it might mean?
14 Repeat that again.
15 BY MR. HOMER:
16     Q.  It says that checks that have been returned
17 NSF have been directed to be put back on.
18     A.  Okay.
19     Q.  What was it regarding that that Valerie Hue
20 said to you that you believe was improper if she did say
21 something you believe to be improper?
22     A.  You want to know what I believed to be
23 improper about that?
24     Q.  Yes.

Page 44

1          What did she instruct you to do that you
2  felt was improper as it relates to this direction to be
3  "put back on"?
4      A.  I can speculate. That's all I can do. And
5  I'm not sure that's what you want me to do.
6      Q.  Well, did she ever tell you to fill out a form
7  and put false information in the form?
8      A.  No.
9      Q.  Pardon?
10     A.  No.
11     Q.  Was there anything that she directed you to do
12 that you believe was a violation of the policy regarding
13 the resubmission of NSF checks for payment?
14     A.  You're asking if there's anything that she
15 directed me to do. I had no control on NSFs being put
16 back in. I would verify them and request it. As far as
17 that, I had no control of handling how they went from
18 there. That was her handling. She handled that.
19     Q.  So is the answer no to the question?
20     A.  Is the answer -- read the question again. I
21 want to make sure I'm giving you the right answer. I'm
22 sorry.
23         MR. HOMER: Okay. The court reporter is
24 going to read back the question.

Page 45

1          THE WITNESS: Okay.
2          (The reporter read the requested
3  portion.)
4          MR. HOMER: "She" referring to Valerie
5  Hue.
6          THE WITNESS: Okay. Was there anything
7  she asked me to do that I considered to be a violation of
8  the policy? No. Because I didn't do anything --
9          MR. HOMER: Okay.
10         THE WITNESS: -- of NSF checks.
11 BY MR. HOMER:
12     Q.  Okay. Mr. McQuisten, during your time in the
13 Dover office, were you ever disciplined for any issue?
14     A.  Well, I guess.
15     Q.  Do you recall what the discipline was for?
16     A.  Oh, boy. Failure to record -- failure to
17 identify nonrecorded line. Gosh, I don't know. I can't
18 think beyond -- I'm sure there's probably something else.
19 I don't know if it was — something along those lines.
20 Compliance violation, maybe.
21     Q.  Okay. Was Valerie Hue the one that imposed
22 the discipline?
23     A.  I can't remember if it was her or someone
24 else.

Case 1:05-cv-00225-KAJ    Document 84-3    Filed 05/16/2006    Page 27 of 30

Hue  vs.  NCO Financial Systems                          3/16/06 - Kathy Obenshain

## Page 1

```
                    IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT DELAWARE


         VALERIE HUE,                )
                                     )
                     Plaintiff,      )  CIVIL ACTION FILE
                                     )
             vs.                     )  NO.  05-225-KAJ
                                     )
         NCO FINANCIAL SYSTEMS, INC.,)
         A Delaware corporation,     )
         trading as NCO FINANCIAL    )
         COMMERCIAL SERVICES,        )
                                     )
                     Defendant.      )
                                     )
```

              Deposition of KATHY OBENSHAIN, taken on
         behalf of the Plaintiff, pursuant to the
         stipulations contained herein, in accordance with
         the Federal Rules of Civil Procedure, before G.
         Paige Alexander, Certified Court Reporter, at 56
         Perimeter Center East, Suite 100, Atlanta,
         Georgia, on the 16th day of March, 2006,
         commencing at the hour of 10:45 a.m.

                          * * *


                     D'AMICO GERSHWIN, INC.
                     Certified Court Reporters
                        11475 West Road
                     Roswell, Georgia  30075
                        (770) 645-6111

## Page 2

```
 1            INDEX TO EXHIBITS
 2
 3   Plaintiff's   Description      Marked/First
      Exhibit                       Identified
 4
 5   1   Email from Kathy Obenshain to      183
         Valerie Hue, dated 9-24-02, 2 pages
 6
     2   Memorandum from Phil Weaver to     185
 7       All Managers, dated 10-25-02, 1 page
 8   3   Email from Kathy Obenshain to      186
         Commercial ops managers, et al,
 9       dated 1-30-04, 2 pages
10   4   Email from Phil Weaver to          192
         Commercial ops managers, dated 3-05-03,
11       2 pages
12   5   Memorandum to Kathy Obenshain from  194
         Brian Laiche, dated 7-15-03, 1 page
13
14   6   Email from Kathy Obenshain to      196
         Brian Laiche, et al, dated 8-20-03,
         1 page
15
     7   Memorandum to All Collectors from  198
16       Mike Scher, dated 8-07-03, 1 page
17   8   Email from Kathy Obenshain to      199
         Dina Loft, dated 1-19-04, 1 page
18
     9   Memorandum to Dina Loft, et al,    206
19       from Kathy Obenshain, dated 1-22-04,
         1 page
20
     10  Memorandum to All Collectors from  207
21       Steve Hallam, dated 1-20-04, 1 page
22   11  Position Statement, Bates numbered  211
         000080 through 000121, 43 pages
23
24   12  Email from Kathy Obenshain to      232
         Dina Loft, dated 1-19-04, 1 page
25
```

