Case 1:05-cv-00225-KAJ    Document 84-4    Filed 05/16/2006    Page 1 of 40

Hue vs. NCO Financial Systems                           3/16/06 - Kathy Obenshain

Page 25

1  documents or meet with Mr. Israel; did I understand that?
2  Q    Yes.
3  A    Well, sure.
4  Q    Why did you elect to do that?
5  A    Why did I elect to meet with Mr. Israel?
6  Q    Yes, and review the documents.
7  A    Why did I agree to meet with Mr. Israel;
8  well, number one, I've been an associate and a friend of
9  Mr. Israel's for a number of years. I've known him since
10  I first came to this company. I happen to enjoy his
11  company. I happen to respect him immensely. And in that
12  you are going to be asking me specific information, I
13  wanted to see the documents that you were going to,
14  perhaps, ask me about.
15  Q    Okay.
16  A    I wouldn't want to be sitting here
17  unprepared.
18  Q    Do you have any current relationship -- and I
19  mean business relationship -- with the defendant in this
20  case, NCO?
21  A    Do I have any specific business relationship;
22  in what regard?
23  Q    Do you do any business with NCO in any way?
24  A    Do I do any business with NCO in any way; as
25  in what --

Page 26

1          MR. ISRAEL: Like, are you competitors? Do
2      you get work from NCO? That's the question.
3  A    Oh, am I a competitor; yes, I am a
4  competitor. Do I get work from NCO; no.
5  BY MR. HOMER:
6  Q    Any other way you do any other kind of
7  business with them?
8  A    Do I do any other business with them?
9  Q    For example, would they send clients to you?
10  Would you send clients to them?
11  A    Would they send clients to me or me send
12  clients to them; I don't think so.
13  Q    Okay.
14  A    Not in this lifetime.
15  Q    You've already indicated that Mr. Israel is a
16  friend of yours.
17  A    Uh-huh.
18  Q    Are there any employees of NCO that are
19  friends of yours?
20  A    Are there any employees at NCO that are
21  friends of mine; are you speaking of, like, friends as in
22  past experiences or present, I mean?
23  Q    Well, anybody that -- let's do that one
24  first.
25          People at NCO, are you still friends with any

Page 27

1  of them, at the present --
2  A    Am I still friends with any of the people
3  that still work at NCO; yes.
4  Q    Which people are they?
5  A    Which people are they; I'm not sure I can
6  name all of them.
7          MR. ISRAEL: I'll make an objection of
8      relevance.
9          But go ahead and answer.
10  A    Yeah, I don't think I can name all of them,
11  but I'll try.
12  BY MR. HOMER:
13  Q    Are you still friends with Cherie Sugg?
14  A    Was I a friend of Cherie Sugg?
15  Q    Yes.
16  A    No.
17  Q    Are you a friend of Phil Weaver?
18  A    Am I a friend of Phil Weaver; yes.
19  Q    Do you have any contact with him now?
20  A    Do I have contact with Phil Weaver?
21  Q    Yes.
22  A    Yes.
23  Q    How often do you do that?
24  A    How often do I do that; about once every
25  couple of months when I am home in Louisiana.

Page 28

1  Q    He lives in Louisiana, and you lived in
2  Louisiana?
3  A    I am -- you are asking me, he lives in
4  Louisiana and where do I live?
5  Q    Right.
6  A    I'm spending part of my time here, working
7  here, and I also have a residence in Louisiana.
8  Q    How frequently do you have contact with
9  Mr. Weaver?
10  A    How frequently do I have contact; I think I
11  already answered that.
12  Q    Well, you said you --
13  A    I think I answered that and said every couple
14  of months. I don't see him every time I am home.
15  Q    Did you discuss with him his deposition in
16  this case?
17  A    Did I discuss with him his deposition; I
18  called him; I asked him, How long was your day.
19  Q    Anything else that you talked with him about
20  it?
21  A    Anything else that I talked with him about
22  it; no.
23  Q    Did he tell you anything about his
24  deposition?
25  A    Did he tell me anything about his deposition;

Case 1:05-cv-00225-KAJ    Document 84-4    Filed 05/16/2006    Page 2 of 40

Hue  vs.  NCO Financial Systems                                    3/16/06 - Kathy Obenshain

## Page 33

1    A    They called it -- it's called outsourcing. I
2  don't exactly know how it works. I mean, specific
3  clients, from my understanding -- and that I was not
4  directly involved in it -- would outsource their
5  receivables to them to handle on a first-party basis.
6    Q    Who would outsource this business --
7    A    I don't know who they are, because I was not
8  involved in it. It's my understanding that is the
9  additional business that they conduct.
10   Q    Did they have that business when you were
11  there?
12   A    Did they have the business when I was there;
13  well, it was not part of my division, so it was not under
14  my purview, so, therefore, I don't know the details.
15   Q    Do you know approximately how many employees
16  NCO had when you were there?
17   A    Do I know how many employees NCO had; not
18  really.
19   Q    I don't want an exact number, obviously, but
20  was it 100, 1,000, 10,000?
21   A    No; 100,000, no, I don't think so; maybe 3 to
22  4,000. I could be wrong.
23   Q    Okay.
24   A    Probably am wrong, because I just don't know.
25   Q    Do you know how many employees there were in

## Page 34

1  the commercial collection division?
2    A    How many employees were in the commercial
3  collection division --
4    Q    And I'm talking about in January 2004.
5    A    Are you talking altogether, both collectors
6  and salespeople?
7    Q    Yes.
8    A    And admins and et cetera, geez, 3 to 400,
9  somewhere in that range.
10   Q    How many different cities were -- did the
11  commercial collection division operate in January of 2004?
12   A    In January 2004, you want to know how many
13  different cities we operated in, the commercial division.
14        We had an office in Portland. We had an
15  office in Tucson, Arizona. We had an office in Metairie,
16  Louisiana, an office in Atlanta, Georgia; an office in
17  Tampa; an office in Dover, Delaware; and an office in
18  Baltimore.
19   Q    Is that Portland, Maine or Portland, Oregon?
20   A    Oregon.
21        Let me -- you are talking about strictly
22  collections?
23   Q    Right.
24   A    Okay.
25   Q    Did NCO --

## Page 35

1        MR. ISRAEL: He was asking strictly
2  commercial?
3    A    Yeah.
4  BY MR. HOMER:
5    Q    Right. Yeah. Were there other offices that
6  NCO had that weren't for commercial collections?
7    A    Were there other offices that NCO had that
8  were not for commercial collections; as far as I know,
9  yes.
10   Q    How many of those were there?
11   A    I -- you are asking me if I know how many
12  there were that NCO had?
13   Q    Yes, if you know.
14   A    I don't know.
15   Q    Could you describe for me what your job
16  duties were when you were the vice president of the
17  collections division in --
18   A    What my responsibilities were, what my job
19  duties were?
20   Q    Right.
21   A    My primary responsibility, or my job duties
22  at NCO as the -- in that position were to manage the
23  collections staff for the division under the guise of my
24  immediate boss, who was Phil Weaver, under his direction.
25   Q    How long was Phil Weaver your boss?

## Page 36

1    A    In what capacity? I mean, he was -- are you
2  asking me in this position or --
3    Q    Yeah. While --
4    A    When I was in this position?
5    Q    While you were the vice president of the
6  collection division, how long was Phil Weaver your boss at
7  that time?
8    A    How long was Phil Weaver my boss; almost the
9  entire time, save for a month or two.
10   Q    Was Ted Fox -- did Ted Fox succeed Phil
11  Weaver as your boss?
12   A    Did Ted Fox succeed; yes.
13   Q    When did he do that?
14   A    When did Ted Fox succeed Phil; that was in
15  December of 2003.
16   Q    What was Ted Fox's position before he became
17  your boss?
18   A    Ted Fox's position before he became my boss;
19  Ted Fox was my counterpart, responsible for the sales side
20  of the business.
21   Q    What was his title when he became your boss?
22   A    When he came my boss, what was Ted's title?
23   Q    If you remember.
24   A    Senior vice president of operations for the
25  commercial division, something in that.

Case 1:05-cv-00225-KAJ    Document 84-4    Filed 05/16/2006    Page 3 of 40

Hue  vs.  NCO Financial Systems                                    3/16/06 - Kathy Obenshain

## Page 37

1    Q      How frequently did you have interaction with
2  Mr. Fox when he became -- after he became your boss?
3      A      How frequently did I have interaction with
4  Ted Fox when he became my boss; daily.  His office was
5  directly next to mine.
6      Q      Do you know who Cherie Sugg is?
7      A      Do I know who Cherie Sugg is; yes.
8      Q      Who is she?
9      A      I don't know -- who is she?  I don't know
10  what her current title is, but she was in human resources.
11      Q      Was she the head of human resources for NCO
12  while you were there?
13      A      Was she the head of human resources; I
14  believe she answered to -- and I can't remember his name.
15  I don't remember the name of the person that she answered
16  to, but I presume -- I just can't remember his name.  I
17  don't remember his name.
18      Q      Did you have interaction with Cherie Sugg
19  when you worked with NCO?  And by that I mean interaction
20  with respect to performing your job duties.
21      A      Did I have interaction with her?
22      Q      Not about personal interaction, but something
23  to do with business.
24      A      Did I have interaction with her having to do
25  with business; yes.

## Page 38

1      Q      Can you describe what the nature of that was.
2      A      What would the nature of that interaction be;
3  at any time if we had any concerns or questions about
4  human resource issues, we were certainly able to pick up
5  the phone and ask for her direction and guidance.
6      Q      Do you know who Mike Scher is?
7      A      Do I know who Mike Scher is; yes.
8      Q      Was he the general manager of the Dover
9  office while you were at NCO?
10      A      Was he the general manager of the Dover
11  office; yes, he was.
12      Q      Do you know what his job duties were as
13  general manager of the Dover office?
14      A      Do I know what his job duties were as general
15  manager; well, he was certainly responsible for the sales
16  production in that office and the daily operations in that
17  particular branch.
18      Q      That would include the collection --
19  commercial collections?
20      A      That would include the commercial
21  collections, you are asking me?
22      Q      Yes.
23      A      To a degree.  The individual GCM also
24  reported directly to me.
25      Q      So the GCM, that's the general collection

## Page 39

1  manager?
2      A      General collection manager, correct.
3      Q      That's the position that Valerie Hue held?
4      A      That's the position that Valerie Hue held;
5  yes.
6      Q      So she would report both to Mike Scher and
7  you --
8      A      Report to both of us, yes, uh-huh.
9      Q      Did you visit the Dover office?
10      A      Did I visit the Dover office; yes.
11      Q      How often did you do that?
12      A      How often did I do that.
13      Q      And right now I'm talking strictly about when
14  you were the vice president of the collections division.
15      A      When I was vice president of the collections
16  division, as I recall, I was in the Dover office probably
17  once a quarter.
18      Q      Is that approximately once a quarter, or did
19  you actually every quarter make a point of visiting every
20  quarter?
21      A      You are asking if I made a scheduled
22  appointment to go there every quarter; my answer would be
23  no.  I'm giving you an approximation.
24      Q      Okay.
25      A      My travel schedule was not planned out in

## Page 40

1  that regard.
2      Q      But you averaged maybe a visit every quarter?
3      A      I would say yes.  I would say I averaged
4  about a visit every quarter.
5      Q      How many people worked in that office in the
6  collections division?
7      A      How many people worked in that office in the
8  collection division; maybe -- I would say probably 20; 25,
9  max.
10      Q      I take it you knew each of those individuals?
11      A      Did I know each of the individuals; yes.
12      Q      I take it they knew you?
13      A      You are asking me if they knew me?
14      Q      Yes.
15      A      Who I was, recognized me?
16      Q      Yes.
17      A      Yes.
18      Q      You had meetings with them from time to
19  time --
20      A      Did I have meetings with them when I was
21  there, is that --
22      Q      Yes.
23      A      Training meetings or just in general?
24      Q      Any kind of meetings.
25      A      Yes.

B-363

10 (Pages 37 to 40)

Case 1:05-cv-00225-KAJ    Document 84-4    Filed 05/16/2006    Page 4 of 40

Hue  vs.  NCO Financial Systems                                    3/16/06 - Kathy Obenshain

## Page 41

1   Q      Would you generally have a meeting every time
2   you visited?
3      A      Would I have a meeting every time I visited;
4   yes.
5      Q      Did you have any policy about any employee
6   being able to come to you and tell you anything that they
7   wanted to about anything that was going on at the office?
8      A      Did I have a policy about anybody being able
9   to come to me and tell me anything that was going on at
10  the office?
11     Q      Some people refer to that as an open-door
12  policy.
13     A      Yes.
14     Q      Did that you have policy?
15     A      Yes, I had that policy.
16     Q      Did the employees know it?
17     A      Did the employees know it?
18         MR. ISRAEL: Did the employees know it; you
19     can answer that.
20  BY MR. HOMER:
21     Q      The people that worked for you in the
22  commercial division.
23     A      Yes.
24     Q      Prior to January of 2004, did any employee at
25  the Dover office come to you to tell you anything about

## Page 42

1   something that Valerie Hue may have done wrong?
2      A      Did any --
3         MR. ISRAEL: I'm sorry, I didn't --
4   BY MR. HOMER:
5      Q      Did anybody come to you -- any employee of
6   the Dover office come to you, prior to January 2004, to
7   tell you that -- or inform you in some way that Valerie
8   Hue was doing something that was improper?
9      A      Did anybody come to me specifically telling
10  me that Valerie Hue was doing anything improper; no.
11     Q      Other than your visits to the Dover office,
12  did you communicate with the Dover office by other means,
13  for example, email?
14     A      Did I communicate with Dover via email; yes.
15     Q      And by phone?
16     A      Did I communicate with them by phone; yes.
17     Q      Did you communicate with Valerie Hue by
18  email?
19     A      Did I communicate with Valerie by email; yes.
20     Q      How frequently would you send her emails and
21  would she send you emails?
22     A      How frequently; whenever necessary. I
23  preferred doing business by phone personally.
24     Q      Okay.
25     A      I prefer to pick up the phone.

## Page 43

1      Q      But can you give me an approximation of how
2   many times you would have emailed her or --
3      A      Can I give you an approximation --
4      Q      Yes.
5      A      -- of how many times?
6      Q      Yes.
7      A      No. Honestly, I can't.
8      Q      Would it be in the hundreds or tens or --
9      A      During the period of time -- are you asking
10  me for the entire period of time that she worked for me as
11  a GCM?
12     Q      Yes.
13     A      How many times I emailed her, probably 100.
14     Q      Were you involved in the promotion of Valerie
15  Hue at any point in time?
16     A      Was I involved in the promotion of Valerie
17  Hue; from -- to the GCM, the general collection manager?
18     Q      If you were involved in that. Were you
19  involved in that?
20     A      Yes.
21     Q      What was your involvement?
22     A      What was my involvement in her promotion; I
23  was involved with Phil Weaver in making the decision. I
24  also did the paperwork concerning her promotion.
25     Q      Did you make the decision to promote her?

## Page 44

1      A      Did I make the decision to promote her; Phil
2   and I did that together. We -- that was the general way
3   that we would make decisions about promotions in that
4   division.
5      Q      But Phil Weaver had authority over you;
6   correct?
7      A      Did Phil Weaver have authority over me; yes.
8      Q      Are you saying that you conferred and jointly
9   agreed that she should get a promotion?
10     A      Did we confer and jointly agree that she
11  should get a promotion; absolutely.
12     Q      Were you familiar with her work before she
13  got the promotion?
14     A      Was I familiar with her work; yes.
15     Q      Did you believe she was a good employee?
16     A      Did I believe she was a good employee; from
17  all that I knew, yes.
18     Q      Do you recall disciplining her one time after
19  she got promoted to general collection manager?
20     A      Do I recall disciplining her one time
21  concerning -- concerning what?
22     Q      Anything.
23     A      Do I recall disciplining her in what way?
24     Q      Do you recall her doing something that you
25  thought was improper and giving her a written reprimand

B-364

Case 1:05-cv-00225-KAJ    Document 84-4    Filed 05/16/2006    Page 5 of 40

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

Page 49

1  month.
2      Q       Were these mostly people that were terminated
3  because they couldn't collect enough debt?
4      A       Mostly they were -- you are asking me if they
5  were terminated because they could not collect enough
6  debt?
7      Q       Yes, or was it just a broad range of
8  different reasons?
9      A       Mostly for that reason, but a broad range of
10 other reasons, of various other reasons having to do with
11 compliance.
12     Q       Let's go back to December of 2004.
13         Do you recall that Valerie Hue was terminated
14 and Matt Lane was terminated during that month?
15     A       Do I remember that they were terminated in
16 December of 2004?
17     Q       No, January 2004.
18     A       You said December.
19     Q       I'm sorry?
20     A       Do I recall that they were terminated in --
21 that Matt Lane and Valerie Hue were both terminated in
22 January?
23     Q       Yes.
24     A       I just want to be sure that Matt was term--
25 Matt, he may have been terminated right at the end of

Page 50

1  December; but I think probably yes, the first part of
2  January.
3      Q       Do you recall approximately how many other
4  people were terminated in that month?
5      A       How many other people were terminated in that
6  month; in December of 2004?
7          MR. ISRAEL:  In January.
8  BY MR. HOMER:
9      Q       January 2004.
10     A       In January 2004, do I remember how many
11 people were terminated during January of 2004; no.
12     Q       How about December of 2003?  Would there have
13 been some in that month?  Do you know?
14     A       Were there any in December of 2003; for
15 various production issues, for compliance, I am sure; I am
16 sure.
17     Q       All right.
18     A       As one month would end, we would make
19 decisions.
20     Q       Who was involved in deciding -- making these
21 decisions about terminating these people?  Was it
22 different at different times, or was it always the same
23 group of people that got involved with that?
24     A       Who was involved in making decisions
25 concerning terminations or --

Page 51

1      Q       Right.
2      A       -- how -- well, the termination itself had to
3  follow specific guidelines concerning write-ups,
4  concerning progression of discipline.
5      Q       I'm sorry, I probably asked you a confusing
6  question. I didn't phrase it very well.
7      A       Uh-huh.
8      Q       The question was -- you said that there were
9  a lot of terminations.
10     A       Uh-huh.
11     Q       I'm just trying to get at what process was
12 used to do it, in terms of who was involved in it
13 generally.  For example, was it always yourself, somebody
14 from HR, somebody higher up, somebody lower?  Who would
15 generally be involved, or did it vary, depending on who it
16 was being terminated?
17     A       Who would get involved, or did it vary,
18 depending on who was being terminated; concerning the
19 termination, human resources would always be involved to
20 be certain that all documentation was proper.
21     Q       Okay.
22     A       Okay, I would be involved to make certain
23 that they had gotten -- checked with HR to be sure that
24 everything was in place, generally, the general collection
25 manager or the -- and the immediate manager of that

Page 52

1  person.  If it was a -- if it was going to be a compliance
2  issue, a violation of compliance policies that were in
3  place, that would be Sessions & Fishman.
4      Q       Did you ever -- while you were the vice
5  president of the collection division, were you ever
6  involved in the termination of a general collection
7  manager other than Valerie Hue?
8      A       Was I ever involved in the termination of a
9  general collection manager other than Valerie Hue; oh,
10 let's see, I'm not sure if you call it -- yes, I was.
11     Q       Who was that?
12     A       That would be -- good lord, he was the GCM in
13 Chicago.  I'll be honest with you, I'll telling you right
14 now here, I can't remember his name.
15     Q       Do you remember when it was?
16     A       In the year 2003, earlier 2003.
17     Q       Who was involved in the decision to terminate
18 him?
19     A       Who was involved in the decision to terminate
20 him; I was involved in the decision to terminate him,
21 Michele Przepasniak.  She works for HR.
22     Q       Can you spell her last name.
23     A       P-R-Z-P-O-S-N-I-A-K, Michele Przepasniak.
24     Q       Okay.
25     A       Cherie Sugg, both.  They had a number of

B-365

13 (Pages 49 to 52)

Case 1:05-cv-00225-KAJ    Document 84-4    Filed 05/16/2006    Page 6 of 40

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

## Page 53

1 different counseling sessions with him; Phil Weaver.
2   Q     What was his involvement?
3   A     As my boss.
4   Q     What did he do?
5   A     What did Phil Weaver do; we concurred
6 together as to what action needed to happen, and we
7 involved HR to make sure that --
8   Q     So you consulted with Phil Weaver?
9   A     Consulted with Phil Weaver.
10  Q     What did this general manager do that
11 resulted in his termination?
12  A     What did the general manager do that resulted
13 in his termination; I'd have to go back and look at the
14 records exactly. There was some definite wrongdoing, his
15 conduct with speaking to employees, the manner in which he
16 spoke to employees.
17  Q     Was inappropriate, how he dealt with
18 employees?
19  A     Correct.
20  Q     Can you be a little more specific as to what
21 he did.
22  A     Can I be a little more specific; not to --
23 it's in the records. I'm not trying to skirt it. It's
24 just a question that I don't recall. He was written up
25 for the manner in which he spoke to people.

