Case 1:05-cv-00225-KAJ    Document 84-5    Filed 05/16/2006    Page 1 of 41

Hue vs. NCO Financial Systems                                3/16/06 - Kathy Obenshain

## Page 233

```
1    Q      This is and email from you to Dina Loft;
2  correct?
3    A      To Dina Loft, correct.
4    Q      It's dated January 19, 2004, which is shortly
5  before Valerie Hue was suspended; correct?
6    A      Correct.
7    Q      It says in the first sentence, Here is a
8  individual policy in place for 2 LB -- would that be large
9  balance?
10   A      Uh-huh.
11   Q      -- collectors in Dover, Mark LeFevre and Dave
12 McQuisten.
13   A      Correct.
14   Q      Can you tell me what the policy was for those
15 two?
16   A      Can I tell you what the policy was for those
17 two?
18   Q      Yes, the one that -- the policy that's
19 referenced in the statement, Here is an individual
20 policy —
21   A      I don't have a copy of it, so I don't —
22          MR. HOMER: I don't think we got a copy of
23      the policy either.
24          MR. ISRAEL: I don't have anything more to
25      give you.
```

## Page 234

```
1    A      Probably -- I cannot attest to it.
2  BY MR. HOMER:
3    Q      Do you recall there being a reason to have a
4  special policy for LeFevre and McQuisten?
5    A      I can't answer that right now because I don't
6  remember specifically.
7    Q      Well --
8    A      There must have been a reason based on the
9  information that was in Dina's records as to why -- I
10 would -- I would surmise and I'm only guessing at this
11 point in time, that the majority of checks perhaps were
12 theirs, or they were larger items, one of those two. And
13 that they're both large balance collectors -- both Dave
14 McQuisten and Mark LeFevre were large balance collectors.
15 Either the items were very large or there were too many.
16   Q      Then it goes on to say, I'm sending you over
17 a synopsis of our check policies shortly.
18   A      Uh-huh.
19   Q      What check policies are you talking about
20 there?
21   A      The one's that --
22   Q      The previous exhibit?
23   A      Yeah, the one that you already have a copy of
24 it.
25   Q      Dina Loft wouldn't have already known what
```

## Page 235

```
1  those policies were; is that a true statement?
2    A      Dina Loft wouldn't have known what they were
3  already?
4    Q      Yes.
5    A      Yes, Dina Loft did know, but she just wanted
6  to reiterate it. She just wanted to see it in black and
7  white to make sure it met with their. . .
8          (Marked for identification, Plaintiff's
9      Exhibit Number 13.)
10 BY MR. HOMER:
11   Q      This is a memo from Valerie to Dave
12 McQuisten; correct?
13   A      Uh-huh.
14   Q      Can you explain -- do you know what the
15 purpose of this memo was?
16   A      The purpose of this memo, what I understand
17 it to be was, as I said, there was -- as we read here,
18 there was going to be a specific policy for McQuisten and
19 LeFevre.
20   Q      You think this is the policy, then?
21   A      I think this is the procedure, yeah.
22   Q      Okay.
23   A      Because from what I read in here, she came up
24 with this.
25   Q      Does this policy apply to the NSF
```

## Page 236

```
1  verification process?
2    A      Let me see; she's referring specifically to
3  postdates.
4    Q      But that's the same process, isn't it? It
5  says in the first sentence, Your NSFs were 10,000.
6    A      Uh-huh.
7    Q      Is she talking about both NSFs and postdates.
8    A      Well, she references specifically postdates.
9    Q      But the postdate procedure and the NSF
10 procedure were the same; correct?
11   A      Should be, yes.
12   Q      She says here -- did you require Valerie Hue
13 to give this memo to Dave McQuisten, or was this something
14 she did independent of you?
15   A      We discussed it. I said, Come up with a
16 procedure; let's see if it works; let me see what you have
17 in mind; let me see how you would handle this.
18   Q      So did you approve of the policy before it
19 was given to McQuisten?
20   A      Did I approve the policy before it was given
21 to McQuisten; I'm sure I did.
22   Q      In the last paragraph it says, Verification
23 must be with a bank, and then it guess on to say, You must
24 ask if there's a stop payment on the check. If the bank
25 won't verify, then you must not contact the debtor and get
```

Page 237

```
 1   written verification, (deposit ticket, letter of intent to
 2   clear check, et cetera).
 3       A       That's what it says.
 4       Q       Then it says, Previously, your postdated
 5   checks will not be deposited until I have verification of
 6   the funds.
 7       A       That's what it says.
 8       Q       Wasn't that the process for all the
 9   collectors, they all had to verify the funds?
10       A       That is correct.
11       Q       So why is this -- how is this any
12   different -- this isn't a special procedure just for
13   McQuisten, is it, or is this different than what other
14   collectors had to do?
15       A       Is it different from what other collectors
16   had to do?
17       Q       Yes.
18       A       In that I was going to be getting involved in
19   every one of his?
20       Q       Yes.
21       A       That's a little bit different. I wasn't
22   involved in every single --
23       Q       Was that the only difference?
24       A       That's part of the difference.
25       Q       What --
```

Page 238

```
 1       A       I'm looking. That looks like the biggest
 2   part of it.
 3               Yeah, I wanted to see, indeed, if the
 4   authorization was done properly. So that's the biggest
 5   difference, that I'm involved in all of his checks.
 6       Q       Okay.
 7       A       If she was not available, that was the --
 8   yeah.
 9               (Marked for identification, Plaintiff's
10               Exhibit Number 14.)
11   BY MR. HOMER:
12       Q       Can you identify Exhibit 14.
13       A       Exhibit 14. I can read it; I don't remember
14   seeing it.
15       Q       Do you know who -- do you remember this
16   policy being in effect, that's reflected in here?
17       A       I believe it references, if I'm not mistaken,
18   the same memo that Dina Loft sent to Carolyn Moore about
19   all of her managers questioning the 59 checks/redips.
20       Q       Do you know when it was in effect?
21       A       I can't say.
22       Q       Down at the bottom the date is blacked out.
23       MR. HOMER: Dave, do you have any
24   understanding why that is?
25       MR. ISRAEL: No. I was going to ask you
```

Page 239

```
 1   the same question.
 2       MR. HOMER: Was it redacted? Did
 3   somebody --
 4       MR. ISRAEL: Not by us.
 5       MR. HOMER: You don't have the form that
 6   wasn't -- where the date appears on it?
 7       MR. ISRAEL: I don't know where we got it.
 8   I thought you had produced it to us.
 9       MR. HOMER: No.
10       MR. ISRAEL: So I don't know anything about
11   it.
12       MR. HOMER: I don't remember that. I
13   don't --
14       MR. ISRAEL: I'm not saying you did. But
15   I'm looking at it, because I'm wondering who
16   signed it.
17       MR. HOMER: Okay.
18       MR. ISRAEL: Kathy, is this a commercial
19   division?
20       THE WITNESS: I don't see it as being a
21   commercial --
22       MR. ISRAEL: Do you know who Mr. Lee is?
23       THE WITNESS: No, do not know a Mr. Lee.
24   BY MR. HOMER:
25       Q       There's a Barry Lee in the Dover office,
```

Page 240

```
 1   correct, or there was? He was a collector there.
 2       A       I don't know. I don't remember.
 3       Q       Do you see where in paragraph 7 of this
 4   statement it says, All redips need to go through
 5   compliance to verify funds with the bank, exclamation
 6   point?
 7       A       I see that.
 8       Q       Did this mean that checks had to be verified
 9   with a bank, or do you understand what it means -- could
10   you still go to the debtor for verification?
11       A       I cannot --
12       MR. ISRAEL: She doesn't --
13       A       I don't know this memo.
14   BY MR. HOMER:
15       Q       You don't --
16       A       I don't know this memo; I have not seen this
17   before.
18       Q       I understand that. But can you tell me
19   whether this paragraph 7 accurately reflects the policy,
20   as you understood it, of NCO in December 2003?
21       MR. ISRAEL: You mean in the commercial
22   division?
23   BY MR. HOMER:
24       Q       The commercial division.
25       MR. ISRAEL: We've been through this so
```

B-402

Hue vs. NCO Financial Systems                                    3/16/06 - Kathy Obenshain

---

Page 241

1   many times, Jerry.
2       MR. HOMER:  No, I've never asked her this
3   question.  This is another statement about the
4   redip policy.
5       MR. ISRAEL:  I know, but she said she's
6   never seen the policy before.
7       MR. HOMER:  I'm not asking her if she's --
8   I'm just asking if this reflects the policy as
9   she understood it.
10      MR. ISRAEL:  I know, but that's the same
11  question you asked her 15 times earlier.  It says
12  it must go through the bank.
13      Answer him again.
14      Is this the commercial division policy?
15  A    Yes.
16  BY MR. HOMER:
17  Q    And --
18      MR. ISRAEL:  Wait; wait; wait.  Focus on
19  the question.
20      Is this the commercial division policy?
21      THE WITNESS:  Oh, this policy — I
22  apologize; I'm sorry.
23      MR. ISRAEL:  It's late in the day, six
24  hours of testifying.
25  A    I have never seen this, and I think this

---

Page 242

1   policy relates specifically to the retail division.
2   BY MR. HOMER:
3   Q    Okay.
4   A    I have never seen this before.
5       (Marked for identification, Plaintiff's
6   Exhibit Number 15.)
7       MR. ISRAEL:  Is this the latest one that
8   Dina Loft produced?
9       MR. HOMER:  I'm going to go through that in
10  a minute.
11  BY MR. HOMER:
12  Q    I'm going to put my understanding of this on
13  the record.
14      We received from opposing counsel a batch of
15  documents not long ago with a written explanation of the
16  documents.  And as I understand it from that written
17  explanation, Dina Loft worked from the documents that
18  are -- that comprise Exhibit 15.  It's one report, but
19  they are Bates stamped 944, 982, 1025; it's not
20  consecutive because in the version that we got that was
21  Bates stamped, after each individual sheet there were fact
22  sheets, which were submitted, I believe, to the
23  proposition that they supported the information that was
24  in Exhibit 15.
25      MR. ISRAEL:  You mean collector notes?

---

Page 243

1       MR. HOMER:  Right.
2   BY MR. HOMER:
3   Q    On that collector notes, I'm not sure they're
4   all -- I think they were information put into the system
5   that supported each one of these.
6       But collectively, what Exhibit 15 represents,
7   as I understand the information that we were given about
8   it by opposing counsel, is this is the report that Dina
9   Loft worked from to put together her violation report for
10  December of 2003.
11      MR. ISRAEL:  Didn't she create this?
12      MR. HOMER:  Didn't --
13      MR. ISRAEL:  I understood that Dina Loft
14  created this document, and then she created the
15  report with her conclusions.
16      MR. HOMER:  Well --
17      MR. ISRAEL:  That's an important
18  difference.
19      MR. HOMER:  Well --
20      MR. ISRAEL:  I think this is a Dina Loft
21  document.
22      MR. HOMER:  She obviously created it.  I
23  mean --
24      MR. ISRAEL:  Okay.
25      MR. HOMER:  Actually, I'm not sure she --

---

Page 244

1   she did; I think she did create it.
2       MR. ISRAEL:  Okay.
3   BY MR. HOMER:
4   Q    But the form that we got it in was as I just
5   explained.
6       MR. ISRAEL:  Okay.
7       Did you understand that?  Are you
8   listening?
9       THE WITNESS:  Yes, I'm listening.
10  BY MR. HOMER:
11  Q    I'd like to put that aside for a second.
12  We're going to be going back and forth between these two
13  documents.
14      I'd like to next identify Exhibit 16.
15      (Marked for identification, Plaintiff's
16  Exhibit Number 16.)
17  BY MR. HOMER:
18  Q    This is another lengthy document.  This was a
19  document that was sent recently by opposing counsel.  It
20  is a letter explaining what the document is and indicating
21  that there are exhibits attached to it, the second of
22  which, Exhibit B, is the compliance violation report -- or
23  it's characterized in the letter as a policy violation
24  report that Dina Loft put together regarding the -- her
25  investigation in December of 2003.

B-403

61 (Pages 241 to 244)

Hue vs. NCO Financial Systems

3/16/06 - Kathy Obenshain

---

Page 245

1    MR. ISRAEL:  Where is the policy violation
2  report?
3    MR. HOMER:  It's Exhibit B --
4    MR. ISRAEL:  Exhibit B.
5    MR. HOMER:  -- to the letter, which is
6  Exhibit 16.  Exhibit B is part of Exhibit 16.
7    MR. ISRAEL:  I don't see any policy
8  violation report.
9    MR. HOMER:  Well —
10   MR. ISRAEL:  Where is it?
11   MR. HOMER:  It's right after where it says
12  Exhibit B.
13   MR. ISRAEL:  Okay.  Maybe it's in there.
14  Maybe I don't have a full one.
15   MR. HOMER:  You have to go to the right
16  page.
17      There's one exhibit that has a lot of
18  information; then after that, there's an Exhibit
19  B laid in the document.
20   MR. ISRAEL:  Give me a moment.
21      Okay.
22  BY MR. HOMER:
23   Q    Now, according to your letter of March 3 --
24  or Elizabeth Fite's letter of March 3, that is a policy
25  violation report.  If you look at the first page of

---

Page 246

1  Exhibit 16, you will see where she says that --
2    MR. ISRAEL:  I think, Jerry -- this is my
3  view of it.  I've seen the policy violation
4  report, and I think what Liz was saying was that
5  Dina's conclusions were put in a policy violation
6  report, but that they are from the column titled
7  "root of problem," which is -- I don't think this
8  document that I'm holding up to show you is
9  actually the policy violation report.  I think
10  this root of problem in the information is what
11  went to the document called policy violation
12  report.
13   MR. HOMER:  Okay.
14   MR. ISRAEL:  That's what I understand.
15   MR. HOMER:  Do we have a document that's
16  called policy violation report?
17   MR. ISRAEL:  Yeah, we produced that.  We
18  produced that early, early on.  That's what it's
19  called, a policy violation report.
20   MR. HOMER:  Is that this document?
21   MR. ISRAEL:  Yeah, that's it right there.
22   MR. HOMER:  It's not called policy
23  violation report.
24   MR. ISRAEL:  Well, that's what I understand
25  to be the policy violation report.

---

Page 247

1    MR. HOMER:  Okay.
2    MR. ISRAEL:  What happened was -- we can go
3  off the record a second.
4    (Thereupon, an off-the-record discussion
5  was held.)
6  BY MR. HOMER:
7   Q    Let's go back to Exhibit 15.
8    MR. ISRAEL:  Let's just make sure -- let's
9  make a short — as I explained to Mr. Homer off
10  the record, the reference in Miss Fite's March 3,
11  2006 letter, on the first page, last paragraph,
12  Exhibit B to a policy violation report is not
13  Exhibit B to her letter.
14      Exhibit B to her letter, I understand to be
15  Miss Shaantiel's work and information from
16  Miss Shaantiel's work which was titled in
17  Elizabeth Fite's March 3 letter, called, quote,
18  "root of problem," closed quote was transferred,
19  summarized, or somehow reported on the policy
20  violation report; which I can see at least a
21  piece of -- one page, looks like Exhibit 2 to
22  Miss Shaantiel's deposition, and it's got a
23  Number 2 Bates number produced by NCO.
24   MR. HOMER:  Okay.
25  BY MR. HOMER:

---

Page 248

1   Q    With that explanation --
2    MR. ISRAEL:  Go to Exhibit 15.
3    MR. HOMER:  Go to 15.
4  BY MR. HOMER:
5   Q    Do you see on the exhibit where — and I
6  think this is the same exhibit as Exhibit B to Exhibit 16,
7  although I haven't compared it line for line.  But do you
8  see the -- at the top of the first page, which is 944,
9  there are various columns, and one of the columns is the
10  date of check; the next column is the collector name; next
11  is an account number; next says root of problem,
12  collector/cash debtor; next says unit; next says check
13  amount; and next says explanation.  And in there, there
14  are some -- it also says, 1st bounce was never made up
15  with certified funds.  But that deals with the first
16  debtor entry.
17      Now, there are numerous pages of this
18  document, and there are various collector names that
19  appear in it.  The first thing I would like to do is ask
20  if you know where these different collectors work.
21      Let's start with William Catlett.  Do you
22  know where he worked, what office he was in?
23   A    William Catlett was in Atlanta.
24   Q    How about Steve Troxell?
25   A    I believe Steve was here in Atlanta also.

