## 210

1  January 2004.
2      Q.  Right. Is this the policy violation report
3  that is referenced in Obenshain Exhibit Number 16, the
4  March 3, 2006 letter?
5      A.  I don't know. I didn't write this letter.
6      Q.  Well, do you know whether this report
7  memorializes your findings that are set forth in
8  Exhibit B of the letter, which is the NSF report?
9      A.  I would --
10         MR. ISRAEL: This is the same as Exhibit B.
11         THE WITNESS: This is B.
12         MR. ISRAEL: This is your report.
13         THE WITNESS: This is the NSF report. This
14  is the policy violation report.
15         MR. ISRAEL: Now, listen to his question.
16  BY MR. HOMER:
17      Q.  Now, the letter I got from Ms. Fite says,
18  Ms. Shaantiel's conclusions, and she is talking about
19  from reviewing the NSF report, the exhibit --
20      A.  It could be titled wrong. I think it was
21  being related -- I think -- to the NSF report. When you
22  look here, it says the conclusions are the root of
23  problem. The root of problem is on the NSF report.
24      Q.  That's right. But it goes on to say, from

## 211

1  her review as memorialized in the policy violation
2  report.
3      A.  This is the policy violation report.
4      Q.  And you are referring to Exhibit Number 2,
5  Shaantiel Exhibit 2, right?
6      A.  Yes.
7      Q.  So my question is: Does this letter that is
8  Exhibit 16 accurately state that your conclusions from
9  your review of the NSF checks in December or January
10  2003, 2004 were memorialized in the January 2004
11  violation report, which is Exhibit 2?
12      A.  Yes.
13      Q.  Okay. And am I right in saying that this
14  Obenshain Exhibit Number 15, which is the NSF report
15  that shows the root of problem, is the document that you
16  worked from in December '03, January '04, when you did
17  the audit of the NSF checks?
18      A.  This is the results of the document that I
19  worked up.
20      Q.  Okay. And when was that document prepared?
21  I'm talking again about Obenshain Exhibit Number 15.
22      A.  This is the document that was prepared at
23  the beginning of January of '04.
24      Q.  Okay.

## 212

1      A.  Or the middle of '04.
2      Q.  Okay. Now, when you look at that Exhibit
3  Number 2, Shaantiel Exhibit Number 2, the policy
4  violation report, it identifies just a handful -- I
5  guess three or four collectors from the Dover office,
6  namely, Mr. Reavis, Mr. Lane, and Mr. McQuiston, whereas
7  your NSF report, which is Exhibit 15, lists many other
8  collectors from the Dover office. Do you see where it
9  shows that?
10      A.  Right here.
11      Q.  Can you tell me why the violation report
12  summary doesn't include all the collectors in Dover that
13  were listed in the NSF report that you did in January of
14  '04?
15      A.  The report that I did in the NSFs were
16  submitted to Kathy Obenshain to do the investigation.
17  When the investigation was completed by Kathy, she got
18  back to me with her results, and that is what I put in
19  my report.
20      Q.  Okay. Can you explain what you mean by that
21  is what you put in the reports? She told you what
22  collectors to list in the report? Is that what you are
23  saying?
24      A.  She gave me the information to put in the

## 213

1  report. This is the outcome and the results of her
2  report.
3      Q.  Well, let's back up. What did you give
4  Kathy Obenshain to investigate? Did you give her the
5  NSF report that you prepared?
6      A.  That is correct.
7      Q.  And that is the Exhibit 15; am I right?
8  Obenshain Exhibit 15?
9      A.  Yes.
10      Q.  So you gave her that report? She
11  investigated, and then she gave you the information to
12  put in the policy violation report?
13      A.  She gave me the information.
14      Q.  Okay. Did she give you any instructions as
15  to how to put the information in the report?
16      A.  It's a long time ago. I don't remember if
17  she gave me specific instructions. I know that we
18  discussed it, and I came up with my report. I don't
19  remember if she said: Oh, you need to do this, this,
20  and this. I don't remember the vital statistics. It
21  was a long time ago.
22      Q.  You say she gave you the information to put
23  in the report. How did she give you the information?
24      A.  We had some telephone conversations, and we

**214**

1 also had some e-mails.

2    Q.   Okay. And if I remember correctly, you

3 looked for those e-mails and weren't able to find them;

4 is that right?

5    A.   That is correct.

6    Q.   During the course of the e-mails and the

7 phone conversations, did she list the debtors that she

8 wanted to put in the report -- I mean the collectors

9 that she wanted to put in the policy violation report?

10       MR. ISRAEL: Did she list the collectors,

11 not the debtors.

12       THE WITNESS: Thank you. She gave me the

13 collectors that were going on the report.

14 BY MR. HOMER:

15    Q.   Do you know how she selected which

16 collectors would be put in the report?

17    A.   No. I was not part of her investigation.

18    Q.   What else do you recall about the

19 information that she gave to you to put in the report?

20 Do you recall? In the e-mails, for example, did she

21 give you the specifics of what it says in these columns

22 regarding description of resolution?

23       MR. ISRAEL: Asked and answered.

24

**215**

1 BY MR. HOMER:

2    Q.   The right-hand column, it is hard to read.

3 But I know what it says. It says description of

4 resolution at the top of that column, and then there is

5 information about it. Do you recall whether she gave

6 you all of the information that you put in there?

7       MR. ISRAEL: Are you asking did she give her

8 the verbiage?

9       MR. HOMER: Yes.

10       MR. ISRAEL: Did she give you this verbiage?

11       THE WITNESS: Not all of it, no.

12 BY MR. HOMER:

13    Q.   But did she give you the substance of the

14 information?

15    A.   She gave me the information, correct.

16    Q.   Okay. Do you recall? Before, when Kathy

17 Obenshain investigated these problems that are set out

18 in the NSF report, which is Obenshain Exhibit Number 15,

19 did you give her any other information other than the

20 NSF report which is Exhibit 15? Or did you just give

21 her that one report?

22    A.   I sent the report to her.

23    Q.   Did you give her any other information? Do

24 you recall?

**216**

1    A.   I don't remember.

2    Q.   Okay. Do you know who else got a copy of

3 the report that you sent to Kathy Obenshain?

4    A.   Uh-huh.

5    Q.   Who else got it?

6    A.   Carolyn Moore, Josh Ginden, Steve

7 Loockerman, Ted Fox, Cherie Suggs.

8       MR. ISRAEL: Sugg.

9       THE WITNESS: Sugg, thank you. I think they

10 were all cc'd. I don't know if they looked at it or

11 not.

12       MR. ISRAEL: But he didn't ask that.

13       THE WITNESS: That is true.

14 BY MR. HOMER:

15    Q.   Looking at Exhibit 15, Obenshain Exhibit

16 Number 15 --

17    A.   Which one is that? This one? Obenshain

18 Exhibit 15? This one?

19       MR. ISRAEL: This one.

20 BY MR. HOMER:

21    Q.   There is a column there headed unit. Do you

22 see that? It is in the middle of the first page.

23    A.   Uh-huh.

24    Q.   And under it, there are various letters and

**217**

1 numbers, the first one being in the first row, A11. And

2 then it goes on. There are several A11s and then there

3 is A20 and so forth. And it isn't until you get to the

4 second page, at the bottom of the page, where you get to

5 a B. You get to a B57.

6       I will represent to you that during Kathy

7 Obenshain's deposition, she testified that the letter in

8 that unit column referred to the office location. A,

9 for example, referred to Atlanta. B would have referred

10 to Boone and so forth. Is that your understanding, as

11 well, that that is the unit that those letters refer to?

12    A.   Yes.

13       (Following a discussion off the record:)

14 BY MR. HOMER:

15    Q.   I know we have been through this before.

16 But just to sort of refresh this, could you explain,

17 first of all, what the term redepping means in the

18 jargon of debt collection?

19       MR. ISRAEL: Objection.

20       Could we go off the record for just a

21 second?

22       (Following a discussion off the record:)

23 BY MR. HOMER:

24    Q.   Could you explain what redepping means in

---

**218**

1  the debt collection business?
2        MR. ISRAEL: Asked and answered.
3  Go ahead and tell him.
4        THE WITNESS: A redep is a check that has
5  been returned NSF that we resubmit to the bank for
6  payment.
7  BY MR. HOMER:
8      Q. Could you tell me what DCI refers to?
9        MR. ISRAEL: Asked and answered.
10        MR. HOMER: Go ahead.
11        MR. ISRAEL: Go ahead.
12        THE WITNESS: A DCI check is a check that we
13  implement or put into the system based on information
14  that we get from the debtor.
15  BY MR. HOMER:
16      Q. And that stands for debtor check
17  information; is that right?
18      A. Yes.
19      Q. That is to be compared to a paper check; is
20  that a fair statement? It's not a paper check. It is
21  usually an electronic check; is that right?
22      A. No.
23      Q. Okay. What --
24      A. It is a safety paper check. It is not an

---

**219**

1  electronic check. It is a check that we electronically
2  data entry into the system, and we actually print a
3  safety paper check to submit to the bank. So when it
4  goes to your bank, you actually have a safety paper
5  instrument.
6      Q. Okay. But when you get the check
7  information from the debtor, he's not giving you a paper
8  check. He's giving you information, typically over the
9  phone, about what the check can be for and how much it
10  is and so forth, correct?
11      A. That is correct.
12      Q. Okay. And finally, can you tell me what a
13  postdated check is?
14        MR. ISRAEL: Asked and answered.
15  Go ahead and tell him.
16        THE WITNESS: A postdated check is a check
17  that is dated in advance from the current date present.
18  BY MR. HOMER:
19      Q. Okay. An example would be a debtor might
20  indicate on the first day of the month that a check will
21  be good on the 15th of the month, so then you can
22  postdate the check and submit it on the 15th. Is that a
23  fair statement?
24      A. That is correct.

---

**220**

1      Q. Okay. Turning your attention back to
2  January '04, when you were doing your audit on the NSF
3  checks, were you looking for all types of problems that
4  related to the NSF check handling procedures?
5        MR. ISRAEL: I don't understand the
6  question. Could you rephrase?
7  BY MR. HOMER:
8      Q. Well, what I'm trying to get at is were you
9  looking for any type of violation of a policy that
10  related to your NSF audit when you did the audit?
11      A. I was looking for any inconsistencies to the
12  policy for NSFs.
13      Q. Okay. And would you have looked, for
14  example, at problems that related to redepping?
15      A. Would I look to anything related to
16  redepping?
17      Q. Yes.
18      A. Yes.
19      Q. And DCIs, the same thing?
20      A. And DCIs, yes.
21      Q. And postdated checks?
22      A. Yes.
23      Q. Is the verification procedure for a
24  postdated check any different than the verification

---

**221**

1  procedure for a redepped check?
2        MR. ISRAEL: Asked and answered. Jerry, we
3  went through this a lot the last time with her.
4        MR. HOMER: I think you've got it confused.
5  I don't think I asked her this. I asked Obenshain.
6        MR. ISRAEL: To save time -- I think it is
7  asked and answered -- go ahead and answer.
8        THE WITNESS: Repeat the question.
9        MR. ISRAEL: Is the verification
10  procedure --
11  BY MR. HOMER:
12      Q. Well, let me back up. When a check is going
13  to be submitted for a redep or for a postdated check,
14  there are certain obligations to try to verify the check
15  is going to be good before the check is submitted,
16  correct?
17      A. Yes.
18      Q. My question is: Is there any different
19  procedure for verifying a postdated check than for
20  verifying a redepped check?
21      (Following a discussion off the record:)
22  BY MR. HOMER:
23      Q. Can you answer the question?
24      A. I apologize. I was distracted. Could you

---

---

**222**

1  reask the question?
2        MR. ISRAEL: You can read it back.
3        (The following was read:
4        "Question: My question is: Is there any
5  different procedure for verifying a postdated check than
6  for verifying a redepped check?")
7        THE WITNESS: It's the same process, a
8  little more detailed when it is a redep. But you still
9  have to go through the verification process.
10 BY MR. HOMER:
11       Q.   How is it more detailed?
12       A.   When you are dealing with an NSF check or a
13 check that you want to redep, you already have a bad
14 check at hand. So when you are going through the steps,
15 you want to really make sure your money is going to be
16 there the second time around, because it is not
17 advantageous to put it in the second time if there is no
18 money. It just doesn't work.
19       You want to make sure you do everything;
20 call the bank, call the debtor, get verification of
21 funds. Whereas, for the first time, when it is not, you
22 get the basic information. Does the debtor have the
23 money? You try to get a copy of the check. You try to
24 get a copy of the information. You could always get it.

---

**223**

1  But the second time around, you go the extra mile to get
2  it.
3        Q.   I guess I don't understand where the extra
4  mile is in that, though. If you have a redepped check,
5  is it sufficient to contact the debtor? First of all,
6  as I understand it, you have to attempt first with the bank to
7  verify the check is good. If you can't do that, then
8  you have to contact the debtor and have him tell you the
9  check is going to be good. Have I got that right?
10       A.   Yes.
11       MR. ISRAEL: Mischaracterization of prior
12 testimony, but go ahead.
13 BY MR. HOMER:
14       Q.   Okay. What I am trying to get at is if you
15 have a redep check, is there anything you have to do
16 when you do that second step? Contact the debtors? Any
17 information you have to get from the debtor that you
18 wouldn't have to get if you are just trying to verify
19 for a postdated check?
20       A.   We try to get a deposit slip, proof of funds
21 that are in the bank. The first time around, that isn't
22 something you must do; whereas, the second time around,
23 it is something we strongly want.
24       Q.   When you say strongly want, though, is that

---

**224**

1  a requirement that you get that, or is that something
2  that is preferred, for example?
3        A.   It is something that is needed to make sure.
4  It is not always able to be obtained.
5        Q.   Okay. When you say it is needed, though, is
6  that a requirement of the NCO policy, or is it just
7  something that –
8        A.   It is something that --
9        MR. ISRAEL: Wait a second. NCO Commercial
10 Division?
11       MR. HOMER: Yes. All of these questions
12 relate to the commercial division.
13       MR. ISRAEL: Do you understand that?
14       THE WITNESS: Yes.
15 BY MR. HOMER:
16       Q.   I will represent to you that we have gone
17 through the fact sheets that were sent to us, and we
18 have already identified them in the letters, according
19 the Bates-stamped numbers. I saw almost no place in
20 there where it says anything about getting a deposit
21 slip when there is debtor verification.
22       Is it your testimony that routinely there
23 would be a reference to getting a deposit slip in order
24 to get the verification requirement satisfied when you

---

**225**

1  do a redep?
2        A.   Let me make sure I understand that question
3  before I give it back to you.
4        Q.   Okay.
5        A.   You are asking me if is it a requirement to
6  get a deposit slip on every redep?
7        Q.   I didn't ask that question, but I will ask
8  that question.
9        A.   In that case, you will ask for it. You
10 won't always get it, but it is something that you will
11 ask for.
12       Q.   The fact sheets that I looked at don't
13 indicate that people are asking for a deposit slip. Are
14 there things that are required that are not set out in
15 the fact sheets that you use to support the audit that
16 you did in this case? Do you understand the question?
17       A.   No.
18       Q.   I will try to rephrase it. Okay. Let's
19 back up. You did an audit in December of '03, January
20 of '04 that resulted in the NSF report which is Exhibit
21 15. Recently, we received this Exhibit 16, which tells
22 us that Exhibit B to the letter includes the NSF report.
23 And attached to each page of the NSF report are various
24 documents that are called fact sheets that are basically

---

226

1  account information that was pulled from the computer
2  and in which the Defendant has asserted supports the
3  information that is in the NSF report. Correct? Do I
4  have all of that right?
5      A.   (The witness nodded head up and down.)
6      Q.   You have to answer yes.
7      A.   Yes.
8      Q.   My question is: Are there requirements in
9  the NCO verification policy that the fact sheet wouldn't
10 reflect have been satisfied? For example, would there
11 be reference in the fact sheets to the fact that the
12 debtor was asked for a deposit slip?
13     A.   There could be. It's how the collector
14 documented the account.
15     Q.   But when you did your audit, would you have
16 looked for each fact sheet to see whether they asked for
17 a deposit slip when there is a redep of an NSF check?
18     A.   I might have.
19     Q.   But I guess you might not have is also true,
20 correct?
21     A.   I looked at the notes as a whole, so it was
22 all encompassing to make sure that we met certain levels
23 of requirements.
24     Q.   Okay. And if I were to ask you now to look

227

1  at a fact sheet and you looked at it and the fact sheet
2  didn't indicate that the debtor had been asked for the
3  deposit slip, would you view that to be a violation of
4  NCO policy?
5      A.   I would have to look at the complete notes
6  and see what was said in the notes before I would make
7  that determination.
8      Q.   Okay. What would you be looking for? Let's
9  assume that it doesn't have that information. What
10 would be in the notes that would tell you that it is
11 still okay to redep the check?
12     A.   I would look for several things. I would
13 look for a contact to the bank, a contact to the debtor.
14 I would look for whether a manager would have reviewed
15 the account, whether there were date changes. I would
16 look at the notes up until and after the NSF, from the
17 time the check was put in.
18     Q.   And what information would tell you that it
19 is okay to redep the check, even if the debtor wasn't
20 asked for the deposit slip?
21     A.   I would look to see whether or not the funds
22 were there.
23     Q.   Well, let's assume they were not there.
24 Let's assume the bank didn't verify.

228

1      A.   The bank didn't verify. If there was no
2  proof of deposit and if there was no contact with the
3  debtor, at that point, in my mind, it would be a flag.
4      Q.   Well, if there was no contact with the
5  debtor. We're assuming there was contact with the
6  debtor. It just doesn't indicate that he was asked if
7  there was a deposit slip --
8      A.   At that point, there should be --
9           MR. ISRAEL: Wait. Let him finish.
10 BY MR. HOMER:
11     Q.   I'm assuming what I am trying to get at.
12 And let me try to back up again, just to make sure you
13 understand this. I am aware that if you can't verify
14 the funds with the bank, then you have to try to contact
15 the debtor. And if the debtor assures that the money is
16 there, then the check is redeposited.
17          But what you have told me today, I think, is
18 with a redeposit check, it is not enough to contact the
19 debtor. You have to get something more. You have to at
20 least ask whether there is a deposit slip to support
21 what the debtor is telling you. Am I right so far?
22          MR. ISRAEL: I think that is a
23 mischaracterization, because it is not the only thing
24 she said. But keep going.

