1    responsible for all of HR, including benefits, payroll,

2    and employee relations.  And then three managers would

3    have, of course, reported in to that person.

4              And I was the vice president of employee

5    relations, which was responsible for recruitment and

6    retention, responsible for employee relations, which

7    basically addressed employee complaints, managed the

8    progressive discipline program, trained our supervisors

9    and managers at the locations on employment practices,

10   you know, handbooks, discrimination, EEO, all of those

11   terms that -- you know, some and more of those terms you

12   brought up earlier about how to be a manager, really

13   following employment laws and regs.

14        Q.    I'm sorry to interrupt you.  But what was

15   the title of that position again?

16        A.    That was when I was in employee relations,

17   manager and VP of HR, both of those.

18        Q.    And how long did you hold that position?

19        A.    Corporate ER manager, I was into the

20   position for six years prior to being promoted to the

21   vice president of ER.

22        Q.    Okay.  When you were the vice president of

23   ER, when was that?

24        A.    January of '04.

1    discipline relate to that time period.  I'm not looking

2    for the current policies.  I don't know if they are the

3    same as they were in January of '04 or not.  But my

4    questions will have to do with the policies and

5    procedures that were in place in January of '04.

6            First of all, what types of discipline were

7    there back in January of '04 that were imposed by NCO?

8        A.    Are you speaking in general terms?

9        Q.    Yes.

10       A.    Employees could be disciplined for several

11   different employment categories --

12       Q.    I'm sorry.  I asked a confusing question.  I

13   not really looking for the types of things they could be

14   disciplined for.  I am asking for the types of

15   discipline; for example, a written reprimand,

16   suspension, that kind of thing.

17       A.    Based on the severity of the violation or

18   the frequency, they could have a discussion, you know, a

19   discussion with their supervisor or manager or a verbal

20   written warning, a written warning, a final warning.

21   Suspension could be involved based on the severity, as

22   well, and/or termination.

23       Q.    Okay.

24       A.    Retraining could be part of, you know, any

B-482

1    of that.

2          Q.    So the least level of discipline would be

3    just an oral discussion with the employee; is that

4    right?

5          A.    Yeah.  And it would be very minor.  You

6    know, a note would typically be made to the employee's

7    file, you know, if it needed to be referenced on a

8    written, verbal warning.

9          Q.    And that would involve matters that were not

10   deemed very serious, is that right, relative to other

11   types of problems?

12         A.    That's correct.

13         Q.    Then the next level after that would be --

14   If you could, tell me again.  I think there were three

15   different levels of reprimands.  What is the next level?

16         A.    The next level would be a verbal written

17   warning.  So it is considered a verbal, but it is in

18   writing.

19         Q.    Okay.  And would this be done up on a formal

20   form that is made up for that purpose?

21         A.    That is correct.

22         Q.    Okay.  And is that something that is called

23   a job summary statement or something like that?

24         A.    Yes.  It is called a JDS, a job discussion

1    summary form.

2         Q.    And those are used for things that are more

3    serious than the one you talked about a minute ago, but

4    not serious enough to warrant suspension or termination.

5    Is that a fair statement?

6         A.    I think it is fair that it is more -- you

7    know, to let the employee know it is serious enough to

8    document, any kind of documentation to a file.  But it

9    is also to keep them from getting to the next level.

10   And based on the severity, our policy also provides

11   for a provision -- you know, again, based on the

12   seriousness -- that you could also skip a step of

13   discipline.  And again, the discipline could be made on

14   the severity of the offense.

15        Q.    What is the next level after you have this

16   JDS form?  What would be the next and more serious level

17   of discipline?

18        A.    After the verbal written warning, then an

19   employee would progress.  If they continued a violation,

20   they would progress to a written warning.

21        Q.    What form is that on?

22        A.    The forms are identical.

23        Q.    Okay.

24        A.    It's the same form.  There are different

1    check boxes for the different severities.

2        Q.    Okay.  And can you explain what the

3    progressive discipline policy is, in general terms?

4        A.    Yes.  In general terms, it is when an

5    employee violates a policy or procedure.  And based on

6    the severity of that violation, it could be a

7    discussion, a verbal, written, final suspension, or a

8    termination.  And that would be documented.  And in

9    addition, you would skip levels, based on the severity,

10   of course, of the event.

11       Q.    Okay.  So if there is something that is

12   deemed serious, you might not start at the first level

13   of discipline.  You might start at the third, or you

14   might even start with termination.  Is that a fair

15   statement?

16       A.    That is a fair statement.

17       Q.    Okay.  Is there a different process if a

18   manager is involved as the person who is to be

19   disciplined?

20       A.    Can I ask you to clarify?  Are you asking if

21   a manager is involved in the discipline of their

22   employees?

23       Q.    No.  I mean the manager himself or herself

24   is the one that is going to be disciplined.  Do you have

1    the same process for doing that or, for example, do you

2    follow progressive discipline when you discipline

3    managers?

4        A.    That's a good question.  Most of our

5    managers, supervisors and managers, are in positions

6    where they really know the offenses.  They know what

7    they should and shouldn't do.  They understand the rules

8    and procedures, because they are enforcing them with

9    their employees.  So many times a manager could have a

10    sped-up discipline, so to speak.

