Phillip Weaver

Page 70

1  you wanted followed for redepositing the NSF checks?
2     A.   That simply sets forth the timing and who to
3  contact, yes.
4     Q.   It doesn't set out anything but timing and who
5  to contact in those bullet points?
6     A.   Time frame, time frame, who to contact -- no.
7  I guess it does go on to say that you can only -- can
8  only be made on items that have been returned once and
9  can't be done on anything other than NSFs and that
10 they're going to be processed in the order received.
11    Q.   And there will have to be a final
12 verification.  Right?  That's what the last bullet point
13 says.
14    A.   Whatever that means.  I didn't write that.
15    Q.   Who wrote it?
16    A.   It looks like a Bette Capaldo.
17    Q.   Okay.  Who is she?
18    A.   I think she is somebody with NCO Financial in
19 the accounting department.
20    Q.   Okay.  Is she telling you what the process is
21 going to be?
22    A.   Yep.
23    Q.   Okay.  Did you ever write the memo that you
24 said you were going to publish in your February 24, 2003

Corbett & Wilcox                               B-521

Page 71

1  memo?
2      A.   Don't know.  I bet I'm going to find out.
3      Q.   Pardon me?
4      A.   I said I don't know but I bet I'm going to
5  find out.
6      Q.   Well, other than this March memo, I haven't
7  seen any memos that you authored regarding the redipping
8  of NSF checks.  Do you recall there ever being one that
9  you wrote after February 24, 2003?
10     A.   Well, there's a memo from Steve Hallam.  I
11 mean, I had a memo in June of 2001 for redeposits.
12     Q.   Do you have that in front of you?
13     A.   Yes.
14     Q.   Can you read that to me?
15     A.   Sure.  To all collectors --
16          MR. ISRAEL:  One second.
17          Jerry, do you not have this?
18          MR. HOMER:  I'm not sure.  I might.  I
19 called --
20          MR. ISRAEL:  One second.  Let me just
21 tell you something important.  We found this -- a couples
22 things that we have found.  We found two things.  This is
23 the older of the two documents we found.  These were sent
24 to you last week.  Remember the two pages that were sent

Corbett & Wilcox                          B-522

Page 78

1   up checks?
2       A.   In the old Milliken & Michaels days when we
3   worked on a -- they were basically -- we had something
4   called supplemental period, which was the first two weeks
5   of every month.  Collectors had an opportunity to get
6   those funds via certified mail so that they could be
7   remitted to our clients.
8       Q.   Okay.  Let's go back to the Exhibit 13, if you
9   have that in front of you.
10      A.   Okay.
11      Q.   I'd like to go to the second page again where
12  you state -- and this is a quote -- I will be publishing
13  a process for collectors to utilize for redeposited items
14  only returned once on a case-by-case basis.
15           I'll represent to you that we have not
16  been shown any such policy that you published.  Do you
17  have any understanding that you wrote such a policy or do
18  you have any recollection that you wrote such a policy?
19      A.   No.  I -- honestly, I probably stated that and
20  didn't follow through with a, quote/unquote, policy
21  because we didn't need a policy.  It was always known
22  that when checks were returned once by the bank that, you
23  know, we did not redeposit them absent verification.  You
24  know, it was just like lying, cheating and stealing.

Phillip Weaver

Page 82

1    A.   Yes.
2    Q.   Okay. Am I correct in assuming, then, that
3    the Capaldo memo does outline the policy for redepositing
4    NSF checks?
5    A.   Outlines the policy for how they facilitate
6    that in corporate but doesn't go on to talk to the ethics
7    of running checks that no funds are good for.
8    Q.   Okay.
9    A.   Which is always a no-no in our business from
10   day one.
11   Q.   Let's say there's an NSF check for $2,000 that
12   comes in August 1, 2001. The collector wants to resubmit
13   the check for payment. Can you tell me how that check
14   goes through the process and ultimately is reposted for
15   payment?
16   A.   Yeah. In 2001 --
17   Q.   August of 2001 after your June 5, '01 memo.
18   A.   Yeah. It was simply that the collector would
19   have to document his screen relative to what steps he
20   took to confirm that funds were available, e.g., either
21   speaking directly with the bank and verifying funds were
22   available or speaking with the debtor and confirming a
23   viable source, you know, a check has been deposited
24   that's waiting to be cleared, etc. At that point their

