IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VALERIE HUE, | : | |
| | : | |
| Plaintiff, | : | C.A. No.: 05-225-KAJ |
| | : | |
| v. | : | |
| | : | |
| NCO FINANCIAL SYSTEMS, INC., a | : | |
| Delaware corporation, trading as | : | |
| NCO FINANCIAL COMMERCIAL SERVICES, | : | |
| | : | |
| Defendant. | : | |

## NCO'S REPLY BRIEF IN SUPPORT OF NCO'S
## MOTION FOR SUMMARY JUDGMENT

Jennifer C. Jauffret (#3689)
jauffret@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

*Pro Hac* Counsel:

David Israel
Sessions, Fishman & Nathan, L.L.P.
3850 North Causeway Boulevard, Suite 1240
Metairie, Louisiana 70002
(504) 828-3700

Attorneys for Defendant
NCO Financial Systems, Inc.

Elizabeth Fite Blanco
Sessions, Fishman & Nathan, L.L.P.
9009 Corporate Lake Drive, Suite 300-S
Tampa, Florida 33634
(813) 890-2461

Dated: May 22, 2006

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii

**ARGUMENT** .............................................................................................................................1

    I.    Plaintiff's Answer Brief Misrepresents Record Evidence In
         A Dishonest Attempt To Create Issues of Fact............................................1

         A.    Plaintiff Twists Ted Fox's Words In An Attempt to Show
               That Mr. Fox Was Not Concerned About Bill Savage's
               Racial And Sexual Comments..............................................2

         B.    Plaintiff Mischaracterizes Ted Fox's Benign Statement
               About Inappropriate Relationships In The Workplace.......................3

         C.    Plaintiff Asserts That Ted Fox Was Not Concerned About
               Bill Savage's Misconduct Despite Record Evidence
               Showing The Exact Opposite..............................................3

         D.    Plaintiff's Final Attack On Ted Fox Is Based On Her Own
               Testimony That Mr. Fox And Mr. Savage Were Friends
               Despite Uncontroverted Evidence Proving That They
               Were Not "Friends."..............................................4

    II.    Plaintiff's Answer Brief Points Out Immaterial Factual Disputes
         That Cannot Serve As Genuine Issues for Trial......................................6

         A.    The Undisputed Evidence Shows That NCO's Check
               Handling Policy Requires Verification Prior To
               Re-Dipping..............................................7

         B.    The Undisputed Evidence Shows That Plaintiff Instructed
               Her Subordinates to Re-Dip Checks Without Obtaining
               Verification..............................................8

**CONCLUSION** ..................................................................................................................11

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................................................ 1

*Brzoska v. Olson,*
  668 A.2d 1355 (Del. 1995) ....................................................................................... 7

*Hockman v. Westward Communications, L.L.C.,*
  407 F.3d 317 (5th Cir. 2004) .................................................................................. 12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986) ................................................................................................. 6

*Milner v. Anders,*
  2001 WL 637394 (D. Del. May 10, 2001) ............................................................... 6

*Robertson v. Allied Signal, Inc.,*
  914 F.2d 360 (3d Cir. 1990) .................................................................................... 6

*Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n,*
  310 F.3d 1188 (9th Cir. 2002) ................................................................................. 6

## ARGUMENT

Despite a 31 page brief with 540 pages of attachments, plaintiff, Valerie Hue, is unable to identify a material fact in dispute "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, plaintiff's Answer Brief misrepresents deposition testimony and record evidence, and attempts to direct the Court's attention to <u>immaterial</u> factual disputes that cannot serve as genuine issues that relate to plaintiff's claims of discrimination or retaliation. NCO Financial Systems, Inc. is entitled to Summary Judgment as a matter of law.

