IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                                          :
                                                     :
        Plaintiff,                                   :    C.A. No.: 05-225-KAJ
                                                     :
        v.                                           :
                                                     :
NCO FINANCIAL SYSTEMS, INC., a                       :
Delaware corporation, trading as                     :
NCO FINANCIAL COMMERCIAL SERVICES,   :
                                                     :
        Defendant.                                   :

## APPENDIX TO NCO'S
## REPLY BRIEF IN SUPPORT OF NCO'S
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Pro Hac Counsel:

David Israel
Sessions, Fishman & Nathan, L.L.P.
3850 North Causeway Boulevard, Suite 1240
Metairie, Louisiana  70002
(504) 828-3700


Elizabeth Fite Blanco
Sessions, Fishman & Nathan, L.L.P.
9009 Corporate Lake Drive, Suite 300-S
Tampa, Florida  33634
(813) 890-2461


Dated: May 22, 2006

Jennifer C. Jauffret (#3689)
jauffret@rlf.com
Alyssa M. Schwartz (#4351)
schwartz@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700

Attorneys for Defendant
NCO Financial Systems, Inc.

## **TABLE OF CONTENTS**

| **Document** | **Page** |
|---|---|
| Deposition Excerpts of Ted Fox dated March 13, 2006 | C-1 |
| Job Discussion Summary for William Savage | C-6 |
| Memo from Valerie Hue to Ted Fox dated October 15, 2001 | C-7 |
| Handwritten statement by Eric Shaw dated October 15, 2001 | C-8 |
| Memo from Ric Boudreau to Ted Fox | C-9 |
| Deposition Excerpts of Michael Scher dated March 23, 2006 | C-10 |
| Deposition Excerpts of Richard Boudreau dated March 28, 2006 | C-12 |
| Deposition Excerpts of Valerie Hue dated January 4, 2006 | C-14 |
| Deposition Excerpts of Kathy Obenshain dated March 16, 2006 | C-17 |
| E-mail from Valerie Hue to Steve Leckerman dated January 22, 2004 | C-20 |
| Deposition Excerpts of Valerie Hue dated January 4, 2006 | C-22 |
| Deposition Excerpts of Matthew Lane dated January 4, 2006 | C-25 |
| Deposition Excerpts of Eric Shaw dated February 1, 2006 | C-28 |
| Deposition Excerpts of Kim Marlow dated March 8, 2006 | C-31 |
| Deposition Excerpts of Kenneth Rose dated March 8, 2006 | C-33 |
| Deposition Excerpts of David McQuisten dated March 23, 2006 | C-35 |
| Sworn Statement of Brian Laiche dated June 28, 2004 | C-37 |
| Sworn Statement of Darrin DeEsch dated June 22, 2004 | C-38 |
| Sworn Statement of Steve Ross dated June 22, 2004 | C-39 |
| Sworn Statement of Chris Santasiero dated June 22, 2004 | C-40 |
| Sworn Statement of Lenny Ciccarone dated June 22, 2004 | C-41 |

**Document**                                                                                                **Page**

Sworn Statement of Manny Cardozo dated June 24, 2004 ................................................... C-42

Sworn Statement of Joe Batie dated June 22, 2004 ...................................................... C-43

Sworn Statement of Mike Scher dated June 14, 2004 ............................................... C-44

Sworn Statement of Joe Thomas dated June 24, 2004 ............................................... C-45

Sworn Statement of Kathy Obenshain dated June 24, 2004 ...................................... C-46

Deposition Excerpts of Dina Sha'altiel dated January 31, 2006 ............................... C-47

NSF Report ................................................................................................................ C-50

RLF1-3016971-1

Tex Fox

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VALERIE HUE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. |
| NCO FINANCIAL SYSTEMS, INC., | ) | 05-225-KAJ |
| a Delaware corporation, | ) | |
| trading as NCO FINANCIAL | ) | |
| COMMERCIAL SERVICES, | ) | |
| | ) | |
| Defendant. | ) | |

Telephone Deposition of TEX FOX taken
pursuant to notice at the law offices of Parkowski,
Guerke & Swayze, P.A., 116 West Water Street, Dover,
Delaware, beginning at 2:30 p.m. on Monday, March 13,
2006, before Robert Wayne Wilcox, Jr., Registered
Professional Reporter and Notary Public.

APPEARANCES:

        JEREMY W. HOMER, ESQ.
        PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware  19903
          for the Plaintiff,

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street     Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

C-1

Corbett & Wilcox

544afc8b-2727-4477-97ce-2f37ff6e4c2e

Tex Fox

| Page 14 | Page 16 |
|---|---|

**Page 14**

1    Q.  Okay.
2    A.  E-Payments is outside of NCO Financial
3  Systems, Inc.
4    Q.  You need to speak up.
5    A.  I'm sorry.  I was just clarifying that
6  E-Payments is part of NCO Financial Systems.  It's part
7  of NCO Group.  And Portfolio Management is not part of
8  Financial Systems.  It's part of NCO Group.
9    Q.  All these entities are serviced by the same HR
10  department.  Is that true?
11    A.  True.
12    Q.  Okay.  Would the employees in these different
13  entities share a 401 (k) plan, have the same benefits and
14  so forth, or are all there distinctions among the
15  different entities for those types of programs?
16    A.  Again, Jerry, I think I'd be speculating if I
17  told you I knew exactly what benefits were offered to
18  each division.  I do know in commercial every employee is
19  offered the same package of what benefits are available
20  to them.  I really truly don't know -- I believe that
21  it's the same package for all the other divisions, but I
22  can't really tell you that for sure.
23    Q.  Okay.  You know who Bill Savage is.  Correct?
24    A.  I do know who Bill Savage is.

**Page 15**

1    Q.  When did you first become acquainted with him,
2  assuming you did become acquainted with him?
3    A.  I was hired by Lou Molitiere, who was at the
4  time the person who was heading up the sales and
5  marketing for Milliken & Michaels.  When Lou --
6    MR. ISRAEL:  Go slow.
7    THE WITNESS:  I'm sorry.
8    When Lou hired me to work for the
9  organization as an executive recruit, I was living in the
10  Northern Virginia area.  And they decided they did not
11  want me to do my training down in Louisiana.  It would
12  make more sense to do it in the closest geographic
13  branch, which was Dover.
14    So the first time that I ever met Bill
15  Savage was after I was offered the job.  Lou had asked me
16  to take a ride over to Dover to meet Bill Savage, to take
17  a look at the branch and see if that was something I'd be
18  comfortable to do.  So that was back somewhere in the
19  fall of 1997.
20  BY MR. HOMER:
21    Q.  Okay.  Is Molitor spelled M-o-l-i-t-o-r?
22    A.  I don't recall.
23    Q.  Okay.
24    A.  I would have to take a guess at it.

**Page 16**

1    Q.  When you went to work in the Dover branch, I
2  think you said you did that for about three and a half
3  months.  Is that right?
4    A.  Yeah.  It was three and a half -- a little
5  over -- maybe a couple days over three and a half
6  months.
7    Q.  Okay.  Who did you report to when you worked
8  there?
9    A.  I reported to Lou Molitiere.
10    Q.  Did he work --
11    A.  I'm sorry.  I reported to Lou Molitiere, but
12  when I was in Dover, my first direct manager on a daily
13  basis was Mike Gibson.
14    Q.  Okay.  Who ran the office?  Who was the branch
15  manager at that time?
16    A.  The branch manager was Bill Savage.
17    Q.  Okay.  Other than that three-and-a-half-month
18  period that you worked at the Dover office, was there any
19  other time where you and Bill Savage were located in the
20  same geographical location?
21    A.  No.
22    Q.  Okay.  Can you describe for me what types of
23  things you interacted with Bill Savage on at the time
24  that you worked in the Dover office?

**Page 17**

1    A.  I interacted with Bill on coordination of some
2  expense reports I had, in coordination with following
3  my -- I'll call it a contract I had with Lou Molitiere
4  that at the end of three months I was to move from the
5  primary department to the CFD department.
6    Q.  To the what department?
7    A.  The CFD department.  It was essentially their
8  customer service department.
9    Q.  Okay.
10    A.  That was my interaction with Bill.
11    Q.  Okay.  How many people were in the Dover
12  office?  How many employees did they have during that
13  time you were there?
14    A.  At that time?  Fifty.
15    Q.  Okay.  Would you see Bill Savage every day
16  that you went to work?  I realize there were days that
17  you may have been on vacation or he may have been sick.
18  But in the normal course of things, if you were both
19  working, would you normally see each other every day?
20    A.  Yes.  It was Bill's practice to walk the
21  floor.  Any day he was in the branch, he would walk not
22  only the sales floor but the collection floor to make his
23  presence known.
24    Q.  Okay.  Incidentally, I forgot to tell you

5 (Pages 14 to 17)

544afc8b-2727-4477-97ce-2f37ff6e4c2e

Tex Fox

Page 18

1  this, but just I want to put on the record:  You
2  understand that even though we're doing this by telephone
3  it doesn't change the fact that you really can't talk to
4  the attorney during any kind of sidebar conversations
5  with your attorney or get other communication from him by
6  way of written notes or gestures or anything like that?
7      A.  I understand.
8      Q.  Okay.  Was Mr. Savage involved in any way in
9  you receiving any promotion?
10     A.  No.  My contract was written very specific
11 that I was to move from primary to CFD on the first day
12 of the fourth month.  It was written that I was supposed
13 to move on the first day of the seventh month into
14 management.  We never got that far into the deal because
15 they had terminated their relationship with the branch
16 manager of the credit services division down here in
17 Metairie, Louisiana.
18     Q.  Okay.
19     A.  And Lou Molitiere and Tray Cefalu were the
20 only ones involved in that promotion.
21     Q.  Okay.  Can we get a spelling for that name you
22 just gave as Tray --
23     A.  C-e-f-a-l-u.
24     Q.  Was Mr. Savage ever involved in instructing

Page 19

1  you as to how to do your job?
2      A.  All of my sales and management meetings were
3  held by Mike Gibson.  The only involvement I had with
4  Bill Savage was whenever he would hold a branch meeting
5  or an awards meeting.  I would -- if I had to explain it,
6  it was more or less a secret that I was an executive
7  recruit in the branch.  So anytime that I needed to get
8  something from corporate, which is where Lou and Tray
9  Cefalu were located, I would have to do that through Bill
10 Savage.  So there was an occasion where I would have to
11 go to his office and have him call Lou or get something
12 to Lou or to Tray for me during that three-month period.
13 And that goes back to the expense reports, my corporate
14 housing.  I had a lot of questions, especially in the
15 early months when they were putting that together.
16     Q.  Okay.  Were you ever involved in any way in
17 Mr. Savage receiving a promotion?
18     A.  For as long as I knew Bill, he was a branch
19 manager.  Never anything more.  We did move him from
20 Dover to the Boone location.  And then when we reduced
21 the size of the Boone location, we moved him back to
22 Dover.
23     Q.  Okay.
24     A.  But he never got a promotion.  He got moved.

Page 20

1      Q.  Okay.  Did you at any time socialize with
2  Mr. Savage outside the office?
3      A.  You know, I've been thinking about this for a
4  while because, obviously, we're going back several years.
5  Bill is an avid golfer.  And I am trying to recall -- and
6  I can't recall if I ever did golf with him one time.  I
7  know that he had invited me on several occasions.  And if
8  I had, it would have been one time, mainly because my
9  free time -- I did still live in Virginia when I had the
10 Dover office.  I did not stay in Dover on any weekends.
11 So I really -- Jerry, I can't recall.  And if I had, it
12 would have been one time.  And it would have been with
13 other people from that office.
14     Q.  Would this jar your recollection?  Did you
15 ever make a trip to Hilton Head to golf where Savage was
16 present?
17     A.  No.  Never.
18     Q.  Okay.  To get back to the question I asked
19 before, you mentioned the possibility that you golfed
20 with him.  Were there any other times that you socialized
21 with Bill Savage outside the office?  For example, did
22 you go out to dinner with him or engage in any other
23 contact with him outside the office?
24     A.  When he was the Boone manager, I did often do

Page 21

1  branch visits.  When I do a branch visit, I take the
2  managers out to dinner.  I did have dinner with him and
3  Cliff Scales back when -- this was one visit prior to us
4  reducing the branch.  So, again, this was back somewhere
5  in the late 1990s.
6      Q.  Okay.  Anything other than the dinner where
7  you would have had contact with Bill Savage outside the
8  office?  I understand there's a possibility that you
9  golfed with him at least one time.
10     A.  No.
11     Q.  Okay.  Did you consider Bill Savage a friend
12 of yours while you worked with him at NCO?
13     A.  No.
14     Q.  Okay.  Have you had any contact with him since
15 he left NCO?
16     A.  I think I talked to him one time, and it was a
17 business-related issue about a crossover of clients.
18     Q.  Okay.
19     A.  And that was one time and one time only.
20     Q.  Okay.  Did you know Valerie Hue before
21 December '03?
22     A.  Yeah.  Valerie -- she, I believe, at the time
23 I was in Dover was a collector.
24     Q.  Okay.

6 (Pages 18 to 21)

C-3                    Corbett & Wilcox

Tex Fox

Page 22

1      A.  I met Valerie when I first came to the Dover
2  office. Maybe not right away, because I was on the sales
3  side. But, yeah, I knew Valerie.
4      Q.  Okay. After you left the Dover office, did
5  you retain any contact with her in connection with your
6  job?
7      A.  The time that I would see Valerie would be
8  when I did a Dover branch visit. I do recall seeing
9  Valerie when we were doing CRS straining where Valerie
10  and a couple others came down here to Metairie. Really
11  that's most of -- all of the involvement I've ever had
12  with Valerie after I left Dover.
13      Q.  Okay. So it would be fair to say that you had
14  very infrequent contact with her after you left the Dover
15  office?
16      A.  Yeah. That would be very fair to say.
17      Q.  Okay. Were you involved in any way in the
18  termination of employment of Bill Savage at NCO?
19      A.  I was his direct manager, and I was involved
20  in firing Bill Savage, correct.
21      Q.  Okay. Could you describe for me the process
22  that was used to terminate Bill Savage?
23      A.  I'm going to do this from recollection, Jerry.
24  If I recall, we received a call, "we" being Phil Weaver,

Page 23

1  who was then -- was then senior vice president and
2  general manager of the commercial division. We received
3  a call from the then general collection manager, Rick
4  Boudreau, about what Bill had been saying in -- or had
5  done to Val -- said or done to Valerie, if I call. We
6  then got a statement from Valerie learning what things
7  offensive that were said and done. There was no
8  hesitation. The only consideration was to terminate his
9  employment with our organization.
10      Q.  Okay. You mentioned a phone conversation with
11  Boudreau. Were you on that conversation, and was Phil
12  Weaver on the conversation and Boudreau? Were those the
13  three that were on the conversation?
14      A.  I recall that the conversation was in my
15  office on a speakerphone with Phil Weaver in my office.
16  And I believe Boudreau in his office in Dover.
17      Q.  Okay. Have you seen a transcript of that
18  phone conversation?
19      A.  I saw -- yeah, I have. Yes
20      Q.  Okay. Who was the decision-maker regarding
21  the termination of Bill Savage?
22      A.  The decision-making -- I mean, it really was
23  a -- it was a no-brainer. I mean, you know, we have
24  specific things that you can do or you can't do. And

Page 24

1  based on what we learned, our HR department, Phil Weaver
2  and myself all agreed that that was the only thing to do
3  So it wasn't a one person -- it was a such an obvious
4  thing that he needed to go.
5      Q.  Okay. So HR was involved in the decision as
6  well as you and Phil Weaver?
7      A.  HR is involved in every termination.
8      Q.  Okay. What was the extent of their
9  involvement? Can you describe what they did in
10  connection with it?
11      A.  Again, I'm going to go from memory. I believe
12  they received the information that we gathered. I want
13  to say we did suspend Bill. We did -- I believe it
14  was -- I want to say it was Cherie Sugg over the phone.
15  And that was it. You know, they keep the documentation
16  And I truly don't know what they do on their end with
17  that
18      Q.  Okay. Was there any attorney involved in it,
19  do you remember?
20      A.  No. Truthfully, I remember us calling Bill,
21  saying, Bill, you said this. You did this. And he said
22  yeah, I did. We said, okay, you're done.
23      Q.  Okay. Would it be fair to say that, given
24  what Bill Savage did, NCO had some concern about the

Page 25

1  legality of the situation and its possible liability if
2  it didn't fire him?
3      A.  I can't speak for -- yeah. Absolutely. I
4  mean --
5      Q.  Okay.
6      A.  -- it was offensive.
7          It was offensive on every level.
8      Q.  Okay. Your position when Bill Savage was
9  fired was vice president of sales in the collection
10  division?
11      A.  At the time I was called senior vice president
12  of sales.
13      Q.  Okay. Bill Savage was the branch manager and
14  reported to you at that time. Correct?
15      A.  Yes. He was.
16      Q.  Okay. I'd like to refer to that transcript
17  that we just talked about. I don't know if you got a
18  copy of it there or not.
19          MR. ISRAEL: Hold on a second.
20          MR. HOMER: It was Weaver Exhibit 1.
21          MR. ISRAEL: I have it.
22  BY MR. HOMER:
23      Q.  Okay. If you turn to page 17 --
24          MR. ISRAEL: Hold on one moment.