## Page 3

```
 1   13  Memorandum to Dave McQuisten from      235
         Valerie Hue, dated 1-12-04, 1 page
 2
     14  Memorandum regarding 59 Checks/Redips, 238
 3       1 page
 4   15  Report, 10 pages                   242
 5   16  Composite exhibit, 41 pages        244
 6   17  January 2004 Dina Loft             270
         Policy Violations, 3 pages
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20        I N D E X   T O   E X A M I N A T I O N
21
22   Examination by Mr. Homer              5
23   Examination by Mr. Israel             272
24   Re-examination by Mr. Homer           280
25   Re-examination by Mr. Israel          283
```

## Page 4

```
 1   APPEARANCES OF COUNSEL:
 2
 3   On behalf of the Plaintiff:
 4     JEREMY W. HOMER
       Attorney at Law
 5     Parkowski, Guerke & Swayze, P.A.
       116 W. Water Street
 6     P. O. Box 598
       Dover, Delaware 19903-0598
 7     Tel: (302) 678-3262
       Fax: (302) 678-9415
 8     email: jhomer@pgslegal.com
 9
10   On behalf of the Defendant:
11     DAVID ISRAEL
       Attorney at Law
12     Sessions Fishman & Nathan, LLP
       Lakeway Two, Suite 1240
13     3850 North Causeway Boulevard
       Metairie, Louisiana 70002-1752
14     Tel: (504) 828-3700
       Fax: (504) 828-3737
15     email: disreal@sessions-law.com
16
17               - - -
18
19
20       (Pursuant to Article 8.B of the Rules &
21   Regulations of the Board of Court Reporting of
22   the Judicial Council of Georgia, a disclosure
23   form was submitted to all parties/counsel for
24   signature and attachment to the original
25   transcript in this matter.)
```

B-357

1 (Pages 1 to 4)

## Page 13

1    A    -- you're interested in specifically?
2    Q    I am interested in that, yes.
3        MR. ISRAEL:  If you want to.  I don't think
4    that --
5    A    Sure.
6  BY MR. HOMER:
7    Q    In your severance agreement, did you make any
8  promises to cooperate if there were any issues that arose
9  about your work while you were at NCO?
10    A    You are asking me if at the time I left that
11  I signed any agreements stating --
12    Q    No, it doesn't have to be a signed agreement.
13        Was there some understanding when you left
14  the company that if some issue came up that involved
15  something that you were involved with while you were with
16  NCO, that you would cooperate with the company in dealing
17  with the issues?
18    A    Was I asked if I would cooperate with the
19  company if any issues came up after my employment.
20    Q    Yes.
21    A    Is that what you are asking me?
22    Q    Right.
23    A    Yes.
24    Q    Did you enter an agreement -- did you agree
25  that you would cooperate?

## Page 14

1    A    I think I've already answered that.
2    Q    No.  I haven't heard the answer.
3        Could you answer it now.
4    A    Are you asking me if I signed a written
5  agreement or was --
6    Q    No.
7    A    -- there discussion concerning it?
8        MR. ISRAEL:  He's asking, whether it's
9        written or oral, was there an understanding that
10        if you were called upon relating to something
11        that related to your working at NCO, would you be
12        available.
13    A    Would I be available?
14        MR. ISRAEL:  Is that fair?
15        MR. HOMER:  Yes.
16    A    If I'm not mistaken, that's part of the
17  confidentiality agreement, that I not discuss the terms of
18  the agreement.
19        MR. ISRAEL:  Let me say it this way to save
20        time.
21        If you can remember whether or not, that's
22        okay.  If you can remember whether was a term or
23        condition, then I think it's okay to tell him
24        that.
25    A    If I can remember whether it was a term or

## Page 15

1  condition.
2        MR. ISRAEL:  He's got the right to explore
3        whether you have any bias.  That's what he's
4        looking for.
5        THE WITNESS:  All right.
6    A    Yes, I did agree if anything came -- that if
7  something came up about the period of time when I was
8  working with NCO, would I be willing to come forward with
9  answers or -- and handle any concerns.
10  BY MR. HOMER:
11    Q    Was that put in writing, that agreement?
12    A    Was that put in writing in the agreement; as
13  I recall, yes.  But I don't have the agreement so. . .
14    Q    NCO would have the agreement.  Is that fair
15  to say?
16        Would NCO have the agreement?
17    Q    You don't know probably.
18    A    Yeah.
19    Q    We will follow up on that.
20    A    I presume they do.
21    Q    Could you tell me what positions you held
22  while you worked for Millican & Michaels and NCO.
23    A    What positions I held while I worked there;
24  starting with the time it was Millican & Michaels, I was a
25  collector.  I was a mid-balance manager.  I was also a