## Page 54

1   Q     Was he too disrespectful of people? Was
2 that --
3   A     Was he too disrespectful; yes, he was
4 disrespectful. His tone and the use of certain language
5 was inappropriate.
6   Q     Okay.
7   A     And the details are in his -- in his record,
8 if I can remember his name.
9   Q     Do you recall what was done to investigate
10 that problem?
11  A     What was done to investigate the problem;
12 human resources conducted the complete investigation.
13  Q     Okay. Did you get involved in the
14 investigation?
15  A     Did I get involved in the investigation;
16 human resources, when they decided they were going to do
17 an investigation, would conduct the investigation and give
18 you the results.
19  Q     And then --
20  A     And so I get the results.
21  Q     So you didn't personally interview people?
22  A     Did I personally interview people concerning
23 these statements; no.
24  Q     It was just the HR people that did that?
25  A     Was it just the HR people; yes.

## Page 55

1   Q     Do you recall if -- let me put it this way:
2 When Ted Fox became your boss, do you recall how many
3 people were terminated between December and January 2004?
4   A     Do I recall how many people were terminated
5 between December and January?
6   Q     Yes. After he became your boss, do you
7 recall how many people got terminated in that time period?
8   A     Are you asking me as a result of Ted Fox
9 becoming --
10  Q     No, not as a result. But after he became
11 your boss, how many -- if you recall, how many people were
12 terminated in that period, approximately?
13  A     How many people --
14       MR. ISRAEL: One second.
15       In collections?
16       MR. HOMER: Yes.
17 BY MR. HOMER:
18  Q     People that you were involved in the
19 termination with.
20       MR. ISRAEL: That's been asked and
21       answered, but go ahead and tell him if you know.
22  A     For sure Matt and Valerie.
23 BY MR. HOMER:
24  Q     Okay.
25  A     But beyond that, I can't honestly tell you

## Page 56

1 exactly.
2   Q     Do you recall whether Ted Fox did any
3 investigation into the Matt Lane issue? In other words,
4 did he interview people about Matt Lane's -- what Matt
5 Lane did to get fired?
6   A     Did Ted Fox interview people about Matt Lane
7 specifically?
8   Q     Yes, if you know.
9   A     I know he interviewed people in the Dover
10 branch, but I don't know whether he asked them specific
11 questions about Matt Lane; I don't recall.
12  Q     He interviewed people in the Dover branch
13 about Valerie Hue; correct?
14  A     He interviewed people in the Dover branch
15 about Valerie Hue; I can't honestly say if he only asked
16 them questions about Valerie Hue. He asked them questions
17 about procedures and what was going on in the Dover
18 branch.
19  Q     He also asked questions about Valerie Hue; do
20 you recall that?
21  A     Did he ask questions about Valerie Hue;
22 specifically, I wasn't on the phone with him when he did
23 the interviews.
24  Q     So you don't know whether he asked questions
25 about Valerie Hue?

B-366

Page 61

1  Q    Are you familiar with the term redip?
2  A    Am I familiar with the term redip?
3  Q    Yes.
4  A    Yes.  It stands for redeposit.
5  Q    Isn't it spelled R-E-D-I-P, or is it D-E-P?
6  Do you know?
7  A    Is it spelled R-E-D-I-P or R-ED-E-P?
8  Q    I've seen it both ways, but I think more
9  commonly it's --
10  A    Yeah, it's spelled R-E-D-I-P.  Whether that's
11  correct or not, it's just an abbreviation.
12  Q    When you say redeposit, is that term applied
13  when a check is -- had been returned NSF and then you
14  submit it back for payment again?  Is that what a redip
15  is?
16  A    When a check is returned for nonsufficient
17  funds and it's submitted for redeposit, is that what you
18  are asking me?
19        MR. ISRAEL:  Yes.
20  BY MR. HOMER:
21  Q    Yes.
22  A    Yes.
23  Q    So it applies to NSF checks?
24  A    Would it apply to NSF checks; yes.
25  Q    Did NCO have any policies regarding what you

Page 62

1  had to do to redip an NSF check?  I'm talking about
2  December of 2003?
3  A    Are you asking me if we had policies in
4  what --
5  Q    Yes.  Generally, what would you have to do,
6  if there was a policy in order to redip an NSF check in
7  December 2003?
8  A    What was the -- the policy that was in effect
9  during December 2003 in order to redip a check?
10  Q    Yes.  And I'd like you to focus on
11  verification, if you would.  I know there were some --
12  A    Okay.
13  Q    There are various things that got done when
14  you redip.  But what was the policy, if there was one, in
15  December 2003 regarding verification?
16  A    What was the policy concerning verification;
17  right?
18  Q    Of a redip NSF check.
19  A    Okay, of a redeposited check, there was to be
20  a call to the bank to verify whether or not there was
21  sufficient funds to reposit the check.  A question would
22  also be asked of the bank if there was a stop payment on
23  the item.  We would have the item number.  All of these
24  notes concerning that call must be recorded in the record,
25  as all notes in anything that went on with any account

Page 63

1  were to be notated in the record.
2  Q    When you say in the record, are you talking
3  about --
4  A    In the record; in the file, the collector's
5  notes, regardless of who did the verification process or
6  who worked an account, whether it was a manager, whether
7  it was me, whether it was a collector, whoever, anything
8  that went on on any account, the record -- the
9  documentation had to be in the notes.
10  Q    In the year 2003, those notes were electronic
11  notes?  Where were they kept?
12  A    They were kept in the file, in the actual
13  debtor record.
14  Q    Was that a hard copy file, or was that an
15  electronic file, or both?
16  A    Was that a hard copy or electronic file?
17        MR. ISRAEL:  Talking about computers.
18  A    Yeah, we are talking about computers, so it's
19  part of the record.  It's there permanently.
20  BY MR. HOMER:
21  Q    But when you are talking about the collector
22  noting -- keeping these notes in the file, you are saying
23  that they kept them in a file drawer or --
24  A    No; no; no.
25  Q    -- or put them in a computer, or where did

Page 64

1  they go physically?
2  A    You are asking if they kept it in a file
3  drawer or in the computer; no.  They were part of the
4  permanent record of the debtor information.  All the
5  information -- all accounts were worked in the computer.
6  Q    Okay.
7  A    So all notes are in the computer.
8  Q    Okay.
9  A    Any time you touch an account, you took any
10  action on an account, made any calls to anywhere, whoever
11  you were, you were to document the record.
12  Q    Okay.
13  A    The permanent record with regard to that
14  collection file.
15  Q    You've talked about what you had to do
16  regarding bank verification.
17  A    Uh-huh.
18  Q    Was there any other verification required to
19  redip an NSF check?
20  A    Any other bank verification required to
21  redip --
22  Q    No, I didn't say bank verification.  Any
23  other verification --
24  A    Any other verification that needed to be done
25  in order to redeposit a check.

B-367

Page 65

1    Q    An NSF check.
2    A    An NSF check; if you were not able to obtain
3    the information from the bank, your job, as the collector,
4    manager, and/or admin that was responsible for doing this
5    was -- well, if the bank could not be verified -- let's
6    put it this way: If the bank information could not be
7    verified at all, then that information was given to the
8    general collection manager.
9    Q    All right.
10    A    This -- I cannot verify this check; the bank
11    won't give me information; I don't have sufficient
12    information; it's not good; there's a stop payment,
13    there's a whatever, that information was to be given to
14    the general collection manager and the producer.
15    Q    The producer is the collector?
16    A    The collector, right.
17    Q    Okay.
18    A    At that point -- do you want to --
19    Q    No. Go ahead.
20    A    At that point in time, it was the
21    responsibility of the collection manager, or GCM, and/or
22    producer to get in touch with the debtor and to find out
23    what the source of funds were to make a determination as
24    to whether or not the check was going to be made good.
25    Q    So if you couldn't get bank verification, you

Page 66

1    had to get debtor verification. Is that a simpler way of
2    saying it?
3    A    Correct.
4    Q    If you did get bank verification, did you
5    have to also get debtor verification?
6    A    If you received bank information that the
7    funds were there, you would have to get debtor cooperation
8    to redeposit the check. If you were not going to take the
9    original instrument and redeposit it, okay -- if you were
10    going to create a different instrument, a check fax, if
11    you were going to recreate that again, you would get
12    permission from the debtor. That's always been our
13    policy.
14    Q    So you have bank verification, but you want
15    to recreate the check. By that, you mean electronically
16    create a check?
17    A    Uh-huh.
18    Q    You would have to get the debtor's permission
19    to do that?
20    A    That's correct.
21    Q    What if it were not a re-creation
22    electronically? What if there was a paper check that you
23    just wanted to resubmit? Would you have to contact the
24    debtor to do that if the bank had verified it?
25    A    If the bank had verified -- you are asking me

Page 67

1    if the bank had verified and everything was fine did they
2    have to contact the debtor, and it was a paper item that
3    was going to go to the bank again, the original item, did
4    they need to get the debtor's permission; no.
5    MR. ISRAEL: Before you ask your next
6    question, do you mind if we take a short break?
7    MR. HOMER: If you don't mind, I just have
8    a couple more. I'm almost done with this topic.
9    I'll try to be quick.
10    BY MR. HOMER:
11    Q    I just have one or two more.
12    A    All right.
13    Q    Well, let's just take the break now. I'm not
14    cruel.
15    (A brief recess was had.)
16    BY MR. HOMER:
17    Q    We were taking about what you had to do to
18    verify a NSF check. And the next question I have for you
19    is: Was it acceptable to do debtor verification without
20    trying to do bank verification?
21    A    Was it acceptable to do debtor verification
22    without doing bank --
23    Q    Without attempting to do bank verification.
24    A    No.
25    Q    Okay.

Page 68

1    A    No, if you had the bank information, you
2    should always talk to the bank first, especially to
3    determine if there's a stop payment on the item, in
4    addition to verifying funds.
5    Q    When the debtor called the -- I'm sorry, when
6    the collector called the debtor to verify funds, what
7    information did the collector have to obtain from the
8    debtor?
9    A    What information did the collector have to
10    obtain from the debtor; would this be an instance where we
11    already attempted to verify funds at the bank?
12    Q    Yes.
13    A    Okay.
14    Q    You already tried to verify on --
15    A    Okay.
16    Q    -- an NSF check.
17    A    Correct. We would call the debtor and find
18    out -- look, as of today, your check for $1,000 does not
19    verify at the bank; it's already been returned once.
20    Q    Or you might tell them that, the bank
21    wouldn't tell us. That happened a lot; right?
22    A    Yes, that could happen; that would happen.
23    Q    So you called the debtor and said, it hasn't
24    verified. Then what else would you tell them?
25    A    You're asking if we called the debtor and let

B-368

Case 1:05-cv-00225-KAJ    Document 84-4    Filed 05/16/2006    Page 9 of 40

Hue  vs.  NCO Financial Systems                                    3/16/06 - Kathy Obenshain

Page 69

1  him know whether or not the check had verified; yes,
2  that's correct. We would call him and let him know that
3  your check has not verified, or it came back nonsufficient
4  funds; your bank will not give us information as to
5  whether or not the funds are there. And then usually the
6  debtor would say, Well, I the funds are there; I just made
7  a deposit today. Okay, one question you might want to ask
8  as a collector, Can you conference me in to your bank
9  officer so that we can confirm together that the funds
10 have not cleared.
11   Q    Was that required, that you conference in the
12 bank?
13   A    Was it required that we conference in the
14 bank; no, it wasn't required. But during many weekly
15 conference calls that we had with our GCMs and when I was
16 in the branches having my meetings with the collectors,
17 which I said, Here's another way for you to get around the
18 fact that banks won't verify funds for you.  If the
19 debtor's words are good --
20   Q    Because they will talk to the debtor --
21   A    That's right.
22   Q    -- when they wouldn't talk to you?
23   A    Exactly. You can get them on the phone and
24 do a three-way, and you can hear that the funds are good.
25 And then that information -- if you were the producer --

Page 70

1  if you were the producer, then that information would be
2  documented in the -- if you were obtaining all this
3  information, then all these notes should be in the record,
4  who you called at the bank, what the phone number is, what
5  they said.
6    Q    Would it be acceptable to call a debtor when
7  you are doing this verification and say, you don't have --
8  the bank wouldn't verify that the money is there; have you
9  put money in the bank there. A debtor says, yes, it's a good
10 check now; you can collect it. Then you put notes into
11 the file, and then you can redip the check; is that
12 accurate? Would that be acceptable to do that?
13   A    If the -- you are asking me if the collector
14 picked up the phone and called the debtor and the debtor
15 said, I just made a deposit today, but it isn't reflecting
16 on my bank account but you can go ahead and redeposit the
17 check, depending on the circumstances of it. You can
18 always ask the debtor for -- and we discuss this in
19 training also with GCMs and collectors, about get a copy
20 of the deposit slip.
21   Q    But that wasn't required, to get a copy of
22 the deposit slip?
23   A    It was not required, but if you, as a general
24 collection manager, were permitting this redeposit to
25 occur, then it was ultimately your responsibility to be

Page 71

1  absolutely certain that this information was in the file.
2    Q    Okay.  I understand that would be helpful if
3  you had it.
4    A    Uh-huh.
5    Q    But what I'm really trying to get at is what
6  was required by the policy. And I think you are telling
7  me it wasn't required, that you should have the debtor
8  produce a deposit slip.
9    A    You are asking me if it was required that the
10 debtor produce a deposit slip; no, it was not required.
11 It was strongly suggested, particularly if you are dealing
12 with -- and this is ongoing training, weekly conversations
13 with collection managers, if you have a individual who has
14 a history of -- a particular producer who has a history of
15 collecting bad checks, then it's your responsibility to
16 make sure they're verified.
17   Q    When the collector contacted the debtor and
18 got authorization or verification that the funds were
19 good, he would put a note in the computer system
20 indicating that that had happened; correct?
21   A    You are asking me if when he called and
22 verified, he was to put a note in the system; yes, he was
23 to put a note in the system to be part of the permanent
24 record, who he called, where he called.
25   Q    And what was said?

Page 72

1    A    And what was said, absolutely.
2    Q    Would he be required to have the debtor
3  indicate what the sources of the funds would be?  In other
4  words, would he have to say to the debtor, I know you've
5  told me the check is good, but I want to know what you did
6  to make the check good; for example, did you sell a lot of
7  cars this month to make it good?  Was he required to do
8  that, or could he just take the word that the check was
9  good?
10   A    Would he be required to find out what the
11 source of funds -- you know, what allowed him to have the
12 money in the bank; you are asking me that question?
13   Q    Yes.
14   A    Well, I would say that he needed to confirm
15 whether or not the money was in the bank that day. We
16 just talked to your bank; your bank says you don't have
17 sufficient funds. What happened today for you to have
18 sufficient funds. Or here's another question: Your bank
19 doesn't confirm that you have sufficient funds; well, I
20 have overdraft protection.
21   Q    But I don't know that you specifically
22 answered my question.
23        If the debtor -- does this policy -- the NCO
24 verification policy, was the debtor -- and would there be
25 notes in the computer reflecting whenever the debtor got

B-369

Case 1:05-cv-00225-KAJ    Document 84-4    Filed 05/16/2006    Page 10 of 40

Hue vs. NCO Financial Systems                          3/16/06 - Kathy Obenshain

## Page 73

1  verification that they qualified the source of the monies
2  that the debtor said were available?
3      A      Were there supposed to be notes in the file
4  confirming where the money was coming from?
5      Q      Right.
6      A      What was the source of funds?
7      Q      Yes.
8      A      Yes, there should be.
9      Q      So it was part of the requirement that
10  they --
11      A      Document --
12      Q      -- talked to the debtor, they asked them what
13  the source of the funds was?
14      A      They need to find out why is the check going
15  to be good today.
16      Q      Okay.
17      A      That was the source of funds.  Did you make a
18  deposit; where did you get your money from.  Yeah, Did you
19  make a deposit, that's usually the question.  Did you make
20  a deposit today that's not showing up.
21      Q      So if we were to --
22      A      How is this check going to be made good?
23      Q      So if we were to look at individual accounts
24  and in the notes in those accounts -- and those are made
25  under something called a fact sheet?  Do you know if

## Page 74

1  that's the term that's used?
2      A      A fact sheet; do I know if that's the correct
3  terminology for the debtor screen?
4      Q      Well, yes.
5          MR. ISRAEL:  It says that on the top.
6      A      Yes, it's a fact sheet, yeah.
7  BY MR. HOMER:
8      Q      Would we expect --
9      A      It's a fact sheet.
10      Q      Would we expect to find there for every time
11  an NSF was redipped that there would be a note, saying,
12  debtor qualified source of funds by saying such and such?
13      A      Would you expect to find that in every
14  instance when there was a redeposit; I can't answer that.
15  I don't know.  I mean, there should be some notes from
16  them concerning what process was taken, what verification
17  process was taken.
18      Q      But you said --
19      A      Either -- yeah; yeah.
20      Q      You've said one of the requirements --
21      A      I --
22          MR. ISRAEL:  One second; let him finish.
23      A      Go ahead.
24  BY MR. HOMER:
25      Q      You said one of the requirements was the

## Page 75

1  debtor had to qualify the source of the funds.  It wasn't
2  enough just for the debtor to say the funds are good, the
3  funds are there.  One of the requirements was the debtor
4  had to qualify the source of the funds, which meant he had
5  to inquire about why the funds were there.  And my
6  question is:  Would the fact that he did that, would he
7  have to make a note that he did that and put that in the
8  computer so that it was documented, that he had qualified
9  the source of the funds?
10      A      Did he have to document in the computer why
11  the funds were there?
12      Q      Yes; that the debtor had qualified the source
13  of the funds.
14      A      Quali-- did he have to write in the notes the
15  qualification of the source of the funds?
16      Q      Right.
17      A      More, like, did he deposit his ARs today?
18  Are you asking that?  I mean --
19      Q      No.  Maybe it would be easier if I gave you
20  an example.  Sorry this isn't clear.
21          A debtor is contacted because you can't get
22  bank verification, and the debtor says, oh, you can
23  redeposit that check because I know it's good.  Now, as I
24  understand it, that's not enough.  The collector has to go
25  beyond that and say, well, why is it good; what is the

## Page 76

1  source of the funds that you put into the account.  Am I
2  correct in saying that that is required under the policy,
3  to ask that question?
4      A      Are you asking if he has to write what the
5  source of the funds are?
6      Q      I haven't got to the question of writing the
7  source.
8      A      Okay.
9      Q      I'm just saying, does he have to ask the
10  debtor what the source of the funds are, as part of the
11  verification process?
12      A      You could ask whether or not the money is in
13  the bank, and if so, how was it going to be verified the
14  money is in the bank; did you make a deposit today; what
15  happened today; it isn't reflecting in your bank record.
16      Q      Well, that's not --
17      A      I wouldn't ask -- I would never ask a debtor,
18  what is the source of funds that's good.  I would never
19  ask that.  Is the money in the bank today.
20      Q      I thought you told me --
21      A      And if so --
22      Q      I'm sorry.
23      A      If so, how did it get there; did you make a
24  deposit.  But I don't care if he deposited his rent
25  checks, a personal check.  I don't really care as long as