B-404

62 (Pages 245 to 248)

Hue vs. NCO Financial Systems                                    3/16/06 - Kathy Obenshain

Page 253

1    A    Okay.
2    Q    Does that signify that the collector made a
3    mistake in following policy?
4    A    I can't say. I'd have to go back and look at
5    these all over again, and I don't remember.
6    Q    The second one for Catlett says, Debtor says
7    no — it says MY there, but I think it means no money?
8    A    No --
9    Q    Do you know what MY stands for?
10   A    I would presume — I don't know, but I'm
11   guessing no money, MY.
12   Q    No money on 2/12, and then it says check
13   should -- CF, do you know what that means?
14   A    Check should --
15   Q    Should have been pulled.
16   A    -- of pulled; yeah, check should have been
17   pulled.
18   Q    So does that tell you that when the debtor
19   was told that there weren't monies on 12/12 and yet the
20   check was dated 12/31 and it wasn't pulled?
21   A    That's what I'm reading.
22   Q    That would be a violation of the check
23   handling process; correct?
24   A    Yes.
25   Q    Going to the bottom of the next page --

Page 254

1        MR. ISRAEL: What Bates number?
2        MR. HOMER: This is 982.
3    BY MR. HOMER:
4    Q    -- it says, Knew check no good, moved DCI.
5        Does that reflect that the collector
6    submitted it knowing it wouldn't be good?
7    A    Knew check no good, moved DCI; that's what it
8    looks like to me.
9    Q    At the top of the page there for Julie Rees,
10   it says, No money/multi NSF.
11       Would that be a --
12   A    The reason the check bounced was because
13   there was no money.
14   Q    And multi NSF, doesn't that indicate that it
15   was resubmitted several times?
16   A    No, does not.
17   Q    What does it mean?
18       MR. ISRAEL: I don't even have that page.
19       THE WITNESS: It's page 982.
20       MR. ISRAEL: Oh, I'm sorry.
21   A    Multi NSF, what that means is that there were
22   multiple NSFs on that account, nonsufficient fund checks,
23   different nonsufficient fund checks. Multi NSFs wouldn't
24   mean redeposit the same item.
25   BY MR. HOMER:

Page 255

1    Q    The next page, top of the page, Multi NSF,
2    reDCI without debtor okay.
3    A    Multi NSF, re-- R-E-D redci --
4    Q    DCI.
5    A    Redci without debtor's okay.
6    Q    Violation of the check handling policy?
7    A    Yes.
8    Q    Okay.
9    A    Well, from what it says here.
10   Q    Okay.
11   A    Perhaps we did an investigation and found
12   that was not the case. This is just her preliminary
13   giving to me.
14   Q    This is her preliminary?
15   A    This is what she gave to me.
16   Q    She gave you the full list, this whole
17   document, Exhibit 15?
18   A    I don't know if she gave me all of it, but
19   she gave this to somebody and hoped that they would look
20   at it very carefully.
21       I think I didn't get this one -- I don't
22   remember seeing this one in this detail. I don't remember
23   seeing this one in detail. I think I saw this document,
24   the other one.
25   Q    Going to page 1175, at the top of the page --

Page 256

1    A    1175, yeah.
2    Q    I'm just trying to go through some examples.
3    I don't want to go through it all because it is getting
4    late.
5    A    1175, okay.
6    Q    There it says, 2 bounces in a row, never
7    verified funds.
8    A    Two bounces in a row.
9    Q    Never verified funds; correct?
10   A    Uh-huh.
11   Q    That's a violation of the policy; correct?
12   A    That would be correct.
13   Q    Going down to where it says Annie Hunt,
14   Verified no money with bank, still ran. Do you see that,
15   where it says that?
16   A    Yes, I do.
17   Q    That would be a violation of policy?
18   A    Yes.
19   Q    I'm not going to go through the rest of it.
20   But you got this list showing that collectors from several
21   different offices had violated the check handling policy;
22   correct?
23       MR. ISRAEL: She didn't testify she got
24       this list. She got a list.
25       MR. HOMER: I didn't say this list.

13-405

D'AMICO GERSHWIN, INC. - (770) 645-6111
www.AtlantaCourtReporter.com

**Hue vs. NCO Financial Systems**

Page 257

1    A    I don't remember seeing this one. Yeah, I'm
2    sure whether I saw this one.
3         I got a list.
4    BY MR. HOMER:
5    Q    What was done to address the violations that
6    took place in the other offices?
7    A    Restatement of -- what was done in the other
8    offices to address the problems; right?
9    Q    Yes.
10   A    Is that what you are asking me?
11   Q    Yes.
12   A    Restatement of procedures, finding out why
13   these things had been done. This explanation may not
14   be -- the brief explanation that you see either on this
15   one or over here, either way, may not be the full story,
16   may not be complete.
17   Q    Are you saying that in this Document 15, that
18   there may be an explanation why wherever there is a
19   collector -- for all the different collectors, there may
20   be an explanation why --
21   A    No.
22   Q    -- they really weren't at fault?
23   A    No, I'm not saying that in every case. I'm
24   just saying there may have been further information that I
25   was able to provide to Dina about these -- what she had

Page 258

1    uncovered to begin with.
2    Q    Well, you did you personally look into each
3    one of the problem checks that Dina Loft identified in
4    January of 2004?
5    A    Did I look into each one of them; I looked at
6    the report that she gave me and looked at each one of
7    them.
8    Q    So you would have been in a position to know
9    that there were violations of the check handling policy in
10   other offices, and you were in a position to know that in
11   January 2004?
12   A    Yes.
13   Q    What disciplinary action was taken against
14   individuals in the other offices regarding violations of
15   the NSF policy?
16   A    What additional disciplinary action was
17   taken?
18   Q    Disciplinary action of any kind.
19   A    Disciplinary action of any kind;
20   specifically, I don't remember of any other disciplinary
21   action of any kind.
22        There was the termination of Matt Lane --
23   Q    All right.
24   A    -- that I remember specifically. There may
25   have been other disciplinary action. I cannot remember

Page 259

1    specifically whether other job description summaries were
2    issued for people doing these things or --
3    Q    Did you examine when you did your
4    investigation the role of the general collection managers
5    in the other offices and their involvement in these
6    violations?
7    A    Yes.
8    Q    What did you conclude? Were there general
9    collection managers that were also at fault in other
10   offices for these violations?
11   A    Were there collection managers at fault in
12   other offices --
13   Q    For these violations of the NSF check
14   handling policy?
15   A    Were there; I don't recall.
16   Q    Were there any other general collection
17   managers at any of the other offices that were of
18   African-American descent?
19   A    Were there other collection managers at other
20   offices that were of African-American descent?
21   Q    Other than Valerie Hue, were any of the
22   general collection managers in December 2003 of
23   African-American descent?
24   A    No.
25        MR. ISRAEL: Who was running Tucson? Who

Page 260

1    was the collection manager there?
2    A    Yeah, I take that back.
3        MR. HOMER: Dave, you are going to have a
4    chance for cross.
5    A    No; no; no. I'm just trying to -- see, we
6    moved the collectors -- what we did, we moved the
7    collectors into Tucson, all right, when we shut down San
8    Diego. So ultimately, the collectors came under Joe
9    Batie's purview, and Joe Batie was the branch manager.
10   BY MR. HOMER:
11   Q    But he wasn't --
12   A    I take that.
13   Q    But he wasn't a general collection manager?
14   A    He was responsible -- I take that back. He
15   was responsible for the collectors, because we didn't need
16   an acting GCM with him being there. We only had a few --
17   a few collectors, so they fell under his guise.
18   Q    What other general collection managers were
19   of African-American descent, other than Valerie Hue,
20   throughout the time you were there?
21   A    The -- throughout the time that I was there,
22   the gentleman in Chicago, whose name I cannot -- just
23   totally --
24   Q    Who was the other one that got fired?
25   A    Yes, he was the other one that got fired, Joe

B - 406

65 (Pages 257 to 260)

Hue vs. NCO Financial Systems                           3/16/06 - Kathy Obenshain

Page 261

1  Batie.
2      Q      Was there any other -- was there any general
3  collection manager that worked for NCO that did not get
4  fired that was African-American?
5      A      General collection manager that got fired --
6      Q      That didn't get fired.
7              Was there ever a general collection manager,
8  while you were at NCO, that was African-American that
9  didn't get fired?
10     A      Who didn't get fired; well, Joe Batie was
11 acting as general collection manager; he's not been fired.
12     Q      Well, other than Joe Batie.
13     A      Other than Joe Batie. I'm trying to think if
14 there were any other ones; general collection managers,
15 no.
16     Q      Were there any white general collection
17 managers that ever got fired while you were at NCO?
18     A      While I was at NCO?
19     Q      Yes, general collection managers.
20     A      Absolutely.
21     Q      Who were they?
22     A      Greg Cavalcante, for one.
23     Q      What did he get fired for?
24     A      Covering up a situation in the office whereby
25 one of his managers had one of the employees in the office

Page 262

1  after hours with questionable -- with questionable
2  behavior.
3      Q      Anybody else that was fired that was a white
4  general collection manager while you were there?
5      A      While I was there; when we shut down the San
6  Diego branch.
7      Q      He was laid off?
8      A      Yeah, he was.
9      Q      Along with other people?
10     A      Yes. He wasn't offered another general
11 collection manager position anywhere.
12             Let me think; Tampa.
13     Q      What was that one?
14     A      That was -- what was his name, gosh, before
15 Penny -- good lord; I don't remember his name. Sorry. He
16 was replaced by Penny Loftin.
17     Q      When was he fired?
18     A      I couldn't give you the date.
19     Q      Do you know what he was fired for?
20     A      As I recall, just not performing, just not
21 producing, not producing. Let me think. That's it for
22 now. I will have to --
23     Q      Were there any --
24     A      I'm trying to remember others. There were
25 none in -- Steve Ross, that didn't occur while I was

Page 263

1  there. I'm just thinking through the offices, Tucson,
2  Metairie, while I was in that position; Atlanta, Tampa.
3      Yeah, what is his name? He works for -- used
4  to work in -- used to work in Baltimore, moved back to New
5  Orleans, was working for Vera Cornell (phonetic).
6          MR. ISRAEL:  What office?
7          THE WITNESS:  Vera Cornell.
8      A      He works in Metairie; Mike Reginald. Mike
9  Reginald was removed from the, at that point, Odenton
10 office and moved back to Metairie.
11 BY MR. HOMER:
12     Q      Does that cover it?
13     A      Yes.
14     Q      In January of '04, how many general
15 collection managers in your division were female?
16     A      How many general collection managers in my
17 division were female; I don't recall whether Penny was one
18 at that point in time, Penny Loftin in Tampa, or not.
19             But it was Penny Loftin and Valerie Loftin.
20     Q      Before January '04, how many other general
21 collection managers were female, while you were there?
22     A      Myself. I didn't have a general collection
23 manager; had a finals manager, Mary Landry. She was
24 responsible for a very huge department, which was almost
25 the same as a general collection manager, just called a

Page 264

1  different division called finals; Mary Landry.
2              Prior to her you had Denise LeBlanc, also
3  responsible for the finals department, huge department,
4  finals; and legal, as a matter of fact, Denise was
5  responsible for.
6      Q      Other than the two general managers that you
7  mentioned, Valerie Hue and the general manager in Chicago
8  that were African-American, were there any other
9  minorities, you know, such as Asians or any other type
10 minority that was employed as a general collection manager
11 employed by NCO, if you recall?
12     A      Employed by NCO?
13     Q      As a general collection manager.
14     A      As a general collection manager.
15          MR. ISRAEL:  In the commercial division?
16          MR. HOMER:  Yes.
17     A      Oh, in the commercial division? Let me
18 think.
19          MR. ISRAEL:  Objection; relevance.
20     A      I can't think of any.
21 BY MR. HOMER:
22     Q      If a general collection manager knowingly
23 violated the check handling policy for redipping NSFs, was
24 that grounds for termination?
25     A      Knowingly violated the policy for

B-407

66 (Pages 261 to 264)

Hue vs. NCO Financial Systems                                    3/16/06 - Kathy Obenshain

Page 265

1  redepositing checks; it could be.
2      Q    It was in the case of Valerie Hue; correct?
3      A    Valerie Hue specifically was terminated
4  because she told people to violate the policy.
5      Q    Okay.
6      A    She specifically told them to do it, gave
7  them specific instructions to ignore everything.
8      Q    Who told you that?
9      A    All the statements.
10     Q    I never saw a statement where somebody said,
11 she told us to totally ignore everything.
12     A    She told —
13          MR. ISRAEL: Wait a minute.
14          Don't get into an argument with him. Just
15     testify. It's late in the day.
16          THE WITNESS: Got it.
17 BY MR. HOMER:
18     Q    Let me just put it this way: You don't have
19 any knowledge beyond what's in the written statements that
20 we've gone through; correct?
21          MR. ISRAEL: And other than her testifying
22     today, what they told her and what she learned in
23     her investigation and everything that you heard
24     today?
25 BY MR. HOMER:

Page 266

1      Q    Is there any statement that you got from a
2  witness during your investigation that is not in —
3  related to Valerie Hue's wrongdoing that is not reflected
4  in the documents that are part of Exhibit 11?
5      A    Are there any other statements that —
6          MR. ISRAEL: Is that the EEOC position
7     statement?
8          MR. HOMER: That is.
9          MR. ISRAEL: If you know.
10     A    That I know of, no; I don't know of any. I
11 don't recall.
12 BY MR. HOMER:
13     Q    You said you didn't really recall any of
14 those statements being made to you; correct? You weren't
15 sure whether you got the statements or whether Ted Fox got
16 them?
17          MR. ISRAEL: Objection. It's been asked
18     and answered numerous times.
19          MR. HOMER: I just want to make sure.
20          MR. ISRAEL: Well, you've already heard
21     her. She keeps telling you.
22          MR. HOMER: I'm laying a little foundation
23     here.
24 BY MR. HOMER:
25     Q    You didn't have any knowledge, other than

Page 267

1  what's in the statements, and you didn't even get those
2  statements?
3          MR. ISRAEL: Objection;
4     mischaracterization; argumentative.
5          Go ahead and answer.
6      A    I do can answer you because shortly after
7  this whole situation occurred, I went to Dover to make
8  sure that Kim Marlow understood what her responsibilities
9  were. And she was terrified that she was going to do the
10 same things that Valerie had done, because she had been
11 told by Valerie to do things a certain way for so very
12 long. So, yes, did I have interaction with these people
13 that made these statements; absolutely.
14 BY MR. HOMER:
15     Q    Did you ever have any discussion with Ted Fox
16 about possibly taking disciplinary action in some of the
17 other offices regarding the check handling violations that
18 are reflected in this Exhibit 15?
19     A    Did I have any discussion with Ted Fox over
20 disciplinary action with any other of the people --
21     Q    Yes, the possibility.
22     A    The possibility; I don't recall.
23     Q    Can you explain to me why we have this long
24 list of collector violations, and you don't recall a
25 single person, other than the two individuals in Dover,

Page 268

1  being disciplined?
2      A    Why --
3          MR. ISRAEL: Wait. Which two individuals?
4          MR. HOMER: Mr. Lane and Valerie Hue.
5          Those are the only two she's identified that got
6     disciplined.
7      A    Why do I not recall --
8  BY MR. HOMER:
9      Q    No. Can you explain why it is --
10     A    Why --
11     Q    -- that we have this long list of violations
12 of the check handling policy, and only those two
13 individuals were disciplined?
14     A    Why do I think it happened? I can't answer
15 that other people were not disciplined. I can't tell you
16 that other people did not receive JDSs. I can't answer
17 that that didn't happen.
18     Q    Well, this was your division. You were in
19 charge of it; right?
20     A    Correct.
21     Q    You did this investigation?
22     A    Correct.
23     Q    You learned that there were multiple
24 violations by collectors in all the offices basically, in
25 most of the offices, at least?