229

1          THE WITNESS: I am going to say it is a
2  total package. You just don't go by one item on there.
3  You have to look at the notes, get the essence of the
4  notes, see if a manager reviewed it, if they documented
5  it on the account. You just don't --
6          MR. ISRAEL: But answer this question.
7  Maybe go at it this way: If the debtor does not get the
8  deposit slip -- okay?
9          THE WITNESS: Uh-huh.
10         MR. ISRAEL: -- what other information? We
11 are past the bank. There is no debtor verification.
12 The debtor did not get a deposit slip. What other
13 information, if anything, would be acceptable from the
14 debtor to make the redep?
15         Is that the question?
16         THE WITNESS: A three-way with the bank, you
17 can call the bank and do a three-way.
18         MR. ISRAEL: Okay. Assume you can't get to
19 the bank. Assume it is just a straight-on debtor, and
20 you talk to the debtor. What information does the
21 debtor give if there is no objective evidence --
22         THE WITNESS: Source of income. They would
23 give you a source of income, and, usually, it is
24 documented.

**230**

1    MR. ISRAEL: Do you mean for the deposit?
2    THE WITNESS: For the deposit. My
3  receivables came in this week. I got money from the X,
4  Y and Z Company. I made a deposit today. And you do
5  see that in the notes. If a manager went ahead and
6  reviewed the account, had the discussion with the
7  collector and the manager signed off and changed the
8  status code, then we would allow that. We trust our
9  managers.
10 BY MR. HOMER:
11    Q.    So the manager has the discretion to approve
12 it even if you don't have a deposit slip or any of the
13 other forms of verification?
14    A.    Uh-huh.
15    Q.    The answer is yes?
16    A.    Yes.
17    Q.    Now, the last question on this subject is
18 you have told me that you do have to have something more
19 for a redep. And you gave me several examples. If the
20 account notes or the fact sheets that are in the
21 computer don't provide the information that shows any of
22 those forms of verification, would that be a violation
23 of the NCO policy?
24    A.    It would be a reason to investigate to

**231**

1  determine if a violation has occurred.
2    Q.    And when you did your audit, did you review
3  fact sheets involving redeps of NSF checks where there
4  was debtor verification but not -- where the fact sheets
5  indicate the debtors were contacted, but there wasn't
6  any information about a deposit slip or a bank
7  conference or the other examples that you gave?
8    A.    To the best of my recollection, there were
9  accounts on there where there was contact with the
10 debtor where the other requirements weren't met.
11    Q.    Did you flag those as violations?
12    A.    I don't remember exactly each and every one
13 by detail. I would have to look at the notes to go back
14 and review it.
15    Q.    But according to what you told me before,
16 there would have been violations if the fact sheet
17 didn't document the things we talked about?
18    A.    I didn't do the violations. All I did was:
19 Hey, there is a flag here. There is the root of cause
20 problem, and then I sent it on to the somebody else to
21 make the decision whether there was a violation.
22    Q.    Okay. Fair enough.
23    MR. HOMER: Let's take a break now.
24    (Following a brief recess:)

**232**

1  BY MR. HOMER:
2    Q.    Ms. Shaantiel, can you tell me what
3  documents you reviewed in preparation for the deposition
4  today?
5    A.    I reviewed the NSF report. I reviewed fact
6  sheets. I reviewed account notes. I reviewed cash
7  journals.
8    Q.    Have you reviewed any of the transcripts of
9  the other depositions in this case?
10    A.    No, I have not.
11    MR. HOMER: Can we have this marked as
12 Shaantiel Exhibit 13, please?
13    (Shaantiel Exhibit Number 13 was marked for
14 identification and attached to the record.)
15 BY MR. HOMER:
16    Q.    I am going to hand you the original marked
17 version of Shaantiel Exhibit Number 13.
18    A.    Okay.
19    Q.    Can you identify that document that has been
20 marked as Exhibit 13?
21    A.    It is a debtor fact sheet.
22    Q.    Okay. And this is one of the --
23    A.    It has more than one account in it.
24    Q.    Okay. This is one of the documents -- Well,

**233**

1  it has how many pages?
2    A.    Seven.
3    Q.    I'm sorry. I will take that back. That is
4  not the same document that I'm looking at.
5    MR. ISRAEL: Do you want this one back?
6    MR. HOMER: I'm not sure yet. I have to see
7  what is going on here.
8    Yes, there is a second account, right. It
9  should just be one account. I'm going to take off the
10 last two pages, which are Bates stamped 949 and 950.
11 BY MR. HOMER:
12    Q.    I'm going to hand the exhibit back to you.
13 This is 945 and ending with 948, actually, four pages.
14    MR. ISRAEL: So it is Bates-stamped 945 to
15 948?
16    MR. HOMER: Right.
17 BY MR. HOMER:
18    Q.    And you say this is a fact sheet. Well,
19 maybe you can explain to me what this is. This is the
20 first one we are looking at. Can you tell me what this
21 document is?
22    A.    This is a debtor fact sheet.
23    Q.    Okay. Can you expound a little bit? This
24 is one of the documents that supports your audit

234

1  findings, right?
2      A.  I would have to look on the report to see if
3  it is on here.  Do you want me to do that?
4      Q.  Yes, you can do that.  I think it is the
5  first one.
6      A.  S787813.
7      Q.  This is the document that you reviewed to
8  make the conclusion that there was a problem with a
9  violation of the NSF report or the NSF policy, correct?
10     A.  This is a portion of the document.
11     Q.  Okay.  And what portion is missing?
12     A.  I would have to run an actual copy to give
13 you the full sheet.  This is a user friendly copy.
14     Q.  Okay.  Can you explain what you mean by
15 that?
16     A.  This is a -- It seems to be or appears to be
17 a copy that was created where it is highlighted or
18 circled where we found there was a problem with the
19 account or what led us to believe there may be a root of
20 cause problem here.
21     Q.  So there are some pages in the account that
22 weren't produced; is that right?
23     A.  This one looks like some of them are past
24 the time frame that the report was done and the property

235

1  was not included.
2      Q.  You say past the time frame.  Do you mean
3  following January of '04, there were additional sheets
4  that would have been in that account?
5      A.  Possibly.
6      Q.  Okay.  Just to make sure I understand some
7  of the terms that are used on here, first of all, on the
8  left-hand side at the top there, it says CRS number,
9  S78713?
10         MR. ISRAEL:  You are on the first page?
11         MR. HOMER:  Yes.
12 BY MR. HOMER:
13     Q.  That is the account number, correct?
14     A.  That is the NCO inventory number.
15     Q.  And it is that number that matches up to the
16 Exhibit 15 document, correct --
17     A.  That is correct.
18     Q.  -- as the account number.  On the left-hand
19 side of that first page of the fact sheet of Exhibit 13,
20 there is various information that relates to the debtor;
21 is that right?
22     A.  Yes.
23     Q.  And then on the right-hand side, there is
24 various information that relates to the client of NCO.

236

1  Is that the way it is formatted?
2      A.  The top part of this is what we call the
3  master information and detail of account.  This gives
4  you all the information necessary concerning who the
5  debtor is and the client information.
6      Q.  Okay.
7          MR. ISRAEL:  One second.  Before you ask, we
8  have a confidentiality order in this case, if I
9  remember.
10         MR. HOMER:  I don't know.
11         MR. ISRAEL:  Do we have a confidentiality
12 order?
13         MS. FITE:  Yes.  Well, we had --
14         MR. ISRAEL:  Is it in place?
15         MS. FITE:  We agreed to confidentiality
16 without an order, I believe.
17         MR. ISRAEL:  I just want to make sure that
18 any of the account notes, we treat them as confidential
19 for the case.
20         MR. HOMER:  I don't remember any agreement.
21 I have no intention to --
22         MS. FITE:  Oh, Dave, we redacted the
23 financial information of the debtor, such as checking
24 account numbers, and included that as part of our --

237

1          MR. ISRAEL:  I just don't want this floating
2  around.  We have like the Millwork Group, and now you
3  have information about the --
4          MS. FITE:  We have client information in
5  here.
6          MR. ISRAEL:  Right.  Do you have any problem
7  with --
8          MR. HOMER:  I don't have any intention.
9  Maybe we will need to show these documents to some
10 people, but I will notify you before I do that.
11 Obviously, we are going to have to show them to -- There
12 may be other witnesses that no longer work for NCO that
13 have to look at them.  I don't know.
14         MR. ISRAEL:  I have no problem showing them
15 to witnesses in the case.  I don't have any problem with
16 using them as part of the proceeding.  It is just that I
17 want to make sure that to the extent possible, we do not
18 distribute them publicly outside of the case.
19         MR. HOMER:  Okay.  I understand that.
20 BY MR. HOMER:
21     Q.  Going to the first page again of Exhibit
22 Number 13, there is, down at the bottom third of the
23 exhibit, a portion that says payments on the left and
24 transactions on the right.  Do you see where it says

## 238

1  that?
2      A.  Yes, I do.
3      Q.  And then underneath of that, it shows the
4  date. And the date, that would be the date that the
5  payment was made; is that right? Or is that the date
6  that the payment was attempted to be made with the bank?
7  Is that right?
8      A.  Right here is where we posted the payment to
9  the account or we backed the payment off. It is a
10 complete payment history.
11     Q.  You say we posted it to the account. What
12 do you mean by that?
13     A.  The way you can look at it here is we will
14 look at the first payment on 12/26, $5,930.43.
15     Q.  And the first payment is 3/5/04, right?
16     A.  Yes. You are looking here, and you have to
17 go backwards. 3/5/04 is an adjustment for the NSF.
18     MR. ISRAEL: Oh, I see.
19     THE WITNESS: 87 and 88 are adjustments to
20 the payment, which it shows a number 13.
21     MR. ISRAEL: It's in reverse order, Jerry.
22 BY MR. HOMER:
23     Q.  Okay. But is this the payment? The date
24 that you tried to push or have the payment accepted at

## 239

1  the bank?
2      MR. ISRAEL: Is what date?
3      MR. HOMER: The date in the column, under
4  payment date.
5      THE WITNESS: Not all of those are dates
6  that are going to the bank. You have to use the payment
7  code here, the 87, the 88, the 13, the 16. Anything
8  with a one in front of it is a payment to the house.
9  116 is a principal payment, whereas when you go to 13 --
10     MR. ISRAEL: Wait. Go slower. Speak
11 slower.
12     THE WITNESS: All right. A one with a six
13 is an actual cash payment or a check that we received
14 here, a form of payment. The 13 is an NSF.
15 BY MR. HOMER:
16     Q.  Okay. And what is an 87?
17     A.  87 and 88 go together. They are the
18 adjustment to show that the check returned for client
19 reporting. So it might have been returned. In this
20 case, on 12/4 -- we did the adjustment for it on 11/25
21 to rectify it so it would not go to our client and we
22 would not back off certain types of commissions. It is
23 all accounting type issues, to make sure that we were
24 balanced.

## 240

1      Q.  Okay. On your Exhibit 15, there is an
2  explanation for the root of the problem. It says
3  collector debtor. Can you tell me, by looking at this
4  fact sheet now, which is Exhibit 13, what it is that the
5  collector did wrong?
6      A.  Where it says here on 12/1 --
7      MR. ISRAEL: You are on page 946.
8      THE WITNESS: At the bottom of page 946.
9      MR. HOMER: Right.
10     THE WITNESS: They had postdates here. The
11 check was stopped. At that point any postdates should
12 have been pulled, and we should not have let any more go
13 through.
14 BY MR. HOMER:
15     Q.  And the collector did let more go through?
16     A.  Yes.
17     Q.  Okay. Then on the next page, which is 947,
18 about midway down the column, was there another
19 violation in there that you can see?
20     A.  I put in here -- Again, these are not
21 violations. These are root of cause that I think might
22 be a problem.
23     Q.  Okay.
24     A.  I want to make sure we are on the same page.

## 241

1  I do not determine whether or not there is a violation
2  here. The debtor said that he had not received his
3  refund or return yet. He swears he sent it certified
4  last Wednesday.
5      MR. ISRAEL: So what does that mean?
6      THE WITNESS: If the guy says or if the
7  debtor says they sent money, at that point you should be
8  pulling checks or you should be getting more information
9  on the check or you shouldn't be letting future checks
10 run.
11 BY MR. HOMER:
12     Q.  Then going down a little further on the same
13 page, isn't it true there is no verification for the
14 next check that gets submitted? All we see is that they
15 are trying to contact the debtor at home, but unable to
16 reach the debtor.
17     A.  They did reach the debtor on 12/30/03. They
18 talked to Ken. They said he is on the road, but he will
19 call in by phone this afternoon. We will see.
20     Q.  But if you go back to the first page, you
21 will see an NSF check for 12/26/03, won't you?
22     A.  Which one are you looking for?
23     Q.  The first page, it shows a --
24     A.  The 12/26?

---

**242**

1     Q.  Yes. It says 12/26/03, you got an NSF check
2 there shown by code 13A for 5,930.43.
3     A.  That check was actually returned. You have
4 to go to the 87. That was actually returned on 1/6.
5     Q.  What do you mean by it was returned on 1/6?
6     A.  Do you see on 1/6/04? Remember, I explained
7 the way we do it. The 87 and 88, that is date of the
8 deposit of the check, which would be the 12/26.
9     Q.  So the check was deposited 12/26/03?
10     A.  Yes.
11     Q.  But if you look on page 947, before that
12 check was deposited, there is no debtor verification or
13 bank verification, is there?
14     A.  No, there is not.
15     Q.  So that would be not in compliance with the
16 verification policy, correct?
17     A.  Uh-huh.
18     Q.  So that would be a third violation on this
19 collector, correct, or a third time the collector didn't
20 follow the policy? The two that you spotted, plus that
21 one?
22     A.  Yes.
23     Q.  Okay. Then if you go over to the next page,
24 you will see at the top there, NSF payment stopped,

---

**243**

1 correct?
2     A.  Yes, that is correct.
3     Q.  Was there any verification of the debtor
4 before that payment? If you look back on the previous
5 page --
6     A.  Excuse me. I need to understand. This is
7 not a payment we are talking about. This is a returned
8 item.
9     Q.  Before that check --
10     A.  That check was the one that went in on the
11 26th, which we just discussed.
12     Q.  Okay. So it would be the same one we
13 discussed before. So there were at least three
14 violations or three instances on this Exhibit Number 13
15 where the collector didn't follow the policy for NCO
16 policy for verification. Is that true?
17     A.  There are three concerns here, yes.
18     Q.  I notice when you listed the violations for
19 the -- I'll call them violations. I realize you don't
20 necessarily call them violations. In your NSF report
21 for the Dover office, there are cases where you -- We
22 will go to the third page of Exhibit 15.
23        MR. ISRAEL: The third page of Exhibit 15.
24 Okay.

---

**244**

1 BY MR. HOMER:
2     Q.  If you look for the collector named Brad
3 Reavis -- it's R-E-A-V-I-S -- if you look at his second
4 and third listing there, it is both for account S51306,
5 correct?
6     A.  Correct.
7     Q.  And again, if you go down a little further,
8 you will see 24S98825, again Brad Reavis. If you go a
9 little further, you will see again that twice you have
10 listed the account, S85602, correct?
11     A.  Yes, that is correct.
12     Q.  Why is it that you are listing these twice
13 on this list, but when you had one for the Atlanta
14 office where there were three violations, you only
15 listed the account once?
16     A.  In Atlanta there was only one check that was
17 NSF during the time of the report; whereas, during the
18 report time, he had two checks for the same account come
19 back.
20     Q.  Well, when I look at Exhibit 13, there are
21 three different NSF checks listed.
22        MR. ISRAEL: You are looking at Exhibit 13?
23        MR. HOMER: Exhibit 13, the first page.
24

---

**245**

1 BY MR. HOMER:
2     Q.  You have three checks NSF, correct?
3     A.  Yes. But there is a difference. Remember
4 the time frame. If you look at the report, this is from
5 November and February, and it was during that time frame
6 that only one check was deposited during the report. So
7 when the information was extrapolated, it pulled out
8 only one check; whereas, when you went to this account,
9 there was more than one check during that time frame.
10        MR. ISRAEL: Oh, I get it. So you found
11 other stuff in looking at the account notes, but that is
12 not what is on the system-generated report that you
13 started with?
14        THE WITNESS: Right.
15        MR. ISRAEL: Okay.
16 BY MR. HOMER:
17     Q.  Okay. But in any event, in some cases --
18 and this is a good example, the first one that we looked
19 at, the first one on the list -- there might be multiple
20 violations of the policy, NCO policy on one account, one
21 fact sheet?
22        MR. ISRAEL: Objection. That's asking the
23 witness to speculate. We will stipulate that there were
24 three root of cause issues that she has just spoken to

---

246

1  you about.
2        MR. HOMER: Okay. That is fine. I will
3  take that.
4        MR. ISRAEL: Okay.
5        MR. ISRAEL: And when you are asking
6  questions, Jerry, if you could just respect her
7  testimony. She is not calling it a violation. She is
8  calling it root of problem.
9        MR. HOMER: Well, I am going to call it a
10 violation of policy.
11 BY MR. HOMER:
12    Q.   If it is not a violation of policy, you can
13 let me know. But as I understand it, when you were
14 looking for roots of problems, you were looking for
15 instances where the NSF check handling policies weren't
16 being followed. Am I right about that?
17    A.   I was looking for more than just that that
18 we discussed. I was looking for anything that might
19 have caused the NSF, whether it was good or bad. And
20 when it looked suspicious or there was a problem, I then
21 reported it.
22 BY MR. HOMER:
23    Q.   Right. That is what I am talking about. I
24 am talking about only the ones that are on this list

247

1  that you reported that are on Exhibit 15.
2        MR. ISRAEL: I just think you are arguing.
3  She has unequivocally testified and said that she has
4  identified the root of problem. Someone else confirms
5  the violation. I don't think it is fair to just keep
6  putting in the word violation if that's --
7        MR. HOMER: I realize you are on the record.
8  I understand. You don't need to keep raising that every
9  time.
10       MR. ISRAEL: Then you will respect the
11 witness's --
12       MR. HOMER: No, I'm going to ask the
13 questions the way I want to ask them.
14       MR. ISRAEL: Then I will object if I think
15 it is an unfair characterization.
16       MR. HOMER: Fine. Then don't complain if
17 the deposition lasts a long time then.
18       MR. ISRAEL: I will when you ask those types
19 of questions and don't respect the witness.
20       (Following a discussion off the record:)
21       MR. HOMER: I would like to have this marked
22 as Exhibit Number 14.
23       (Shaantiel Exhibit Number 14 was marked for
24 identification and attached to the record.)