11        Q.    Would it also be fair to say that if you

12    have an experienced employee who has been around a long

13    time and they violate a policy or procedure that is well

14    known, that they might start at a higher level of

15    discipline than would a less seasoned employee who might

16    be not as aware of the policies?

17        A.    I would like to agree with you on that.

18    However, many times there are new procedures and

19    policies.  There are, you know, new guidelines to be

20    implemented.  So they may not have had that benefit,

21    just because of their tenure with the company.

22        Q.    So you would have to look at it on a

23    case-by-case basis to determine what level of discipline

24    would be appropriate, and you would probably look at the

34

1    any idea at all?

2             MR. ISRAEL:  Objection; asked and answered.

3    Tell him what you know.

4             THE WITNESS:  I wish I could answer that for

5    you, but I really don't know.

6    BY MR. HOMER:

7         Q.    Do you have any sense of how many written

8    reprimands there might be in a year at NCO Financial

9    Systems, Inc.?

10        A.    I do not.  I apologize, but I just don't.

11        Q.    Okay.  When there is a written reprimand, it

12   goes in the employee's personnel file.  Is that a fair

13   statement?

14        A.    Correct.

15        Q.    Is there a retention policy for those?  Do

16   you throw them out after a couple of years, or do they

17   just stay there forever?

18        A.    Well, they would go in the employee's file.

19   And if the employee leaves, of course, they would

20   obviously -- you know, we keep files for seven years on

21   termed employees.  Active employees, it would stay

22   forever.  But obviously, they would fall off, and they

23   become obsolete after a certain time.

24        Q.    Okay.  What records would you keep if you

1    terminated an employee for cause?  What sort of records

2    do you have in the file?

3        A.    Well, we have several different files that

4    we recordkeep for employees.  We have their personnel

5    file.  They could have a worker's comp file.  They could

6    have a family medical leave file.  They could have an

7    employee relations file.

8        Q.    Okay.  If you terminate someone for cause,

9    where would the documentation justifying the termination

10   be kept?  Which one of those files?

11       A.    The justification would be in the employee

12   relations file.

13       Q.    Okay.  You are aware in this case that

14   Valerie Hue's employment was terminated by NCO, correct?

15       A.    I am.

16       Q.    Were you involved personally in

17   investigating any of the matters that led to her

18   termination?

19       A.    I was not involved in the investigation, but

20   I did review the documents as they were presented to me.

21       Q.    And was anybody else at HR involved in

22   investigating the Hue matters that led to her

23   termination?

24       A.    No.  Actually, Kathy Obenshain investigated

1    the majority of this.  I believe Ted also talked to some

2    employees.  But Carol Murray, a member of my staff and

3    who was a senior specialist at the time, reviewed all of

4    the documents, you know, information that Kathy had

5    presented, that Ted had presented, and then, you know,

6    ensured that, again, when she presented this to me, that

7    their recommendation was a valid recommendation.

8         Q.    You said you reviewed documents.  Which

9    documents did you review?

10        A.    I reviewed some of the employee statements,

11   witness statements, and manager witness statements.

12        Q.    The manager witness statements, as I

13   understand it, were done in response to the charge of

14   discrimination.  Do you recall that?

15        A.    I believe some of them were.  I mean I

16   recall seeing statements, you know, that NCO does not

17   redep checks and rerun checks by the managers, that that

18   is not their process, and employees, of course, on their

19   witness statements from the Dover office.

20        Q.    Okay.  Did you review any documents, other

21   than witness statements, in connection with the Valerie

22   Hue investigation?

23        A.    I don't recall reviewing.  There may have

24   been communication notes by, you know, Carol Murray from

1    my staff, that she and Kathy Obenshain had discussed.

2    But other than that, I don't believe that there were

3    really any documents.  I don't know that Valerie ever

4    denied the allegation.

5         Q.    Okay.  Do you know whether anybody at HR

6    interviewed Valerie Hue about the events that were the

7    basis for her termination?

8         A.    No.  That would not have been necessary.

9         Q.    Okay.  And why is that?

10        A.    Well, it would be that situation that I was

11   describing that, you know, at times the managers would

12   look into things.  And if we felt, after reviewing the

13   documentation -- I mean this is a case where we had

14   employees that had witness statements that said that

15   Valerie had directed me to do this.

16             And there just would have been -- that was

17   the whole crux, you know, that this rerunning the

18   checks, the NSF checks and, you know, the DCIs -- these

19   employees were admitting that Valerie were instructing

20   them to do so.  I mean that clearly in itself -- and

21   there were several employees.

22             So normally if I get one or two employees, I

23   would send my team or the general managers or the

24   supervisors back to get more witness statements, because

1   I feel it is not enough.  But in this case, there were

2   plenty.

3       Q.    Okay.  Were you personally familiar with the

4   policies that Valerie Hue was alleged to have violated?

5       A.    I'm sorry.  I'm not sure I understand the

6   question.

7       Q.    Let me back up a little bit.  In this case

8   you were talking about these witness statements.  And

9   some of the witness statements refer to the various

10  check handling policies of NCO.

11          My question for you is:  When you reviewed

12  these statements, did you know what policies these were

13  that they were talking about?  Did you have any

14  familiarity with the check handling policies?