Corbett & Wilcox                                B-524

Page 83

1 manager would have to review that information, sign off
2 on it and submit an accounting request slip to accounting
3 to redeposit that check. And that would have to come
4 from the manager.
5      Q.   The manager would submit that request where?
6      A.   To their accounting department, whether that
7 was in the branch location or the corporate location.
8      Q.   Then what would happen with the request?
9      A.   The request would be processed.
10     Q.   By whom?
11     A.   The accounting department.
12     Q.   What would they do with it?
13     A.   Take whatever action the collection manager
14 approved.
15     Q.   For example, if they approved it, would they
16 then resubmit the check?
17     A.   Yes.
18     Q.   Where is your part in this? I thought you
19 said before that you had to review all the checks over a
20 thousand dollars.
21     A.   Yeah. Accounting would bring me the slips
22 before they go to accounting and I would spot-check them.
23 If I got ten, I may look at two. If I got twenty, I may
24 look at three.

Case 1:05-cv-00225-KAJ   Document 84-8   Filed 05/16/2006   Page 6 of 20
Phillip Weaver

Page 106

1   MR. ISRAEL: You mean other than what
2   he's already told you?
3   MR. HOMER: Yes.
4   MR. ISRAEL: Asked and answered.
5   MR. HOMER: I think all he's said so far
6   is that in some cases the collectors and not admins did
7   the bank verification.
8   MR. ISRAEL: No. That's not all that he
9   said. He said a number of things, Jerry.
10  MR. HOMER: Well, that's what I
11  understood what he said.
12  MR. ISRAEL: Well --
13  MR. HOMER: He talked about what was in
14  paragraphs 2 and 3. Those are different paragraphs.
15      A.  Yeah. I would say that this line that says
16  any check that's not verified is given to the immediate
17  manager who is to make a decision about whether or not to
18  run the check. I think that she's just expounding on the
19  fact that the banks were becoming less favorable at
20  providing that information. No, I don't think there's
21  anything different there at all.
22      Q.  Okay. So you agree that this accurately
23  states the policy that was followed by NCO corporate-wide
24  in December of 2003 except for the statement that you

Page 107

1  made earlier which was that in some cases in some offices
2  collectors rather than admins would contact the bank?
3           MR. ISRAEL:  Objection.  Leading.
4     A.   Yes.
5     Q.   Okay.  When it says here the immediate
6  manager -- this again is paragraph 1 of Exhibit 15 -- is
7  that the general collection manager?
8     A.   They say "immediate."  She says "immediate
9  manager."  So she could be meaning, you know, collection
10 supervisor.
11    Q.   Well, who was it in the offices that had
12 authority to make a decision about whether or not to run
13 a check?
14    A.   The general collection manager.
15    Q.   Okay.  The immediate manager is referring to
16 general collection manager?
17    A.   I suppose.
18    Q.   Okay.  On what basis would the immediate
19 manager or the general collection manager make a decision
20 about whether to run a check or not?
21          MR. ISRAEL:  Objection.  Asked and
22 answered.
23    A.   Based on whether the bank said that funds were
24 available and based on what the debtor indicated as far

Phillip Weaver

Page 108

1   as the funds clearing the bank.
2       Q.   Was there any discretion whether the check
3   should run or not?
4            MR. ISRAEL:  I didn't understand the
5   question.
6   BY MR. HOMER:
7       Q.   Did the general collection manager have any
8   discretion as to whether to run a check or not?
9       A.   Yeah.
10      Q.   Why does the general manager have to make a
11  decision?
12      A.   Because we wanted some oversight to make sure
13  that the collectors were making the proper choice because
14  they were commissioned employees and they could
15  improperly inflate their income, you know, for a period
16  of time by improperly running checks that were no good.
17      Q.   Okay.  This sentence that says -- and I'll
18  quote -- If we decide to run a check that we were unable
19  to verify funds for, that check is to be followed through
20  the bank to make sure it clears, end quote, what does
21  that mean?
22      A.   For a postdated check, for end of month, the
23  debtor has given you a check dated for the 30th because
24  they say they're going to have monies available.  We call