## I.   PLAINTIFF'S ANSWER BRIEF MISREPRESENTS RECORD EVIDENCE IN A DISHONEST ATTEMPT TO CREATE ISSUES OF FACT.

Plaintiff fails to meet her burden of coming forward with evidence of discrimination, retaliation, or pretext. Instead, plaintiff brazenly misrepresents record evidence in a failed attempt to create a causal link between plaintiff's 2001 written statement regarding Bill Savage's inappropriate comments and her 2005 termination for misconduct.[1]

---

[1] Plaintiff's Answer Brief asserts that NCO's "credibility is suspect" because of a recently transcribed tape that records Cherie Sugg, Vice President of Human Relations, telling plaintiff that her employment with NCO was terminated. Plaintiff argues that "nothing" on the tape "remotely supports Sugg's story" that "Ms. Hue stated that Ms. Obenshain was instructing her to violate NCO's check handling policies and that Ms. Hue knew she was wrong when she did violate the policies." (AB 4, B-175). Ironically, it is plaintiff's credibility that is suspect for failing to disclose that during the taped call Ms. Sugg states, "I actually have Carol Giovanni here. Carol was with me on the other call," demonstrating that there were 2 phone calls relating to Ms. Hue's termination. Plaintiff's failure to disclose even the existence of the tape during discovery mandates that the tape be quashed.

A.   **Plaintiff Twists Ted Fox's Words In An Attempt To Show That Mr. Fox Was Not Concerned About Bill Savage's Racial and Sexual Comments.**

Plaintiff has no evidence, aside from her own conjecture that Mr. Fox had any reason or desire to retaliate against her for complying with Mr. Weaver's and Mr. Fox's request that she give a written statement regarding Bill Savage's inappropriate comments. These comments were made over 2 years prior to her termination.

Plaintiff attempts to provide retaliation "evidence" through the tape-recorded conversation where Ric Boudreau reported to Ted Fox and Phil Weaver that Bill Savage was making racial and sexual comments in the workplace. (AB 6).[2] Specifically, plaintiff states that the transcript shows that "Fox attempted to defend Savage," because Mr. Fox "says about [the report of inappropriate comments], 'That is not our concern'." (AB 6).

Plaintiff's misrepresentation of the record evidence is inexcusable. First, plaintiff fails to advise the Court that Mr. Fox's comment, "That is not our concern," is immediately following a portion of the transcript marked "[u]nintelligible." (B-16). Second, plaintiff fails to advise the Court that for a full page prior to the statement and almost a full page after, the 3 managers are discussing a collection meeting that was held earlier that day, <u>not</u> Mr. Savage's racial and sexual comments. (B-14 – 17).

Therefore, while it is impossible to know exactly what Mr. Fox was commenting about when he said, "That is not our concern," common sense dictates that it related to the meeting earlier that day and not to Mr. Boudreau's report of Mr. Savage's racial and sexual comments.

---

[2] References to plaintiff's Answering Brief are referred to as "AB ___," and references to exhibits to the Answering Brief are referred to as "B-___." References to documents that are not part of plaintiff's Answer Brief are referred to as "C – ___" in the Appendix to the Reply Brief filed contemporaneously herewith.

2

**B.    Plaintiff Mischaracterizes Ted Fox's Benign Statement About Inappropriate Relationships In The Workplace.**

Plaintiff also twists Mr. Fox's words by stating: "Fox tries to excuse the Savage comments about the plaintiff's breasts" by stating "Don't get comfortable with somebody. This is what you get." (AB 6, B-18). Plaintiff has no basis for concluding that Mr. Fox's comment was an attempt to "excuse the Savage comments about the plaintiff's breasts" since the sentence immediately preceding the comment is cut-off and the statement prior to that is partially "[u]nintelligible." (B-18).

The undisputed evidence about the meaning of the comment -- "Don't get comfortable with somebody. This is what you get" -- comes from Mr. Fox himself. During his deposition, Mr. Fox explained that there "are business relationships and there are personal relationships. And I don't believe personal relationships should be in there." *See* Fox, 31: 5 – 8 (C-5).