7 (Pages 22 to 25)

Corbett & Wilcox

544afc8b-2727-4477-97ce-2f37ff6e4c2e

Tex Fox

Page 30

1      MR. ISRAEL: He's explained it by you
2  describing what you understand the court reporter to have
3  done regarding a tape that he hasn't heard which is
4  contrary to his recollection. So all you're doing is
5  arguing with him. He's given you his answer.
6      MR. HOMER: Well, I don't think he
7  recalled there being more. I think what he said was that
8  he's assuming there might have been something more.
9      MR. ISRAEL: Okay. Well --
10     MR. HOMER: My question is: Assuming
11 that there wasn't anything more, can you make any sense
12 out of what this statement means other than what I
13 explained?
14     MR. ISRAEL: Wait. You don't have to
15 assume anything. If you have a recollection different,
16 then tell him what your opinion is. But you don't have
17 to assume anything.
18     MR. HOMER: Well --
19     A. I'm not going to assume anything, Jerry. My
20 opinion of what this conversation represented -- and I'll
21 restate it again for you -- is that Phil and I were more
22 or less talking to the general collection manager who was
23 responsible for all the collectors in that office. And
24 they were -- Rick was relaying to us what was going on in

Page 31

1  the Dover branch.
2      So my comments here would be in
3  relationship to what information we were gathering. And
4  I can only tell you -- and I know how I control myself
5  and how I control what I manage directly -- that there
6  are business relationships and there are personal
7  relationships. And I don't believe personal
8  relationships should be in there. They shouldn't be that
9  way. And that's possibly where I'm going with the "Don't
10 get comfortable with somebody." If you do that, you're
11 opening a lot of windows and doors you probably don't
12 want to.
13     Q. Okay. Let's move on to another topic.
14     A. Okay.
15     Q. Have you, during the time that you've worked
16 at NCO, been involved in the termination of other
17 managers?
18     MR. ISRAEL: One second. Are we done
19 with the transcript?
20     MR. HOMER: Yes.
21     MR. ISRAEL: Okay.
22 BY MR. HOMER:
23     Q. Have you been involved in the termination of
24 other managers other than Valerie Hue and Bill Savage?

Page 32

1      A. Yeah, I have.
2      Q. Can you tell me how many times has that
3  happened other than those two?
4      A. Are you talking in the time that I was --
5  since I've run the division or when I was also including
6  the time when I was senior vice president of sales or
7  when I was also running the credit services division?
8      Q. Let's break it down. Let's say before you
9  ascended to the position of vice president of the
10 collection division in December of '03. How many times
11 would you have been involved in terminating a manager?
12     A. There were several. I can name a few that I
13 remember.
14     Q. Well, I don't need to know the names. I'm
15 just trying to get an idea of how many times it happened.
16     A. Recognizing there was eight general collection
17 positions at the time -- and I think there were ten
18 branch manager positions at the time --
19     MR. ISRAEL: I don't think he was
20 limiting it to those. I think he was asking any manager?
21     THE WITNESS: Any manager?
22     MR. HOMER: Yes.
23     THE WITNESS: You're talking a lot.
24

Page 33

1  BY MR. HOMER:
2      Q. Okay. How about after you became the vice
3  president of collections in January of '04? How many
4  times have you terminated a manager?
5      MR. ISRAEL: That would be to date?
6      MR. HOMER: Yes.
7      A. A lot.
8      Q. Okay. What was the process that you generally
9  followed before you were promoted in December of '03?
10 What process was usually followed if you terminated a
11 manager, if there was a process that was usual?
12     A. You have to -- if somebody broke a rule or a
13 law, there's no process. It's immediate. If it was
14 production-related --
15     MR. ISRAEL: Are you asking about a
16 manager versus a producer?
17     MR. HOMER: No. I'm talking about
18 managers.
19     MR. ISRAEL: Okay. He's asking about
20 managers.
21     THE WITNESS: I'm just quantifying.
22     If it was production-related, you would
23 follow really progressive discipline from a verbal to a
24 written to final to termination. That would be depending

9 (Pages 30 to 33)

Corbett & Wilcox

544afc8b-2727-4477-97ce-2f37ff6e4c2e

+3027351835          MILLIKEN & MICHAELS          654 P02   OCT 11 '01  15:11



## Job Discussion Summary

## ** PLEASE PRINT OR TYPE **

| LAST NAME | FIRST NAME | SOCIAL SECURITY NUMBER |
|---|---|---|
| Savage | William | REDACTED |

| LOCATION (CITY, STATE) | ACQUISITION NAME | |
|---|---|---|
| Dover, Delaware | | October 11, 2001 |

**Nature of Discussion (check one):**
Verbal Warning        Written Warning        Final Warning        ☒ Termination

**Topic of Discussion (check one):**
Attendance    Performance    ☒ Violation of Co Policy - Harassment & Unprofessional Conduct/Workplace Behavior

**Written Summary (use separate sheet if necessary, include dates, times, who, what, when, why, etc.):**

Management was recently informed of your offensive and harassing behavior in the workplace relating to sexist remarks, racism, and offensive comments to employees. As a member of NCO Management, you are required to promote a positive work environment, free from discrimination and harassment. NCO policy clearly states that physical violence, threats, intimidation or harassment of another associate including but not limited to racial harassment will result in immediate dismissal. A fact-finding was conducted and found these allegations to be true. There are several witnesses to your unprofessional conduct.

Consistent feedback is that your management style is witnessed as unprofessional conduct to include but not limited to use of offensive language and/or behavior that causes disruption in the work setting. This type of behavior has created an offensive environment that constitutes racial and sexual harassment in the workplace. The behaviors you display question your ability to adequately perform the tasks assigned to you, and will not be tolerated.

**Action To Be Taken (results of discussion, follow up, dates of follow up, etc.):**

Due to the violation of NCO's EEO and Harassment and Unprofessional Conduct policies, your employment is terminated effective immediately.

**Employee Comments:**

_____

_____

_____

_____

_____

**Employee Signature (Your signature does not indicate Agreement, only receipt of discussion.)**          **Manager/Supervisor Signature/Date**

Copy – Human Resources

EmpRelat/JobDiscussionSummaryForm.doc edited 3/00

C-6                                              TOTAL P.02

10/11/2001 THU 15:09  [TX/RX NO 9199]  Ø002

**NCO Financial Systems, Inc**

# Memo

**To:**  Ted Fox

**From:** Valerie Hue

**CC:**  Ric Boudreau

**Date:** 10/15/01

**Re:**  Comments of Bill Savage

---

I have been asked to document comments made to me by Bill Savage.  The following are only some of the comments made.

I have been the only African American female large balance collector/manager the Dover branch has had.  Over my tenure with Milliken & Michael's/ NCO Financial System, Inc  Bill has made numerous comments.

While completing a sit-with, Mr. Savage yells to me to come here.  When I reached his location he states, " Tell Her to wake her fat ass up".  He was referring to Audrey Williams, apparently she was sleep in her office.  24 hrs later she resigned.  I told Mr. Savage he can't say those things and his response was and I quote "fuck her"

At the award ceremony he yells at the receptionist. "Don't you thing he is fucking busy." He was referring to a call from Phil Weaver and Ted Fox to Mike Scher.

At the receptionist counter he stated he loved black pussy in context to a conversation to my mixed heritage

I was wearing a tee shirt that has Dollar bills printed on it.  He comments"Val walking around with fucking money on her tits"

I was walking around the corner and ran into him.  He put his arms around me and said nice tits.  I told him to get his hands off of me.

At a large balance meeting he made a comment to one of the collectors to stop being a wet pussy and put their numbers on the board.

There are many other comments that Bill has made over the years. To make a complaint against Mr. Savage would only result in me loosing my job.

1

C-7

A MONTH OR SO AGO MY MANAGER RIC BOUDREAU
WAS IN MY OFFICE GOING OVER A FILE WITH
ME. MR BILL SAVAGE INTERUPTED OUR MEETING
BY WALKING IN AND STATING TO MR BOUDREAU
"WHATS THAT NIGGER DOING THERE POINTING TO THE
SMALL BALANCE COLLECTION DEPARTMENT". AT THAT
POINT MR SAVAGE AND MR. BOUDREAU LEFT
MY OFFICE.

ERIC SHAW

10 - 15 - 01

C-8

TO: Ted Fox
From: Ric Boudreau

**RE: Bill Savage**

The following is events are for the record:

**Incident 1.**    In mid September 2001, I was reviewing a collection account in Eric Shaw's office when Mr. Savage came in. He said to me in a "Matter of Fact" voice, "Do you think that that "N>>" (Audrey Williams) can stay on the phone" and collect some fee? I responded to him that she was on the phone and collecting fee and that his commentary about her lineage was uncalled for. I escorted him out of the collectors office and away from the collection floor.

**Incident 2.**    Early in the following week, Mr. Savage came up to me in the hall and asked if I was "casting for a Tarzan movie". My small balance manager Brian Waystack had been interviewing a few African American collectors that day and was noticeably taken back by the comment.