## Page 16

1  client-specific manager.  I was --
2        MR. ISRAEL:  On the collections side?
3        THE WITNESS:  On the collections side,
4        correct.
5    A    Client-specific manager, managing collectors;
6  specifically, we had one client.  I was a general
7  collection manager.
8  BY MR. HOMER:
9    Q    How long were you a general collection
10  manager?
11    A    A general collection manager, at least -- oh,
12  I'm bad with dates, but I think at least two years.
13    Q    Were you in Metairie at that time?
14    A    Was I in Metairie; yes.
15    Q    What were the dates, do you remember
16  approximately?
17    A    I am very -- you are asking me for the dates?
18    Q    If you know.
19    A    I'll be honest with you, I --
20    Q    I don't need exact dates, but just roughly --
21    A    I would say for approximately '90 through --
22  oh, wait; I take that back.  Sorry.  2002 -- no; 2000 to
23  2002.
24    Q    Okay.
25    A    Uh-huh.

13-358

**Hue vs. NCO Financial Systems**                                    **3/16/06 - Kathy Obenshain**

---

Page 17

1    Q    What other positions did you hold with NCO?
2    A    What other positions did I hold with NCO;
3  from that position, I was moved to the vice president of
4  collections for the division.
5    Q    Was that the commercial division?
6    A    Commercial division, correct.
7    Q    What was the time period that you held that
8  position?
9    A    From -- the period that I held that position
10  would have been from 2002 to 2004.
11    Q    That was the last position you had with NCO?
12    A    That was the last position I had with NCO,
13  correct.
14    Q    During the course of your employment, have
15  you ever received any education or training regarding laws
16  that dealt with discrimination?
17    A    Have I personally ever received any training
18  about the laws that dealt with discrimination while I was
19  at NCO?
20    Q    Yes.
21    A    Yes.
22    Q    Can you describe what training you received?
23    A    What training did I receive; I received
24  training specifically from our compliance department,
25  headed by Dave Israel, Dave Israel's office; additional

Page 18

1  training that we received was from the HR department of
2  NCO.
3    Q    Can you give me some sense of how many hours
4  of training you received.
5    A    How many hours of training I received; I
6  would say equivalent to at least four days.
7    Q    Was that over the ten-year period you worked
8  or --
9    A    Minimum, minimum. I mean, if you are talking
10  about -- if -- you are talking about specific hours spent
11  training in a -- in an environment like this, or what are
12  you asking? Or just ongoing discussions concerning --
13    Q    I was really trying to find out if this four
14  days' worth of training you took place over a ten-year
15  period, or did it take place over a shorter time period?
16    A    Over a ten-year period or a shorter time
17  period; probably a shorter time period.
18        We were consistently having discussions and
19  conference calls with our compliance department, with our
20  division heads about anything that went on with regard to
21  human resources.
22    Q    Can you tell me what you did to prepare for
23  today's deposition.
24    A    What did I do to prepare for today's
25  deposition? What specifically are you wanting to know?

Page 19

1    Q    Did you review documents? Did you discuss
2  the deposition with Mr. Israel? Did you do anything else
3  to get ready for the deposition?
4    A    Did I discuss with Mr. Israel -- did I have a
5  discussion with Mr. Israel; yes, okay.
6    Q    When was that discussion?
7    A    When was the discussion I had with Dave
8  Israel; yesterday.
9    Q    Did you have more than one discussion with
10  him about it?
11    A    Did I have more than one discussion with Dave
12  Israel; the additional discussions that I've had with Dave
13  Israel were regarding the timing of when and where --
14    Q    So you had just --
15    A    -- and how.
16    Q    So you just had one discussion about the
17  substance of the deposition, which was yesterday?
18    A    I only had one discussion with Dave, as best
19  as I recall. I mean, we talked about when we were setting
20  up the deposition, you know, the approximation of how many
21  hours it would take, details like that.
22    Q    How many hours did you discuss the deposition
23  yesterday with Mr. Israel?
24    A    How many hours did he we discuss the
25  deposition might be; well, let's see, Dave said something