B-370

19 (Pages 73 to 76)

Hue vs. NCO Financial Systems                              3/16/06 - Kathy Obenshain

| Page 77 |
|---|
| 1 the money is in the bank. |
| 2   Q   So let me get back to my example. |
| 3   A   Uh-huh. |
| 4   Q   You call the debtor, and the debtor says, oh, |
| 5 you can redeposit the check; there's money in the account. |
| 6   Does the collector have to ask for any more |
| 7 information beyond that? |
| 8   A   Does the collector have to -- |
| 9   Q   Yes -- |
| 10  A   -- ask for any more information -- |
| 11  Q   -- under the NCO policy. |
| 12  A   He should ask the information, did you make a |
| 13 deposit today. |
| 14  Q   Okay. |
| 15  A   It makes good business sense to ask, did you |
| 16 make a deposit today. |
| 17   MR. ISRAEL: Kathy, listen. |
| 18   If the collector doesn't get the debtor to |
| 19 confirm, is he violating the policy? If the |
| 20 debtor says, hey, I promise you I got the money, |
| 21 is the collector supposed to go further? |
| 22  A   Yes, he's supposed to go further, absolutely. |
| 23 BY MR. HOMER: |
| 24  Q   What is he supposed to do beyond -- the |
| 25 debtor says, I put the money in the account -- |

| Page 78 |
|---|
| 1   A   Uh-huh. |
| 2   Q   -- you don't have to worry about it. What |
| 3 more does the collector have to get, in terms of |
| 4 information, before he can resubmit the check? |
| 5   A   He needs to find out was there a deposit made |
| 6 today and for how much. |
| 7   Q   He just said -- I just said he did tell the |
| 8 collector that, I made the deposit today. |
| 9   MR. ISRAEL: Okay, I get the question. I |
| 10 understand now. |
| 11  A   All right. |
| 12 BY MR. HOMER: |
| 13  Q   So is that enough? Can the debtor then -- |
| 14 can the collector then redip if the debtor has told him, I |
| 15 made a deposit today? |
| 16  A   The collector -- you are asking me if the |
| 17 collector -- |
| 18   MR. ISRAEL: Listen. |
| 19  A   -- had a re-- had a redeposit -- |
| 20   MR. ISRAEL: Stop. |
| 21   THE WITNESS: Okay. |
| 22   MR. ISRAEL: If the debtor says to the |
| 23 collector, I swear to you I redeposited, is that |
| 24 enough, or are you supposed to do something else? |
| 25   THE WITNESS: Are you supposed to do |

| Page 79 |
|---|
| 1   something else? |
| 2   MR. ISRAEL: Yes. |
| 3   A   You need to get with your manager and make |
| 4 sure that your manager concurs with what you are saying. |
| 5 And if your manager doesn't believe you, then he or she |
| 6 has the option to call the debtor themselves to confirm |
| 7 what was said; depends on who the individual is; depends |
| 8 on the circumstances of the history of this individual, or |
| 9 this particular debtor. |
| 10   The manager should make the final call in |
| 11 that kind of a circumstance. The manager should have been |
| 12 involved in that circumstance. |
| 13 BY MR. HOMER: |
| 14  Q   Well, doesn't the general collection manager |
| 15 has to approve all the redip requests that the collector |
| 16 makes; is that correct? |
| 17  A   The manager -- you are asking me if the |
| 18 manager should confirm all the redeposits that the |
| 19 collector has? |
| 20   MR. ISRAEL: No, has to approve. |
| 21  A   Has to approve; yes. |
| 22 BY MR. HOMER: |
| 23  Q   So at some point in time, the general |
| 24 collection manager is going to look to determine whether |
| 25 they are going to approve it or not. They have to look at |

| Page 80 |
|---|
| 1 what the collector did; correct? |
| 2   A   Yeah, they should look -- you want to know if |
| 3 they did look to see, yes. |
| 4   Q   Let me ask you this: Can you tell me whether |
| 5 you know if the collector is required to ask for any |
| 6 additional information of the debtor after the debtor |
| 7 tells them that he's deposited the funds and the account |
| 8 is good? |
| 9   A   Is he required to ask the debtor any more |
| 10 information? |
| 11  Q   Yes, under the NCO policy for NSF |
| 12 resubmissions. |
| 13  A   Is he required to ask any more information; |
| 14 did you make a deposit today. I mean, there's not a |
| 15 written policy that says that. It is a given; it is |
| 16 understood. For you to be able to redeposit checks, you |
| 17 must be able to redeposit checks, you know, where -- why are you |
| 18 doing this; why are you doing this. |
| 19  Q   You are giving me really general statements. |
| 20  A   So. |
| 21  Q   I'm asking a very specific question. |
| 22   Let's assume you are the general collection |
| 23 manager. |
| 24  A   Okay. |
| 25  Q   A collector comes to you and says, we |

**D'AMICO GERSHWIN, INC. - (770) 645-6111**
**www.AtlantaCourtReporter.com**

Hue vs. NCO Financial Systems

**3/16/06 - Kathy Obenshain**

Page 81

1  couldn't get this check verified at the bank, but I called
2  Joe Schmo and he said that he deposited funds today to
3  cover it, and I want to redip the check.
4      Now, as general collection manager, would you
5  say, well, that's not enough; you have to find out from
6  the debtor why that check is good, and that's qualifying
7  the funds, or would you say, okay, we will resubmit the
8  check?
9  A    Would I personally or what --
10 Q    No.
11 A    — (inaudible) would a collection manager --
12 Q    Applying the NCO policy -- if you applied the
13 NCO policy, could the general collection manager approve
14 the redip just on the basis of that information?
15 A    Shouldn't happen; shouldn't happen.
16 Q    Can you answer yes or no?
17 A    He or she —
18 Q    Can you answer --
19 A    I did.
20     MR. ISRAEL: Stop.
21 BY MR. HOMER:
22 Q    Okay. Now --
23     MR. ISRAEL: Wait.
24     THE WITNESS: Okay.
25     MR. ISRAEL: First of all --

Page 82

1      THE WITNESS: Okay.
2      MR. ISRAEL: — let's slow this down.
3      THE WITNESS: Okay.
4      MR. ISRAEL: He gets to ask --
5      THE WITNESS: Okay.
6      MR. ISRAEL: -- and you definitely get to
7  answer.
8      And you can't just keep asking the same
9  question.
10     MR. HOMER: Well, I haven't gotten the
11 answer.
12     MR. ISRAEL: You got the answer. We can go
13 back and read it. She said it shouldn't happen.
14 That's --
15     MR. HOMER: Okay, but that is not
16 responsive. I just need a yes-or-no answer.
17     MR. ISRAEL: Okay. You can answer the
18 question any way that's appropriate. But let's
19 slow this down so he can get his question, and
20 then we can hear it, and then you can answer in
21 any way that's appropriate.
22     Ask it again.
23     MR. HOMER: I think I don't need to ask it
24 again. I think she understands. But I'll repeat
25 it for the sake --

Page 83

1      MR. ISRAEL: You don't need to repeat the
2  whole scenario again. She's already answered it
3  shouldn't happen.
4      MR. HOMER: Well, you got --
5      MR. ISRAEL: Why don't we read it back.
6      MR. HOMER: No, I'll restate it.
7  BY MR. HOMER:
8  Q    A collector comes to you, as the general
9  collections manager, indicates that the debtor -- they
10 couldn't do bank verification. The debtor has -- you
11 called the debtor, and the debtor said, I redeposited -- I
12 put money in the account today; you can rerun the check;
13 it's going to be good; didn't give any other -- didn't
14 give the collector any other information whatsoever.
15     As general collection manager, under the NCO
16 policy for verification, has the collector satisfied the
17 requirements, and can that check be redipped, or does the
18 collector have to get additional information about the
19 source of the funds?
20     MR. ISRAEL: It's been asked and answered.
21     Tell him again.
22 A    It should not happen that way. The general
23 manager -- the general collection manager is responsible
24 not to just do what the collector wants them to do. They
25 have to look in the notes. They have to make a decision

Page 84

1  based on the facts. And the facts are, it's up to them to
2  pick up the phone and go through the verification process
3  again. If it was a larger item, I would hold them
4  ultimately responsible for putting notes in the screen
5  specifically what they did.
6  BY MR. HOMER:
7  Q    So as general collection manager, you would
8  not approve --
9  A    Me personally?
10 Q    No. Under the NCO -- if you were applying
11 the NCO policy, you would not approve the redipping of the
12 check under the circumstances I just mentioned to you?
13     MR. ISRAEL: Asked and answered.
14     Tell him again.
15 A    Asked and answered.
16     MR. ISRAEL: No; no; no.
17     THE WITNESS: Sorry.
18     MR. ISRAEL: I get to make the objection.
19     You tell him the answer.
20 A    No, it shouldn't happen that way.
21 BY MR. HOMER:
22 Q    The answer is you wouldn't allow it to be
23 redipped under that circumstance?
24     MR. ISRAEL: For the third time.
25 A    No.

B-372

**D'AMICO GERSHWIN, INC. - (770) 645-6111**
**www.AtlantaCourtReporter.com**

**Hue vs. NCO Financial Systems**

**3/16/06 - Kathy Obenshain**

---

Page 85

1  BY MR. HOMER:
2      Q      Why would you not allow it to be redipped
3  under that circumstance?
4      A      Because I don't -- why wouldn't I allow it to
5  be redeposited --
6          MR. ISRAEL:  No.  What -- the policy --
7          THE WITNESS:  Okay.
8          MR. ISRAEL:  Why, under the policy --
9      A      Okay.  You --
10         MR. ISRAEL:  Stop.
11         THE WITNESS:  Go ahead.
12         MR. ISRAEL:  Why, under the policy,
13     wouldn't you permit it to be redipped is the
14     question.
15     A      Because there's not sufficient information to
16  determine that the check is going to clear.
17  BY MR. HOMER:
18     Q      What information is needed before you can
19  make that determination?
20     A      Okay, well, based on what you --
21         MR. ISRAEL:  That's been asked and
22     answered.
23         But go ahead.
24     A      Okay, based on what you just asked me and the
25  scenario that you just gave me, collector came to me,

---

Page 86

1  said, no bank verification; the debtor says, I
2  redeposited -- or I put money in the bank today, okay to
3  redeposit, I want to do it; that's not sufficient for a
4  general collection manager to sign off on a redeposit.
5  BY MR. HOMER:
6      Q      I understand you said that.  But what more is
7  needed?
8      A      What more is needed; verification that the
9  money is going to be there, a comfort level by perhaps
10  picking up the phone yourself, which I've trained my
11  managers on, looking in the notes to see that this
12  conversation even occurred.  Where is your notes; where is
13  your notes.  I mean, that would be my first -- let's look
14  at the file together.  Let's look at the notes.
15     Q      I'm assuming that the facts are that he did
16  make the call.  I'm not questioning the collector.  What
17  I'm doing is --
18     A      I would.
19     Q      -- telling -- you're telling me that the
20  collector hasn't gotten enough information yet.  What
21  other information does the collector have to get before he
22  can redip the check?
23     A      Okay, what other information do you have to
24  have for a collector to redeposit a check; where is your
25  bank information; I don't see the bank information; did

---

Page 87

1  you actually try to get hold of the bank manager or
2  somebody else.
3      Q      No.  No, I've already said he's shown you
4  that he's --
5      A      Okay.  He can't --
6          MR. ISRAEL:  Listen to me; listen to me.
7          THE WITNESS:  Okay.
8          MR. ISRAEL:  Assume for his question --
9          THE WITNESS:  Okay, that no bank
10     verification --
11         MR. ISRAEL:  -- that the collector admits
12     no bank verification.
13         THE WITNESS:  Okay.
14         MR. ISRAEL:  The collector reports solely
15     that --
16         THE WITNESS:  Right.
17         MR. ISRAEL:  -- I spoke with the debtor,
18     and the debtor promises that the money is in the
19     account.
20         You've already testified that would not be
21     permitted as a deposit.
22         THE WITNESS:  No.
23         MR. ISRAEL:  Mr. Homer is asking you what
24     other information would be received that would
25     reverse the decision so that the policy would be

---

Page 88

1  satisfied and you would allow the check to be
2  run.  Assume that the collector is not lying to
3  you --
4          THE WITNESS:  Okay.
5          MR. ISRAEL:  -- and he really did call --
6          THE WITNESS:  Okay.
7          MR. ISRAEL:  -- and all you are going is --
8      so said another way -- and tell me if I'm wrong,
9      Mr. Homer -- you are asking what other
10     information, if it's just the debtor's word for
11     it, do you want before the check goes in.  Is
12     that fair?
13         MR. HOMER:  Yes.
14  BY MR. HOMER:
15     Q      And I'm talking about not what you personally
16  want or what you think might be helpful, but what's
17  required under the policy.
18         MR. ISRAEL:  That's all.
19     A      I would -- what is required under the policy;
20  information concerning why the funds are going to be
21  there, additional information.  When did you make the
22  deposit, how much was the deposit, can you fax me over a
23  copy of the deposit slip.  I would take it one step
24  further and make the call to the debtor myself.
25                         ///

---

B-373

**D'AMICO GERSHWIN, INC. - (770) 645-6111**
**www.AtlantaCourtReporter.com**

**Hue vs. NCO Financial Systems**

3/16/06 - Kathy Obenshain

Page 89

1  BY MR. HOMER:
2      Q      Right.
3      A      That's what I would do as manager, and that's
4  what I have told my managers to do; pick up the phone
5  yourself and go through the process yourself and have a
6  comfort level with it, because it's your ultimate
7  responsibility.
8      Q      You keep telling me what you would do
9  personally. But --
10     A      No, and I instructed them to do also.
11     Q      What I'm trying to get at -- and you did say
12 there that they would need to get some more information.
13         Would that information be related to why the
14 check was going to be good? For example, I gave --
15     A      What information would be --
16     Q      -- you -- I gave you --
17     A      -- available as to why the check was going to
18 be made good?
19     Q      Yes.
20     A      Yes.
21     Q      So it was required under the NCO policy that
22 the collector obtain information from the debtor as to why
23 the check was going to be good. And, for example, the
24 debtor might say, we just sold five cars at our business,
25 and now we've made the check good. That would be one

Page 90

1  example. It's not the only example. But the NCO policy
2  required the debtor to get information of that nature,
3  which is called qualifying the funds. That would be
4  required under the NCO policy before a check would be
5  redipped; am I saying that correctly?
6      A      I'm not sure that you need to have exact
7  details, did you sell five cars or whatever; did you make
8  a deposit today; how much was the deposit.
9      Q      That's all you would need to know, is how
10 much was the deposit?
11     A      I'm not sure I care where the money came
12 from.
13     Q      Okay.
14     A      I'm not sure. It wasn't required to have
15 where did the money come from. If you, as a general
16 collection manager signing off on a redeposit -- then your
17 comfort level better be -- if that's the detail that you
18 need, then you should have that information.
19     Q      If it wasn't required what the source of the
20 funds was, what was required in addition to the statement
21 from the debtor that, I made the check good; the funds
22 have been deposited? What was needed besides that before
23 you can redip the check under the NCO policy?
24         MR. ISRAEL: You've asked that half a dozen
25     times.

Page 91

1          Go ahead already.
2      A      Additional information to support the fact
3  that the money is in the bank, a comfort level, a comfort
4  level with that information.
5          MR. ISRAEL: I have an idea.
6          List it. You've said deposit.
7          THE WITNESS: Uh-huh.
8          MR. ISRAEL: You said deposit slip.
9          Is there any other objective information
10     that you could use as an example for Mr. Homer?
11     A      I would say, let's do a conference call with
12 the bank manager.
13         MR. ISRAEL: You did that one. That's
14     three.
15     A      I did that one.
16         Do you have overdraft protection. Somebody
17 can tell me you've got overdraft protection at the bank.
18 BY MR. HOMER:
19     Q      Was it NCO policy that you had to have a
20 debtor establish that they had overdraft protection?
21     A      That would be something I would put in the
22 notes right off. If that's --
23     Q      Suppose they didn't have that protection.
24     A      Well, then, they don't have it.
25     Q      Then you can't redip the check under that

Page 92

1  circumstance?
2      A      I can't -- no, I never said --
3          MR. ISRAEL: Stop. Wait.
4          THE WITNESS: Okay.
5          MR. ISRAEL: I don't understand your
6      question. Is your question that you are supposed
7      to confirm with the bank that he has overdraft,
8      or are you asking whether he can believe the
9      debtor?
10 BY MR. ISRAEL:
11     Q      Here's the problem I'm having.
12     A      Uh-huh.
13         MR. ISRAEL: Just wait.
14         THE WITNESS: Okay.
15 BY MR. HOMER:
16     Q      You're telling me that it's not enough and
17 you can't redip a check simply because the debtor comes to
18 you and says -- a collector comes to you and says, the
19 debtor has told me he's made the funds good. He's told
20 you that; that's not enough.
21         MR. ISRAEL: That's correct; right?
22     A      That is correct.
23 BY MR. HOMER:
24     Q      What I'm asking you is under the NCO policy,
25 what other information is needed. And you are telling me

Page 93

1  that, well, it would be nice to call in the bank; it would
2  be nice if they have overdraft protection. I'm not
3  looking for things that would be helpful. I'm looking for
4  a requirement.
5      A     Well, he --
6      Q     Let me finish.
7            What does the policy require, in terms of
8  information, not different ways that you might address it,
9  but what specifically does the policy require before the
10 check can be redipped, in terms of information?
11           MR. ISRAEL: You can't keep asking it so
12     many times, Mr. Homer. She's been unequivocal.
13     The policy requires --
14           MR. HOMER: Well --
15           MR. ISRAEL: The policy requires, that
16     she's testified, verification. She gave you
17     examples of the type of verification that works.
18           MR. HOMER: Well, this is a critical issue
19     in this case. You know it is; I know it is.
20           The question is: What was the policy that
21     Valerie Hue violated.
22           MR. ISRAEL: Okay.
23           MR. HOMER: And I don't believe that the
24     witness has told me yet what had to be done in
25     terms of debtor verification.

Page 94

1            She's told me one way. She said you do
2  have to get more information about it; it's not
3  enough just to say the debtor -- the check is
4  going to be good. And I've asked her what more
5  information is available, and what she's told me
6  basically is, well, you could do this; you could
7  do that, but she hasn't said that there was a
8  requirement that you do any of these things.
9            I want to know exactly what was required in
10 order to satisfy the policy for redipping the
11 check.
12           MR. ISRAEL: Okay. That's a gross
13     mischaracterization. She couldn't have been more
14     clear what was required. She said you had to
15     have verification of the funds, and she gave you
16     examples that would be acceptable to verify the
17     funds.
18           MR. HOMER: Okay. I'm going to --
19           MR. ISRAEL: We can list them again. We
20     can go back and look at them.
21 BY MR. HOMER:
22     Q     Let's say those examples don't apply. Let's
23 say they don't have overdraft protection, and they
24 don't -- and you haven't called in the bank in a
25 conference call; you don't have a deposit slip. If you

Page 95

1  don't have those things, is there any other information
2  required, or can you redip the check? I mean, you told me
3  you can't redip the check. What information do you have
4  to get in order to redip the check?
5            MR. ISRAEL: Oh, geez, wait. That's got to
6      be the tenth time now.
7            You listed three out of the four, and she
8      has unequivocally confirmed exactly what you've
9      just said. It's not fair to keep going over and
10     over them.
11           MR. HOMER: What was the fourth one?
12           MR. ISRAEL: It was the --
13     A     No overdraft protection --
14           MR. ISRAEL: -- copy of the deposit slip --
15     A     Copy of the deposit slip, the bank conference
16 call, find out if there's overdraft protection, bank
17 conference call, get the debtor on the phone.
18 BY MR. HOMER:
19     Q     Let's assume that none of those apply.
20           Can you redip the check?
21           MR. ISRAEL: She already told you no.
22 BY MR. HOMER:
23     Q     What do you need to get?
24           MR. ISRAEL: Other than what the four items
25     were?