13-408

67 (Pages 265 to 268)

Hue vs. NCO Financial Systems

3/16/06 - Kathy Obenshain

## Page 277

1  Q    -- the mid-balance manager telling you;
2  right?
3  A    Uh-huh; uh-huh.
4  Q    Say "yes."
5  A    Yes.
6  Q    Kim Marlow made similar reports; correct?
7  A    Yes.
8  Q    Did Miss Hue have any explanation as to these
9  allegations being made by the other managers and by the
10 other collectors in the office? What did she say about
11 all that?
12 A    Nothing.
13 Q    Did she have any explanation at all?
14 A    Nothing.
15 Q    Did she ever complain that it was because of
16 sex or race that these issues were being raised?
17 A    Never.
18 Q    In the time that you supervised Miss Hue when
19 she was the GCM, what was Mr. Fox's role while Weaver was
20 your boss?
21 A    What was Mr. Fox's role with regard to
22 Valerie Hue or --
23 Q    In the division. What was Ted Fox's job?
24 A    He was responsible for sales offices and for
25 sales managers. He had no interaction with -- with the

## Page 278

1  GCMs. He would come to me if he had something he wanted
2  to discuss with them. So he didn't interact with him.
3  Q    At any time prior to Miss Hue's discharge,
4  did she ever complain that Mr. Fox was mistreating her in
5  any way?
6  A    Never.
7  Q    Retaliating in any way?
8  A    No.
9  Q    Did you know of any friction or issue between
10 the two of them, until issues were alleged in this
11 lawsuit?
12 A    Until issues were alleged in this lawsuit is
13 the first time I have heard anything.
14 Q    And regardless it's the first you've heard of
15 anything, did you ever witness anything that in any way
16 gave you concern that Fox was retaliating or treating
17 Miss Hue badly?
18 A    No.
19 Q    Do you know who Bill Savage is?
20 A    I know the name. I've never met the man.
21 Q    Do you have any information that Mr. Fox and
22 Bill Savage were special friends or business associates?
23 Did you hear that?
24 A    I don't think I ever even heard it until, you
25 know, this -- this -- this -- these allegations. I never

## Page 279

1  even heard that they were friends.
2  Q    Did you ever hear those allegations by anyone
3  besides Miss Hue?
4  A    No.
5  Q    Have you ever had a GCM instruct collectors
6  to intentionally violate policies other than Miss Hue?
7  A    Not to my knowledge; none that I'm aware of,
8  no.
9  Q    Were you ever aware of other managers, even
10 if they are not GCMs, having collectors violate policies?
11 A    Other managers specifically telling
12 collectors to violate policy?
13 Q    Yes.
14 A    Do I know of any; not that I can -- not that
15 I remember and can detail specifically.
16 Q    When you learned about what Valerie Hue had
17 done, were you upset?
18 A    Very.
19 Q    Why?
20 A    Because she had violated the rules. She had
21 done something immoral -- in my opinion, it was immoral.
22 It was tantamount to stealing, and she made everybody look
23 ridiculous and violate relations with our clients and put
24 all of her collectors in jeopardy, in a nutshell.
25 Q    You testified that you spearheaded the

## Page 280

1  recommendation to fire Miss Hue.
2  A    Uh-huh.
3  Q    Is that fair?
4  A    Yes, I did.
5  Q    Why?
6  A    Why; because I did not want to have a manager
7  in that position telling people to, number one, break the
8  rules, violate policy in order to drive revenue, and
9  jeopardize all of our relationships with clients and the
10 collectors.
11      I just didn't want to have anybody like that
12 working for me. She violated all the rules and told
13 people to do it.
14      MR. ISRAEL: Pass the witness.
15      MR. HOMER: I have a couple more.
16           RE-EXAMINATION
17 BY MR. HOMER:
18 Q    Were you upset when you learned that other
19 collectors outside the Dover office were violating the
20 check handling policies?
21 A    Was I upset to know that other collectors
22 outside of -- always. You can ask anybody that ever
23 worked for me. There are other people that have been
24 terminated for violating policies -- and for anybody; you
25 can ask anybody.

B-409

70 (Pages 277 to 280)

**Hue  vs.  NCO Financial Systems**                    **3/16/06 - Kathy Obenshain**

| Page 281 |
|---|

1    Q    You testified that all the collectors knew
2   the policies; correct?
3    A    I testified that all the collectors knew the
4   policies; yes.
5    Q    So when you saw the report of all the
6   collectors who were violating the policies around the
7   country, did that upset you, to find that out?
8    A    Did it upset me to find out that they were --
9   I can't -- yes, it upset me to find out we had this many
10  nonsufficient fund checks, as much as anything.  The
11  details about each one of them became very clear.  I can't
12  say that each instance was a violation.  I mean, we had to
13  peel back the onion on a lot of them.
14   Q    When a collector violated a policy --
15   A    Uh-huh.
16   Q    -- if I understand this correctly, it would
17  have had to have been intentional, because all the
18  collectors understood the policies?
19   A    It would have to have been intentional
20  because all the collectors understood the policies; I
21  presume that's your -- yes, I'd say.
22   Q    Did it upset you to learn that collectors
23  around the country were intentionally violating the
24  policy?
25       MR. ISRAEL:  Objection; mischaracterization

| Page 282 |
|---|

1   of the testimony in evidence.
2       There's never been established that they
3   are all violating the policy.
4    A    I mean, just --
5       MR. ISRAEL:  One second.
6       MR. HOMER:  I didn't say they were all
7   violating the policy.
8    A    Right, uh-huh.
9       MR. ISRAEL:  She's already testified.
10      MR. HOMER:  Dave, you are just suggesting
11  the answer to the witness.  It's improper.
12      MR. ISRAEL:  But you are intentionally,
13  late in the day, mischaracterization previous
14  testimony --
15      MR. HOMER:  I'm not --
16      MR. ISRAEL:  -- on unfair
17  cross-examination.
18      MR. HOMER:  She said she reviewed the
19  report; she discovered that there were -- and we
20  went through some examples today.  She discovered
21  there were other problems in other offices.  She
22  doesn't know whether people got disciplined or
23  not, but she was aware of the problems.  She's
24  testified that the collectors knew the policies.
25  If there were violations of the policies by other

| Page 283 |
|---|

1   collectors, they must have known they were
2   violating them; correct?
3       MR. ISRAEL:  Okay, that's an incorrect
4   summary.  You haven't even established which
5   report she looked at, and Miss Obenshain couldn't
6   have been more clear that she did not know the
7   specifics.
8       MR. HOMER:  Okay.  I think what you are
9   saying is improper.  I think you are impeding my
10  examination.  I think it's pretty obvious that
11  she understands the question, and it's a proper
12  question.
13      MR. ISRAEL:  Well --
14      MR. HOMER:  But given the time of day, I'm
15  going to conclude my examination.
16      MR. ISRAEL:  Let me ask this question.
17      MR. HOMER:  That's fine.
18           RE-EXAMINATION
19  BY MR. ISRAEL:
20   Q    From your view and your knowledge relating to
21  all facts and circumstance regarding Miss Hue's
22  separation, do you have any belief that any discrimination
23  or retaliation played in any part of the decision?
24   A    No.
25      MR. ISRAEL:  Okay.

| Page 284 |
|---|

1       MR. HOMER:  Are you done?
2       MR. ISRAEL:  I'll pass the witness.
3       MR. HOMER:  Okay, I'm done.
4       So I need to instruct the witness that you
5   have the right to review the transcript of this
6   deposition once the court reporter has it
7   prepared.  You will have an opportunity, if you
8   find any mistakes in the transcript, to make
9   changes.
10      You also have the right to waive that
11  opportunity.  There's no obligation to review the
12  transcript and make changes.
13      But you do have to tell us what you want to
14  do.  And my question is:  Do you want to have an
15  opportunity to review the transcript?
16      THE WITNESS:  Yes.
17      MR. HOMER:  Okay.
18      MR. ISRAEL:  If you send me the transcript,
19  I'll make sure she gets it.
20      (Deposition concluded at 4:40 p.m.)
21
22
23
24
25

B-410                                71 (Pages 281 to 284)

ORIGINAL[1]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                          )
        Plaintiff,                    )
                                      )
              v.                      ) C.A. No.
                                      ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a        )
Delaware corporation, trading as      )
NCO FINANCIAL COMMERCIAL SERVICES,)
        Defendant.                    )

            Telephone deposition of **BRADFORD REAVIS**,
taken before Cheryl A. Anthony, Court Reporter, in the
law offices of Parkowski, Guerke & Swayze, 116 West
Water Street, Dover, Delaware, on Wednesday, February 1,
2006, beginning at 11:01 a.m.

APPEARANCES:

        PARKOWSKI, GUERKE & SWAYZE
        BY:  JEREMY W. HOMER, ESQUIRE
        116 West Water Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

BY TELEPHONE:

        SESSIONS, FISHMAN & NATHAN
        BY:  DAVID ISRAEL, ESQUIRE
        3850 North Causeway Boulevard
        Lakeway Two, Suite 1240
        Metairie, Louisiana  70002-1752
        Attorney for Defendant.

ALSO PRESENT:
        MR. ERIC SHAW

        **ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302) 674-8884**

7

1        A.      As long as I've been here.

2        Q.      Okay.

3        A.      What is this?  It will be 14 years in June.

4        Q.      Okay --

5        A.      13, 13 or 14.

6        Q.      And you have been a collector that entire

7   time?

8        A.      Yes.

9        Q.      I would like, if you could, to look at a

10   document that has been marked Exhibit 1 -- Is Reavis the

11   right way to pronounce your name?

12        A.      Yes.

13        Q.      -- Reavis 1, which I believe your attorney

14   has a copy of.

15              MR. ISRAEL:  Yes.  I just put in front of

16   him 000093, and it looks like 000094 is the statement.

17   Is that what you've got?

18              MR. HOMER:  Yes.

19              MR. ISRAEL:  Okay.  I'm showing him the

20   statement.  He has both pages in front of him.

21              MR. HOMER:  Again, this was a document that

22   was premarked yesterday by the court reporter that is

23   here today.  She has the original of the exhibit.

24   Yesterday she made a copy of it and left it with

1    talking about a check that has been returned for not

2    having sufficient funds and then resubmitting that for

3    payment again.  That is the redepping of NSF, correct?

4        A.    Correct.

5        Q.    What was NCO's policy, to your

6    understanding, in December of 2003 regarding the

7    procedures for redepping NSF?

8        A.    My understanding of the policy was if the

9    check was returned, we were first supposed to try to get

10   certified funds.  But if we called the bank and the bank

11   said they were available, we could redeposit it.

12            Also, sometimes if we called the debtor and

13   they said they were putting the money in, we could also

14   go to our manager and get the okay to put it in.  And

15   that is a possibility that we would put it in, even

16   though I think the policy strictly was supposed to be

17   certified funds.  We were supposed to call the bank to

18   make sure the funds were available.

19       Q.    So your understanding was you were supposed

20   to get bank verification that the funds were available

21   or have a certified check in order to redep an NSF

22   check?  That was the official policy?

23       A.    Yes.

24       Q.    Did you see a written policy to that effect?

20

1          A.     No, the checking account.

2          Q.     Oh, the checking account.  Okay.  And this

3    practice that you mention of redepping the checks

4    sometimes without contacting the debtor, how long had

5    that gone on at the Dover office prior to December of

6    2003?

7          A.     I don't remember.

8          Q.     Would it have been back 14 years, or would

9    it have been -- Do you have any idea how many years it

10   was?

11         A.     It's not 14 years, no.  I would guess -- I

12   mean right now, I'm guessing, because when you are there

13   14 years, they all run together.  But I would imagine it

14   probably started around the time that the collectors did

15   DCIs on their own.

16         Q.     Do you know when that was?

17         A.     No.

18         Q.     Would it have been 2003 or 2002?  Do you

19   have any idea at all?

20         A.     All the years run into one another.  I would

21   imagine -- I don't know; one or two years before that,

22   but I couldn't say specifically.

23         Q.     Okay.  Do you know whether Kathy Obenshain

24   was aware that people were or collectors were requesting

1            THE WITNESS:  The same time she told us to

2  make sure our checks go in, the bounced checks go in by

3  the end of the month.

4  BY MR. HOMER:

5        Q.    Well, you didn't always resubmit NSF checks

6  for repayment, did you?

7        A.    Not every one, no.

8        Q.    So sometimes you did, and sometimes you

9  didn't.  And Valerie Hue didn't tell you to resubmit all

10  the checks every time, did she?

11            MR. ISRAEL:  Asked and answered.

12            THE WITNESS:  She didn't talk to me about

13  every single check, no.

14  BY MR. HOMER:

15        Q.    Well, you didn't redep NSF checks sometimes,

16  correct?

17            MR. ISRAEL:  Asked and answered.

18            THE WITNESS:  If I knew there was no way it

19  was going to clear, no, I would not redep it.

20  BY MR. HOMER:

21        Q.    Okay.  She didn't tell you to redep it in

22  that situation, did she?

23        A.    No.  You are talking about if an account was

24  closed or the people were out of business, no, we didn't

37

1   A.   No.

2   Q.   Did you see others do that?

3   A.   Not to my knowledge.

4   Q.   You mentioned in your testimony with

5   Mr. Homer that there were meetings where Valerie Hue

6   discussed the running of checks with the LBs as a group.

7   Do you remember that?

8   A.   Yes.

9   Q.   What specifically did she tell the group?

10   A.   We had LB meetings a couple of times a week.

11   And I do know specifically there would be times near the

12   end of the month where she would say:  If you have

13   checks during the month, make sure they go on by the end

14   of the month.

15   Q.   What did you understand that specific

16   statement to mean?

17   A.   If you have a check that is not closed -- My

18   understanding specifically was if you have a check that

19   you can recreate or redeposit by the 31st, make sure you

20   put it in so that we can hit our number.

21   Q.   And you understood that is what violated

22   NCO's policy?

23   MR. HOMER:  I'll object to that question.

24

KENNETH ROSE

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3

     VALERIE HUE,                    )
 4                                   )
            Plaintiff,               )
 5                                   )
     v.                              )
 6                                   )    Civil Action No.
     NCO FINANCIAL SYSTEMS, INC.,    )      05-225-KAJ
 7   a Delaware corporation,         )
     trading as NCO FINANCIAL        )
 8   COMMERCIAL SERVICES,            )
                                     )
 9            Defendant.             )

10

11              Deposition of KENNETH ALAN ROSE taken
     pursuant to notice at the law offices of Parkowski,
     Guerke & Swayze, P.A., 116 West Water Street, Dover,
12   Delaware, beginning at 11:20 a.m. on Wednesday, March 8,
     2006, before Robert Wayne Wilcox, Jr., Registered
13   Professional Reporter and Notary Public.

14   APPEARANCES:

15              JEREMY W. HOMER, ESQ.
                PARKOWSKI, GUERKE & SWAYZE, P.A.
16                116 West Water Street
                  Dover, Delaware  19903
17                for the Plaintiff,

18              ELIZABETH K. FITE, ESQ.
                SESSIONS, FISHMAN & NATHAN, L.L.P.
19                15316 North Florida Ave - Suite 100
                  Tampa, Florida  33613
20                for the Defendant.