248

1  BY MR. HOMER:
2     Q.   That's the exhibit. I'm going to ask you --
3  so maybe you can start looking -- what problem you found
4  in this account, Exhibit Number 14.
5        MR. ISRAEL: Do you want to look at your
6  report and see if you can find it?
7        THE WITNESS: I know where it is on the
8  report. It is Atlanta. It is right here.
9        MR. HOMER: It is just two pages.
10       (Following a discussion off the record:)
11 BY MR. HOMER:
12    Q.   Okay. Have you had a chance to review the
13 documents that have been marked as Exhibit Number 14?
14    A.   Yes, I have.
15    Q.   And can you tell me what the problem with
16 this one was?
17    A.   The problem on this one was there was a
18 dispute in process. It was partially resolved. Nobody
19 followed up to see if the resolution was completed, and
20 they let the check go through.
21    Q.   Okay. If you turn to page 964 of the
22 document, do you see where, about a little more than
23 halfway down, there is an entry for 12/22/03?
24       MR. ISRAEL: Uh-huh.

249

1  BY MR. HOMER:
2     Q.   Am I right in saying on that date, a
3  postdate check was taken for the date 1/1/04?
4     A.   Yes, that is correct.
5     Q.   And can you tell, from reading this account,
6  whether there was any attempt to verify the check either
7  with the bank or the debtor before 1/1/04?
8     A.   No. There was no attempt to verify with the
9  bank.
10    Q.   And that would be a violation of the NCO
11 policy as it relates to verification, correct?
12    A.   No. This is not a violation.
13    Q.   Why is it --
14    A.   It may be a root of cause, but it is not a
15 violation. This is a first check. When you have a
16 first check here, which the debtor has given you, you do
17 not have to obtain. You recommend and we strongly urge
18 and we do go through all of the process which we
19 previously talked about. But it was not something that
20 you had to do.
21       Secondly, the issuers gave us a check, and
22 we knew where the source of funds was coming from.
23 There was a dispute in hand. Each case is individual.
24 In this type of case, we did not determine whether or

## 250

1  not the dispute was resolved. Once the dispute is
2  resolved, then you would have more opportunities to do
3  what you need to do here.
4       Q.   I thought you told me before that the
5  verification process for the postdated check situation
6  did require you to contact the debtor to verify before
7  the check was actually posted for payment.
8       A.   When we received this, we did contact the
9  debtor and we had communications with them. We did not
10  follow up. And if you look at my root of cause, we
11  never did do the follow-up on it. The root of cause
12  here was there was a dispute pending. The collector
13  pushed the check through, and there was no appropriate
14  backup to do it. That is why I chose it to be root of
15  cause.
16      Q.   Let me ask you this. On December 22, '03,
17  you get a postdated check for two weeks later. Is it
18  okay or is it proper under NCO policies for check
19  handling, after you had that contact with the debtor and
20  you've got the postdated check on 12/22/03, to not
21  contact the debtor prior to the check being submitted on
22  the two week later date?
23      A.   Are we referring it to this case?
24      Q.   Not this case, but it is basically the same

## 251

1  facts. What I am trying to get at is I thought that
2  the --
3       A.   You make an attempt to contact the debtor or
4  the bank.
5       Q.   Okay. You make an attempt. And this is for
6  a postdated check. But if you are not able to reach the
7  debtor or the bank, can you still submit the check when
8  the date comes up?
9       A.   Yes, you can still submit it. You would
10  need to get other information.
11      Q.   Okay. Well, looking at this, what other
12  information was obtained that justified putting the
13  check through?
14      A.   In this case?
15      Q.   Yes.
16      A.   What was not obtained or what was obtained?
17      Q.   What was obtained that justified putting the
18  check through on the date that it was put through,
19  January 1, '04?
20      A.   What was needed to be obtained was not
21  obtained, and that is why it went on my report.
22      Q.   Okay. You are telling me that in certain
23  circumstances for a postdated check, you don't have to
24  contact the bank or the debtor, and you are still in

## 252

1  compliance with the NCO check handling policy?
2       A.   Yes.
3       Q.   And what are those circumstances?
4       A.   It could be balance driven. It could be --
5       Q.   What do you mean by balance driven?
6       A.   If you take a check for $25 on the 3rd of
7  the month, there is no need to contact the bank. So if
8  you are looking at something under a thousand dollars,
9  there is really no need to follow up on it during this
10  time frame, between the time you take it. There are
11  other things you can do, also. You can make sure that a
12  certain letter -- in this case, would be the 12 -- that
13  could have gone out --
14      Q.   I am sorry. The 12?
15      A.   -- a letter saying that you have given us a
16  postdated check and it is going to the bank, to make
17  sure the funds are there, and if there is a problem,
18  make sure you contact NCO. And it gives a number on the
19  letter to contact us.
20      Q.   So you could send out a letter after you get
21  the check asking the debtor to contact you. If the
22  debtor doesn't contact you, you can still put the
23  postdated check through?
24      A.   Yes.

## 253

1       Q.   Okay. I understand from this letter,
2  Exhibit 16, that your audit review related only to
3  checks over a thousand dollars, right?
4       A.   Uh-huh.
5       Q.   Is there any other situation where you could
6  submit for payment a postdate check where you hadn't
7  contacted the debtor right before or within a day or two
8  before the check is posted?
9       A.   Case by case.
10      Q.   What other situation would you allow that to
11  go forward, in compliance with the NCO policy?
12      A.   There's numerous. To sit down and discuss
13  them all, I mean it would take a long time. But the
14  bottom line is if the manager feels comfortable and has
15  changed the status code and reviewed the account,
16  scanned the file, if all the requirements are met, if
17  the letter goes out, if there are previously no NSFs on
18  the account.
19      Q.   Okay. Is that in writing anywhere? Does
20  NCO have any document that reflects that policy?
21      MR. ISRAEL: Are you asking NCO or the
22  commercial division?
23      MR. HOMER: Well, NCO would encompass the
24  commercial. I am really talking about the commercial.

254

1      THE WITNESS: I'm not sure if it is in
2  writing.
3          MR. HOMER: Let's mark that as Exhibit 15.
4          (Shaantiel Exhibit Number 15 was marked for
5  identification and attached to the record.)
6  BY MR. HOMER:
7      Q.   Ms. Shaantiel, if you could, look at the
8  document that has been marked Shaantiel 15, starting
9  with Bates stamp number 967. Again, I would like to ask
10  what the problem was in this matter, in this case.
11      A.   On 12/31 they spoke with Evelyn, that Edward
12  was no longer employed, and they told her everything
13  that has happened. She explained to me that Tent
14  Engineering is closing down and reopening with another
15  company and checking information. She said she is not
16  sure if funds would be in the old account at any time.
17  I tried to run the check, but she will have the new
18  account on the 7th. In case it is not, she is giving me
19  the check number 2156, and it says Hamni Bank account,
20  BIF.
21      Q.   And you read all of that from page 969,
22  correct?
23      A.   Correct. Do you want me to explain the rest
24  of the root of cause here?

255

1      Q.   I just want to make sure I understand this.
2  Basically, what happened here was the collector had
3  information that the check wouldn't be good, correct --
4      A.   Correct.
5      Q.   -- and submitted a check anyway?
6      A.   The collector didn't verify if the check was
7  good or not at that point. They then submitted the
8  check and changed the date on the check.
9      Q.   Okay. And all of that was violation of NCO
10  policy?
11      A.   It was a root of cause. It was not
12  violation. It was for somebody else to determine if it
13  was a violation.
14      Q.   Okay. But the collector didn't follow the
15  NCO policy, is that a fair statement, with respect to
16  what you just testified about?
17      A.   The collector did not do what was needed to
18  verify the funds on the check.
19          (Shaantiel Exhibit Number 16 was marked for
20  identification and attached to the record.)
21          (Following a discussion off the record:)
22  BY MR. HOMER:
23      Q.   You have been handed Exhibit Number 16. And
24  again, I would ask you to look at this fact sheet and

256

1  tell me what the concern was here.
2      A.   In this particular case here, it looks like
3  when the debtor stopped payment on the account, that she
4  sent a check when she had a direct -- in other words,
5  she mailed it to the client. Therefore, the check was
6  not supposed to be here. And there was no money, I
7  guess. The check shouldn't have run.
8      Q.   Okay. The collector knew it wasn't going to
9  clear; is that correct?
10      A.   That is correct.
11          (Shaantiel Exhibit Number 17 was marked for
12  identification and attached to the record.)
13  BY MR. HOMER:
14      Q.   If you could, review Exhibit Number 17. And
15  again, I would ask that you tell me what the problem was
16  here.
17      A.   In this case, you start on 12/12 of '03.
18  They spoke with the debtor. Something that he had
19  sent in a cashier's check, but it was lost and it was
20  traced --
21          MR. ISRAEL: Go slower. Go slower.
22          THE WITNESS: I am sorry.
23          MR. ISRAEL: That is okay.
24          THE WITNESS: They spoke with the debtor.

257

1  They said they were sending in a cashier's check. It
2  was lost. They were going to put a trace on it. They
3  were going to give us the new information.
4  BY MR. HOMER:
5      Q.   Please slow down a little bit so the court
6  reporter can --
7      A.   I'm sorry. Supposedly the payment was lost,
8  that the last check should have cleared, and they gave
9  another check for January at the end of the month. We
10  then see that the check is DCI'd for 12/31. And then
11  the check date is changed for 130 -- I'm sorry. Then
12  another check for 130 was put in. The banking
13  information automatically populates at that point. And
14  the next thing you have here is a postdated check for
15  end of month.
16          MR. ISRAEL: Slowly.
17          THE WITNESS: I'm sorry. I am used to
18  running these. And there is no contact between --
19          MR. ISRAEL: You didn't finish your
20  sentence.
21          THE WITNESS: And on 12/31 we had a postdate
22  for the end of January. On 1/7 the check runs and is
23  returned NSF. The problem with this account is from
24  12/12 to when the check posted, there was no work on the

**258**

1 account. You didn't know what was going on. There were
2 multiple NSFs. And the notes don't make sense. Why
3 wasn't he following up with the certified funds or the
4 tracer on the certified funds?
5 BY MR. HOMER:
6     Q. Okay. Maybe a simpler way to say it -- and
7 I don't think I am trying to cover all the different
8 problems here -- but at 985, it says 12/12/03, a check
9 was taken, postdate check for 1/30/04, correct? I'm
10 about one-third of the way down the column. I think you
11 mentioned it already, but I just want to make sure I
12 understand. About --
13     A. Give me the time that you are talking.
14     Q. 12/12/03.
15     A. 12/12/03. At what time?
16     Q. At 9:08.
17     A. 9:08.
18     Q. There is a postdated check given for
19 1/30/04, correct?
20     A. And a check for 12/31 and a check for 1/30.
21     Q. All right. Both of those checks, so what
22 you are telling me is at least the first check, the one
23 for 12/31/03, was put through the system without doing
24 the verification that was required.

**259**

1     A. That's correct.
2     MR. ISRAEL: When it says bank runs --
3     THE WITNESS: This was an automatically
4 populated situation. After all the investigation, this
5 was no longer allowed. After this report, they stopped
6 doing this, because they found that people were taking
7 the information from here and repopulating the DCI
8 window. So this is no longer populated. The system
9 automatically populated this window.
10     MR. ISRAEL: Got it. I got it.
11     (Shaantiel Exhibit Number 18 was marked for
12 identification and attached to the record.)
13     (Following a discussion off the record:)
14     MR. HOMER: I'm not sure where the other
15 copy is, but I will let you look at that one. It is
16 Exhibit Number 18. Here it is.
17     MR. ISRAEL: Thanks.
18 BY MR. HOMER:
19     Q. Again, that same question, if you can tell
20 me what the concern was when you reviewed Exhibit 18.
21     A. In this case, we should have held the check
22 until 1/2 of '04. The check was destroyed. It was then
23 on 12/29 that we entered in for the correct date. On
24 1/2 the debtor called in, and the funds weren't there,

**260**

1 basically. She didn't have it. And we could have
2 pulled the check.
3     Q. Was that a collector problem or a debtor
4 problem?
5     A. This is not a collector problem because of
6 the way we would have posted back then. We would not
7 have had the ability to pull the check.
8     Q. Okay.
9     A. It was the debtor not having funds.
10     Q. Let's go to page 995 of the exhibit.
11 This reflects that postdated checks were put on
12 September 5th, right? Up at the top this says this has
13 PCKS. That is postdated checks, isn't it?
14     THE WITNESS: Did he say 995?
15     MR. ISRAEL: I thought.
16     MR. HOMER: Same account.
17     MR. ISRAEL: We are going to what line?
18 9/18, you said?
19 BY MR. HOMER:
20     Q. We are looking at 9/05.
21     A. This has postdated checks on it.
22     Q. Okay. Looking down after 12/11/03, it says
23 check 3131 NSF. Do you see where it says that for
24 $4,000?

**261**

1     A. Uh-huh.
2     Q. When was that check taken that was NSF on
3 12/11.
4     A. The 12/11 check was the one you want to know
5 when we took it?
6     Q. Yes. It was check 3131.
7     A. On 12/29/03, 12/30/03, for $18,997.60?
8 3132, is that the check you are questioning?
9     Q. Well, I'm looking at the date at page 995.
10 The date is 12/11/03. And underneath that, it says CK
11 3131, which I take to mean check 3131, $4,000, NSF.
12 That is the check I am talking about.
13     A. Where do you see the NSF? We are talking --
14     MR. ISRAEL: Right there, 12/11/03.
15     THE WITNESS: 3131 returned NSF.
16 BY MR. HOMER:
17     Q. Correct. When was that check authorized?
18     A. I don't see where the check was inputted
19 into the system. It might have been a mailed-in check.
20     Q. I asked you about this before. But do you
21 see where the postdated checks were put in, 9/5/03?
22 This has postdate --
23     A. Where?
24     Q. Same page, up a little bit above it, it says

**262**

1   this has postdated checks on it at 9/05/03?
2       A.    This has no documentation on this where the
3   checks were inputted as a DCI.
4       Q.    I don't understand what you are saying.
5       A.    The checks were not DCI'd.
6       Q.    That is not my question. Weren't there
7   postdated checks that were put into the system in this
8   account?
9       A.    I don't see where postdated checks were put
10  into the system on this account. What I see here is
11  this has checks on it. This has postdated checks on it.
12  Postdate does not mean that we actually implement every
13  single one in the system. It could have been --
14          MR. ISRAEL: Go slower.
15          THE WITNESS: I am so sorry. The checks
16  could have been mailed into the office. If the checks
17  were mailed into the office, you would not have seen
18  them entered in like you would see here on 12/12, where
19  it says BK/RP on 12/26/03 for $4,000. This could have
20  been a mailed-in check, or this could have been -- and
21  the way you determine this -- but nowhere here on 8/26,
22  going down on 9/10, do you see checks that are DCI'd
23  into the system.
24

**263**

1   BY MR. HOMER:
2       Q.    Well, whether it is DCI'd or mailed, there
3   has to be verification, correct? Doesn't there have to
4   be verification before you can put the check through?
5       A.    If the check is mailed in, the collector
6   wouldn't have the information to verify it.
7       Q.    Well, when you did this NSF audit, my
8   understanding was that you were looking at these fact
9   sheets put into the system to determine whether or not
10  checks that turned out NSF were properly processed,
11  correct?
12      A.    I was looking at a specific period of time.
13      Q.    Right. Are you telling --
14      A.    This is not during that time frame for these
15  checks. At a later date, I did review these accounts.
16      Q.    Well, are you telling me that you can't tell
17  from the computer account, the fact sheet, what the
18  reason for this NSF check that is 12 -- the $4,000 NSF
19  check that is listed on 12/11/03, you can't tell whether
20  or not that was for a postdated check?
21      A.    On 12/11?
22      Q.    Yes, the NSF check that is listed here on
23  12/11.
24      A.    I would have had to have gone to the shared

**264**

1   files, and we do have access to shared files.
2       Q.    Did you do that in the case?
3       A.    I don't remember.
4       Q.    So you don't know whether or not in this
5   case there was a collector failure to verify when that
6   check that came back, the NSF on 12/11/03 came back?
7       A.    I did not review this from my report.
8       Q.    Why is that? I thought you were reviewing
9   all the NSF checks for that period.
10      A.    The period that I reviewed on this one here
11  was from 12/15. If you look --
12          MR. ISRAEL: Where is the data?
13          THE WITNESS: On these checks, they were
14  from 12/15 until January.
15  BY MR. HOMER:
16      Q.    Okay. Let's go down a couple entries then.
17  Let's go down to 12/12/03. Do you see there where it
18  says check was put on for 12/26/03?
19      A.    Uh-huh.
20      Q.    That is a postdate check for 12/26/03, taken
21  December 12th, correct?
22      A.    It looks like that is a DCI'd check, yes.
23      Q.    And can you tell me where it indicates on
24  here that there was verification or that there was

**265**

1   verification before that check went through?
2       A.    On 12/12 debtor called in and said still
3   needs the 26 to cover, said 18 will definitely be good.
4   On 12/29 the debtor called in and said to hold the check
5   until 1/2. So we had contact within an appropriate
6   period of time with the debtor here that they told us to
7   hold the check.
8       Q.    When was that contact with the debtor?
9       A.    That was done right here on 12/29/03 at
10  10:40.
11      Q.    But the check was for 12/26/03, right?
12      A.    For the 4,000, correct. Did it post? On
13  12/26 it did. It would have been a Western Union, WU.
14      Q.    We are going to the --
15      A.    It might have been in here.
16      Q.    Let's go down a little bit further. It says
17  on 12/29/03 there is a postdated check that goes on for
18  January 2, '04. Do you see where that is? It is for
19  $18,997.
20      A.    This is the check. We destroyed the check
21  for 12/30, and then we reentered it for 1/2.
22          MR. ISRAEL: 1/2? Oh, I see. So 18,997.60?
23          THE WITNESS: The 18, yeah.
24

**266**

BY MR. HOMER:

Q. So on 12/29/03 there is a postdated check for 1/2/04 in the sum of 18,976.60?

A. That is correct.

MR. ISRAEL: 18,997.