15      A.    No.  I do not know if there is a check

16  handling policy.

17      Q.    So basically what you were doing when you

18  did your review is to just rely on what the witness

19  statements said.  And you didn't do any investigative

20  work about whether the policies were really followed or

21  not.  Is that a fair statement?

22      A.    I would say it's fair.  But I would add that

23  I truly did not see that there was a need to continue to

24  get any further information.

1    Q.    Okay.  Did anybody at the HR department do

2  any investigation into the events other than to review

3  the witness statements that were supplied in connection

4  with the Valerie Hue matter?

5    A.    Not that I'm aware of, other than Carol

6  Murray communicating with Kathy Obenshain.

7    Q.    And that was a discussion they had?

8    A.    I believe they had several discussions.

9    Q.    Okay.  Do you know if there was any writing

10  that reflects what they discussed?

11    A.    I do not know that off of the top of my

12  head.  I apologize.

13        MR. ISRAEL:  Jerry, I just told Ms. Sugg she

14  doesn't have to apologize.

15  BY MR. HOMER:

16    Q.    Yes.  You don't have to apologize if you

17  don't know everything about the case.

18    A.    I felt like I wanted to.

19    Q.    Excuse me just a second here.  Do you know

20  what records were kept in connection with the

21  investigation of Valerie Hue that were related to the

22  termination?

23    A.    I am not aware, other than, you know, there

24  were witness statements that came in.  And I'm just not

1    Valerie admitted, as well, that she followed that

2    process.

3        Q.    What I'm really getting at here is not the

4    substance of the decision so much as what process was

5    followed.   I think I understand that there was an

6    investigation and some witness statements were gathered,

7    and I understand you reviewed them.

8        A.    It was recommended at that time then by

9    Kathy Obenshain to HR -- actually, Kathy went out even

10   and talked with Ms. Hue.   And then it was recommended

11   that Valerie be terminated.   So that was recommended to

12   HR.   We reviewed everything, and we agreed that Valerie

13   would be terminated.

14       Q.    When you say we agreed, who is we?

15       A.    Kathy would have had really the say and the

16   recommendation.   And the we would be, at that time,

17   George Huyler and myself, based on the information Carol

18   Murray provided, as well.   And it was determined that we

19   would proceed with the termination.

20       Q.    Is Huyler spelled H-Y-L-E-R?

21       A.    H-U-Y-L-E-R.

22       Q.    Okay.   Was there ever a discussion between

23   yourself and Ted Fox about this?

24       A.    I don't recall any discussion.   I recall

1    talking with Kathy, maybe even more with Kathy once or

2    twice.  But I don't recall talking to Ted.

3        Q.    Okay.

4        A.    I don't know.  I mean I may have, but I just

5    don't recall.

6        Q.    You said that Kathy Obenshain recommended

7    that Valerie Hue's employment be terminated.  Who was it

8    that actually made the decision to terminate her or

9    approved her recommendation?

10       A.    It would have been Kathy.  I mean it would

11   have been really her decision to.  And then any managers

12   above her would be aware of it, just like I would go to

13   George and basically let them know it's a good term.

14   Then we would process it.

15       Q.    So Kathy Obenshain made this recommendation.

16   Was it a recommendation in writing?

17       A.    I don't believe so.  It could have been.  I

18   just don't have any file or information in front of me

19   to reference right now.  But I believe it was, you know,

20   either -- I believe it was a phone call.

21       Q.    Okay.  Then HR reviewed it, yourself and

22   Mr. Huyler and maybe someone else.  I can't recall what

23   you said.  But what did you do after you reviewed it?

24   Did you call back Kathy Obenshain and say go ahead or it

1   is okay with us?  What was the next step for you?

2          A.      Actually, I conducted the term over the

3   phone with Carol Murray.

4          Q.      Okay.  So Kathy Obenshain made the

5   recommendation.  HR agreed to it, and then you just went

6   ahead and did it.  Did you tell Kathy Obenshain that you

7   were going to call her?

8          A.      Yes.

9                  MR. ISRAEL:  One second, Jerry.  Is Valerie

10  Hue with you?

11                 MR. HOMER:  No.

12  BY MR. HOMER:

13         Q.      Did you tell Ted Fox that you were going to

14  call Valerie Hue and terminate her?

15         A.      I don't recall calling Ted at all.  I would

16  assume that if Ted knew, it was from Kathy.

17         Q.      Okay.  What was his involvement in the

18  decision-making process, if you know?

19         A.      Personally, I always understood that Kathy

20  was the, you know, person that made the recommendation,

21  and it was her decision after that fact finding of

22  information.

23         Q.      So Ted Fox didn't have any role in it, to

24  your knowledge?

1      A.    Well, to the hierarchy, Kathy, in my

2  opinion -- I do not know this -- that she would have

3  obviously let him know of her decision, of her

4  recommendation.  I don't know that.

5      Q.    But you don't have any knowledge that Ted

6  Fox played any role in the decision to terminate Valerie

7  Hue; is that correct?

8      A.    That is correct.

9      Q.    Is there any other person, other than the

10 ones you have already told me about that were in the HR

11 department and Kathy Obenshain, that participated in any

12 way in the decision-making, the decision to terminate

13 Valerie Hue?

14     A.    No, there wasn't.

15     Q.    Okay.  And you say you called Valerie Hue;

16 is that right?