Phillip Weaver

Page 109

1   the bank. The bank says we don't have monies available
2   to cover that check. We can't reach the debtor. We --
3   it's a postdated check. It's not a NSF to make a
4   decision about it.
5       Q.   Well, why wouldn't this apply to the NSF check
6   as well?
7       A.   Because that was not the way we did business.
8       Q.   Okay. So it was okay to run a postdated check
9   without verifying the funds were available, but it wasn't
10  okay to do it for an NSF check?
11      A.   Yeah.
12      Q.   For all postdated checks, would the collector
13  have to attempt to reach the debtor?
14      A.   We would attempt to verify the funds were good
15  proactively, yes.
16      Q.   Was the answer yes to my question?
17      A.   We would attempt to verify the funds
18  proactively, yes.
19      Q.   In all cases did the collector have to attempt
20  to contact the debtor before submitting a postdate check?
21      A.   Yes.
22      Q.   If he failed to do that, it was okay to run
23  the check?
24      A.   Because it's a postdate. It's not an NSF. It

Corbett & Wilcox                    B-529

Page 110

1  hasn't been returned by the bank.
2      Q.   Do you know what Kathy Obenshain is referring
3  to when she says we had a problem in Atlanta last month?
4      A.   No idea.
5      Q.   Okay.  Also in that first paragraph it says
6  this with respect to live checks:  We also ask debtors to
7  provide us bank information when the check is sent to
8  Horsham, not always successfully.  Is that a true
9  statement too?
10     A.   Yes.  Because Horsham was unable to provide us
11 the copies of the postdates, which we had always had in
12 the past.
13     Q.   Do you have an understanding as to why this
14 information in paragraph 1 doesn't apply to NSF checks?
15     A.   Can you repeat your question?
16     Q.   Yeah.
17          If I understand this correctly, you
18 testified that this information that's in paragraph 1 of
19 Exhibit 15 doesn't apply to NSF checks.  It applies to
20 postdated checks, but it doesn't apply to NSF checks.
21     A.   It looks like it applies to postdates and
22 live, yes, sir.
23     Q.   Why do you also include it doesn't apply to
24 NSF checks?

Page 118

1  under 250.

2      Q.   Okay.  The next document I'd like to use is a
3  December 15, 2003 memo from Kathy Obenshain to GCMs
4  regarding the first quarter postdate contest.  It's
5  showing a copy to Phil Weaver.

6           (Weaver Deposition Exhibit No. 18 was
7  marked for identification.)

8  BY MR. WEAVER:

9      Q.   Do you recall this contest that's referenced
10 in this memorandum?

11     A.   Yeah.  We had contests every month.

12     Q.   Do you know what Valerie Hue would have to do
13 to win any money under this contest?

14     A.   Yes.  She would have to get her -- we have
15 several historical business models.  One of those
16 historical models shows that for a collection department
17 that consistently achieve their quota that they needed to
18 commence the beginning of the month with a certain
19 percentage of that quota in postdates.  We consider a
20 postdate a very strong promise to pay in our industry,
21 essentially.  So we would have contests to make sure that
22 our managers and collectors were -- you know, if somebody
23 wanted to pay but they couldn't pay until the 20th, to
24 make sure that we were securing those funds via postdated

1   check.
2       Q.   So whenever it refers to the first quarter,
3   that's the first quarter of what?  The month or the year?
4       A.   Of the year.
5       Q.   Okay.  To win this contest or to share in the
6   proceeds of the contest, Valerie Hue would have to show
7   that postdate checks in the first quarter were equal to
8   some amount?  Or what would she have to do to show that
9   she's entitled to some money under the contest?
10      A.   Yeah.  They would -- it looks like they would
11  receive shares of the pool by meeting or exceeding their
12  goal.
13      Q.   Okay.  It didn't depend on anything that
14  happened in the year 2003.  Am I right about that?
15      A.   No.  It didn't have anything to do about --
16  with 2003.  It was for the first quarter of '04.
17           MR. HOMER:  Okay.  I don't have any
18  other questions.  Thank you, Mr. Weaver.
19           THE WITNESS:  You're welcome.
20           MR. ISRAEL:  I'm going to ask a few.
21  BY MR. ISRAEL:
22      Q.   Mr. Weaver, would you distinctly describe the
23  process that collectors were expected to follow regarding
24  NSF checks before they would be resubmitted?