**C.    Plaintiff Asserts That Ted Fox Was Not Concerned About Bill Savage's Misconduct Despite Record Evidence Showing The Exact Opposite.**

Plaintiff points to Mr. Fox's alleged lack of enthusiasm to correct Mr. Savage's misconduct as "evidence" of his desire to retaliate against her. (AB 7). Specifically, plaintiff points out that Mr. Weaver said, "I need that stuff documented and forwarded here first thing in the morning," to which Mr. Fox responded "Very good." (B-19). NCO is unclear how Mr. Fox's act of agreeing with Mr. Weaver that witness statements were needed could somehow buttress plaintiff's retaliation claim. This is especially true in light of the fact that Mr. Weaver then stated: "Ted makes a good point to document and go on record with all of this [stuff]," demonstrating that Mr. Fox also requested documentation of the wrongdoing. (B-22) (emphasis added). This hardly suggests the conduct of someone who is trying to protect Mr. Savage.

3

The undisputed evidence proves that Mr. Fox secured witness statements about Mr. Savage's inappropriate comments, including the written statement by plaintiff. *See Fox*, 23: 2 – 9 (C-4). The written statements could not have caused Mr. Savage's termination -- Mr. Savage was terminated on October 11, 2001 and plaintiff and 2 others did not give witness statements until 4 days later on October 15, 2001. *See* Savage Term. Doc. and witness statements (C-6 – C-9). Therefore, even viewing the plaintiff's baseless retaliation allegations in the light most favorable to plaintiff, Mr. Fox had absolutely <u>no reason</u> to retaliate against plaintiff, eliminating any possibility of a causal chain linking plaintiff's 2001 written statement to her 2005 termination.

> **D.  Plaintiff's Final Attack On Ted Fox Is Based On Her Own Testimony That Mr. Fox And Mr. Savage Were Friends Despite Uncontroverted Evidence Proving That They Were Not "Friends."**

The Answer Brief's final, unfounded attack on Mr. Fox is that "[t]he evidence suggests Fox's relationship to Savage was closer than he admits." (AB 7). The "evidence" is plaintiff's own, self-serving affidavit. (B-242A). While plaintiff purportedly remembers Mr. Fox and Mr. Savage having "lunch together frequently" and Mr. Savage telling her that he "was responsible for helping [Mr. Fox] succeed," every other witness who was asked about Mr. Savage and Mr. Fox's relationship said just the opposite.

Mr. Fox testified that the "first time [he] ever met Bill Savage was after I was offered the job," and that Mr. Savage was never involved in any way in his promotions because Mr. Fox's "contract was written very specific that I was to move from primary to CSD on the first day of the fourth month. It was written that I was supposed to move on the first day of the seventh month into management . . . [a]nd Lou Molitiere and Tray

4

Cefalu were the only ones involved in that promotion." *See* Fox, 15: 14 – 15 (C-2); 18: 10
– 20 (C- 3).

Upon starting work with NCO, Mr. Fox testified that he reported to Lou Molitiere
and Mike Gibson, not Bill Savage. *See* Fox, 16: 9 – 13 (C- 2). He also testified that "[a]ll
of [his] sales and management meetings were held by Mike Gibson." *See* Fox, 19: 2 – 3
(C-3). While Mr. Fox interacted with Mr. Savage "on coordination of some expense
reports," Mr. Fox testified that he did not consider Mr. Savage a friend and never
socialized with him outside the office unless it was business related. *See* Fox, 20: 1 – 24;
21: 1 – 19 (C- 3).

Other than plaintiff, every other witness who was asked about Mr. Fox's
relationship with Mr. Savage confirmed that Mr. Fox and Mr. Savage were not friends and
did not socialize with each other outside of work. *See, e.g.,* Scher, 7: 15 – 23; 8: 1 – 20;
(Scher was the former Delaware general manager) (C-11); Boudreau, 16: 15 – 18
(Boudreau is a former general collections manager for the Dover, Delaware office who
immediately preceded plaintiff) (C-13).