WITNESS TO INCIDENT #2

C-9

Michael Scher

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
VALERIE HUE,                    )
                                )
        Plaintiff,              )
                                )
v.                  )           )
                                )    Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,    )     05-225-KAJ
a Delaware corporation,         )
trading as NCO FINANCIAL        )
COMMERCIAL SERVICES,            )
                                )
        Defendant.              )
```

Telephone Deposition of MICHAEL SCHER taken pursuant to notice at the law offices of Parkowski, Guerke & Swayze, P.A., 116 West Water Street, Dover, Delaware, beginning at 10:00 a.m. on Thursday, March 23, 2006, before Robert Wayne Wilcox, Jr., Registered Professional Reporter and Notary Public.

APPEARANCES:

        JEREMY W. HOMER, ESQ.
        PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware  19903
          for the Plaintiff,

        ELIZABETH K. FITE, ESQ. (via teleconference)
        SESSIONS, FISHMAN & NATHAN, L.L.P.
          15316 North Florida Ave - Suite 100
          Tampa, Florida  33613
          for the Defendant.

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street     Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

Michael Scher

3 (Pages 6 to 9)

Page 6

1    Q. Okay. In 2000 you were general manager, did
2  you say?
3    A. No. In 2001 I was general manager.
4    Q. Okay. How long did you hold that position?
5    A. Until June 30th, 2005.
6    Q. During that time period that you were general
7  manager, where did you work?
8    A. Dover, Delaware.
9    Q. Okay. Then in June of 2005, you assumed a new
10 position?
11   A. Yes. I moved down here to Tampa, Florida to
12 assume the senior general sales manager position in
13 Tampa.
14   Q. Okay. Was that a promotion?
15   A. I would call it more a lateral move.
16   Q. Okay.
17   A. I was no longer general manager, but I was
18 head of sales management here.
19   Q. Okay.
20   A. That lasted two months, three months. And
21 then I was moved to a position called director of
22 vertical markets of NCO Financial.
23   Q. Okay.
24   A. That is the position I currently hold.

Page 7

1    Q. Okay. Where were you located prior to the
2  time during which you were the general manager of the
3  Dover office?
4    A. I spent 13 years in the Dover office. I was
5  located in the Dover office my entire career.
6    Q. Okay. During the course of your employment in
7  the Dover office, did you know an individual named Bill
8  Savage?
9    A. Yes.
10   Q. Did you report to him?
11   A. At times, yes, I did.
12   Q. Okay. Did you also know while you worked in
13 the Dover office an individual named Ted Fox?
14   A. Yes.
15   Q. Okay. Did you and Mr. Fox and Mr. Savage ever
16 socialize together while you were all in the Dover
17 office?
18   A. Not that I recall.
19   Q. Do you ever recall playing golf with him?
20   A. With Bill Savage?
21   Q. Yes.
22   A. Yes, I've played golf with Bill Savage.
23   Q. Okay. Did you also play golf with Ted Fox?
24

Page 8

1    A. I don't believe I've ever played golf with Ted
2  Fox.
3    Q. Okay. Did you ever have other occasions to
4  get together socially with Mr. Savage? For example,
5  going out to dinner, playing pool -- any type of activity
6  outside the office.
7    A. I have been to dinner with Bill Savage outside
8  the office, yes.
9    Q. How many times did you do that?
10   A. I could not tell you.
11   Q. It was several times? Would that be fair to
12 say?
13   A. Yes.
14   Q. Okay. On any of those occasions, do you
15 recall whether Ted Fox was also there?
16   A. I don't recall. I don't believe so.
17   Q. Okay. Do you know whether Ted Fox and Bill
18 Savage were personal friends when they were in the Dover
19 office?
20   A. I would not call them personal friends, no.
21   Q. Okay. I'd like to ask some questions about
22 your duties as general manager of the Dover office.
23   A. Okay.
24   Q. Could you just generally describe what your

Page 9

1  job functions were there?
2    A. Sure. I ran the sales department and more of
3  the day-to-day functions of the Dover branch.
4    Q. Okay. What did the Dover branch consist of
5  when you were the general manager? What departments did
6  it have?
7    A. We had a sales department, and we had a
8  collection department.
9    Q. Okay. The collection department: What types
10 of collections did they do? Did they do consumer?
11 Commercial?
12   A. Commercial.
13   Q. Just commercial?
14   A. That's correct.
15      MS. FITE: Let him finish the question.
16      THE WITNESS: Sorry.
17 BY MR. HOMER:
18   Q. Okay. About how many employees did you have
19 under you when you were general manager of the Dover
20 office? I'm looking now at the time period 2003. I'm
21 not asking for an exact number but just a rough idea.
22   A. The Dover office in 2003 probably had 80
23 employees, I want to say.
24   Q. Okay. Do you know approximately what

Corbett & Wilcox

COPY    1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALERIE HUE,                          )
        Plaintiff,                    )
                                      )
            v.                        )  C.A. No.
                                      )  05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a        )
Delaware corporation, trading as      )
NCO FINANCIAL COMMERCIAL SERVICES,    )
        Defendant.                    )

            Telephone deposition of **RICHARD BOUDREAU**,
taken before Cheryl A. Anthony, Court Reporter, in the
law offices of Parkowski, Guerke & Swayze, 116 West
Water Street, Dover, Delaware, on Tuesday, March 28,
2006, beginning at 12:05 p.m.

APPEARANCES:

        PARKOWSKI, GUERKE & SWAYZE
        BY:  JEREMY W. HOMER, ESQUIRE
        116 West Water Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        SESSIONS, FISHMAN & NATHAN
        BY:  DAVID ISRAEL, ESQUIRE
        3850 North Causeway Boulevard
        Lakeway Two, Suite 1240
        Metairie, Louisiana  70002-1752
        and ELIZABETH FITE, ESQUIRE
        15316 North Florida Avenue
        Suite 100
        Tampa, Florida  33613
        Attorneys for Defendant.

ALSO PRESENT:
        MS. VALERIE HUE

        **ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE**

        _____

                    **ANTHONY REPORTING**
                       **PO Box 234**
                 **Dover, Delaware  19903**
                     (302)674-8884.

C-12

16

1    his wife and my wife went out to dinner at that time.  I

2    have been to his house at New Year's Eve with 25 other

3    people, that type of a situation.

4              And often managers would go to

5    lunch/breakfast meetings with Bill.  He would come into

6    town, you know, on a Saturday morning, and we were

7    obligated to sort of meet him for breakfast at the Blue

8    Hen Restaurant.  And our morning meetings were held

9    there.  When we would have lunch, they would be over

10   at, I guess, the Sheraton, that big hotel.  I don't

11   remember the place anymore.  But that is where we would

12   go for lunch, me and three other managers, sales

13   managers, collection managers, that type of thing.  And

14   we would have business lunches in that scenario.

15        Q.    Do you recall whether Ted Fox was at any of

16   those lunches or dinners?

17        A.    No.  I don't recall it.  Ted Fox was never

18   at any of those meetings.

19        Q.    Okay.  Did you ever play golf with Bill

20   Savage?

21        A.    The only time I ever go near those -- I know

22   this is a -- no.

23        Q.    Okay.  How about pool?  Did you ever play

24   pool with him?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


VALERIE D. HUE,                    )
                                   )
            Plaintiff,             )
                                   )    Civil Action
v.                                 )    No. 05-225-KAJ
                                   )
NCO FINANCIAL SYSTEMS, INC.,       )
a Delaware corporation,            )
trading as NCO FINANCIAL           )
COMMERCIAL SERVICES,               )
            Defendant.             )

    Deposition of VALERIE D. HUE taken pursuant to
notice at the law offices of Parkowski, Guerke &
Swayze, 116 West Water Street, Dover, Delaware,
beginning at 9:41 a.m. on Wednesday,
January 4, 2006, via telephone before
Lucinda M. Reeder, RDR, CRR and Notary Public.

APPEARANCES:

        JEREMY W. HOMER, ESQ.
        PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware  19901
          for the Plaintiff,

        ELIZABETH FITE, ESQ.
        THE LAW OFFICE OF ELIZABETH FITE
          15316 North Florida Avenue, Suite 100
          Tampa, Florida  33613
            - and -
        DAVID B. ISRAEL, ESQ.
          3850 N. Causeway Boulevard, Suite 1240
          Metairie, LA  70002
          for the Defendants

- - - - - - - - - - - - - - - - - - - - - - - --
              WILCOX & FETZER, LTD.
      1330 King Street - Wilmington, Delaware  19801
                  (302) 655-0477



Valerie D. Hue                          75

1    Mr. Davies, retaliated against you or treated you

2    badly as a result of anything you did regarding

3    Savage. Are you?

4        A.    No.

5        Q.    It's your testimony that Mr. Fox retaliated or

6    has treated you badly over Mr. Savage being fired and

7    your report regarding Mr. Savage?

8        A.    Yes.

9        Q.    What aside from your discharge, if anything,

10   did Mr. Fox do of a retaliatory or discriminatory

11   nature after Savage was gone?

12       A.    He suspended me, and he terminated me.

13       Q.    And that all relates to the issue of improper

14   handling of checks. Correct?

15       A.    That's what he claimed.

16       Q.    Between October of 2001 when you made your

17   report about Savage and when you were suspended

18   regarding improper handling of checks, as claimed by

19   NCO and Ted Fox, what, if anything, did Ted Fox do of

20   a retaliatory or discriminatory nature against you?

21       A.    Other than my suspension and termination?

22       Q.    Yes.

23       A.    And ignoring me. That would be basically it.

24       Q.    When you say ignoring you, what do you mean?

**W&F**
**WILCOX & FETZER LTD.**
Registered Professional Reporters                    C-15

1     A.    When he visited the office, he would not

2   acknowledge me.  When I saw him on business trips, he

3   would not acknowledge me.

4     Q.    Okay.  So he would ignore you?

5     A.    Mm-hmm.

6     Q.    And in addition or aside from him ignoring you

7   from October of 2001 until your January 2004

8   suspension, what else, if anything else, did he do?

9     A.    Nothing.  I had no direct contact with Ted as

10  he was in sales.  Only when he became the

11  vice-president or president of operations.

12    Q.    Only when he became the head of the commercial

13  division?

14    A.    Right.

15    Q.    Once he became head of the commercial division,

16  aside from ignoring you, anything else?

17    A.    He called me and terminated me and suspended

18  me.

19    Q.    I am only asking for the time period between

20  October of 2001 when you made your report, which is

21  Hue 7 in front of you, and January of 2004 when you

22  were suspended and then terminated.  That's the time

23  period I'm looking for.  Aside from Mr. Fox ignoring

24  you during that time as head of the commercial

# Condensed Deposition of

# KATHY OBENSHAIN

### Date: March 16, 2006

### Case: HUE v. NCO FINANCIAL SYSTEMS
### No.:  05-225-KAJ
### Volume:  I

### Reported by: G. PAIGE ALEXANDER, CSR

**D'AMICO GERSHWIN, INC.**
**Phone: 770.645.6111**
**Fax: 770.643.1317**
**www.AtlantaCourtReporter.com**

Page 161

1    There's no privilege; there's no discussion with
2    attorneys at all. There's nothing about that
3    that's privileged.
4         MR. ISRAEL: I'm not sure that's true,
5    because the process --
6         MR. HOMER: That is just a routine
7    question.
8         MR. ISRAEL: Well, I don't think I agree.
9         But go ahead. If you can remember when, go
10   ahead and answer.
11   A    I cannot remember when, but -- and it
12   probably didn't -- didn't come from me. If I'm not
13   mistaken -- and I honestly don't know the time frame
14   there -- I believe Cherie Sugg got the attorneys involved.
15   BY MR. HOMER:
16   Q    Do you know if it was before Valerie Hue was
17   terminated?
18   A    Before Valerie Hue was terminated; I can't
19   say for a fact.
20   Q    You don't know?
21   A    Don't know.
22   Q    You didn't have any discussion with any of
23   the attorneys before the termination took place?
24   A    Did I have any discussion with any of the
25   attorneys before the termination took place; I'm trying to

Page 162

1    think; no.
2    Q    Who was involved in the decision to terminate
3    Valerie Hue?
4    A    Who was involved in the decision to make --
5    Q    To terminate.
6    A    To terminate her; myself, Ted Fox, Steve
7    Leckerman, and Cherie Sugg. Dina Loft was there with
8    information.
9    Q    When did you have the discussion about
10   terminating her, was it before the suspension or after the
11   suspension?
12   A    Was it before or after or during the whole
13   time; we discussed that that could be the ultimate result.
14   Q    Well, at some point you decided she was going
15   to be terminated; right?
16   A    At some point we decided she was going to be
17   terminated.
18   Q    Was that at the time you decided to suspend
19   her or was it later or was it --
20   A    Was it at the time we decided to suspend her
21   or was it later; I can't say. I think it was all about
22   the same time.
23   Q    Was there just one decision, let's suspend
24   her and then terminate her? Was that what happened? Or
25   was there two separate decision points?

Page 163

1    A    Were there two separate decision points;
2    there were definitely two separate decision points. We
3    decided to suspend her with pay to make sure we had all of
4    the facts.
5    Q    Could you describe what roles this group of
6    yourself, Mr. Fox, Mr. Leckerman, and Miss Sugg -- what
7    role did they have in making the decision to terminate
8    Valerie Hue?
9    A    What roles did they have individually --
10   Q    Right.
11   A    -- in making the decision.
12   Q    Let's start with that.
13        Let's start with Leckerman. What was his
14   role in this?
15   A    Leckerman wanted answers as to how this was
16   allowed to happen in the branch. He relied upon the
17   people that work for him to get the answers.
18   Q    Okay.
19   A    Dina Loft was responsible for gathering the
20   information. She provided all the documentation
21   concerning the items themselves.
22        In that Valerie Hue worked for me directly, I
23   felt very strongly about not wanting a person who had,
24   indeed, falsified records, advised other people --
25   Q    You are a little off track in what I'm trying

Page 164

1    to ask. I'm really trying to get a sense of who -- in
2    making the decision, did you all have an equal say in it?
3    Did somebody have the final say? Did --
4         MR. ISRAEL: That's exactly what she was
5    answering.
6    A    I was trying to answer you.
7         MR. HOMER: Well, she told me Dina got the
8    information.
9    A    Okay.
10        MR. HOMER: I was concerned about this.
11   BY MR. HOMER:
12   Q    I'm just trying to find out --
13   A    Who spearheaded it?
14   Q    Who had what amount of say in it?
15   A    I did. I spearheaded the -- I spearheaded
16   the recommendation that she be terminated, based on all of
17   the facts. Now, that's why it was done in a group manner,
18   to be absolutely certain that everybody concurred.
19   Q    What was the rationale for terminating her?
20   A    That she violated --
21        MR. ISRAEL: Wait; wait.
22        THE WITNESS: Go ahead.
23        MR. ISRAEL: It's been asked and answered.
24        Go ahead and tell him again.
25   A    Go ahead, all right.

41 (Pages 161 to 164)

Hue vs. NCO Financial Systems                                        3/16/06 - Kathy Obenshain

Page 165

1      She falsified information; she violated the
2  rules.
3  BY MR. HOMER:
4      Q      What did you believe Valerie Hue's motivation
5  for falsifying the information was?
6      A      What did I believe Valerie Hue's motivation
7  was for falsifying the information; to look good, to put
8  the numbers on the board, to produce revenue that, whether
9  or not it stuck or not was not her concern; she wanted to
10 look good.
11     Q      When you are talking about falsifying
12 information, that goes back to the statement in the
13 complaint, correct, that she committed intentional acts of
14 wrongdoing which were fraudulent in nature? Is that what
15 you are talking about when you say she —
16     A      She committed intentional acts of wrongdoing
17 by — yes; she told people to redeposit checks without any
18 verification process.
19     Q      Okay.
20     A      Many people have testified to that.
21     Q      Before this investigation of Valerie Hue —
22 well, strike that.
23         Did you ever have any conversations with Mark
24 LeFevre about bad checks?
25     A      Did I have any conversations with Mark

Page 166

1  LeFevre about bad checks; yes.
2      Q      He was a collector in the Dover office;
3  correct?
4      A      Mark LeFevre was a collector in the Dover
5  office; correct.
6      Q      Did he have a problem with bad checks?
7      A      Did he have a problem with bad checks; I
8  can't say that Mark LeFevre had any more problems than
9  anybody else in the division, no.
10         Mark LeFevre was a high-producing — very
11 high-producing collector.
12     Q      What was the problem with his bad checks, if
13 you recall?
14     A      What was the problem with his bad checks;
15 specifically I don't recall.  He had a number of bad
16 checks.
17     Q      You talked to him about it?
18     A      I talked to him about it.  I also talked to
19 Valerie about it.
22     A      Specifically with Mark LeFevre, no, I don't
23 recall specifically.
24     Q      Did you ever have any conversation with Eric
25 Shaw about problems with his checks?

Page 167

1      A      With Eric Shaw about problems with his
2  checks; no.
3         MR. ISRAEL: Would you like to take a
4      break?
5         THE WITNESS: No, I'm fine.
6  BY MR. HOMER:
7      Q      Do you know who Matt Lane is?
8      A      Do I know who Matt Lane is; yes.
9      Q      Did you have any — he was terminated at NCO;
10 correct?
11     A      Matt Lane was terminated at NCO; yes.
12     Q      What was your — did you have any involvement
13 in that termination?
14     A      Did I have any involvement in that
15 termination; yes.
16     Q      What was your involvement?
17     A      That was one of the records that was — that
18 was involved in Dina Loft's investigation.  And he had
19 altered an amount on a — on a DCI check facts.  Valerie
20 Hue investigated it.  As I recall, Valerie Hue even talked
21 to the debtor to make certain — after — when I presented
22 it to her to determine whether or not Matt Lane had been
23 given permission from the debtor to run this DCI, this
24 check by phone, for a different amount, and determined
25 that that was not the case.

Page 168

1      Q      Do you recall that that conversation with the
2  debtor was taped and there was a witness to it, Jenny
3  Birdsong?
4      A      Do I recall the conversation was taped; I
5  don't recall, but I believe that is the case.  I don't
6  recall specifically.
7      Q      Did you approve the firing of Matt Lane?
8      A      I approved the termination of Matt Lane, with
9  the guidance of human resources.
10     Q      Why did you approve it?
11     A      Because he falsified records.
12     Q      I'd like to talk about the bonus and
13 commission system that was used at NCO and ask you a few
14 questions about that.
15         As we understand it in this case, NCO has
16 asserted that Valerie Hue was motivated in December of '03
17 to put on NSF checks, resubmit them, have them resubmitted
18 for the purpose of increasing her bonus, or her
19 commission.
20         What I would like to ask — first of all is
22         MR. ISRAEL: That's a mischaracterization.
23 NCO hasn't — the Defendant hasn't asserted that
24 as a position.
25         MR. HOMER: Well, I don't know if you want

42 (Pages 165 to 168)

belly dance
_____

From:     "belly dance" <bellydance12@msn.com>
To:       <steve.leckerman@ncogroup.com>
Cc:       <ted.fox@ncogroup.com>
Sent:     Thursday, January 22, 2004 9:28 AM
Subject:  Valerie Hue

Dear Mr. Leckerman,

First, let me thank you for speaking to me this morning. I am stating for the records that I have
not committed fraud nor, was my intent to commit fraud.

1/21 I was placed on suspension with pay due to 2 concerns: Not pulling checks and recreating
dci on redips

**Not pulling checks:** I, as well as my mgt staff were given directives by Kathy on some months
not to pull any checks. She would state they need to start working supp right away. I remember
this being directed either June or July. This directive was given many different times during my
2 yrs as GCM. When a collector has asked me to pull or move check into next month. I look
at where the producer is mtd. Is he sand bagging? Usually that is the case. I wouldn't tell the
producer he is sand bagging but, no to his request. There has been hundreds of times when I
have pulled check with out the producers okay because of stop pay, etc.

**Recreating DCI redips:** We had a policy under Phil Weaver that all checks were redipped 2
times automatically. When that policy went away it was mgt discretion on redipping checks. I
have a redip policy in my branch with a form that the producer fills out. This form asks for
verification method and once it is signed then it is redipped. If that form isn't filled out then it
wasn't approved.

My manager, under my direction went to the producers with cash journal in December and
discussed nsf if we could redip any checks. The same paper work had to be completed however,
I did notice numerous checks were redipped without the form being signed after I returned from
vacation. Yes, I should have given Eric clearer direction. The managers and producers always
talked together about this. I never advised any producer they HAD to redip a check if we knew
there was no chance to recover. If the banks won't verify which is 80% of the time then the
decision is made based on that collector gut and discussion with the debtors.

In the beginning mgt were given a directive from upper management that on
redipping dci we would have to recreate them with the same check number. I believe there are
emails to that effect. That directive was never officially changed by upper management. I have
reviewed cash journals from all offices and noticed dci being created on nsf.

Kathy, on the conference call on 1/20/04 did clarify we had to redip the dci not recreate another
one. Mac MacKenzie, asked the question on the conference call if dci comes back could we
recreate it with same check number. Kathy asked him is that going on in his branch and he
stated not as of right now. Yesterday, Kathy stated I was the only branch that recreated checks
on dci. I was surprised since she knew Atlanta also had done the same thing. I know there was
no fraud attempt as she alleged. The direction that was given wasn't clear by upper
management.

Kathy had stated on calls to my office to redip everything except stop pay. I believe this was in
June or July.

1/22/2004

000023

Brian Laiche stated to me that he was upset not bonusing and he redipped many of his checks in Jan or Feb of last year to make a bonus. He said Kathy knew.

I am being disciplined because the direction from upper management was not clear on numerous occasions. I believe I am being singled out for things alll gcm have done not because we are stealing but, due to direction that wasn't clear.

My attempt in this email is for you to understand as gcm we have not always had clear direction. I don't deserve to be treated in this manner.

Thank you,


Valerie Hue

000024

1/22/2004

1

```
1              IN THE UNITED STATES DISTRICT COURT

2                 OF THE STATE OF DELAWARE

3              IN AND FOR THE DISTRICT OF DELAWARE

4
   VALERIE HUE
5
            Plaintiff
6
            vs.                        Civil Action No.
7                                      05-225-KAJ
   NCO FINANCIAL SYSTEMS, INC.
8  a Delaware corporation,
   trading as NCO FINANCIAL
9  COMMERCIAL SERVICES

10          Defendant

11                     - - - - - - - - - - -

12

13          Continuation of the deposition of Valerie

14  Hue, taken before Genevieve Ritter, a Notary Public and

15  Registered Professional Reporter, on January 4, 2006 at

16  1:45 p.m. at 116 West Water Street, Dover, Delaware.