Page 20

1  to the effect -- I said, a late plane flight out. That's
2  all.
3    Q    No, but can you tell me -- did you discuss
4  with Mr. Israel the subjects that could come up during the
5  deposition today?
6    A    Did I discuss with Mr. Israel the subjects --
7        MR. ISRAEL: Let's take it question by
8        question --
9    A    Yes.
10        MR. ISRAEL: -- because I don't want to
11        breach privilege.
12        But you can tell him did we discuss
13        subjects. You can go ahead and tell him that.
14    A    Yes, we discussed subjects.
15  BY MR. HOMER:
16    Q    How much time did you spend discussing the
17  subjects?
18    A    How much time did --
19        MR. ISRAEL: You can answer that.
20    A    How much time; let's see, well, we were
21  together a couple of hours last night, but a lot of that
22  was social time having dinner. So I would say probably
23  less than -- less than a half hour discussing this matter.
24        We also spent time this morning. We got
25  together at 8:30. That's not the only thing we've been

13-359

5 (Pages 17 to 20)

Case 1:05-cv-00225-KAJ    Document 84-3    Filed 05/16/2006    Page 30 of 30

Hue vs. NCO Financial Systems                          3/16/06 - Kathy Obenshain

Page 21

1  doing since then. So maybe another -- maybe another hour,
2  hour and a half max.
3  BY MR. HOMER:
4      Q    Okay.
5      A    Maybe.
6      Q    Did you review any documents in preparation
7  for the deposition?
8      A    Did I review any documents; yes.
9      Q    Which documents did you look at?
10     A    Which documents did I specifically look at;
11 those are the documents.
12     Q    You have a stack of documents over there --
13     A    Uh-huh.
14     Q    -- about 2 inches thick?
15     A    Right.
16     Q    How much time did it take you to go through
17 those documents?
18     A    How much time did it take me to go through
19 the documents; well, not very long, maybe two hours.
20     Q    What is your current job?
21     A    What is my current position here? Is that
22 what you want to know, here?
23     Q    Yes.
24     A    I am the sales manager at C2C Resources.
25     Q    What does that company do?

Page 22

1      A    What does C2C Resources do; C2C Resources is
2  a commercial collection company.
3      Q    I understand that you -- or NCO plans to have
4  you attend the trial in this case if there is a trial. Is
5  that your understanding?
6      A    NCO plans on having me attend the trial?
7      Q    Yes.
8           MR. ISRAEL: What is the basis of that
9      understanding?
10          MR. HOMER: You told me that.
11          MR. ISRAEL: No, I didn't.
12          MR. HOMER: Either you did or Elizabeth.
13          MR. ISRAEL: I don't believe, but I don't
14     know.
15          We haven't discussed that.
16          You don't have to discuss that with him.
17 BY MR. HOMER:
18     Q    Right now you are not aware that you might be
19 going to a trial in the case?
20     A    No.
21     Q    Well, I didn't ask that question correctly.
22          Are you aware that you may be going to trial
23 in this case?
24     A    Am I aware that I may be going to the trial
25 in this case?

Page 23

1      Q    Let me just start over.
2           You haven't had any discussions with NCO
3  about possibly testifying at the trial in this case. Is
4  that a true statement?
5      A    Have I --
6           MR. ISRAEL: Wait; wait. You don't have to
7      discuss what you've discussed with me or what
8      you've discussed with Elizabeth.
9           THE WITNESS: Okay.
10          MR. ISRAEL: So if you've discussed
11     something like that with someone from NCO, feel
12     free to talk about it.
13 BY MR. HOMER:
14     Q    Can you explain why it is that -- I know you
15 have this agreement. Is there any other reason why you
16 are cooperating with NCO in connection with this matter?
17     A    Why would I be cooperating with NCO on this
18 matter?
19     Q    Yes.
20          MR. ISRAEL: We haven't confirmed that
21     she's cooperating with NCO.
22          MR. HOMER: Well, she said she's spent
23     hours looking at documents; she's met with you;
24     she's here today.
25          MR. ISRAEL: Well, you subpoenaed her.

Page 24

1      A    Right. And I -- okay.
2  BY MR. HOMER:
3      Q    Let me ask the question: Are you cooperating
4  with NCO in this lawsuit?
5      A    Am I cooperating with NCO in the lawsuit; I'm
6  giving testimony that -- information -- questions asked
7  about a specific wrongdoing while I was in the position of
8  responsibility.
9      Q    Well, I know, but could you answer the
10 question? Do you believe you are cooperating with NCO in
11 connection with --
12     A    Do I believe I'm cooperating --
13     Q    -- this --
14     A    -- with NCO in connection --
15     Q    Let me finish -- in connection with this
16 litigation?
17     A    Do I believe I'm cooperating with NCO; I'm
18 giving facts concerning Valerie Hue's action at NCO. You
19 asked me to give you that information. That's why you
20 asked me here today, and, indeed, I feel very strongly
21 about what was done.
22     Q    You understand you weren't required to review
23 the documents; you weren't required to meet with
24 Mr. Israel; correct?
25     A    Do I understand I wasn't required to review

B-360

6 (Pages 21 to 24)