Page 96

1      A     Verification of funds.
2            MR. ISRAEL: That's a fair -- ask it a
3      different way.
4            Can you think of any other examples of how
5      you could verify, other than, what was it, the
6      deposit slip --
7      A     Yeah, deposit slip, bank conference call,
8  overdraft protection; let's see, if the guy says it was a
9  bank error, I would get hold of the bank officer, the
10 commercial officer handling the account, for example.
11 Sometimes people say that. Let me think what other would
12 work. I would go --
13           MR. ISRAEL: That's fine.
14     A     That's at least four different ways.
15 BY MR. HOMER:
16     Q     If you --
17           MR. ISRAEL: If you don't have that.
18 BY MR. HOMER:
19     Q     If you can't do any of those things, then you
20 can't redip the check; is that accurate?
21     A     That's correct.
22     Q     So qualifying the source has nothing do with
23 redipping the check. It doesn't matter if this guy tells
24 you, you know, I just inherited $10 million; I put all the
25 money in the bank; it doesn't matter if he tells you that

B-375

Hue vs. NCO Financial Systems

3/16/06 - Kathy Obenshain

Page 97

1 the business just had a huge profit and he put the money
2 in. He had not requirement -- the debtor couldn't satisfy
3 the requirement by telling you what the source of the
4 funds was. The only way he could satisfy the requirement
5 was these four instances that you gave to me?
6    A    Only four instances.
7    Q    Yes.
8    A    He couldn't just say that he had a huge
9 inheritance and he's putting the money in the bank today.
10        MR. ISRAEL: Would you accept that?
11        THE WITNESS: No. I still want to confirm
12    the money is in the bank, for God's sake.
13 BY MR. HOMER:
14    Q    Let me see if I --
15    A    I still need to --
16        MR. ISRAEL: Wait; wait. Let her finish.
17        I still need to. . .
18    A    To confirm how is it -- is it in the bank
19 yet; how do I confirm that. Obviously, you want to take
20 care of this bad check that we have out here. Okay. So
21 if you've put the money in the bank and it's a huge amount
22 of money, are they going to hold your funds. Sometimes
23 they don't release those funds. Is there any way we can
24 do a conference call with your bank. I don't need to say
25 a word, just have the bank confirm. That's the greatest

Page 98

1 way, of getting bank confirmation.
2 BY MR. HOMER:
3    Q    Let me see if I can state this correctly
4 then.
5    A    Okay.
6    Q    Under the NCO verification policy that was in
7 effect -- and we are talking about December 2003.
8    A    Uh-huh.
9    Q    First, you would go to the bank, and if the
10 bank wouldn't verify the funds, if the funds were in the
11 account, then you would go to the -- a collector would go
12 to the debtor and ask if the funds were in the bank?
13        MR. ISRAEL: We'll stop there. We'll take
14    it in pieces.
15 BY MR. HOMER:
16    Q    Is that right so far?
17    A    Okay, go to the bank, try to verify funds.
18    Q    Okay.
19        MR. ISRAEL: The second part is?
20    A    Collector, right, and/or the manager --
21 remember, there's two people that get a copy of a check
22 that doesn't verify.
23 BY MR. HOMER:
24    Q    Either one. Somebody is --
25    A    The producer and the manager. It is not just

Page 99

1 the producer's responsibility on his own to go make that
2 decision. It has always been.
3        MR. ISRAEL: Okay. So after the bank?
4 BY MR. HOMER:
5    Q    So after the bank --
6    A    Then they call.
7    Q    -- the collector calls the bank -- I mean the
8 debtor. The debtor says, don't worry about this check;
9 you can resubmit it; I've put money in the bank; we just
10 sold, you know, a lot whole lot of inventory; we have a
11 lot of money; we put the money in the bank. The collector
12 takes that information to the general collection manager
13 and the general collection manager is reviewing whether or
14 not the check can be redeposited. The collector doesn't
15 show that he's got the deposit slip; the collector doesn't
16 conference call with the bank, with the general collection
17 manager or with the debtor; the collector indicates
18 there's no overdraft protection; and there's no indication
19 the bank made an error.
20        Would the general collection manager be able,
21 under that circumstance, to approve the check under the
22 NCO policy?
23    A    Under that circumstance, they should not.
24    Q    Okay.
25    A    I'm not going to tell you it hasn't happened.

Page 100

1 I'm going to tell you it should not.
2    Q    It's the NCO policy that it does not, unless
3 you have one of those four --
4    A    It's not one of those four. It's strictly
5 verification of funds.
6    Q    Okay.
7    A    It's not written down what you should do to
8 verify funds. We have many conference calls concerning
9 what you can do to verify funds.
10    Q    The next question -- well, if the -- if there
11 is verification of the funds on a redipped check, that --
12 the information about the verification would be in the
13 fact sheet in the computer to document that the
14 verification took place; is that correct?
15    A    The information, you are asking me should it
16 be in the fact sheet in the notes in the system?
17    Q    Yes.
18    A    Correct.
19    Q    If you found an account where the fact sheet
20 simply indicates the debtor was called and says the funds
21 were available, that wouldn't satisfy the check
22 verification process requirements at NCO, correct, because
23 that wouldn't show the information that you said would be
24 needed before you could redip the check?
25    A    In other words, you are asking me if all that

B-376

25 (Pages 97 to 100)

Hue vs. NCO Financial Systems                           3/16/06 - Kathy Obenshain

Page 101

1   was said, talked to debtor and okay to deposit check?
2       Q       Right.
3       A       You are asking me would that be sufficient?
4       Q       If that's all that's in the account, the
5   computer information, that wouldn't be sufficient to
6   justify the redipping of an NSF check?
7       A       Should not be.
8       Q       You would need something along the lines of
9   what you said, a deposit slip, a reference to a conference
10  with the bank, an indication that there's overdraft
11  protection, something along that line that essentially
12  assures that the check is going to be good?
13      A       Assures the check would be good, you are
14  asking me; there should be notes in there to assure the
15  check is going to be good; there should be some detailed
16  information.
17      Q       That detailed information is what you were
18  talking about before. It's got to be about one of these
19  things, deposit slip or bank -- you know, conference with
20  a bank or overdraft protection, something like that that
21  assures that the funds are going to be good?
22      A       Those items at least.
23      Q       Are there any other examples?
24      A       I can't think of them off the top of my head.
25      Q       Okay.

Page 102

1       A       I'm not going to tell you it hasn't happened,
2   but --
3       Q       We know it hasn't happened.
4       A       No.
5       Q       Let me ask you this: That policy that you
6   just described to me about the redipping of NSF checks and
7   what the NCO requirements were, how was that policy
8   established? Was it in writing? Was it orally? Was it a
9   combination of both?
10      A       How was that established; it was a policy
11  that had been in place since I came to work there in
12  1994 --
13      Q       Okay.
14      A       -- about never depositing a check. We just
15  don't do it. It never was part of our culture, that you
16  would arbitrarily redeposit -- deposit a check that you
17  could not verify the sources, you could not verify the
18  funds for.
19      Q       Do you know whether that policy was in
20  writing when you got to Millican & Michaels in 1994?
21      A       Was the policy in writing when I got to
22  Millican & Michaels in 1994; probably, but have I seen it
23  in black and white? I've been trained on it many, many,
24  many times over the years, many times. It's a situation
25  where it is understood that we do not lie; we don't cheat;

Page 103

1   we don't steal.
2       Q       Well, how would --
3       A       We just don't.
4       Q       -- it be cheating or stealing if you simply
5   called the debtor and the debtor said, look, Joe, I put
6   the check in today; I put the money in the account today;
7   the check is good. How is that cheating or stealing if
8   you trust the debtor to say that he is telling you the
9   truth and resend the check --
10      A       How would that be cheating?
11      Q       Yes.
12      A       Okay, how would that be cheating? You are
13  asking me to give an interpretation of how that would be
14  cheating?
15      Q       Right.
16      A       Okay.
17              MR. ISRAEL: She doesn't trust the debtor?
18      A       Yeah, I trust the debtor, the person who has
19  already written the bad check already one time; one time,
20  he's written the bad check, and he didn't give me the
21  courtesy of a phone call telling me check was even going
22  to come back. He's a -- he's a debtor and he's already
23  written me one bad check, and this is a debt that he
24  didn't pay an original time, I should believe; no.
25              ///

Page 104

1   BY MR. HOMER:
2       Q       When a debtor writes a check, isn't there an
3   element of trust that their check is good?
4       A       Isn't there an element of trust that their
5   check is good?
6       Q       Yes.
7       A       I can't answer that. I would -- not always;
8   not always.
9       Q       Did this policy that you described to me for
10  resubmitting NSF checks, did that policy at NCO evolve
11  over time? Did it change at all while you were at NCO?
12              MR. ISRAEL: I don't understand.
13      A       Yeah, I don't --
14              MR. ISRAEL: Which policy?
15  BY MR. HOMER:
16      Q       The policy for resubmitting NSF checks.
17              MR. ISRAEL: Oh, asked --
18      A       Did it change?
19  BY MR. HOMER:
20      Q       When I'm talking about policy, I'm talking
21  about the requirements --
22              MR. ISRAEL: Asked and answered.
23  BY MR. HOMER:
24      Q       I'm talking about the requirements for
25  resubmitting NSF checks.

B-377

26 (Pages 101 to 104)

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

## Page 105

1  A    Did they change?
2  Q    Yes.
3       MR. ISRAEL:  It's been asked and answered.
4  A    No.
5  BY MR. HOMER:
6  Q    They were always the same?
7  A    They were -- it's always been that way, since
8  I came to work here in 1994.
9  Q    So those --
10 A    Pretty much so, yes.
11 Q    So those requirements that you mentioned,
12 that you've told me about with respect to resubmission of
13 NSF checks, have always been in place since 1994 at NCO,
14 from the time you were there in 1994 to the time you left
15 in 2004?
16 A    Collector, yeah; right.
17 Q    How were the general collection managers
18 notified about the policy?  How did they become aware of
19 it?
20 A    How did they become aware of the policy?
21 Q    Yes.  When I refer to policy --
22 A    Okay.
23 Q    -- I'm talking about the requirements that
24 NCO had for redipping a check.  You understand that?
25 A    Yes.

## Page 106

1  Q    How did general collection managers become
2  aware of the policy?
3  A    Number one, we had ongoing training with GCMs
4  whenever I would be in the office, okay, weekly conference
5  calls with them concerning procedures, weekly.
6  Q    Did anybody ever think to put it in writing,
7  that policy?  They did all this training --
8  A    Did anybody ever think to put it in writing,
9  concerning this policy?
10 Q    You had all these weekly training sessions.
11 Did anybody ever say, hey, why don't we write this down so
12 people can see it in black and white and we can hold them
13 accountable to it?
14      MR. ISRAEL:  Objection; argumentative.
15 A    I don't know.  Did anybody -- I can't answer.
16 I don't know.  I'm sure they did, but --
17 BY MR. HOMER:
18 Q    You're sure --
19 A    -- we had enough -- I'm sure they thought
20 about it.
21      MR. ISRAEL:  Do you even know whether it
22      was written or not?
23 A    I don't know whether -- I'll be honest with
24 you, I don't know if it was written or not.  If I'm not --
25 I cannot attest to it because I -- over the years, I've

## Page 107

1  seen many, many, many different written statements
2  concerning the handling of bad checks.
3  BY MR. HOMER:
4  Q    Well, I assume that you wanted the collectors
5  to follow the policy; correct?
6  A    Yes.
7  Q    Why wouldn't you want to put it in writing so
8  it was clear to them what the policy is regarding --
9  A    Why wouldn't I?  I wouldn't --
10      MR. ISRAEL:  Stop; stop.
11      THE WITNESS:  Go ahead.
12      MR. ISRAEL:  Assumes facts not in evidence.
13 I think it's argumentative also.
14      But go ahead and answer.
15 A    Why wouldn't I want it in writing?
16 BY MR. HOMER:
17 Q    Why wouldn't NCO want the policy to be in
18 writing so it was clear -- let's assume the policy is not
19 writing.  And I can tell you that we have interrogatory
20 answers saying that the policy is not in writing.
21      Why would NCO not want to put the policy in
22 writing so that the collectors would know what to follow
23 and also could be held accountable for it?
24 A    Why wouldn't NCO want it to be in writing; I
25 didn't know that NCO didn't want it in writing.  I don't

## Page 108

1  think it was an intention on anybody's part.  We did
2  enough discussions concerning training, ongoing weekly
3  conference calls.  We brought it up all the time.  We
4  talked about checks all the time.
5  Q    Do you agree with me that if it were in
6  writing, nobody could dispute what the policy is, and the
7  collectors could held more accountable to the policy?
8  A    Would I agree with you --
9      MR. ISRAEL:  One second.
10      Objection; argumentative.
11      Go ahead and answer.
12 A    Would I agree with you?
13 BY MR. HOMER:
14 Q    Yes.
15 A    No.
16 Q    You wouldn't have the ability to hold the
17 collector to the policy, better ability to do it if it
18 were in writing, rather than just oral?
19      MR. ISRAEL:  Objection; asked and answered.
20 A    Just would I agree?  I can't answer that.
21 BY MR. HOMER:
22 Q    Okay.
23 A    I can't answer that; I don't know.
24 Q    Was there a point in time when checks that
25 had been returned NSF were automatically redipped?

B-378

D'AMICO GERSHWIN, INC. - (770) 645-6111
www.AtlantaCourtReporter.com

| Page 109 |
|---|

1     A     Was there a time when checks were
2  automatically redeposited; correct.
3     Q     There was a time?
4     A     Correct.
5     Q     When was that?
6     A     When was that time?
7     Q     Yes.
8     A     That time was when Horsham took over our
9  accounting functions.
10     Q     Who explained that to you?
11     A     Who explained that to me; it was explained by
12  Bette Capaldo.
13     Q     When did she explain it?
14     A     I'm trying to remember. She explained it
15  directly to Phil Weaver, and we provided the information
16  directly to all our GCMs. When we converted to the facts
17  system; I have to say 2003, early 2003.
18     Q     When did you first learn about that policy?
19     A     When did I first learn about that policy;
20  early 2003.
21     Q     When that policy was in effect, there wasn't
22  any verification required at all, right, the checks just
23  got redeposited, the NSF checks?
24     A     When that policy was -- when that was going
25  on, there was no policy. Is that what you are asking me?

| Page 110 |
|---|

1  There was no --
2     Q     Well, I'm saying there wasn't any
3  verification. An NSF check would come in, and then it
4  would be automatically redipped with the bank, without
5  anybody trying to verify if the check was good or calling
6  the debtor or doing anything else to verify the funds?
7     A     That's correct.
8     Q     Was that fraudulent to do that?
9     A     Was it fraudulent to do that?
10     Q     Yes.
11     A     It's not my place to determine. It was a
12  standard accounting practice in the -- in the retail
13  division.
14     Q     So it wasn't fraudulent?
15     A     It wasn't fraudulent, not to my knowledge,
16  no.
17     Q     Even though when the check was redipped,
18  nobody knew whether it was going to be good or not?
19     MR. ISRAEL: That's been asked and
20  answered.
21     MR. HOMER: I just want to make sure. It's
22  not the same question.
23     MR. ISRAEL: I think it is.
24     But go ahead and answer.
25     A     I think it is too but -- no.

| Page 111 |
|---|

1  BY MR. HOMER:
2     Q     Can you tell me what the importance of this
3  redip policy was. Why did you have the policy?
4     A     What was the importance of the redip policy;
5  the importance of the redeposit policy was to make certain
6  that we were putting on good solid revenue for our
7  clients; so the collectors would be paid accurately, based
8  on numbers that were good; so that general collection
9  managers who were earning bonuses would be paid correctly;
10  so there was no falsification of records.
11     Q     Okay.
12     A     So the debtors weren't -- you know, debtors
13  are charged for redeposits of nonsufficient funds, checks.
14     Q     Can you tell me what a postdated check is?
15     A     Can I tell you what a postdated check is; a
16  postdated check is a check that is written for a specific
17  date in the future. It's for an amount of money agreed
18  upon with the debtor.
19     Q     Why do you use a postdated check?
20     A     Why do we use a postdated check; if, indeed,
21  the debtor says he's going to pay the money and he's not
22  going to have the funds until the 20th of the month,
23  that's fine. I can only explain that to my client, if you
24  are willing to sit down today and write out a check dated
25  for that specific date.

| Page 112 |
|---|

1     Q     Okay.
2     A     I would then fax a copy of that check to my
3  client showing them why we are not proceeding with the
4  collection.
5     Q     So let's say on January 1, the debtor tells
6  you they don't have the funds now, but on January 20th,
7  they will, and it will be in the bank. So he gives you a
8  check dated January 20th on January 1.
9     A     Right.
10     Q     Before that check is submitted, does NCO
11  policy require that anything be done to verify that he
12  actually did make the funds good?
13     A     Does NCO policy require that anything be done
14  to verify postdated checks; is that what you are asking?
15     Q     Yes.
16     A     Or on that particular item?
17     Q     Right.
18     A     We had a procedure in place that we would
19  start verifying postdated checks usually three to four
20  days before end of month.
21     Q     Was that the same procedure that was used for
22  verifying redipped NSF checks?
23     A     Was it the same policy?
24     Q     Same procedure.
25     A     It was similar, yes, very similar.

B-379

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

Page 113

1    Q    How was it different?
2         First of all, was there any difference?
3    A    I'm trying to think; probably not a whole lot
4    of difference. I'll be honest with you, not a whole lot
5    of difference.
6    Q    Can you tell me any difference between the
7    two procedures.
8    A    I can think of any difference, I'll be honest
9    with you.
10        MR. ISRAEL: Can we stop a second, go off
11       the record.
12        MR. HOMER: Sure.
13        (Thereupon, an off-the-record discussion
14        was held.)
15   BY MR. HOMER:
16   Q    I take it the postdate policy was also an
17   important policy.
18   A    Correct.
19   Q    If someone violated the redip NSF policy,
20   were they disciplined for that?
21   A    If they violated the redip policy, would
22   they --
23   Q    Disciplined.
24   A    Disciplined for it; yes.
25   Q    How would they be disciplined, depending on

Page 114

1    how they violated it or --
2    A    How would they be disciplined; yes, it would
3    depend on how they violated it. It could be a JDS, job
4    description summary.
5    Q    That's a written reprimand?
6    A    Uh-huh.
7    Q    How about the --
8    A    Could be verbal.
9    Q    How about the postdate check policy? How
10   would people be disciplined for violating that?
11   A    How would they be disciplined for violating
12   that; the same procedure. It could be a verbal warning.
13   It could be discussion, ongoing training. It could have
14   been an ongoing training issue.
15   Q    If a redipped NSF came back with insufficient
16   funds again, would that necessarily be a problem that the
17   collector created, or could that also be a problem that
18   the debtor created?
19   A    Could it be a problem that the debtor created
20   and/or the debtor. Could it be either; is that what you
21   are asking me?
22   Q    Right.
23   A    Yes, it could be either.
24   Q    Under what circumstances would it be a
25   debtor -- would the debtor be at fault?