21

22                     CORBETT & WILCOX
                 Registered Professional Reporters
23        1400 French Street     Wilmington, DE 19801
                       (302) 571-0510
24                www.corbettreporting.com
```

B-417

2b390812-80df-4f98-afc0-44fb1969260d

KENNETH ROSE

Page 10

1       But what I'm saying is, if you had a
2   group of NSF checks and you redeposited all of them, some
3   of them are going to go through normally.  Correct?
4           MS. FITE:  Object to form.  You can
5   answer.
6       A.  I -- the idea was to get money that cleared
7   the bank.
8       Q.  What is your understanding of what the policy
9   for resubmitting checks was in the year 2003?  I'm
10  talking about NSF checks.
11      A.  For us to resubmit a check, we had to qualify
12  that the funds would be good in one of two ways or both
13  ways, one with the bank itself, if we could.  Some banks
14  don't let us do that.  Secondly would be with the debtor
15  themselves.  And in doing that, qualify where those funds
16  are coming from in order to do so, that being redeposit
17  the check.
18      Q.  I'm not sure I follow the last part of what
19  you just said there.  You say you verify with the debtor
20  the source of the funds?
21      A.  That's correct.
22      Q.  What do you mean by that?
23      A.  We were dealing with businesses.  Businesses
24  relied on income from sales, services, whatever it was

Page 11

1   that drove that business.  They would expect funds at
2   certain times.  So in qualifying them to redeposit that
3   check, we would ask when they expected that money.  And
4   if that money fell into a time frame that allowed us to
5   redeposit the check, then I would present that to the
6   manager for their approval.
7       Q.  Well, were there cases where you would just
8   call the debtor and say, "Is this check going to be good
9   or not"?  Would that satisfy the requirement to do the
10  debtor verification?
11      A.  No.
12      Q.  That wouldn't do it?
13      A.  Not for me.
14      Q.  When you say not for you, what do you mean by
15  that?
16      A.  Again, being income-driven, okay, if the check
17  didn't clear the bank, there was no benefit to me.
18      Q.  In addition to soliciting a statement from a
19  debtor that the funds were good, you would want to know
20  some information that supports his statement that the
21  funds would be good?
22      A.  What do you mean solicit?
23      Q.  When you call up the debtor and ask him, "Is
24  this check going to be good?  Can we resubmit the check?"

Page 12

1   it wasn't enough for him to say, "Yes, it is.  You can
2   resubmit it."  You would want to know why it was a good
3   check.
4       A.  If your question is if I'm qualifying his
5   statement, the answer is yes.
6       Q.  I don't understand why you qualified your
7   answer.
8       A.  Because that's what we did.  We had to qualify
9   what the debtor was saying was in fact what was going to
10  happen, okay, given the circumstance.
11      Q.  Was that your personal method of dealing with
12  it or was that NCO's policy that you had to go beyond
13  just getting a debtor's statement?  You actually had to
14  find out what the basis of the statement was.
15      A.  With regard to that, again, I'm going to go
16  back to being income-driven.  You know, policies and
17  procedures, yes, were followed.  Would I go a little step
18  further to ensure that I can calculate my commission
19  check for the next month?  The answer is yes.
20      Q.  So it would have been an extra step to take to
21  ask the debtor why the check would be good?
22      A.  It would be part of procedure.  But for me,
23  being in my position and being in this business as long
24  as I have, you know, it was just, you know, a natural

Page 13

1   course of events in dealing with an insufficient funds
2   check.
3       Q.  Well, was it NCO's policy for processing the
4   resubmission of NSF checks that you would have to have
5   the debtor explain why the check would be good?
6       A.  Part of training was always to qualify the
7   source of funds.
8       Q.  So the answer is yes to my question?
9       A.  That's correct.
10      Q.  Okay.  Was this policy that you've described
11  for redepositing the checks in writing?
12      A.  I really don't know.  There were many
13  policies.  A lot of policies were read to us in morning
14  meetings.  We may have gotten a memo on them.
15      Q.  You don't remember if it's in writing or not?
16      A.  Again, being ingrained in my brain on how to
17  process that type of a check, you know, the policy,
18  whatever it was, was followed in a way that the check
19  would clear the bank with some certainty on redeposit.
20      Q.  Okay.  How did you learn about this policy
21  that you described to me about resubmitting NSF checks?
22      A.  It would be through training.
23      Q.  NCO trained you on the policy?
24      A.  The managers would train us on policy.  If

B-418

KENNETH ROSE

Page 18

1    Do you know a name for a form you're
2  talking about?
3    Q.  I'm give you some names -- check verification
4  form, a redip form.
5    A.  Those are different things.  Now you're asking
6  about a procedure in order to do something.  That's a
7  little bit different.
8    Q.  Okay.
9    A.  But to actually talk to a debtor or a bank
10  about the check itself, the computer notes and the
11  recording were sufficient.
12    Q.  Okay.  Well, tell me, are you familiar with a
13  form that was called a redipping form --
14    A.  Yes.
15    Q.  -- or something like that?
16    A.  Yes.  That was a necessary form.  There you
17  had to qualify that the funds were there, hopefully, with
18  both the debtor and the bank, and then you would give it
19  to your manager to sign off on.
20    Q.  What was the title of the form?
21    A.  Redip form.
22    Q.  Was it ever called anything but redip form, do
23  you remember?
24    A.  No.

Page 19

1    Q.  Okay.  Who prepared the form?  Who originally
2  came up with the form, do you know?
3    MS. FITE:  Object to form.  You can
4  answer.
5    A.  The form -- we were told at one point that if
6  we were to redip a check we would use this form.
7    Q.  Okay.  Who told you that?
8    A.  Our manager.
9    Q.  Would that be Valerie Hue?
10    A.  I'm not sure when that form came to be.
11    Q.  Okay.  But it might have been Valerie Hue or
12  maybe a predecessor of Valerie Hue?
13    A.  Yes.
14    Q.  Okay.  Did you use the redip forms?
15    A.  I couldn't redeposit the check without a redip
16  form.
17    Q.  Okay.  So --
18    A.  Let me rephrase it.  I couldn't have the check
19  redeposited --
20    Q.  Okay.
21    A.  -- without the redip form.
22    Q.  Let's continue on with what you were talking
23  about before.  You were telling me that when you
24  contacted the debtor you would make notes in the computer

Page 20

1  about your conversation.  Assuming the debtor told you
2  that funds were going to be available, when did you fill
3  out the redip form?
4    A.  At the time of the qualification, if I also
5  got a bank verification.  One or the other.  I would fill
6  it out at that point.
7    Q.  I'm not sure I follow.
8    You fill it out --
9    A.  Once I could qualify that the funds would be
10  good if the check were to be redeposited.
11    Q.  Then you would fill out the form?
12    A.  Yes.
13    Q.  So, normally, that would be after you talked
14  to the debtor if you couldn't get bank verification?
15    A.  Yes.
16    Q.  So you hang up the phone with a debtor and you
17  fill out the form?
18    A.  Yes.
19    Q.  Okay.  Then what do you do with the form?
20    A.  Gave it to my manager.
21    Q.  When do you do that?
22    A.  After I filled it out.
23    Q.  Okay.  Same day?
24    A.  Yes.

Page 21

1    Q.  Okay.
2    A.  It would -- depending on what was going on, it
3  would go in their bin.
4    Q.  Okay.
5    A.  Every manager had a bin outside their office.
6  We put the form in the bin.
7    Q.  Okay.  Let's say that you've tried to get bank
8  verification and the bank wouldn't tell you whether the
9  funds were good or not.  Does that happen very often, by
10  the way?  Will banks verify whether funds are available
11  or not normally?
12    A.  No.  Now they don't.  The Freedom of
13  Information Act has really limited our ability to verify
14  funds with a bank.
15    Q.  How long has that been the case?
16    A.  I think that started in 2005 -- the Freedom of
17  Information Act.
18    Q.  I'm not asking when the Act started.  I'm
19  asking when you did start having problems getting bank
20  verification.
21    A.  When the Act was enforced.
22    Q.  Do you know when that was?
23    A.  Not exactly.
24    Q.  Do you recall, independent of the Act, when

B-419

2b390812-80df-4f98-afc0-44fb1969260d

KENNETH ROSE

Page 26

1      A.   We had all kinds of spreadsheets.
2      Q.   Do you recall when you met with them at the
3    end of the month that they would go through a list of NSF
4    checks with you?
5      A.   It really depended on if I had any.
6      Q.   Well, let's say you had some.
7      A.   How many?
8      Q.   Let's say you had five of them.
9      A.   I don't know that I had five in any given
10   month.
11     Q.   Okay. Whatever number you want to give to it.
12     A.   All right. Okay. Well, if there was one
13   check that bounced and someone asked me if I could make
14   it up by the end of the month with some certainty, okay,
15   given my background in this business, I would say yes.
16   Okay. Whether or not that actually happened is another
17   question.
18     Q.   Do you recall in meeting with the managers or
19   a manager at the end of the month or towards the end of
20   the month -- and when you went over and discussed the
21   making up of NSF -- do you recall that that manager had a
22   list of NSF checks that they were discussing with you?
23          MS. FITE: Object to form. Asked and
24   answered. Go ahead.

Page 27

1      A.   When a check bounced, everybody knew about it.
2    It was public knowledge if a check bounced. Okay. Cash
3    was always posted. We would see what was going on. If
4    you had a bounced check, you were notified about it
5    immediately.
6      Q.   Okay.
7      A.   First of all, you would see it, because you
8    had the ability on a daily basis to look at your fees.
9    When your fees went backwards, one of two things
10   happened, either there was an AR backoff because a client
11   didn't pay us or, B, there was an NSF check.
12     Q.   Okay. Do you recall whether the manager had
13   this list of NSF checks when you met with them at the end
14   of the month?
15     A.   Yes.
16     Q.   Okay. The manager would go through that list
17   with you if you had NSF checks that month. Is that
18   right?
19     A.   Yes.
20     Q.   Okay. What was the purpose of going through
21   the list with you?
22     A.   To see if I could make the check up.
23     Q.   Okay. Why would the manager need to do that?
24   Why would they need to ask you about it?

Page 28

1      A.   Being fee-driven, the only way we could get
2    fee is if the check clears the bank.
3      Q.   Right.
4           When the manager sat down with you
5    towards the end of the month, wouldn't the manager have
6    the documentation, the redip form that you filled out,
7    regarding the NSF check?
8      A.   If they were asking me about a check that
9    hasn't cleared the bank yet, I don't know that they would
10   have a redip form at that point.
11     Q.   Well, maybe you can tell me.
12          How was the redip form used by the
13   manager, if you know?
14     A.   Well, the idea of the form -- okay. Nothing
15   can be redeposited without manager approval. That was
16   the purpose of the form.
17     Q.   So you would give the manager the redip form.
18   The redip form would explain that you'd contact the
19   debtor --
20     A.   Or the bank.
21     Q.   -- or the bank and explain how the funds had
22   been qualified. So the manager would have all that
23   information.
24          Why did they need to talk to you about

Page 29

1    it? Why couldn't they just approve the form?
2           MS. FITE: Object to form. I think
3    you're talking about two different things.
4      A.   You are talking about two different things.
5      Q.   Well, can you explain to me why that is?
6      A.   Why you're talking about two different things?
7      Q.   Yeah.
8           How am I talking about two different
9    things?
10     A.   First of all, if you're talking about a check
11   that has yet to be qualified for redeposit, it wouldn't
12   come up in that meeting.
13     Q.   I'm not talking about those checks. I'm
14   talking about checks that at the end of month you're
15   discussing with the manager because you want to make up
16   NSF or you want to resubmit the check.
17     A.   I'm not understanding what you're saying.
18     Q.   Okay. Let me ask you: What was the process
19   after you put the redip form in the manager's bin? What
20   was the process from there on forward for you to get that
21   check resubmitted?
22     A.   That was the process.
23     Q.   What was?
24     A.   The redip form.

B-420

KENNETH ROSE

Page 42

1   A.  I wasn't really sure.  Again, I'm taken a
2   little off guard when I'm taken out of my office into the
3   general manager's office to talk to Ted Fox.
4       Q.  Did you ever tell Ted Fox or Kathy Obenshain
5   or anyone else that Valerie Hue ever directed you to
6   violate a policy of NCO?
7       A.  No.
8       Q.  Has Valerie Hue ever directed you to violate a
9   policy of NCO?
10      A.  No.
11      Q.  That would include the policy that deals with
12  check handling policies, I assume.
13      A.  Yes.
14      Q.  Okay.  Could you explain the term
15  "sandbagging" to me as it relates to collection practice?
16      A.  Yes, I could.
17      Q.  Okay.  Would you?
18      A.  Oh, okay.  I guess it's a term used for
19  carrying money over to the next month that you could post
20  this month.
21      Q.  By that do you mean that a collector would not
22  want to submit a check until the following month even
23  though he knows it would clear during the existing month?
24      A.  That's the definition of the term.

Page 43

1       Q.  Why would they want to do that?
2       A.  I really don't know.  But I wouldn't do that.
3   But I guess to inflate their income for the next month.
4       Q.  Okay.  Have you ever been disciplined by NCO?
5       A.  Yes.
6       Q.  Were you ever disciplined by Valerie Hue?
7       A.  I'm not sure.  We would get verbal warnings or
8   some kind of warnings, disciplinary warnings.
9           THE WITNESS:  What were they?  JDS's?
10  What were they called?  Yeah.  Yes.
11  BY MR. HOMER:
12      Q.  Did Valerie Hue ever talk to you about sexual
13  harassment?
14          MS. FITE:  Object to form.  Answer if
15  you can.
16      A.  I'm not sure what you mean.
17      Q.  In the course of being supervised by Valerie
18  Hue, was there ever a time where she came to you and
19  discussed sexual harassment?
20      A.  Yes.
21      Q.  Could you relay what the substance of that
22  discussion was?
23      A.  Sure.  There was an allegation by a secretary
24  that I said something.

Page 44

1       Q.  Do you recall what the allegation was?
2       A.  That I had said something.
3       Q.  Do you recall what it was that you had
4   allegedly said?
5       A.  I know what I said.  As far as the allegation,
6   I know what I said.  As far as what was alleged,
7   something that I didn't say.
8       Q.  Did you get disciplined for that, do you know?
9       A.  Yes, I did.
10      Q.  What kind of discipline did you get for it?
11      A.  I got written up with a -- I'm not sure if it
12  was like a final warning.  One step down from being
13  terminated.
14      Q.  Okay.  When was that?
15      A.  In 2003.
16      Q.  Do you remember what month it was in?
17      A.  No.
18      Q.  Have you ever been convicted of a crime?
19      A.  No.
20      Q.  How are you compensated by NCO?  Do you earn
21  salary or commission or a combination?
22      A.  I get a draw.  And once I fill a certain fee
23  bucket or dollars collected, I start making commissions
24  at 15 percent.

Page 45

1       Q.  Okay.  Do you know what your income was from
2   NCO in the year 2005?
3           MS. FITE:  Object to form.  Irrelevant.
4   Answer if you can remember.
5       A.  In what?  Last year, you're saying?
6       Q.  Yes.
7       A.  Mm-hmm.
8       Q.  Approximately what was the amount?
9       A.  A little over $77,000.
10      Q.  Okay.  In 2004 do you remember?
11      A.  $55,000.
12      Q.  How about 2003?
13      A.  $96,000.
14          MR. HOMER:  Okay.  I don't have any
15  other questions.
16          MS. FITE:  I'm going to step out and
17  talk with Dina.  Off the record for a minute.
18          (A recess was taken.)
19          - - - - -
20          KENNETH ALAN ROSE, resumes
21  BY MS. FITE:
22      Q.  You know me.  I'm Elizabeth Fite.  I'm an
23  attorney for NCO in this matter.  I'm just going to ask
24  you two questions.

B-421

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                          )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )
                                      )      Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,          )       05-225-KAJ
a Delaware corporation,               )
trading as NCO FINANCIAL              )
COMMERCIAL SERVICES,                  )
                                      )
        Defendant.                    )

        Telephone Deposition of MICHAEL SCHER taken
pursuant to notice at the law offices of Parkowski,
Guerke & Swayze, P.A., 116 West Water Street, Dover,
Delaware, beginning at 10:00 a.m. on Thursday, March 23,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.

APPEARANCES:

        JEREMY W. HOMER, ESQ.
        PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware  19903
          for the Plaintiff,

        ELIZABETH K. FITE, ESQ. (via teleconference)
        SESSIONS, FISHMAN & NATHAN, L.L.P.
          15316 North Florida Ave - Suite 100
          Tampa, Florida  33613
          for the Defendant.


                    CORBETT & WILCOX
            Registered Professional Reporters
        1400 French Street      Wilmington, DE 19801
                    (302) 571-0510
                www.corbettreporting.com

Michael Scher

8 (Pages 26 to 29)

Page 26

1  didn't have anything to do with where the collection
2  records were kept.
3      Q.  I understand that.
4          But as general manager you were aware
5  that the policy of the office was to retain all records.
6  Is that a fair statement?
7      A.  When things were sent to our corporate
8  office — I really do not know whose responsibility it
9  was to keep those records. I don't know if we had to
10  keep something on site or if it was corporate's
11  responsibility to keep records on site.
12      Q.  Okay. But let's just talk about records that
13  were at the Dover office. As I understand it, your
14  policy at the Dover office was not to throw away any
15  records. Is that correct?
16      MS. FITE:  Object to form. I think
17  that's a mischaracterization. They wouldn't have kept
18  every piece of paper that ever went out of the Dover
19  office. That would have been millions of pieces of paper
20  per year.
21      THE WITNESS:  Absolutely.
22      MR. HOMER:  Well, now you're sort of
23  testifying for the witness, Elizabeth.
24

Page 27

1  BY MR. HOMER:
2      Q.  You did testify earlier that the policy was
3  not to throw anything away, as I understood it. Am I
4  right about that?
5      A.  No.
6      Q.  Okay. Let's go —
7      A.  We had to purge our records every now and
8  again. I mean, it just — it would be impossible to keep
9  every piece of paper.
10      Q.  I understand that.
11          But when there are records that reflect
12  a transaction with a debtor, for example — and we'll
13  talk specifically about the redip forms — those types of
14  records are records that the policy was to retain,
15  correct, and not throw away?
16      A.  I would believe the collections department
17  would be responsible for retaining those, yes.
18      Q.  Okay. Going back to Exhibit 2, which is your
19  sworn statement, I'll read to you paragraph No. 2. It
20  says, "At no time did Kathy Obenshain, former vice
21  president of operations for the commercial division,
22  instruct me to redeposit checks without verification of
23  funds. Such conduct is a known violation of NCO check
24  handling policies."

Page 28

1          My question for you is: Kathy Obenshain
2  would not instruct you to redeposit a check under any
3  circumstance, would she?
4      A.  I cannot think of one, no.
5      Q.  You didn't have any role whatsoever for
6  redepositing checks. Correct?
7      A.  Instructions would have been given to the
8  collections department.
9      Q.  Okay. I'd also like to refer to paragraph
10  No. 5 of the exhibit, which reads — again, I'll quote
11  this -- It is known that fraudulently violating NCO's
12  check handling policies would result in termination, end
13  quote. This follows your paragraph 4 statement where
14  you're talking about the resubmission of checks and
15  verification and so forth.
16          Mr. Scher, are you stating here in
17  paragraph No. 5 of the statement that it would have been
18  fraudulent to redeposit an NSF check without getting
19  verification from the debtor that the funds are
20  available?
21      A.  Unless you had bank verification, then you
22  were not — then it's a violation of policy. There were
23  only two ways to deposit the check -- or redeposit a
24  check.

Page 29

1      Q.  Okay. I understand that was the policy, but
2  this seems to go one step further. It says it's actually
3  fraudulent to redeposit a check unless there's been
4  verification with a bank or verification with a debtor.
5  Isn't that what it's saying?
6      A.  It does say fraudulent.
7          Are you asking me my opinion?
8      Q.  Well, I'm asking if that's what you meant by
9  your written statement.
10      A.  Yes. That would be fraudulently violating
11  NCO's check handling policies.
12      Q.  So if an NSF check was redeposited for payment
13  without getting verification from the bank that the funds
14  were there or else getting verification from the debtor
15  that the funds were there, that would be fraudulent?
16      A.  Fraudulently inflating our end-of-the-month
17  revenue numbers.
18      Q.  Well, it says "fraudulently" violating the
19  policy. Doesn't it?
20      A.  Yes, it does.
21      Q.  Okay. So am I right in saying, according to
22  your statement here, if you don't get bank verification
23  or debtor verification that an NSF check is going to be
24  good, then you've engaged in fraud if you resubmit the

Michael Scher

Page 34

1    Q.  Do you recall when you first became aware of
2  that?
3    A.  I believe it was whenever NCO obtained the
4  documents of the discrimination charge.
5    Q.  Okay.  Do you recall if the charge was sent to
6  the Dover office?  Or was it sent somewhere else, if you
7  recall?
8    A.  I don't recall.
9    Q.  Okay.  Do you recall who it was that told you
10  about the charge?
11    A.  No, I don't recall.
12    Q.  Okay.  Do you recall the approximate time that
13  you've learned about it vis-a-vis the time when Valerie
14  Hue was terminated?  In other words, do you remember
15  being notified a week after she left?  A month?  A year?
16  Anything along that line?
17    A.  I'm sorry.  I don't recall.
18    Q.  Okay.  Mr. Scher, have you ever been
19  disciplined by NCO regarding any matter that has to do
20  with sexual harassment?
21    A.  No, I have not.
22    Q.  Okay.  Has anyone at NCO ever accused you of
23  engaging in sexual harassment?
24    A.  No.  There was one time that there was a

Page 35

1  misunderstanding that I had had over something that was
2  said with a former -- with an employee.
3    Q.  Okay.  Would that have been Jenie Birdsong?
4    A.  Correct.
5    Q.  Are you sure it was over something that was
6  said, or did it involve touching?
7    A.  I don't recall.  As far as I recall, it was
8  something that was said.
9    Q.  Okay.  What do you recall about it?
10    A.  Jenie had misunderstood something that I had
11  said.  The next day it was addressed.  We sat down like
12  adults and discussed it and got past it.  And as far as I
13  know, nothing has been stated since.  We remain great
14  friends today.
15    Q.  Okay.  Was NCO management made aware of the
16  issue?
17    A.  I believe Jenie Birdsong said something to
18  Valerie.
19    Q.  Anybody other than Valerie that was aware of
20  it that you know of?
21    A.  I don't know if Valerie said anything else.
22    Q.  Okay.  I take it you weren't suspended or
23  disciplined as a result of this incident.
24    A.  No.  There was no -- Jenie and I had sat down

Page 36

1  and talked about it.  There was nothing further.
2    Q.  Okay.  As far as you know, other than Jenie
3  and Valerie Hue and yourself, nobody else even knew about
4  this incident?
5    A.  I don't know if it went past our office.  It
6  was resolved.  And that was it.
7    Q.  Okay.  But the answer to the question would
8  be, no, you're not aware of anybody else?
9    A.  No.
10    Q.  Okay.  Let me put that in a way that's clear
11  what your answer it.  Was there anybody other than
12  yourself, Valerie Hue and Jenie Birdsong that was aware