BY MR. HOMER:

Q. Okay. Maybe I got that number wrong. What was done to verify that check before it was posted?

A. On 1/2 there was a conversation with the debtor. The debtor called in. And there should have been a pull when they would call us and have it. And we were unable to pull it, because we already posted the check.

Q. So the check was posted before there was any verification on 1/2/04?

A. That is correct.

Q. And that would not be in compliance with NCO policy, correct?

A. Again, it's a root of cause. It is not whether it is in compliance or violation.

Q. Well, should the collector, if it had been following NCO policy, have gotten that verification before the postdated check was posted?

A. Could you please repeat that question?

**267**

Q. Well, you said that the check was deposited on 1/2/04 without verification. And I'm just asking you: NCO policy does require that verification take place before the postdated check is posted, correct?

A. That is ambiguous, because what you are saying isn't what happened here. You have to understand that on the 2nd, this check had already -- you never had the opportunity to do that. So you can't make it a collector's fault in this case 100 percent, because we posted the check for the last day of the month. So when it posted for the last day of the month, we never would have had the ability to follow the process.

Q. Well, it says 12/29/03, it was posted for -- the postdated check was taken for 1/2/04. That's what it says.

A. For 1/2, right?

Q. So on 12/29 you have a postdated check for 1/2/04. And you have already said that according to these facts, there wasn't any verification before the check --

A. The check posted on 12/31.

Q. Okay. And why was that done? Why would you post it without verifying the funds?

A. In this case, the way the system worked back

**268**

in that time frame, we took the first two or the first day of the following business and posted it to the last day of the month. So this would have been caught in the sweep to pull the check.

So the collector -- you can't blame a collector, because he never had the time to verify it. You can say it was a root of cause. You can investigate it. But during that time frame, you can't say what if, if you have never given the collector the opportunity to do the work.

MR. HOMER: Excuse me just a second.

BY MR. HOMER:

Q. Okay. Let's go back to the previous one that came back, the one at 12/20/03.

A. In the same account?

Q. The same account, page 995, you already have a history of NSF here. There was an NSF on 11/30/03, correct, on the first page?

A. In the notes it shows that the Western Union was backed off as an NSF on 11/30. So we would have to go to the 11/30 note, and there is no information. It just says on 12/11. So there is no documentation from cash, why they backed off the Western Union. It might have been a bookkeeping entry. I don't know.

**269**

Q. Okay. Going to page 995, where you have a postdated check taken on December 12th for December 26th in the sum of $4,000, didn't the collector have time to verify that check? I understand that you are saying it didn't have time on the 12/29 one. But how about the one on 12/12?

A. No. It was not done.

Q. Okay. And the collector should have done the verification, correct?

A. I'm sorry. The collector should have what?

Q. The collector should have done the verification of that postdated check?

A. He should have or she should have.

(Shaantiel Exhibit Number 19 was marked for identification and attached to the record.)

BY MR. HOMER:

Q. You have been handed Exhibit Number 19. If you could, look at that and tell me again what the concern was in this account.

A. In this case the debtor was a good-paying debtor, having an NSF. They contacted the debtor. They switched their bank accounts, and it was good to go. They had done the work, and they had determined what was the root of cause.

B-455

270

1    Q.    Let's look down at the bottom of page 1001.
2  Do you see there on the entry for January 9, '04, there
3  is an NSF check in the sum of 1,937.67?
4    A.    Uh-huh.
5    Q.    And then if you look back up near the top of
6  the page, on 11/18/03, you will see there was a
7  postdated check that is the same number, 5602, that was
8  taken for that 1/1/04 date. Correct?
9    A.    Yes.
10   Q.    So we have a postdated check given on
11  November 18th for 1/1/04, and that came back NSF on
12  1/9/04. Can you show me where in the intervening time
13  between the taking of the check and the time that it
14  came back NSF that there was an attempt to verify with
15  the bank or with the debtor that the check would be
16  good?
17   A.    In this case, you have the number 12 letter
18  that went out on 12/22. The debtor had a good --
19      MR. ISRAEL:  Slow, slow.
20      THE WITNESS:  Okay. The debtor had a --
21      MR. ISRAEL:  Stop. Stop. You need to
22  really go slow, because it is too hard to take it down.
23      THE WITNESS:  On 12/22 you had the number 12
24  letter go out, which reminds you the posted payment is

271

1  going to be good. In this case, the debtor had already
2  had a good paying history, so there was really -- they
3  had already shown that they were paying in good
4  standings.
5  BY MR. HOMER:
6    Q.    So you are saying there wasn't any debtor
7  verification or bank verification required in this case?
8    A.    At this time that was not done on this
9  account. Was there a need -- Excuse me. Was there a
10  need to do it?  The debtor had a good paying history.
11  They had already done that in the past or they had
12  been -- partial pay accounts or pay accounts, you
13  normally wouldn't have to do that until and if they had
14  a balance.
15   Q.    Okay. Do you know whether that policy was
16  something that was followed in all the commercial
17  division offices of NCO during this time period?
18   A.    Which policy?
19   Q.    The policy of saying you don't need bank
20  verification or debtor verification for a postdated
21  check if there is no history of NSF, and you sent out
22  this letter reminding the debtor that he's got to make
23  the check good.
24   A.    I'm going to repeat this to make sure I

272

1  understand it in my terms.
2    Q.    Okay.
3    A.    You are asking me: Is there any written
4  policy saying if there are a series of postdated checks
5  that are good, that you need to go in and verify the
6  checks each and every month?
7    Q.    No. I wasn't asking if there was a written
8  policy. I was asking whether what you have just
9  testified about, that you don't have to do bank or
10  debtor verification in the situation where you have a
11  postdated check, there is no history of NSF and you have
12  sent out a letter reminding the debtor to make the check
13  good, whether that policy was something that was
14  followed in all of the commercial offices in NCO's
15  commercial division? Do you know that, if that was the
16  policy that was followed?
17   A.    That is normally a standard collection
18  procedure.
19   Q.    So the answer is yes?
20   A.    Yes.
21      MR. HOMER:  Okay. Do you want to stop here?
22      (Following the telephone deposition of Rick
23  Boudreau:)
24

273

1          DINA SHAANTIEL,
2    the witness herein, having first been
3    previously sworn on oath, was examined and
4    testified as follows:
5      (Shaantiel Exhibit Number 20 was marked for
6  identification and attached to the record.)
7  BY MR. HOMER:
8    Q.    I'm going to hand you Exhibit 20, and I'm
9  going to ask the same questions that I have been asking.
10     First of all, can you just identify what the
11  exhibit is?
12   A.    It's a debtor fact sheet or a portion of a
13  debtor fact sheet.
14   Q.    Okay. And can you identify in this one what
15  the concern was about the handling of the NSF? I don't
16  think that you need to look at the --
17   A.    Yes, I would like to look at it. I would
18  feel more comfortable.
19   Q.    Okay.
20      MR. ISRAEL:  You can look at anything you
21  want. You can absolutely look at it.
22      MR. HOMER:  Not really, but go ahead and
23  look at it.
24      MR. ISRAEL:  Why can't she look at --

B-456

**282**

1  the relevancy of the NSF administrative hold is to
2  whether or not the collector did the verification before
3  12/31/03, when the check was bad?
4       A.    Again, my report was more than just to check
5  if there was verification of whether the funds were good
6  on the check. We looked for numerous things. It wasn't
7  just one particular, oh, I'm looking for verification.
8       Q.    I understand that. What I am trying to get
9  at is why don't you identify this as a collector
10 problem, when there is clear evidence that there is a
11 postdated check taken on 12/01, and 12/31 there is an
12 NSF, and there is nothing in there in your account notes
13 to indicate there was any verification done. Why does
14 that indicate to you there was a collector problem
15 there?
16       A.    What is clear to me is that there was a bank
17 issue, because it came back from the bank with a bank
18 issue. I was looking at the original NSF here.
19       Q.    Wasn't the collector required to put in the
20 computer the information that showed that he did the
21 verification in terms of contacting the bank and then
22 contacting the debtor? Wasn't that a requirement that
23 he put in the computer so when you look at these fact
24 sheets, you could see whether or not he did the

**283**

1  verification?
2       A.    Yes.
3       Q.    And in this case, the collector didn't put
4  in any information between 12/1/03 and 12/31/03,
5  correct?
6       A.    Correct.
7       Q.    Can't we presume, therefore, that he didn't
8  do the verification that was required?
9       A.    That wouldn't be for me to make that final
10 decision. Again, I flag stuff based on my knowledge. I
11 sent it over for further investigation.
12       Q.    Well, what I am trying to get at -- and I'm
13 going to try one more time -- is if you saw account
14 notes such as this one that is in Exhibit 20, that
15 reflected there wasn't any debtor verification, there
16 wasn't any bank verification between the date of the
17 check and the date of the postdated check and the date
18 that they put it through the bank, why wouldn't that
19 tell you that this is one that the collector may have
20 gotten wrong, that they should have done the
21 verification?
22       A.    I don't know if the collector did something
23 wrong. I don't know.
24       Q.    So are you telling me you can't tell by

**284**

1  looking at this account sheet that the debtor did
2  anything wrong, even though there is nothing in there
3  that indicates he did the verification?
4       A.    I don't know if the debtor did anything
5  wrong. The debtor is somebody who pays us.
6       Q.    I'm sorry. I am talking about the
7  collector. I misspoke. I am talking about the
8  collector.
9       MR. ISRAEL: He is talking about the
10 collector.
11       THE WITNESS: I am sorry. I don't know if
12 the collector did anything wrong. What I saw here was
13 the bank had an issue. When I saw that, in my mind, it
14 was a bank issue.
15 BY MR. HOMER:
16       Q.    So is it fair to say then that even though
17 the fact sheets that you reviewed in your audit don't
18 reflect that the collector verified with the bank or
19 contacted the debtor, that doesn't necessarily mean that
20 the collector did anything wrong?
21       MR. ISRAEL: Objection. I object as to
22 form. If it will save time -- maybe this will -- we
23 will stipulate that if there is nothing between posting
24 and putting in it, like December 1st to December 31st,

**285**

1  that that is what would be cause for her to submit for
2  further review. We will also stipulate then, if it is
3  blank -- I mean we have been through this so many times.
4       MR. HOMER: Well, I don't understand. We
5  have a major issue here, because I thought the whole
6  premise of this was -- and based somewhat on the letter
7  that Elizabeth wrote -- that what happened was the
8  witness took the list of NSF checks and then went
9  through the computer, through these fact sheets for each
10 one of the NSF checks, and tried to determine whether or
11 not the verification process was followed.
12       Now, she did say that in the first
13 deposition. She doesn't remember that, but that is what
14 she said.
15       MR. ISRAEL: I think that is partly correct.
16       THE WITNESS: It was --
17       MR. ISRAEL: Let him finish.
18       MR. HOMER: We have an account here, where
19 there is nothing in the fact sheet that indicates the
20 debtor or the collector tried to do the verification.
21 And she is not willing to say that that would have
22 triggered a question about whether the collector did the
23 thing or not.
24       MR. ISRAEL: I understand the question. We

286

1  ask it that way. Assume for a moment there was no
2  reference to the bank. Assume that the only entries
3  were December 1st and December 31st.
4          MR. HOMER: That is not an assumption.
5  Those are the facts.
6          MR. ISRAEL: But she's been looking at the
7  1/7 entry. I have covered it up.
8          If you had just seen these two entries,
9  would you have circled it for further review?
10         THE WITNESS: Yes.
11         MR. ISRAEL: Why?
12         THE WITNESS: Why? Because there was no
13 documentation there.
14         MR. ISRAEL: Okay.
15         MR. HOMER: Okay. Well, I don't understand
16 that.
17         MR. ISRAEL: What don't you understand?
18         MR. HOMER: You had her cover up something.
19 There is nothing on the record. I don't know what you
20 are talking about.
21         MR. ISRAEL: I covered up 1/7/04. I will
22 ask it again.
23         If you had only looked at these two entries,
24 12/1/03, and 12/31/03, would you have circled this for

287

1  further review?
2          THE WITNESS: Yes.
3  BY MR. HOMER:
4      Q.   And why would you have done that?
5      A.   Because there was no documentation.
6      Q.   Of what?
7      A.   Of anything.
8      Q.   Of verification?
9      A.   There's no notes, so I would have circled it
10 to find out what happened for further investigation.
11 Maybe something happened in between here that I have no
12 knowledge of, so I would have shipped it over.
13     Q.   Well, doesn't it mean that the collector
14 didn't put any information in there between 12/01 and
15 12/31/03?
16     A.   There was no information there.
17     Q.   Okay. So why would that not be a collector
18 problem? What if the collector didn't put any
19 information in for a whole month, and the check went in
20 and was NSF?
21     A.   Part of the review that I did was to look at
22 the NSF. In this case, this was returned because of the
23 bank. The NSF here is an administrative term related to
24 the bank. That was the root of cause for this NSF.

288

1      Q.   The check was bad on 12/31/03, wasn't it?
2  Isn't that what you said before?
3      A.   No. That is when the check shows that it
4  comes off. Remember, we went through the payment codes?
5      Q.   I'm sorry?
6      A.   The check was actually returned on the 7th,
7  is when it was returned.
8      Q.   Right. But it was posted 12/31.
9      A.   Correct.
10     Q.   And the policy was before you could post it,
11 you had to do verification?
12     A.   Right.
13     Q.   The record reflects there was no
14 verification?
15     A.   This record shows that, right.
16     Q.   So the collector didn't put anything in the
17 system indicating there was verification before the
18 check was posted on 12/31/03?
19     A.   Correct.
20     Q.   Why would that not tell you that that was a
21 collector problem? That is my question.
22     A.   Because when I looked at this --
23         MR. ISRAEL: No. Now he's asking: If you
24 look at that now, would that, in your mind, be

289

1  considered a collector problem?
2          THE WITNESS: If I didn't show what was
3  underneath it?
4          MR. ISRAEL: Yes.
5          THE WITNESS: Yes.
6  BY MR. HOMER:
7      Q.   So what you are saying is after the fact,
8  something that happened after 12/31/03, that takes the
9  collector off the hook for not doing the verification?
10     A.   Does it take the collector off the hook?
11     Q.   You are saying this isn't a collector
12 problem now, because this check came back later as
13 something else.
14     A.   In my mind, this was a bank issue, and that
15 is the way I perceived it.
16         MR. ISRAEL: That is when you perceived it
17 when you did the report.
18         THE WITNESS: Right.
19         MR. ISRAEL: But looking at it today in a
20 vacuum, do you see this as a collector problem?
21         THE WITNESS: It could be a collector
22 problem.
23         MR. ISRAEL: Okay.
24

B-458

290

1  BY MR. HOMER:
2      Q.   Okay.  Well, if we have a Dover office
3  collector who doesn't do the verification -- he's got a
4  postdated check, it comes in, he doesn't do the
5  verification before the check is posted -- you see that
6  as a collector problem, correct?
7      A.   Each one I would have to look at case by
8  case.  I don't want to make a broad range assumption.
9      Q.   Okay.  Can I get that one back, please?
10         MR. ISRAEL:  Sure.
11         MR. HOMER:  I want to get this marked.
12         (Shaantiel Exhibit Number 21 was marked for
13  identification and attached to the record.)
14  BY MR. HOMER:
15      Q.   I am going to ask you not to look at the NSF
16  report this time, because I think you are looking at the
17  report to find out whether you called it a debtor
18  problem or a collector problem, and then you are
19  fashioning your answers to try to suit that category.
20      A.   Okay.  I will put it way.
21         MR. ISRAEL:  Hold on.  Wait, wait.  Even if
22  she is, so what?
23         MR. HOMER:  She doesn't have the right to do
24  that during a deposition.  Do you think during a trial

291

1  somebody can just say:  I want to see this document
2  before I can make an answer?
3         MR. ISRAEL:  I guess it depends on the scope
4  of questions.  What are you trying to do?  To see if her
5  review of it now would be the same as it was then?
6         MR. HOMER:  I am trying to find out what the
7  problem in the fact sheet is.  And I would rather it not
8  be colored by her review of what she called it
9  originally, because I think she's fashioning the answers
10  to try to justify what she put in the NSF report.
11         MR. ISRAEL:  Okay.  All right.  Well --
12  BY MR. HOMER:
13      Q.   We have another document that has been
14  marked as Exhibit 21.  Can you take a look at that, and
15  tell me what the problem with this one was?
16      A.   My notes show that there was good work on
17  this, that they did the follow-up on 12/3.  They called
18  to get the routing identity, cause routing number, did
19  not identify on file.  On 12/19 they tried to reach the
20  bank.  There was no answer.  The check was returned stop
21  pay.  They tried to reach, and there was no message.
22  The check went in.
23      Q.   Okay.  Let's turn to page 000975 of the
24  exhibit.  If you could, review the entries that start at

292

1  12/04/03.  Do you see where it says CRS system does not
2  recognize ABA numbers for debtor bank?
3      A.   That's correct.
4      Q.   Is that the collector saying there is going
5  to be a problem with this check if you submit it?
6      A.   This is a collector saying that the ABA
7  number is not good.  And they e-mailed the accounting to
8  get the corrected information.
9      Q.   Okay.  And now come down to 12/04/03.  I'm
10  sorry, down to -- let's go down to 12/16/03.
11         MR. ISRAEL:  12/16/03, on page 975?
12         MR. HOMER:  Right.
13         MR. ISRAEL:  Which --
14         MR. HOMER:  Do you see what the first entry
15  there is?
16         MR. ISRAEL:  Telephone the client or TT
17  client?
18  BY MR. HOMER:
19      Q.   TT means talked to, right?
20      A.   Yes.
21      Q.   Talked to client Bob, says he will -- do you
22  know who the Bob is there?  That is the client, right?
23      A.   Yes.
24      Q.   Says he will -- CB is call back?