17     A.    That's correct.

18     Q.    Can you explain to me what the substance of

19 the conversation was, the best you can remember it?

20     A.    Yeah.  I basically, you know, told Valerie

21 that obviously, you know, I was aware that she was

22 suspended, based on, you know, the allegation of the

23 violation of the check handling process and that from

24 what we learned from the investigation, you know, that

1      A.    That's correct, a written response, or a

2   mediation would be set up.

3      Q.    Okay.  And in the case of a written

4   response, does the HR department have any role in

5   drafting or reviewing the response?

6      A.    Yes.  We would -- it could be possible that

7   we could go back and forth communicating during the

8   creation of the document and/or the final document,

9   reviewing it.

10      Q.    So in some cases the HR department would

11   actually help draft some of the letter.  Would the HR

12   department review the final letter before it was sent to

13   the agency?

14      A.    Yes.  We have the ability to do that.

15      Q.    Would that be the typical way you did it?

16      A.    Yes.  I think if there were any questions by

17   any of the attorneys that were working on it, our

18   documents -- you know, we have dealt with them for a

19   long time.  And we are pretty good on what we hand over.

20   I will tell you that.  So, you know, they usually get a

21   good package.

22      Q.    Okay.  And this final review that the HR

23   department does of the response letter that the

24   attorneys send to the agency that investigates the

62

1    charge of discrimination, is that done in part just to

2    make sure that the statements in the position statement

3    are accurate?

4        A.    And I apologize.   Did you ask is that why we

5    review it?

6        Q.    Is that one of the reasons you review the

7    final letter before it went to the agency?

8        A.    Yeah.   I think that, you know, in a perfect

9    world, we like to review every one.   I think we do.

10   But, you know, yeah, that is one of the reasons.   It is

11   a courtesy.   It is to make sure everything is accurate.

12   It is to make sure they didn't misinterpret any

13   documents.

14       Q.    Now, turning to the Valerie Hue case, after

15   her charge of discrimination was filed, what was the

16   process used to respond to the charge?

17       A.    I can't -- Right now, off the top of my

18   head, I apologize.   I don't know.   I am assuming a

19   response was prepared.   I don't know.

20       Q.    Okay.   Did you have any involvement in the

21   response?   Any personal involvement in the response?

22       A.    I wouldn't have.   You know, the team would

23   have handed over the file, and it would have been the

24   procedure as usual.

66

1    that this position statement was written, whether

2    Valerie Hue received a bonus based on the

3    end-of-the-month figures?

4         A.    I can't remember that.

5         Q.    Okay.  Would that have been a relevant fact

6    related to the investigation?

7         A.    It would have been, and the thought would be

8    that she would benefit financially from it.  But

9    regardless, she was instructing her employees to do

10   this, as well.  And it wouldn't have changed the

11   decision, as far as her termination.

12        Q.    What wouldn't have changed the decision?

13        A.    If she did, indeed, benefit financially from

14   this as a result, it wouldn't have changed the decision

15   to terminate.

16        Q.    So whether or not she received the bonus

17   didn't really matter when it came to making the

18   termination decision?

19        A.    That is correct.

20        Q.    Do you know why this was put in the position

21   statement, this statement I just read to you?

22        A.    I would imagine because the probability of

23   that being accurate is true.

24             MR. ISRAEL:  Is high.

B-499

67

1                THE WITNESS:  Is high.

2    BY MR. HOMER:

3         Q.    The probability of it being accurate?

4         A.    Most probably, if her employees were doing

5    this, she would benefit financially.

6         Q.    How do you know that?

7         A.    It's the way it works.  I mean they would

8    benefit, she would benefit.

9         Q.    Well, it really isn't something that you had

10   to speculate about, is it?  I mean wouldn't it have been

11   known in January of '04 or in June of '04 whether or not

12   she did receive a bonus for the end-of-month figures?

13              MR. ISRAEL:  Jerry, I don't understand the

14   question.  I mean we will stipulate that the information

15   was known when the position was written.  The witness

16   has testified that she doesn't even remember reading the

17   position statement, and she wasn't involved in preparing

18   it.

19              MR. HOMER:  Okay.  If you are willing to

20   stipulate the figures were known, that is fine.

21              MR. ISRAEL:  I am not saying that.  What I

22   am willing to stipulate is the concept that she would

23   benefit is what is known.

24              MR. HOMER:  Well, you didn't say it that

B-500

78

1   commercial side.

2          Q.     And he was a general collections manager in

3   the Atlanta office at one time?  Do you recall that?

4          A.     I believe so.

5          Q.     Do you recall that he was the Atlanta

6   manager at the time that the Valerie Hue investigation

7   was going on?

8          A.     I don't know that.  Matt has not been with

9   the company for a while, so I just don't recall his term

10  date.

11         Q.     Okay.  Do you recall that he was transferred

12  to the Dover office after Valerie Hue was terminated?

13         A.     I believe so.  I mean I don't know, in fact,

14  when.  But I believe he worked in the Dover office.  I

15  just don't know if it was at that time off the top of my

16  head.