Phillip Weaver

Page 120

1    A.   Certainly.  They would attempt to contact the
2    bank and, using the account number, verify that funds
3    were available.  If they were able to verify the funds
4    were available, they would document that information in
5    the system.  If it was prior to the accounting going to
6    Horsham, they would complete an accounting request form.
7    They would take that to their manager who would review
8    the account to make sure that the collector's request was
9    accurate.  And then they would submit that to corporate
10   for review and processing.
11        Q.   How long had that process been in place when
12   you worked at NCO or the predecessor business, Milliken &
13   Michaels?
14        A.   It was in place, I'm sure, before I started.
15   I started December 5th of 1990, and it was in place at
16   that point.
17        Q.   There were questions asked by Mr. Homer as to
18   whether you have any knowledge as to whether that policy
19   was in writing.  Why, in your opinion, if the policy
20   wasn't in writing had not it been reduced to writing?
21        A.   Because it was <u>one of the ultimate sins.</u>
22   Everyone just knew that you didn't redeposit checks
23   without verification because it inflated people's
24   commissions.  It caused us to remit to clients when

Corbett & Wilcox                            B-533

Phillip Weaver

Page 121

1  monies weren't due. And, you know, we operated on a cash
2  basis. And anytime you operate on a cash basis, you have
3  to manage your money.
4      Q.   Were collectors in your experience at NCO or
5  M&M ever found to violate the policy?
6      A.   Sure.
7      Q.   What would happen?
8      A.   Corrective action up to and including
9  termination.
10     Q.   Do you know of any circumstance where a
11 manager was ever involved in directing collectors to
12 violate this policy?
13     A.   With postdated checks?
14     Q.   Yes.
15     A.   Not while I was there.
16     Q.   Now, you testified that you were not aware of
17 any audits of -- I was asking about NSF checks, not
18 postdated checks.
19     A.   All Right.
20     Q.   Let me ask it that way to make sure I'm clear.
21          Were you aware of any managers who
22 directed collectors to violate the NSF check verification
23 procedures you've described?
24     A.   No. I'm not.

Corbett & Wilcox            B-534

Page 122

1      Q.   Mr. Homer asked you about audits of NSF
2  checks.  Do you remember that?
3      A.   Yes.
4      Q.   Why wouldn't you have, as the general manager
5  of the commercial division, run audits to check regarding
6  whether NSF checks were being improperly put into the
7  system?
8      A.   I really had no need to because I had a set of
9  metrics that showed me on a monthly basis the percentage
10 of checks that came back based on revenues by branch, and
11 I could very easily utilize that information.  And if I
12 had something outside the norm, then I could have gone
13 back and completed an audit, but there was no need to
14 because I never saw any trends.
15     Q.   From your experience as the general manager of
16 the commercial division, if there had been a manager who
17 was found to instruct collectors to violate the NSF check
18 procedure, what would have been the result?
19     A.   They would have been terminated.
20     Q.   Why?
21     A.   Because they were improperly accruing revenue
22 that was not revenue for that producer and, you know,
23 subsequently for their own numbers.
24     Q.   Now, in the time that you worked at NCO, did

Page 123

1   you ever see any discriminatory conduct against Ms. Hue?
2       A.   No.
3       Q.   I want to focus on the discharge of
4   Mr. Savage.  Why was Mr. Savage fired?
5       A.   For making inappropriate comments.
6       Q.   In addition to yourself, who was involved in
7   that decision?
8       A.   Ted Fox, Cherie Sugg.
9       Q.   During the process where Mr. Savage was fired,
10  did Ted Fox in any way interfere with that discharge?
11      A.   Not whatsoever.  He supported it a hundred
12  percent.
13      Q.   Who again did Savage report to?
14      A.   Ted Fox.
15      Q.   From the time that Mr. Fox took over sales
16  until the time you left, did you ever see Mr. Fox
17  retaliate against Ms. Hue or treat her badly in any
18  manner?
19      A.   No.  Not at all.
20      Q.   Any complaints about that?
21      A.   Not one.
22      Q.   In fact, had there ever been any complaints
23  about whether Mr. Fox discriminates on the basis of sex?
24      A.   I have never had a complaint on Ted Fox for