Plaintiff's only other "evidence" of retaliatory animus by Mr. Fox is that he
purportedly ignored her. When asked "[w]hat, if anything, did Ted Fox do of a retaliatory
or discriminatory nature against you," plaintiff replied: "Other than my suspension and
termination . . . ignoring me. That would be basically it."[3] *See* Hue, 75: 9 – 23, Part I (C-

---

[3] Plaintiff's brief points out that NCO's position statement incorrectly states that Ted Fox was "not
involved in this investigation or decision." (AB 3, B-128). Taken out of context plaintiff's
observation is correct. More accurately described by NCO regarding Mr. Fox's activities (and
within the same paragraph of the same position statement) is the summary that "Mr. Fox did not
independently make the decision to terminate [plaintiff]." This summary properly indicates that
Mr. Fox did have involvement in this process. (B-128) (emphasis added). It is clear from Mr.
Fox's deposition transcript that he played a small role in the decision to terminate plaintiff. (B-
266) (stating that "[t]he heavy weight [regarding Ms. Hue's termination] came from what Kathy

15). When asked: "And in addition [to] him ignoring you from October of 2001 [when Bill Savage was fired] until your January 2004 suspension, what else, if anything else, did he do," plaintiff could only reply: "Nothing. I had no direct contact with Ted as he was in sales." *See* Hue, 76: 6 – 10, Part I (C-16). Because "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment," plaintiff's retaliation claim must be dismissed as a matter of law. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 (3d Cir. 1990) (citation omitted).

## II.    PLAINTIFF'S ANSWER BRIEF POINTS OUT IMMATERIAL FACTUAL DISPUTES THAT CANNOT SERVE AS GENUINE ISSUES FOR TRIAL.

Plaintiff cannot defeat NCO's Summary Judgment Motion by pointing out immaterial issues of fact in dispute. A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 310 F.3d 1188, 1194 (9th Cir. 2002) (citations omitted).

Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted). As stated by this Court, "[a]lthough factual disputes are usually not resolvable through summary judgment, immaterial factual disputes will not preclude summary judgment." *Milner v. Anders*, 2001

---

[Obenshain] was doing"). Regardless of what was said at the charge level relating to Mr. Fox's role, this does not suggest any type of animus or pretext. K. Obenshain could not have been clearer: "I spearheaded the recommendation that [V. Hue] be terminated, based on all of the facts . . . [that] she falsified information; she violated the rules." *See* Obenshain, 164: 15 – 18; 165: 1 – 2 (C-18, C-19).

6

WL 637394, at *7 (D. Del. May 10, 2001) (citing to *Brzoska v. Olson*, 668 A.2d 1355, 1365 (Del. 1995)).

A.    **The Undisputed Evidence Shows That NCO's Check Handling Policy Requires Verification Prior to Re-Dipping.**

The Answering Brief points out differences in testimony regarding the procedure used to verify NSF checks under NCO's Check Handling Policy.[4]  Specifically, plaintiff points out that while manager Kim Marlow testified that the check handling policy required debtor authorization and bank verification prior to re-dipping, collector David McQuisten testified the policy required debtor authorization or bank verification.  (AB 12).  While collector Brad Reavis testified that verification meant "bank verification or a certified check" absent manager approval to re-dip when only debtor authorization could be obtained, collector Ken Rose testified that the debtor had to also "qualify the source of funds," an added precaution of asking the debtor how they will obtain money to cover the check.  (AB 12 – 13; B-418).

Implicit in the above descriptions of the verification procedure is the fact that is material to this case: verification was required.  Whether verification was obtained from the debtor, the bank, or both, every person deposed in this case, including plaintiff, confirmed that NCO requires objective verification of NSF checks prior to re-dipping. *See* 1/22/04 where plaintiff acknowledges verification requirement (C-20).

Plaintiff's knowledge of the verification requirement is undisputed.  In her "explanation" 1/22/04 e-mail to Steve Leckerman, Chief Operating Officer, plaintiff stated

---

[4] The Answering Brief asserts that Ms. Obenshain allowed checks to be re-dipped based on "collector gut, as Ms. Obenshain referred to it . . . ."  (AB 9).  The phrase "as Ms. Obenshain referred to it" seems to imply that this is a quote from Ms. Obenshain's deposition, which it is not.  Ms. Obenshain unequivocally testified that verification was required.  (B-367, B-368).