17                     - - - - - - - - - - -

18              DELMARVA REPORTING
             217-A North DuPont Boulevard
19             Smyrna, Delaware 19977
                  302-653-1036
20
             delmarva@prodigy.net
21

22

                DELMARVA REPORTING
                  (302) 653-1036
```

Hue - Israel

1    Q.        Yes; is that what you are

2    saying?

3    A.        I'm reading the statement.

4    Q.        Oh.

5    A.        You are asking me a question

6    about that?

7    Q.        Yes.

8    At any time did Kathy Obenshain instruct

9    you to redeposit checks without verification of funds?

10   A.        If you cannot reach a bank,

11   which is verification of funds, yes.

12   Q.        Okay.  Did you ever witness

13   Miss Obenshain instruct any other managers to

14   redeposit checks without verification of funds?

15   A.        No.

16   Q.        I'm talking about in a

17   general meeting, where you would have conference calls

18   with other GCM's and Miss Obenshain.  You participated

19   in that?

20   A.        Yes.

21   Q.        Did she ever say, I want you

22   to redeposit checks without verification of funds?

DELMARVA REPORTING
(302) 653-1036

C-23

Hue - Israel

1            A.            She would say, go through

2    and see what you can get on the system, in her normal

3    flip little way.

4            Q.            Okay.

5                          (Whereupon an off-the-record

6                          discussion was held.)

7    BY MR. ISRAEL:

8            Q.            Do you believe that Kathy

9    Obenshain had any influence relating to the decision

10   you be discharged?

11           A.            Very little.

12           Q.            What is the basis of that

13   belief?

14           A.            A conversation I had with

15   Kathy.

16           Q.            When was this conversation?

17           A.            The day before I was

18   suspended.

19           Q.            What did Miss Obenshain and

20   you discuss?

21           A.            The firing of Matt Lane, the

22   analysis that I had done, and her response to me that

DELMARVA REPORTING
(302) 653-1036

C-24

1

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE


VALERIE HUE,                         )
                                     )
              Plaintiff,             )
                                     )     Civil Action
v.                                   )     No. 05-225-KAJ
                                     )
NCO FINANCIAL SYSTEMS, INC., a       )
Delaware corporation, trading as     )
NCO FINANCIAL COMMERCIAL SERVICES,   )
                                     )
              Defendants.            )
```

          Deposition of MATTHEW HARRISON LANE,
taken pursuant to notice at the law offices of
Parkowski, Guerke & Swayze, 116 West Water Street,
Dover, Delaware, beginning at 12:04 p.m., on
Wednesday, January 4, 2006, before Dale C. Hawkins,
Registered Merit Reporter and Notary Public.


APPEARANCES:


              JEREMY W. HOMER, ESQ.
              PARKOWSKI, GUERKE & SWAYZE, P.A.
               116 West Water Street
               Dover, Delaware   19903
               for the Plaintiff


              DAVID ISRAEL, ESQ.
              SESSIONS, FISHMAN & NATHAN, LLP
               114 Northpark Boulevard, Suite 10
               Covington, Louisiana   70433

                    -and-

              ELIZABETH K. FITE, ESQ.
              LAW OFFICES OF ELIZABETH K. FITE, P.A.
               15316 North Florida Avenue, Suite 100
               Tampa, Florida   33613
               for the Defendant

14

```
 1              Q.   Did Ms. Hue ever tell you to do

 2     anything wrong at NCO by way of mishandling

 3     checks?

 4              A.   We were instructed to put checks

 5     through without speaking to debtors.

 6              Q.   And that was a violation of the

 7     policy that you had been taught?

 8              A.   Yes.

 9              Q.   And did Ms. Hue instruct you to

10     put checks through without speaking to the

11     debtor?

12              A.   All of the managers, in an effort

13     to achieve a department number.

14              Q.   End of month number?

15              A.   Right.

16              Q.   And was that for as long as you

17     worked there?

18              A.   No, not as long as I worked there.

19              Q.   Well, if you can remember, you

20     were there a couple of years approximately?

21              A.   Right.

22              Q.   Was that the rule when you

23     started?

24              A.   No.
```

15

1          Q.   Tell me the timing of the rule

2    about putting checks on with no confirmation?

3          A.   I don't know if I can give a

4    specific date.

5          Q.   Let me ask it differently.  Were

6    you trained as I thought I understood your

7    testimony that you were not permitted to put a

8    check on without confirming from the debtor that

9    the money was there?

10         A.   Correct.

11         Q.   At some point, were you instructed

12   by Ms. Hue and/or other managers, and we'll get

13   to which ones, that you were to put checks on

14   without being so -- I'm sorry, without receiving

15   such information from the debtor?

16         A.   Yes.

17         Q.   And how long after you started

18   working at NCO do you remember the change

19   between your training and the practice?

20         A.   I would have to say it was after

21   we received the ability to create checks on the

22   system ourselves.

23         Q.   Phone checks?

24         A.   Correct.

**1**

```
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE

VALERIE HUE,              )
    Plaintiff,            )
                          )
    v.                    ) C.A. No.
                          ) 05-225-KAJ
NCO FINANCIAL             )
SYSTEMS, INC., a          )
Delaware corporation, trading as  )
NCO FINANCIAL COMMERCIAL SERVICES,)
    Defendant.            )
```

    Telephone deposition of ERIC JOHN SHAW,
taken before Cheryl A. Anthony, Court Reporter, in the
law offices of Parkowski, Guerke & Swayze, 116 West
Water Street, Dover, Delaware, on Wednesday, February 1,
2006, beginning at 9:15 a.m.

APPEARANCES:

    PARKOWSKI, GUERKE & SWAYZE
    BY: JEREMY W. HOMER, ESQUIRE
    116 West Water Street
    Dover, Delaware 19901
    Attorney for Plaintiff.

BY TELEPHONE:

    SESSIONS, FISHMAN & NATHAN
    BY: DAVID ISRAEL, ESQUIRE
    3850 North Causeway Boulevard
    Lakeway Two, Suite 1240
    Metairie, Louisiana 70002-1752
    Attorney for Defendant.


    ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE


            ANTHONY REPORTING
              PO Box 234
           Dover, Delaware 19903
              (302)674-8884

**2**

1    (Shaw Exhibits Number 1 and 2 were marked
2  for identification and attached to the record.)
3            ERIC JOHN SHAW,
4    the witness herein, having first been
5    duly affirmed, was examined and
6    testified as follows:
7  BY MR. HOMER:
8    Q.  Mr. Shaw, my name is Jeremy Homer. I am the
9  attorney representing Valerie Hue in this case. I would
10 like to tell you that if you have any problem
11 understanding my question, don't answer it. Just ask me
12 to rephrase it so that you do understand it. Do you
13 understand that?
14   A.  Yes.
15   Q.  Okay. Is there any reason that you can't
16 testify today? Because of medication or any other
17 problem?
18   A.  No.
19   Q.  Okay. Your ability to testify isn't
20 impaired in any way; is that true? Is it true that
21 there is no impairment of your ability to testify today?
22   A.  There is no impairment.
23   Q.  Okay. Thank you. And you understand that
24 you have been placed under oath, that this is a

**3**

1  deposition. And I just want to make sure that you
2  understand that it is a crime not to tell the truth once
3  you are under oath. You are aware of all of that, I am
4  sure. Is that true?
5    A.  Yes.
6    Q.  Okay. Now, this deposition is being taken
7  by telephone. Is it fair to say that in the room that
8  you are in right now, it is just you and Mr. Israel?
9    A.  That's correct.
10   Q.  Okay. I would like to advise you that it is
11 not proper for you to communicate with Mr. Israel in a
12 way that I can't understand; for example, passing notes,
13 making facial gestures, that sort of thing. He's not
14 allowed to coach you regarding your answers. Do you
15 understand that?
16   A.  Yes.
17   Q.  Okay. Could you state your address and your
18 phone number, please?
19   A.  My address?
20   Q.  Yes.
21   A.  2722 Jacqueline Drive, M13 is the apartment
22 number, and that is in Wilmington, Delaware.
23   Q.  Okay. And your --
24   A.  And the ZIP is 19810.

**4**

1    Q.  And your phone number?
2    A.  302-529-7518.
3    Q.  Okay. Thank you. Can you tell me what you
4  did to prepare for today's deposition, if anything?
5    A.  I went over some of the problems we had with
6  the attorney. Pretty much that's about it. There
7  wasn't that much to it. Basically, we are waiting to
8  see what you have to say.
9    Q.  Did you review any documents in preparation
10 for the deposition?
11   A.  Yes.
12   Q.  And which documents did you review?
13   A.  Some of the e-mails.
14   Q.  Can you tell me approximately how many
15 documents you reviewed?
16   A.  Several.
17   Q.  More than ten?
18   A.  No.
19   Q.  Okay. What is your educational background,
20 Mr. Shaw?
21   A.  High school and about -- I guess about six
22 months of college.
23   Q.  Okay. Well, let me ask you, first of all,
24 since I can't see you, how old are you?

33

1    A.   I can't answer that. That would be up to
2  the collectors individually.
3    Q.   What was your experience? Were you always
4  able to contact the debtor? Or sometimes you weren't
5  able to contact the debtor?
6    A.   Personally, you are asking?
7    Q.   Yes.
8    A.   Well, I never really had too many problems
9  with bad checks. My history of bad checks when I had a
10 check that went bad on myself, I usually contacted the
11 debtor first and then sometimes I would conference the
12 bank and the debtor. That is my normal procedure for
13 myself. Usually, I try to verify with both the debtor
14 and the bank. But I have just really never had that
15 major problem with checks myself.
16   Q.   Do you know what happened when the debtor
17 couldn't be contacted and the bank couldn't be
18 contacted? What happened with the resubmission of
19 checks? And I'm talking about the period December 2003.
20   A.   They were ran anyway.
21   Q.   Okay. And they were all run, or some of
22 them were run?
23   A.   Both.
24   Q.   Well, it can't be both. Are you telling me

34

1  that in some cases checks were run, and in some cases
2  they weren't run?
3    A.   Well, I told you originally that some checks
4  were on accounts that were closed or there were stop
5  payments. We did not rerun those.
6    Q.   How do you know which checks were rerun?
7  Were you involved in rerunning the checks?
8    MR. ISRAEL:  You are talking about December
9  of '03?
10 BY MR. HOMER:
11   Q.   I am talking about December of '03, but I am
12 also talking about before that. Were you involved in
13 running NSF checks?
14   A.   No.
15   Q.   So your only experience with what checks got
16 rerun was in the December 2003 month?
17   A.   Was I involved in that decision of what was
18 run, you are saying?
19   Q.   Well, involved in knowing what was rerun.
20   MR. ISRAEL:  He is asking what experience
21 you had before December of 2003, relating to the running
22 of checks. Is that right?
23   MR. HOMER:  Well, I'm asking whether, before
24 December of 2003, he would have knowledge of what checks

35

1  got rerun and what checks didn't get rerun.
2    THE WITNESS:  Not in her department.
3  BY MR. HOMER:
4    Q.   Okay. Were you in her department before
5  December of 2003?
6    A.   As a collector?
7    Q.   Yes.
8    A.   Yes.
9    Q.   And you were under Val Hue for a few years,
10 right?
11   A.   Yes.
12   Q.   Okay. By the way, were you disciplined for
13 what happened in December of 2003?
14   A.   Yes.
15   Q.   And what was the discipline?
16   A.   I was not allowed to be a manager anymore.
17 I was put back on the collections.
18   Q.   Okay. Did Kathy Obenshain ever give you any
19 written or oral instruction regarding what NSF checks to
20 run?
21   A.   No.
22   Q.   Do you have any knowledge that she
23 instructed other people on the same issue?
24   A.   No.

36

1    Q.   Okay. Do you know what happened to the NSF
2  report that you used in December of 2003 to go over the
3  checks with the collectors?
4    MR. ISRAEL:  Asked and answered.
5    MR. HOMER:  No, he hasn't answered that.
6    MR. ISRAEL:  Well, I disagree.
7    But go ahead and answer it again.
8    THE WITNESS:  Probably just -- I would say
9  they are probably discarded. Usually, after we do the
10 reports, we just throw them away, as far as paperwork.
11 It's a paper jam.
12 BY MR. HOMER:
13   Q.   What did you do with it? Do you recall?
14   A.   Usually, just discarded it.
15   Q.   Well, I understand that is what you think
16 was the practice. But do you specifically recall what
17 you did with the report when you were done with it?
18   A.   After I reviewed the checks, I would --
19 After it was said and done and the month was over with,
20 I would discard the report. We got the same report
21 every month.
22   Q.   Did Kathy Obenshain or Ted Fox or anyone
23 else connected with NCO ask for the monthly report that
24 you ran?

Hue v. NCO Financial Systems                    2/1/06 Depo of Eric J. Shaw

41

1   Q.   And when you went through this list in
2   December of 2003 with the collectors, did you see any of
3   these forms filled out?
4   A.   Yes.
5   Q.   So the collectors did have forms for
6   requesting the redepping of the checks?
7   A.   Yes.
8   Q.   And on those forms, there would be some
9   explanation of whether they contacted the debtor or not.
10  Is that true?
11  A.   Yes.
12  Q.   Okay. And did you review the forms when you
13  went over the NSF report with the collectors?
14  A.   Yes.
15  Q.   And why did you review those forms?
16  A.   Again, as I mentioned earlier, I was looking
17  for checks that were either stop payment or the accounts
18  were closed. I wanted to make sure none of those checks
19  were reran myself.
20  Q.   Or where there were too many NSFs, correct?
21  Isn't that what you put in your letter?
22  A.   Yes.
23  Q.   How did you determine if there were too many
24  NSFs?