Page 115

1    A    The debtor would be at fault because perhaps
2    he provided you with a falsified deposit slip.
3    Q    Is there any other example where the debtor
4    might be at fault?
5    A    I'm sure there are. I can't think of any
6    right off the top of my head. I mean, I'll be honest with
7    you. I'm sure there are others, I'm just not --
8    Q    Well, if you followed the verification
9    process that you mentioned, you had to either get that --
10   A    Right.
11   Q    -- you had to get that deposit slip or you
12   had to have a bank conference, you wouldn't have an NSF
13   check if the bank confirmed it, would you?
14   A    Wouldn't have an NSF check if the bank --
15   you've conferenced in the bank --
16   Q    Right.
17   A    -- and he said he made a deposit today?
18   Q    Right.
19   A    Well, he might have written a check from
20   another bank account which he didn't have funds on.
21   Q    Okay.
22   A    That's an example. Floated funds that
23   weren't there.
24   Q    When might the collector be at fault?
25   A    When would the collector be at fault; if he

Page 116

1    made no effort whatsoever to verify funds, the collector
2    would be at fault.
3    Q    If I understand the process right, the
4    general collection manager has to review with the
5    debtor -- with the collector the NSF checks that are going
6    to be resubmitted; correct?
7    A    Correct, they have to review that with the
8    information -- you are asking if he should be reviewing
9    that information --
10   Q    Right.
11   A    -- with the general collection manager?
12   Q    Right.
13   A    Okay.
14   Q    And the general collection manager has to
15   approve the redip; correct?
16   A    The general collection manager has to approve
17   the redeposit; yes.
18   Q    So the general collection manager approves
19   it, and it comes back NSF. Under what circumstance would
20   the collector be at fault for that? What could the
21   collector have done that was wrong?
22   A    What could the collector have done that was
23   wrong; the collector may have falsified notes, may have
24   said that he called the debtor, may have said he called
25   the bank.

B-380

Page 117

1    Q    Okay.
2    A    Didn't do it.
3    Q    But calling the debtor -- calling the debtor
4    wouldn't have been enough? He still --
5    A    Right. I'm just saying he didn't call the
6    bank; he didn't call the debtor; he didn't do anything he
7    said he did.
8    Q    Let's say he did call the bank; he did call
9    the debtor, but let's say he didn't get the NSF deposit
10   slip.
11   A    Well, he didn't get sufficient information.
12   Q    Okay. But the general collection manager
13   wouldn't approve that; right?
14   A    Okay.
15   Q    The general collection manager only approves
16   if they have this additional information beyond contacting
17   the debtor; there has to be either a deposit slip, there
18   has to be a bank conference, there has to be overdraft
19   protection, or there has to be a bank error. It has to be
20   one of those things before a general collection manager
21   will approve it?
22   A    The general collection manager -- you are
23   asking me if the general collection manager should have
24   additional information before they approve the redeposit?
25   Q    Right.

Page 118

1    A    Yes.
2    Q    So if they've approved it -- and let's
3    assume -- there must have been that information in the
4    system; right? So how was the collector at fault if the
5    check was resubmitted?
6         MR. ISRAEL: Asked and answered.
7         Tell him again.
8    A    Okay. He or she may have falsified the
9    information in the record.
10   BY MR. HOMER:
11   Q    If the information is falsified, I guess that
12   would be construed as an intentional violation?
13   A    Would that be construed as an intentional
14   violation; absolutely.
15   Q    What was the discipline for that?
16   A    What was the discipline for intentional
17   violations?
18        MR. ISRAEL: Yes, for a collector.
19   A    Up to and including termination.
20   BY MR. HOMER:
21   Q    Were there situations where the collector
22   could have been at fault without intentionally violating
23   the policy?
24   A    Are there situations where the collector
25   could have been at fault without violating the policy.

Page 119

1    Give me an example.
2    Q    I'm talking about the policy for -- I asked
3    for you to give me an example. We know that you've talked
4    about the collector putting in false information in the
5    system. Is there any situation where he could have been
6    at fault, even though he didn't do that, didn't put false
7    information in the system?
8    A    Could the collector have been at fault if he
9    didn't put information in the system; could he have been
10   at fault.
11   Q    False information in the system.
12   A    If he didn't put false information in the
13   system --
14        MR. ISRAEL: I don't understand the
15   question.
16   A    I don't either.
17   BY MR. HOMER:
18   Q    Here's my question: The general collection
19   manager reviews what the collector did before they approve
20   the redip; correct?
21   A    Correct.
22   Q    So if the collector didn't intentionally
23   misrepresent what information was in the system, wouldn't
24   the general collection manager appropriately review that
25   and say the requirements are met, therefore, we can redip?

Page 120

1         MR. ISRAEL: Objection; vagueness.
2         Why don't you do it by way of example,
3    because I don't understand the question.
4    A    I don't either.
5         MR. HOMER: Listen, I wish you would let
6    the witness indicate that, instead of
7    interrupting. Give her a chance to answer the
8    question. You are just suggesting that she
9    shouldn't answer the question.
10        MR. ISRAEL: I didn't suggest anything. I
11   objected on the basis of vagueness, and I gave
12   you a way to correct the form.
13        MR. HOMER: It's not your place to do that,
14   Dave.
15        MR. ISRAEL: Yes, it is.
16        MR. HOMER: No.
17        MR. ISRAEL: No, I disagree. I have the
18   right to object and protect the record. I'm
19   giving you a specific objection, vagueness.
20   BY MR. HOMER:
21   Q    You've told me that the general collection
22   manager reviews the redip requests if there are criteria
23   used to determine whether it should be resubmitted or not
24   and if it's resubmitted, that the collector could be at
25   fault for what happened.

B - 381

Hue vs. NCO Financial Systems                                    3/16/06 - Kathy Obenshain

Page 121

1        I'm asking you: If you submitted the
2   information and the general collection manager has
3   reviewed it and approved it, what could he have done
4   wrong, other than intentionally say something that wasn't
5   true that the general collection manager provided — that
6   relied upon to collect — to resubmit the check?  What
7   other types of things could the collector be at fault for?
8        A    What could he —
9             MR. ISRAEL:  Objection.
10            Go ahead and answer.
11       A    I'm asking, what other things could he be --
12  what other things could he do --
13  BY MR. HOMER:
14       Q    Yes.
15       A    -- incorrectly?
16       Q    Yeah.  How else could he be at fault, other
17  than intentionally mislead the general collection manager
18  what information was in the system.
19            MR. ISRAEL:  I get it now.
20       A    Okay.  What other things could he do that
21  would be incorrect; other things that he could do to --
22            MR. ISRAEL:  I think he's asking, is there
23       a way for the collector to be in violation of the
24       policy without lying, cheating, or stealing, by
25       falsely representing in the notes.

Page 122

1        Is that fair?
2        A    Is there anything else he could do —
3             MR. ISRAEL:  Is that what you are asking?
4             MR. HOMER:  Yes.
5   BY MR. HOMER:
6        Q    I'm trying to see if a collector is at
7   fault -- if a collector is deemed at fault after an NSF
8   check has been resubmitted, would that mean that he has
9   intentionally violated the policy because if he didn't
10  intentionally violate and didn't put in false information,
11  the general collection manager would have had the right
12  information to make the decision?
13            MR. ISRAEL:  Objection.
14       A    I -- I still --
15  BY MR. HOMER:
16       Q    Let me ask it --
17       A    Okay.
18       Q    Can you think of any example where a
19  collector would be at fault for the redipping of a check
20  where he didn't intentionally misrepresent to the general
21  collection manager what the status of the information was?
22       A    Yes, I can.
23       Q    What would it be?
24       A    He would be told by his manager to
25  arbitrarily deposit all NSFs.

Page 123

1        Q    Any other example?
2        A    That's one.
3        Q    Can you think of any other example?
4        A    Not right off the top of my head.
5        Q    If a collector put a check through after a
6   stop payment was noted in the system, would that be an
7   intentional violation?
8        A    If a collector tried to put through a stop
9   payment on a check?
10       Q    In other words, you have the collector -- you
11  have a notation in the system that there's been a stop
12  payment, and then after that, the collector tries to
13  submit the check, or doesn't pull the check off the
14  system.  Is that a violation?
15       A    Is that a violation; it wouldn't be allowed
16  to happen.  The accounting department wouldn't --
17            MR. ISRAEL:  Answer the question.  Is that
18       a violation, that the collector --
19       A    Yes.
20            MR. ISRAEL:  -- to run that check?
21       A    Yes.
22  BY MR. HOMER:
23       Q    Is there any NCO policy, or was there in
24  December 2003, against running -- that prohibited running
25  an NSF check more than once or twice?  Was there any

Page 124

1   number limit that applied to the running of NSF checks?
2        A    Was there any policy in place that said that
3   you couldn't run a check more than once?
4        Q    Or twice or three times.  Was there any --
5        A    There's no policy in place, because the bank
6   wouldn't allow you to do it.  They put holes in the bottom
7   of the check once it has been run it through twice.  You
8   have to enter it for collection --
9        Q    So the answer to the question, NCO didn't
10  have a policy against running an NSF check more than once,
11  redipping more than once --
12            MR. ISRAEL:  Objection; argumentative.
13            MR. HOMER:  No, it's not.  I'm just trying
14       to --
15       A    Does NCO have a policy in place by attempting
16  to continue to redeposit a check?
17  BY MR. HOMER:
18       Q    Let me restate the question.
19       A    Okay.
20       Q    Was there a policy in December 2003 at NCO
21  that limited the number of times you could rerun an NSF
22  check for -- I mean redeposit a given NSF check?
23       A    It would fall under the same policy as
24  redepositing a check, period.  I mean, yeah, your general
25  collection manager, your -- your -- your collector -- I

B-382

31 (Pages 121 to 124)

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

---

Page 133

1    A    I think we have it here somewhere. She gave
2  me examples of accounts that there was no verification, no
3  notes in the file, nothing.
4    Q    Was it a spreadsheet she gave you, or was
5  it --
6    A    Was it a spreadsheet --
7    Q    -- individual fact sheet notes, or what did
8  you see, if you remember?
9    A    What did I see as I recall, whether it was a
10  spreadsheet or it was a detailed email; I believe it was a
11  spreadsheet.
12    Q    Was it an NSF report?
13    A    Was it an NSF report that came off the system
14  or one that she -- what are you asking?
15    Q    Yes. Do you recall whether the spreadsheet
16  was an NSF report?
17    A    An NSF report; no, I don't recall whether it
18  was an NSF report. I mean, it was definitely an NSF
19  report. It had NSFs on there.
20    Q    Okay.
21    A    It was one compiled by her.
22    Q    After you talked to Dina Loft about the
23  problem --
24    A    Uh-huh.
25    Q    -- did you talk to any of your superiors

---

Page 134

1  about the problem before you started the investigation?
2    A    Did I talk to any of my superiors; yes. I
3  informed Ted Fox.
4    Q    When did you do that?
5    A    When did I do that; the same day I got the
6  information from Dina Loft.
7    Q    What did you and -- what did you tell Mr. Fox
8  about the problem?
9    A    What did I tell Mr. Fox about the problem;
10  just what Dina Loft had told me.
11    Q    What did --
12    A    The exact information. In fact, I think he
13  had got a copy of the email from --
14    Q    He had a copy --
15    A    If I'm not mistaken.
16    Q    What did Mr. Fox say to you?
17    A    What did Mr. Fox say to me; so you are going
18  to find out what happened.
19    Q    Did he tell you to investigate the matter, or
20  you already told --
21    A    Did he tell me to investigate the matter?
22    Q    Yes.
23    A    I had already told him that was what I was
24  going to do.
25    Q    Did he give you any directions at all about

---

Page 135

1  how to do it?
2    A    Did he give me any direction as to how to
3  handle it; no. I told him what I was going to do.
4    Q    What did you tell him you were going to do?
5    A    What did I tell him I was going to do; I told
6  him I was going to look at each account, find out what had
7  happened, why they were deposited, why there were no
8  notes, you know, why was a DCI run for an amount different
9  from the original one.
10    Q    When did you next to talk to Mr. Fox after
11  this initial discussion with him about the problem?
12    A    When did I next talk to Mr. Fox; we talked on
13  a daily basis.
14    Q    About this problem?
15    A    We talked daily just about everything.
16    Q    So you would have talked to him about this
17  problem probably a number of times during the month of
18  January?
19    A    Would I have talked to him a number of times
20  during the month of January; absolutely, to keep him in
21  the loop.
22    Q    Okay.
23    A    Uh-huh.
24    Q    When you got this information from Dina Loft,
25  did the spreadsheet you looked at indicate all the

---

Page 136

1  problems she found, or did it just have information about
2  the Dover office?
3    A    Did the spreadsheet have a number of
4  different accounts; yes, it had a number of different
5  accounts.
6    Q    Some of them weren't from the Dover office;
7  correct?
8    A    Some of them were not from the Dover office;
9  that's correct.
10    Q    Did you investigate any of the other offices
11  other than the Dover office?
12    A    Did I investigate the other offices; yes.
13    Q    Which offices did you investigate?
14    A    Which offices did I investigate; whatever was
15  on the sheet.
16    Q    So you investigated all -- every account that
17  was on the sheet that you got?
18    A    Did I investigate every account that was on
19  the sheet; yes.
20    Q    How did you go about doing that?
21    A    How did I go about doing that; I reviewed the
22  record to see what was done.
23    Q    By that you --
24    A    I looked for specific notes.
25    Q    By records, you looked in the computer to see

---

B-383

34 (Pages 133 to 136)

**Hue vs. NCO Financial Systems**

**3/16/06 - Kathy Obenshain**

Page 137

1  the fact sheet?
2  A  Yes, uh-huh.
3  Q  Okay.
4  A  To see if there were any notes concerning why
5  they had done this.
6  Q  Okay.
7  A  And then I also talked to Valerie to find out
8  why --
9  Q  Okay.
10  A  -- it had been done.
11  Q  Did you find that there was any wrongdoing on
12  the part of collectors in any of the other offices other
13  than the Dover office?
14  A  Did I find any wrongdoing in any of the other
15  offices; not that I recall.
16  Q  What time period did you look at --
17  A  What time period did I look at.
18  Q  In other words, in what time frame were these
19  list of problems -- let's back up a little bit.
20  The list of problems you got had to do with
21  NSF checks; correct?
22  A  The list of problems had to do with NSF
23  checks; yes.
24  Q  In what time frame did the NSF checks cover,
25  from what time?

Page 138

1  A  What time frame?
2  Q  Yes. In other words, did the checks go for a
3  six-month period, a one-month period, a two-year period?
4  A  The checks that we were looking at
5  specifically at this time were December of '03.
6  Q  You were aware that Valerie Hue was out of
7  the office at the end of December '03; correct?
8  A  I was aware that Valerie Hue was out of the
9  office in December '03?
10  Q  The end of December.
11  A  I can't -- you could tell me that, and I
12  would probably have to go back and look at the record.
13  But for me to tell you back -- remembering back that time
14  frame, I'd have to look at the absentee records.
15  Q  When you looked at the records that you
16  talked about, did you look at the record that dealt with
17  Eric Shaw where he indicated what happened with the NSF
18  checks?
19  A  Did I look at what Eric Shaw had said?
20  Q  Yes.
21  A  Or did I --
22  Q  Yes.
23  A  Well, I looked at -- I talked to Valerie Hue
24  specifically.
25  MR. ISRAEL:  No.  He's asking for these

Page 139

1  documents, there was a statement from Eric Shaw.
2  Was that in there?
3  A  A statement from Eric Shaw, you know, I don't
4  remember seeing it.
5  BY MR. HOMER:
6  Q  Do you remember that Eric Shaw is the one who
7  ran the checks at the end of the month in December of 2003
8  and not Valerie Hue?
9  MR. ISRAEL:  Objection.
10  A  Do I remember --
11  MR. ISRAEL:  Wait; wait.
12  THE WITNESS:  Okay.
13  MR. ISRAEL:  I think that's a
14  mischaracterization of testimony.
15  But go ahead and answer.
16  A  Do I remember that Valerie Hue -- that Eric
17  Shaw made the decision --
18  BY MR. HOMER:
19  Q  Let's strike that --
20  A  Is that what you are asking?
21  Q  -- question.
22  A  Are you asking me if I --
23  Q  Let's clarify the question.
24  A  Okay.
25  Q  Do you recall that in connection with this

Page 140

1  case, a statement was obtained from Eric Shaw which
2  indicated that he ran certain checks at the direction of
3  Valerie Hue?  Do you recall that?
4  A  Do I remember that specifically, yes.
5  Q  He did that in the month of December 2003;
6  correct?
7  A  He did that in the month of December 2003;
8  yes.
9  Q  Do you recall the time period in which
10  Valerie Hue was in the hospital?
11  A  Do I remember the time period in which
12  Valerie Hue was in the hospital; yes.
13  Q  Do you recall calling her while she was in
14  the hospital?
15  A  Do I remember calling her while she was in
16  the hospital; to check and see how she was, yes.
17  Q  Okay.
18  MR. ISRAEL:  Is this the same time?
19  BY MR. HOMER:
20  Q  Do you remember the time?
21  A  I don't remember it being in December.
22  Q  Was it in November of 2003, a month before
23  that?
24  A  Was it in November; I don't recall, but I
25  remember her being in the hospital.

B-384

35 (Pages 137 to 140)

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

| Page 141 |
|---|

1    Q    Can you describe what the end-of-the-month
2 process was for reviewing NSF checks at NCO in December of
3 2003, that time period.
4    A    Can I recall -- can I remember what the
5 policy was?
6    Q    Process was.
7    A    Process was. The same -- it's the same
8 process that we discussed earlier, exact same process.
9    Q    Okay.
10    A    The verification process of nonsufficient
11 fund checks, if you want to redeposit it --
12    Q    Was there a time period, though, at the end
13 of the month, or towards the end of the month, where the
14 general collection manager would go through the checks
15 that were NSF checks to see if some of them or all of them
16 could be rerun? And by that, I mean redipped.
17    A    Was there a policy or procedure in place for
18 general collection managers to dig out all their NSFs and
19 see what could be run or not?
20    Q    Yes.
21    A    Not a policy, not --
22    Q    A practice?
23    A    A practice, a little strange -- no, not a
24 practice, a consistent practice in place that says I'm
25 going to go look and see all of my NSF checks that I have

| Page 142 |
|---|

1 and see how many of them could be run.
2    Q    Do you ever recall instructing any of the
3 offices, including the Dover office, but other offices as
4 well, to put the checks on? And by that I mean rerunning
5 the NSF checks.
6    A    Do I ever recall instructing any of my
7 managers to put the checks on?
8    Q    Yes.
9    A    Put the checks on after appropriate
10 verification is done.
11    Q    What does that mean, put the checks on?
12    A    Deposit the checks for revenue purposes on
13 all items that could be verified.
14    Q    Do you ever recall instructing the general
15 collection managers, or any one of them, to check to see
16 if the NSF checks -- rerun the NSF checks through that
17 process of verification?
18    A    Do I ever recall telling the general
19 collection managers to go get all the NSFs and see how
20 many of them could be redeposited?
21    Q    Yes, something to that effect, words to that
22 effect.
23    A    No; no.
24    Q    You never did that?
25    A    No.

| Page 143 |
|---|

1    Q    You never instructed the Dover office to put
2 all the checks on? And by that, I mean to take all the
3 NSF checks and see if they could be verified.
4    A    Take all the NSF --
5         MR. ISRAEL: She's already said --
6    A    -- checks and see if they could be verified;
7 did I ever tell the Dover office to do that?
8 BY MR. HOMER:
9    Q    Yes.
10    A    No.
11    Q    Words to that effect.
12    A    No.
13    Q    Do you ever recall Kim Marlow being in charge
14 of reviewing checks with the collectors --
15    A    Do I ever recall -- go ahead.
16    Q    -- for rerunning NSF checks?
17    A    Do I ever recall Kim Marlow reviewing checks
18 with collectors before redeposits; certainly after Valerie
19 was terminated.
20    Q    How about in November of 2003 when she was in
21 the hospital -- Valerie was in the hospital?
22    A    Do I know for a fact it was Kim Marlow? I
23 mean, she was acting in Valerie's place, so I would assume
24 that she did that.
25    Q    Let's get back to this investigative process.

| Page 144 |
|---|

1         You reviewed the accounts.
2         What else did you do to investigate this
3 problem with too many NSF checks in the Dover office?
4    A    What did I do to investigate the checks; I
5 allowed Valerie to give me an explanation on each one as
6 to how it happened.
7    Q    Anything else?
8    A    Talked to collectors.
9    Q    Okay.
10    A    Ted specifically talked to collectors.
11    Q    Were you present when Ted talked to the
12 collectors?
13    A    Was I present when Ted talked to the
14 collectors; I don't re-- I don't think so.
15    Q    Other than you and Ted, was anyone else
16 involved in the investigation of the problem, other than
17 Dina Loft? We will count her because she gave you the
18 report.
19    A    Correct.
20    Q    But who else besides you and Ted Fox?
21    A    Who else was involved in the investigation; I
22 believe Mike Scher was also involved in the investigation,
23 because he was at the branch level, and Ted asked him to
24 get -- if I'm not mistaken, asked him to get statements,
25 written statements from various people.