13  of the incident that you mentioned a minute ago where
14  there was a misunderstanding about a comment of a sexual
15  nature?
16        MS. FITE:  Object to form.
17    A.  I do not know if there was anybody else that
18  was aware of the misunderstanding.
19    Q.  Okay.  Mr. Scher, can you tell me
20  approximately what you earned in the year 2003 from NCO?
21    A.  I cannot recall.
22    Q.  Do you have any idea?
23    A.  2003?
24        MS. FITE:  Jerry, let me just object to

Page 37

1  form, because I don't see how this is relevant.
2        You can go ahead and answer.
3        MR. HOMER:  Well, you know you don't
4  have to object to any question bearing relevancy.
5  BY MR. HOMER:
6    Q.  Go ahead.  You can answer the question.
7    A.  Maybe 150,000.
8    Q.  Okay.  How much did you make last year?
9    A.  2005?
10    Q.  I'm sorry?
11    A.  2005?
12    Q.  Yes.
13    A.  Probably about 150,000.
14    Q.  Okay.  Last question.
15        Have you ever been convicted of a crime?
16    A.  No.
17        MR. Homer:  Okay.  I don't have any
18  other questions.
19        Elizabeth, do you have any?
20        MS. FITE:  No.  No questions.
21        MR. HOMER:  Okay.  Mr. Scher, you have a
22  right to review the transcript of the deposition and note
23  any errors that you think might have been made in the
24  transcription.  You also have the right to waive reading

Case 1:05-cv-00225-KAJ    Document 84-5    Filed 05/16/2006    Page 25 of 41

**1**

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                    )
    Plaintiff,                  )
                                )
        v.                      ) C.A. No.
                                ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a  )
Delaware corporation, (trading as )
NCO FINANCIAL COMMERCIAL SERVICES,)
    Defendant.                  )

Deposition of DINA BETH SHAANTIEL, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of NCO Financial Commercial Services,
Prudential Drive, Horsham, Pennsylvania, on Tuesday,
January 31, 2006, beginning at 1:15 p.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiff.

SESSIONS, FISHMAN & NATHAN
BY: DAVID ISRAEL, ESQUIRE
3850 North Causeway Boulevard
Lakeway Two, Suite 1240
Metairie, Louisiana 70002-1752
Attorney for Defendant.

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

**2**

1    DINA BETH SHAANTIEL,
2        the witness herein, having first been
3        duly affirmed, was examined and
4        testified as follows:
5    BY MR. HOMER:
6        Q.    Good afternoon.   My name is Jeremy Homer.
7    I am the attorney representing Valerie Hue in this case.
8    Could you first state your name again?
9        A.    It's Dina Beth Shaantiel.
10       Q.    Okay.   At one time did you go by the name of
11   Dina Loft, L-O-F-T?
12       A.    Yes.
13       Q.    Could you explain why you changed -- First
14   of all, could you explain during what time period you
15   used that name, Dina Loft?
16       A.    I have been using Dina Loft since I went
17   into the collection industry back in 1985 as an alias.
18       Q.    And when did you change it to your present
19   name?
20       A.    About a year, year and a half ago, give or
21   take, NCO required everybody to stop using their aliases
22   and start using your real names.
23       Q.    I may refer to you as Dina Loft or Ms. Loft
24   during the course of this, only because I don't feel I

**3**

1    can pronounce your name correctly.   So please bear with
2    me when I do that.
3            I would like to instruct you that if I ask a
4    question today that you don't understand, I would ask
5    you not to try to answer, but instead ask me to rephrase
6    it so that you do understand it.   Do you understand
7    that?
8        A.    Yes.
9        Q.    Okay.   Is there any reason why your ability
10   to answer today would be impaired in any way?   For
11   example, have you had any medication?
12       A.    No.   I'm fine.
13       Q.    Okay.   And there isn't any other reason why
14   you can't testify today?
15       A.    No.
16       Q.    Okay.   Do you understand that this is a
17   deposition, that you are under oath, that it is a crime
18   not to tell the truth, and that you do need to make your
19   best efforts to tell the truth?
20       A.    I understand.
21       Q.    Okay.   What is your educational background?
22       A.    I went to high school, college.
23       Q.    Okay.   Where did you go to college?
24       A.    Johnson & Wales.

**4**

1        Q.    Where is that?
2        A.    Providence, Rhode Island.
3        Q.    Okay.   When did you graduate?
4        A.    I didn't graduate from there.   I did a
5    two-year program.
6        Q.    Okay.   What was the program in?
7        A.    Culinary arts and business administration.
8        Q.    Okay.   And you got a degree there?   A
9    two-year degree?
10       A.    Back then they didn't have a two-year
11   degree.   Back then it was a certificate of completion.
12       Q.    Okay.   Could you relate your work history,
13   going back to the time you began the collection
14   business?   And if you could, identify each job you have
15   had, approximately what dates you had that job, and, if
16   you could, just briefly describe what your duties were.
17       A.    I started in I want to say '83, working in
18   Florida for a collection agency as a collector, called
19   Credit Control.
20       Q.    Okay.   How long were you there?
21       A.    Oh, I want to say -- Was it '82 or '83?   I'm
22   sorry.   I want to say somewhere in '83 to '85, and I at
23   that time did part-time work for a mortgage company at
24   night as a collector, also.   And then from there, I came

B-425

13

1   deposits of checks.
2      Q.   Okay. Well, with respect to the commercial
3 ops programming, it says at the top, this is the policy
4 for NSF checks. Are you saying that this policy didn't
5 apply to all of the commercial ops?
6      A.   This policy applied at this time for them.
7 This was before my time with commercial.
8      Q.   Okay. What did Laura Harkinson and her
9 group do with these requests once they were received?
10      A.   To the best of my knowledge, Laura Harkinson
11 was a cash posting clerk. She would take an e-mail and,
12 based on what the e-mail was, either post or destroy a
13 check, to my knowledge.
14      Q.   Okay.
15      A.   But again, I was not involved at that time
16 with this.
17      Q.   And what request is being made here, to your
18 understanding? In the second bullet point, what is the
19 request --
20      A.   You have several here. Which one are you
21 referring to?
22      Q.   I'm talking about the one in bullet point
23 two.
24      A.   Requests should be e-mailed to Laura

14

1 Harkinson.
2      Q.   Yes. What kinds of requests are they
3 talking about there?
4      A.   I wasn't a part of this at that time, so I
5 was not involved and I wouldn't want to give you an
6 exact answer.
7      Q.   Okay. Do you know what the third bullet
8 point is, requests for redeposits can only be made for
9 NSF items processed within the past 30 days?
10      A.   Repeat that question.
11      Q.   Well, just read the third bullet.
12      A.   Request for redeposits can only be made for
13 NSF items processed within the past 30 days (time frame
14 provided by executives).
15      MR. ISRAEL: I think he's asking: Do you
16 know what that means?
17      MR. HOMER: Yes.
18      THE WITNESS: Yes. I do know what that
19 means.
20 BY MR. HOMER:
21      Q.   Okay. What does that mean?
22      A.   Anytime we have a check that is returned
23 NSF, we have 30 days to make that same check good. We
24 have to go through a verification process before we do

15

1 that, and that would be -- if it's not within that time
2 frame, you cannot redeposit the check.
3      Q.   Okay. And that policy is stated in this
4 Exhibit 1, correct?
5      A.   Right here.
6      Q.   At the third bullet point, that is what that
7 is saying; is that correct?
8      A.   Uh-huh.
9      MR. ISRAEL: You have to say yes.
10      THE WITNESS: I'm sorry. Yes. I am sorry.
11      MR. ISRAEL: That is okay. You are doing
12 good.
13 BY MR. HOMER:
14      Q.   So a clerk would get a request. Who would
15 submit the request? Do you know?
16      A.   I apologize; I do not know who requested
17 these during this time frame.
18      Q.   Would it be collectors? Do you know?
19      A.   I don't know. I really don't want to answer
20 a question I don't have information on.
21      MR. ISRAEL: I don't know is fine. There is
22 no rush. She has all day.
23 BY MR. HOMER:
24      Q.   What was your involvement in 2003 in

16

1 reviewing NSF requests, if you had any involvement at
2 all?
3      A.   Steve Leckerman came to me in I want to say
4 sometime early October, maybe September, October (And
5 he said to me that he wanted me to start reviewing all
6 the NSFs across the board.
7      Q.   Who is Steve Leckerman?
8      A.   Steve Leckerman is the senior vice president
9 of operations.
10      Q.   Did he explain why he wanted to do that?
11      A.   He explained that he wanted to make sure
12 that we were following policy and that we were putting
13 good money in and we weren't chasing bad money.
14      Q.   Okay. Did he explain anything else about
15 why he was doing it?
16      A.   I don't recall.
17      Q.   Did you work with Bette Capaldo's group in
18 doing this, or did you work independent?
19      A.   I worked independent.
20      Q.   Okay. And did you review the NSF requests
21 to see if they complied with this policy that is in
22 Exhibit 1?
23      A.   I did not go by this specific set of
24 details. I went with the details that were given to me

by Steve Leckerman.

Q. What details were those?

A. He wanted me to check to see if we contacted the debtors. He wanted to see if we contacted the banks. He wanted to see if the checks were verified, and he wanted to see that the accounts were documented accordingly. And he wanted to check for a time frame. I do know that.

Q. When you say time frame, what do you mean by that?

A. The 30-day policy, that has always been our rule.

Q. Did he tell you that he wanted you to focus on any one office? Or was it across the board, that he wanted all offices or some specific offices?

A. He expressed that he wanted every office across the board.

Q. Okay. And did you have anybody helping you with this job?

A. At that time I did not, and it took a long time.

Q. And you started this in October of 2003?

A. I actually started it in the beginning of November.

---

Q. Okay. You say it took a long time. How long did it take?

A. I don't remember.

Q. Was it a matter of months or years or weeks, if you recall?

A. By the end of December I said I couldn't do it by myself, and they told me to go ahead and get somebody right away.

Q. How far had you gotten at that point?

A. I was pretty much through all of AmEx, all of Buffalo. And I want to say Credit Trust and Baltimore, but don't quote me on which ones. I know that I was probably about halfway through, maybe, give or take.

Q. AmEx is a client, or is that a location?

A. American Express is our client.

Q. So you did it by client, and then you did it by office location?

A. No. AmEx is actually a whole division, just like our commercial division. So I did their whole division. They were first.

Q. Do you recall when you did Dover?

A. Not the exact date.

Q. Was it before the end of December?

---

**19**

A. I started Dover I want to say somewhere maybe -- I don't remember the dates. I really don't remember.

MR. ISRAEL: You don't have to guess.

THE WITNESS: Yeah, I really don't remember.

BY MR. HOMER:

Q. You say that Mr. Leckerman told you that he wanted you to check to see that the debtor had been contacted and the bank had been contacted and there was verification from the bank. Did he give you anything in writing that set out these requirements?

A. He did not give me anything in writing. We had discussed the issue back when I first started doing this for him. And we put it in writing for us as a guideline, what we would consider good to post and what would not be good to post. And I used that as my guideline.

Q. Where is this document kept?

A. This document is now in my folder on my desk. I have a copy of it on my bulletin board, I think. We have since modified it a couple of times.

Q. Do you know what the title of this document is?

A. It's called the 59 Checks.    B-426

---

**20**

MR. ISRAEL: 59 Checks?

THE WITNESS: The 59 Checks.

BY MR. HOMER:

Q. 59 is a code for NSF checks; is that correct?

A. Yes.

Q. And do you know what the date of the document is?

A. No.

Q. Is there a date on it? Do you know?

A. I don't remember.

Q. Okay. But this is a document you drew up or Steve Leckerman drew up?

A. It's a document that I drew up and sent to Steve Leckerman.

Q. And what did he do with it? Did he tell you it was okay, or did he give you any feedback on it?

A. He said that was fine.

Q. Now, you said there were guidelines. What do you mean by guidelines?

A. There is no cut-and-dry in anything that you do, so sometimes you just have to read the collector notes, decipher them. Sometimes the collectors will put things in there that tells you right there they didn't

**21**

1  call the bank or they did call the bank or they will
2  document.
3       And based on what you might read in the
4  notes, the guidelines might not apply. Where we
5  might -- say, we were given a proof of deposit, well,
6  then you don't need to go to the guidelines, because we
7  know the money is in the bank.
8  Q.  What are some of the other examples of when
9  the guidelines might apply?
10  A.  Each case scenario might be different. It
11  would be very hard for me to go through this at this
12  time. If I had an account in front of me, I could go
13  through it.
14  Q.  But there are a number of other examples you
15  could come up with if you had documents in front of you?
16  A.  Yes.
17  Q.  Is it fair to say that in some cases
18  collectors aren't able to contact debtors?
19       MR. ISRAEL: You are talking about NSF
20  checks?
21       MR. HOMER: I am talking about an NSF check
22  that has been sent up for redeposit or if there is no
23  request for redeposit.
24       THE WITNESS: Okay. I just want to make

**22**

1  sure I understand this question. Can you repeat that,
2  please?
3  BY MR. HOMER:
4  Q.  Yes. You were giving me examples of where
5  the guidelines of Mr. Leckerman wouldn't apply; that is,
6  you wouldn't necessarily have all the points that he
7  mentioned in place. For example, there might not be
8  debtor authorization or maybe the debtor wasn't
9  contacted. That is just an example.
10       What I'm asking you is: Were there
11  situations that you are aware of where the collector
12  tried to contact debtors but couldn't get a hold of them
13  but still submitted the request form for NSF?
14       MR. ISRAEL: I don't understand. I'm going
15  to object. I think the question is unclear. Are you
16  asking where collectors would request that an NSF check
17  be put in, even though the guidelines, as written, is
18  what they would have followed?
19  BY MR. HOMER:
20  Q.  What I am asking -- Let me try again.
21  A.  Sure.
22  Q.  Your job was to review checks that had gone
23  in for redeposit that had been NSF checks, correct? Is
24  that correct?

**23**

1  A.  After -- From when? This time with
2  Leckerman, right?
3  Q.  Right.
4  A.  Okay. Repeat that.
5  Q.  Why don't you just explain it to me? What,
6  again, did Mr. Leckerman charge you to do?
7  A.  He asked me to review all the accounts
8  across the board that had NSFs to see if they were
9  handled properly.
10  Q.  When you say they had NSFs, are you saying
11  where there were NSFs that were redeposited?
12  A.  No. It was all NSFs, whether they were
13  redeposited or not.
14  Q.  And with respect to the debtor authorization
15  point that Mr. Leckerman made with you, that had to do
16  not only with redepping an NSF check, but also with any
17  check that came back NSF; is that correct?
18  A.  That is correct.
19  Q.  Okay. So you were trying to find out
20  whether a collector or someone else had obtained the
21  debtor's authorization to submit the check that came
22  back NSF?
23  A.  I reviewed the accounts that came back NSF,
24  whether it was a redep or not, to determine if we had

**24**

1  made contact with the debtor or followed the proper
2  procedure to do so.
3  Q.  Now my question for you is: Were there
4  situations where the collector, or whoever else was
5  working on the case for NCO, didn't obtain debtor
6  authorization because they couldn't get a hold of the
7  debtor? Did you see that situation arise?
8  A.  Are you talking about for the redep or not
9  for the redep?
10  Q.  Either way.
11  A.  Yes, there were.
12  Q.  Okay. And was that, to your understanding,
13  improper in all cases? Or were there situations where
14  the collector was allowed to do that?
15  A.  On first contact, when the check went in on
16  the first time and there was no contact with the debtor,
17  that is improper and cannot be done. If nobody gives
18  you authorization to take a check, you can't take a
19  check. In a redep situation, because we already have
20  the authorization to post the check, if we can verify
21  the funds are good at the bank and we cannot make
22  contact with the debtor, we have put the check through.
23  Q.  Okay. Well, let's say that nobody could
24  verify with the bank that the check was good. Are you

**33**

1  THE WITNESS: Right. I don't know.
2  BY MR. HOMER:
3  Q.  Is that an approximate number?
4  A.  I apologize. I don't know.
5  Q.  You don't need to apologize. If you don't
6  know, you don't know. But there were several collection
7  offices within NCO back in 2003, correct?
8  A.  Yes.
9  Q.  And Dover was one of them, right?
10  A.  Yes.
11  MR. ISRAEL: One second. Are all of these
12  questions going to be about commercial so that you
13  don't --
14  MR. HOMER: Yes.
15  MR. ISRAEL: I don't want to interrupt you.
16  But if you are asking about commercial and the witness
17  understands, then that is fine.
18  MR. HOMER: Yes. That is what I am talking
19  about.
20  MR. ISRAEL: Okay.
21  BY MR. HOMER:
22  Q.  With respect to all of the offices, was
23  nobody submitting forms to support redepping checks, to
24  your knowledge?

**34**

1  A.  I don't know.
2  Q.  Well, you said a minute ago that your
3  understanding was that they weren't. What was the basis
4  for that understanding?
5  MR. ISRAEL: That is a mischaracterization,
6  but start over. What do you know about who was or was
7  not by office, I think, is his question?
8  THE WITNESS: I know that forms were
9  supposed to be sent. I was told that they were not
10  getting all of them. I was told -- When I went through
11  to look for everything, I was being told that policies
12  were not being followed, people weren't doing what they
13  were supposed to be doing. People were not sending in
14  the appropriate paperwork, and to look for it.
15  BY MR. HOMER:
16  Q.  And did you find any paperwork? Strike
17  that. I assume you knew what the appropriate paperwork
18  that you were looking for was. Is that fair to say?
19  A.  My job was to review the notes to see if it
20  was documented, to see if the paperwork was sent.
21  Q.  Okay. And did you know what the paper was
22  that was supposed to be sent to support the redepping of
23  NSF checks?
24  A.  It's what they called the check -- It was a

**35**

1  form, a check form.
2  Q.  A check verification form?
3  A.  That was one of the names that it went by,
4  yes.
5  Q.  And did you look for these forms that
6  supported the request for redepping NSF checks when you
7  did your audit?
8  A.  I did not look for the forms.
9  Q.  And why is that?
10  A.  Because they were supposed to be documented
11  on the account, and if they were not documented on the
12  account, it didn't happen.
13  Q.  What do you mean it didn't happen?
14  A.  If you do not put a transaction in the notes
15  that you did something, then you didn't do it.
16  Q.  Well, are you saying it would have been
17  impossible for somebody to have submitted the form and
18  not checked on the account, the information on the
19  account? Do you understand the question?
20  A.  No.
21  Q.  Okay. You were saying you didn't look for
22  the forms that supported the redepping of NSF because
23  the accounts didn't show the forms had been used. Is
24  that what you are saying?  B-428

**36**

1  A.  Correct.
2  Q.  Okay. So are you saying that nobody could
3  have submitted the forms without noting it on the
4  account?
5  A.  It's a possibility.
6  Q.  Okay. And what did you find when you did
7  your audit about the compliance with the requirement
8  that debtors be contacted for redepping NSF?
9  A.  When I did the audit for this division, we
10  had found that there was a specific area that did not
11  document the accounts, that contact was made with the
12  debtor or the bank and that they went ahead and had the
13  checks redepped.
14  Q.  Okay. And how widespread was that practice?
15  A.  It was pretty much isolated to one specific
16  area.
17  Q.  What area was that?
18  A.  The Dover office.
19  MR. HOMER: Let's go to the next exhibit.
20  (Shaantiel Exhibit Number 2 was marked for
21  identification and attached to the record.)
22  MR. HOMER: Before we get to that, though, I
23  would like a copy of this memo to Mr. Leckerman, if I
24  haven't already gotten it. I guess that is the one we

**45**

1    A.    Different offices.

2    Q.    When you prepared this report for January,
3 do you know how many collectors you reviewed at that
4 point?

5    A.    At this point in here?

6    Q.    Yes.

7    A.    We had reviewed the complete commercial
8 file, I think. I mean 90 -- I'm almost 100 percent sure
9 we went through all of commercials for that time frame.

10    Q.    Well, I thought you had said before that by
11 the end of December, you were crying for help, that you
12 couldn't get through it, and you mentioned only four
13 that you had gone through, Baltimore, Buffalo, AmEx, and
14 one other.

15    A.    Right. This is the February report. We did
16 this in January.

17    Q.    I understand that. You are saying that in
18 the next month, you finished all the rest of them in
19 January 2004? You only had four done by the end of
20 December. And then in January, you got everything else
21 done in the commercial division?

22        MR. ISRAEL:    Can we go off the record for a
23 second?

24        (Following a discussion off the record:)

**46**

1 BY MR. HOMER:

2    Q.    Let's back up a little bit. When did you
3 start reviewing, pursuant to Mr. Leckerman's directive,
4 the commercial offices and the collector practices
5 regarding redepping NSF checks?

6    A.    It was the beginning of the year.

7    Q.    January?

8    A.    Yes, sir.

9    Q.    Okay. January of 2004, you are talking
10 about?

11    A.    Yes.

12    Q.    Okay. And when did you complete that
13 review?

14    A.    In the month of January.

15    Q.    Okay.

16        MR. ISRAEL:    You believe?

17        THE WITNESS:    I believe.

18 BY MR. HOMER:

19    Q.    You are not sure about that? Apparently
20 not. Is that true? You are not sure?

21        MR. ISRAEL:    By the time we are done, you
22 won't be sure of anything.

23        THE WITNESS:    I have to tell you, give me a
24 rubber band.

**47**

1        MR. ISRAEL:    You are 99 percent sure?

2        THE WITNESS:    Yes.

3 BY MR. HOMER:

4    Q.    Let's get back to Exhibit 2. It says all
5 the checks were returned.

6        MR. ISRAEL:    Still on that first block?

7        MR. HOMER:    Right.

8 BY MR. HOMER:

9    Q.    What time period are you talking about
10 there?

11    A.    I reviewed the checks from the end of
12 December through the middle of January.

13    Q.    And you say at the end of December. Do you
14 mean December 31st or --

15    A.    No. I would say from the 15th, give or take
16 a few days.

17    Q.    Okay. Would that have been true of all of
18 the collectors you were looking at in that one-month
19 period, December 15th to January 15th?

20    A.    I would say that would be true.

21    Q.    Okay. It says here that Valerie Hue put
22 through the checks. Again, I'm referring to Exhibit 4.

23    A.    Absolutely.

24    Q.    How do you know she put through the checks?

**48**

1    A.    At the time I didn't know it was Valerie
2 Hue, until I actually did the final report. I went by
3 user code. At that time I only identified user codes.
4 And then I went through and I was able to get the
5 information, what user code related to what person to
6 identify what went on the report.

7    Q.    Can you find the specific checks that she
8 put through that you claim or you indicate here were
9 returned? Can you find those checks?

10    A.    Not today.

11    Q.    Well, can you find them?

12    A.    I can get access to them.

13    Q.    Okay. Do you have any way of knowing
14 whether someone else might have used her user code when
15 the checks were put through?

16    A.    To my knowledge, nobody uses anybody's user
17 code by their own.

18        (A recess was taken from 2:14 p.m. until
19 2:18 p.m.)

20 BY MR. HOMER:

21    Q.    What documentation have you kept to show
22 that the authorization procedures weren't followed and
23 that people put these checks through that were returned?
24 What do you have in terms of records that show it?    B-429

**Page 49**