293

1      A.   Yes.
2      Q.   -- to set conference call between the debtor
3  and I, right?
4      A.   Uh-huh.
5      Q.   Now, on the same date there is a stop
6  payment, correct?
7      A.   That is correct.
8      Q.   Okay.  So we have a stop payment on the
9  check that was done 12/16.  And you have an indication
10  that you are going to try to set up a conference call
11  with the debtor, correct?
12      A.   It looks like they are working on setting up
13  a call between the client and the debtor and the
14  collector.
15      Q.   Now skip down to 12/22/03.  There is another
16  check that there is a stop payment for, correct?
17      A.   Yes.
18      Q.   Okay.  Is there anything in this fact sheet
19  that suggests that before that second check went
20  through, that there was a contact with the debtor or
21  with the bank to verify funds?
22      A.   There is a lot of work on this account.  On
23  12/3 you are speaking with debtor.  You are talking with
24  the accounting system because they didn't recognize the

298

1  what I think -- and still think here -- it looks like it
2  was actively worked. It looks like the people were
3  going through it, and it looks like there was a problem
4  here.
5  BY MR. HOMER:
6      Q.  You say it was actively worked. You have
7  an NSF check on the first page. The first one was an
8  NSF check. You knew --
9      A.  Could you stop for a minute so I can
10 understand you?
11     Q.  The first page of the exhibit.
12     A.  All the NSFs are on the first page.
13     Q.  Right. On that first page, you have three
14 NSFs. One of them was posted 12/24/03?
15     A.  Right. Wait a minute. 12/24/03 was not a
16 posting of a payment. That is a returned check.
17     Q.  I'm looking at --
18     A.  It says IT returned 13. It's a returned
19 check, 12/24. Am I right on that? IT is a 13, intel
20 check.
21         MS. HUE:  It is a returned check, NSF.
22         THE WITNESS:  It's not a return.
23 BY MR. HOMER:
24     Q.  It is returned on 12/24/03?

299

1      A.  Correct.
2      Q.  When was that check posted?
3      A.  That check was posted on 12/17.
4      Q.  Okay. And what in here indicates that there
5  was verification of that check before it was posted?
6      A.  On 12/16, that they were dealing with the
7  client, so they were actively working the account.
8      Q.  12/16?
9      A.  On 12/16/03 at 1248 they had a telephone
10 call with the client. Obviously, they brought the
11 client into this, and they were having discussions. So
12 it was being worked.
13     Q.  Now, it was says for 12/16, talked to
14 client. It says Bob will call back to set conference
15 call between the debtor and I. It doesn't say there was
16 a conference call with the debtor there.
17     A.  I didn't say that.
18     Q.  Okay. Well, maybe you didn't understand it,
19 but I thought you were saying --
20     A.  They were actively working it with the
21 client.
22     Q.  Actively working it with the client means
23 you don't need to get verification?
24     A.  I didn't say that.

300

1      Q.  I thought you were telling me that that
2  satisfied the verification requirement, the fact that
3  they just contacted the client and were working it?
4      A.  No, I didn't say that.
5      Q.  Okay.
6      A.  I just said they were actively working the
7  account.
8      Q.  Maybe you can answer the question I gave to
9  you. Where in here does it show that there was an
10 attempt to verify the check that was posted 12/17/03?
11     A.  There isn't any. It shows that they tried
12 to make conversations and contacts.
13     Q.  Okay. And can we agree that that is
14 something the collector should have done? Before this
15 check was posted 12/17/03, they should have tried to
16 verify with the debtor that the check was going to be
17 good?
18     A.  Yes.
19         MR. HOMER:  All right. Can I get that
20 marked?
21         (Shaantiel Exhibit Number 22 was marked for
22 identification and attached to the record.)
23 BY MR. HOMER:
24     Q.  Okay. You have been handed the document

301

1  that has been marked as Exhibit 22. Again, it is
2  another fact sheet. Can you tell me what the concern
3  here was?
4      A.  On 12/3 there was a dispute. There was a
5  question of the balance.
6      Q.  What do you mean by that?
7      A.  Right here it says: Telephone client was
8  disputed and asked for tickets that are not theirs. And
9  then -- You are missing part of it, I guess. We are
10 missing some of it, so I don't know what the rest it is.
11     Q.  We are missing it because it was deemed not
12 relevant, I presume.
13     A.  Okay. And then between 12/8, you see a lot
14 of back and forth messages, telephone POE faxing now,
15 and there is a DCI entered into the system.
16         MR. ISRAEL:  Slowly.
17         THE WITNESS:  I'm sorry.
18         MR. ISRAEL:  DCI entered into the system.
19         THE WITNESS:  An intel check, the banking
20 information there. On 12/12, telephone POE, place of
21 employment; 12/23, funds were good.
22 BY MR. HOMER:
23     Q.  That 12/23 entry indicates that the
24 appropriate contact was made?

---

**302**

1    A.    Telephone POE left message, telephone bank
2    funds verified.
3        Q.    So 12/23, the funds were verified. And then
4    on 12/24, a redep form was submitted, correct? Isn't
5    that what that indicates?
6        A.    Uh-huh.
7        Q.    Is there anything improper with that? We
8    have bank verification, and it says redepped the funds
9    the next day. Is there any problem with that?
10       A.    At this point, no.
11       Q.    Okay. Where does the problem appear?
12       A.    On 1/13 the funds hadn't cleared. Telephone
13   bank, spoke with.
14           (Following a discussion off the record:)
15           THE WITNESS: -- spoke with Linda, funds are
16   available, waiting for clearance. And then they left
17   the message at the place of employment.
18   BY MR. HOMER:
19       Q.    And what did the collector do that was
20   incorrect here?
21       A.    What the collector did is they had a dispute
22   on here, and there is no resolution of the dispute.
23       Q.    You are talking about the first page of the
24   exhibit, 12/3/03?

---

**303**

1        A.    Uh-huh.
2        Q.    And I don't understand how that is related
3    to the NSF, the redepping of the NSF check.
4        A.    When you have a dispute, until you have it
5    resolved, you can't post the money except to the
6    disputed part of the balance. And it is -- I'll slow
7    down. When you have a dispute, you are supposed to
8    document what is the disputed part of the bill and what
9    is not the disputed part of the bill.
10           And when I saw that and I saw money being
11   posted on the account, when you are looking at it here
12   in the notes, they are too vague. It doesn't say who
13   they spoke with here or anything in here.
14           On 12/9, telephone POE faxing letter now,
15   who did we speak with there? Where are the funds coming
16   from? It doesn't give us the information on anything at
17   all. The next thing you know is --
18       Q.    Well --
19       A.    I'm not finished, please.
20       Q.    Okay.
21       A.    We are also telephoning the place of
22   employment, and they are making a deposit today. Where
23   is the deposit being made? Who did they speak to?
24   There is no information there. They are very vague.

---

**304**

1        Q.    Isn't --
2        A.    They are missing information.
3        Q.    Isn't it NCO policy that if you verify the
4    funds with the bank, you can redep the check without any
5    contact with debtors or anything else? Isn't that the
6    policy?
7        A.    On a redep. But when you were looking at
8    this in the beginning, this is for the first check.
9        Q.    Well, we end up with an NSF check here. We
10   will get to that in a second. But the check was
11   redepped after there was bank verification on 12/23,
12   correct?
13       A.    Uh-huh.
14       Q.    There is nothing wrong with that.
15   Eventually, the check comes back NSF on 1/13/04. Do you
16   see where it says that?
17       A.    At 9:04.
18       Q.    Well, it says 1/13/04, check number 1329,
19   NSF, correct?
20       A.    The one from 9:04 in the morning?
21       Q.    Yes. That check came back NSF. But it
22   wasn't the collector's fault, was it? Wasn't it
23   accounting's fault for not posting the check after the
24   submission for reposting? Isn't that what this says?

---

**305**

1    Let me run through this. On 12/24/03 the account says
2    dropped redep form, ML. ML stands for Mark LeFevre,
3    right?
4        A.    Uh-huh.
5        Q.    He is the collector. He dropped the redep
6    form. Then there is a note. There is a contact with
7    Valerie Hue. Did you call bank and verify the funds?
8    12/31, prior to redep, it says. And then there is an
9    answer, yes, per 12/23 notes, end redep form.
10           So is he telling Valerie Hue there that he
11   has verified the funds and it should be redepped?
12   Correct?
13       A.    But you said was it an accounting problem.
14   It wasn't accounting.
15       Q.    I haven't gotten through yet.
16       A.    I have to understand this, please. I
17   apologize. I just want to make sure. You said to me:
18   Wasn't it an accounting form because it wasn't deposited
19   timely? The answer to that is Mark gave it to Valerie.
20   Valerie waited until 12/31 to get the information to
21   send it to accounting, so it is not accounting's error.
22       Q.    How do you know that? It says dropped
23   redep. Isn't that --
24       A.    Marked dropped it to Valerie. That doesn't

---

B-461

306

1   mean -- and Valerie didn't work on it until 12/31,
2   because her documentation is here at 12/31 at 8:45.
3        Q.   I will represent to you that she wasn't in
4   the office when he submitted it for redepping. Can you
5   explain why it is --
6        A.   So that wouldn't be accounting then, would
7   it?
8        Q.   Why is it that it hasn't gone out for a
9   posting and hasn't come back until 1/13/04, if on 12/24,
10  he tried to redep it?
11       MR. ISRAEL: If you know.
12  BY MR. HOMER:
13       Q.   If you know.
14       A.   That, I don't know.
15       Q.   Again, what did the collector do wrong here?
16       A.   In my mind, the notes are too vague to make
17  a determination from 12/9. So I put it on my report as
18  a flag.
19       Q.   Okay. The notes are too vague here. But in
20  the case of the Atlanta one, the one we just went
21  through where there wasn't any information at all for a
22  whole month period between the time the authorization
23  for the check and the time it was postdated, that you
24  didn't view as a collector problem. But this one is a

307

1   collector problem, because you think the notes are too
2   vague?
3        A.   This is a collector problem, because this is
4   NSF. The other one was returned as an administrative
5   hold.
6        MR. HOMER: Okay. Let's get this marked.
7        (Shaantiel Exhibit Number 23 was marked for
8   identification and attached to the record.)
9   BY MR. HOMER:
10       Q.   Okay. You have been handed Exhibit Number
11  23, which is another fact sheet. And again, I would
12  ask: What was the concern on this one?
13       A.   On 12/30 at 1303, we left a message on the
14  answering machine. The next documentation at 1315,
15  there was a check that was DCI'd. Status was changed.
16  The information is there. And at 1316 we telephoned the
17  POE, and they did a phone pay. Why would we call back
18  so quickly? It doesn't make sense.
19       Q.   Now, can you explain what you mean by that?
20  First of all, let's go to 12/30/03 on the second page of
21  the exhibit, which is 1127. At 12/30/03 there is
22  authorization for a check put on, right? It says on
23  12/30/03 for 1,745.62. It says that, doesn't it?
24       A.   Can you show me where he is talking? Right

308

1   here, this is where they entered the check into the
2   system.
3        Q.   Right. That is what is known as a live
4   check? Right? This isn't a postdated check?
5        A.   No. It is a current date check.
6        Q.   On 12/30/03, there is authorization shown in
7   the account for a check that is a live check that is
8   going to be submitted right then, correct?
9        A.   Yes.
10       Q.   Okay. So in that case, the collector
11  doesn't have to do any verification. That is the
12  verification, correct? He's had the contact with
13  debtor, the debtor has authorized the check, and the
14  check goes through?
15       A.   We don't know if there is contact with the
16  debtor here, and that is what I questioned. The 1303
17  and then 1315, why would you call somebody at 1303 and
18  then turn around and call them again?
19       Q.   If you go down there a little further, it
20  says: 12/30/03, 1315, tell POE Rosalee did PH pay ML.
21  What does that mean?
22       A.   Right there it says: Telephone POE. This
23  is what my flag was on this. At 1303 telephone and left
24  a message on an answering machine. Why would you call

309

1   back a few minutes later, ten minutes later? Normally
2   you would leave a message and then move on. You might
3   call later in the evening. It's not what you do in
4   collections. You don't call every five minutes to a
5   debtor. You call and you leave a message and --
6        Q.   What does POE stand for?
7        A.   Place of employment.
8        Q.   Rosalee, who is that?
9        A.   Rosalee is the name that supposedly gave the
10  check.
11       Q.   So that is the debtor, right?
12       A.   Top Notch Automotives is the debtor.
13       Q.   But Rosalee is the contact with the debtor?
14       A.   I don't know that to be true.
15       Q.   What does PH stand for in that same line?
16  Tel POE, tel PH. What does that mean?
17       THE WITNESS: Phone pay? I'm asking --
18       MR. ISRAEL: That's right, phone pay.
19       THE WITNESS: Left message, bank --
20       MR. ISRAEL: They are talking about 12/30/03
21  at 1116?
22       MR. HOMER: Right.
23       THE WITNESS: 1316.
24       MR. ISRAEL: Did phone pay ML. Who is ML,

**310**

1 or what is ML?
2      THE WITNESS: That is Mark LeFevre.
3      MR. HOMER: That's the collector.
4 BY MR. HOMER:
5      Q.   So one minute after he has called, there is
6 another call with a debtor. And it says did PH. What
7 is PH?
8      A.   Phone pay.
9      Q.   So you have account notes that clearly show
10 that he took a live check on 12/30, correct?
11      MR. ISRAEL: Stop. This has been asked and
12 answered three times. If you want to do it one more
13 time, go ahead.
14      MR. HOMER: It has not. . ...
15      MR. ISRAEL: She went through it three
16 times. She told you what her concern was.
17      Tell him again.
18      THE WITNESS: My concern was in a 15-minute
19 period of time, between 1303 and 1315, why would you
20 leave a message for the debtor and then call back right
21 away? It just doesn't make sense. You leave a message,
22 and you should give an appropriate time for somebody to
23 call you back.
24

**311**

1 BY MR. HOMER:
2      Q.   Okay. 12/30 is the end of month, isn't it?
3      A.   Absolutely.
4      Q.   Isn't that the time when everybody is making
5 a big effort to try to collect?
6      A.   Absolutely.
7      Q.   So you call the debtor, and you can't
8 contact them. So you call back again. Is there
9 anything strange about that?
10      A.   The time frame is strange to me.
11      Q.   To try to call back in 15 minutes?
12      A.   Uh-huh.
13      Q.   It worked, didn't it?
14      A.   I don't know that to be true.
15      Q.   You don't believe what your account note
16 says?
17      A.   As I say, it was a flag to me. I put it on
18 my report.
19      Q.   So the flag for you on this one and the
20 reason you attribute this problem to the collector is
21 because the collector called back 15 minutes after he
22 first couldn't get through to the debtor and then got a
23 live check?
24      A.   That is just something that, just in my

**312**

1 mind, looked very odd and put it on there as a flag.
2      Q.   And that is a collector problem?
3      A.   In my mind, it needs to be clarified.
4      Q.   And what the collector did that was wrong
5 was to call back shortly after he couldn't reach the
6 debtor the first time?
7      A.   I don't know that to be true. I don't know.
8      Q.   But the account notes do reflect that he
9 took a live check. They say that in two different
10 places. He took the live check, and that check came
11 back NSF. But you can't say there is anything that the
12 collector didn't do in terms of verification there, can
13 you?
14      A.   All I can say here is that these notes are
15 ambiguous. I was concerned. I put a flag on it. It
16 was up to Kathy to make the decision whether there was a
17 problem or not.
18      MR. ISRAEL: Off the record.
19      (Following a discussion off the record:)
20      MR. ISRAEL: My question is this: Why would
21 a collector post a live check and then call back two
22 minutes later to take information for a phone pay?
23 Aren't you supposed to get the information first?
24      THE WITNESS: You have to get the

**313**

1 information first and then DCI the check.
2      MR. ISRAEL: So was this in improper order?
3      THE WITNESS: A, it is an improper order,
4 yes. But in my mind, I thought they DCI'd the check
5 based on the fact that they left a message and called
6 back later. But again, there is something not right
7 here.
8      MR. ISRAEL: Well, do you know that there
9 was permission to post the phone pay?
10      THE WITNESS: I wouldn't know that. That
11 would have to go to Kathy to either pull phone reports
12 or whatever.
13      MR. ISRAEL: Okay.
14 BY MR. HOMER:
15      Q.   Well, when you have an account number that
16 says, tel place of employment, Rosalee did phone pay,
17 it's got a time on it, why do you think that he didn't
18 do it?
19      MR. ISRAEL: Because it is just -- it's a
20 minute later. Tell him, just like Valerie Hue said,
21 because it is backward.
22      THE WITNESS: It's not right. It's not
23 systemically in order.
24      MR. HOMER: All right. All right. Let's go

314

1  to another one.
2      MR. ISRAEL: Tell him about that.
3      (Following a discussion off the record:)
4      MR. HOMER: Let's mark this one.
5      (Shaantiel Exhibit Number 24 was marked for
6  identification and attached to the record.)
7  BY MR. HOMER:
8      Q.  Can you explain what the concern was with
9  Exhibit 24, the fact sheet that is marked 24?
10     A.  On 12/29, SLM requested to know whether or
11 not we spoke to the bank. No contact with the debtor
12 whatsoever. Then on 12/29 they went ahead and changed
13 the date of the check to 12/31 for $3,000. And they
14 left a message. You cannot change any check information
15 without actual contact with the debtor. That was a flag
16 right there.
17     Q.  Could you look at the entry of 12/31/03 on
18 page 1149?
19     A.  Phoned business, talked to debtor, said no
20 money until next week, did agree to check.
21     Q.  Did agree to check dated 12/31. Isn't that
22 the contact with the debtor that was needed?
23     A.  No, because it is after the fact and not
24 before the fact. Anybody can put anything in the notes

315

1  after the fact. But in this case, when it was done,
2  there is no documentation that the call was made where
3  they spoke with the debtor. It was after the fact.
4      Q.  How was that different than the one we
5  talked about with the Atlanta case where you were saying
6  after the fact because the bank said it was an
7  administrative hold, that it doesn't matter what
8  happened before that? How is this any different than
9  that?
10     MR. ISRAEL: First of all, I think it is
11 argumentative, but go ahead and answer.
12     THE WITNESS: They are two different
13 scenarios.
14 BY MR. HOMER:
15     Q.  In this case, the check went on January 2,
16 '04, correct? Isn't that what it says, 12/31/03?
17     A.  The check went on 12/31.
18     Q.  Where do you see that?
19     A.  On the payment history, there is no entry
20 for 1/2.
21     Q.  I'm sorry. I'm not following what you are
22 saying.
23     A.  You asked me when it was posted, and I go by
24 the information here.