17                MR. HOMER:  Okay.  Excuse me just a second.

18  Do you mind if we take a short break?  I would like to

19  see if we have that letter that Elizabeth promised me

20  today.  We will take about a five-minute break.

21                MR. ISRAEL:  Sure.

22                MR. HOMER:  Okay.  You are not allowed to

23  discuss the substance of the deposition during the

24  break, as you know.

B-501

1           THE WITNESS:  Okay.

2           MR. HOMER:  Thanks.

3           (Following a brief recess:)

4    BY MR. HOMER:

5      Q.    I think we are almost done, just a couple of

6    more questions.  Ms. Sugg, did you ever have any

7    discussion with Kathy Obenshain or anyone else at NCO

8    about the possibility of imposing discipline on any

9    other employee of NCO related to the audit that Dina

10   Loft, also known as Dina Shaantiel, undertook in

11   December of '03 and January of '04?

12     A.    No.  As far as, you know, the information

13   from the fact findings, there were no other managers

14   that showed that they had any violations with respect to

15   following this procedure.

16     Q.    I didn't limit my question to managers.  I

17   asked any other employee.  And the question again was:

18   Did you ever discuss the possibility of bringing some

19   sort of disciplinary action against any other employee,

20   including the collectors, as a result of that audit?

21     A.    No, I did not.

22           MR. ISRAEL:  Jerry, did Elizabeth Fite's

23   letter get there?

24           MR. HOMER:  Yes.  That is why I'm not asking

Phillip Weaver

Page 1

            IN THE UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF DELAWARE


VALERIE HUE,                    )
                                )
        Plaintiff,              )
                                )
v.                              )
                                )        Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,    )          05-225-KAJ
a Delaware corporation,         )
trading as NCO FINANCIAL        )
COMMERCIAL SERVICES,            )
                                )
        Defendant.              )

        Telephone Deposition of PHILLIP WEAVER taken
pursuant to notice at the law offices of Parkowski,
Guerke & Swayze, P.A., 116 West Water Street, Dover,
Delaware, beginning at 2:30 p.m. on Monday, March 13,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.

APPEARANCES:

            JEREMY W. HOMER, ESQ.
            PARKOWSKI, GUERKE & SWAYZE, P.A.
              116 West Water Street
              Dover, Delaware  19903
              for the Plaintiff,

            DAVID ISRAEL, ESQ. (via teleconference)
            SESSIONS, FISHMAN & NATHAN, L.L.P.
              3850 North Causeway Boulevard
              Lakeway Two - Suite 1240
              Metairie, Louisiana  70002
              for the Defendant.



                    CORBETT & WILCOX
            Registered Professional Reporters
      1400 French Street     Wilmington, DE 19801
                    (302) 571-0510

B-503

Phillip Weaver

Page 5

1        A.    Because I was under the assumption that I

2    would probably be subpoenaed if I didn't voluntarily

3    agree.

4        Q.    Okay.  What did you do to prepare for the

5    deposition, if anything at all?

6        A.    No.  The only thing that I really have done is

7    I read through a -- what do I want to call this?  I read

8    through a copy of a transcription that was provided to me

9    by David Israel.

10       Q.    Okay.  Did that have to do with a telephone

11   conversation?

12       A.    Yes.

13       Q.    Between yourself, Mr. Boudreau and Mr. Fox?

14       A.    That is correct.

15       Q.    Okay.  Have you looked at any other documents

16   relating to this matter?

17       A.    No, sir.

18             MR. ISRAEL:  Wait.  Hold on.

19             THE WITNESS:  Yeah.  Mr. Israel showed

20   me a fax or a memorandum that was from me dated June 5 of

21   2001 that was a memorandum to all collectors regarding

22   redeposits.

23   BY MR. HOMER:

24       Q.    Okay.  Anything else?

Phillip Weaver

Page 6

1                    MR. ISRAEL:  Jerry, you also got a copy,

2    because I'm looking at it, of the unemployment

3    compensation hearing that you attended where Mike Scher

4    testified.

5                    MR. HOMER:  Yes.

6                    MR. ISRAEL:  I sent him that too.

7                    MR. HOMER:  All right.

8                    MR. ISRAEL:  Then there's a second

9    memo from a Stephen Hallam to all collectors dated

10   January 20th of 2004 that is noted regarding NSF

11   redeposits.

12   BY MR. HOMER

13       Q.   Are those all the documents that you've looked

14   at?

15       A.   Yes, sir, they are.

16       Q.   Okay.  Did you discuss the substance of the

17   deposition with Mr. Israel before we've started here

18   today?

19       A.   Yes.

20       Q.   How long did you do that?  For how long did

21   you discuss it with him?

22       A.   Approximately an hour.

23       Q.   Okay.  Can you tell me why you were willing to

24   do that, that is, spend time with Mr. Israel discussing

Phillip Weaver

Page 7

1    the deposition and reviewing the documents?

2        A.    Because I've known him for several years and

3    he asked me to.

4        Q.    Okay.  Is it fair to say you still feel a

5    loyalty to NCO?