1   any matter.
2        Q.   Anything relating to discrimination
3   specifically?
4        A.   No.
5        Q.   Were you aware of any special friendship or
6   relationship between Mr. Fox and Mr. Savage?
7        A.   No.  Other than the professional relationship
8   that they had as boss and employee.
9        Q.   Who was the boss?
10       A.   Ted Fox.
11            MR. ISRAEL:  I pass the witness.
12  BY MR. HOMER:
13       Q.   You testified that you didn't need to do an
14  audit regarding the NSF checks because you had metrics
15  that would have indicated to you that somebody was
16  abusing the process.  Am I stating that correctly?
17       A.   Yes.
18       Q.   Let's take the year 2003.
19            Did you have any indication from your
20  metrics that the Dover, Delaware office was not following
21  the NSF policy?
22       A.   No.
23       Q.   You didn't see any trend that the Dover office
24  was violating the NSF policy?

Phillip Weaver

Page 125

1    A.    Not from -- not that I recall.  No, sir, I
2    didn't.
3         MR. HOMER:  Okay.  That's all I have.
4    BY MR. ISRAEL:
5    Q.    Mr. Weaver, if there's been no history
6    relating to the Dover office, could you explain why it
7    came about from an audit in January?
8         MR. HOMER:  Objection.  That question is
9    objectionable for a number of reasons, but I'll object to
10   the form of it.
11   A.    Repeat the question.
12   Q.    Sure.
13        You left when?
14   A.    January or December of '03.
15   Q.    Of '03.
16        If there were metrics in place, can you
17   explain, then, why Dina Loft picked up a disproportionate
18   number of checks in January of '04 regarding December of
19   '03?
20        MR. HOMER:  Objection.  That information
21   is not even in front of him.
22        MR. ISRAEL:  It doesn't have to be.
23   I'm saying that's been in evidence.
24        MR. HOMER:  Not if he doesn't even know

Corbett & Wilcox                                    B-538

Page 126

1    about it.
2                   MR. ISRAEL: Well, he does now.
3    BY MR. ISRAEL:
4        Q.   I'm going to tell you that --
5                   MR. HOMER: There's is no foundation to
6    the question.
7                   MR. ISRAEL: Well, I'm going to give him
8    foundation.
9    BY MR. ISRAEL:
10       Q.   I'm going to tell you that Dina Loft found --
11   during her audit that in December of '03 during her
12   January '04 review, a disproportionate number of checks
13   were found in the Dover, Delaware office.
14       A.   Oh.  Well, I wouldn't have seen those metrics
15   until January of '04, and I was gone at that time.  So if
16   something happened in December, I wouldn't have known
17   about it.  I was gone at the beginning of December.
18                  MR. ISRAEL: I don't have any more
19   questions.
20                  MR. HOMER: Just to follow up on that.
21   BY MR. HOMER:
22       Q.   When would your metrics have revealed the
23   problem?  I mean, you left in December.  Would you be
24   aware of a problem in November?  How far back would you

Page 127

1   have to go to be aware of the problem?

2       A.   If I left in the beginning of December, then I
3   probably would have seen October's numbers mid month of
4   November.  So, you know, there would have had to have
5   been an October problem for me to have recognized that
6   before I left.

7       Q.   Okay.  If there had been a problem at any time
8   up until October and through October, you would have been
9   aware of it before you left by virtue of your metrics?

10      A.   Absolutely.

11              MR. HOMER:  That's all I have.

12              MR. ISRAEL:  Me too.

13              MR. HOMER:  Mr. Weaver, you have a right
14  to review the transcript, and you also have a right to
15  make corrections and changes to it.  If you do that, you
16  have to fill out a form and explain the changes.  You
17  also have the right to waive reading the transcript, in
18  which case you're done with this.  But we need to know
19  which option you want to choose so that we can follow the
20  procedures that are required by the Federal Rules of
21  Civil Procedure.

22              So would you like an opportunity to
23  review the transcript and make any corrections or would
24  you just prefer to waive that right?

Corbett & Wilcox                    B-540