7

that she had "a re-dip policy in [her] branch with a form that the producer fills out. This form asks for verification method and once it is signed then it is redipped." (C-20). Plaintiff then admitted that she did "notice numerous checks were redipped without the [Re-Dip] form being signed" and that, "yes, I should have given Eric [Shaw] clearer direction." (C-20).

While plaintiff later tried to blame her wrongdoing on Kathy Obenshain by asserting that Ms. Obenshain instructed her that "**ALL** checks were automatically redeposited," plaintiff back-pedaled from blaming Ms. Obenshain during her deposition. Plaintiff was asked, "Did [Ms. Obenshain] ever say, I want you to redeposit checks without verification of funds," to which plaintiff replied: "She would say, go through and see what you can get on the system, in her normal flip little way." *See* Hue 67: 21 – 22 (C-23); 68: 1 – 3, Vol. II, (C- 24).

While plaintiff's Answering Brief points out that Jenie Birdsong and Kimberly Marlow heard Ms. Obenshain tell plaintiff to "get them on," plaintiff fails to point out that Ms. Marlow testified that she understood that Ms. Obenshain wanted to "[m]ake sure they're verified" and Ms. Birdsong understood that Ms. Obenshain wanted to "make sure all the post dates verified and . . . get on the phone and qualify the checks." (B-246, B-345). Importantly, plaintiff's Answering Brief makes it abundantly clear that "plaintiff believes Fox was the person responsible for the discriminatory decision," not Kathy Obenshain. (AB 8).

### B.    The Undisputed Evidence Shows That Plaintiff Instructed Her Subordinates To Re-Dip Checks Without Obtaining Verification.

What is important to the case and what remains an undisputed material fact is that every person deposed who worked under plaintiff's supervision confirmed that plaintiff

8

instructed personnel to re-dip checks without verification. *See* Lane, 14: 1 – 15 (C-26);
15: 11 – 16 (C-27); Shaw, 33: 16 – 20 (C-29); 43: 2 – 7 (C - 30); Marlow, 53: 19 – 24 (C-
32). This intentional act of wrongdoing was in violation of NCO's check handling policy.
The Answering Brief claims that this fact is disputed, asserting that "Rose testified that
plaintiff never instructed him to violate any policy" and that "McQuisten testified the
plaintiff didn't ask him to do anything he considered a violation of the policy." (AB 4).
Plaintiff even goes so far as to call Rose's testimony "exculpatory" and asserts that NCO's
statement that "[a]ll Dover collectors . . . confirmed plaintiff instructed personnel to
violate the policy" is a lie because "some of the collectors who were deposed swore to just
the opposite." (AB 21).

The Answering Brief again attempts to mislead the Court. Collector Ken Rose
testified during his deposition that while he, personally, had not been instructed by Valerie
Hue to submit checks without verification, it was his understanding from seeing the
collection numbers "jump" and speaking with other collectors about why they would
"jump" that plaintiff was instructing personnel to violate NCO's check handling policy.
*See* Rose, 50: 1 – 7; 51: 6 – 7 (C-34).

Likewise, Mr. McQuisten testified that he "informed Ms. Hue, my manager, that a
check had to be pulled. We have to pull this check. The money is not available. And I --
because I was called by the writer of the check advising me that the funds did not come in.
Hold that check for another week. And when I filled out a form to hold the check, I was
told nothing is being held. They're running. You just have to make it up next month."
When asked whether it was his "understanding that that is a violation of NCO's policy,"

9

Mr. McQuisten replied under oath: "<u>Absolutely</u>." *See* McQuisten 48: 23 – 24; 49: 1 – 6, 20 – 22 (emphasis added) (C-36).

Plaintiff ignores the sworn statements from her NCO peers—other collections managers who all confirmed that Kathy Obenshain never permitted them to submit checks unless there was proper verification. *See* statements of managers (C-37 – C-46). It defies logic to believe that 10 NCO managers would all perjure themselves.