42

1   A.   Judgment call.
2   Q.   Why was it that you were unwilling to run
3   the check again if there were too many NSFs?
4   A.   Could you repeat the question?
5   Q.   Why is it that you were unwilling to run the
6   check again if there were too many NSFs?
7   A.   In some cases, they might have been put in
8   three or four times. And I just thought -- It was like:
9   Why kill a dead horse? So I stopped it.
10  Q.   So based on the number of NSFs, you were
11  afraid they wouldn't clear again? Is that what you were
12  saying?
13  A.   I just thought it was overkill.
14  Q.   Could you answer my question?
15  A.   It was overkill. That's why I didn't run
16  the check.
17  Q.   Well, is it because you thought that it was
18  unlikely it would clear again, since they had already
19  gone NSF a number of times?
20  A.   It was --
21  Q.   Let me finish -- since they had already gone
22  NSF a number of times?
23  A.   Yes. But there is a problem here. A lot of
24  those checks went on anyway, because Val made them put

43

1   it off.
2   Q.   When you did your review in December of
3   2003, you exercised your judgment not to run some of
4   those checks that had already been run several times,
5   correct?
6   A.   Yes. But I was told by my boss to put them
7   on anyway.
8   Q.   But you didn't?
9   A.   In some cases, some of them did go on.
10  Q.   All right. So even though your boss that
11  you are loyal to told you to put them all on, you made
12  judgments not to put them on when there were too many
13  NSFs, among other things?
14  A.   Yes.
15  Q.   I would like you to look now at what has
16  been marked as Exhibit Number 2, Shaw Exhibit Number 2.
17          MR. ISRAEL: Do you want him to read it?
18          MR. HOMER: I just want him to look at it
19  for the time being.
20          MR. ISRAEL: Okay.
21  BY MR. HOMER:
22  Q.   First, let's make sure we are looking at the
23  same document. This one is a January 22, 2004 letter
24  from Kimberly Marlow to Ted Fox and Kathy Obenshain,

44

1   correct?
2   A.   Yes.
3   Q.   And down at the bottom of the right-hand
4   corner there is the number 00096, correct?
5   A.   Correct.
6   Q.   When did you last see this letter before you
7   just got it out today or before just a minute ago?
8   A.   I briefly looked at it yesterday. That is
9   the first time I saw it. But I didn't really read it.
10  I just kind of like looked over it.
11  Q.   Okay. Have you discussed this letter with
12  anybody?
13  A.   No. Like I say, I just briefly looked at it
14  yesterday. I didn't really discuss it.
15  Q.   Okay. Looking at the second paragraph of
16  the letter, in the third sentence there it says -- and I
17  will quote this -- then we pulled each collector in one
18  by one and discussed the checks that were to be run and
19  the level of comfort of them.
20          MR. ISRAEL: Well, is it okay if he reads
21  the paragraph first?
22          MR. HOMER: Well, if he needs to.
23          THE WITNESS: Yes, yeah. I would like to.
24          MR. HOMER: Why don't you go ahead and read

Anthony Reporting   (302)674-8884

Kimberly Marlow

                IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF DELAWARE


VALERIE HUE,                        )
                                    )
        Plaintiff,                  )
                                    )
v                                   )
                                    )    Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,        )      05-225-KAJ
a Delaware corporation,             )
trading as NCO FINANCIAL            )
COMMERCIAL SERVICES,                )
                                    )
            Defendant.              )

            Deposition of KIM MARLOW taken pursuant
to notice at the law offices of Parkowski, Guerke &
Swayze, P.A., 116 West Water Street, Dover, Delaware,
beginning at 9:15 a.m. on Wednesday, March 8, 2006,
before Robert Wayne Wilcox, Jr., Registered Professional
Reporter and Notary Public.

APPEARANCES:

            JEREMY W. HOMER, ESQ.
            PARKOWSKI, GUERKE & SWAYZE, P.A.
              116 West Water Street
              Dover, Delaware  19903
              for the Plaintiff,

            ELIZABETH K. FITE, ESQ.
            SESSIONS, FISHMAN & NATHAN, L.L.P.
              15316 North Florida Ave - Suite 100
              Tampa, Florida  33613
              for the Defendant


                  CORBETT & WILCOX
            Registered Professional Reporters
      1400 French Street    Wilmington, DE 19801
                  (302) 571-0510
               www.corbettreporting.com


Corbett & Wilcox

Kimberly Marlow

14 (Pages 50 to 53)

Page 50

1    A   I -- the only rule that I know of is a
2  deposit. They would do post dates at the end of the
3  month to make sure that they were going to clear. Now, I
4  do know that that was a policy that the admins were
5  responsible for. But as far as clearing an NSF check, it
6  was primarily up to the collector to do that. But at
7  times we did ask the admins to call the banks.
8    Q.   Mm-hmm.
9    A.   And I don't recall if that's one of those
10  times or not, to be honest.
11    Q.   What do you mean at times? You mean for the
12  whole month or just for specific checks or --
13    A.   No. Just the end of the month run.
14    Q.   For the whole run?
15    A.   It might not be for the whole run. It might
16  be a couple of checks here or there.
17    Q.   Okay.
18    A.   It depends on if -- it depends on how busy we
19  were at that point in time.
20    Q.   Okay. What did you work from when you brought
21  in the collectors? Did you have some documents you had
22  in hand that you knew were the NSF checks?
23    A.   Yes. We would -- there was a spreadsheet that
24  we had actually. I believe that admins put together that

Page 51

1  spreadsheet. Or we might have as managers. I don't
2  remember at that point in time. And it would list all
3  the NSFs.
4    Q.   You don't know whether the admin had already
5  contacted the bank and couldn't get verification for the
6  list of these checks?
7    A.   I have no idea.
8    Q.   Okay. You don't know whether they did or not?
9    A.   I don't know.
10    Q.   So you don't really know what the process was.
11  Is that what you're telling me?
12    MS. FITE: Object to form.
13    A.   No. I don't know if she helped in that
14  process or not at that point in time.
15    Q.   Well, I just want to get this clarified,
16  because before you told me that you had to do both bank
17  verification and debtor verification, but now you're
18  telling me you don't know whether the checks that you got
19  a list of had already been run through the bank
20  verification process and not passed.
21    MS. FITE: Object to form. She said
22  and/or.
23    A.   Yeah. I don't believe I said that. I said
24  that you could either have the debtor verify funds. And

Page 52

1  then that was a judgment call to the manager. Or you
2  could call the bank and find out if the funds were
3  available. But your policy -- the policy is to call
4  both. You might not get a hold of the bank, and they
5  might not verify.
6    Q.   What you said before was that the policy was
7  the collector was to call the debtor for verification
8  even if the bank had already verified.
9    A.   Yes.
10    MS. FITE: Jerry, do you mind if we take
11  a break?
12    MR. HOMER: That's fine.
13    (A brief recess was taken.)
14    - - - - -
15    KIM MARLOW, resumes
16  BY MR. HOMER:
17    Q.   Referring back to Exhibit 2, which is your
18  statement to Fox, the last paragraph says, quote, last
19  month before Valerie left for vacation, she gave the
20  directive to Eric Shaw (mid balance manager) and handed
21  him all the cash journals of the collectors that she
22  found multiple NSFs -- and there's a -- I'm not sure if
23  that word is "or not" -- but it goes on and says and told
24  to get them all on, quote/end quote.

Page 53

1    Do you recall making that statement?
2    A.   Yes.
3    Q.   Could you tell me, where did you learn that
4  this directive had been given to Mr. Shaw to get them all
5  on?
6    A.   That's what he told me.
7    Q.   Okay. You don't have independent knowledge of
8  it? You weren't present when he was told to?
9    A.   No.
10    Q.   Okay. It goes on to say in the letter right
11  after that, "I know this because we were in our morning
12  managers meeting..." What does that mean? Why would you
13  know that because you were in the morning managers
14  meeting?
15    A.   Managers meetings we held every morning, and
16  she would give us things to do as per the day goes on.
17  And as she was leaving, she would give me things to do
18  that day, and he would have things to do that day.
19    Q.   Okay. All right. Referring again to your
20  statement, Exhibit 2, in the second paragraph, it says,
21  "On a monthly basis, we were given the directive to run
22  checks that we knew were not going to clear the bank."
23  Who does "we" refer to there?
24    A.   Our management staff.

Corbett & Wilcox

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3
     VALERIE HUE,                    )
 4                                   )
             Plaintiff,              )
 5                                   )
     v.                              )
 6                                   )     Civil Action No.
     NCO FINANCIAL SYSTEMS, INC.,    )      05-225-KAJ
 7   a Delaware corporation,         )
     trading as NCO FINANCIAL        )
 8   COMMERCIAL SERVICES,            )
                                     )
 9              Defendant.           )

10
                Deposition of KENNETH ALAN ROSE taken
11   pursuant to notice at the law offices of Parkowski,
     Guerke & Swayze, P.A., 116 West Water Street, Dover,
12   Delaware, beginning at 11:20 a.m. on Wednesday, March 8,
     2006, before Robert Wayne Wilcox, Jr., Registered
13   Professional Reporter and Notary Public.

14   APPEARANCES:

15                   JEREMY W. HOMER, ESQ.
                     PARKOWSKI, GUERKE & SWAYZE, P.A.
16                      116 West Water Street
                        Dover, Delaware  19903
17                      for the Plaintiff,

18                   ELIZABETH K. FITE, ESQ.
                     SESSIONS, FISHMAN & NATHAN, L.L.P.
19                      15316 North Florida Ave - Suite 100
                        Tampa, Florida  33613
20                      for the Defendant.

21

22                       CORBETT & WILCOX
                   Registered Professional Reporters
23      1400 French Street      Wilmington, DE 19801
                        (302) 571-0510
24                  www.corbettreporting.com
```

KENNETH ROSE

Page 50

1    Yeah. Collectors would have checks go
2  on that may not have been qualified.
3    Q.  Was it your understanding that the manager
4  would have to have known about that for these checks to
5  go back on?
6    A.  My understanding was that the check couldn't
7  be redeposited without manager authorization.
8    MS. FITE:  Sorry. That was more than
9  two questions. That's it.
10 BY MR. HOMER:
11   Q.  When did Mr. McQuisten tell you that he had
12 been directed to violate the policy?
13   A.  I couldn't give you a date and time. Again, I
14 would see fees, you know -- do you know anything about
15 our business?
16   Q.  Well, I'm learning.
17   A.  Okay. Everything is published -- what you
18 post every day, what your quota is, where you are, where
19 you need to get to. So at end of month you pretty much
20 had an idea where you were. And being competitive as I
21 am, I like to know where everyone else was.
22   Q.  But you wouldn't have any way of knowing
23 whether McQuisten had called the debtors like you might
24 have done at the last minute and called the debtor, got a

Page 51

1  hold of them, got verification. Right?
2    A.  If I was that inquisitive, I certainly could
3  find out, but that wasn't my job. My job was to collect
4  my money.
5    Q.  So --
6    A.  But I would see things -- fees jump
7  dramatically.
8    Q.  So you had reason to think that there were
9  large balance collectors violating the policy?
10   A.  Yes.
11   Q.  Okay. When Mr. Fox talked to you, you chose
12 not to tell him that, or did you --
13   A.  He didn't ask the question.
14   Q.  Okay. But he was asking you about the NSF?
15   A.  He was asking me about my insufficient funds
16 checks.
17   Q.  Okay. It didn't occur to you to tell him that
18 you understood other people were violating the policy?
19   A.  I didn't get asked the question.
20   Q.  Well, you knew he was interested in that
21 subject, right, when you were talking to him?
22   A.  For the most part, again -- and I'll
23 restate -- Mr. Fox generally didn't call me, and the
24 general manager didn't usually call me into his office.

Page 52

1  Okay. So I had no reason to expect or, you know, even
2  understand what the conversation was about. But in
3  having the conversation, it was very limited, and it
4  pertained to me. The questions pertained to me.
5    Q.  When you had this information from McQuisten
6  or maybe others that what you thought the check handling
7  policy was being violated, did you think to talk to
8  your manager about that -- Valerie Hue?
9    A.  You know, for the most part, I kept to myself
10 and did my job. Okay. My thought as -- and history
11 dictates, if you violated the policy, ultimately you got
12 caught.
13   Q.  So the answer would be that you didn't talk to
14 Valerie Hue about it?
15   A.  No.
16   Q.  It didn't occur to you to talk to her about
17 it?
18   MS. FITE:  Object to form.
19   A.  Well, I'll answer that.
20   No, I didn't think to talk to her about
21 it, because, again, history dictated that if you did
22 that, if you violated policy, it would come back and bite
23 you.
24   Q.  So even though it bothered you that maybe

Page 53

1  other people were maybe violating the policy --
2    A.  It didn't bother me what they did. That was
3  their choice. We're all adults. You make your own
4  decisions.
5    Q.  Okay. I thought you testified before that you
6  were interested and inquired about this -- that you
7  didn't like the fact that others were doing it. That's
8  not the case?
9    A.  You know, my opinion has no bearing. Okay.
10 And, again, for the most part, in my job I do what makes
11 me money. And I stay within the policies in order to do
12 that.
13   Q.  Okay. The fact is you didn't really know
14 whether someone else was violating a policy or not, did
15 you?
16   A.  There was some hearsay that policies were
17 being violated. Okay.
18   Q.  That's all you had, basically?
19   A.  But the thing is that, with that, there was
20 some perhaps concrete proof when fees would jump at the
21 end of the month.
22   Q.  Well, wouldn't your fee jump at the end of the
23 month sometimes?
24   A.  Yes. But with a check that didn't come back.

2b390812-80df-4f98-afc0-44fb1969260d

David McQuisten

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