B-385

36 (Pages 141 to 144)

Hue vs. NCO Financial Systems                                    3/16/06 - Kathy Obenshain

Page 145

1    Q        Were you present when Ted Fox and Mike Scher
2    discussed it?
3    A        Was I present when Ted Fox and Mike Scher
4    discussed it; no.
5    Q        How do you know that Scher was asked by Fox
6    to do that?
7    A        How do I know that?
8    Q        Yes.
9    A        In our daily conversations about it. We met
10   together daily about everything that went on in our
11   company.
12   Q        So Fox told you that he told Scher that --
13   A        Yeah, to go ahead and get --
14   Q        Okay.
15   A        -- some written statements, that he had -- he
16   had talked to a few of the people, gotten their
17   statements, been told by them that Valerie Hue had
18   instructed them to redeposit these checks.
19   Q        Did anyone in HR have any involvement in the
20   investigation?
21   A        Did anyone in HR have involvement in the
22   investigation; yes.
23   Q        Who else was that?
24   A        Who else was that; that was Cherie Sugg.
25   Q        What did she do?

Page 146

1    A        What did Cherie Sugg do; Cherie Sugg took the
2    information that we had gathered and took our
3    recommendation.
4    Q        She was involved in the decision to terminate
5    Valerie Hue; correct?
6    A        Was she involved in the decision to terminate
7    Cherie Sugg?
8    Q        No, terminate Valerie Hue.
9    A        I'm sorry, terminate Valerie Hue; she wasn't
10   involved in making the decision. That was ultimately -- I
11   spearheaded that, that decision.
12   Q        We will get to that in a minute. But what I
13   was trying to get at was did Cherie Sugg have any
14   involvement in actually investigating the problems, or did
15   she just come into it once the decision was made to take
16   disciplinary action?
17   A        Did Cherie Sugg get involved in the
18   investigation; actually of looking at the records, of --
19   no.
20   Q        Was anybody at HR involved in the
21   investigation of the problem with the NSF checks and
22   Valerie Hue?
23   A        Was anybody involved in the investigation --
24   Q        Any HR people.
25   A        They were involved in the entire process as

Page 147

1    it went along, reviewed the investigative steps, reviewed
2    the information, took our recommendations, and made a
3    decision --
4    Q        I understand that they --
5    A        -- based on what we recommended.
6    Q        Do you understand the distinction between
7    being involved in the review of what was to be done and
8    actually going out and getting the information for the
9    decision? Do you understand the distinction?
10   A        Yes, I do.
11   Q        Was anybody in HR involved in going out and
12   getting the information to be used to make the decision?
13   A        Was anybody in HR involved in going out and
14   gathering the information to be used; no.
15   Q        What documents did you review during the
16   course of your investigation of the Valerie Hue NSF
17   problem?
18   A        What documents did I review?
19   Q        Yes.
20   A        Specifically, the file notes.
21   Q        Those are the computer notes?
22   A        The computer notes, uh-huh.
23   Q        Of the collectors?
24   A        Correct, uh-huh.
25   Q        Anything else?

Page 148

1    A        The actual checks themselves, as I recall.
2    Q        Okay.
3    A        Yeah, the actual items themselves.
4             I'm trying to remember; my discussions with
5    Valerie, asking her what had happened, to give her an
6    opportunity to tell me how this had happened.
7    Q        Did you ever look at the redip request forms
8    that the collectors filled out for the redipping of NSF
9    checks?
10   A        Did I ever look at those redeposit forms; I
11   don't think so.
12   Q        Why not?
13   A        I didn't -- it didn't -- it wouldn't have --
14   by my not looking at the form, it wouldn't have given me
15   any -- it was a piece of paper. It wouldn't have told me
16   if the procedure had been followed correctly, because the
17   information -- there was no documentation on the screen;
18   there was nothing -- I never looked at it.
19   Q        Did you understand that the redip request
20   forms did have information about the justification for
21   redipping an NSF check?
22   A        That was not the policy at the company ever.
23   It always had to be in the notes. There was no extra
24   piece of paper that would ever suffice for a record as to
25   what's being done on the account.

B-386

Hue vs. NCO Financial Systems                          3/16/06 - Kathy Obenshain

Page 149

1    Q      Listen to the question.
2           The question was:  Were you aware that the
3    redip forms that collectors filled out regarding the
4    redepositing of an NSF check contained information about
5    what they did to verify the check?
6    A      Was I aware that they had information on the
7    form that would substantiate why they wanted to redeposit
8    the check?
9    Q      Yes.
10   A      No.  But even if it was there, it's not in
11   the records, so, thereafter, it doesn't matter.  It
12   doesn't exist.  If it's not in the record -- very clear.
13   This has been our policy forever --
14   Q      You said no?
15   A      Yeah.
16   Q      I'll take that.
17   A      Okay.
18   Q      You weren't aware of it; is that --
19          MR. ISRAEL:  You can explain any way you
20   want.
21   A      Yeah.  I mean, it's --
22   BY MR. HOMER:
23   Q      What did you --
24          MR. ISRAEL:  One second; don't cut her off.
25   That's not nice.  If you want her answer --

Page 150

1           MR. HOMER:  If you want to be here for
2    hours and hours --
3    A      That's okay.
4           MR. HOMER:  That was a long answer.  All I
5    needed was a no.
6           MR. ISRAEL:  Well, we're here for hours and
7    hours because you ask the same question 15 times.
8           MR. HOMER:  Sometimes I have to do that.
9           MR. ISRAEL:  I don't agree.
10          But regardless --
11          THE WITNESS:  Yeah.
12          MR. ISRAEL:  -- you can answer any way that
13   best answers the question.  And don't be
14   intimidated into being quiet.  You have to give a
15   full and fair answer.
16   BY MR. HOMER:
17   Q      What did you know about what information was
18   in the redip request forms that the collectors filled out
19   in the Dover office?
20   A      What did I know about them?  What did I know
21   about them; they used a form.  I thought it was
22   superfluous; I thought it was a waste of time.
23   Q      Did you ever see the form?
24   A      At one time or another, sure, I saw it.
25   Q      Okay.

Page 151

1    A      And I thought it was superfluous and a waste
2    of time.
3    Q      Did you see when you looked at the form that
4    there was information about what the collector had done to
5    verify that the funds were available?
6    A      Did I ever see that there was information on
7    there about whether or not the collector had other -- no.
8    Q      If you felt these forms were superfluous --
9    A      Uh-huh.
10   Q      -- why didn't you tell the collectors not to
11   use them?
12   A      Why didn't I tell the collectors not to use
13   them; because on a daily basis, I didn't run the branch.
14   I did not -- if they had internal procedures like that
15   that didn't violate any rules and it worked for them --
16   Q      Did you see the -- are you aware that Eric
17   Shaw gave to Mike Scher a list of NSF checks that related
18   to the investigation of Valerie Hue?
19   A      Was I aware that Eric Shaw gave a list of NSF
20   checks to Mike Scher; I don't recall.
21   Q      Did you ever see a list that Eric Shaw
22   prepared regarding the NSF checks?
23   A      Did I ever see a list that Eric Shaw provided
24   to Mike Scher or --
25          MR. ISRAEL:  Asked and answered.

Page 152

1           Is that the same list?  Is that what you
2    are asking?
3    A      Yeah, did I --
4    BY MR. HOMER:
5    Q      I'm asking --
6    A      -- ever see the list?
7    Q      Yes.
8           MR. ISRAEL:  Did you ever see the list?
9    BY MR. HOMER:
10   Q      If you recall.
11   A      I honestly do not recall.
12   Q      Okay.
13   A      I may have.  I don't recall.  Yeah, I looked
14   at a lot of the documentation at that time.
15   Q      While you were undertaking this
16   investigation, was it in your mind that one possibility
17   was that Valerie Hue could be fired because of the
18   problem?
19   A      Was it in my mind that there was a
20   possibility that Valerie Hue could be terminated; yes.
21   Q      Can you tell me who it was that was
22   interviewed in connection with the investigation of
23   Valerie Hue about the NSF checks?
24   A      Who was interviewed in connection with the
25   investigation; you have Kim Rose, Matt Lane, Dave

B-387

38 (Pages 149 to 152)

Hue vs. NCO Financial Systems

3/16/06 - Kathy Obenshain

Page 153

1  McQuisten, Mark LeFevre, Brad Reavis; Eric Shaw; Kim
2  Marlow.
3      Q       Just for the record, you are reading off a
4  list right now; correct?
5      A       Yeah, uh-huh.
6      Q       Who did these interviews?
7      A       My understanding -- who did the interviews;
8  some of them were done by Ted on the phone.
9      Q       Do you know which ones?
10     A       No.
11     Q       Okay.
12     A       Some were done by Ted on the phone, and some
13  were done by Mike.
14             I think Mike's responsibility was to get the
15  statements.
16     Q       So --
17     A       Get the written statements once Ted had
18  talked to these people.
19     Q       So Ted interviewed these people, and then
20  Scher would get the statement. How would Scher get the
21  statement?
22     A       How would Scher get the statement; he would
23  ask them if they would be willing to write a statement
24  about what they had told Ted.
25     Q       Why did he need to be involved in it? Why

Page 154

1  couldn't --
2      A       Why did he need to be involved in it?
3      Q       Yes.
4      A       Because he was at the location, and Ted was
5  in Louisiana, and he's the branch manager ultimately re --
6      Q       Were you present during any of the
7  conversations between Ted Fox and the collections about
8  the -- when he was interviewing these people?
9      A       Was I present during any of
10  conversations; I may have been. I just -- I'm sorry, I
11  don't remember. I don't -- for some reason, I may have
12  been out of town. I'm just not -- I don't know. I don't
13  remember being actually present during the conversation.
14     Q       Do you know what notes were kept of the
15  conversations?
16     A       Do I know what notes he kept of the
17  conversations; no, I do not. I mean, I know he kept
18  pretty extensive notes on anything.
19     Q       Do you know how he selected who to interview?
20     A       Do I know how he selected who to interview;
21  he selected a lot of the large balance collectors, most of
22  the large balance collectors. Those are large -- large
23  balance collectors. He selected the managers. He
24  selected the people that were ultimately that the -- most
25  of them -- the checks are on their files.

Page 155

1      Q       Do you know after the statements were
2  collected, did anyone at NCO give Valerie Hue an
3  opportunity to look at the statements?
4      A       Did Valerie Hue get an opportunity to look at
5  the statements; do I know whether or not she was given
6  that opportunity; I don't know.
7      Q       Could you just generally describe the process
8  that was followed to make the decision to suspend Valerie
9  Hue. We will get to the termination in a minute; but the
10  initial -- the suspension.
11     A       What was the process made to make the initial
12  decision to suspend Valerie Hue?
13     Q       Yes.
14     A       The initial process was we were completing
15  the investigation, okay. Human resources advised us that
16  at that point in time, we could suspend her with pay,
17  pending the results of the investigation.
18     Q       Who was involved in the decision?
19     A       Myself, Ted Fox, Cherie Sugg, Steve
20  Leckerman.
21     Q       There was a discussion about doing the
22  suspension among that group?
23     A       There was a discussion about doing the
24  suspension amongst that group; yes.
25     Q       Who made the decision to suspend her?

Page 156

1      A       Who made the decision to suspend her?
2      Q       Yes.
3      A       I made the recommendation, and we made the
4  decision together as a group.
5      Q       Okay.
6      A       And Cherie Sugg indicated that would be the
7  appropriate way to do that until the investigation is
8  terminated, then we can suspend her with pay.
9      Q       Do you know what documents were considered
10  when the suspension decision was made?
11     A       Do I know what documents were considered; the
12  actual accounts themselves, some of the information from
13  the collectors and managers and some of those statements;
14  definitely some of those statements.
15     Q       Do you recall any of the discussions that
16  took place when the suspension decision was made?
17     A       Do I recall the conversation between whom?
18     Q       The discussion between this group that made
19  the decision to --
20     A       Do I recall the conversation; no, not for
21  word.
22     Q       Okay.
23     A       Not by word.
24     Q       Who advised Ms. Hue about the suspension?
25     A       Who advised Valerie Hue about the suspension;

B-388

39 (Pages 153 to 156)

**Hue vs. NCO Financial Systems**                    **3/16/06 - Kathy Obenshain**

| Page 157 |
|---|

1  Ted and I.
2      Q      You did it jointly?
3      A      You know, I don't recall us doing it jointly.
4  I recall as -- we did it the same day, but I don't
5  remember who called her first. I honestly do not.
6      Q      Why would two of you need to call her?
7      A      Well, she worked for me directly, so I
8  definitely wanted to let her know. I think he did it as
9  a -- as a courtesy.
10     Q      You think it's a courtesy to have two people
11 call you to tell you you've been suspended?
12     A      Well --
13         MR. ISRAEL: Objection.
14     A      -- I don't --
15         MR. HOMER: I want to get that clarified.
16         MR. ISRAEL: Well, no. You just want to
17     argue with the witness.
18         MR. HOMER: No. I'm just trying to
19     understand why that would be a courtesy.
20 BY MR. HOMER:
21     Q      Normally, one person telling you you are
22 suspended would be enough, would it not? I'm just
23 curious.
24         MR. ISRAEL: Your curiosity isn't record
25     evidence; it's just argumentative.

| Page 158 |
|---|

1  BY MR. HOMER:
2      Q      You don't have any answer?
3         MR. ISRAEL: He wants to know why do you
4      think --
5      A      Why do I think --
6         MR. ISRAEL: Wait. Why did you use the
7      word courtesy?
8      A      Because I think it is a courtesy that,
9  indeed, not only her immediate manager was involved in
10 this decision, that being me, but also the vice president
11 of the entire division was involved in it so that she
12 would understand the gravity.
13 BY MR. HOMER:
14     Q      So this was a decision that you made, both of
15 you would call and tell her that she was suspended? Do
16 you recall?
17     A      I don't recall.
18     Q      Let's turn to the termination of Miss Hue's
19 employment with NCO.
20         Could you describe again, generally, what
21 process was followed to make the decision to terminate
22 her.
23     A      What process was followed to make the
24 decision to terminate her; again, Dina Loft in early 2004
25 and January, the first week --

| Page 159 |
|---|

1      Q      I don't want to go through the whole --
2      A      Okay.
3      Q      -- investigative process.
4             We're up to the suspension.
5      A      Okay.
6      Q      You've made the decision to suspend her.
7      A      Uh-huh.
8      Q      At what point in time did you discuss
9  actually terminating Miss Hue?
10     A      At what point in time did we discuss actually
11 terminating Miss Hue; during that same week.
12     Q      Okay.
13     A      A couple of days later.
14     Q      Can you describe -- you have a two-step
15 process. First, there's a suspension and then there's a
16 termination; correct?
17     A      Uh-huh.
18     Q      Why not just terminate her right away? What
19 happened after the suspension that moved you into the
20 termination mode, if anything?
21     A      What happened after the suspension that moved
22 us into the termination; just a -- a confirmation that we
23 had given everybody an opportunity to -- that we had
24 gathered all the information just for us to be certain we
25 had all the information.

| Page 160 |
|---|

1      Q      What happened between the time of the
2  suspension and the termination in terms of this whole
3  process?
4      A      What happened between the suspension and the
5  termination; we might have gotten another statement or
6  two. I don't recall.
7      Q      Do you recall if at some point in time the
8  attorneys for NCO were consulted about the termination, or
9  about any of this?
10     A      Were the attorneys at NCO consulted about the
11 termination; I believe so, yes.
12     Q      When did they get involved in it?
13         MR. ISRAEL: Wait.
14     A      Were they --
15         MR. ISRAEL: Wait; wait; wait.
16         THE WITNESS: Okay, go ahead.
17         MR. ISRAEL: I think that's privileged.
18         MR. HOMER: When the attorneys got
19     involved?
20         MR. ISRAEL: Yes. How is that not
21     privileged? It gets right to giving advice and
22     the process. I mean, they are allowed to rely on
23     attorneys that --
24         MR. HOMER: You're saying I can't find out
25     when they first consulted with attorneys?

**Hue vs. NCO Financial Systems**

**3/16/06 - Kathy Obenshain**

## Page 161

1    There's no privilege; there's no discussion with
2    attorneys at all. There's nothing about that
3    that's privileged.
4         MR. ISRAEL: I'm not sure that's true,
5    because the process --
6         MR. HOMER: That is just a routine
7    question.
8         MR. ISRAEL: Well, I don't think I agree.
9         But go ahead. If you can remember when, go
10   ahead and answer.
11   A    I cannot remember when, but — and it
12   probably didn't -- didn't come from me. If I'm not
13   mistaken — and I honestly don't know the time frame
14   there — I believe Cherie Sugg got the attorneys involved.
15   BY MR. HOMER:
16   Q    Do you know if it was before Valerie Hue was
17   terminated?
18   A    Before Valerie Hue was terminated; I can't
19   say for a fact.
20   Q    You don't know?
21   A    Don't know.
22   Q    You didn't have any discussion with any of
23   the attorneys before the termination took place?
24   A    Did I have any discussion with any of the
25   attorneys before the termination took place; I'm trying to

## Page 162

1    think; no.
2    Q    Who was involved in the decision to terminate
3    Valerie Hue?
4    A    Who was involved in the decision to make --
5    Q    To terminate.
6    A    To terminate her; myself, Ted Fox, Steve
7    Leckerman, and Cherie Sugg. Dina Loft was there with
8    information.
9    Q    When did you have the discussion about
10   terminating her, was it before the suspension or after the
11   suspension?
12   A    Was it before or after or during the whole
13   time; we discussed that that could be the ultimate result.
14   Q    Well, at some point you decided she was going
15   to be terminated; right?
16   A    At some point we decided she was going to be
17   terminated.
18   Q    Was that at the time you decided to suspend
19   her or was it later or was it --
20   A    Was it at the time we decided to suspend her
21   or was it later; I can't say. I think it was all about
22   the same time.
23   Q    Was there just one decision, let's suspend
24   her and then terminate her? Was that what happened? Or
25   was there two separate decision points?

## Page 163

1    A    Were there two separate decision points;
2    there were definitely two separate decision points. We
3    decided to suspend her with pay to make sure we had all of
4    the facts.
5    Q    Could you describe what roles this group of
6    yourself, Mr. Fox, Mr. Leckerman, and Miss Sugg -- what
7    role did they have in making the decision to terminate
8    Valerie Hue?
9    A    What roles did they have individually --
10   Q    Right.
11   A    -- in making the decision.
12   Q    Let's start with that.
13        Let's start with Leckerman. What was his
14   role in this?
15   A    Leckerman wanted answers as to how this was
16   allowed to happen in the branch. He relied upon the
17   people that work for him to get the answers.
18   Q    Okay.
19   A    Dina Loft was responsible for gathering the
20   information. She provided all the documentation
21   concerning the items themselves.
22        In that Valerie Hue worked for me directly, I
23   felt very strongly about not wanting a person who had,
24   indeed, falsified records, advised other people --
25   Q    You are a little off track in what I'm trying

## Page 164

1    to ask. I'm really trying to get a sense of who -- in
2    making the decision, did you all have an equal say in it?
3    Did somebody have the final say? Did —
4         MR. ISRAEL: That's exactly what she was
5    answering.
6    A    I was trying to answer you.
7         MR. HOMER: Well, she told me Dina got the
8    information.
9    A    Okay.
10        MR. HOMER: I was concerned about this.
11   BY MR. HOMER:
12   Q    I'm just trying to find out --
13   A    Who spearheaded it?
14   Q    Who had what amount of say in it?
15   A    I did. I spearheaded the -- I spearheaded
16   the recommendation that she be terminated, based on all of
17   the facts. Now, that's why it was done in a group manner,
18   to be absolutely certain that everybody concurred.
19   Q    What was the rationale for terminating her?
20   A    That she violated --
21        MR. ISRAEL: Wait; wait.
22        THE WITNESS: Go ahead.
23        MR. ISRAEL: It's been asked and answered.
24        Go ahead and tell him again.
25   A    Go ahead, all right.