```
 1        MR. ISRAEL: Do you mean this right here?
 2        MR. HOMER: Yes.
 3        MR. ISRAEL: What records? Okay.
 4        THE WITNESS: You can go into the
 5   transactions of all of these accounts that were here,
 6   and you can go into the NSF files from the reports and
 7   pull them up individually. And ultimately, it is
 8   clearly in the notes.
 9        MR. ISRAEL: Assuming like the individual
10   collector account notes?
11        THE WITNESS: Yes.
12   BY MR. HOMER:
13        Q.   Can you do that for any office in the
14   country?
15        A.   Yes.
16        Q.   And did you do that? Did you go through all
17   of the NSF files for all the offices in the country?
18   I'm referring again to the commercial division.
19        A.   Excuse me. Can I clarify?
20        Q.   Yes.
21        A.   You are again back to apples and oranges.
22        Q.   Okay.
23        A.   For the commercial division, there is one
24   shared NSF file. It is called the Met Share file. You
```

**Page 50**

```
 1   can review on a -- they go back to log every NSF check
 2   that comes through and review the accounts.
 3        Q.   When you did your review, did you review
 4   every office and every NSF check from every office to
 5   see if the proper authorization had been obtained?
 6        A.   When I did my review, I did not do it by
 7   office. I did it by unit code, and I did it via the
 8   notes and the check.
 9        Q.   Okay. But the same question, though, by the
10   time you were done, had you done every office and every
11   collector and every NSF check?
12        A.   I did everything over $500.
13        MR. ISRAEL: For every collector?
14        THE WITNESS: For every collector unit code.
15   There are times when collectors -- you have more than
16   one --
17        MR. ISRAEL: Got it.
18   BY MR. HOMER:
19        Q.   And is your testimony then that the only
20   violations of policy that you found are reflected in
21   this Exhibit 2?
22        A.   If you go down in the report, there is
23   another person in here for -- We are dealing with
24   commercial only in Tampa for a Patrick Baker. So it
```

**Page 51**

```
 1   wasn't just the M & M in Dover.
 2        Q.   I'm referring to the whole exhibit. You
 3   reviewed every NSF check in the whole company for that
 4   one-month period. And you found debtor verification or
 5   bank verification for every NSF check except for the
 6   ones that are listed in this exhibit? Is that your
 7   statement?
 8        MR. ISRAEL: Just an objection,
 9   mischaracterization. You don't mean the whole company,
10   but just in the commercial division?
11        MR. HOMER: In the commercial division.
12   BY MR. HOMER:
13        Q.   Those were the only ones that were redepped,
14   right?
15        MR. ISRAEL: Why don't we keep the questions
16   in order?
17        THE WITNESS: I'm sorry. You confused me.
18   BY MR. HOMER:
19        Q.   I want to make sure that what you are
20   telling me is that this Exhibit Number 2 contains every
21   violation that you found that related to redepping an
22   NSF check where the proper procedures weren't followed.
23        MR. ISRAEL: For the commercial division?
24        MR. HOMER: For the commercial division.
```

**Page 52**