316

1      MR. ISRAEL: She's pointing to the payment
2  history on the first page.
3  BY MR. HOMER:
4      Q.  Okay. But he's got on 12/31/03, he has a
5  contact with a debtor saying the date 12/31 is good,
6  right?
7      A.  No.
8      Q.  What does it say?
9      A.  No money until next week.
10     Q.  It says: Did agree to check dated 12/31.
11     A.  You are taking it out of context. Here, it
12 says: There is no money until next week.
13     Q.  Okay.
14     A.  Did agree to a check on 12/31, but no AP
15 people will use check number -- account payable people.
16 It's somebody at the bank.
17     (Following a discussion off the record:)
18 BY MR. HOMER:
19     Q.  These postdates that are on page 1147 of the
20 exhibit, these are all end-of-the-month postdates,
21 right?
22     A.  PD is not a postdate. PD is pay direct.
23     Q.  Well, I'm looking --
24     A.  I am sorry. Go ahead. I apologize. I want

317

1  to make sure we are talking about the same thing.
2      Q.  On the first page of the exhibit, 12/31/03,
3  there are three entries, correct, for that date? For
4  the date 12/31/03?
5      A.  12/31/03, there is a 16, a 13, and an 88.
6  If you notice, that is an NSF, the 13.
7      Q.  Right.
8      A.  And it was done on 1/13 of '04.
9      Q.  Where do you see that?
10     A.  Here is your -- Am I getting it right? Yes.
11     Q.  Are you writing on the exhibit?
12     A.  No, I'm not. You told me not to.
13     Q.  Okay. I just wanted to make sure.
14     A.  Okay. If you see at 113, when they reverse
15 the payment, it reflects a 12/31 payment. And that is
16 your 88 and 87. So you have the actual date of the
17 reversal, the commission adjustments for the client so
18 that we don't do a double report back, and then here is
19 the NSF. So it actually is the date of the check, when
20 it was the one that went in. So you are NSF'ing off the
21 12/13/03 --
22     MR. ISRAEL: 12/31/03.
23     THE WITNESS: -- 12/31/03, so this is the
24 check.

B-464

318

1    MR. ISRAEL: And you say this --
2    THE WITNESS: On 12/31 the $3,000 check
3    posted. Right after that, the 12/31 was NSF'd off, and
4    it was done on 12/31/04. These 88 and 87's are
5    adjustments for when we send statements to the client
6    that we have to do that so that we don't do double
7    report-backs or re-reports of the same issue.
8    BY MR. HOMER:
9    Q.    Let's look again at the 12/31/03 date. The
10    collector has information there. The debtor says that
11    it is okay. And then it talks about no money until next
12    week. So on the same day, there is a postdated check
13    for 1/02/04 for $3,000, right?
14    A.    That check -- Let's make sure. I want to
15    repeat back what you said. On here, we spoke with the
16    debtor that there was no money until next week but
17    agreed to a 12/31 -- why would somebody agree to take a
18    12/31 check if they didn't have the money until next
19    week? That doesn't make sense. It would send off a
20    warning in my head. If I were to pay you and I --
21    MR. ISRAEL: That is fine. It sends off a
22    warning in your head.
23    THE WITNESS: Okay.
24

319

1    BY MR. HOMER:
2    Q.    To me, the common sense of it is he is
3    saying: I don't have the money today. Go ahead and use
4    check 1231 and put it on 1/02/04. And that is exactly
5    what the account says. The account says on 12/31/03,
6    on 1/02/04 for $3,000, and he puts a check number, 1231.
7    That is what he did. That is pretty clear.
8    A.    No.
9    Q.    Why isn't that clear?
10    A.    12/31 is the date of the check and the date
11    of the month. Why are we giving the check number 1231
12    when you are waiting for the deposit of 12/31? You
13    don't do that. It is not in sequential order. In other
14    words, you were to give me a check today and say, Dina:
15    You can take a check today for payment on a bill for 123
16    and use check number 998 and next month use 997. Here,
17    what you doing is you are changing the date of the
18    check.
19    Q.    Which the debtor authorized.
20    A.    Right. But if you look at it, when you did
21    all the changes, originally when you changed it, you had
22    check number 1230. And then you are changing it from
23    1/2 to check 1230. And then when you are changing it
24    again, you are changing the check number to 1231.

320

1    Something is inconsistent here, and it just sends off
2    warnings.
3    Q.    These two entries on page 1149 of the
4    exhibit that are dated 12/31/03, don't they indicate
5    that the collector contacted the debtor, the debtor said
6    it's okay to use the check but it won't be good until
7    next week? And then on the next entry doesn't it say,
8    on 1/02/04, that check was put through? Isn't that what
9    the account is saying?
10    A.    That is not what it says.
11    Q.    Well, what --
12    A.    Because it says here, they did agree --
13    first of all, they said they have no money until next
14    week. They did agree to a check dated 12/31, but no AP
15    people will use check number 1231 for date, advised AP
16    on Monday, which is their accounts payable person would
17    be in there on Monday.
18    Why would you then put in a check for 1/2/04
19    and not for 12/31 if they tell you 12/31? Something is
20    not right here. It is missing something. It doesn't
21    make sense why you would go ahead. If they say use it
22    for 12/31, why would you make it for 1/2, unless you
23    want to get some type of extra bonus off it. There is
24    something not right here. It just doesn't make sense to

321

1    me. I am --
2    Q.    On 12/31/03 the account notes reflect that
3    the debtor was contacted by the collector. The debtor
4    says the check won't be good now, because I don't have
5    the money. But it will be good next week. On the very
6    same date, the notes of the collector say on 01/02/04,
7    he is taking a postdated check, in effect, on 12/31/03
8    to resubmit on 1/02/04. And he puts the 1231 number. I
9    don't know if that is a check number or a date number.
10    But in any event, basically what has
11    happened here, it seems clear that the collector called
12    the debtor. The debtor said the check won't be good
13    today, but next week it will. Put it through then. So
14    he puts in the account that note. He says he contacted
15    the debtor, and the debtor told him it would be good.
16    He said he could do it the next week. So he puts in the
17    postdated check in 1/02/04.
18    Isn't that easy to understand?
19    MR. ISRAEL: Are you done testifying?
20    MR. HOMER: No, I'm asking her the question.
21    MR. ISRAEL: That is not a question. No,
22    she can't answer it.
23    MR. HOMER: Oh, she can, too. There is no
24    reason she can't follow that question.

Case 1:05-cv-00225-KAJ    Document 84-6    Filed 05/16/2006    Page 26 of 40

**322**

1  MR. ISRAEL: Okay. First of all, I can't
2  follow it. But regardless if she can, that is not an
3  appropriate question. Second of all, you have rehashed
4  this, and you are just arguing with her. She has told
5  you what her opinion is as to what happened and why she
6  reported it. That's it. How many times are you going
7  to ask her?
8  BY MR. HOMER:
9      Q.  Can you answer the question?
10     A.  I don't even know what the question is. I
11  apologize. I just don't know.
12         MR. ISRAEL: Why don't you make the question
13  shorter and not have that whole thing? You've been
14  through this three times now, and she has given you the
15  same answer why she reported it.
16  BY MR. HOMER:
17     Q.  In the 12/31/03 entries, what is in those
18  entries that suggests the collector did anything wrong?
19     A.  That there was no money until next week, but
20  agreed to a check dated 12/31, something doesn't add up
21  there. That is inconsistent, and it is an oxymoron.
22  Number two, in what I figure, we will use check number
23  12/31. And their AP people, accounts payable people,
24  will be in on Monday. So if they are going to be in on

**323**

1  Monday, why aren't we waiting until Monday to put this
2  in?
3         Then we are changing the date of the check,
4  which was already here. And we are changing it to 1/2,
5  when they are telling us the check was good for 12/31.
6  Why would we then put it in for 1/2 and use the date of
7  12/31? It doesn't make sense. It's a warning sign.
8         MR. ISRAEL: Or use the number 1231.
9  BY MR. HOMER:
10     Q.  You keep going back and forth. This 1231
11  that is in the second entry of 12/31/03, is that a check
12  number or is that a date?
13     A.  It's both. And that was some of the things
14  that we did find in the report in the Dover office and
15  have found.
16     Q.  How do you know that 1231 was the check
17  number?
18     A.  How do I know that 1231 is the check number?
19     Q.  Yes.
20     A.  Because of the way it is put into the
21  system, it is dated here. Here is your check amount,
22  check number. And it is also for the date that we did
23  this.
24     Q.  How is this different from any postdate

**324**

1  situation, where the debtor calls in and says: I don't
2  have the money right now, but I will have it next week,
3  so you can go ahead and put it through on a date for
4  next week? How is this situation any different than --
5     A.  Then why didn't you date it for next week?
6  The collector did not date the information for the next
7  week.
8     Q.  How do you know that?
9     A.  Because if you look at this, it's dated here
10  for 1/2. If he is saying in here it is good for 12/31,
11  why -- it is inconsistent. He is telling us it is good
12  for 12/31, yet we are DCI'ing it for 1/2. And we are
13  using -- Do you see where I am talking about?
14     Q.  He isn't telling you it's good for 12/31.
15  He is telling you it isn't good for 12/31.
16     A.  No, debtor agreed to check date 12/31.
17     Q.  But not until next week.
18     A.  But the check is dated for 1/2. That is an
19  inconsistency. And it still went in for the end of the
20  month. If you look at this -- somebody got bonused off
21  this, because if you take a payment for the first two
22  days of the month, you get bonused off that if it is
23  into the next month.
24         MR. HOMER: All right. I don't have any

**325**

1  other questions.
2         MR. ISRAEL: I don't have any questions
3  either.
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 1**

FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                )
   Plaintiff,              )
                  )
   v.                      ) C.A. No.
                  ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a  )
Delaware corporation, trading as )
NCO FINANCIAL COMMERCIAL SERVICES,)
   Defendant.              )

Telephone deposition of ERIC JOHN SHAW,
taken before Cheryl A. Anthony, Court Reporter, in the
law offices of Parkowski, Guerke & Swayze, 116 West
Water Street, Dover, Delaware, on Wednesday, February 1,
2006, beginning at 9:15 a.m.

APPEARANCES:

   PARKOWSKI, GUERKE & SWAYZE
   BY: JEREMY W. HOMER, ESQUIRE
   116 West Water Street
   Dover, Delaware 19901
   Attorney for Plaintiff.

BY TELEPHONE:

   SESSIONS, FISHMAN & NATHAN
   BY: DAVID ISRAEL, ESQUIRE
   3850 North Causeway Boulevard
   Lakeway Two, Suite 1240
   Metairie, Louisiana 70002-1752
   Attorney for Defendant.

ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE

ANTHONY REPORTING
PO Box 234
Dover, Delaware 19903
(302)674-8884

**Page 2**

1   (Shaw Exhibits Number 1 and 2 were marked
2   for identification and attached to the record.)
3                   ERIC JOHN SHAW,
4   the witness herein, having first been
5   duly affirmed, was examined and
6   testified as follows:
7   BY MR. HOMER:
8   Q.   Mr. Shaw, my name is Jeremy Homer. I am the
9   attorney representing Valerie Hue in this case. I would
10  like to tell you that if you have any problem
11  understanding my question, don't answer it. Just ask me
12  to rephrase it so that you do understand it. Do you
13  understand that?
14  A.   Yes.
15  Q.   Okay. Is there any reason that you can't
16  testify today? Because of medication or any other
17  problem?
18  A.   No.
19  Q.   Okay. Your ability to testify isn't
20  impaired in any way; is that true? Is it true that
21  there is no impairment of your ability to testify today?
22  A.   There is no impairment.
23  Q.   Okay. Thank you. And you understand that
24  you have been placed under oath, that this is a

**Page 3**

1   deposition. And I just want to make sure that you
2   understand that it is a crime not to tell the truth once
3   you are under oath. You are aware of all of that, I am
4   sure. Is that true?
5   A.   Yes.
6   Q.   Okay. Now, this deposition is being taken
7   by telephone. Is it fair to say that in the room that
8   you are in right now, it is just you and Mr. Israel?
9   A.   That's correct.
10  Q.   Okay. I would like to advise you that it is
11  not proper for you to communicate with Mr. Israel in a
12  way that I can't understand; for example, passing notes,
13  making facial gestures, that sort of thing. He's not
14  allowed to coach you regarding your answers. Do you
15  understand that?
16  A.   Yes.
17  Q.   Okay. Could you state your address and your
18  phone number, please?
19  A.   My address?
20  Q.   Yes.
21  A.   2722 Jacqueline Drive, M13 is the apartment
22  number, and that is in Wilmington, Delaware.
23  Q.   Okay. And your --
24  A.   And the ZIP is 19810.

**Page 4**

1   Q.   And your phone number?
2   A.   302-529-7518.
3   Q.   Okay. Thank you. Can you tell me what you
4   did to prepare for today's deposition, if anything?
5   A.   I went over some of the problems we had with
6   the attorney. Pretty much that's about it. There
7   wasn't that much to it. Basically, we are waiting to
8   see what you have to say.
9   Q.   Did you review any documents in preparation
10  for the deposition?
11  A.   Yes.
12  Q.   And which documents did you review?
13  A.   Some of the e-mails.
14  Q.   Can you tell me approximately how many
15  documents you reviewed?
16  A.   Several.
17  Q.   More than ten?
18  A.   No.
19  Q.   Okay. What is your educational background,
20  Mr. Shaw?
21  A.   High school and about -- I guess about six
22  months of college.
23  Q.   Okay. Well, let me ask you, first of all,
24  since I can't see you, how old are you?

6

1    A.   53.
2    Q.   Okay. Could you just briefly run through
3  your job history? And for each job that you've had, if
4  you could, identify the approximate dates that you held
5  it and also what your job duties were. Let's start back
6  from the time you stopped going to school. And I'm not
7  interested in jobs that lasted for, you know, six months
8  or less, summer jobs and that kind of thing. I'm
9  interested in jobs that you held for at least six months
10  or longer.
11    A.   We are going way back here then. Back in
12  '67, I worked for a company called Everfast Industries.
13  I used to go out to their Everfast Mill Stores. They
14  were a fabric store. I worked with them up until -- I
15  would have to say '87 or '88. I'm not sure about the
16  year. Time starts to fly as you get older.
17    Q.   I know that problem.
18    A.   After that --
19    Q.   What did you do for that company?
20    A.   Actually, I started from the ground up. I
21  was a stock person. Then I worked my way into
22  management. I worked in South Jersey, the Marlton, New
23  Jersey location for years as the manager of a fabric
24  store. And obviously, they were sold, I believe, back

1  in the mid '80s. And it changed hands a few times after
2  that, so I just left.
3    Q.   And in '87, you went to work somewhere else.
4  Where was your next job?
5    A.   I worked for a collections agency, CMS, in
6  Conshohocken, Pennsylvania. I worked for them for a
7  few good years, until about '92, as a collector. And
8  from there I went to a few jobs, trying to find myself
9  with what I wanted to do.
10          And then I hooked up with Milliken &
11  Michaels back in '93. And I have been with the company
12  as a collector since that time, except for when I was a
13  manager during the Val situation. I was a manager then,
14  and then I went back into collections back to this date.
15  That is basically it, not too many jobs.
16    Q.   You mentioned Milliken & Michaels. That was
17  the company that preceded NCO, the Defendant in this
18  case; is that correct?
19    A.   There was another company that had purchased
20  Milliken & Michaels, and then NCO purchased them.
21    Q.   Okay. How long have you worked for NCO?
22    A.   Since '93, March of '93.
23    Q.   Let's take out the time that you worked for
24  Milliken & Michaels and the next purchaser. When did

7

1  NCO first start operating the company that you are
2  working for?
3          MR. ISRAEL: Do you want the year, Jerry?
4          MR. HOMER: Yes, that would be fine.
5          THE WITNESS: May of 1999 was when
6  NCO purchased what historically had been the
7  Milliken & Michaels business.
8  BY MR. HOMER:
9    Q.   Okay. And you are a collector now; is that
10  correct?
11    A.   Yes.
12    Q.   And how long have you been a collector?
13    A.   17, 18 years.
14    Q.   And would you have been a collector for NCO
15  since 1999, May of 1999, which is when they acquired
16  Milliken & Michaels?
17    A.   Yes.
18    Q.   Okay. Mr. Shaw, I would ask that you look
19  at an exhibit that was premarked for this deposition
20  that is identified --
21          MR. ISRAEL: Hold on a second. I'm pulling
22  it out. Do you want him to have Shaw 1?
23  BY MR. HOMER:
24    Q.   Yes, it has been identified as Shaw 1. We

8

1  have the original here. The court reporter marked it
2  yesterday and left a copy with Mr. Israel. We have the
3  original down here.
4          Do you have the exhibit in front of you,
5  Mr. Shaw?
6    A.   Yes, I do.
7    Q.   Let me ask you this: Down on the right-hand
8  corner, does it have the number 00098?
9    A.   Yes, it does.
10    Q.   And is this a January 22, 2004 letter from
11  you to Ted Fox and Kathy Obenshain?
12    A.   Yes.
13    Q.   Can you explain why you wrote this letter?
14    A.   Now, when you say explain it, pretty much it
15  is explanatory in the letter.
16          MR. ISRAEL: He is asking you what caused
17  you to write it? Is that correct, Jerry?
18          MR. HOMER: Yes.
19          THE WITNESS: Oh, I was asked to give a
20  statement by Kathy.
21  BY MR. HOMER:
22    Q.   Okay. And do you recall when she asked?
23  Was it the same day that you wrote the statement, or was
24  it earlier than that? Do you remember?