6        A.    Sure.

7        Q.    Okay.  In your discussion with Mr. Israel, did

8    you discuss the check handling policies that were used at

9    NCO while you were there?

10       A.    Yes.

11       Q.    Did he explain to you what the issue in this

12   case is about the check handling policies?

13       A.    Yes.

14       Q.    What is your understanding of that issue?

15       A.    My understanding of the issue is that Valerie

16   was terminated for improperly depositing NSF checks for a

17   second time without verification that funds would be

18   available.

19       Q.    Okay.  Did Mr. Israel discuss with you the

20   policy that NCO has asserted was in place during the time

21   that Ms. Hue has alleged to have done that?  I'm talking

22   about the policy related to check handling procedures.

23       A.    Well, he asked me what my recollection of the

24   policies were when I was in place as the general manager

B-506

Phillip Weaver

Page 10

```
 1                    I then opened a San Diego location in
 2   what probably would have been '95 or '96 and spent
 3   approximately one year at that location.  And then I was
 4   brought to Louisiana at the time the company was sold to
 5   become vice president of collections over the whole
 6   organization.
 7        Q.   What year was that again?
 8        A.   '97.
 9        Q.   Okay.
10        A.   Then, let's see --
11                    MR. ISRAEL:  Jerry, I told him to keep
12   going.
13                    THE WITNESS:  Milliken & Michaels was
14   acquired by NCO in, let me think here -- it would have
15   been '99, May of '99.  And -- let's see.  I became the
16   general manager for the commercial division at that time.
17   And I stayed with NCO until December of 2003, at which
18   point I left their employment.
19                    In May of -- actually, March of 2004 I
20   opened my own company called Revenue Assurance,
21   A-s-s-u-r-a-n-c-e, Partners, LLC.  And I am currently the
22   CEO and president of Revenue Assurance Partners.
23   BY MR. HOMER:
24        Q.   Okay.  How many employees work for you now?
```

Phillip Weaver

Page 20

1      A.    No.

2      Q.    Okay.  Do you know what, if any, say

3  Mr. Savage would have had in any promotion that Mr. Fox

4  received?

5              MR. ISRAEL:  Asked and answered.  Go

6  ahead and tell him.

7      A.    No.

8      Q.    Did you ever go to dinner with Mr. Savage and

9  Mr. Fox?

10      A.    I've been to lunch with Mr. Savage.  I don't

11  believe I've been to lunch with both of them.

12      Q.    Okay.  Have you ever spent any time with

13  Mr. Savage and Mr. Fox outside of business hours?

14      A.    I have spent some time with Mr. Fox outside of

15  business hours.  I don't recall ever spending time with

16  Mr. Savage outside of business hours.

17      Q.    Okay.  Can you relate to me in what settings

18  you spent time with Mr. Fox outside of business hours?

19              MR. ISRAEL:  Objection.  Relevance.  Go

20  ahead and answer.

21      A.    Yes.  We both owned boats, and sometimes we

22  would go out fishing together.

23      Q.    Okay.  How many times did you do that?

24      A.    Two or three.

Phillip Weaver

Page 21

1       Q.   Okay.  Other than that, did you ever spend any

2  time outside of business hours with Mr. Fox?

3       A.   I think that we probably -- I probably saw him

4  at one of the company Christmas parties.  We -- our

5  families did not go back and forth or -- you know, our

6  kids were not of the same age.  So we really didn't

7  socialize.

8       Q.   Okay.  Anything other than those two things,

9  the boat activity and the Christmas parties?

10      A.   Yeah.  We had a paint ball game, I think,

11  once.  Oh, man.  I'm trying to remember.  You know,

12  that's all I can recall off the top of my head.

13      Q.   Okay.  Did you ever go golfing with him?

14      A.   I don't golf.

15      Q.   Okay.

16      A.   So no.

17      Q.   Do you know whether Mr. Fox and Mr. Savage

18  ever spent time together outside of business hours?

19      A.   I have no idea.

20      Q.   Okay.  Have you had any contact with either

21  Mr. Savage or Mr. Fox since you left NCO in December of

22  2003?

23      A.   I had a telephone conversation with Mr. Fox

24  approximately April of last year, which would have been

Phillip Weaver

Page 22

1    '05, to see if he wanted to go for opening day of snapper

2    fishing season.

3        Q.    Is that the only time you've been in contact

4    with him since you've left NCO?

5        A.    I think we may have talked on the phone on one

6    other occasion regarding a client that was a mutual

7    client between NCO and Revenue Assurance.

8        Q.    Okay.  I thought before you said you hadn't

9    had any contact with NCO about any business matter since

10   you left NCO.

11       A.    Yeah.

12       Q.    Is this the exception to that -- what you were

13   saying before?

14       A.    Well, no.  I think that Ted and I just had a,

15   you know, two-second conversation about does this happen

16   to be a client in Metairie.  Yeah.  It's a client there.

17   Okay.  Well, we'll handling them here too.  So just kind

18   of just an FYI.

19       Q.    Okay.  That's the extent?  That's the only

20   contact you've had with NCO about any business matters

21   since you left NCO?

22       A.    Yes.

23       Q.    Okay.  Mr. Savage was terminated by NCO.  Is

24   that correct?  His employment was terminated, I should

Phillip Weaver

Page 23

1    say.   Is that correct?