The Answering Brief also raises purported "audit problems" with the January 2004 audit conducted by Dina Sha'altiel. (AB 12). Specifically, plaintiff alleges that the NSF Report containing Ms. Sha'altiel's audit findings "doesn't accurately portray the relative amount of 'wrongdoing' in each office" because the "assessment incorrectly faulted Dover collectors for problems they didn't cause and failed to fault collectors of other offices for problems they did cause." (AB 17). Plaintiff then points out that Ms. Sha'altiel found "collector errors" in other offices besides Dover, and that with respect to 5 bounced checks Ms. Sha'altiel may have attributed the root of the problem to be collector error or debtor error, when the notes may also indicate a different root of problem.

Viewing the facts in the light most favorable to plaintiff, any errors by Ms. Sha'altiel in conducting the audit are immaterial to this case. Ms. Sha'altiel is not accused of discriminating or retaliating against plaintiff—and could not be accused of such wrongdoing since it is undisputed that she identified the subjects of her audit by user code, not by name or any other personally identifying characteristic. *See* transcript of Sha'altiel, 48: 1 – 6 (C-49). It is also undisputed that Ms. Sha'altiel conducted the audit without any help from Ted Fox or Kathy Obenshain, and advised them of her conclusions after her

10

NSF Report was finalized. *See* transcript of Sha'altiel, 16: 19; (C-48) (stating that she "worked independent.")

Further, it is undisputed that Ms. Sha'altiel concluded that an inordinate number of Dover checks bounced due to "collector" error and that Dover was the <u>only</u> branch where checks also bounced due to manager behavior. *See* NSF Report (C-50 – C-59). Because Ms. Sha'altiel's audit conclusions pointed toward a systemic problem in Dover that involved <u>management</u>, the upper echelon of NCO management became very concerned and involved.

Finally, it is undisputed that Ms. Sha'altiel's conclusions—100% accurate or not— sparked an investigation into Dover's check handling practices where it was confirmed by collectors and managers alike that plaintiff was instructing her subordinates to re-dip checks without verification. *See* Lane, 14: 1 – 15 (C-26); 15: 11 – 16 (C-27); Shaw, 33: 16 – 20 (C-29); 43: 2 – 7 (C - 30); Marlow, 53: 19 – 24 (C-32). Plaintiff was discharged not because she was "confused" regarding NCO's check handling policy, but because every witness interviewed confirmed that she was instructing her employees to cheat the system.

## CONCLUSION

This case is not complicated, regardless of the voluminous pages of exhibits and briefing in the pending Summary Judgment Motion and Answering Brief. The overwhelming and undisputed evidence shows that plaintiff intentionally violated the rules, got caught, and was appropriately terminated. Her race and 2001 written statement regarding Bill Savage had nothing to do with her discharge. Plaintiff's only "evidence" of discrimination and retaliation amounts to nothing more than misrepresentations of record evidence and immaterial factual disputes. Because a plaintiff cannot survive summary

11

judgment with "conclusory allegations, improbable inferences, and unsupported speculation," NCO requests that the Court grant NCO's Motion for Summary Judgment and dismiss plaintiff's lawsuit with prejudice. *Hockman v. Westward Communications, L.L.C.*, 407 F.3d 317, 332 (5th Cir. 2004).

Jennifer C. Jauffret (#3689)
jauffret@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
Wilmington, Delaware 19899
(302) 651-7700

*Pro Hac* Counsel:

David Israel
Sessions, Fishman & Nathan, L.L.P.
3850 North Causeway Boulevard, Suite 1240
Metairie, Louisiana  70002
(504) 828-3700

Elizabeth Fite Blanco
Sessions, Fishman & Nathan, L.L.P.
9009 Corporate Lake Drive, Suite 300-S
Tampa, Florida  33634
(813) 890-2461

Attorneys for Defendant
NCO Financial Systems, Inc.

Dated: May 22, 2006

12

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2006, I electronically filed the foregoing with the Clerk

of Court using CM/ECF which will send notification of such filing(s) to the following and which

has also been served as noted:

### BY FEDERAL EXPRESS

Jeremy W. Homer, Esq.
Parkowski & Guerke, P.A.
116 West Water Street
P. O. Box 598
Dover, DE 19903

Alyssa M. Schwartz (#4351)
schwartz@rlf.com

RLF1-2874570-1