```
VALERIE HUE,                     )
                                 )
        Plaintiff,               )
                                 )
v.                               )
                                 )   Civil Action No.
NCO FINANCIAL SYSTEMS, INC.,     )     05-225-KAJ
a Delaware corporation,          )
trading as NCO FINANCIAL         )
COMMERCIAL SERVICES,             )
                                 )
        Defendant.               )
```

Telephone Deposition of DAVID MC QUISTEN taken pursuant to notice at the law offices of Parkowski, Guerke & Swayze, P.A., 116 West Water Street, Dover, Delaware, beginning at 2:00 p.m. on Thursday, March 23, 2006, before Robert Wayne Wilcox, Jr., Registered Professional Reporter and Notary Public.

APPEARANCES:

        JEREMY W. HOMER, ESQ.
        PARKOWSKI, GUERKE & SWAYZE, P.A.
          116 West Water Street
          Dover, Delaware  19903
          for the Plaintiff,

        ELIZABETH K. FITE, ESQ. (via teleconference)
        SESSIONS, FISHMAN & NATHAN, L.L.P.
          15316 North Florida Ave - Suite 100
          Tampa, Florida  33613
          for the Defendant.

ALSO PRESENT:  LENNY CICCARONE, NCO

CORBETT & WILCOX
Registered Professional Reporters
1400 French Street      Wilmington, DE 19801
(302) 571-0510
www.corbettreporting.com

David McQuisten

13 (Pages 46 to 49)

Page 46

1    Q.  Okay.  Were you disciplined more than one
2  time, if you recall?
3    A.  Maybe.  I can't remember.  I'm sorry.
4    Q.  Okay.  Mr. McQuisten, can you tell me what
5  your earnings were from NCO in the year 2003?
6        MS. FITE:  Object to form.
7    A.  How much I made?
8    Q.  Yes.  From NCO.  Just a ballpark figure.  I
9  know you probably don't remember the exact amount.
10   A.  I don't know.  $40,000, 50-.  I don't know.
11 30-.
12   Q.  You don't have a good recollection, I guess.
13   A.  2003?  Not off the top of my head, no.
14   Q.  Okay.  Do you know what you earned in the year
15 2005?
16   A.  Yeah.
17   Q.  How much was that?
18   A.  Gosh, that seems like kind of a private and
19 personal question.
20   Q.  Well, I'll assure you that I'm not going to be
21 telling people about this, but it is a relevant fact in
22 the case.
23       MS. FITE:  I'd like to note in the
24 record that I have a continuing objection to this line of

Page 47

1  questioning.
2        MR. HOMER:  I understand.
3    A.  So you want me to answer the question how much
4  I made in 2005?
5    Q.  Yes.
6    A.  65,000.  64,000, maybe.
7    Q.  Okay.  My last question, Mr. McQuisten:  Have
8  you ever been convicted of a crime?
9    A.  DWI.
10   Q.  Anything else?
11   A.  Motor vehicle violations.
12   Q.  Anything else?
13   A.  No.  I don't believe so.
14   Q.  Any crime that would involve honesty?
15   A.  Nope.
16       MR. HOMER:  Okay.  I don't have any
17 other questions.
18 BY MS. FITE:
19   Q.  Mr. McQuisten, I'm going to ask you just a
20 couple of questions.
21       Earlier when you were asked whether
22 Ms. Hue had done anything improper, you answered
23 "integrity."  Then Mr. Homer went back and asked you to
24 answer it in a yes or no form.  What did you mean when

Page 48

1  you answered "integrity"?  Is that what you said:
2  Integrity?
3        (The witness provided an unintelligible
4  response.)
5        THE REPORTER:  I'm sorry.  I didn't hear
6  that answer.
7        THE WITNESS:  I haven't answered.
8        MR. HOMER:  Well, you said something.
9  We couldn't hear it.
10       MS. FITE:  I asked if that was what he
11 said -- "integrity."  And he said yes.
12       THE WITNESS:  You want to know what I
13 meant by that?
14       MS. FITE:  Yes.
15       THE WITNESS:  I was asked to do
16 something that I thought was a violation of my integrity.
17 BY MR. FITE:
18   Q.  What was that?
19   A.  I was informed -- let's put it this way --
20 that something was going to happen that I considered a
21 violation of integrity.
22   Q.  I'm asking you what that something was.
23   A.  That was to -- well, I informed Ms. Hue, my
24 manager, that a check had to be pulled.  We have to pull

Page 49

1  this check.  The money is not available.  And I --
2  because I was called by the writer of the check advising
3  me that the funds did not come in.  Hold that check for
4  another week.  And when I filled out a form to hold the
5  check, I was told nothing is being held.  They're
6  running.  You just have to make it up next month.
7    Q.  Ms. Hue told you that nothing is being held?
8    A.  Correct.
9    Q.  Your understanding of nothing is being held
10 means that everything that's on is going to run
11 regardless of whether or not the funds are verified?
12   A.  Well, yeah.  Let's -- let me refer to
13 everything.  We're talking one check.  I want to pull the
14 check.  The check is not getting pulled.  The check is
15 running.
16   Q.  Do you remember her saying that nothing was
17 being pulled?
18   A.  Yeah, yeah.  Whether it was the exact word
19 "nothing" -- but, yeah, that's what it was.
20   Q.  Is it your understanding that that is a
21 violation of NCO's policy?
22   A.  Absolutely.
23   Q.  Did Ms. Hue ask you at that point whether you
24 were just trying to sandbag?

Corbett & Wilcox

08/28/2004 10:41 FAX

EXHIBIT
6A

State of Louisiana
County of Jefferson

## SWORN STATEMENT OF BRIAN LAICHE

I, Brian Laiche, hereby confirm under oath the following:

1.  I am employed by NCO Financial Systems, Inc. (NCO) and have worked at NCO since *MARCH 1, 1994*. I am currently a *manager* in the Commercial Division in Metairie, LA.
2.  At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.
3.  At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds.
4.  It has always been Kathy Obenshain's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.
5.  It is known that fraudulently violating NCO's check handling policies would result in termination.
6.  I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

_____          6/28/04
Brian Laiche                              Date

F:\NCO HR\FILES\Hue, Valerie\Correspondence\Sworn Statement Laiche.doc

000101



EXHIBIT
68

State of Louisiana
County of Jefferson

## SWORN STATEMENT OF DARRIN DEESCH

I, Darrin DeEsch, hereby confirm under oath the following:

1. I am employed by NCO Financial Systems, Inc. (NCO) and have worked at NCO since April 13, 1998. I am currently a General Manager in the Commercial Division in Metairie, LA as director of NCO's commercial legal management division and financial investigative services division.

2. At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.

3. At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds.

4. It has always been Kathy Obenshain's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.

5. It is known that fraudulently violating NCO's check handling policies would result in termination.

6. I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

_____  6/22/04
Darrin DeEsch                    / Date

H:\DINCO Mt FILES\Hue, Valerie\Correspondence\Sworn Statement DeEsch.doc

C-38

000102

EXHIBIT

6C

State of Oregon
County of __WASHINGTON__

### SWORN STATEMENT OF STEVE ROSS

I, Steve Ross, hereby confirm under oath the following:

1.  I am employed by NCO Financial Systems, Inc. (NCO) and have worked at NCO since __1/27/97__. I am currently a __Branch Mgr.__ in the Commercial Division in Portland, Oregon.

2.  At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.

3.  At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds.

4.  It has always been Kathy Obenshain's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.

5.  It is known that fraudulently violating NCO's check handling policies would result in termination.

6.  I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

Steve Ross                                                            6/22/64
Steve Ross                                                                Date

F:\DIV\NCO HR FILES\Ross, Valerie\Correspondence\Sworn Statement_Ross.doc

000103

08/22/2004 09:20 FAX                                                    @001



State of _GEORGIA_
County of _Fulton_

## SWORN STATEMENT OF CHRIS SANTASIERO

I, Chris Santasiero, hereby confirm under oath the following:

1. I am employed by NCO Financial Systems, Inc. (NCO) and have worked at NCO since _October 9, 2000_ . I am currently a _MANAGER_ in the Commercial Division in _ATLANTA GEORGIA_.

2. At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.

3. At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds.

4. It has always been Kathy Obenshain's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.

5. It is known that fraudulently violating NCO's check handling policies would result in termination.

6. I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

_Chris Santasiero_                    _6-22-04_
Chris Santasiero                          Date

H:\DATA\NCO HR FILES\Hue, Valerie\Correspondence\Sworn Statement.Santasiero.doc

000104



State of Colorado
County of Arapahoe

### SWORN STATEMENT OF LENNY CICCARONE

I, Lenny Ciccarone, hereby confirm under oath the following:

1.   I am employed by NCO Financial Systems, Inc. (NCO) and have worked at NCO since January 25, 1995. I am currently the managing director in the Commercial Division in Denver, Colorado.

2.   At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds   Such conduct is a known violation of NCO check handling policies.

3.   At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds.

4.   It has always been Kathy Obenshain's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.

5.   It is known that fraudulently violating NCO's check handling policies would result in termination.

6.   I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

_____          6/22/04
Lenny Ciccarone                             Date

H:\DIV\CO RE FILES\Misc, Valerie\Correspondence\Sworn Statement_Ciccarone.doc

009105

C-41

06/24/2004 14:42 FAX 8139642383          NCO FINANCIAL SYSTEMS                    @ 002/002



State of Florida
County of _Hillsborough_

### SWORN STATEMENT OF MANNY CARDOZO

I, Manny Cardozo , hereby confirm under oath the following:

1.  I am employed by NCO Financial Systems, Inc. (NCO) and have worked at NCO since _07\21\2001_ . I am currently a _BRANCH MANAGER_ in the Commercial Division in Tampa, FL.
2.  At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.
3.  At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds.
4.  It has always been Kathy Obenshain's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.
5.  It is known that fraudulently violating NCO's check handling policies would result in termination.
6.  I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

H:\2\NCO HR FILES\Hue, Valerie\Correspondence\Sworn Statement.Cardoza.doc

Manny Cardozo                                    Date 06/24/04

009106

05/22/2004 07:27 FAX 5203259406          NCO AZ                              ☑002

```
                                                              ┌─────────────┐
                                                              │   EXHIBIT    │
                                                              │    6 G       │
                                                              └─────────────┘
```

State of Arizona
County of Pima

### SWORN STATEMENT OF JOE BATIE

I, Joe Batie, hereby confirm under oath the following:

1. I am employed by NCO Financial Systems, Inc. (NCO) and have worked at NCO since January 3, 1991. I am currently the Managing Director in the Commercial Division in Tucson, Arizona.

2. At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.

3. At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds.

4. It has always been Kathy Obenshain's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.

5. It is known that fraudulently violating NCO's check handling policies would result in termination.

6. I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

_____     6/22/04
Joe Batie                           Date

E:\D\NCO RR FILES\Hue, Valeria\Correspondence\Sworn Statement Batie.doc

000107



EXHIBIT

_10H_

State of Delaware
County of Kent

## SWORN STATEMENT OF MIKE SCHER

I, Mike Scher, hereby confirm under oath the following:

1. I am employed by NCO Financial Systems, Inc. (NCO) and have worked at NCO since June 1992 . I am currently a General Manager in the Commercial Division in Dover, Delaware.

2. At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.

3. At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds.

4. It has always been NCO's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.

5. It is known that fraudulently violating NCO's check handling policies would result in termination.

6. I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

H:\NCO JOB FILES\Misc. Valeri\Correspondence\Sworn Statement_Scher.doc

Mike Scher                          6/24/04
                                       Date

Jun-24 04 06:22p                                                    P.2

EXHIBIT

_10 I_

State of Louisiana
County of Jefferson

## SWORN STATEMENT OF JOE THOMAS

I, Joe Thomas, hereby confirm under oath the following:

1.  I am employed by NCO Financial Systems, Inc (NCO) and have worked at NCO since _September 2000_. I am currently a _GCM_ in the Commercial Division in Metairie, LA handling commercial matters arising out of NCO's Boone, NC office.

2.  At no time did Kathy Obenshain, former vice president of operations for the Commercial Division, instruct me to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.

3.  At no time did I witness Ms. Obenshain instruct Valerie Hue to re-deposit checks without verification of funds

4.  It has always been Kathy Obenshain's policy and direction that unless there was verification of funds available, no non-sufficient funds (NSF) checks should be re-deposited.

5.  It is known that fraudulently violating NCO's check handling policies would result in termination.

6.  I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

_6-24-04_
Date

Joe Thomas

H:\NCO NR FILES\Hue, Valerie\Correspondence\Sworn Statement_Thomas.doc

000103

C-45

State of Louisiana
County of Jefferson



## SWORN STATEMENT OF KATHY OBENSHAIN

I, Kathy Obenshain, hereby confirm under oath the following:

1. I was employed by NCO Financial Systems, Inc. (NCO) and worked at NCO from December 1, 1994 to April 19, 2004 as the vice president of operations in the Commercial Division.

2. As the vice president of operations in the Commercial Division, I had consistent contact with Valerie Hue as her superior.

3. At no time did I instruct any branch manager, including Ms Hue, to re-deposit checks without verification of funds. Such conduct is a known violation of NCO check handling policies.

4. As a result of a routine monthly audit, a large number of non-sufficient funds checks were found in Ms. Hue's department. A fact-finding investigation by Corporate Employee Relations and my department was completed, which revealed Ms. Hue was violating NCO's check handling policies.

5. I have provided this sworn statement of my own free will and the information contained in this statement is accurate to the best of my knowledge and belief.

_____   _____
Kathy Obenshain                        Date

H:\DJ\NCO HR FILES\Hue, Valerie\Correspondence\Sworn Statement Obenshain.doc

000110

HUE _v. NCO Financial Systems                    1/31/06 Depo of Dina B. Shaantiel

```
                    1
        IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF DELAWARE

VALERIE HUE,              )
        Plaintiff,        )
                          )
    v                     ) C.A. No.
                          ) 05-225-KAJ
NCO FINANCIAL SYSTEMS, INC., a  )
Delaware corporation, trading as )
NCO FINANCIAL COMMERCIAL SERVICES,)
    Defendant.           )

        Deposition of DINA BETH SHAANTIEL, taken
before Cheryl A. Anthony, Court Reporter, in the
conference room of NCO Financial Commercial Services,
Prudential Drive, Horsham, Pennsylvania, on Tuesday,
January 31, 2006, beginning at 1:15 p.m.

APPEARANCES:

    PARKOWSKI, GUERKE & SWAYZE
    BY: JEREMY W. HOMER, ESQUIRE
    116 West Water Street
    Dover, Delaware 19901
    Attorney for Plaintiff

    SESSIONS, FISHMAN & NATHAN
    BY: DAVID ISRAEL, ESQUIRE
    3850 North Causeway Boulevard
    Lakeway Two, Suite 1240
    Metairie, Louisiana 70002-1752
    Attorney for Defendant