B-390

41 (Pages 161 to 164)

Page 165

1        She falsified information; she violated the
2    rules.
3    BY MR. HOMER:
4        Q      What did you believe Valerie Hue's motivation
5    for falsifying the information was?
6        A      What did I believe Valerie Hue's motivation
7    was for falsifying the information; to look good, to put
8    the numbers on the board, to produce revenue that, whether
9    or not it stuck or not was not her concern; she wanted to
10   look good.
11       Q      When you are talking about falsifying
12   information, that goes back to the statement in the
13   complaint, correct, that she committed intentional acts of
14   wrongdoing which were fraudulent in nature?  Is that what
15   you are talking about when you say she --
16       A      She committed intentional acts of wrongdoing
17   by -- yes; she told people to redeposit checks without any
18   verification process.
19       Q      Okay.
20       A      Many people have testified to that.
21       Q      Before this investigation of Valerie Hue --
22   well, strike that.
23             Did you ever have any conversations with Mark
24   LeFevre about bad checks?
25       A      Did I have any conversations with Mark

Page 166

1    LeFevre about bad checks; yes.
2        Q      He was a collector in the Dover office;
3    correct?
4        A      Mark LeFevre was a collector in the Dover
5    office; correct.
6        Q      Did he have a problem with bad checks?
7        A      Did he have a problem with bad checks; I
8    can't say that Mark LeFevre had any more problems than
9    anybody else in the division, no.
10             Mark LeFevre was a high-producing -- very
11   high-producing collector.
12       Q      What was the problem with his bad checks, if
13   you recall?
14       A      What was the problem with his bad checks;
15   specifically I don't recall.  He had a number of bad
16   checks.
17       Q      You talked to him about it?
18       A      I talked to him about it.  I also talked to
19   Valerie about it.
20       Q      You don't recall what the problem with the
21   bad checks was with Mark LeFevre?
22       A      Specifically with Mark LeFevre, no, I don't
23   recall specifically.
24       Q      Did you ever have any conversation with Eric
25   Shaw about problems with his checks?

Page 167

1        A      With Eric Shaw about problems with his
2    checks; no.
3             MR. ISRAEL:  Would you like to take a
4    break?
5             THE WITNESS:  No, I'm fine.
6    BY MR. HOMER:
7        Q      Do you know who Matt Lane is?
8        A      Do I know who Matt Lane is; yes.
9        Q      Did you have any -- he was terminated at NCO;
10   correct?
11       A      Matt Lane was terminated at NCO; yes.
12       Q      What was your -- did you have any involvement
13   in that termination?
14       A      Did I have any involvement in that
15   termination; yes.
16       Q      What was your involvement?
17       A      That was one of the records that was -- that
18   was involved in Dina Loft's investigation.  And he had
19   altered an amount on a -- on a DCI check facts.  Valerie
20   Hue investigated it.  As I recall, Valerie Hue even talked
21   to the debtor to make certain -- after -- when I presented
22   it to her to determine whether or not Matt Lane had been
23   given permission from the debtor to run this DCI, this
24   check by phone, for a different amount, and determined
25   that that was not the case.

Page 168

1        Q      Do you recall that that conversation with the
2    debtor was taped and there was a witness to it, Jenny
3    Birdsong?
4        A      Do I recall the conversation was taped; I
5    don't recall, but I believe that is the case.  I don't
6    recall specifically.
7        Q      Did you approve the firing of Matt Lane?
8        A      I approved the termination of Matt Lane, with
9    the guidance of human resources.
10       Q      Why did you approve it?
11       A      Because he falsified records.
12       Q      I'd like to talk about the bonus and
13   commission system that was used at NCO and ask you a few
14   questions about that.
15             As we understand it in this case, NCO has
16   asserted that Valerie Hue was motivated in December of '03
17   to put on NSF checks, resubmit them, have them resubmitted
18   for the purpose of increasing her bonus, or her
19   commission.
20             What I would like to ask you first of all is,
21   how was Valerie Hue's commission calculated?
22             MR. ISRAEL:  That's a mischaracterization.
23   NCO hasn't -- the Defendant hasn't asserted that
24   as a position.
25             MR. HOMER:  Well, I don't know if you want

B-391

42 (Pages 165 to 168)

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

Page 169

1    to call it a position but --
2         MR. ISRAEL: I mean, we will acknowledge
3    that the result of running checks improperly was
4    to temporarily increase her position financially.
5         MR. HOMER: Okay.
6    BY MR. HOMER:
7    Q    Let's just strike all that. Ignore what I
8    just said, if it makes your attorney feel better.
9         How was Valerie Hue's -- first of all, let me
10   ask you this: Is there a difference between a commission
11   and a bonus for the -- that the general commission --
12   general collection manager earns?
13   A    Is there a difference between a bonus and a
14   commission; yes.
15   Q    What is the commission and what is it based
16   on?
17   A    Commission, it's a similar terminology, but
18   the commission or the -- actually, let me step back.
19   GCMs made bonuses, okay, based on revenue.
20   All right. They also -- it's all considered bonuses.
21   It's not considered commissions. It's all considered
22   bonuses. And it's all based on what their -- number one,
23   their revenue production is, what percentage of their
24   quota they achieved. There are also other bonus
25   opportunities that they could participate in having to do

Page 170

1    with postdates and --
2    Q    Okay.
3    A    -- achievement at certain levels, production
4    so --
5    Q    Do you recall how Valerie Hue's bonus was
6    determined, the one that relates to revenue?
7    A    How Valerie Hue's bonus was figured based on
8    revenue; it was all determined by achieving a specific
9    percentage of that revenue bonus number -- excuse me, that
10   revenue quota number that was assigned to her at the
11   beginning of every month.
12   Q    So at the beginning of every month, she would
13   get a quota, and then her commission would depend on what
14   percentage of the quota she hit?
15   A    Her bonus would -- yes, would be determined
16   by what percentage of that number she achieved.
17   Q    How would the number -- when would the number
18   be calculated?
19   A    When would the number be calculated; are you
20   asking me --
21   Q    For revenue.
22   A    Wait a minute. Let me ask you, are you
23   asking when the quota assignment was made to her? When
24   did she know what she was --
25   Q    No. I think you told me the quota was

Page 171

1    assigned at the beginning of the month.
2    A    Okay.
3    Q    What I'm trying to get at is, at what point
4    in time would you -- would NCO determine how much revenue
5    was generated for that month?
6    A    When would they make a determination how much
7    revenue was generated for that month; after end-of-month
8    closing, right at the end of the month.
9    Q    So she would get a bonus depending on how
10   much revenue was realized at the end of the month for all
11   the collectors; is that a fair statement?
12   A    Correct.
13   Q    Did anybody in the course of the
14   investigation of Valerie Hue regarding the NSF problem
15   take a look to see if she earned a bonus based on the
16   revenue for December of 2003?
17   A    Do I know if anybody looked at whether or not
18   Valerie Hue would have achieved a bonus for that month?
19   Q    Yes.
20   A    No, don't know.
21   Q    Okay.
22   A    I do not know.
23   Q    Would that have been something that would
24   have been relevant to determining whether she had a motive
25   to try to inflate the revenue?

Page 172

1    A    Would it have been relevant to determine
2    whether or not she had a relative for inflating --
3    Q    A motive.
4    A    A motive; would it have been relevant, a
5    motive; whether it was relevant or not has nothing to do
6    with her wrongdoing.
7    Q    Okay.
8    A    I don't know what her motive was.
9    Q    Do you know if anybody at NCO looked to see
10   if she earned a bonus based on revenue for December of
11   2003 before she was terminated?
12   A    Do I know if anybody looked at the number to
13   see if she would have earned a bonus based on revenue for
14   December of 2003; not that I know of.
15   Q    Do you know what her quota was for
16   December 2003?
17   A    Do I know what her quota was for December
18   2003; no.
19   Q    What records would there be to show, first of
20   all, what her quota was, and secondly, whether she got any
21   bonus based on any revenue for December 2003?
22   A    What records are there?
23   Q    Would NCO have that would show that.
24   A    What records would NCO have that would show
25   that; the daily fee numbers for all of the branches.

B-392

## Page 181

1    A    In December 2003, they were paid on EOM-1
2  numbers, okay.
3    Q    I understand that.
4    A    Okay.
5    Q    But what about adjustments for that?  What
6  happened if --
7    A    I don't think Johnny made -- Cortez -- or our
8  payroll department made any adjustments at that point in
9  time.
10   Q    When you say, I don't think, does that
11 reflect that you are not sure?
12   A    To my understanding -- I don't remember; but
13 I'll be honest with you, at that point in time, what I
14 remember is that we were not making adjustments to EOM-1
15 numbers.
16   Q    Okay.
17   A    That didn't occur until January, where the
18 policy is in place about what kind of adjustments we are
19 going to make.  And that became effective in January 2004.
20   Q    Couple other topics I hope we can get through
21 quickly, and then we have to run through some documents.
22   A    Sure.
23   Q    Were you ever aware that Jenny Birdsong made
24 a complaint about Mike Scher regarding offensive touching?
25   A    Was I ever aware of any complaints that Jenny

## Page 182

1  Birdsong made about Mike Scher touching her?
2    Q    Yes.
3    A    Never.
4    Q    Were you ever aware of anybody in the
5  collectors division making a complaint about Mike Scher
6  regarding a racist or a sexual matter?
7         MR. ISRAEL:  Mike Scher being the one who
8     did it?
9         MR. HOMER:  Yes.
10   A    Was I ever aware of Mike Scher making a
11 racist --
12 BY MR. HOMER:
13   Q    No; no.  Anybody that complained --
14   A    Complained.
15   Q    -- about Mike Scher either doing something --
16   A    Racist?
17   Q    -- racist or sexual -- unwelcomed sexual
18 matter?
19   A    No.
20   Q    Were you still at NCO when Valerie Hue filed
21 her charge of discrimination?
22   A    Was I still at NCO when Valerie Hue filed her
23 charge of discrimination; geez, if it occurred before
24 April, I was.  If it didn't, I don't -- I don't remember
25 when she filed.

## Page 183

1    Q    Do you remember reviewing her charge of
2  discrimination?
3    A    Do I remember reviewing her charge of
4  discrimination at that point in time; no.
5    Q    Were you ever involved in responding to the
6  charge of discrimination?
7    A    Was I ever involved in responding to the
8  charge concerning discrimination; no.
9    Q    I may have already asked this, but was Kim
10 Marlow -- you know who Kim Marlow is; right?
11   A    Do I know who Kim Marlow is; yes.
12   Q    Was she white -- or is she white?
13   A    Is she white; yes.
14        MR. HOMER:  I propose we take a short
15     break, and then we have to run through these
16     things.  Hopefully, we can do it fairly quickly.
17        (Marked for identification, Plaintiff's
18     Exhibit Number 1.)
19 BY MR. HOMER:
20   Q    I'm going to hand to you a document that's
21 been marked Exhibit 1.  Your attorney does have a copy,
22 but I would just you as soon look at the original that's
23 been marked as Exhibit 1.
24   A    Okay.
25   Q    And ask if you can identify this, first of

## Page 184

1  all.  Let's take a look at it first.
2    A    Okay.
3    Q    This is a document that I think we talked
4  about before where I think you testified that Valerie Hue
5  was disciplined.
6    A    Uh-huh.
7    Q    As I understand it -- and correct me if I'm
8  wrong -- this one had to do with how she disciplined
9  somebody; am I correct about that?
10   A    Concerning the -- this was discipline --
11 concerning how she disciplined somebody, job discussion
12 summary, correct.
13   Q    Do you see on the first page of the exhibit
14 at the top of the page, there's an email from you to
15 Valerie Hue about this?
16   A    Uh-huh.
17   Q    I'll read it to you, what it says.  It's a
18 quote, "Let's move way beyond this.  You are an excellent
19 manager," and then there are ten exclamation points.
20   A    Uh-huh.
21   Q    Is it accurate that she -- Valerie Hue was,
22 at least a good manager, when she worked for NCO?
23   A    Was Valerie Hue a good manager when she
24 worked for NCO?
25   Q    Yes.

B-393

## Page 185

1    A    During a period of time, yes.
2    Q    Would that period of time be up until
3    January 2004 when you decided to terminate her?
4    A    I wouldn't -- I would not say that she was an
5    excellent manager during that entire period of time.
6    Q    Would you say that she was able to perform
7    her job capably?
8    A    Would I say that she was able to perform her
9    job capably; yes.
10        (Marked for identification, Plaintiff's
11        Exhibit Number 2.)
12    BY MR. HOMER:
13    Q    Miss Obenshain, I hand you a document that's
14    been marked as Exhibit 2.
15    A    Okay.
16    Q    Can you identify this.
17    A    This is a document from Phil Weaver
18    concerning the system administration procedures so when
19    we -- that we have our salesmaker and CRS.  And this was
20    when we were changing over to NCO's system.
21    Q    Do you see there at the first bullet point
22    what it says family and then it puts in parens,
23    master/slave?
24    A    Uh-huh.
25    Q    What does that connote?

## Page 186

1    A    What does that connote; family master/slave
2    changes, that's relative to clients that are of like
3    origin; in other words, you may have three different
4    offices of NCO, and you're all going to put the master NCO
5    office.  And then if they were all clients of C2C
6    Resources, then you would have NCO here, and all of the
7    other offices would be slaves of the master accounting.
8    Q    So slaves are offices -- are NCO offices?
9    A    No; no; no.  I'm giving you an example; I'm
10    giving you an example.  It's a sales terminology.  Let's
11    say I have a client Xerox, for lack of a better
12    description.  Xerox Corporation has this office here.
13    That's the master account number that I'm going to write
14    business under.  And then they have other divisions that
15    we also get business under -- or other offices that we get
16    business from.  We are not going to put them all with --
17    in that same account number.  We are going to set up other
18    account numbers for those other offices but slave them so
19    when you look up the master, you are looking up all the
20    slaves at the same time.  It's just to show that they are
21    all related, all those businesses are related.  It's a
22    sales terminology.
23        (Marked for identification, Plaintiff's
24        Exhibit Number 3.)
25        ///

## Page 187

1    BY MR. HOMER:
2    Q    Miss Obenshain, you've been handed a document
3    that's been marked Exhibit 3.
4        Can you take a moment to review that, please.
5    A    Okay.
6    Q    Do you see down on the first page about
7    two-thirds of the way down, there's an email from Dina
8    Loft, and it starts the word Carolyn?
9    A    Uh-huh.
10    Q    It says, "I had several managers call me in
11    the last week in the month questioning 59 checks" --
12    A    Uh-huh.
13    Q    -- "and what the criteria was to determine
14    the destroy or non posting of an item."
15    A    Uh-huh.
16    Q    And then it goes on, "Here is what I go by."
17    A    Uh-huh.
18    Q    What is 59 checks?
19    A    You know, as I recall -- I've been gone over
20    two years, so 59 checks are usually NSF items, as I
21    recall.
22    Q    Do you have any idea why several managers
23    would be calling about -- well, first of all, do you know
24    who the manager would be that were calling?  Would they be
25    general collection managers?

## Page 188

1    A    You're asking me if I know who would be
2    calling her?
3    Q    Yes.
4    A    Okay, let me state that the -- this memo was
5    directed to Carolyn Moore.  Carolyn Moore is the
6    divisional vice president for the retail division.
7    Q    Okay.
8    A    It was her managers who were calling Dina
9    Loft questioning 59 checks and what the criteria was to
10    determine the destroy or nonposting.
11    Q    But up at the top of the page, page 1, you
12    take that and you forward it to the commercial op
13    managers; correct?
14    A    Correct.
15    Q    Then you say, "please know and understand."
16    A    Uh-huh.
17    Q    So did you send this to the general
18    collection managers --
19    A    Uh-huh.
20    Q    -- and ask them to understand these policies
21    that are stated in the email that appeared below?
22    A    Did I ask them to understand this; yes.
23    Q    Was it because the policy applied to the
24    collection managers that you sent them this?
25    A    Did the policy apply to the collection

Hue vs. NCO Financial Systems

3/16/06 - Kathy Obenshain

## Page 189

1  managers?

2  Q    Yes.

3  A    It applied to the matter in which all NSFs

4  were going to be handled.

5  Q    Is it fair to say you sent this to them

6  because you weren't sure whether they understand how these

7  were to be handled?

8  A    Did I think they didn't understand?

9  Q    Yes.

10  A    I had no reason to think they didn't

11  understand. It wasn't general ops sending me a memo. She

12  was sending Carolyn Moore concerning all her managers.

13  Q    I see. So why did you send it to your

14  managers?

15  A    Why did I send it to my managers; any

16  information that I get that I think will be beneficial, I

17  always provide it to them.

18  Q    Why would it be beneficial to your

19  managers --

20  A    Why would it be beneficial; because it

21  related to the manner to which Horsham was processing

22  their checks.

23  Q    Could you turn to the second page. There's a

24  heading there "mail checks"; correct? And it says in

25  Number 3, All checks over $500, try to verify.

## Page 190

1         Do you see where it says that?

2  A    Do I see; uh-huh.

3  Q    Can I take that to mean that checks that were

4  less than $500 didn't have to be verified?

5  A    This policy from Dina Loft became effective

6  in January so --

7  Q    Well, isn't her memo dated December 3, 2003?

8  A    Dated December 3, 2003, yeah.

9         You know, I can't answer for Dina Loft but --

10         MR. ISRAEL:  When did you get it?

11         THE WITNESS:  For some reason, I didn't --

12  it's interesting, because I don't see the -- I

13  didn't get it until January the 20th, if you

14  notice.

15  BY MR. HOMER:

16  Q    Can you tell me --

17  A    At least that's what I see.

18         MR. ISRAEL:  Oh, I see.

19  A    Sent Tuesday, January 20th, to myself and

20  everybody else.

21  BY MR. HOMER:

22  Q    Independent of this memo, do you recall that

23  checks that were less than $500 didn't have to be

24  verified? Was that NCO policy in December 2003?

25         MR. ISRAEL:  You are asking in the

## Page 191

1         commercial division?

2         MR. HOMER:  Yes.

3         MR. ISRAEL:  The commercial division.

4  A    In the commercial division, we generally did

5  not verify checks under $250.

6  BY MR. HOMER:

7  Q    Well, this says $500.

8  A    Okay.

9  Q    Is your answer, then, that you didn't

10  generally verify checks under $500?

11  A    We didn't generally verify checks under $500,

12  unless we had a history of NSF with that particular

13  debtor.

14  Q    That was true of NSF checks; correct?

15  A    NSF checks?

16  Q    Yes.

17  A    NSF checks, in order to redeposit, I don't

18  think the policy had changed a whole lot. The policy

19  hadn't changed. We still needed to verify the funds

20  whether or not to redeposit the check.

21  Q    Right. But if it was less than $500, you

22  wouldn't have to do that?

23  A    Try to verify; you know, it's not a -- we

24  didn't have a policy in place about reverifying those

25  checks, no.

## Page 192

1         (Marked for identification, Plaintiff's

2         Exhibit Number 4.)

3  BY MR. HOMER:

4  Q    Have you had a chance to look at Exhibit 4?

5  A    Uh-huh.

6  Q    If you could turn to the second page of the

7  exhibit, this is an email from Phil Weaver to the

8  commercial ops managers; correct?

9  A    Commercial sales -- yes, commercial ops

10  managers; yes, correct.

11  Q    And in it, he advises that the automatic

12  redepositing of NSFs is going to cease; correct?

13  A    Right.

14  Q    Then it goes on to say that he's going to

15  publish a process for utilizing redeposit items on a

16  case-by-case basis; correct?