```
 1        THE WITNESS: To the best of my
 2   recollection, yes.
 3   BY MR. HOMER:
 4        Q.   Okay. And you are saying that company-wide,
 5   no other collector for a one-month period redepped an
 6   NSF check without doing the proper authorization? Your
 7   review shows that; is that correct?
 8        A.   Company-wide or commercial?
 9        MR. ISRAEL: Commercial.
10        THE WITNESS: I'm so sorry.
11   BY MR. HOMER:
12        Q.   I'm always referring to that. I am always
13   referring to the commercial division.
14        A.   Okay. I just want to make sure we
15   understand that it is commercial only.
16        MR. ISRAEL: Right. He's made that clear.
17        THE WITNESS: Okay. It gets confusing. I
18   apologize. It's a big place now. Rephrase the
19   question.
20        MR. HOMER: Could you read back the last
21   question?
22        (The following was read:
23        "Question: Okay. And you are saying that
24   company-wide, no other collector for a one-month period
```

53

1  redepped an NSF check without doing the proper
2  authorization? Your review shows that; is that
3  correct?")
4          THE WITNESS: To the best of my knowledge.
5  BY MR. HOMER:
6      Q.  Do you have any understanding why
7  Mr. Leckerman thought this was such a big problem, that
8  he wanted this reviewed if there was only this small
9  amount of problems that you found when you did the
10 review?
11         MR. ISRAEL: That is a mischaracterization;
12 assuming facts not in evidence, especially, quote, a
13 small problem.
14 BY MR. HOMER:
15     Q.  Okay. Let me ask you this. When
16 Mr. Leckerman asked you to do this, he expressed concern
17 that people weren't following the right verification
18 policies, correct?
19     A.  I don't know.
20     Q.  You don't remember what he told you?
21     A.  He asked me to do the job. I did the job.
22     Q.  I thought before, you explained to me why he
23 did that.
24     A.  We are referring back to, again, when he

54

1  originally came to me. The purpose was so that we
2  posted good money when I started doing this.
3      Q.  And he had a concern that people were not
4  doing it, right? Doing the verification?
5      A.  I don't know if that was his concern when he
6  came to me to start doing this. They came to me in -- I
7  want to say, again, the beginning or the end of that
8  year and saying: Hey, we want to review all of these
9  accounts. I don't know what their motive behind it was.
10 I didn't ask.
11     Q.  What percentage of checks come back NSF,
12 just generally speaking, in the commercial division?
13         MR. ISRAEL: Of course.
14         THE WITNESS: I don't know.
15 BY MR. HOMER:
16     Q.  You have no idea?
17     A.  No.
18     Q.  10 percent? 20 percent?
19         MR. ISRAEL: You don't have to guess. If
20 you don't know, you don't know. If you do know, tell
21 him.
22         THE WITNESS: It changes every year.
23 BY MR. HOMER:
24     Q.  Okay. You testified before that you didn't

55

1  look for the verification forms that might have been
2  submitted. Is that correct? And I'm talking again
3  about the verification that a debtor had been contacted
4  regarding the redepping of NSF checks in the commercial
5  division.
6      A.  I looked in the transaction notes to see if
7  that was done.
8      Q.  Okay. And it was based on what you saw in
9  the transaction notes that made you conclude whether or
10 not somebody had verified; is that correct? Somebody
11 verified with the bank? Somebody contacted the debtor?
12     A.  Those were some of the things we looked for.
13     Q.  What else did you look for?
14     A.  To see if people documented the account,
15 that they worked it, to read the notes to see what the
16 debtor said.
17     Q.  Okay. And all of that information is still
18 available for us to look at that you looked at at the
19 time you made this Exhibit Number 2?
20     A.  To the best of my knowledge, it should be.
21         MR. ISRAEL: Meaning that if you can
22 identify which account, you can go back to the account
23 and pull it up?
24         THE WITNESS: Yes.

56

1          MR. ISRAEL: Is that what you are saying?
2          THE WITNESS: Yes.
3  BY MR. HOMER:
4      Q.  Well, is there any reason why you couldn't
5  identify the account?
6          MR. ISRAEL: Do you know which accounts you
7  looked for?
8          THE WITNESS: I don't have the list, and I
9  don't remember off the top of my head. I can go ahead
10 and recreate the report that I used at that time to go
11 to those accounts. And I would get the same
12 information.
13 BY MR. HOMER:
14     Q.  How would you do that? How would you
15 recreate the report?
16     A.  I would have to go into system reports, fill
17 in the documentation that was requested for the time
18 frame, and the computer would spit the information out.
19     Q.  Okay. How much effort would it take to do
20 that?
21         MR. ISRAEL: To go and pull each account
22 that she looked at?
23         MR. HOMER: No, to recreate the document,
24 the one that you just talked about.    B-431

69

1  Kathy Obenshain --
2       MR. ISRAEL: We made it broader than that.
3  We asked about anything relating to her investigation
4  that touched upon commercial. I think we have produced
5  everything. But if you have more, we can certainly
6  produce it.
7       THE WITNESS: Yeah. I will go back and look
8  again, and I will have somebody else double-check me.
9  BY MR. HOMER:
10      Q.  I'm looking back again at this December 15th
11  to January period, 2003, 2004. Do you have any idea of
12  what the percentage of redepped NSF checks came back NSF
13  again?
14      A.  No.
15      Q.  You didn't look at that question at all?
16      A.  No.
17      Q.  How do you know that a collector would have
18  just noted on the paperwork that you reviewed that he
19  contacted the debtor? How would you know that he
20  actually did contact the debtor?
21      A.  We can run phone reports to see if there was
22  actually a phone call made.
23      Q.  And did you do that in all cases? When you
24  did your audit, when you found in your accounts that the

70

1  collector indicated he had contacted the debtor, did you
2  then check to see if he had actually done it in all
3  cases?
4       A.  Not in all cases.
5       Q.  And what percentage of cases would you have
6  checked?
7       A.  I don't know.
8       Q.  No idea?
9       A.  No.
10      Q.  Is it fair to say that all the offices that
11  were involved in commercial collections would have been
12  requesting the redeposit of NSF checks?
13      A.  Yes.
14      Q.  Can you explain what a DCI check is?
15      A.  A DCI check is check information that is
16  entered into our system that we obtain from the debtor.
17  It's called debtor check information.
18      Q.  And essentially, it is an authorization to
19  create a check for the debtor, correct?
20      A.  That's correct.
21      Q.  Was it proper, going back to the 2000 year
22  period --
23      MR. ISRAEL: The 2003?
24

71

1  BY MR. HOMER:
2       Q.  2003, I'm sorry, the 2003 period, was it
3  proper to recreate a DCI check that had been returned
4  NSF as opposed to redepping the same check?
5       A.  It's not -- At that time it was not common
6  practice to recreate the DCI to redep a check. In
7  certain cases, collectors would do that if the microline
8  was invalid or any certain set of circumstances that it
9  did not allow to clear at the bank after verification.
10      Q.  Okay. And in your audit, did you try to
11  determine whether that practice was being followed? Let
12  me back up a little bit. Was there a written policy
13  back in 2003 regarding any requirement to redep DCI
14  checks returned NSF as opposed to recreating a DCI check
15  returned NSF?
16      A.  I want to make sure that I understand you
17  here.
18      Q.  Okay.
19      A.  And again, it goes back to your definition
20  of what an NSF check is. If we are talking about a true
21  NSF, the policy was that you had to contact the debtor
22  or you had to contact and you would not recreate the
23  check. You would actually take the check that was
24  returned as an NSF and put it through. The only way

72

1  that you would not put it through is if the bank put
2  holes in the bottom of the check in the microline.
3       If the check is returned to a utility which
4  is unable to locate the account, if the check is
5  returned stop payment -- there are other examples here
6  that are considered NSF when we back it off the system,
7  that although it is a true NSF because the check is
8  returned, it could be because of a key stroke error
9  where somebody entered it into a system where it should
10  have been a three and it was a two, and the bank
11  returned it.
12      Q.  So then you could recreate under certain
13  circumstances?
14      A.  Under certain circumstances, you could
15  recreate the check.
16      MR. ISRAEL: Let him finish his question. I
17  know it's hard, because the questions are easy. But let
18  him finish his question.
19      THE WITNESS: Okay.
20  BY MR. HOMER:
21      Q.  You could in certain circumstances recreate
22  a DCI check that had been returned NSF, correct?
23      A.  Correct.
24      Q.  To get back to my original question, was

B-432

## 73

1 there, in 2003, any written NCO policy regarding the
2 recreation of a DCI check versus redepping a DCI check
3 that had been returned NSF?
4     A.    To my knowledge, I did not see it. But I
5 was told there was one there.
6     Q.    Who told you that there was?
7     A.    When I started the investigation and had
8 started talking to Kathy, she had told me that it was
9 written policy for her division.
10    Q.    But you never saw the policy?
11    A.    No.
12    Q.    Okay. To your knowledge, did Kathy
13 Obenshain do anything that was improper in terms of the
14 check handling policies?
15    A.    No.
16    Q.    Do you know anything about the reason she
17 left NCO?
18    A.    No.
19    Q.    You have no knowledge at all of why she
20 left?
21    A.    No.
22    Q.    Going back to Exhibit 2, is there any
23 violation that you are reporting in this exhibit that
24 is a violation of any of the policies that are in

## 74

1 Exhibit 1?
2     A.    Referring to the commercial, yes.
3     Q.    And what violations are there in Exhibit 1
4 that are reported in Exhibit 2?
5     A.    I don't have the account in front of me
6 here, so I can't give you an exact example.
7     Q.    Well, can you tell me what policy was
8 violated? I'm talking about what policy in Exhibit 1
9 was violated?
10    A.    The checks that were invalid or NSF were put
11 through.
12    Q.    Can you tell me which bullet it went by?
13    A.    Requests can only be made on true NSF items
14 and not refer to makers, invalid accounts, et cetera.
15    Q.    Refer to maker and invalid account, what do
16 those two terms refer to?
17    A.    An invalid account is where the check was
18 returned because the account number was invalid. And a
19 refer to maker could be several different reasons,
20 depending on how the bank stamps the check. It says
21 refer to maker, and then there is a tag on there.
22    Q.    Well, there is nothing in Exhibit 1 that
23 refers to verification by the debtor or verification by
24 the bank, is there?

## 75

1         MR. ISRAEL: I mean that document speaks for
2 itself. It is right --
3         MR. HOMER: I know. I need this question
4 for foundation.
5 BY MR. HOMER:
6     Q.    There is nothing in there that refers to
7 debtor contact or bank verification?
8     A.    Well, where?
9         MR. ISRAEL: He is asking.
10        THE WITNESS: Show me where you are -- Right
11 here and here?
12        MR. ISRAEL: Yes.
13        THE WITNESS: Requests can only be made on
14 true NSF items --
15        MR. ISRAEL: No, no. Listen to his
16 question. He is asking: Do any of these bullets read
17 verification? Read each one. No rush, there is no
18 rush.
19        THE WITNESS: Right here, it says
20 verification. It says: Accounting clerk will have the
21 final verification in all items meeting the above
22 criteria.
23 BY MR. HOMER:
24    Q.    Yes. But what the clerk does is verify the

## 76

1 other bullets have been approached. They are not
2 verifying that the other banks have been contacted,
3 right? Didn't you testify before that you didn't even
4 use this policy when you did your review? What you were
5 looking for was bank verification and debtor contact?
6     A.    Correct.
7     Q.    And when you did your report, you weren't
8 looking to cite anybody for a violation under this
9 Exhibit 1 policy. You were looking to cite or find
10 violations of this alleged policy of having to contact
11 the debtor or verify with the bank, correct?
12        MR. ISRAEL: Mischaracterization,
13 argumentative. Go ahead.
14        THE WITNESS: Correct.
15 BY MR. HOMER:
16    Q.    Okay. So my question again is: Did your
17 report in Exhibit 2 reflect any violations of the
18 Exhibit 1 policy? And by that policy, I'm referring to
19 the bullet points.
20        MR. ISRAEL: Do you mean other than what she
21 has told you?
22        MR. HOMER: She hasn't told me of any yet
23 that I'm aware of. She talked about the last one being
24 verification. But it is clear that verification isn't a

## 77

1  bank verification. It's a verification that the other
2  bullet points have been followed.
3          MR. ISRAEL: Well --
4          THE WITNESS: Can I ask a clarification?
5          MR. HOMER: Sure.
6          MR. ISRAEL: You should. And just because
7  he makes a statement in his question doesn't mean that
8  that is what you said. So go ahead and ask away.
9          THE WITNESS: If what you are asking me
10 is -- and I want to make sure I understand this -- did I
11 use this to create this? The answer is no.
12 BY MR. HOMER:
13      Q.   That is not what I am asking. I understand
14 you didn't use that at all. When you did your work, you
15 didn't use the Exhibit 1 policy. You weren't looking
16 for Exhibit 1 violations. You were looking for problems
17 where the debtor hadn't been contacted or where the bank
18 hadn't verified the funds, correct?
19          MR. ISRAEL: Or there wasn't an independent
20 verification.
21          MR. HOMER: Or there wasn't an independent
22 verification.
23 BY MR. HOMER:
24      Q.   Wasn't that the scope of your review?

## 78

1      A.   That was a part of it.
2      Q.   And you weren't looking for whether any of
3  these policies were being followed, correct, that are in
4  Exhibit 1?
5      A.   Part of our policy that we looked for, for
6  example, requests for NSF within the past 30 days --
7      Q.   Right.
8      A.   -- that is part of something.
9      Q.   You mentioned that before. But does your
10 table --
11      A.   So your --
12          MR. ISRAEL: Let her finish. Go ahead. I
13 am sorry. You are confusing me. I apologize. But you
14 are getting ambiguous, and I apologize.
15 BY MR. HOMER:
16      Q.   It's okay. Maybe I am confused, and that is
17 part of my problem. But here in your description of
18 four, you are saying proper authorization procedures
19 were not followed. That is what you were looking for,
20 whether the check was authorized, correct?
21      A.   Yes.
22      Q.   Either by the bank --
23      A.   By the bank --
24      Q.   -- or the debtor? You weren't looking to

## 79

1  establish whether these bullet points that are in
2  Exhibit 1 were being followed, correct?
3      A.   I wasn't looking for that. Some of these
4  overlap.
5      Q.   Okay. Which ones overlap?
6      A.   The 30-day rule.
7      Q.   Well, there is nothing in Exhibit 4 that
8  talks about a 30-day rule.
9      A.   No. I understand that.
10      Q.   Okay. And you recall that there were 30-day
11 violations?
12      A.   I don't recall.
13      Q.   So you don't know whether or not there were
14 any violations of the Exhibit 1 policy reported in your
15 Exhibit 2 report, correct?
16      A.   Correct.
17          MR. HOMER: Mark this as Exhibit 3.
18          (Shaantiel Exhibit Number 3 was marked for
19 identification and attached to the record.)
20 BY MR. HOMER:
21      Q.   Can you identify Exhibit 3?
22      A.   It's an e-mail from Michele Moore. It
23 actually originated from Kathy Obenshain. It was sent
24 on January 19th, and it was sent directly to me

## 80

1  concerning LeFevre and McQuisten.
2      Q.   Okay. Exhibit 3 says -- and I will quote --
3  I am sending you over a synopsis of out check -- I think
4  that should be our check policy shortly. Do you see
5  where it says that?
6      A.   Uh-huh.
7          MR. ISRAEL: I don't. Where is it?
8          THE WITNESS: Right here.
9          MR. ISRAEL: I'm sorry. I got it.
10 BY MR. HOMER:
11      Q.   Why was it that Kathy Obenshain was going to
12 be sending you a synopsis of the check policies?
13      A.   I don't remember.
14      Q.   Did you know what the policies were as of
15 January 19th?
16      A.   I knew what we had used as our guidelines as
17 a check policy, yes.
18      Q.   And you don't recall why Kathy Obenshain
19 would be telling you that she was going to be sending
20 you the check policies?
21      A.   I cannot remember.
22          MR. HOMER: Okay. Let's get this marked as
23 Exhibit 4.
24          (Shaantiel Exhibit Number 4 was marked for

**137**

1  again.
2  MR. HOMER: Can you read back the question?
3  (The following was read:
4  "Question: Do you recall whether you gave
5  her the specific information that supports your report
6  which you have told me you can still access in terms of
7  supporting your conclusions in that report? I'm talking
8  again about the Exhibit 2 report?")
9  THE WITNESS: Before this date?
10 BY MR. HOMER:
11 Q.  Yes, before.
12 A.  Yes.
13 Q.  You gave her the specific information?
14 A.  I gave her account examples, yes.
15 Q.  Well, you said you have given her examples.
16 I understand that. But did you give her all the
17 information that you used to make this conclusion that
18 is in Exhibit 2?
19 A.  I gave her the list of accounts that we had
20 determined for each person.
21 Q.  Well, that isn't responsive. Did you give
22 her all the information that you used to make this
23 report that is Exhibit 2?
24 MR. ISRAEL: Asked and answered.

**138**

1  But go ahead and tell him.
2  MR. HOMER: No, she said she gave her a
3  list. She didn't say she gave her all the information.
4  THE WITNESS: To the best of my
5  recollection, I think I did.
6  BY MR. HOMER:
7  Q.  And you gave this to her in what form?
8  A.  I know that I gave her examples of accounts.
9  I know that we talked about it. I don't remember. It
10 was a long time ago.
11 Q.  Well, do you remember that you gave her all
12 of the information?
13 A.  I don't remember if I gave her every little
14 bit of information. I do know that I gave her a lot of
15 information.
16 Q.  Okay. And in what form did you give her the
17 information? Was it a hard copy of electronic
18 information, or how did you get it to her?
19 MR. ISRAEL: Asked and answered.
20 Tell him.
21 MR. HOMER: She hasn't answered that
22 question.
23 THE WITNESS: I gave her information through
24 phone calls, review of accounts, and I think e-mails.

**139**

1  BY MR. HOMER:
2  Q.  Were there hard copies other than e-mails of
3  the information you gave?
4  A.  There were hard copies on the shared file,
5  the Met Share file, that she has accessibility to view
6  off of.
7  Q.  Well, what I am trying to get at, would you
8  have delivered to her -- independent of what is in the
9  computer, would you have delivered to her specific
10 information that supports your findings that are
11 reported in Exhibit 2?
12 A.  There was information that I gave to her
13 that supported it in Exhibit 2.
14 MR. ISRAEL: He is asking like did you send
15 her a document, a notebook, materials --
16 THE WITNESS: I understand --
17 MR. ISRAEL: Let me finish -- other than
18 what is in the computer? If you didn't, you didn't. If
19 you did, you did.
20 THE WITNESS: I don't remember.
21 MR. ISRAEL: Tell him that.
22 THE WITNESS: I don't remember.
23 BY MR. HOMER:
24 Q.  But you have looked in your file, and you

**140**

1  haven't found any transmittal e-mail or any other
2  document that reflects that you gave her information.
3  Would that be a fair statement?