1   A.   I don't remember.

2   Q.   Do you remember why she asked you to give

3 this statement?

4   A.   Yes.

5   Q.   And what was the reason?

6   A.   To give more clarification of what was

7 happening.

8   Q.   Did she explain it in those terms, that she

9 wanted you to clarify what had happened? Or did she

10 explain it in the terms that she wanted you to confirm

11 what had happened?

12   A.   No. She wanted me to clarify what happened.

13 She didn't direct me in any way of how to write the

14 letter, if that's what you are asking.

15   Q.   No, I wasn't really asking you that. Did

16 you have conversations with Ms. Obenshain about what

17 happened before you wrote the letter? Did you have any

18 conversation with her about what happened before you

19 wrote the letter? When I say what happened, I'm talking

20 about what is in the letter.

21   A.   Honestly, I can't remember if it was before

22 or right after the letter.

23   Q.   Okay. When she asked you to write the

24 letter, wouldn't she have had an understanding of what

---

1 happened?

2        MR. ISRAEL: Objection. Go ahead and

3 answer.

4        THE WITNESS: Could you repeat the question?

5 BY MR. HOMER:

6   Q.   Well, you say you weren't sure whether you

7 had talked to Ms. Obenshain about the content of the

8 letter before you wrote the letter. I'm asking why.

9 Didn't she have some understanding that you knew

10 something about this? Isn't that why she asked you to

11 write the letter?

12   A.   I would have to say she wasn't sure what had

13 happened at that time, because obviously, everything

14 happened at once. She wanted to get it in writing what

15 I thought or what my feelings were on what happened.

16   Q.   Okay. Were there any drafts that you wrote

17 of the letter before you signed this one that has been

18 marked as Exhibit 1?

19   A.   No. It was just Word Perfect, because I had

20 some misspellings. I did it on the computer.

21   Q.   Did you have any discussions about the

22 letter, either before you wrote it or after it, with Ted

23 Fox?

24   A.   The letter itself was never mentioned, but I

---

11

1 did speak with Ted Fox after.

2   Q.   Okay. What was the substance of the

3 conversation you had with Ted Fox?

4        MR. ISRAEL: Just so I understand, you

5 talked to Ted Fox after you issued the exhibit Shaw

6 Number 1? Is that what you are saying?

7        THE WITNESS: Yes.

8        MR. ISRAEL: Okay. Now, he is asking what

9 you and Ted Fox had talked about.

10        THE WITNESS: Well, Ted wanted to know --

11 Obviously, he wanted to know why it happened, why did we

12 do that procedure when we knew that procedure was not

13 allowed at NCO? And I advised him that -- Bear with me.

14 I'm trying to collect my thoughts from something two

15 years ago.

16        All I remember is Ted, obviously, he was new

17 in his position at the time. He had just come into the

18 situation. And he just wanted to know a deeper

19 understanding of what had happened at this location, of

20 why we were running the checks.

21        And I had mentioned to Ted -- I didn't know

22 if he had seen the letter or not -- that I pretty much

23 spelled it out in the letter what I had sent to Kathy

24 and to his attention.

---

12

1        That is why I think it was right after I

2 wrote the letter. I don't think he had an opportunity

3 to read the letter yet that I had sent down to

4 corporate.

5 BY MR. HOMER:

6   Q.   Okay. Did he call you to talk to you about

7 it, or did you call him?

8   A.   He called me.

9   Q.   Why was the letter addressed to both Mr. Fox

10 and Kathy Obenshain?

11   A.   Kathy at the time asked me to put Ted Fox's

12 name on it also, since he was in charge at that time.

13 She wanted to make sure he got a copy of that letter.

14   Q.   When you wrote this letter, did you have any

15 understanding that it might have some importance with

16 respect to Valerie Hue keeping her job?

17   A.   Yes.

18   Q.   Would it be fair to say you were aware, when

19 you wrote the letter, that what you wrote about the

20 events that are in the letter might be used to justify

21 terminating her employment?

22   A.   Yes.

23   Q.   So would it be fair to say that you were

24 careful in writing the letter to be accurate about what

**13**

1  you put in it?
2      A.  Yes. I wanted to be truthful.
3      Q.  Okay. Could you take a moment now to read
4  through the entire letter? I want to make sure it is
5  fresh in your mind, unless you read it before we just
6  started here.
7      A.  Yes. I can read it over again.
8      Q.  Okay. Why don't you take a few minutes and
9  read it slowly? And make sure you have had a chance to
10  read it all carefully.
11      A.  You asked me to -- Read it to myself?
12      Q.  Yes, just read it to yourself. It may be a
13  little quicker. I have it in front of me, so I don't
14  need it to be read.
15      A.  Okay.
16      MR. ISRAEL: Okay. He's done.
17  BY MR. HOMER:
18      Q.  Okay. You have had a chance to read it all
19  over?
20      A.  Yes.
21      MR. ISRAEL: You know what, Jerry? Can you
22  wait one second? I am going to move our positions at
23  the table.
24      THE WITNESS: Yes. We are wired up here.

**14**

1      (Following a discussion off the record:)
2      MR. ISRAEL: What we are trying to do,
3  Jerry, is so that we are sitting on same side of the
4  table, because I didn't make any copies of the exhibits,
5  we can both look at the exhibit.
6      (Following a discussion off the record:)
7      MR. ISRAEL: I'm sorry. Go ahead.
8  BY MR. HOMER:
9      Q.  Okay. Referring to the last sentence of the
10  first paragraph of the letter, it says -- Well, let me
11  back up a bit, just to get some time framing here.
12      You say in the letter, in the first
13  paragraph, that you were given a directive by Valerie
14  Hue to acquire the list of all NSF checks to review.
15  And then it also says you were then instructed to review
16  with each collector the status of the nonsufficient
17  funds. Those are NSF checks, as I understand it.
18      When did she give you these instructions
19  that are referenced in paragraph one?
20      A.  Actually, she was -- From what I remember at
21  that time, she had to go away. I can't remember if it
22  was -- if she was taking a holiday or a leave of absence
23  from being sick for a few days. She wasn't going to be
24  around at that time.

**15**

1      She did, actually, a printout of all the
2  checks that the large balance collectors had in their
3  queues or in their files. And she had asked me to check
4  each one with each collector to see -- to get these
5  checks off prior to the end of the month.
6      Q.  This printout of checks, would that have
7  been on what is known as an NSF report?
8      A.  Yes.
9      MR. HOMER: I didn't intend to do this, but
10  I think it would be worth it to take a moment to fax you
11  the exhibit from yesterday's deposition, which is
12  Exhibit 10.
13      MR. ISRAEL: I have that here.
14      MR. HOMER: You have it?
15      MR. ISRAEL: Yes. I have yesterday's
16  exhibits here.
17      MR. HOMER: Let's have the witness take a
18  look at Shaantiel Exhibit Number 10.
19  BY MR. HOMER:
20      Q.  Do you have that in front of you, Mr. Shaw?
21      A.  Yes, I do.
22      Q.  Down in the right-hand corner, there is the
23  number 000043. That is four zeros and 43.
24      A.  Correct.

**16**

1      Q.  Is this the NSF report that you just talked
2  about that you were asked to review? Can you tell?
3      MR. ISRAEL: Don't speculate, if you don't
4  know.
5      THE WITNESS: It doesn't look like what I
6  saw.
7  BY MR. HOMER:
8      Q.  Okay. And is that because there are names
9  in this report that aren't even collectors from your
10  office in Dover?
11      A.  It could be. But it doesn't look like the
12  setup that I've seen on the printouts. It looks like a
13  different report than what I normally look at.
14      Q.  Thank you. I just wanted to make sure that
15  we weren't talking about the same report.
16      A.  This doesn't look like a report that we
17  would have.
18      Q.  Okay. So let me see if I can characterize
19  this correctly. Valerie Hue knew she was going to be
20  out at the end of the month of December of 2003. So she
21  asked you to go through the NSF checks with the
22  collectors, is that correct, and make a determination as
23  to which checks should be redepped, resubmitted for
24  payment? Is that a fair characterization?

**Page 17**

1  A. No.
2  Q. How have I got it wrong?
3  A. Her directive was to get the checks on one
4 way or the other. And she wanted me to go through the
5 list with each collector and get these checks on.
6  Q. Okay. Well, let me ask you about this. The
7 last sentence in paragraph one says: I was then
8 instructed to review with each individual collector the
9 status of their nonsufficient fund checks for the
10 purpose of locating additional fees we could add on to
11 the end of the month figures. Isn't that what it says?
12  A. Yes.
13  Q. Well, why would you be reviewing them and
14 trying to locate fees if you were going to put them all
15 back on?
16  A. Counselor, if you read the next paragraph, I
17 think I answer that question for you. She instructed me
18 afterwards to inform the collectors to re-input the
19 checks on the system, just like I had put it in the
20 letter.
21  Q. Okay. Why is it that you reviewed them with
22 the collector?
23  A. Because obviously, what I was looking for, I
24 wanted to make sure that checks that were like stop

**Page 18**

1 payment or the accounts were closed would not go on.
2 But the collectors were way ahead of me on this and
3 already knew what to do.
4  Q. Okay. You say in the third paragraph that
5 in reviewing the checks with the collectors, there were
6 some judgments made for some of the checks not to run
7 do -- I think that should be D-U-E instead of D-O,
8 correct?
9  A. Probably, yes.
10  Q. -- due to stop payments. And then it goes
11 on to say: And/or too many NSFs in some cases. Can you
12 explain what that means? Too many NSFs in some cases?
13  A. I would have to say that part there is
14 incorrect. What I was looking for at the time was stop
15 payments or closed accounts.
16  Q. Well, you said before that you were careful
17 to be accurate in the letter. Of course, you wrote this
18 letter close in time to when the events took place. You
19 are saying now that that is not accurate in your letter,
20 that statement? You are sure that right now your
21 recollection is better than what it was when you wrote
22 the letter?
23  MR. ISRAEL: Objection, argumentative.
24  But go ahead and --

**Page 19**

1  MR. HOMER: No, it's not being
2 argumentative. I just want to make sure that that is
3 what he is saying.
4  THE WITNESS: I would have to say that that
5 sentence is not complete. It is accurate, but it is not
6 complete.
7 BY MR. HOMER:
8  Q. Okay. And how is it not complete?
9  A. It doesn't have closed accounts written on
10 there. It should have been added into that sentence.
11  Q. The next sentence in paragraph three states:
12 I gave Michael Scher a list of these checks that were
13 entered and not entered into the system, as I did keep a
14 record.
15  Do you know what happened to that list that
16 you gave to Mr. Scher?
17  A. No.
18  Q. When you say you did keep a record, what did
19 you mean by that?
20  A. At the time it would be that list that you
21 referred to earlier, the list of nonsufficient funds --
22 you know, all the bad checks. That was that list I'm
23 referring to, and I don't have a copy of that now.
24  Q. Okay. When did you not have the copy

**Page 20**

1 anymore? Did you throw it away, or what happened to it?
2  A. At the time I probably discarded it.
3  Q. Do you know about when you discarded it?
4  A. Probably right after the end of the month.
5  Q. Do you know what Mr. Scher did with the
6 record?
7  A. No.
8  Q. And what was indicated on the list? What
9 information was on the list that you gave to Mr. Scher?
10  A. It was a list of all the checks that ran and
11 the checks that did not run.
12  Q. Did it contain any explanation of why ones
13 were run and why others weren't run?
14  A. No.
15  Q. When did you give the list to Mr. Scher?
16  A. I can't remember now.
17  Q. Was it given to Mr. Scher after you prepared
18 the list? Do you know whether it was done in December
19 of 2003?
20  A. I can't remember.
21  Q. Well, it was certainly done before this
22 letter, correct?
23  A. Yes.
24  Q. The next sentence in the letter states: You

**21**

1  asked me what happened at the end of December.
2       Doesn't that reflect that you did have a
3  discussion with Kathy Obenshain or Ted Fox about these
4  events before you wrote the letter?
5       MR. ISRAEL: Where are you looking, Jerry?
6       THE WITNESS: Yes, I am trying to look.
7       MR. HOMER: It is the next sentence after
8  paragraph three, after the one dealing with the list.
9  BY MR. HOMER:
10      Q.  It says: You asked me. I assume that means
11  you asked me, E-D, what happened at the end of December.
12  Isn't that true? In other words, isn't this letter
13  saying that either Obenshain or Fox or maybe both asked
14  you about what happened? And you must have had some
15  discussion with them about the events before you wrote
16  the letter?
17      A.  Kathy, like I had stated before, asked me to
18  write a letter, to write this letter so she could get a
19  better understanding. That is the only conversation I
20  had with her before that.
21      Q.  Okay.
22      A.  My recollection is Ted really didn't -- I
23  didn't have any conversations with Ted at that time yet.
24      Q.  Okay. The next statement is -- again, in

**22**

1  the bottom part of paragraph three -- this practice has
2  been going on for as long as I can remember, even as a
3  collector from passed -- and that passed word should be
4  P-A-S-T, I think -- managers, I went through the same
5  routine and was instructed to put on checks the same
6  way.
7       First of all, when you say this practice,
8  are you referring to the practice that was followed in
9  December of 2003 that you related in the letter?
10      A.  I'm trying to recollect here. Bear with me.
11  Over the years, that was a common practice with agencies
12  or with Milliken & Michaels to run checks. That was
13  just the normal procedure if you saw or you felt that
14  the check would be good. It seemed to drop as time went
15  on. Then Val herself, when she first started taking
16  over the checks, it seemed to escalate again.
17      Again, she was handling this. I did not.
18  Most of this practice I'm talking about in this letter
19  was done by her. It wasn't done by my department. You
20  have to understand, I walked in after the fact, and I
21  ran her checks. I only took care of this one time for
22  her.
23      Q.  That is really not my question. Just be
24  careful and listen to the question. When you use the

**23**

1  words, this practice, isn't it true that you are
2  referring to the practice that you have just mentioned
3  in the letter about reviewing checks with the collectors
4  and putting the checks back on?
5       A.  It was sort of routine, yes.
6       Q.  Okay. Who were the past managers? And
7  would you agree with me that that passed there should be
8  P-A-S-T, instead of P-A-S-S-E-D?
9       A.  Yes.
10      Q.  Who were the past managers that used the
11  same practice that you used in December of 2003?
12      A.  It's hard to remember all the managers
13  before me. There's been so many of them.
14      Q.  Can you remember who was before Valerie Hue?
15      A.  I believe Rick Woudreaux.
16      Q.  When was he there?
17      A.  Probably from 2000 to 2003, but I could be
18  wrong on the time.
19      Q.  Okay. But he was the one that was right
20  before Valerie Hue; is that correct?
21      A.  Yes.
22      MR. ISRAEL: W-O-U-D-R-E-A-U.
23      MR. HOMER: I think there's an X on the end
24  of it, isn't there?

**24**

1       MR. ISRAEL: I'm not sure.
2       MR. HOMER: I think there is.
3       THE WITNESS: I always had trouble spelling
4  his name.
5  BY MR. HOMER:
6       Q.  Let's look at the last paragraph of the
7  letter. It says: In addition, I have had collectors
8  complain to me regarding checks they desire to pull
9  because they were insufficient, but were unable to,
10  because they had been told by Valerie Hue they could not
11  pull them.
12      A.  This is where it's different.
13      Q.  Okay. Do you know what the term sandbagging
14  means as it relates to processing the checks at NCO?
15      A.  I have heard the phrase sandbagging, yes.
16      Q.  What does it mean?
17      A.  Well, if somebody is at quota or something
18  at the end of the month and they know that something is
19  going to post, they will hold it and post it the
20  following month.
21      Q.  Why would they want to hold the check and
22  post it the following month?
23      A.  For the fees.
24      Q.  Okay.

**25**

1 A. It's just to make sure you have quotas every
2 month. Some people do that, which I never agreed to. I
3 always thought: What happens if you die the next day?
4 And then you don't get your fee.
5 Q. Do you know whether Valerie Hue from time to
6 time refused to hold the check and instead ran it
7 because she suspected there was sandbagging going on?
8 A. No. I can't answer that for Val.
9 Q. Okay. You don't know if she ever did that?
10 A. No.
11 Q. There is nothing in this letter that you
12 wrote to Ted Fox and Kathy Obenshain that says Valerie
13 Hue asked you to create a fraudulent check, is there?
14 A. No. I don't think that's a question here.
15 Q. And there is nothing in here that says she
16 instructed you to redep a check that you knew wouldn't
17 clear the bank. That is correct, also, isn't it?
18 A. Could you rephrase the question?
19 Q. Okay. There is nothing in your letter to
20 Kathy Obenshain that says that Valerie Hue instructed
21 you to redep a check when you knew that the check
22 wouldn't clear the bank?
23 A. But we were instructed to --
24 Q. That is not the question. The question is:

**26**

1 Does the letter say that? Does your letter say that
2 anywhere?
3 A. Yes, it does, at the bottom.
4 Q. Where does it say that at the bottom?
5 A. They just told me that Valerie Hue
6 instructed him to put in checks -- let me see -- in
7 addition, I have had collectors complain to me regarding
8 checks they desire to pull because they were
9 insufficient, but were unable to, because they had been
10 told by Valerie Hue they could not pull them.
11 Q. Well, that doesn't answer the question I
12 asked, which was there is nothing in this letter where
13 Valerie Hue told you to submit a check that you knew
14 wouldn't clear. That is the question I had. I'm not
15 talking about what other collectors complained to you
16 about. I'm asking whether you say anything in this
17 letter about you being instructed to redep a check where
18 you knew there would not be funds available. There is
19 nothing in the letter that says you were told that, is
20 there?
21 A. Not directly in the letter, no.
22 Q. Okay. Did Valerie Hue ever instruct you to
23 redep a check that you knew was not going to be good?
24 A. Yes.