2          A.    That is correct.

3          Q.    Do you know who made the decision to terminate

4    his employment?

5          A.    Well, myself, Mr. Fox and probably, I believe

6    it was, Cherie Sugg in human resources made a group

7    decision to terminate Mr. Savage.

8          Q.    Okay.   Why was he terminated?

9          A.    He was terminated for improper verbiage

10   directed towards fellow employees.

11         Q.    Okay.   Can you explain what the process was

12   for, first of all, investigating what Mr. Savage may have

13   done that was improper?

14         A.    Specifically to that?   Or are you talking what

15   the process is for --

16         Q.    No.

17                   Specifically with respect to Mr. Savage,

18   what was the process used to investigate what he did?

19         A.    We received an incoming call from Rick

20   Boudreau who indicated on that call that Mr. Savage had

21   been heard utilizing terms that were inappropriate.   At

22   that point we contacted our human resources department to

23   inform them of this.

24         Q.    When you say "we," are you talking about

Phillip Weaver

Page 37

1    mind?

2         A.    Absolutely.

3         Q.    Okay.  Do you know a woman named Dina

4    Shaaltiel?  She is also known as Dina Loft.

5         A.    No, I don't.

6         Q.    Okay.  Were you aware in December of 2003 that

7    an audit was being done of the collections division

8    regarding NSF checks?

9         A.    No.

10        Q.    You know what NSF checks are.  Correct?

11        A.    Yes.

12        Q.    Just for the record, what are they?

13        A.    Nonsufficient funds.

14        Q.    These are checks that are returned from the

15   banks because there's not enough money in the account to

16   cover them.  Correct?

17        A.    Or the account has been closed or the account

18   is fraudulent.

19        Q.    Okay.

20        A.    Any number of reasons.

21        Q.    Okay.  I'm sorry.  Did you say you were not

22   aware of any audit being done in December of 2003?

23        A.    Correct.

24        Q.    Okay.  While you were the general manager at

B-512

Phillip Weaver

Page 38

1    NCO, were there routine monthly audits that were

2    undertaken of checks that were termed NSF?

3        A.    When I was a general manager at NCO?

4        Q.    Yes.

5        A.    Not to my knowledge.

6        Q.    Would you know if there were such audits being

7    undertaken?

8        A.    Apparently not, since I didn't know about this

9    one.

10        Q.    Okay.  Well, what I'm asking you is:  You said

11    you were a hands-on general manager.  But you don't know

12    whether or not there were regular monthly audits

13    undertaken?

14                MR.  ISRAEL:  Objection.  Argumentative,

15    asked and answered.  Tell him what you know.

16        A.    If these audits were driven by NCO corporate

17    and they chose not to bring me into the loop, it really

18    doesn't have anything to do with me being a hands-on

19    manager to the people I was responsible for.

20        Q.    Okay.  Did you ever request that there be an

21    audit done of NSF checks that had been resubmitted for

22    payment?

23        A.    Not to my knowledge.  I don't recall ever

24    doing that, no.

Phillip Weaver

Page 39

1      Q.    Okay.  Do you know anybody at NCO that did?

2      A.    Not from my division, no.

3      Q.    Okay.  I take it you know Valerie Hue.

4            How long have you known Valerie?

5      A.    Oh, gee.  I don't know.  A long time.

6  Probably ever since -- I think I probably met Valerie in

7  the Milliken & Michaels days during one of the manager

8  seminars that they used to have down in New Orleans.

9      Q.    Okay.  Were you involved in her promotion to

10 general collection manager?

11     A.    Yes.

12     Q.    Who else was involved in that?

13     A.    Gee.  At the time I don't know if it was Kathy

14 or Peter Buggeln.  But, certainly, my senior vice

15 president of collections was involved in it.

16     Q.    What was involved in making the decision for

17 that promotion?  When someone is promoted to general

18 collection manager, what criteria go into making the

19 decision?

20     A.    Well, certainly, a knowledge and an

21 understanding of our business and how it operates, good

22 people skills, good communication skills.  Things like

23 that.

24     Q.    Who evaluates those criteria?

B-514

Phillip Weaver

Page 51

1                    (Weaver Deposition Exhibit No. 6 was

2      marked for identification.)

3      BY MR. HOMER:

4          Q.    Can you explain what this memorandum is about?

5          A.    I have no clue.

6          Q.    Well, doesn't this set out a procedure for how

7      closings are to be handled in the Dover office?

8                    MR. ISRAEL:   Objection.   Leading.

9          A.    I guess.   But what they're describing here is

10     totally foreign to any processes or procedures I've seen

11     at NCO or Milliken & Michaels.

12         Q.    Okay.   Did different offices have different

13     procedures for the collection practices?

14         A.    No.

15         Q.    So you think this procedure here is something

16     that was not authorized by NCO corporate?

17         A.    No.   I think this procedure is managers not

18     wanting to work their review files and assigning clerks

19     to do it.

20         Q.    I'm not sure I understand.

21                   Could you explain that?

22         A.    Yeah.   They're -- these are all close codes

23     that managers typically would go into their review file.

24     And as people close accounts, they would have to review

Phillip Weaver

Page 65

1    marked for identification.)