    ORIGINAL RETAINED BY JEREMY W. HOMER, ESQUIRE


            ANTHONY REPORTING
              PO Box 234
         Dover, Delaware 19903
            (302)674-8884
```

                    2

1       DINA BETH SHAANTIEL,
2   the witness herein, having first been
3   duly affirmed, was examined and
4   testified as follows:
5   BY MR. HOMER:
6       Q.   Good afternoon.  My name is Jeremy Homer.
7   I am the attorney representing Valerie Hue in this case.
8   Could you first state your name again?
9       A.   It's Dina Beth Shaantiel.
10      Q.   Okay.  At one time did you go by the name of
11  Dina Loft, L-O-F-T?
12      A.   Yes.
13      Q.   Could you explain why you changed -- First
14  of all, could you explain during what time period you
15  used that name, Dina Loft?
16      A.   I have been using Dina Loft since I went
17  into the collection industry back in 1985 as an alias.
18      Q.   And when did you change it to your present
19  name?
20      A.   About a year, year and a half ago, give or
21  take, NCO required everybody to stop using their aliases
22  and start using our real names.
23      Q.   I may refer to you as Dina Loft or Ms. Loft
24  during the course of this, only because I don't feel I

                    3

1   can pronounce your name correctly.  So please bear with
2   me when I do that.
3           I would like to instruct you that if I ask a
4   question today that you don't understand, I would ask
5   you not to try to answer, but instead ask me to rephrase
6   it so that you do understand it.  Do you understand
7   that?
8       A.   Yes.
9       Q.   Okay.  Is there any reason why your ability
10  to answer today would be impaired in any way?  For
11  example, have you had any medication?
12      A.   No.  I'm fine.
13      Q.   Okay.  And there isn't any other reason why
14  you can't testify today?
15      A.   No.
16      Q.   Okay.  Do you understand that this is a
17  deposition, that you are under oath, that it is a crime
18  not to tell the truth, and that you do need to make your
19  best efforts to tell the truth?
20      A.   I understand.
21      Q.   Okay.  What is your educational background?
22      A.   I went to high school, college.
23      Q.   Okay.  Where did you go to college?
24      A.   Johnson & Wales.

                    4

1       Q.   Where is that?
2       A.   Providence, Rhode Island.
3       Q.   Okay.  When did you graduate?
4       A.   I didn't graduate from there.  I did a
5   two-year program.
6       Q.   Okay.  What was the program in?
7       A.   Culinary arts and business administration.
8       Q.   Okay.  And you got a degree there?  A
9   two-year degree?
10      A.   Back then they didn't have a two-year
11  degree.  Back then it was a certificate of completion.
12      Q.   Okay.  Could you relate your work history,
13  going back to the time you began the collection
14  business?  And if you could, identify each job you have
15  had, approximately what dates you had that job, and, if
16  you could, just briefly describe what your duties were.
17      A.   I started in I want to say '83, working in
18  Florida for a collection agency as a collector, called
19  Credit Control.
20      Q.   Okay.  How long were you there?
21      A.   Oh, I want to say -- Was it '82 or '83?  I'm
22  sorry.  I want to say somewhere in '83 to '85, and I at
23  that time did part-time work for a mortgage company at
24  night as a collector, also.  And then from there, I came

### 13

1  deposits of checks.
2      Q.   Okay. Well, with respect to the commercial
3  ops programming, it says at the top, this is the policy
4  for NSF checks. Are you saying that this policy didn't
5  apply to all of the commercial ops?
6      A.   This policy applied at this time for them.
7  This was before my time with commercial.
8      Q.   Okay. What did Laura Harkinson and her
9  group do with these requests once they were received?
10     A.   To the best of my knowledge, Laura Harkinson
11 was a cash posting clerk. She would take an e-mail and,
12 based on what the e-mail was, either post or destroy a
13 check, to my knowledge.
14     Q.   Okay.
15     A.   But again, I was not involved at that time
16 with this.
17     Q.   And what request is being made here, to your
18 understanding? In the second bullet point, what is the
19 request --
20     A.   You have several here. Which one are you
21 referring to?
22     Q.   I'm talking about the one in bullet point
23 two.
24     A.   Requests should be e-mailed to Laura

### 14

1  Harkinson.
2      Q.   Yes. What kinds of requests are they
3  talking about there?
4      A.   I wasn't a part of this at that time, so I
5  was not involved and I wouldn't want to give you an
6  exact answer.
7      Q.   Okay. Do you know what the third bullet
8  point is, requests for redeposits can only be made for
9  NSF items processed within the past 30 days?
10     A.   Repeat that question.
11     Q.   Well, just read the third bullet.
12     A.   Request for redeposits can only be made for
13 NSF items processed within the past 30 days (time frame
14 provided by executives).
15         MR. ISRAEL: I think he's asking: Do you
16 know what that means?
17         MR. HOMER: Yes.
18         THE WITNESS: Yes. I do know what that
19 means.
20 BY MR. HOMER:
21     Q.   Okay. What does that mean?
22     A.   Anytime we have a check that is returned
23 NSF, we have 30 days to make that same check good. We
24 have to go through a verification process before we do

### 15

1  that, and that would be -- if it's not within that time
2  frame, you cannot redeposit the check.
3      Q.   Okay. And that policy is stated in this
4  Exhibit 1, correct?
5      A.   Right here.
6      Q.   At the third bullet point, that is what that
7  is saying; is that correct?
8      A.   Uh-huh.
9          MR. ISRAEL: You have to say yes.
10         THE WITNESS: I'm sorry. Yes. I am sorry.
11         MR. ISRAEL: That is okay. You are doing
12 good.
13 BY MR. HOMER:
14     Q.   So a clerk would get a request. Who would
15 submit the request? Do you know?
16     A.   I apologize; I do not know who requested

18     Q.   Would it be collectors? Do you know?
19     A.   I don't know. I really don't want to answer
20 a question I don't have information on.
21         MR. ISRAEL: I don't know is fine. There is
22 no rush. She has all day.
23 BY MR. HOMER:
24     Q.   What was your involvement in 2003 in

### 16

1  reviewing NSF requests, if you had any involvement at
2  all?
3      A.   Steve Leckerman came to me in I want to say
4  sometime early October, maybe September, October. And
5  he said to me that he wanted me to start reviewing all
6  the NSFs across the board.
7      Q.   Who is Steve Leckerman?
8      A.   Steve Leckerman is the senior vice president
9  of operations.
10     Q.   Did he explain why he wanted to do that?
11     A.   He explained that he wanted to make sure
12 that we were following policy and that we were putting
13 good money in and we weren't chasing bad money.
14     Q.   Okay. Did he explain anything else about
15 why he was doing it?
16     A.   I don't recall.

18 doing this, or did you work independent?
19     A.   I worked independent.
20     Q.   Okay. And did you review the NSF requests
21 to see if they complied with this policy that is in
22 Exhibit 1?
23     A.   I did not go by this specific set of
24 details. I went with the details that were given to me

### 45

1    A.  Different offices.

2    Q.  When you prepared this report for January,

3  do you know how many collectors you reviewed at that

4  point?

5    A.  At this point in here?

6    Q.  Yes.

7    A.  We had reviewed the complete commercial

8  file, I think. I mean 90 -- I'm almost 100 percent sure

9  we went through all of commercials for that time frame.

10    Q.  Well, I thought you had said before that by

11  the end of December, you were crying for help, that you

12  couldn't get through it, and you mentioned only four

13  that you had gone through, Baltimore, Buffalo, AmEx, and

14  one other.

15    A.  Right. This is the February report. We did

16  this in January.

17    Q.  I understand that. You are saying that in

18  the next month, you finished all the rest of them in

19  January 2004? You only had four done by the end of

20  December. And then in January, you got everything else

21  done in the commercial division?

22    MR. ISRAEL: Can we go off the record for a

23  second?

24    (Following a discussion off the record:)

### 46

1  BY MR. HOMER:

2    Q.  Let's back up a little bit. When did you

3  start reviewing, pursuant to Mr. Leckerman's directive,

4  the commercial offices and the collector practices

5  regarding redepping NSF checks?

6    A.  It was the beginning of the year.

7    Q.  January?

8    A.  Yes, sir.

9    Q.  Okay. January of 2004, you are talking

10  about?

11    A.  Yes.

12    Q.  Okay. And when did you complete that

13  review?

14    A.  In the month of January.

15    Q.  Okay.

16    MR. ISRAEL: You believe?

17    THE WITNESS: I believe.

18  BY MR. HOMER:

19    Q.  You are not sure about that? Apparently

20  not. Is that true? You are not sure?

21    MR. ISRAEL: By the time we are done, you

22  won't be sure of anything.

23    THE WITNESS: I have to tell you, give me a

24  rubber band.

### 47

1    MR. ISRAEL: You are 99 percent sure?

2    THE WITNESS: Yes.

3  BY MR. HOMER:

4    Q.  Let's get back to Exhibit 2. It says all

5  the checks were returned.

6    MR. ISRAEL: Still on that first block?

7    MR. HOMER: Right.

8  BY MR. HOMER:

9    Q.  What time period are you talking about

10  there?

11    A.  I reviewed the checks from the end of

12  December through the middle of January.

13    Q.  And you say at the end of December. Do you

14  mean December 31st or --

15    A.  No. I would say from the 15th, give or take

16  a few days.

18  the collectors you were looking at in that one-month

19  period, December 15th to January 15th?

20    A.  I would say that would be true.

21    Q.  Okay. It says here that Valerie Hue put

22  through the checks. Again, I'm referring to Exhibit 4.

23    A.  Absolutely.

24    Q.  How do you know she put through the checks?

### 48

1    A.  At the time I didn't know it was Valerie

2  Hue, until I actually did the final report. I went by

3  user code. At that time I only identified user codes.

4  And then I went through and I was able to get the

5  information, what user code related to what person to

6  identify what went on the report.

7    Q.  Can you find the specific checks that she

8  put through that you claim or you indicate here were

9  returned? Can you find those checks?

10    A.  Not today.

11    Q.  Well, can you find them?

12    A.  I can get access to them.

13    Q.  Okay. Do you have any way of knowing

14  whether someone else might have used her user code when

15  the checks were put through?

16    A.  To my knowledge, nobody uses anybody's user

18    (A recess was taken from 2:14 p.m. until

19  2:18 p.m.)

20  BY MR. HOMER:

21    Q.  What documentation have you kept to show

22  that the authorization procedures weren't followed and

23  that people put these checks through that were returned?

24  What do you have in terms of records that show it?

000544

| DATE OF CHECK | Collector Name | A/C # | Root of Problem collector/cash collector/debtor | Unit | Check Amount | Explanation |
|---|---|---|---|---|---|---|
| 12/26/2003 | william callet | S78713 | collector/debtor | A11 | -5930.43 | 1st bounce was nievered/inatie up w cert funds |
| 12/31/2003 | william callet | R95152 | collector | A11 | -3221 | debtor said no my on 12/12 ck should o/ pulled |
| 12/31/2003 | william callet | T03297 | debtor | A11 | -3000 | no money |
| 12/31/2003 | william callet | S92674 | collector | A11 | -1020.65 | debtor told collector funds no good |
| 12/31/2003 | steve troxell | S57063 | debtor | A20 | -2500 | no money |
| 12/31/2003 | steve troxell | R19352 | debtor | A20 | -2500 | stop pay |
| 12/31/2003 | steve troxell | R83836 | debtor | A20 | -1000 | no money |
| 12/30/2003 | michelle glidden | R01080 | debtor | A21 | -1500 | no money |
| 12/31/2003 | keith bryant | S78635 | collector/debtor | A3 | -2744.03 | nvr flu to see if roller recd |
| 12/31/2003 | keith bryant | T35950 | collector/debtor | A3 | -2529.73 | d called to pull ck same day |
| 12/31/2003 | keith bryant | S13415 | collector/debtor | A3 | -1000 | had nsf should of mette up w nsf |
| 12/31/2003 | claude jones | T04496 | debtor | A32 | -2225.86 | no money |
| 12/24/2003 | harold moore | Q97254 | debtor | A37 | -3044.6 | no money |
| 12/24/2003 | kevin brown | T16561 | debt | A43 | -1051.73 | no money |
| 12/31/2003 | ellis phelps | A68860 | debtr | A53 | -5000 | no money/multi nsf |
| 12/31/2003 | ellis phelps | S42563 | debtr | A53 | -2000 | no money |
| 12/31/2003 | ellis phelps | T14389 | debtr | A53 | -1718 | no money |
| 12/26/2003 | ellis phelps | A68860 p. | debtr | A53 | -1000 | no money multi nsf |
| 12/29/2003 | julie rees | R49535 | collector/debtor | A63 | -3011.0 | money was in the hosp |
| 12/20/2003 | julie rees | R07439 | debtor | A63 | -3369.61 | debtor is client |

| Date | Name | Account | Role | Code | Amount | Notes |
|---|---|---|---|---|---|---|
| 12/31/2003 | david Kornahrens | T07557 | collector | B59 | -2500 | mull nsf redcl w/o cl ck |
| 12/20/2003 | david Kornahrens | S47763 | debtor | B59 | -1000 | mull nsf |
| 12/31/2003 | bob feger | S98456 | debtor | B6 | -1220 | no money |
| 12/30/2003 | walter theodore | S84627 | debtor | B62 | -1000 | ver hank good for 1 pull 2 cks in poss rensf |
| 12/30/2013 | linda costa | S09348 | debtr | B63 | -2845 | no money |
| 12/30/2003 | linda costa | S83272 | debtr | B63 | -1682 | accounting issue |
| S21335 | sieven birdsong | S21335 | collector | D1 | -1813 | collector ran ck -f/nrls tno verf |
| 12/29/2003 | raymond morrison | 573686 | debtor | D17 | -2500 | no money |
| 12/30/2003 | daniae ramirez | T16568 | debtor | D19 | -1166.58 | no money |
| 12/31/2003 | daniae ramirez | R07082 | collect/rmgr | D19 | -1000 | redcl w/o contlact |
| 12/31/2003 | BRAD REAVES | R08156 | collector | D22 | -7000 | nvr recd aulhrzin from d eom |
| 12/31/2003 | BRAD REAVES | S51306 | collector | D22 | -3435.5 | nvr recd aulhrzin from d eom |
| 12/31/2003 | Brad  REAVES | S51306 | collector | D22 | -3400 | nvr recd aulhrzin from d eom |
| 12/31/2003 | BRAD REAVES | T32974 | debtor | D22 | -2401.46 | no money |
| 12/31/2003 | BRAD REAVES | T20071 | collector | D22 | -2030 | nvr recd aulhrzin to d/d ck |
| 12/31/2003 | BRAD REAVES | S98825 | collector | D22 | -2000 | knew no money nvr pulled ck |
| 12/29/2003 | BRAD REAVES | S98825 | collector | D22 | -2000 | knew no money nvr pulled ck |
| 12/31/2003 | BRAD REAVES | S98825 | collector | D22 | -2000 | change postdale lilen dlocrmnl |