17  A    Correct.

18  Q    Do you recall whether he ever did publish a

19  process to do that?

20  A    Did he publish a process by which to do that;

21  I believe on the first page he says, The following

22  outlines the policy for redeposit of NSF checks. That's

23  dated March 5th. Read carefully and adhere accordingly.

24         This went out -- February 24th, he sent it to

25  all the commercial ops managers, saying, there was no --

B-395

48 (Pages 189 to 192)

Hue vs. NCO Financial Systems       3/16/06 - Kathy Obenshain

---

Page 197

1 BY MR. HOMER:
2  Q Can you identify 6 -- let me see if I can
3 characterize this so we can speed this along.
4   This is your email back to Laiche regarding
5 the EOM check verification process, which was the Exhibit
6 5 document; correct?
7  A Uh-huh.
8  Q Do you know why it took more than a month to
9 tell him the approach was okay?
10  A Why it took more than a month?
11  Q Yes.
12  A No.
13  Q You say in this memo that's Exhibit 6 that
14 everyone -- I guess that refers to the other offices?
15  A It's all; sent to all commercial ops
16 managers.
17  Q They need to adopt a similar, not the same,
18 approach; correct?
19  A Uh-huh, yeah.
20  Q So were the other offices free to have a --
21 adopt their own approach if it was similar, or did they
22 have to -- well, obviously, they didn't have to do exactly
23 the same approach; correct?
24  A I recommended that they adopt a similar
25 approach because this one was very effective.

---

Page 198

1  Q The local offices had some discretion in how
2 they were going to do it; correct? They could do the same
3 or they could do something similar?
4  A Provided they didn't break the rules, that
5 they didn't violate any of the procedures in place.
6   (Marked for identification, Plaintiff's
7 Exhibit Number 7.)
8 BY MR. HOMER:
9  Q Have you had a chance to look at Exhibit 7?
10  A Uh-huh.
11  Q Again, I'll try to characterize it just to
12 speed things along.
13   This is a memo from Mike Scher to all
14 collectors; correct?
15  A Correct.
16  Q Would this be all collectors in the Dover
17 branch office, or would this be all collectors
18 companywide, or would it be all collectors in the
19 commercial division, if you know?
20  A It would be only collectors in his office.
21  Q So is it fair to say that Mike Scher was
22 involved in giving direction to the collectors in his
23 office about how to process the checks?
24  A Is it clear that he was involved in this?
25  Q Yes.

---

Page 199

1  A Evidenced by this.
2  Q He didn't copy you on this, did he?
3  A No, he did not.
4  Q Do you know why?
5  A No, I don't.
6  Q Shouldn't he have copied you?
7  A It would have been nice.
8   MR. ISRAEL: Did you get a copy?
9  A I've not seen this.
10 BY MR. HOMER:
11  Q Doesn't that reflect, too, that the offices
12 were exercising some independence regarding how they
13 handled things from -- independence from you regarding how
14 they handled things?
15  A It doesn't — I don't feel it provides
16 evidence that they were independently making decisions. I
17 think this is an incident by a branch manager flexing his
18 authority, as he sees it.
19   (Marked for identification, Plaintiff's
20 Exhibit Number 8.)
21 BY MR. HOMER:
22  Q Have you had a chance to look at this memo?
23  A Uh-huh.
24  Q Can you explain why -- this is a memo you
25 wrote to Dina Loft; correct?

---

Page 200

1  A Correct.
2  Q Can you explain what the purpose of writing
3 this was.
4  A What the purpose of writing this was?
5  Q Yes.
6  A She asked me for it.
7  Q What did she ask you specifically?
8  A Asked me for our check verification policies.
9  Q That dealt with all checks or NSF checks or
10 what?
11  A Checks — she asked me to give her our check
12 verification policies.
13  Q These apply to -- I see they apply, for
14 example, to postdated checks.
15  A Uh-huh.
16  Q It says in the beginning, We make a serious
17 attempt to verify all postdates over 1,000 gross.
18  A Uh-huh.
19  Q I think a minute ago you said that you didn't
20 verify checks that were less than $500.
21   Can I take this to mean that you also didn't
22 verify checks that were under $1,000?
23  A That's correct.
24  Q That would be true of postdates; it says
25 postdates.

B - 396

Page 205

1    Q      What discipline was meted out for that?
2    A      What discipline was meted out for that; I
3  don't recall.
4    Q      Was there any discipline?
5    A      That the admin didn't give the information to
6  the general collection manager; I don't recall whether
7  there was a JDS or not, job description summary. There
8  was quite a bit of discussion concerning it.
9    Q      Wouldn't the general collection manager have
10 been responsible for seeing that that policy was being
11 followed in the Atlanta office?
12   A      It always has been; so, yes, I agree.
13   Q      Who was the general collection manager in
14 December 2003?
15   A      Ooh, that's a good question, December of
16 2003, I'm not sure if it was Mack Mackenzie or not. I
17 think we had some changes at that point in time.
18   Q      Mack Mackenzie is a white male; right?
19   A      Mack Mackenzie was a white male.
20   Q      True?
21   A      Correct.
22          But I'm not sure if he was there at that time
23 or not. I would have to go back. I'll be honest with
24 you, it might have been after he had left the company.
25          We had some transition managers in there.

Page 206

1          (Marked for identification, Plaintiff's
2          Exhibit Number 9.)
3  BY MR. HOMER:
4    Q      Have you had a chance to review Exhibit 9,
5  Miss Obenshain? Can you identify this exhibit that's been
6  marked Exhibit 9?
7    A      Uh-huh.
8    Q      Is this a memo you wrote on January 22, 2004?
9    A      Correct.
10   Q      It went to Steve Leckerman and a few other
11 people; right?
12   A      Uh-huh.
13   Q      Do you see in the second paragraph there it
14 says, Today Ted Fox and I started conducting an
15 independent investigation --
16   A      Ugh uh-huh.
17   Q      -- interviewing producers in Dover?
18   A      Uh-huh.
19   Q      I thought your investigation began sooner
20 than January 22. Am I wrong about that?
21   A      As I said, I couldn't recall the exact date
22 in January that the investigation began.
23   Q      Okay.
24   A      It's over two years ago.
25   Q      Did you actually -- here it says that you and

Page 207

1  Ted Fox were interviewing producers.
2          In fact, was it Ted Fox that was doing that?
3    A      Again, we both did some of it. I don't
4  remember who did what.
5    Q      Okay.
6    A      I'm not trying to evade you. It's a question
7  of -- I don't remember back that far. I know we both
8  conducted the investigation.
9          (Marked for identification, Plaintiff's
10         Exhibit Number 10.)
11 BY MR. HOMER:
12   Q      Miss Obenshain, have you had a chance to read
13 Exhibit 10?
14   A      Yes.
15   Q      Who was Steve Hallam?
16   A      Steve Hallam was a GCM.
17   Q      Where was he located?
18   A      In Metairie.
19   Q      This is a memo that he wrote to the
20 collectors in Metairie, then; is that right?
21   A      Correct.
22   Q      Does this memo state a new policy that went
23 into effect in January of -- January 20th, 2004?
24   A      That's correct.
25   Q      Was this done at your direction?

Page 208

1    A      Correct.
2    Q      In it you needed to -- well, let's go to the
3  second sentence there. It says, Under no circumstance
4  should anyone request a redeposit of a check without clear
5  notes, with bank information, including the telephone
6  number of the bank that indicates we verified the
7  availability of funds and that there's no stop payment;
8  correct?
9    A      Yes.
10   Q      Am I to understand, then, that as of
11 January 20, 2004, the NCO policy for verification no
12 longer allowed you to redeposit a check unless the bank
13 verified the funds? There was no longer this option of
14 going to the debtor to get verification?
15   A      In January of 2004, all $5,000 checks or
16 greater must also be approved by me.
17   Q      Right. And --
18   A      Okay, so the other procedures had not
19 changed.
20   Q      Are you telling me that this second paragraph
21 only applied to checks over $5,000?
22   A      No.
23   Q      So the second sentence that starts, Under no
24 circumstance, that applied to all checks that were going
25 to be redeposited; is that correct?

B-397

52 (Pages 205 to 208)

Page 213

```
 1    A     Uh-huh.
 2          MR. ISRAEL: Are you making this Exhibit
 3    11?
 4          MR. HOMER: This whole exhibit is 11. All
 5    these documents are going to be one exhibit.
 6  BY MR. HOMER:
 7    Q     Do you see there where it says -- this letter
 8  from McQuisten is addressed to you. Do you know why it
 9  was addressed to you as opposed to -- it was Mike Scher
10  that was collecting these statements; correct?
11    A     As I recall, Ted talked to a lot of these
12  people, and then Mike asked them to put it in writing to
13  my attention so. . .
14    Q     Okay.
15    A     It does not mean that I did not also talk to
16  them. I just don't recall which ones I, you know, called
17  or not.
18    Q     I understand.
19          In the third line -- in the third paragraph
20  it says -- and this is a quote -- "Checks that have been
21  returned NSF, have been directed to be 'put back on.'"
22    A     Uh-huh.
23    Q     What do you take that to mean, to be put back
24  on?
25    A     Put back on, redeposited.
```

Page 214

```
 1    Q     You don't take that to mean run through the
 2  verification system again?
 3    A     Do I take it to mean run through the
 4  verification system; no, because he states, attempts to
 5  contact the debtor have and have not happened; no; no.
 6    Q     Okay.
 7    A     No. This -- put back on means put it back
 8  on.
 9    Q     Means put it?
10    A     Put it on.
11    Q     Resubmit it --
12    A     Put it on.
13    Q     Resubmit it to the bank for payment?
14    A     Uh-huh.
15    Q     Do you see where the -- at the end of the
16  letter, it says, This has been a, quote, "semi," end
17  quote, practice for some time? And it goes on to say, I
18  only have started notating the accounts in the last few
19  months.
20    A     Uh-huh.
21    Q     Did you make any attempt to find out how long
22  the practice that is described in here was in effect at
23  the Dover office?
24    A     Did I make any attempt to find out how many
25  months?
```

Page 215

```
 1    Q     Yes.
 2    A     No.
 3          MR. ISRAEL: Did you say no?
 4          THE WITNESS: No.
 5  BY MR. HOMER:
 6    Q     Isn't it true that Valerie Hue explained to
 7  you during the course of this investigation that the
 8  practice that she followed was the same one that the
 9  previous manager followed in the office?
10    A     Did she tell me that this was the same
11  practice that was followed by the previous manager?
12    Q     Yes.
13    A     No.
14    Q     You don't recall that?
15    A     No.
16    Q     If you could go to page -- these numbers are
17  hard to read, but it's 92.
18          This is a handwritten note.
19    A     Uh-huh.
20    Q     It's hard to read the signature. But it's
21  after a page indicating Mark LeFevre was transmitting to
22  you by fax the attached. And can we assume that the
23  attached is this memo that's at page 92?
24    A     I believe.
25    Q     So these are -- at page 92 is LeFevre's
```

Page 216

```
 1  handwritten note to you; is that correct?
 2    A     Looks like it.
 3    Q     And here it says, Per our conversation.
 4          Do you see where it says that at the top?
 5    A     Uh-huh.
 6    Q     Does this signify that you talked to him
 7  about the subject matter of the memo?
 8    A     I or -- I don't recall if I talked to him
 9  personally or Ted talked to him personally. I probably
10  had a conversation with him.
11    Q     All right.
12    A     Either that or, you know, he had already
13  had -- you know, I don't recall which one got the
14  statements. Both Ted and I talked to these people. Which
15  one talked to Mark first -- and then I might have followed
16  up and said, would you mind putting it in writing, because
17  these people -- these people actually worked for him; they
18  were a lot more familiar with me. Ted might have called
19  to do the preliminary, and then we asked -- it was either
20  through Mike Scher or through myself, would you mind
21  putting it in writing, and when you do, go ahead and give
22  it to Mike, and he'll make sure that you get it, if you
23  feel comfortable in doing it.
24    Q     So these written statements that you got from
25  these collectors, they weren't directed to write these
```

B-398

D'AMICO GERSHWIN, INC. - (770) 645-6111
www.AtlantaCourtReporter.com

Page 217

1 statements? They were just asked and told that if they
2 felt comfortable doing it, they could give you the
3 statement?
4    A    Absolutely.
5    Q    So there wasn't any requirement they provide
6 a written statement?
7    A    There was no requirement they provide a
8 written statement, no.
9    Q    So Ted Fox, who is the --
10   A    You can tell they all came from the branch
11 admin. I'm just looking at the cover sheet.
12   Q    So Ted Fox has conversations with the
13 collectors, and he tells Mike Scher to get written
14 statements from the collectors about these conversations?
15   A    Well, he says, they are going to be gathered;
16 Kathy is probably going to talk to them; I'm going to make
17 sure they turn them in to you, which I can tell they came
18 from the branch admin. I'm just saying it all came from
19 the same fax; they all came from the same fax; looks like
20 they were all typed from the person, the cover sheet.
21   Q    Do you know what Mike Scher said to the
22 collectors about providing the written statements?
23   A    I wasn't there, but nobody was to be
24 intimidated into writing a statement.
25   Q    How do you know that?

Page 218

1    A    Because I know these people. They are not --
2 they are not people that can get easily intimidated by
3 anyone. They are just not; plus the fact I had talked to
4 some of them.
5    Q    Well, if I'm Mike Scher and I answer to Ted
6 Fox and Ted Fox tells me to get the written statements,
7 and I go to my collectors and I say, If you feel
8 comfortable writing these statements, that's not going to
9 get the job done, is it?
10   A    Yes, it is.
11        MR. ISRAEL: Wait.
12        THE WITNESS: Sorry.
13        MR. ISRAEL: Objection; argumentative.
14        Did you say, yes, it would anyway? Was
15     that your answer?
16 BY MR. HOMER:
17   Q    I'll move on.
18   A    All right.
19   Q    Let's go to page 94 of the exhibit.
20        This is Brad Reavis' handwritten statement,
21 again, to you; correct?
22   A    I spoke to Ted and Kathy, yes, uh-huh.
23   Q    Again, this is another statement that
24 somebody requested Mr. Reavis to supply; is that correct?
25   A    Yes.

Page 219

1    Q    And reflects that, again, Ted and you both
2 talked to him?
3    A    In this case, yes.
4    Q    Going to page 96, can you identify this one?
5    A    Uh-huh, yes.
6    Q    This is Kimberley Marlow's written statement;
7 correct?
8    A    That's correct.
9    Q    She references -- this is, again, sent to Ted
10 and copied to you.
11        It says, Per our conversation. Do you recall
12 talking to her, or was it just her conversation with Ted
13 Fox?
14   A    I believe it was her conversation with Ted
15 Fox. We had conversations after that because she was the
16 acting GCM.
17   Q    Do you see in the second paragraph there it
18 says, Then we pulled each collector in one by one and
19 discussed the checks that were to be run and the level of
20 comfort of them clearing; right? Do you see that?
21   A    I see that.
22   Q    This is a description of the monthly process
23 for resubmitting NSFs, is it not?
24   A    That's her description, yes.
25   Q    Did you conclude from this that there was

Page 220

1 something improper?
2    A    Did I conclude from this that something was
3 improper?
4    Q    Yes.
5    A    Yes.
6    Q    What was it that was improper?
7    A    Val stated she had a directive from Kathy
8 Obenshain that we were not pulling any checks off the
9 system and to make this happen.
10   Q    Okay.
11   A    Collectors complained several times about
12 having to put on bad checks at the end of the month that
13 they knew would not clear and will put them at a negative
14 at the beginning of the month.
15   Q    So you are referring to the next paragraph,
16 not the one I was asking you about.
17   A    Well --
18   Q    What is sandbagging?
19   A    Sandbagging is to not put money on at the
20 time you actually know it exists, but to save the
21 information for the next month.
22   Q    So it --
23   A    Save the fees for the next month, the
24 following month.
25   Q    Because, perhaps, you wouldn't get your

B-399

55 (Pages 217 to 220)

Hue vs. NCO Financial Systems                    3/16/06 - Kathy Obenshain

## Page 221

1  bonus -- you didn't have enough money the month that the
2  check was good, and so you want to waiting until the next
3  month where you can put the check in and maybe get a bonus
4  for that month?
5      A    That could be, uh-huh.
6      Q    So was a general collection manager entrusted
7  with trying to prevent sandbagging?
8      A    Was a general collection manager entrusted
9  with trying to prevent sandbagging; yes.
10     Q    In the last paragraph of that memo, Kimberley
11 Marlow writes that Valerie left for vacation. She gave
12 the directive to Eric Shaw and handed him all the cash
13 journals of the collectors that she found multiple NSFs or
14 told -- I think that's what it says -- and told them to
15 get them all on.
16          Do you take that, get them on all, again,
17 meant to run all the NSFs?
18     A    Do I take that to mean to run all the NSFs?
19     Q    Yes.
20     A    Yes.
21     Q    That meant to redeposit all the checks that
22 were NSF checks?
23     A    That meant to redeposit all the checks that
24 were NSF checks --
25     Q    Without going through the verification

## Page 222

1  procedures?
2      A    Without going through the verification
3  procedures; that's what I see.
4      Q    That phrase, get them all on, means -- when
5  someone says get them all on, that means resubmit them; is
6  that correct?
7      A    Get them all on means to resubmit them, yes.
8      Q    For payment?
9      A    Uh-huh.
10     Q    Without verification?
11     A    Yes.
12     Q    Let's go to 98. 98 is Eric Shaw's written
13 statement to you, Kathy Obenshain.
14     A    Uh-huh.
15     Q    Do you know who asked -- it says at the
16 beginning, You've asked me to explain the incidents.
17          Do you know whether it was Ted Fox or you
18 that asked him?
19     A    No.
20     Q    It says at the end of the first paragraph, I
21 was then instructed to review with each individual
22 collector the status of their nonsufficient fund checks
23 for the purpose of locating additional fees we could add
24 on to the end-of-the-month figures.
25          Do you see that?

## Page 223

1      A    Yes.
2      Q    Why would Eric Shaw be doing that if he was
3  instructed to put all the checks on, submit all of them
4  for repayment?
5      A    Why was Eric Shaw doing that if he was
6  instructed to put all of them on; to make sure he knew
7  about all of them. Who knows more about their NSFs than
8  the collectors, to make sure that nothing was missed.
9      Q    Well, it says, The review is for the purpose
10 of locating additional fees.
11          Why are they trying to locate additional
12 fees? If they are going to submit all the checks anyway,
13 why would they need to try to locate them in this review
14 process?
15     A    In the review process, why would they need to
16 try to locate them; they would need to make sure they had
17 all the NSFs that were available to redeposit in order to
18 drive revenue.
19     Q    You have Kim Marlow saying that Shaw was
20 instructed to get all the checks on, which you say meant
21 to take all the NSFs check and redeposit them. Then you
22 have a memo from Shaw saying that he was instructed to go
23 through the NSF checks with the collectors, each
24 individual collector, for the purpose of trying to locate
25 fees.

## Page 224

1          Why spend the time doing that if he was going
2  to resubmit them all anyway?
3      A    I would say the reason he was doing it was to
4  make sure he got every single one of them, make sure
5  nothing was missed.
6      Q    How does that help find them? Doesn't he
7  have a list of all the NSF checks?
8      A    He doesn't have a -- there may be something
9  else from even a previous month. Who knows. I don't know
10 what he was looking for, frankly, but he was instructed,
11 obviously, here to locate as much additional fees as he
12 possibly could add on to the end-of-the-month figures.
13     Q    When you reviewed these documents -- and when
14 I say you, I mean the group that decided to terminate
15 Valerie Hue -- did anybody raise a question about this
16 statement that Shaw made and the statement that Marlow
17 made? Did anybody think there might be an inconsistency
18 there?
19     A    Did anybody think there was any inconsistency
20 there; no, because none of us think there is any
21 inconsistency there at all.
22     Q    Okay.
23     A    Don't feel there is; saying the same thing
24 just in a different -- just in a different manner.
25          He, as being a previous collector, had a

B-400