4  A.  I reviewed my e-mails, and I did not find
5  anything when I went looking.
6  Q.  Okay. Did you attempt to find any other
7  information about what you might have given Kathy
8  Obenshain before the date of this memo of January 22,
9  2004? The Exhibit 7 memo?
10 A.  If I did, I don't remember.
11 MR. HOMER: Let's mark this as Exhibit 8.
12 (Shaantiel Exhibit Number 8 was marked for
13 identification and attached to the record.)
14 BY MR. HOMER:
15 Q.  You have testified that Ted Fox was involved
16 in the investigation. What was your involvement with
17 Ted Fox regarding this whole issue of the check handling
18 procedures?
19 A.  Very little; I dealt directly with Kathy.
20 Q.  Did you ever have any conversations with Ted
21 Fox about it?
22 A.  Very few.
23 Q.  Okay. So you did have a few?
24 A.  A few.

B-435

**149**

1  up the computer and look at it. This is really old, and
2  I don't remember.
3  BY MR. HOMER:
4     Q.  But you could find from your computer what
5  the date of this NSF report is?
6     A.  Uh-huh, I think, I think.
7     Q.  Well, regardless of the actual date of the
8  report, Exhibit 10 does contain various checks that were
9  dated in December of 2003 and January of 2004, correct?
10    A.  Yes.
11    Q.  Could you explain this?  In the second
12 column of the report, we have the collector name.  Those
13 are the individual names of the collectors, correct, we
14 have that collected the checks that went NSF?  Is that a
15 fair statement?
16    A.  Yes.
17    Q.  And are these collectors from what offices?
18 Do you know offhand?
19    A.  It doesn't tell you the office in this
20 column.
21    Q.  Do you know how many of them were from the
22 Dover office?
23    A.  No, I don't.
24    Q.  Okay.  Would you have used the NSF report in

**150**

1  your audit that resulted in the Exhibit 2 report that
2  you prepared showing the violations?
3     A.  This would have been one of my worksheets --
4     Q.  Okay.
5     A.  -- and not this report itself.  I don't know
6  if this was -- because like I said, something looks not
7  right, like there is something missing.
8     Q.  Do you have any idea how many of these
9  collectors are ones from the Dover office?
10    A.  No.  It doesn't say on here.  I can look and
11 see if it gives it and in what office.  It goes by
12 units.
13    Q.  Okay.  What is the unit code?  What is that
14 telling us?
15    A.  The unit code is the work queue that the
16 collector would be responsible for.
17    Q.  Let's take one, for example, A11.  What work
18 queue is that?
19    A.  That is a specific number of accounts that,
20 in this case, William would have been responsible for
21 handling.
22    Q.  Okay.  So the unit reflects the number of
23 different accounts that you have with the creditors that
24 you represent; is that right?

**151**

1     A.  Repeat that?
2     Q.  The unit number refers to a collection of
3  different accounts that you handle for given creditors?
4     A.  Correct.
5     Q.  Okay.  And in the column A/C number, is that
6  the account number for the creditor or for the debtor?
7     A.  That is the NCO inventory number, or better
8  known as the master number or debtor number.
9     Q.  So it is the number that is assigned to the
10 debtor?
11    A.  Uh-huh.
12    Q.  Now, in the column, Root of Problem,
13 Collector/Debtor, what information is supplied there?
14 What is that for?
15    A.  That column is to what we think might be the
16 root of cause.  Was it the collector who did something
17 inappropriate?  Was it the debtor who did it?  Or was it
18 cash posting?
19    Q.  Okay.  Would it be fair to say that wherever
20 you have a collector listed under the column, Root of
21 Problem, that the collector, as you said, did something
22 wrong and that may have resulted in the NSF?  Is that
23 what you are telling me?
24    A.  It is a possibility that they did something

**152**

1  wrong.  It would be something that we would have to look
2  further into.
3     Q.  And from everything on the NSF report that
4  you had, did you look into the cause of the NSF?
5     A.  On this report?
6     Q.  Well, the NSF report, actually; I know you
7  said you are not sure if this is the one you actually
8  used.
9     A.  All right.  Ask the question again.
10       MR. ISRAEL:  Did you go look?
11       THE WITNESS:  I looked the debtor account
12 number up, and I would do the note.
13 BY MR. HOMER:
14    Q.  Okay.  Now, at the end of this, starting at
15 page 47 --
16    A.  47?
17       MR. ISRAEL:  That is the little number at
18 the bottom.
19       THE WITNESS:  Okay.  Thank you.
20 BY MR. HOMER:
21    Q.  There are two more columns.  And I think
22 this is the continuation of the columns, and there just
23 wasn't room on these pages.
24    A.  Right.

B-436

157

1  because again, there is usually a 20- to a 30-day lag
2  back then. So if it came back into our office on the
3  31st, I probably would not have seen it until the end of
4  January. And it would not have gone on the February or
5  the beginning of February report.
6      Q.  Now, you told me before, I thought, that
7  you reviewed the time period of December 15th to
8  January 15th, and you reviewed all of the NSF for all of
9  the offices that didn't clear. In other words, you
10  looked at every single check that was put through that
11  didn't clear.
12      A.  Right. That was on that system. These
13  checks might have gone in on these dates that didn't
14  clear. I don't know when they came back.
15      Q.  Well, can you tell from your system or can
16  you retrieve from your system the NSF report that you
17  actually did review?
18      A.  I know I can't retrieve it from my system.
19  Can the company retrieve it?
20      Q.  Yes.
21      A.  It's a possibility. We would have to check
22  with IT.
23      Q.  Okay. We are going to ask for that report.
24  And also, did you have a subsequent report to the

158

1  Exhibit 2 report regarding violations, or was that the
2  only report that you ever made regarding violations that
3  you found regarding check handling policies?
4      MR. ISRAEL:  Do you mean ever?
5      THE WITNESS:  Do you mean ever?
6  BY MR. HOMER:
7      Q.  Yes, ever.
8      A.  I have made those reports.
9      Q.  When were they made?
10      A.  Usually the beginning of every month, I
11  would submit them.
12      Q.  Okay. And your testimony is that maybe you
13  have a report showing these individuals who are on
14  Exhibit 10 as violating the check handling policies; is
15  that correct?
16      A.  I don't know.
17      Q.  Okay. Well, we are going to ask for the —
18      MR. ISRAEL:  Make sure he gets his whole
19  question out. I would have objected, because that is a
20  mischaracterization of his previous --
21      THE WITNESS:  Okay. I am sorry.
22      MR. HOMER:  You have a hard problem with
23  these characterizations. I think when you read these
24  transcripts, you going to see that you are wrong on just

159

1  about every one of them.
2      MR. ISRAEL:  I don't agree.
3      MR. HOMER:  Well, we are going to ask for --
4  and we have already asked for this information, because
5  it is clearly relevant to the case. We are going to ask
6  for the NSF reports that were applicable, the ones she
7  actually reviewed when she did the audit, as she has
8  testified about, in December of 2003 or January of 2004.
9  She said she used such report, and we are asking for a
10  copy of it.
11      MR. ISRAEL:  Okay. Well, I heard that. But
12  as she said, she doesn't have it. As to whether IT can
13  recreate it, I guess we can put in an IT request or we
14  will decide if that is appropriate. But we don't have
15  it to give to you.
16      MR. HOMER:  We are also going to ask for
17  subsequent reports that she made relating to --
18      MR. ISRAEL:  Check handling?
19      MR. HOMER:  -- check handling policies or
20  violations of check handling procedures for the year --
21  Well, let's pick the first six months of 2004. In the
22  alternative, if you have a report that identifies the
23  individuals who are listed in Exhibit 10 and those
24  checks and the cover of the checks that are in

160

1  Exhibit 10 or some of them, we would ask for those
2  reports.
3      MR. HOMER:  All right. Let's have
4  Exhibit 11 marked.
5      (Shaantiel Exhibit Number 11 was marked for
6  identification and attached to the record.)
7      (Following a discussion off the record:)
8  BY MR. HOMER:
9      Q.  Can you identify the document that has been
10  marked as Exhibit 11?
11      A.  It's the collection cash unit.
12      Q.  And are you familiar with this form?
13      A.  Yeah.
14      Q.  And do you know where it's been used?
15      MR. ISRAEL:  I don't understand the
16  question.
17  BY MR. HOMER:
18      Q.  Do you know where this form has been used?
19  In what offices?
20      A.  These are printed out daily, or they used to
21  be printed out daily for all cash posting.
22      Q.  That would be -- It is a document that would
23  have been printed out, is it fair to say, by all of the
24  collectors in the commercial division?

B-437

## 173

1 and 2004, was any mention ever made to you that you
2 ought to make a copy or keep a copy of the documents
3 that you were relying upon to support the conclusions
4 that are in Exhibit 2? That is, that people violated
5 the policies?
6     A.    I don't recall.
7     Q.    You don't remember that anybody did, I
8 guess?
9     A.    It's a long time ago. I don't remember.
10     Q.    But in any event, you didn't keep a separate
11 document of it. The only source of this information now
12 that you are aware of would be still in the computer, if
13 it's there, correct?
14         MR. ISRAEL: She's testifying.
15         THE WITNESS: The only information would be
16 in the computer.
17 BY MR. HOMER:
18     Q.    So you didn't keep a separate copy of the
19 documents that support the findings of violations?
20     A.    Are you asking me if I kept it other than
21 electronically on my computer?
22     Q.    Yes.
23     A.    Yes. I did not print them out or keep them.
24     Q.    And you did not print out the NSF report

## 174

1 that you used to help you do the review?
2     A.    If I had printed out any NSF reports after I
3 was completed with them, I probably would have either
4 stored them in a secure area or had them shredded,
5 because we don't leave things out with debtor
6 information or people's check information.
7     Q.    And it never occurred to you that there may
8 be a need for people to look at the documents that
9 supported your conclusions at some subsequent time?
10 That never occurred to you while you were doing this, I
11 suppose?
12     A.    When I did these documents and I submitted
13 them, it was my understanding that they were keeping the
14 records. I did keep the information in my computer.
15         MR. HOMER: Okay. We will have that marked
16 as Exhibit 12.
17         (Shaantiel Exhibit Number 12 was marked for
18 identification and attached to the record.)
19 BY MR. HOMER:
20     Q.    The document that has been marked as
21 Exhibit 12, can you identify this document?
22     A.    It says check verification.
23     Q.    Have you ever seen this form before?
24     A.    No.

## 175

1     Q.    Do you know whether different offices in
2 NCO's commercial division utilized different forms for
3 check verification?
4     A.    Yes, they did.
5     Q.    Okay. I guess you have already testified
6 that you didn't look for check verification forms when
7 you did your audit. You just used the master file,
8 correct?
9     A.    That's correct.
10     Q.    Are you familiar with a form that is called
11 the U Deposit Form?
12     A.    U Deposit?
13     Q.    U Deposit? That is a the letter U, Deposit
14 Form. Have you ever heard of the name of that form
15 before?
16     A.    I haven't heard of that name before. If you
17 could show me a copy of the form, maybe it has a
18 different name.
19     Q.    Have you ever heard of any form used at NCO
20 that sets out the reasoning for redepping or the basis
21 for redepping?
22     A.    There were many different ways that people
23 would request to redep.
24     Q.    And did you explain what those ways were?

## 176

1     A.    They could send an e-mail to their manager.
2 They could have had a formal form. I don't remember all
3 of them.
4     Q.    And in some cases, the forms would have had
5 the justification for redepping on them?
6     A.    They should have.
7     Q.    But again, you wouldn't have looked at any
8 of those forms when you did your review, because you
9 were only looking at the master file?
10     A.    At the master file for documentation.
11     Q.    Okay. Do you know whether any of these
12 forms that were not in the master file that went to the
13 reasoning for redepping were sent to the Horsham office?
14     A.    Repeat that question.
15     Q.    Do you know? Any of these forms that were
16 used by different offices to explain the reasoning for
17 redepping, were they sent to the Horsham office?
18     A.    I don't know.
19     Q.    Do you know what forms were sent to the
20 Horsham office that related to the check handling
21 procedures?
22     A.    I don't know.
23     Q.    You don't know? Not one form, do you know,
24 that would be sent to the Horsham office that relates to

191

BY MR. HOMER:

1 Q. Is that the same number it would have been
in December of 2003?

4 A. I don't think so.

5 Q. You don't think so?

6 A. I don't remember. But commercial has
changed a lot recently. I mean just with the Metairie
office closing --

9 MR. ISRAEL: It is opened again.

10 THE WITNESS: I know it's open again, but
that whole Katrina thing just set me off guard. I mean
I don't remember, because I used to have a pretty good
feeling.

14 BY MR. HOMER:

15 Q. Do you know about how many collectors?

16 MR. ISRAEL: What's that?

17 MR. HOMER: Do you know how many collectors?
Would the number have been different in 2003?

19 MR. ISRAEL: I think there has been, for the
last two or three years, between 150 and 200 collectors.
That is my best educated guess.

22 BY MR. HOMER:

23 Q. And that is in the commercial division?

24 A. Commercial.

---

190

1 Q. But there are a number of collectors in the
whole operation that you would have reviewed when you
did your audit in December of 2003?

4 A. Yes.

5 Q. Do you have any idea how many that would
have been? How many collectors you would have looked
at?

8 A. No.

9 Q. A thousand?

10 A. I look at people all day long. It is not
just -- I could look at 100 collectors in a day.

12 Q. Well, in December of 2003, you would have
looked at every collector in the whole company, correct?

14 A. Over the course of 2003 and 2004, we try to
hit everybody. I think we did a pretty good job. If I
missed somebody, it was a fluke. But our job was to
mine, and the person who I subsequently hired was to
make sure that we made at least one round.

19 MR. HOMER: Okay. That is all I have.

20 (The deposition adjourned at 5:43 p.m.)

---

199

INDEX TO TESTIMONY

DEPONENT                                          PAGE
DINA BETH SHAANTIEL
   Examination by Mr. Homer            2
   Examination by Mr. Israel          187
   Further Examination by Mr. Homer   191

INDEX TO EXHIBITS

SHAANTIEL EXHIBIT NO. FOR IDENTIFICATION     PAGE

1  E-mail to Valerie Hue from Phil
   Weaver, dated March 5, 2003            10

2  January 2004 Dina Loft Policy Violations   36

3  E-mail to Michele J. Moore from Kathy
   Obenshain, dated January 19, 2004     79

4  E-mail to Dina Shaantiel from Kathy
   Obenshain, dated January 19, 2004     80

5  Memorandum to Kathy Obenshain from
   Brian Laische, dated July 15, 2003    112

6  E-mail to Michele J. Moore from Kathy
   Obenshain, dated January 30, 2004     117

7  Memo for Record to Josh Gindin from
   Kathy Obenshain, dated January 22, 2004   133

8  Memorandum to All Employees from Ted Fox
   Kathy Obenshain, dated January 21, 2004   140

9  E-mail to Michele J. Moore from Kathy
   Obenshain, dated February 2, 2004     144

10 NSF Report                            146

11 Collection Unit Cash Journal          160

12 Check Verification Report             174

---

200

PLEASE REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE WITNESS.

---

**202**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                    )
          Plaintiff,            )
                                )
     v.                         ) C.A. No.
                                ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a  )
Delaware corporation, trading as )
NCO FINANCIAL COMMERCIAL SERVICES,)
          Defendant.            )

Deposition of DINA BETH SHAANTIEL, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Parkowski, Guerke & Swayze, 116 West Water
Street, Dover, Delaware, on Tuesday, March 28, 2006,
beginning at 10:00 a.m.

APPEARANCES:

PARKOWSKI, GUERKE & SWAYZE
BY: JEREMY W. HOMER, ESQUIRE
116 West Water Street
Dover, Delaware 19901
Attorney for Plaintiff.

SESSIONS, FISHMAN & NATHAN
BY: DAVID ISRAEL, ESQUIRE
3850 North Causeway Boulevard
Lakeway Two, Suite 1240
Metairie, Louisiana 70002-1752
and ELIZABETH FITE, ESQUIRE
15316 North Florida Avenue
Suite 100
Tampa, Florida 33613
Attorneys for Defendant.

ALSO PRESENT:
MS. VALERIE HUE

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302) 674-8884

**203**

1      DINA BETH SHAANTIEL,
2  the witness herein, having first been
3  duly sworn, was examined and
4  testified as follows:
5  BY MR. HOMER:
6      Q.  Good morning, Ms. Shaantiel. My name is
7  Jeremy Homer. It is March 28th. It is 10:00 in the
8  morning, and we are in the Dover office of Parkowski,
9  Guerke & Swayze. This a deposition in the matter of
10 Hue v. NCO. It is the second time we have taken your
11 deposition. I'm sure you are aware of that.
12         I'm going to show you a document that has
13 already been marked Obenshain Exhibit 16. Here is a
14 copy for counsel. I would ask you to read through that
15 document and, after you read it, I'm going to ask you if
16 the information in the letter is accurate, as far as you
17 know.
18         MR. ISRAEL: Do you want her to read the
19 position statement?
20         MR. HOMER: No, this is not the position
21 statement.
22         MR. ISRAEL: Oh, I'm sorry. I wasn't even
23 paying attention. This is a letter from Elizabeth Fite.
24 Okay. This is our March 3rd letter to you detailing

**204**

1  some discovery issues?
2         MR. HOMER: That's right.
3         MR. ISRAEL: Let's go slowly.
4         (Following a discussion off the record:)
5         MR. ISRAEL: Let's go off the record and
6  reflect that Mr. Homer has left, and I have left.
7         (Following a brief recess:)
8  BY MR. HOMER:
9      Q.  Have you had a chance to thoroughly review
10 the letter that has been marked Obenshain Exhibit
11 Number 16?
12     A.  I have read the letter.
13     Q.  And is the letter accurate, to the best of
14 your knowledge?
15     A.  Yes.
16     Q.  Okay. There is an Exhibit A attached to the
17 letter that starts at about the fourth page of the
18 exhibit. Can you tell me where this document was
19 generated?
20     A.  It's a system-generated document that I get
21 from the cash processing department on the 15th and the
22 30th of every month, give or take a day or two.
23     Q.  And did you personally pull this document
24 from the computer?

**205**

1      A.  No.
2      Q.  Who did that?
3      A.  This document comes from the cash processing
4  department, and it is sent to me via e-mail.
5      Q.  When did you receive this document from the
6  cash department?
7      A.  I don't know the exact date.
8      Q.  Okay. Would it have been this year that you
9  got it?
10     A.  No.
11     Q.  Would it have been in 2004?
12     A.  It was in the early part of 2004.
13     Q.  Okay. Turning to Exhibit B, which is quite
14 a ways after that, can you identify Exhibit B?
15     A.  This is our NSF report that we create on a
16 monthly basis.
17     Q.  Okay. And the same question: Who generated
18 this report?
19     A.  My department generated this report.
20     Q.  And your department is -- What is the name
21 of your department?
22     A.  Compliance.
23     Q.  And when was this report generated?
24     A.  This report was generated in January.