**27**

1 Q. When was that?
2 A. On that list we had of nonsufficient fund
3 checks.
4 Q. Well, that list that she gave you was a list
5 that you had gone over with the collectors while she was
6 out of the office, correct?
7 A. Yes.
8 Q. Well, how would she know when she was out of
9 the office and not participating in a conversation with
10 the collectors that a given check wouldn't be good?
11 A. I was instructed by her to get those checks
12 on the list that I was given.
13 Q. But you didn't put all the checks on. You
14 used judgment and, in some cases, you did not put the
15 checks on?
16 A. It depended on the check. If it was a stop
17 payment or account closed, that would be ludicrous.
18 Q. Okay. Any other example of at any other
19 time that Ms. Hue asked you to run a check knowing that
20 it wouldn't clear, other than what you just mentioned,
21 that being with respect to what is in your letter?
22 A. Do you mean at another time?
23 Q. Yes.
24 A. No.

**28**

1 Q. How long was Kathy Obenshain Valerie Hue's
2 supervisor, if you know?
3 A. Since she was the manager; Kathy was the
4 manager with Rick Woudreaux. So I mean she was Val's
5 boss, also.
6 Q. Do you know how many years that was?
7 A. Two years; I'm just roughly guessing here.
8 Q. Did you have any contact with Kathy
9 Obenshain in doing your job?
10 A. Somewhat, but not as much as Val would have
11 had.
12 Q. How frequently, if you know, did Kathy
13 Obenshain have contact with the Dover office, which is
14 where you were at this time, correct?
15 A. Yes.
16 Q. Okay. How frequently did Kathy Obenshain
17 have contact with the Dover office, as far as you know?
18 A. I can't really answer that. That would be
19 between her and Kathy directly, and I wouldn't be
20 involved in that.
21 Q. Okay. Would you know whether she was aware
22 of this practice that you mention in your letter, which
23 is Exhibit 1, that has been going on for as long as you
24 can remember? Would Kathy Obenshain have been aware of

1  that practice? Do you know?
2      A.  I'm not aware of it, you know.
3      Q.  Okay. The last sentence of the letter says:
4  I can only go on the direction of my manager, as she was
5  my superior.
6          Did you have an understanding, when you were
7  performing this function in December of 2003, that you
8  were doing anything that was improper? Did you
9  understand at the time that you were doing something
10  improper?
11      A.  Yes.
12      Q.  And were you aware that if you are doing
13  something improper, that you could have gone to Kathy
14  Obenshain and told her about it? Were you aware at that
15  time you could have done that?
16      A.  Yes.
17      Q.  Why didn't you do that?
18      A.  Val was my boss, and I didn't want to get
19  her in trouble. We do kind of protect each other in our
20  own offices.
21      Q.  Okay. So you knew something was wrong, and
22  you deliberately concealed that fact from Kathy
23  Obenshain. Is that a fair statement?
24      A.  Yes.

1      Q.  What you did wrong was something that not
2  only Valerie Hue was doing as manager, but past managers
3  did the same practice, correct?
4      A.  I can't answer for past managers.
5      Q.  Okay. But you didn't think that there was
6  any reason to go to Kathy Obenshain and ask about
7  whether this practice should be followed or not, even
8  though you knew it was wrong?
9          MR. ISRAEL:  Objection; asked and answered.
10          MR. HOMER:  Okay. I'll move on.
11  BY MR. HOMER:
12      Q.  What was your understanding of the check
13  handling process regarding the resubmission of NSF
14  checks as of December 2003?
15      A.  Redeposited checks had to be checked with
16  the bank to verify if the funds were available or, in
17  some cases, when you couldn't check with the bank, to
18  talk to the debtor and verify with him that it would be
19  okay to run the check. That was the procedure, and that
20  is my understanding at the time.
21      Q.  Okay. Where does that procedure come from?
22  Is it something that was in writing, or is it something
23  that you were told? How did you learn of that
24  procedure?

31

1      A.  I would say both, writing and told.
2      Q.  And do you think that procedure was in
3  writing somewhere?
4      A.  I can't remember now, to be honest with you.
5      Q.  Okay. Do you remember who told you what the
6  procedure was?
7      A.  As far as I know, that procedure has been in
8  place for years.
9      Q.  Well, isn't that procedure at odds with what
10  you did in December of 2003? Did you have the
11  collectors contact the debtors in each case to determine
12  whether the funds were available?
13      A.  No.
14      Q.  So you knew at that time there was a
15  procedure you were supposed to follow, and you didn't
16  follow it. Is that a fair statement?
17      A.  Yes.
18      Q.  Okay. How long was that procedure in
19  effect?
20      A.  For years.
21      Q.  Do you remember how many years it was in
22  effect?
23      A.  Right around the time of the acquisition
24  that NCO made with Milliken & Michaels or the

32

1  acquisition of Milliken & Michaels.
2      Q.  Going back to 1999 then?
3      A.  Yeah. Obviously, NCO had a lot of different
4  procedures than we had in the old schools.
5      Q.  Could you tell me approximately, if you can,
6  what percentage of the time when a collector tries or
7  somebody — I guess it's not the collector, but it is
8  somebody else.
9          But when somebody tries to verify with the
10  bank that a check is good, what percentage of the time
11  is the bank going to tell them whether it is good or
12  not, if you can answer that?
13      A.  Well, we are going back a few years. A lot
14  more banks were more open to verifying funds than they
15  are now. Obviously, it is getting worse as time goes
16  on. But at the time, I'm just speculating 40 percent.
17      Q.  40 percent?
18      A.  I could be off.
19      Q.  And that is around the time of December of
20  2003?
21      A.  Yes.
22      Q.  Okay. And what percentage of time were the
23  collectors able to reach the debtor when they wanted to
24  redep a check?

| 37 | 38 |
|---|---|

**37**

1    A.    I don't know that.

2    Q.    You don't recall, or they did not? Do you

3   understand?

4    A.    I don't know. I don't know if they got the

5   report or not.

6    Q.    But you didn't give it to them? They didn't

7   ask you for it?

8    A.    No.

9    Q.    Nobody asked you for it?

10    A.    No.

11    Q.    When a check is redepped -- Let's go back.

12   We are talking again about the December of 2003 period.

13   When a check was redepped, what forms were filled out to

14   document that it was appropriate to redep?

15         MR. ISRAEL: Objection. I don't think this

16   is clear, Jerry. Are you asking what he did in December

17   of '03 or what he understood the practice was?

18         MR. HOMER: I asked him what forms were

19   used.

20         MR. ISRAEL: But as a practice or what

21   happened in December of '03?

22         MR. HOMER: I think that is quite clear from

23   the question.

24         MR. ISRAEL: Is not clear from me.

**38**

1         But if you understand, go ahead.

2         THE WITNESS: I don't.

3   BY MR. HOMER:

4    Q.    I am asking about the time period December

5   of 2003. What forms were created to support a request

6   for redepping an NSF check?

7    A.    There was a form. I can't remember what

8   type of form it is. Obviously, it's changed since that

9   time. I can't remember what the actual form is. But my

10   understanding is each collector has a form that they

11   resubmit whenever they redeposit a check.

12    Q.    And you didn't have to do that yourself as a

13   collector?

14    A.    Yes.

15    Q.    Okay.

16    A.    You had to have it signed off by your

17   manager.

18    Q.    I am sorry. I didn't hear that.

19    A.    You had to have it signed off by your

20   manager.

21    Q.    But there was a form that was filled -- what

22   information would be on the form?

23    A.    Just, from my understanding -- I'm going by

24   memory now here. I think it would have the date that

**39**

1   the actual check would be resubmitted, and then it had

2   lines below it where it was verified with the bank or if

3   you talked to the debtor. But I could be wrong on that.

4   I don't remember all of the form. Obviously, you would

5   have the manager sign off on it, and you would have the

6   check.

7    Q.    Where would the form go to?

8    A.    The manager.

9    Q.    Do you know where it went after that?

10    A.    The manager should have filed it in their

11   records.

12         MR. ISRAEL: Hey, Jerry?

13         MR. HOMER: Yes.

14         MR. ISRAEL: Can we take a very short break?

15         MR. HOMER: Sure. Let me remind the

16   witness: You are not to discuss any of this with your

17   attorney while you are on the break.

18         MR. ISRAEL: He's not going to discuss

19   anything with me. I'll call you back in a minute.

20         MR. HOMER: Okay.

21         (A brief recess was taken from 10:13 a.m.

22   until 10:16 a.m.)

23   BY MR. HOMER:

24    Q.    I think I was just asking about the forms

**40**

1   that were used to justify a request for redepping an NSF

2   check. And I think I asked: Does the witness know

3   where those forms went after they were filled out by the

4   collector?

5    A.    They were given to the manager.

6    Q.    Okay. And do you know where they went from

7   there? Do you know whether they went to Horsham, for

8   example, for approval or review?

9    A.    I'm sorry. No.

10    Q.    You don't know what happened after the

11   manager had them?

12    A.    No.

13         MR. ISRAEL: They were sent to Horsham.

14         THE WITNESS: They were sent to Horsham. I

15   know myself, I used to keep them in a file. Obviously,

16   they used to build up after a time, and I used to

17   discard them. Obviously, the information on the forms

18   were private. So I would actually get mine chewed up

19   and get rid of them.

20   BY MR. HOMER:

21    Q.    But you understand there was a requirement

22   to fill out a form to justify redepping an NSF check; is

23   that true?

24    A.    Yes.

**41**

1  Q.  And when you went through this list in
2  December of 2003 with the collectors, did you see any of
3  these forms filled out?
4  A.  Yes.
5  Q.  So the collectors did have forms for
6  requesting the reduping of the checks?
7  A.  Yes.
8  Q.  And on those forms, there would be some
9  explanation of whether they contacted the debtor or not.
10 Is that true?
11 A.  Yes.
12 Q.  Okay.  And did you review the forms when you
13 went over the NSF report with the collectors?
14 A.  Yes.
15 Q.  And why did you review those forms?
16 A.  Again, as I mentioned earlier, I was looking
17 for checks that were either stop payment or the accounts
18 were closed.  I wanted to make sure none of those checks
19 were reran myself.
20 Q.  Or where there were too many NSFs, correct?
21 Isn't that what you put in your letter?
22 A.  Yes.
23 Q.  How did you determine if there were too many
24 NSFs?

**42**

1  A.  Judgment call.
2  Q.  Why was it that you were unwilling to run
3  the check again if there were too many NSFs?
4  A.  Could you repeat the question?
5  Q.  Why is it that you were unwilling to run the
6  check again if there were too many NSFs?
7  A.  In some cases, they might have been put in
8  three or four times.  And I just thought -- It was like:
9  Why kill a dead horse?  So I stopped it.
10 Q.  So based on the number of NSFs, you were
11 afraid they wouldn't clear again?  Is that what you were
12 saying?
13 A.  I just thought it was overkill.
14 Q.  Could you answer my question?
15 A.  It was overkill.  That's why I didn't run
16 the check.
17 Q.  Well, is it because you thought that it was
18 unlikely it would clear again, since they had already
19 gone NSF a number of times?
20 A.  It was --
21 Q.  Let me finish -- since they had already gone
22 NSF a number of times?
23 A.  Yes.  But there is a problem here.  A lot of
24 those checks went on anyway, because Val made them put

**43**

1  it off.
2  Q.  When you did your review in December of
3  2003, you exercised your judgment not to run some of
4  those checks that had already been run several times,
5  correct?
6  A.  Yes.  But I was told by my boss to put them
7  on anyway.
8  Q.  But you didn't?
9  A.  In some cases, some of them did go on.
10 Q.  All right.  So even though your boss that
11 you are loyal to told you to put them all on, you made
12 judgments not to put them on when there were too many
13 NSFs, among other things?
14 A.  Yes.
15 Q.  I would like you to look now at what has
16 been marked as Exhibit Number 2, Shaw Exhibit Number 2.
17 MR. ISRAEL:  Do you want him to read it?
18 MR. HOMER:  I just want him to look at it
19 for the time being.
20 MR. ISRAEL:  Okay.
21 BY MR. HOMER:
22 Q.  First, let's make sure we are looking at the
23 same document.  This one is a January 22, 2004 letter
24 from Kimberly Marlow to Ted Fox and Kathy Obenshain,

**44**

1  correct?
2  A.  Yes.
3  Q.  And down at the bottom of the right-hand
4  corner there is the number 00096, correct?
5  A.  Correct.
6  Q.  When did you last see this letter before you
7  just got it out today or before just a minute ago?
8  A.  I briefly looked at it yesterday.  That is
9  the first time I saw it.  But I didn't really read it.
10 I just kind of like looked over it.
11 Q.  Okay.  Have you discussed this letter with
12 anybody?
13 A.  No.  Like I say, I just briefly looked at it
14 yesterday.  I didn't really discuss it.
15 Q.  Okay.  Looking at the second paragraph of
16 the letter, in the third sentence there it says -- and I
17 will quote this -- then we pulled each collector in one
18 by one and discussed the checks that were to be run and
19 the level of comfort of them.
20 MR. ISRAEL:  Well, is it okay if he reads
21 the paragraph first?
22 MR. HOMER:  Well, if he needs to.
23 THE WITNESS:  Yes, yeah.  I would like to.
24 MR. HOMER:  Why don't you go ahead and read

ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                          )
        Plaintiff,                    )
                                      )
             v.                       )  C.A. No.
                                      )  05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a        )
Delaware corporation, trading as      )
NCO FINANCIAL COMMERCIAL SERVICES,)
        Defendant.                    )

             Telephone deposition of **CHERYL SUGG**, taken
before Cheryl A. Anthony, Court Reporter, in the law
offices of Parkowski, Guerke & Swayze, 116 West Water
Street, Dover, Delaware, on Monday, April 3, 2006,
beginning at 2:30 p.m.

APPEARANCES:

        PARKOWSKI, GUERKE & SWAYZE
        BY:  JEREMY W. HOMER, ESQUIRE
        116 West Water Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

BY TELEPHONE:

        SESSIONS, FISHMAN & NATHAN
        BY:  DAVID ISRAEL, ESQUIRE
        3850 North Causeway Boulevard
        Lakeway Two, Suite 1240
        Metairie, Louisiana  70002-1752

**ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B-477

1    is for human resource management, and one is alternative

2    dispute resolution.

3          Q.    Did you go to Cornell School of ILR?

4          A.    Yes.

5          Q.    And how long were you there?

6          A.    I think both of the certificate programs

7    were -- I mean it was through a local office.  They were

8    about nine months.

9          Q.    Did you receive course work and training in

10   discrimination laws?

11         A.    Oh, yeah, over the years, I mean through the

12   human resource management certification, through my work

13   experience, and through just numerous seminars and

14   training seminars throughout my career, as well.

15         Q.    Okay.  Would it be fair to say that you are

16   familiar with what a retaliation claim is when it comes

17   to discrimination claims?

18         A.    It is very fair to say.

19         Q.    And how about a disparate --

20   D-I-S-P-A-R-A-T-E -- treatment claim?

21         A.    Yes.

22         Q.    And are you familiar with the recordkeeping

23   requirements that are imposed by discrimination laws?

24         A.    Yes.  For the most part we are; I mean I am

6

1    or I believe I am.

2         Q.    Okay.  Were you familiar with those

3    requirements in January of '04?

4         A.    Yes.

5         Q.    Okay.  What I would like you to do next is

6    go through your job history, from the time you got out

7    of school until the present.  And for each job that you

8    have had, if you could, tell me the approximate dates

9    that you held the job and what your job title and duties

10   were.  And if you could, just start with the first one

11   after you got out of school, your first job.

12        A.    Right.  And I don't have the exact dates for

13   those.

14        Q.    That is all right.

15        A.    In the '80s, though, I worked in a call

16   center.  And it was, you know, taking ad placements,

17   called Slop Sheet and Picture Page.  I took ads.  When I

18   worked the evening shift, I would be, you know, the

19   night manager.  And then I worked in a sales office and

20   sold plots of land for recreational community vehicles.

21             My HR career basically began at a company

22   called Perry's Ice Cream.  I was hired as HR support in

23   the mid '80s and worked my way up to HR manager.  I was

24   there for ten years.  Then I went to a company called

B-479

1    Emack and was hired as the senior HR specialist.  Then I

2    was the HR person for the night employees.  Then I

3    worked at Collide Health as the employee relations

4    specialist.  And that is a group of hospitals.

5              After that, I began with NCO in 1998 and

6    started as the corporate employee relations manager and

7    then was promoted to vice president of employee

8    relations in January of 2004.  And then in January of

9    2005 -- well, in May of 2005, I learned that I was

10   promoted to senior vice president of human resources.

11        Q.    Okay.  Can you tell me how many years'

12   total, approximately, experience you have in the human

13   relations -- I will refer to that as HR for now -- in

14   the HR field?

15        A.    20.

16        Q.    You have described the various positions

17   that you have had with NCO.  Could you just tell me what

18   the hierarchy is for the top level HR positions at NCO?

19   And let's start with as it was in January of 2004.  What

20   would be the top positions, and who would be supervising

21   who?

22        A.    Well, the corporate HR office in Buffalo at

23   that time would have had a senior vice president of

24   human resources.  And that person would have been