2    BY MR. HOMER:

3        Q.    Okay.    Could you turn to the second page of

4    the exhibit?

5        A.    Yes.

6        Q.    You see at the top where it says February 24,

7    2003?    That's the date that the e-mail is sent to

8    commercial ops managers.    This was an e-mail you sent.

9    Correct?

10       A.    Correct.

11       Q.    Could you read the first paragraph of the

12   memo?

13       A.    "Effective immediately, the automatic

14   redeposit of returned items from the bank will cease.

15   This will prevent items from being returned after client

16   remittance has been issued."

17       Q.    Okay.    When you say the "automatic redeposit

18   of returned items," what were you referring to there?

19       A.    When the company was owned by Milliken &

20   Michaels, including the time when we were owned by HIG

21   group, all of our checks that were deposited to the bank

22   were only deposited once.    Okay.    They would come back to

23   us then if they did not clear.    And we would determine,

24   you know, whether funds were available or not for them to

B-516

Phillip Weaver

Page 66

1    be redeposited.

2                When NCO acquired the organization and

3    they moved the accounting process to Pennsylvania, they

4    had a process in place with their bank for their consumer

5    model whereby all checks were automatically redeposited.

6    And we weren't notified of the debit until it didn't

7    clear that second time.  Therefore, we had funds that we

8    had remitted to clients that -- where we thought the

9    checks were cleared when in fact the checks hadn't

10   cleared.  They had just been automatically redeposited.

11               And because we deal in such large

12   balances in the commercial model versus the -- you know,

13   per account basis versus the relatively small dollars in

14   the consumer model, that automatic redeposit of funds

15   does not work for the commercial division.

16        Q.    Okay.

17        A.    So we ask them to get their bank to stop that.

18   And they finally did.

19        Q.    Just to get the terminology down here, can you

20   tell me what "redipping" means?

21        A.    Yeah.  Redeposit.

22        Q.    Okay.  And NSF, I think we already mentioned,

23   was a check that had been returned because there wasn't

24   an account with money in it to pay for it.  Correct?

Phillip Weaver

Page 67

1      A.   Correct.

2      Q.   So when you're talking here in this first

3  paragraph, are you talking about redipping NSF checks?

4      A.   No.

5      Q.   What are you talking about?

6      A.   The bank was automatically redepositing the

7  check a second time before -- with no notification

8  whatsoever to the depositor, which would be us.  So

9  without any human intervention, that check was being run

10 or it would be run.  If it came back, the bank just

11 automatically re-ran it.  It didn't even debit against

12 our account until it came back for the second time.

13     Q.   Well, you're saying the bank ran it.

14          But that was NCO's policy to have the

15 bank run it again.  Correct?

16     A.   Or consumer, yes.

17     Q.   Well, how long was this policy applied -- this

18 memo -- this e-mail is directed to the commercial ops

19 managers.  Correct?

20     A.   That's because I had that automatic redeposit

21 changed because of the difference in the models.

22     Q.   Right.  I understand.

23          You changed it for the commercial

24 division.  Correct?

Phillip Weaver

Page 68

1          A.    Correct.

2          Q.    How long had this policy been in effect before

3    you changed it.  The one I'm talking about is the one

4    that's stated on the second page of Exhibit --

5          A.    A couple months.

6          Q.    -- 13.

7                        A couple of months?

8          A.    Yes, sir.

9          Q.    Well, when did NCO take over Milliken &

10   Michaels?

11         A.    The NCO takeover and the ultimate transferring

12   of the accounting division were two different things.

13   They took us over -- and it was a couple years before

14   accounting actually got transferred to Pennsylvania,

15   where -- which is where debtor payments were posted.

16                   So, no, it was only a couple months from

17   the time accounting got moved to Pennsylvania to where

18   they were automatically redepositing at the bank to where

19   I got it changed.  At the most.  I mean -- because it was

20   a major issue for us.  It was totally against everything

21   we've always done.

22         Q.    Okay.  Because it was a major issue, you

23   decided that you were going to put a written policy out

24   on it.  Is that what the second paragraph talks about,

Phillip Weaver

Page 69

1    the second paragraph of the same e-mail?

2        A.    Sure.

3        Q.    Okay.  So you decided that you were going to

4    end this policy of automatic redeposits and there was

5    going to be a new policy which you were going to put in

6    writing.  Correct?

7        A.    No.  Again, there -- we had always had a

8    legacy policy about the handling of NSF checks.  When --

9    no policies changed.  Just where we deposited the bank --

10   the funds in the bank was the only thing that changed

11   which, in turn, created an automatic redeposit of those

12   funds.  So there was no change in policy.

13       Q.    If there's no change in policy, why did you

14   write the -- well, let's turn to the first page of the

15   exhibit.  Can you tell me what the purpose of your

16   March 5, 2003 memo to the commercial ops managers was

17   that's in this e-mail?

18       A.    Because the accounting had changed from

19   New Orleans or Metairie to Pennsylvania, I needed to tell

20   people what method they would utilize, which is these

21   e-mail addresses, to facilitate accounting processes.

22       Q.    Yes.

23             These bullet items that are in the first

24   page of Exhibit 13, don't they set out the procedure that