| 12/31/2003 | BRAD REAVES | S42286 | collector | D22 | -2000 | to do so |
| 12/31/2003 | BRAD REAVES | T38089 | ? | D22 | -1500 | documnts no clear |
| 1/5/2004 | BRAD REAVES | S65602 | collector | D22 | -1071.18 | d was sending no mull nsf |
| 12/24/2003 | BRAD REAVES | S85602 | collector | D22 | -1000 | d was sending mo mull nsf |
| 12/31/2003 | BRAD REAVES | R72202 | collector | D22 | -1000 | collcir knew d was sending mo ck should have been pull |
| 12/29/2003 | KEN ROSE | S94552 | COLLECTOR | D29 | -8500 | notes don't add up |
| 12/31/2003 | KEN ROSE | T11659 | collector/client | D29 | -5000 | notes show pending client ck should of pulled |
| 12/29/2003 | KEN ROSE | S27200 | collector | D29 | -1982 | mull nsf should of pulled |

001025

C-51

| Date | Name | ID | Type | Code | Amount | Notes |
|---|---|---|---|---|---|---|
| 12/31/2003 | Joe glaquento | R74588 | collector | D31 | -2683.21 | 2nd ck no contact or authorz'n |
| 12/30/2003 | Joe glaquento | T09615 | debtor | D31 ck | -2459.94 | no money / ck was changed date to 2nd i ran on 31st / no money |
| 12/31/2003 | Joe glaquento | T22837 | cash | D31 | -1202.06 | no money |
| 12/29/2003 | Joe glaquento | S95774 | debtor | D31 | -1112.13 | |
| 12/31/2003 | dan maddox | Q93881 | collector | D36 | -22879.82 | knew aha wrong gor correct info and nvr put in also had rdate change |
| 12/31/2003 | david dunham | S97141 | collector | D43 | -2034.01 | nvr called debtor after 1st bounce |
| 12/31/2003 | david dunham | T16865 | collector | D43 | -1062.5 | no contact w d l'ien dcl |
| 12/30/2003 | david dunham | S07157 | collector | D43 | -1000 | no money |
| 12/31/2003 | SCOTT RAULSTON | D95575 | collector/debtor | D48 | -4000 | no money -funky notes |
| 12/30/2003 | SCOTT RAULSTON | R40912 | debtor | D48 | -1500 | no money |
| 12/30/2003 | SCOTT RAULSTON | S80592 | debtor | D48 | -1050.74 | funky notes |
| 12/31/2003 | matt lane | S28434 | collector | D60 | -7500 | no contact after 1st bounce then rdcl |
| 12/31/2003 | matt lane | S13617 | collector | D60 | -5000 | no contact after 1st bounce then rdcl |
| 12/31/2003 | matt lane | R21037 | collector | D60 | -4325 | no contact after 1st bounce then rdcl |
| 12/30/2003 | matt lane | S64996 | collector | D60 | -4000 | ck was a pull / rdcl |
| 12/31/2003 | matt lane | S70844 | | D60 | -3023.5 | no contact after 1st bounce then rdcl |
| 12/30/2003 | matt lane | R93502 | collector | D60 | -1000 | no contact after 1st bounce then rdcl |
| 12/24/2003 | mark lefevre | T13335 | debtor | D70 | -14046 | no money |
| 12/31/2003 | mark lefevre | Q71642 | collector | D70 | -14000 | 1st ck bounce debtor then told collector ck no good till the 10th collector put ck in on the 2nd |

| Date | Name | ID | Role | Code | Amount | Notes |
|---|---|---|---|---|---|---|
| 12/31/2003 | mark lefevre | T14261 | collector/debtor | D70 | -6617.79 | 1st bounce then redcl funty docs |
| 12/30/2003 | mark lefevre | S51701 | collector | D70 | -1745.62 | no contact w debtor only lm |
| 12/31/2003 | joseph dunning | S11960 | collector | D75 | -1000 | no contact w debtor only lm |
| 12/30/2003 | david mcquisten | 684902 | collector/debtor | D79 | -15000 | unable to verf funds 2nd time |
| 12/31/2003 | david mcquisten | Q83571 | collector/mgt | D79 | -12000 | redp per mgt no funds per notes |
| 12/31/2003 | david mcquisten | S15764 | collector | D79 | -8000 | mult nsf |
| 12/31/2003 | david mcquisten | 667976 | collector | D79 | -4373.34 | 1st ck nsf no real contact redcl |
| 12/31/2003 | david mcquisten | S47717 | collector/mgt | D79 | -3778.08 | ck bounce |
| 12/31/2003 | david mcquisten | S95738 | collector | D79 | -3000 | mult nsf |
| 12/30/2003 | david mcquisten | T32522 | collector | D79 | -2500 | dcl done w/o authrzn redcl w/o authrzn just verf w bank |
| 12/30/2003 | david mcquisten | P96886 | collector | D79 | -1600 | – catld next day and was then told no funds |
| 12/31/2003 | david mcquisten | R92555 | collector | D79 | -1500 | mult nsf for sevral mo change dcl dates |
| 12/31/2003 | david mcquisten | R37499 | collector/mgt | D79 | -1366.86 | mult dcte changes mult nsf |
| 12/31/2003 | mike kraig | 892388 | collector | F11 | -2000 | mult nsf / dcl error |
| 12/30/2003 | St. Clair Carr | Q72441 | collector | F21 | -1000 | collector told debtor to do a stop pmnt |
| 12/30/2003 | Jon Tapia | D32616 | debtor | F51 | -5000 | no money |
| 12/31/2003 | Trenice Harris | Q76796 | debtor | F65 | -2000 | no money |
| 12/31/2003 | Bruce Richardson | S16794 | debtor | F93 | -2000 | no money |
| 12/30/2003 | Storm McIntyre | Q83584 | debtor | M1 | -3000 | no money |
| 12/31/2003 | Brian Dennis | S16508 | debtor/collector | M2 | -12000 | altny sd he would fed-ex ck – ck's were dcl'd |

001123

C-53

| Date | Name | Account | Type | Code | Amount | Notes |
|---|---|---|---|---|---|---|
| 12/31/2003 | julie rees | S09400 | collector/debtor | A63 | -1000 | no money/null risf |
| 12/31/2003 | david dubery | T23443 | debtor | A73 | -1785.33 | no money |
| 12/31/2003 | lori clark | T00940 | debtor | A75 | -4105 | client issues |
| 12/30/2003 | lori clark | S25862 | debtor | A75 | -2900.43 | no money |
| 12/29/2003 | lori clark | T13949 | debtor | A75 | -2898.42 | no money |
| 12/31/2003 | lori clark | T03384 | debtor | A75 | -2524.43 | no money |
| 12/31/2003 | lori clark | T20759 | debtor | a75 | -2030 | no money |
| 12/31/2003 | lori clark | T20248 | debtor | a75 | -1000 | no money mull nsf |
| 12/31/2003 | lori clark | T20248 | debtor | A75 | -1000 | no money null nsf |
| 12/31/2003 | craig cavalcante | T20414 | debtor | A76 | -7333.09 | changed bank accounts w/o |
| 12/31/2003 | craig cavalcante | T07888 | collector | A76 | -12577.13 | clk |
| 12/31/2003 | craig cavalcante | T34793 | debtor | A76 | -16176.62 | took cc decline no contant took |
| 12/31/2003 | craig cavalcante | R63632 | debtor | A76 | -18997.6 | dci-name error made gnod bc debtor called no gnod same day |
| 12/31/2003 | craig cavalcante | S86957 | debtor | A76 | -1937.67 | notices |
| 12/31/2003 | craig cavalcante | T12150 | collector | A76 | -1274 | no contact w d just dcl |
| 12/30/2003 | craig cavalcante | T016B6 | debtor | A76 | -1251.37 | no money |
| 12/31/2003 | frank orr | S60834 | debtor | A77 | -18935.94 | bank hold of funds |
| 12/31/2003 | frank orr | T15748 | debtor | A77 | -3800 | no money |
| 12/31/2003 | frank orr | T06799 | debtor | A77 | -3589.86 | no money |
| 12/31/2003 | frank orr | QG1567 | collector | A77 | -1753.47 | nvr made up 1st nsf or contact w debtor |
| 12/29/2003 | frank orr | D42644 | debtor | A77 | -1500 | no money |
| 12/31/2003 | frank orr | R83014 | collector | A77 | -1004.87 | nvr made up 1st nsf or contact w debtor |
| 12/24/2003 | jessie montoro | S27322 | debtor | A82 | -3857.73 | no money |
| 12/24/2003 | jessie montoro | R88627 | debtor | A82 | -3695.3 | no money |
| 12/31/2003 | tom vanltrone | R25366 | collector/debtor | B67 | -1042.16 | knew ck no good moved dcl |

| Date | Name | Number | Role | Code | Amount | Notes |
|---|---|---|---|---|---|---|
| 12/31/2003 | Brian Dennis | R22796 | debtor/collector | M2 | -11133.33 | 2 bounces in a row-nvr varified funds |
| 12/31/2003 | Brian Dennis | T04342 | debtor | M2 | -4520 | no money |
| 12/22/2003 | Brian Dennis | 591579 | debtor | M2 | -2000 | stop payment |
| 12/31/2003 | Mark Patterson | S09433 | collector | M25 | -1000 | dbtor did to change ck date-collector said no |
| 12/22/2003 | Elkiedra Richard | 060240 | debtor | M26 | -3012 | no money |
| 12/31/2003 | Jim Gillis | 966780 | collector | M31 | -30000 | was told by super to verify funds |
| 12/31/2003 | Jim Gillis | R86579 | debtor | M31 | -2411.5 | no name |
| 1/6/2004 | Annie Hunt | T16484 | collector | M38 | -2536.78 | verified no money with bank-still ran |
| 12/31/2003 | Annie Hunt | D46489 | collector | M38 | -2050.88 | dbtr sd he was sending WU- |
| 12/31/2003 | Fernando Hunt | S89286 | debtor | M4 | -4577.07 | verified no money- still ran ck |
| 12/31/2003 | Fernando Hunt | 808816 | debtor | M4 | -1500 | no money no money |
| 1/8/2004 | Dane Revelle | 248701 | debtor/collector | M40 | -1041.66 | never followed up after 1st bounce. |
| 12/31/2003 | Greg Ansardi | T12054 | collector | M42 | -1050.11 | debtor called to stop pmnt-never done |
| 12/30/2003 | Denise Richardson | S40051 | debtor | M73 | -1962.09 | no money |
| 12/30/2003 | Steve Hallam | 738274 | ??? | M80 | -2500 | ??? |
| 1/13/2004 | Mike Mullens | 090213 | debtor | P15 | -1420.54 | ck not endorsed |
| 12/31/2003 | Frank Sauceda | T16254 | debtor | P16 | -9000 | no money |
| 12/31/2003 | Frank Sauceda | T26854 | debtor | P16 | -6608.38 | no money |
| 12/31/2003 | Frank Sauceda | T24294 | debtor | P16 | -2593.91 | no money |

001175

| | Date | Name | Account | Type | Code | Amount | Notes |
|---|---|---|---|---|---|---|---|
| | 12/31/2003 | Bill Rice | S04710 | collector | P46 | -1000 | every ck in past 4 months bounced. |
| ✓ | 12/31/2003 | Bruce Woodson | S58146 | collector | P49 | -6000 | dbtr said still trying to get funds- collector dcft anyway |
| ✓ | 12/31/2003 | Bruce Woodson | S30421 | collector | P49 | -2000 | 2 bounces-2 checks taken, asked to get cert funds, no attempt made. |
| ✓ | 12/31/2003 | Bruce Woodson | S61445 | collector | P49 | -1835.41 | 3 bounces in a row |
| ✓ | 12/31/2003 | Bruce Woodson | S462S5 | collector | P49 | -1704.76 | 4 bounces in a row |
| ✓ | 12/31/2003 | Ricardo Hernandez | 89757R | debtor | T21 | -1000 | no money |
| ✓ | 12/31/2003 | Ricardo Hernandez | R49951 | debtor | T21 | -1000 | no money |
| ✓ | 12/30/2003 | Dennis Angeles | Q19413 | debtor | T27 | -1000 | debtor is a client |
| - | 12/26/2003 | Andrew Hardin | S95713 | debtor | T47 | -3875 | no money |
| ✓ | 12/29/2003 | Darrel Austin | T16868 | debtor | T63 | -3130.75 | no money |
| ✓ | 12/31/2003 | Darrel Austin | R92845 | collector | T63 | -2000 | dblr wanted put changed-never changed |
| ✓ | 12/31/2003 | Darrel Austin | T19022 | collector | T63 | -1000 | debtr was to fed ex ckc-ck dt/t No Contact |
| ✓ | 12/31/2003 | Darrel Austin | P9B8T1 | debtor | T63 | -1000 | no money |
| ✓ | 12/31/2003 | Ronald Davis | Q7516B | debtor | Z1 | -1750 | no money |
| ✓ | 12/31/2003 | Ronald Davis | R61111 | collector/debtor | Z1 | -2004.11 | dbtr cld sd having trouble with funds, will cfb, client ran n bounced. |
| ✓ | 12/31/2003 | Michael Dubay | T26761 | debtor | Z11 | -1307.44 | mail in check bounced |
| ✓ | 12/31/2003 | Michael Dubay | T22857 | debtor | Z11 | -5133.34 | no money |
| ✓ | 12/31/2003 | Robert Goodrich | T16242 | debtor | Z12 | -1187.15 | no money |

| | Date | Name | Code | Role | Page | Amount | Notes |
|---|---|---|---|---|---|---|---|
| | 12/31/2003 | Frank Saucerda | R52068 | debtor | P16 | -1766.36 | no money |
| ✓ | 12/26/2003 | Dan Slack | S78094 | debtor/collector? | P18 | -22982.54 | ??? Cmnts show dbtr stop pay bvl ck ran |
| ✓ | 12/31/2003 | Dan Slack | T20235 | debtor | P18 | -3927.93 | no money |
| ✓ | 12/26/2003 | Dan Slack | S80488 | debtor | P18 | -1659 | no money |
| | 12/31/2003 | Stephen Ross | R75604 | collector | P3 | -11913.64 | Does not make sense-dc'd x2 no contact |
| | 12/31/2003 | Stephen Ross | R75604 | collector | P3 | -11913.64 | does not make sense- dcsx2 no contact |
| | 12/31/2003 | Stephen Ross | S66790 | collector | P3 | -7290.60 | doesnot make sense- thik2 no contact |
| | 12/31/2003 | Stephen Ross | S66790 | collector | P3 | -7290.60 | Does not make sense-dc'd x2 no contact |
| | 12/31/2003 | Doug Gallaher | T04431 | collector | P42 | -1355.6 | dbtr fed ex'd check- ck was dc'd no contact. |
| | 12/31/2003 | Doug Gallaher | S72495 | debtor/collector | P42 | -1157.23 | unable to contact debtor after 1st bounce. |
| | 12/29/2003 | Doug Gallaher | S25282 | collector | P42 | -1000 | no doc's from dbtr to ok post dates |
| | 1/13/2004 | miguella Christi | Q90213 | debtor | P44 | -1508.22 | changed ck with no contact |
| | 12/31/2003 | miguella Christi | T14046 | debtor | P44 | -1550 | mail in check |
| | 12/31/2003 | miguella Christi | Q97349 | collector | P44 | -2000 | |
| ✓ | 12/31/2003 | Michelle Beck | T22732 | debtor | P45 | -1495 | no money |
| ✓ | 12/31/2003 | Bill Rice | S64638 | debtor | P46 | -1784.39 | no money |
| | 12/29/2003 | Bill Rice | T13604 | collector | P46 | -1490.78 | dbtr said needed more time- collector verified funds with bank |
| ✓ | 12/30/2003 | Bill Rice | T13604 | collector | P46 | -1490.78 | n ran-ck still bounced. dbtr said needed more time- collector verified funds with bank n ran-ck still bounced. |

001292

| Date | Name | ID | Type | Code | Amount | Notes |
|---|---|---|---|---|---|---|
| 12/31/2003 | Gary Garrett | R37980 | collector | Z19 | -1275.4 | 5 bounces in a row- bounced 2 cks after coll. didc'd need cert funds. |
| 12/31/2003 | Gary Garrett | R25371 | debtor/collector | Z19 | -1061.4 | told by manager to get cert funds |
| 12/31/2003 | Edward Falco | S28056 | debtor | Z2 | -5862.14 | client concerned collectors didc's say ck ran easily without dlirs ok. |
| 12/31/2003 | Edward Falco | S63090 | collector | Z2 | -1000 | |
| 12/30/2003 | Maria Munson | T28931 | debtor | Z22 | -1022.94 | no money |
| 12/31/2003 | Patricia Pardo | R59576 | debtor | Z23 | -1500 | no money |
| 12/31/2003 | Jun Fred | T06510 | collector | Z37 | -1254.85 | verified no money with hank- never destroyed |
| 12/31/2003 | Jacqueline Johns | R93838 | collector | Z41 | -2429.7 | debtr has bounced 5 cks in a row starting Oct. |
| 12/30/2003 | Ed Bagrowski | S25765 | debtor | Z52 | -5000 | Stop payment was told by manager to verify ck after first ck bounced |
| 12/30/2003 | Ed Bagrowski | T16839 | collector/debtor | Z52 | -4186.9 | waiting for collector to pull next ck, as requested by manager. |
| 12/29/2003 | Ed Bagrowski | S90838 | debtor | Z52 | -3996.65 | no money |
| 12/26/2003 | Ed Bagrowski | S80928 | debtor | Z52 | -1398.85 | no money |
| 12/31/2003 | Ed Bagrowski | S80928 | debtor | Z52 | -1333.39 | no money |
| 12/31/2003 | Gary Garrett | G29113 | collector/debtor | Z6 | -1000 | Collector was told cert. funds only-too many bounces |
| 12/30/2003 | Richard Thompson | R77406 | debtor | Z7 | -15213 | no money |
| 12/26/2003 | Richard Thompson | T14832 | debtor | Z7 | -1045 | debtor was to mail cert funds, next day lis was taken |
| 12/31/2003 | Richard Thompson | R01525 | debtor | Z7 | -1500 | no money |

12/30/2003   Dan Frazier   T00043   debtor   ZB   -3666.66   Stop Payment- Debtor's been waiting on loan money.

- 001322

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2006, I electronically filed the foregoing with the Clerk

of Court using CM/ECF which will send notification of such filing(s) to the following and which

has also been served as noted:

## BY FEDERAL EXPRESS

Jeremy W. Homer, Esq.
Parkowski & Guerke, P.A.
116 West Water Street
P. O. Box 598
Dover, DE 19903


Alyssa M. Schwartz (#4351)
schwartz@rlf.com